# EXHIBIT 1

FIRM I.D. 44284

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

OCEAN TOMO, LLC, an Illinois limited
liability company,

        Plaintiff,

v.

    No.

JONATHAN BARNEY, an individual,

        Defendant.

**12CH02968**

FILED
CH-2809
JAN 27 2012
DOROTHY BROWN
OF THE CIRCUIT COURT
OF COOK COUNTY, IL

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

    As and for its Verified Complaint for Injunctive Relief and Damages against Defendant

Jonathan Barney ("Barney"), Plaintiff Ocean Tomo, LLC ("OT"), by and through its attorneys,

Vedder Price P.C., states and alleges as follows:

## NATURE OF ACTION

    1.    This is an action for breach of contract, breach of fiduciary duty, violation of the

Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA"), violation of the Computer Fraud

and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and conversion arising out of Barney's destruction,

copying, and use of OT's confidential information and trade secrets.

    2.    Barney was a Member and Managing Director of OT, and as such, was intimately

involved in the development and marketing of OT's services and was given access to detailed

knowledge of OT's confidential information relating to financial data, business plans, business

methods and practices, and client identity, needs, and preferences. Additionally, Barney was

provided access to sensitive and confidential information about OT's financial and client data

related to OT's clients (including historical and realized revenues, and profit margins), strategic

plans, business development efforts, proprietary products and valuation methods, and client requirements.

3.      Because he was provided access to OT's confidential information and client relationships and as a condition of his employment, Barney executed an employment agreement (the "Employment Agreement") that prohibited him from using or disclosing OT's confidential information for his own benefit or the benefit of anyone other than OT.

4.      During the course of his employment with OT, Barney was provided with a laptop for business use (the "Laptop"). The Laptop contained OT's confidential information relating to financial data, business plans, business methods and practices, and client identity, needs, and preferences.   Further, Barney executed a Computer Asset Policy Agreement (the "CAP Agreement") during his employment with OT that prohibited him from modifying, altering, or upgrading any hardware or software provided to him by OT.

5.      Barney resigned from OT on or about February 14, 2011. At that time, he did not return the Laptop to OT. Despite multiple demands by OT for the return of the Laptop, Barney refused to turn over the Laptop until on or about June 14, 2011. Upon receiving the Laptop from Barney, OT hired a forensic expert, who analyzed the Laptop and determined that the hard drive on the Laptop had been intentionally overwritten or wiped, which permanently deleted and destroyed all of OT's confidential and proprietary information on the Laptop.

6.      In addition to completely wiping the hard drive of the Laptop, Barney, upon information and belief, made a copy of the Laptop's hard drive before erasing it. This copy has not been provided to OT. Upon information and belief, Barney continues to access and use data on the copied hard drive, including OT's confidential business and financial information.

7.     OT seeks permanent injunctive relief to restrain and enjoin Barney's continued breaches of the Employment Agreement, which have and continue to cause irreparable injury to OT, including injunctive relief enjoining Barney from using or disclosing OT's confidential information for his own benefit or the benefit of anyone other than OT. OT further seeks an order compelling Barney to return all OT trade secrets, confidential information, and all other proprietary information and property belonging to OT, including without limitation, the copy of the Laptop hard drive believed to be in Barney's possession.

8.     In addition to injunctive relief, OT has incurred damages from Barney's ongoing misconduct and seeks compensatory damages, punitive and exemplary damages, and such other relief as the Court deems just and proper.

## PARTIES

9.     OT is an Illinois limited liability company with its principal place of business in Chicago, Illinois. OT, the leading Intellectual Capital Merchant Banc firm, provides, among other things, financial products and services related to expert testimony, valuation, investments, risk management, and transactions throughout the United States and overseas. Most of OT's high-level executives are located in the Chicago, Illinois area. OT's corporate activities and critical decision-making take place at the corporate headquarters located in Chicago, Illinois.

10.     Barney is an individual who, upon information and belief, resides at 312 Signal Road, Newport Beach, California 92663. Barney was a Managing Director at OT and was the head of OT's PatentRatings® ("OTPR") group at the time of his resignation on or about February 14, 2011. Barney was and currently is one of only three equity owners of OT. Barney is currently the Chief Executive Officer and majority owner of PatentRatings, LLC ("PR"), a California limited liability company that owns and develops proprietary objective computer

generated metrics for determining the quality and relevance of issued United States patents and, upon information and belief, is an actual or potential competitor of OT.

## JURISDICTION AND VENUE

11.     Jurisdiction is proper in this Court pursuant to Section 2-209(a) of the Illinois Code of Civil Procedure (735 ILCS 5/1-101 *et seq.*) because the causes of action arise from, among other things, Barney's transaction of business in Illinois and the making and performance of contracts substantially connected to Illinois.  Moreover, Barney contractually submitted to jurisdiction in this Court.

12.     Venue is proper in this Court under Section 2-101 because the events giving rise to the causes of action occurred in Cook County, Illinois.  Barney also agreed to exclusive venue in this Court.  Specifically, Barney agreed as follows:

> Each of the parties hereto . . . consents to any and all disputes regarding this Agreement to be heard by a court of competent jurisdiction in Cook County, Illinois and agrees to waive any argument regarding the choice of such forum.

## GENERAL ALLEGATIONS

### OT's Business

13.     OT, the Intellectual Capital Merchant Banc firm, provides, among other things, expert testimony, investment advice, risk management, transaction assistance, and valuation services related to intellectual property assets.

14.     One of OT's business units is OTPR, which is responsible for the marketing and sale of Ocean Tomo PatentRatings® products and services based upon the data provided under agreement with PR.  PR has exclusively licensed to OT and has contracted to supply OT with data and tools based upon PR's computer generated metrics for determining the quality and relevance of issued United States patents.  OT is a 25% owner of PR.

15.   Due to its vast research and development initiatives, and cultivation of long-standing business relationships, OT has developed certain trade secrets and confidential information pertaining to its business, including, but not limited to:  valuation report templates, research tools, financial information, collections, revenues, profit margins, business plans, business development efforts, proprietary products, client requirements, business plans and strategies, pricing, fees, profitability factors, marketing materials, training materials, marketing strategies, personnel information, including personnel lists, resumes, salary information, organizational structure and performance evaluations.   These trade secrets and confidential information provide a substantial economic and competitive advantage to OT and, if known to a competitor, would negatively impact OT in the marketplace.

### OT's Hiring of Barney and His Access to Confidential Information

16.   Barney is an attorney and inventor of intellectual property and data used for the evaluation and analysis of United States patents.  Barney created PR.  When Barney wholly owned PR, PR and OT entered into a written licensing agreement on December 31, 2004, pursuant to which PR provided OT with rights under patents, data and other intellectual property. Also, at that time, Barney became an equity owner of OT.  Barney currently remains one of three such equity owners of OT.

17.   In connection with the December 31, 2004 licensing transaction, OT hired Barney to act as Managing Director for the OTPR business unit effective as of January 2005.

18.   As Managing Director for OTPR, Barney was responsible for managing and overseeing the marketing and sale of Ocean Tomo PatentRatings® products and services, including IPQ® patent quality scores and patent relevance scores.  As of the time of his resignation, Barney's annual salary was $210,000, and he also received profit sharing payments.

19.     In his position with OT, and subject to strict confidentiality obligations, Barney was provided access to OT's confidential information. Barney was provided access to nearly all of OT's business information, including information about OT's overall financial performance; the performance of each of OT's practice areas; collections and revenue; business plans; opportunities for business development and growth; and other sensitive and confidential information belonging to OT.

20.     As part of his employment with OT, Barney was provided with the Laptop. The Laptop contained OT's confidential information, trade secrets, and other proprietary information relating to OT's financial data, business plans, business methods and practices, and client identity, needs, and preferences. Furthermore, the Laptop also contained OT's high-level confidential business information, which included information and data regarding overall financial performance; the performance of each of OT's practice areas; collections and revenue; business plans; opportunities for business development and growth; and other sensitive and confidential OT information.

### OT's Agreements with Barney

21.     Because OT was providing Barney with access to OT's confidential information and client relationships, OT required Barney, as a condition of employment, to execute and agree to the Employment Agreement. Barney signed the Employment Agreement on or about January 1, 2005. (A copy of that agreement is attached hereto as Exhibit A.)

22.     In the Employment Agreement, Barney agreed that, as part of his employment, he would be exposed to OT's confidential information and that he would maintain the confidentiality of that information, would not use such information for his own benefit, directly or indirectly, and would not disclose that information. Specifically, Barney agreed as follows:

CHICAGO/#2284773 3

Section 5.2. <u>Confidential   Information</u>.   The   Executive understands and acknowledges that during his employment with the Company he will be exposed to Confidential Information that is proprietary and that rightfully belongs to the Company. The Executive agrees that he will not use or cause to be used for his own benefit, directly or indirectly, or disclose any of such Confidential Information at any time, either during or after his employment with the Company, whether or not such Confidential Information is developed by the Executive ... The Executive shall take all commercially reasonable steps to safeguard Confidential Information that is within his possession or control and to protect such information against disclosure, misuse, loss or theft ... The term "Confidential Information" means any information not generally available to the public that was obtained from the Company, or any of its Affiliates or that was learned as a result of the performance of any services by the Executive to or on behalf of the Company, and which fails within the following general categories:   (a) information concerning trade secrets of the Company or any of its Affiliates; (b) information concerning existing or contemplated products, services, technology, designs, processes, research or product developments of the Company or any of its Affiliates; (c) information concerning business plans, sales or marketing methods, methods of doing business, customer lists, customer usages and or requirements, or supplier information of the Company or any of its Affiliates; (d) information concerning the identity needs, purchase and payment patterns of, and credit terms, pricing of special relations with, the customers of the Company or any of its Affiliates; (e) information concerning the identity, net prices and credit terms of, and special relations with, the suppliers of the Company or any of its Affiliates; or (f) any other confidential information which the Company or any of its Affiliates may reasonably have the right to protect by patent, copyright or by keeping it secret and confidential.

23.     OT and Barney later negotiated an Amendment to the Employment Agreement

(the "Amendment"), which revised Section 6.9 of the Employment Agreement but made no

changes to Section 5.2. Barney executed the Amendment on or about July 28, 2008. (A copy of

the Amendment is attached hereto as Exhibit B).

24.     Barney is also party to the CAP Agreement, which he executed on or about April

27, 2007, wherein he agreed that "[n]o alterations, upgrades, or modifications should be made to

hardware and software purchased by the organization and provided to the employee." (A copy

-7-

of the CAP Agreement is attached hereto as Exhibit C). Barney further agreed that OT retained ownership of all hardware and software provided to him.

### OT's Additional Measures to Maintain the Confidentiality of Its Information

25.     In order to maintain the confidentiality of its information, OT, as a matter of practice and policy, requires employees to execute agreements containing confidentiality provisions the same or nearly identical to the one in Barney's Employment Agreement.

26.     In addition, OT restricts access to its confidential information to certain key individuals and only on a need-to-know basis. For example, OT's financial information and strategic business plans are only distributed to OT's Managing Directors. Customer-related confidential information is only provided to employees who work with that particular customer.

### Barney's Departure from OT and Destruction of the Laptop's Hard Drive

27.     On or about February 14, 2011, Barney resigned from OT as a Managing Director.

28.     Notwithstanding the fact that OT owned the Laptop, Barney did not return the Laptop to OT at the time of his resignation.

29.     On multiple occasions, OT demanded that Barney return the Laptop. Barney refused to comply with any of these requests.

30.     On or about June 14, 2011, approximately four months after he resigned from OT, Barney finally returned the Laptop to OT.

31.     Upon receiving the Laptop from Barney, OT hired a forensic expert, who analyzed the Laptop and determined that the hard drive on the Laptop had been intentionally overwritten or wiped with hexadecimal "00" values. By overwriting or wiping the hard drive's data storage area on the Laptop, Barney rendered the data on the entire hard drive unrecoverable, which thereby destroyed all the data on the hard drive. As such, Barney permanently destroyed

and rendered inaccessible all OT information on the Laptop's hard drive, including, without limitation, OT's confidential information regarding OT's strategic plans, financial performance, and customers.

32.     In addition to completely wiping the hard drive of the Laptop, Barney, upon information and belief, made a copy of the Laptop's hard drive before erasing it. That copy has not been provided to OT. Upon information and belief, Barney continues to access and use data on the copied hard drive, including OT's confidential financial and business information.

**Barney Refuses OT's Request for Compliance with the Employment Agreement and the CAP Agreement**

33.     Upon receiving the Laptop back from Barney and learning from its hired forensic expert that the hard drive on the Laptop had been wiped clean, OT sent a letter to Barney on July 6, 2011 reminding him of his contractual obligations in the Employment Agreement and in the CAP Agreement. (A copy of the July 6, 2011 correspondence is attached hereto as Exhibit D).

34.     In the July 6, 2011 letter, OT requested that Barney explain the circumstances surrounding the destruction of data on the Laptop; identify and return all OT files, data, and information remaining in his possession (whether originals or copies); and disclose the means by which Barney had access to OT's files, data, and information since his resignation from OT.

35.     To date, Barney has not responded to OT's July 6, 2011 letter, nor has he complied with any of the requests made by OT in that letter.

**Injunctive Relief Is Required**

36.     Injunctive relief is necessary to prevent the further loss of OT's valuable confidential information. OT has sustained and will continue to sustain irreparable and unfair competitive injury resulting from Barney's ongoing breaches of his contractual and fiduciary obligations.

CHICAGO/#2284773.3

37. In Section 5.4 of the Employment Agreement with OT, Barney agreed that OT will be irreparably harmed and that OT will not have an adequate remedy at law if he violated the non-disclosure obligation contained in the agreement.

38. Barney has already showed his willingness to disregard his contractual and fiduciary obligations to OT by destroying all of OT's confidential and proprietary information contained on the Laptop's hard drive. Moreover, upon information and belief, Barney has shown a complete disregard for his fiduciary, contractual, and statutory obligations by making a copy of the Laptop's hard drive and using the confidential information (which had been acquired during his employment relationship with OT) contained thereon.

39. Further injunctive relief is necessary to prevent further damage to OT.

**COUNT I**

**BREACH OF CONTRACT**
**(EMPLOYMENT AGREEMENT)**

40. OT restates and realleges Paragraph Nos. 1 through 39 as and for this Paragraph No. 40 of Count I.

41. The Employment Agreement attached as Exhibit A is a valid and enforceable contract.

42. In exchange for the contractual obligations set forth in the Employment Agreement, Barney received adequate and sufficient consideration, including, without limitation, employment, compensation, and bonus eligibility.

43. OT has at all times performed and fulfilled its obligations under the Employment Agreement.

44. Barney has breached Section 5.2 of the Employment Agreement by destroying and failing to safeguard OT's confidential information in his possession, refusing to return OT's

-10-

confidential information in his possession, custody, or control to OT, and using and disclosing OT's confidential information for his benefit and PR's benefit.

45.     The foregoing breaches and continuing breaches of Barney's Employment Agreement with OT have proximately caused and, unless restrained and enjoined, will continue to cause OT severe, immediate and irreparable harm, damage and injury.

**WHEREFORE**, OT respectfully requests the Court to enter judgment in its favor on Count I and award the following relief:

        (a)     Permanent injunction to enjoin Barney from using or disclosing OT's confidential information and trade secrets;

        (b)     Mandatory injunction to compel Barney to return all OT trade secrets, confidential information, and all other proprietary information and property belonging to OT, including without limitation, any copy of the Laptop's hard drive;

        (c)     Compensatory damages in an amount to be determined at trial;

        (d)     Reasonable attorneys' fees and costs; and

        (e)     Such other relief as the Court deems just and proper.

## COUNT II

### BREACH OF CONTRACT
### (COMPUTER ASSET POLICY AGREEMENT)

46.     OT restates and realleges Paragraph Nos. 1 through 39 as and for this Paragraph No. 46 of Count II.

47.     The CAP Agreement attached as Exhibit C is a valid and enforceable contract.

48.     In exchange for the contractual obligations set forth in the CAP Agreement, Barney received adequate and sufficient consideration, including, without limitation, access to and use of software and hardware belonging to OT, including the Laptop.

49.     OT has at all times performed and fulfilled its obligations under the CAP Agreement.

50.     Barney has breached the CAP Agreement by overwriting and permanently destroying all data on the hard drive of the Laptop.

51.     As a direct and proximate result of Barney's breach of the CAP Agreement, OT has expended resources in excess of $5,000 to investigate the foregoing misconduct and to conduct a forensic examination of the Laptop used by Barney to ascertain the scope of his misconduct, and to perform certain remedial measures to the Laptop due to the misconduct.

**WHEREFORE**, OT respectfully requests the Court to enter judgment in its favor on Count II and award the following relief:

(a)     Compensatory damages in an amount to be determined at trial;

(b)     Reasonable attorneys' fees and costs; and

(c)     Such other relief as the Court deems just and proper.

## COUNT III

### BREACH OF FIDUCIARY DUTY

52.     OT restates and realleges Paragraph Nos. 1 through 39 as and for this Paragraph No. 52 of Count III.

53.     As a Managing Director at OT, Barney owed OT fiduciary duties, including, but not limited to, a duty to act at all times with the utmost good faith, loyalty, honesty and fair dealing towards OT, to avoid self-dealing, conflicts of interest and acting for his own personal

-12-

benefit to the exclusion of OT's interest, and to act in the best interest of OT in all matters relating to its business. Barney also owes heightened fiduciary duties to OT as an equity owner and Member of OT.

54.     OT reposed trust and confidence in Barney that he would abide by his fiduciary duties.

55.     Barney has breached his fiduciary obligations to OT by, among other things, (i) destroying OT's confidential information on the Laptop's hard drive, (ii) making a copy of the Laptop's hard drive—which contained confidential information acquired during the course of Barney's employment with OT and prior to his resignation from OT—before erasing it, and (iii) disclosing and using OT's confidential information—which had been acquired during the course of his employment with OT and prior to his resignation from OT—from the copied hard drive for his own benefit and PR's benefit.

56.     These breaches of fiduciary duty have proximately caused and, unless restrained and enjoined, will continue to cause OT severe, immediate and irreparable harm, damage and injury for which OT has no adequate remedy at law.

57.     These breaches of fiduciary duty were knowing, intentional, and reckless, and were of such an aggravated character as to warrant the imposition of punitive damages.

**WHEREFORE**, OT respectfully requests the Court to enter judgment in its favor on Count III and award the following relief:

        (a)     Permanent injunction to enjoin Barney from using or disclosing OT's confidential information and trade secrets;

        (b)     Mandatory injunction to compel Barney to return all OT trade secrets, confidential information, and all other proprietary information and

property belonging to OT, including without limitation, any copy of the

Laptop's hard drive;

(c)     Compensatory damages in an amount to be determined at trial;

(d)     Punitive damages in an amount to be determined at trial; and

(e)     Such other relief as the Court deems just and proper.

## COUNT IV

### VIOLATION OF ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/1 *ET SEQ.*

58.     OT restates and realleges Paragraph Nos. 1 through 39 as and for this Paragraph

No. 58 of Count IV.

59.     Certain of OT's business practices and methods, and information relating to its

products, clients, practice areas, suppliers, and contacts, including, without limitation, valuation

report templates, research tools, financial information, collections, revenues, profit margins,

business plans, business development efforts, proprietary products, client requirements, business

plans and strategies, pricing, fees, profitability factors, marketing materials, training materials,

marketing strategies, personnel information, including personnel lists, resumes, salary

information, organizational structure and performance evaluations are proprietary and

confidential to OT and constitute protectible trade secrets under the ITSA, 765 ILCS 1065/1 *et

seq.*

60.     OT has taken reasonable efforts to protect and maintain the secrecy and

confidentiality of its trade secrets.

61.     OT's trade secrets are not generally known in the industry or to the general

public, and their secrecy confers substantial economic advantage and benefit to OT. Knowledge

of this information would also confer a substantial economic benefit to OT's competitors.

-14-

62. The circumstances of Barney's employment with OT gave rise to fiduciary duties and contractual obligations to maintain the secrecy of OT's trade secrets and confidential information and to strictly limit their use to OT business activities and for OT's exclusive benefit.

63. Barney, through improper means and without authorization, either directly or indirectly, misappropriated, misused, and/or disclosed OT's trade secrets to and for his own benefit. Upon information and belief, Barney has misappropriated and retains copies of OT's trade secrets. Investigation into Barney's theft of OT's confidential information and trade secrets continues and may yet reveal additional information that Barney misappropriated.

64. As a direct and proximate result of Barney's deliberate, willful, and malicious misappropriation of OT's trade secrets, OT has sustained and will continue to sustain severe, immediate and irreparable harm, damage and injury to the value of its trade secrets and competitive advantage, which OT has expended significant time, effort and money to secure.

**WHEREFORE,** OT respectfully requests the Court to enter judgment in its favor on Count IV and award the following relief:

(a) Permanent injunction to enjoin Barney from using or disclosing OT's confidential information and trade secrets;

(b) Mandatory injunction to compel Barney to return all OT trade secrets, confidential information, and all other proprietary information and property belonging to OT, including without limitation, any copy of the Laptop's hard drive;

(c) Compensatory damages in an amount to be determined at trial pursuant to 765 ILCS 1065/4(a);

(d)     Exemplary damages pursuant to 765 ILCS 1065/4(a) in an amount equaling twice the compensatory damages;

(e)     Reasonable attorney fees pursuant to 765 ILCS 1065/5; and

(f)     Such other relief as the Court deems just and proper.

## COUNT V

### VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030

65.     OT restates and realleges Paragraph Nos. 1 through 39 as and for this Paragraph No. 65 of Count V.

66.     The Laptop was used in interstate commerce and constitutes a "protected computer" under the CFAA, 18 U.S.C. § 1030(e)(2)(b).

67.     Without authorization or by exceeding authorized access, Barney intentionally accessed the Laptop with the intent to defraud OT and violated Sections 1030(a)(2)(c), (a)(4), and (a)(5) of the CFAA by:

(a)     Deleting electronic files from the Laptop;

(b)     Destroying the hard drive on the Laptop; and

(c)     Copying the Laptop's hard drive, which contained OT's trade secrets and confidential information for his benefit and PR's benefit.

68.     By engaging in the foregoing misconduct for the purpose of misappropriating OT's trade secrets and confidential information, Barney breached various contractual and fiduciary duties and obligations owed to OT. As the foregoing misconduct occurred after Barney resigned from OT, there is no employment or agency relationship or any other legal basis upon which Barney could claim authorization or authority for accessing and destroying files on the

Laptop. Moreover, under no circumstances was Barney authorized to delete information from the Laptop's hard drive.

69.     Barney intentionally and recklessly caused damage and loss to OT in excess of $5,000 because his conduct impaired the integrity of OT's protected computer and required OT to expend resources in excess of $5,000 to investigate the foregoing misconduct, conduct forensic examination of the Laptop used by Barney to ascertain the scope of his misconduct, and perform certain remedial measures to OT's protected computer due to the misconduct.

70.     As a further direct and proximate cause of the foregoing misconduct, OT has been damaged and suffered loss in an amount in excess of $5,000 to the extent Barney accessed, deleted, destroyed, and copied electronic files containing OT's trade secrets and other confidential and proprietary client and business information belonging to OT for his personal use and/or that of PR.

**WHEREFORE**, OT respectfully requests the Court to enter judgment in its favor on Count V and award the following relief:

(a)     Permanent injunction to enjoin Barney from using or disclosing OT's confidential information and trade secrets;

(b)     Mandatory injunction to compel Barney to return all OT trade secrets, confidential information, and all other proprietary information and property belonging to OT, including without limitation, any copy of the Laptop's hard drive;

(c)     Compensatory damages in an amount to be determined at trial pursuant to 18 U.S.C. § 1030(g);

(d)     Punitive damages in an amount to be determined at trial; and

(e)     Such other relief as the Court deems just and proper.

## COUNT VI

## CONVERSION

71.     OT restates and realleges Paragraph Nos. 1 through 39 as and for this Paragraph No. 71 of Count VI.

72.     OT has a right to immediate possession of any OT documents and materials in Barney's possession.

73.     Barney has assumed control, dominion, and ownership over OT documents and materials to which OT has an absolute and unconditional right to immediate possession.

74.     Barney has not returned or has destroyed the documents and materials that rightfully belong to OT.

75.     Barney's conduct was and is deliberate, willful, and malicious.

76.     The foregoing conduct has proximately caused and, unless restrained and enjoined, will continue to cause OT severe, immediate and irreparable harm, damage and injury.

**WHEREFORE,** OT respectfully requests the Court to enter judgment in its favor on Count VI and award the following relief:

(a)     Permanent injunction to enjoin Barney from using or disclosing OT's confidential information and trade secrets;

(b)     Mandatory injunction to compel Barney to return all OT trade secrets, confidential information, and all other proprietary information and property belonging to OT, including without limitation, any copy of the Laptop's hard drive;

(c)     Compensatory damages in an amount to be determined at trial;

(d)     Punitive damages; and

(e)     Such other relief as the Court deems just and proper.


DATED:  January 27, 2012                   Respectfully submitted,

OCEAN TOMO, LLC

By: _____
                  One of Its Attorneys

M. Derek Zolner
Rachel T. Copenhaver
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601-1003
(312) 609-7500
Firm I.D. No. 44284

-19-

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, I, James Malackowski, Chairman and Chief Executive Officer for Ocean Tomo, LLC, certify that the statements set forth in this Verified Complaint for Injunctive Relief and Damages are true and correct, except as to matters therein stated to be on information and belief and as to such matters, I certify as aforesaid that I verily believe the same to be true.



# EXHIBIT A

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT, dated as of January 1, 2005, is between Ocean Tomo, LLC, an Illinois limited liability company (the "Company"), and Jonathan A. Barney (the "Executive").

WHEREAS, the Company desires to employ the Executive as an Employee of the Company (or one of its Affiliates), and the Executive desires to serve as an employee of the Company (or one of its Affiliates), on the terms and conditions set forth in the Agreement.

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive agree as follows:

### ARTICLE I

### CERTAIN DEFINITIONS

SECTION 1.1    <u>Certain Definitions</u>.  For purposes of this Agreement:

(a)    "Affiliate" means, with respect to any Person, any other Person controlling, controlled by or under common control with such Person, control meaning the power to direct the affairs of a Person by reason of voting capital stock, by contract, by family relationship or otherwise.

(b)    "Cause" means (i) the indictment, admission or plea of no contest by the Executive with respect to any crime, whether or not involving the Company, which constitutes a felony in the jurisdiction involved, (ii) the embezzlement or misappropriation of property of the Company by the Executive, or any other act by the Executive involving fraud with respect to the Company, (iii) the gross negligence or willful misconduct by the Executive in the performance of his duties under this Agreement, (iv) a breach by the Executive of his duty of loyalty to the Company or (v) a breach by the Executive of any of his material obligations under this Agreement.

(c)    "Designated Physician" means a licensed physician practicing in the Chicago, Illinois, area designated by the Company and reasonably acceptable to the Executive.

(d)    "Permanent Disability" means physical or mental incapacity of a nature that prevents or could reasonably be expected to prevent the Executive, in the good faith professional judgment of a Designated Physician, from performing his obligations under this Agreement for a period of 90 consecutive days or 120 days, whether or not consecutive, during any 12-month period.

(e)    "Person" means any natural person, corporation, partnership, limited liability company, trust, estate, association, governmental authority or other entity of any kind.

## ARTICLE II

## EMPLOYMENT

SECTION 2.1 Employment. The Company hereby employs the Executive as a managing director, and the Executive accepts such employment and agrees to serve as an employee of the Company, on the terms and conditions set forth herein.

SECTION 2.2 Initial Term. The term of the Executive's employment under this Agreement (the "Term") will commence on the date hereof and will end upon the termination of this Agreement as contemplated by Section 4.1(a) hereof.

SECTION 2.3 Duties. During the Term, the Executive shall serve as a Managing Director of the Company and, in such capacity and subject to the direction of the Company, shall perform such duties and responsibilities as may from time to time be assigned to the Executive by the Company. The Executive agrees to devote his full attention to the performance of his duties under this Agreement and to perform such duties to the best of his abilities in a diligent, trustworthy, businesslike and efficient manner; provided however the Company acknowledges that Executive owns and operates other business interests, and the Company agrees that Executive may continue to do so in the future. The Executive shall not be entitled to receive additional compensation from the Company for service performed outside of normal business hours.

SECTION 2.4 Other Employment. Except as otherwise expressly provided in this Agreement, while employed by the Company, the Executive shall not, directly or indirectly, render similar or competing services to any other Person for which the Executive receives compensation without the prior written approval of the Company.

SECTION 2.5 Place of Performance. The Executive shall perform his duties under this Agreement at the place as shall be mutually agreed upon in writing by the Company and the Executive from time to time. The Executive may be required to travel from time to time in the performance of his duties under this Agreement.

## ARTICLE III

## COMPENSATION AND BENEFITS

SECTION 3.1 Salary. During the Term, the Company shall pay the Executive, for services rendered hereunder, a salary at the annual rate of $190,000 (the "Salary"). The Salary shall be payable in equal periodic installments, not less frequently than semi-monthly, less any sums that may be required to be deducted or withheld under applicable law. The Salary may be increased periodically in conformity with the Company's standard employment practices as communicated to its employees from time to time.

SECTION 3.2    Benefits.    During the Term, the Executive will be entitled to participate in all employee benefit plans now or hereafter established or maintained by the Company for its employees generally, subject to the terms of such plans.

SECTION 3.3    Equity Ownership.    The Company may allow the Executive (and/or other of the Company's employees) to purchase equity in the Company in conformity with the Company's policies regarding equity ownership, as communicated to its employees from time to time.

SECTION 3.4    Paid Time Off.    The Executive shall be entitled to 25 paid working days away from work ("PTO") during each consecutive 12-month period during the Term, to be utilized during the period for which PTO is allocated or otherwise forfeited.  Such PTO (except in the case of illness) shall be taken at such time and in such intervals as are mutually acceptable to the Executive and the Company.  Such PTO shall be in addition to holidays for which the Company's employees generally have time off.

SECTION 3.5    Expenses.    The Company shall reimburse the Executive for all reasonable expenses incurred by the Executive in the performance of his duties under this Agreement and which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.


ARTICLE IV

TERMINATION

SECTION 4.1    Termination.

(a)    The Executive's employment under this Agreement shall terminate upon the earlier of (i) the voluntary termination of this Agreement by the Executive, (ii) the death or Permanent Disability of the Executive, effective as of the date of such death or the determination of such Permanent Disability, (iii) the determination of the Company to terminate this Agreement for Cause, effective as of the date of written notice by the Company to the Executive of such determination (or such later date as may be set forth in such notice), and (iv) the determination of the Company to terminate this Agreement other than for Cause (a "Company Elective Termination"), effective as of the date of written notice by the Company to the Executive of such determination (or such later date as may be set forth in such notice).

(b)    The Executive agrees to cooperate fully with any Designated Physician in determining whether a Permanent Disability has occurred.

3

SECTION 4.2    Consequences of Termination.

(a)    If the Executive's employment under this Agreement is terminated for any reason other than as a result of a Company Elective Termination, the Company's sole obligation shall be payment of the Salary through the effective date of such termination. Notwithstanding anything to the contrary contained in this Agreement, if Executive owns any equity in the Company or any of its Affiliates, such equity shall be disposed of in accordance with the terms of the Company's (or it's Affiliate's, as the case may be) governing documents.

(b)    If the Executive's employment under this Agreement is terminated as a result of a Company Elective Termination, the Company shall (i) pay the Salary through the effective date of such termination and (ii) pay the Executive a severance benefit in an amount equal to one week's Salary for each full year that Executive was employed by the Company, at the annual rate in effect as of such termination, such amount to be payable over the same number of weeks (in conformity with Company's policies regarding payment of compensation as then in effect) as were used in determining the amount of the severance benefit described in this Section 4.2 (b), commencing as of the date of such termination, when and as if such amount were paid as Salary over such period under this Agreement, less any sums that may be required to be deducted or withheld under applicable law.    Notwithstanding anything to the contrary contained in this Agreement, the amount of severance benefit that Executive shall receive pursuant to this Section 4.2 (b), if any, shall not be less than four (4) week's salary.

(c)    The Executive acknowledges that, notwithstanding the payment of any severance benefit, the Executive will not be an employee of the Company following any termination of the Executive's employment with the Company pursuant to Section 4.1.

(d)    Any termination of Executive's employment with the Company resulting from the termination of that certain License Agreement by and between the Company and PatentRatings, LLC, (the "License Agreement") shall not be deemed to be a Company Elective Termination.

ARTICLE V

COVENANTS

SECTION 5.1    Noncompetition.

(a)    Executive, in exchange for the severance benefits described in Section 4.2 (b) above and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, agrees to comply with the provisions contained in this Agreement, including , but not limited to the provisions of this Article V, which Executive hereby agrees and acknowledges are reasonable and necessary to protect the Company's legitimate business interests in maintaining its customer relationships and to protect the confidentiality of its trade secrets and other confidential information.

(b)    Except as otherwise expressly provided in this agreement, the Executive agrees that during the Noncompetition Period (as hereafter defined) the Executive will not, directly or

4

indirectly, whether as principal, agent, officer, director, partner, employee, independent contractor, consultant, stockholder, licensor or otherwise, alone or in association with any other Person, be employed by, carry on, be engaged in, concerned with or interested in, or render services or advice to, or own, lend money to, guarantee the debts or obligations of, share in the earnings of, or invest in the stock, bonds or other securities of any Person (other than the Company and its subsidiaries and/or its Affiliates) engaged in, concerned with or interested in (directly or through its Affiliates) any business in which the Company (or any of its Affiliates) is engaged at the time of termination of the Executive's employment hereunder (a "Competing Business"); provided, however, that the Executive may invest in stocks, bonds or other securities of any business organization that is engaged, directly or indirectly, in a Competing Business (but without otherwise participating in such business) if (i) such stocks, bonds or other securities are listed on a national or regional securities exchange or have been registered under Section 12(g) of the Securities Act of 1934, as amended, and (ii) such investment in any class of such securities does not exceed one percent of the issued and outstanding shares of such class, or one percent of the aggregate principal amount of such class outstanding, as the case may be. For purposes of this Agreement, "Noncompetition Period" means the period commencing on the date of this Agreement and ending on the first anniversary of the termination of the Executive's employment under this Agreement.

(c)     The Executive further covenants and agrees that during the Noncompetition Period he will not, directly or indirectly, whether for his own account or for the account of any other Person: (i) interfere with the relationship of the Company or any of its Affiliates with any executive, employee, customer, supplier or creditor of the Company or any of its Affiliates, or party with whom the Company or any of its Affiliates has a material business relationship, (ii) solicit or recruit or attempt to solicit or recruit, or hire or attempt to hire, any executive, employee or independent contractor of the Company or any of its Affiliates to participate in or assist in the formation or operation of any Competing Business, (iii) discuss with any existing or potential consultant, employee, customer or creditor of the Company or any of its Affiliates, or party with whom the Company or any of its Affiliates, or has any material business relationship, the present or future availability of products or services provided by any Competing Business or (iv) take any action that is intended to or could reasonably be expected to divert from the Company or any of its Affiliates any business opportunity that would be within the scope of any business then conducted by the Company or any of its Affiliates.

(d)     Notwithstanding anything to the contrary in this Agreement, Executive may continue to engage in any business that he conducted prior to the date of this Agreement.

SECTION 5.2     Confidential Information.     The Executive understands and acknowledges that during his employment with the Company he will be exposed to Confidential Information that is proprietary and that rightfully belongs to the Company. The Executive agrees that he will not use or cause to be used for his own benefit, directly or indirectly, or disclose any of such Confidential Information at any time, either during or after his employment with the Company, whether or not such Confidential Information is developed by the Executive, except (a) to the extent that such disclosure or use is directly related to and required by Executive's performance of his duties to the Company; (b) with the prior written consent of the Company; or (c) in response to a subpoena or similar legal process or to discovery proceedings, in each case brought or initiated by a third party concerning a matter in litigation or based upon advice of

5

counsel that such disclosure is necessary under applicable law or regulation (and the Executive, to the extent reasonably practicable, has given the Company not less than 10 business days' prior written notice of such disclosure). The Executive shall take all commercially reasonable steps to safeguard Confidential Information that is within his possession or control and to protect such information against disclosure, misuse, loss or theft. The Executive's obligations under this Section 5.2 with respect to any Confidential Information shall cease when such Confidential Information becomes publicly known as a result of any authorized disclosure. The term "Confidential Information" means any information not generally available to the public that was obtained from the Company, or any of its Affiliates or that was learned as a result of the performance of any services by the Executive to or on behalf of the Company, and which falls within the following general categories: (a) information concerning trade secrets of the Company or any of its Affiliates; (b) information concerning existing or contemplated products, services, technology, designs, processes, research or product developments of the Company or any of its Affiliates; (c) information concerning business plans, sales or marketing methods, methods of doing business, customer lists, customer usages and or requirements, or supplier information of the Company or any of its Affiliates; (d) information concerning the identity, needs, purchase and payment patterns of, and credit terms, pricing of special relations with, the customers of the Company or any of its Affiliates; (e) information concerning the identity, net prices and credit terms of, and special relations with, the suppliers of the Company or any of its Affiliates; or (f) any other confidential information which the Company or any of its Affiliates may reasonably have the right to protect by patent, copyright or by keeping it secret and confidential.

SECTION 5.3    Inventions and Patents. The Executive agrees that all inventions, discoveries, innovations, improvements, developments, methods, analyses, reports and all similar or related information which relates to the actual or anticipated business of the Company or any of its Affiliates, research and development or existing or future, products or services and that are conceived, developed or made by the Executive while employed by the Company or any of its Affiliates ("Work Product") belong to the Company or such Affiliate. The Executive shall promptly disclose such Work Product to the Company and perform all actions reasonably requested by the Company (whether during or after the Term and at the Company's expense) to establish and confirm such ownership (including, without limitation, assignments, consents, powers of attorney and other instruments). Notwithstanding anything to contrary contained in this Agreement, the provisions of this Section 5.3. shall not apply to the inventions and patents described in and licensed to the Company pursuant to the License Agreement.

SECTION 5.4    Enforcement.

(a)    The Company and the Executive agree and declare that it is impossible to measure in monetary terms the damages that may accrue to the Company by reason of the Executive's breach of his obligations under Sections 5.1, 5.2 or 5.3 and that any breach of Sections 5.1, 5.2 or 5.3 will cause the Company irreparable injury. Therefore, if the Company or any successor-in-interest to the Company shall institute an action or proceeding to enforce the provisions of any of Sections 5.1, 5.2 or 5.3, the Executive shall and hereby does, in advance, waive the claim or defense that there is an adequate remedy at law, and the Company, or its successor-in-interest, shall be entitled to temporary and permanent injunctive relief without the necessity of proving damages at law or posting a bond.

6

(b)     Each of the restrictive covenants contained in Sections 5.1, 5.2 or 5.3 are independent covenants.

## ARTICLE VI

### MISCELLANEOUS

SECTION 6.1    Waiver. None of the terms of this Agreement shall be deemed to have been waived by either party hereto, unless such waiver is in writing and signed by that party. The waiver by either party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or of any further breach of the provision so waived or of any other provision of this Agreement. No extension of time for the performance of any obligation or act hereunder shall be deemed an extension of time for the performance of any other obligation or act.

SECTION 6.2    Notices. All notices and other communications which are required or permitted to be given under this Agreement shall be in writing and shall be delivered personally, mailed by certified or registered mail (postage prepaid, return receipt requested), sent prepaid by reputable overnight courier or sent by confirmed telecopier, addressed as follows:

(a)     if to the Executive, to the address maintained by the Executive with the Company; and

(b)     if to the Company to Ocean Tomo, LLC, 20 N. Wacker Dr., 27th Floor, Chicago, Illinois 60606; telecopy no: (312) 327-4401, with copies (which shall not constitute notice to the Company) to Michael A. Nemeroff, Vedder, Price, Kaufman & Kammholz, P.C., 222 North LaSalle Street, Chicago, Illinois, 60601;

or to such other address and/or such other addressee as any of the above shall have specified by notice hereunder.  Each notice or other communication which shall be delivered personally, mailed or telecopied in the manner described above shall be deemed sufficiently given, served, sent, received or delivered for all purposes at such time as it is delivered to the addressee (with the return receipt, the delivery receipt or the affidavit of messenger being deemed conclusive, but not exclusive, evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

SECTION 6.3    Remedies. If any party of this Agreement obtain judgment against any party hereto by reason of any breach of this Agreement or the failure of such other party to comply with the provisions hereof, a reasonable attorney's fee as fixed by the court shall be included in such judgment.   No remedy conferred upon any party to this Agreement is intended to be exclusive of any other remedy herein or by law provided or permitted, but each such remedy shall be cumulative or shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

7

SECTION 6.4    <u>Amendments and Modifications</u>.    This Agreement may not be amended, modified or changed in any respect except in writing duly signed by the party against whom enforcement of such amendment, modification or change is sought.

SECTION 6.5    <u>Binding Effect; Benefits</u>.    All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, transferees, successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to or shall confer any rights, remedies, obligations or liabilities, legal or equitable, including any right of employment, on any Person other than the parties hereto and their respective successors or assigns as provided herein.

SECTION 6.6    <u>Separability</u>.    Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be unenforceable or invalid under applicable law, such provision shall be ineffective only to the extent of such unenforceability or invalidity, and the remaining provisions of this Agreement shall continue to be binding and in full force and effect.

SECTION 6.7    <u>Survival</u>.    The provisions of Section 4.2 and Articles V and VI hereof shall continue in full force in accordance with their terms notwithstanding any termination of this Agreement or of the Executive's employment hereunder.

SECTION 6.8    <u>Headings</u>.    The section and other headings contained in this Agreement are for convenience only and shall not be deemed to limit, characterize or interpret any provisions of this Agreement.

SECTION 6.9    <u>Entire Agreement</u>.    This Agreement constitutes the sole and entire agreement of the parties with respect to the subject matter hereof.

SECTION 6.10    <u>Waiver of Jury; Choice of Law; Venue</u>.    Each party hereto expressly waives any right to a trial by jury in any action or proceeding to enforce or defend any rights under this Agreement, or under any amendment, instrument, document or agreement delivered or which may in the future be delivered in connection with this Agreement or arising from any relationship existing in connection with this Agreement and agrees that any such action or proceeding shall be tried before a court and not before a jury. Each of the parties hereto has reviewed this waiver and knowingly and voluntarily waives its jury trial rights following consultation with legal counsel, and agrees to the use of Illinois law (without regard to conflicts of law) and consents to any and all disputes regarding this Agreement to be heard by a court of competent jurisdiction in Cook County, Illinois, and agrees to waive any argument regarding the choice of such forum. In the event of litigation, a copy of this Agreement may be filed as a written consent to a trial by the court.

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer, and the Executive has executed this Agreement, all as of the day, month and year first above written.

OCEAN TOMO, LLC

By:_____

Its:_____

_____
Jonathan A. Barney

9

# EXHIBIT B

# AMENDMENT OF EMPLOYMENT AGREEMENT

THIS AMENDMENT OF EMPLOYMENT AGREEMENT is entered into as of _____, 2008 (this "Amendment"), between OCEAN TOMO, LLC, an Illinois limited liability company (the "Company"), and JONATHAN A. BARNEY (the "Executive").

WHEREAS, the Company and the Executive entered into that certain Employment Agreement, dated January 1, 2005 (the "Agreement"); and

WHEREAS, the Company and Executive wish to amend the Agreement as provided below.

NOW, THEREFORE, in consideration of the premises and mutual benefits and covenants contained herein, the parties hereto agree as follows:

1. _Amendment_. Section 6.9 of the Agreement is hereby amended and restated as follows:

"_Entire Agreement_. This Agreement and that certain Second Amended and Restated Operating Agreement of the Company, dated as of January 1, 2008 (the "Operating Agreement"), collectively constitute the sole and entire agreement of the parties with respect to the subject matter hereof and thereof. In the event of a conflict between the terms of this Agreement and the terms of the Operating Agreement, the terms of the Operating Agreement shall control."

2. _Miscellaneous_.

(a) This Amendment is a legal and binding obligation of the parties, enforceable in accordance with its terms.

(b) This Amendment shall be construed in accordance with the internal laws and not the choice of law provisions of the State of Illinois.

(c) This Amendment is effective as of the date first set forth above.

(d) Except as specifically amended hereby, the Agreement shall remain in full force and effect. In the event the terms of the Agreement or any other agreement between the Company and the Executive conflict with this Amendment, the terms of this Amendment shall control.

(e) Except as otherwise provided herein, this Amendment contains the entire understanding between the parties, and there are no other agreements or understandings between the parties with respect to the subject matter hereof. No alteration or modification hereof shall be valid except by a subsequent written instrument executed by the parties hereto.

(f) This Amendment may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts

together shall constitute only one agreement. Any facsimile of this Amendment shall be considered an original document.

*[Signature Page Follows]*

CHICAGO/#1792103.1

*Signature Page to Amendment of Employment Agreement*

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Amendment as of the date first set forth above.

COMPANY:

OCEAN TOMO, LLC

By: _____

Name: _____

Title: _____

EXECUTIVE:

_____

Jonathan A. Barney

CHICAGO/#1792103.1

# EXHIBIT C

## Computer Asset Policy Agreement

Employees should read the entire Computer Asset Policy and sign and date this form in the space provided below. Copies of this agreement will be kept on file.

### Assets Covered By This Policy

Hardware devices and software programs provided to the employee by Ocean Tomo are to be used only for company-related business. Hardware devices and software programs are to be used ethically, lawfully, and appropriately at all times.

### Asset Administration

No alterations, upgrades, or modifications should be made to hardware and software purchased by the organization and provided to the employee. The organization retains ownership of all hardware and software provided to the employee. The employee should ensure the hardware devices and software programs provided by the organization are protected from theft and physical damage using reasonable precautions.

### Email/Internet Use

Users should be aware that all information passing through or stored on company equipment can and will be monitored.

Violations of Internet and e-mail use include, but are not limited to, accessing, downloading, uploading, saving, receiving, spamming or sending material that includes sexually explicit content or other material using vulgar, sexist, racist, threatening, violent, or defamatory language. Users should not use Ocean Tomo services to disclose corporate information without prior authorization. Gambling and illegal activities are not to be conducted on company resources.

By signing below, I agree to the following terms:
- I received and read the Computer Asset Policy
- I understand and agree that any hardware equipment and software programs provided to me by the organization remains the property of the organization
- I understand I am not to modify, alter, or upgrade any hardware or software programs provided to me by the organization.
- I understand I must make reasonable efforts to protect all organization provided hardware equipment and software from theft and physical damage

Signature

Jonathan Barney
Employee Name

04/27/2007
Date

PatentRatings/Irvine
Department/Location

# EXHIBIT D



**OCEAN TOMO®**
INTELLECTUAL CAPITAL EQUITY®

July 6, 2011

**By email**

William Halle, Esq.
O'Neil, LLP
19900 MacArthur Blvd.
Irvine, CA

Re: Spoliation and Misuse of Ocean Tomo
Confidential Information

Dear Bill:

I write to place you on notice of what appear to be serious violations of your client's obligations to maintain evidence and the confidentiality of Ocean Tomo information and to afford you an opportunity to respond, should you so desire.

As you and your client are well aware, there is an obligation to preserve evidence when litigation is reasonably foreseeable. Under his employment agreement and under the Ocean Tomo Operating Agreement, your client also has an obligation to maintain Ocean Tomo confidential information and refrain from disclosing or using it without Ocean Tomo's consent. Further, your client is bound by the Ocean Tomo Computer Asset Policy Agreement which he executed. (Copy attached). Notwithstanding these obligations, as well as others arising under Federal and State law, your client appears to have appropriated and destroyed Ocean Tomo confidential information and data.

Of perhaps greatest concern is the intentional destruction of all data stored on the Ocean Tomo supplied notebook computer in your client's custody. After several months of stalling and assertions that the computer could not be found, your client returned his computer to Ocean Tomo's Orange County office on or about June 14, 2011. Forensic examination revealed that all data on the computer had been intentionally wiped clean and that the hard drive contained nothing but zeros. It is indisputable that this computer would have contained evidence relevant to the ongoing arbitration and that this evidence was destroyed. I am sure that you are aware that spoliation of evidence is grave matter with serious consequences. Such destruction also violates, *inter alia*, the Computer Asset Policy Agreement.



We are also concerned that notwithstanding the destruction of evidence on the notebook computer, it appears that your client continues to have custody of or access to at least some of the data which would have been contained thereon. Specifically, your objection to our designation of Benjamin Hershkowitz and your inquiry regarding Terry Clark both suggest that your client continues to not only improperly have access to Ocean Tomo confidential information, but to use it in violation of his contractual and other legal obligations.

Accordingly, we ask that within five (5) days, you:

1. Provide a full account of the circumstances surrounding the destruction of data on Mr. Barney's computer.
2. Identify any and all Ocean Tomo files, data or records that Mr. Barney continues to have in his custody or to which he has access.
3. Return all originals, versions and copies of any such files, data or records.
4. Disclose all means by which Mr. Barney has had access to Ocean Tomo files, data or records since the effective date of his resignation.

Very truly yours,

Joel E. Lutzker
General Counsel

Attachment

## Computer Asset Policy Agreement

Employees should read the entire Computer Asset Policy and sign and date this form in the
space provided below.  Copies of this agreement will be kept on file.

### Assets Covered By This Policy

Hardware devices and software programs provided to the employee by Ocean Tomo are to be
used only for company-related business.  Hardware devices and software programs are to be
used ethically, lawfully, and appropriately at all times.

### Asset Administration

No alterations, upgrades, or modifications should be made to hardware and software purchased
by the organization and provided to the employee.  The organization retains ownership of all
hardware and software provided to the employee.  The employee should ensure the hardware
devices and software programs provided by the organization are protected from theft and
physical damage using reasonable precautions.

### Email/Internet Use

Users should be aware that all information passing through or stored on company equipment can
and will be monitored.

Violations of Internet and e-mail use include, but are not limited to, accessing, downloading,
uploading, saving, receiving, spamming or sending material that includes sexually explicit content
or other material using vulgar, sexist, racist, threatening, violent, or defamatory language. Users
should not use Ocean Tomo services to disclose corporate information without prior
authorization. Gambling and illegal activities are not to be conducted on company resources.

By signing below, I agree to the following terms:
- I received and read the Computer Asset Policy
- I understand and agree that any hardware equipment and software programs provided
  to me by the organization remains the property of the organization
- I understand I am not to modify, alter, or upgrade any hardware or software programs
  provided to me by the organization.
- I understand I must make reasonable efforts to protect all organization provided
  hardware equipment and software from theft and physical damage

Signature

Jonathan Barney
Employee Name

04/27/2007
Date

PatentRatings/Irvine
Department/Location