# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| OCEAN TOMO, LLC, | ) | |
| | ) | |
| Plaintiff-Counterdefendant, | ) | |
| | ) | |
| vs. | ) | No. 12 C 8450 |
| | ) | |
| JONATHAN BARNEY and | ) | Hon. Joan B. Gottschall |
| PATENTRATINGS, LLC, | ) | |
| | ) | |
| Defendants-Counterplaintiffs. | ) | |

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS
## OF JONATHAN BARNEY AND PATENTRATINGS, LLC

Jonathan Barney ("Mr. Barney") and PatentRatings, LLC ("PatentRatings"), for their Answer to Ocean Tomo, LLC's First Amended and Supplemental Verified Complaint For Injunctive Relief, Declaratory Judgment, and Damages (the "First Amended Complaint"), their Affirmative Defenses, and their Counterclaims against Ocean Tomo, LLC ("Ocean Tomo"), allege as follows:

## ANSWER

1.      This is an action for breach of contract, breach of fiduciary duty, violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA"), violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), conversion, and tortious interference with prospective economic advantage, arising out of Barney's destruction, copying, and use of OT's confidential information and trade secrets, along with his and PR's attempt to divert a business opportunity away from OT. OT likewise seeks a declaratory judgment establishing that it is not tortiously interfering with Defendants' business expectancies or relationships.

ANSWER:      Mr. Barney and PatentRatings admit that in this action Ocean Tomo purports to allege the claims described in Paragraph 1.  Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 1.

2.      Barney was a Member and Managing Director of OT, and as such, was intimately involved in the development and marketing of OT's services and was given access to detailed knowledge of OT's confidential information relating to financial data, business plans, business methods and practices, and client identity, needs, and preferences. Additionally, Barney was

provided access to sensitive and confidential information about OT's financial and client data related to OT's clients (including historical and realized revenues, and profit margins), strategic plans, business development efforts, proprietary products and valuation methods, and client requirements.

ANSWER: Mr. Barney and PatentRatings admit that Mr. Barney: (a) is a Member of Ocean Tomo; (b) formerly was a Managing Director of Ocean Tomo; and (c) in the past, Ocean Tomo provided Mr. Barney with access to certain information about Ocean Tomo's finances, business plans, and clients. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 2.

3. Barney created PR, a company that owns and develops proprietary objective computer generated metrics for determining the quality and relevance of issued United States patents. Barney is the Chief Executive Officer and the majority owner of PR.

ANSWER: Mr. Barney and PatentRatings admits that Mr. Barney founded PatentRatings, and that, among other things, PatentRatings owns and develops proprietary objective computer generated metrics for determining the quality and relevance of issued United States patents. Mr. Barney and PatentRatings further admit that Mr. Barney is the Chief Executive Officer and the majority owner of PatentRatings. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 3.

4. Because he was provided access to OT's confidential information and client relationships and as a condition of his employment, Barney executed an employment agreement (the "Employment Agreement") that prohibited him from using or disclosing OT's confidential information for his own benefit or the benefit of anyone other than OT.

ANSWER: Mr. Barney and PatentRatings admit that Mr. Barney executed an employment agreement with Ocean Tomo (the "Employment Agreement") that, among other things, contained provisions governing the use and disclosure of "Confidential Information," as that term is defined in the Employment Agreement. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 4.

5.      During the course of his employment with OT, Barney was provided with a laptop for business use (the "Laptop"). The Laptop contained OT's confidential information relating to financial data, business plans, business methods and practices, and client identity, needs, and preferences. Further, Barney executed a Computer Asset Policy Agreement (the "CAP Agreement") during his employment with OT that prohibited him from modifying, altering, or upgrading any hardware or software provided to him by OT.

ANSWER:      Mr. Barney and PatentRatings admit that, during a portion of Mr. Barney's employment with Ocean Tomo, he used a Lenovo T400 laptop computer that was owned by Ocean Tomo (the "Laptop").  Mr. Barney and PatentRatings admit that the Laptop contained, among other things, files and emails relating to Ocean Tomo's business.  Mr. Barney and PatentRatings admit that, on or about April 27, 2007, Mr. Barney executed a document entitled "Computer Asset Policy Agreement," which, among other things, states that Mr. Barney was not to "modify, alter, or upgrade any hardware or software programs" provided to Mr. Barney by Ocean Tomo.  Mr. Barney and PatentRatings are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 5.

6.      Barney resigned from OT on or about February 14, 2011. At that time, he did not return the Laptop to OT. Despite multiple demands by OT for the return of the Laptop, Barney refused to turn over the Laptop until on or about June 14, 2011. Upon receiving the Laptop from Barney, OT hired a forensic expert, who analyzed the Laptop and determined that the hard drive on the Laptop had been intentionally overwritten or wiped, which permanently deleted and destroyed all of OT's confidential and proprietary information on the Laptop.

ANSWER:      Mr. Barney and PatentRatings admit that Mr. Barney transmitted a letter of resignation to Ocean Tomo on or about February 14, 2011.  Mr. Barney and PatentRatings are without knowledge or information sufficient to form a belief as to the truth of Ocean Tomo's allegations regarding the hiring of a forensic expert, or what that expert purportedly determined. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 6.

7.      In addition to completely wiping the hard drive of the Laptop, Barney, upon information and belief, made a copy of the Laptop's hard drive before erasing it. This copy has not been provided to OT. Upon information and belief, Barney continues to access and use data on the copied hard drive, including OT's confidential business and financial information.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 7.

8. Further, starting at least as early as in approximately February 2012, Barney and PR began contacting, and continues to contact, NTT Data, a potential customer and business partner of OT, in order to divert NTT Data's business away from OT and to PR. Barney and PR have attempted to solicit business from NTT Data despite knowing that OT has a valid business expectancy in its relationship with NTT Data.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 8.

9. OT seeks preliminary and permanent injunctive relief to restrain and enjoin Barney's continued breaches of the Employment Agreement, which have and continue to cause irreparable injury to OT, including injunctive relief enjoining Barney from (i) using or disclosing OT's confidential information for his own benefit or the benefit of anyone other than OT and (ii) tortiously interfering with OT's business expectancies and relationships. OT further seeks an order compelling Barney to return all OT trade secrets, confidential information, and all other proprietary information and property belonging to OT, including without limitation, the copy of the Laptop hard drive believed to be in Barney's possession.

ANSWER: Mr. Barney and PatentRatings admit that Ocean Tomo purports to seek the

relief described in Paragraph 9. Mr. Barney and PatentRatings deny the remaining allegations of

Paragraph 9.

10. In addition to injunctive relief, OT has incurred damages from Barney's ongoing misconduct and seeks compensatory damages, punitive and exemplary damages, and such other relief as the Court deems just and proper. OT is further seeking a declaratory judgment that it is not tortiously interfering with Defendants' business expectancies or relationships.

ANSWER: Mr. Barney and PatentRatings admit that Ocean Tomo purports to seek the

relief described in Paragraph 10. Mr. Barney and PatentRatings deny the remaining allegations

of Paragraph 10.

## **PARTIES**

11. OT is an Illinois limited liability company with its principal place of business in Chicago, Illinois. OT, the leading Intellectual Capital Merchant Banc firm, provides, among other things, financial products and services related to expert testimony, valuation, investments, risk management, and transactions throughout the United States and overseas. Most of OT's high-level executives are located in the Chicago, Illinois area. OT's corporate activities and critical decision-making take place at the corporate headquarters located in Chicago, Illinois.

ANSWER: Mr. Barney and PatentRatings admit that Ocean Tomo is a limited liability company organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois. Mr. Barney and PatentRatings further admit that Ocean Tomo represents itself as "the leading Intellectual Capital Merchant Banc firm," and that Ocean Tomo represents that it provides, among other things, financial products and services related to expert testimony, valuation, investments, risk management and transactions throughout the United States and overseas. Mr. Barney and PatentRatings lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 11.

12. Barney is an individual who, upon information and belief, resides at 312 Signal Road, Newport Beach, California 92663. Barney was a Managing Director at OT and was the head of OT's PatentRatings® ("OTPR") group at the time of his resignation on or about February 14, 2011. Barney was and currently is one of only three equity owners of OT. Barney is currently the Chief Executive Officer and majority owner of PR.

ANSWER: Mr. Barney and PatentRatings admit that Mr. Barney resides at 312 Signal Road, Newport Beach, California 92663; that, before February 14, 2011, Mr. Barney was a Managing Director at Ocean Tomo; that Mr. Barney currently is an equity owner of Ocean Tomo; and that Mr. Barney currently is the Chief Executive Officer and majority owner of PatentRatings. Mr. Barney and PatentRatings lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 12.

13. PR is a California limited liability company, with its principal place of business in Irvine, California, that owns and develops proprietary objective computer generated metrics for determining the quality and relevance of issued United States patents.

ANSWER: Mr. Barney and PatentRatings admit that PatentRatings is a limited liability company organized under the laws of the State of California, with its principal place of business in Irvine, California. Mr. Barney and PatentRatings further admit that, among other things, PatentRatings owns and develops proprietary objective computer generated metrics for

determining the quality and relevance of issued United States patents. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 13.

## JURISDICTION AND VENUE

14. Jurisdiction is proper in this Court pursuant to Section 2-209(a) of the Illinois Code of Civil Procedure (735 ILCS 511-101 *et seq*.) because the causes of action arise from, among other things, Defendants' transaction of business in Illinois and the making and performance of contracts substantially connected to Illinois. Moreover, Barney contractually submitted to jurisdiction in this Court.

ANSWER: Mr. Barney and PatentRatings admit that jurisdiction over this action is proper in the United States District Court for the Northern District of Illinois. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 14.

15. Venue is proper in this Court under Section 2-101 because a substantial part of the events giving rise to the causes of action occurred in Cook County, Illinois. Barney also agreed to exclusive venue in this Court in his Employment Agreement. Specifically, Barney agreed as follows:

> Each of the parties hereto ... consents to any and all disputes regarding this Agreement to be heard by a court of competent jurisdiction in Cook County, Illinois and agrees to waive any argument regarding the choice of such forum.

ANSWER: Mr. Barney and PatentRatings admit that the language quoted in Paragraph 15 is contained in the Employment Agreement. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 15.

## GENERAL ALLEGATIONS

### OT's Business

16. OT, the Intellectual Capital Merchant Banc firm, provides, among other things, expert testimony, investment advice, risk management, transaction assistance, and valuation services related to intellectual property assets.

ANSWER: Mr. Barney and PatentRatings admit that Ocean Tomo represents itself as "the leading Intellectual Capital Merchant Banc firm," and that Ocean Tomo represents that it provides, among other things, expert testimony, investment advice, risk management, transaction

assistance, and valuation services related to intellectual property assets. Mr. Barney and PatentRatings lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 16.

17. One of OT's business units is OTPR, which is responsible for the marketing and sale of Ocean Tomo PatentRatings® products and services based upon the data provided under agreement with PR. PR has exclusively licensed to OT and has contracted to supply OT with data and tools based upon PR's computer generated metrics for determining the quality and relevance of issued United States patents. Barney owns a controlling interest in PR, and OT owns a minority interest of 25% in PR.

ANSWER: Mr. Barney and PatentRatings admit, on information and belief, that Ocean Tomo characterizes OTPR as one of its business units. Mr. Barney and PatentRatings further admit that Ocean Tomo and PatentRatings entered into a License Agreement effective as of September 1, 2004 (as amended and supplemented, the "License Agreement"). Mr. Barney and PatentRatings further admit that Mr. Barney owns a controlling interest in PatentRatings, and Ocean Tomo owns a 25% interest in PatentRatings. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 17.

18. Due to its vast research and development initiatives, and cultivation of long-standing business relationships, OT has developed certain trade secrets and confidential information pertaining to its business, including, but not limited to: valuation report templates, research tools, financial information, collections, revenues, profit margins, business plans, business development efforts, proprietary products, client requirements, business plans and strategies, pricing, fees, profitability factors, marketing materials, training materials, marketing strategies, personnel information, including personnel lists, resumes, salary information, organizational structure and performance evaluations. These trade secrets and confidential information provide a substantial economic and competitive advantage to OT and, if known to a competitor, would negatively impact OT in the marketplace.

ANSWER: Mr. Barney and PatentRatings lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 18.

### OT's Hiring of Barney and His Access to Confidential Information

19. Barney is an attorney and inventor of intellectual property and data used for the evaluation and analysis of United States patents. Barney created PR. When Barney wholly owned PR, PR and OT entered into a written licensing transaction on December 31, 2004,

pursuant to which PR provided OT with rights under patents, data and other intellectual property. Also, at that time, Barney became an equity owner of OT. Barney currently remains one of three such equity owners of OT.

ANSWER: Mr. Barney and PatentRatings admit that Mr. Barney is an attorney, an inventor of, among other things, the "PatentRatings" technology, and the founder of PatentRatings. Mr. Barney and PatentRatings further admit that PatentRatings and Ocean Tomo entered into the License Agreement, pursuant to which PatentRatings provided Ocean Tomo with the limited, exclusive license described in the License Agreement. Mr. Barney further admit that, in or about 2004, Mr. Barney became an equity owner of Ocean Tomo, and that Mr. Barney remains one of the equity owners of Ocean Tomo. Mr. Barney and PatentRatings lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 19.

20. In connection with the December 31, 2004 licensing transaction, OT hired Barney to act as Managing Director for the OTPR business unit effective as of January 2005.

ANSWER: Mr. Barney and PatentRatings admit that, in or about December 2004, Mr. Barney became employed by Ocean Tomo, and that Mr. Barney's title was "Managing Director." Mr. Barney and PatentRatings deny that Mr. Barney's employment was solely in connection with the License Agreement. Mr. Barney and PatentRatings lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 20.

21. As Managing Director for OTPR, Barney was responsible for managing and overseeing the marketing and sale of Ocean Tomo PatentRatings® products and services, including IPQ® patent quality scores and patent relevance scores. As of the time of his resignation, Barney's annual salary was $210,000, and he also received profit sharing payments.

ANSWER: Mr. Barney and PatentRatings admit that Mr. Barney was involved in the marketing and sale of Ocean Tomo PatentRatings® products and services, including IPQ® patent quality scores and patent relevance scores. Mr. Barney and PatentRatings further admit that, as of February 2011, Mr. Barney's annual salary was $210,000, and that he also was

entitled to receive profit sharing payments. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 21.

22.     In his position with OT, and subject to strict confidentiality obligations, Barney was provided access to OT's confidential information. Barney was provided access to nearly all of OT's business information, including information about OT's overall financial performance; the performance of each of OT's practice areas; collections and revenue; business plans; opportunities for business development and growth; and other sensitive and confidential information belonging to OT.

ANSWER:     Mr. Barney and PatentRatings lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22.

23.     As part of his employment with OT, Barney was provided with the Laptop. The Laptop contained OT's confidential information, trade secrets, and other proprietary information relating to OT's financial data, business plans, business methods and practices, and client identity, needs, and preferences. Furthermore, the Laptop also contained OT's high-level confidential business information, which included information and data regarding overall financial performance; the performance of each of OT's practice areas; collections and revenue; business plans; opportunities for business development and growth; and other sensitive and confidential OT information.

ANSWER:     Mr. Barney and PatentRatings admit that, during a portion of Mr. Barney's employment with Ocean Tomo, he used a Lenovo T400 laptop computer that was owned by Ocean Tomo (the "Laptop"). Mr. Barney and PatentRatings admit that the Laptop contained, among other things, files and emails relating to Ocean Tomo's business. Mr. Barney and PatentRatings are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 23.

## OT's Agreements with Barney

24.     Because OT was providing Barney with access to OT's confidential information and client relationships, OT required Barney, as a condition of employment, to execute and agree to the Employment Agreement. Barney signed the Employment Agreement on or about January 1, 2005. (A copy of that agreement is attached hereto as Exhibit A.)

ANSWER:     Mr. Barney and PatentRatings admit that Mr. Barney executed an employment agreement with Ocean Tomo (the "Employment Agreement") that, among other

things, contained provisions governing the use and disclosure of "Confidential Information," as that term is defined in the Employment Agreement. Mr. Barney and PatentRatings admit that a copy of the Employment Agreement is attached as Exhibit A to the Amended Complaint. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 24.

25. In the Employment Agreement, Barney agreed that, as part of his employment, he would be exposed to OT's confidential information and that he would maintain the confidentiality of that information, would not use such information for his own benefit, directly or indirectly, and would not disclose that information. Specifically, Barney agreed as follows:

> Section 5.2. <u>Confidential Information</u>. The Executive understands and acknowledges that during his employment with the Company he will be exposed to Confidential Information that is proprietary and that rightfully belongs to the Company. The Executive agrees that he will not use or cause to be used for his own benefit, directly or indirectly, or disclose any of such Confidential Information at any time, either during or after his employment with the Company, whether or not such Confidential Information is developed by the Executive ... The Executive shall take all commercially reasonable steps to safeguard Confidential Information that is within his possession or control and to protect such information against disclosure, misuse, loss or theft ... The term "Confidential Information" means any information not generally available to the public that was obtained from the Company, or any of its Affiliates or that was learned as a result of the performance of any services by the Executive to or on behalf of the Company, and which fails within the following general categories: (a) information concerning trade secrets of the Company or any of its Affiliates; (b) information concerning existing or contemplated products, services, technology, designs, processes, research or product developments of the Company or any of its Affiliates; (c) information concerning business plans, sales or marketing methods, methods of doing business, customer lists, customer usages and or requirements, or supplier information of the Company or any of its Affiliates; (d) information concerning the identity needs, purchase and payment patterns of, and credit terms, pricing of special relations with, the customers of the Company or any of its Affiliates; (e) information concerning the identity, net prices and credit terms of, and special relations with, the suppliers of the Company or any of its Affiliates; or (f) any other confidential information which the Company or any of its Affiliates may reasonably have the right to protect by patent, copyright or by keeping it secret and confidential.

ANSWER: Mr. Barney and PatentRatings admit that the Employment Agreement contained provisions governing the use and disclosure of "Confidential Information," as that term is defined in the Employment Agreement, including the language quoted in Paragraph 25. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 25.

26. OT and Barney later negotiated an Amendment to the Employment Agreement (the "Amendment"), which revised Section 6.9 of the Employment Agreement but made no changes to Section 5.2. Barney executed the Amendment on or about July 28, 2008. (A copy of the Amendment is attached hereto as Exhibit B).

ANSWER: Mr. Barney and PatentRatings admit that on or about July 28, 2008, Mr. Barney executed a document entitled "Amendment of Employment Agreement," which is attached to the Amended Complaint as Exhibit B, that the Amendment of Employment Agreement stated that it was amending Section 6.9 of the Employment Agreement, and that the Amendment of Employment Agreement did not state that it was amending Section 5.2 of the Employment Agreement. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 26.

27. Barney is also party to the CAP Agreement, which he executed on or about April 27, 2007, wherein he agreed that "[n]o alterations, upgrades, or modifications should be made to hardware and software purchased by the organization and provided to the employee." (A copy of the CAP Agreement is attached hereto as Exhibit C). Barney further agreed that OT retained ownership of all hardware and software provided to him.

ANSWER: Mr. Barney and PatentRatings admit that, on or about April 27, 2007, Mr. Barney executed a document entitled "Computer Asset Policy Agreement," a copy of which is attached as Exhibit C to the Amended Complaint, and which, among other things, stated that "[n]o alterations, upgrades, or modifications should be made to hardware and software purchased by the organization and provided to the employee," and "any hardware equipment and software programs provided to me by the organization remains the property of the organization." Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 27.

## OT's Additional Measures to Maintain the Confidentiality of Its Information

28. In order to maintain the confidentiality of its information, OT, as a matter of practice and policy, requires employees to execute agreements containing confidentiality provisions the same or nearly identical to the one in Barney's Employment Agreement.

ANSWER: Mr. Barney and PatentRatings are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 28.

29. In addition, OT restricts access to its confidential information to certain key individuals and only on a need-to-know basis. For example, OT's financial information and strategic business plans are only distributed to OT's Managing Directors. Customer-related confidential information is only provided to employees who work with that particular customer.

ANSWER: Mr. Barney and PatentRatings are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 29.

## Barney's Departure from OT and Destruction of the Laptop's Hard Drive

30. On or about February 14, 2011, Barney resigned from OT as a Managing Director.

ANSWER: Mr. Barney and PatentRatings admit that Mr. Barney transmitted a letter of resignation to Ocean Tomo on or about February 14, 2011. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 30.

31. Notwithstanding the fact that OT owned the Laptop, Barney did not return the Laptop to OT at the time of his resignation.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 31.

32. On multiple occasions, OT demanded that Barney return the Laptop. Barney refused to comply with any of these requests.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 32.

33. On or about June 14, 2011, approximately four months after he resigned from OT, Barney finally returned the Laptop to OT.

ANSWER: Mr. Barney and PatentRatings admit that, on or about June 14, 2011, he provided the Laptop to Ocean Tomo. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 33.

34.     Upon receiving the Laptop from Barney, OT hired a forensic expert, who analyzed the Laptop and determined that the hard drive on the Laptop had been intentionally overwritten or wiped with hexadecimal "00" values. By overwriting or wiping the hard drive's data storage area on the Laptop, Barney rendered the data on the entire hard drive unrecoverable, which thereby destroyed all the data on the hard drive. As such, Barney permanently destroyed and rendered inaccessible all OT information on the Laptop's hard drive, including, without limitation, OT's confidential information regarding OT's strategic plans, financial performance, and customers.

ANSWER:     Mr. Barney and PatentRatings are without knowledge or information

sufficient to form a belief as to the truth of Ocean Tomo's allegations regarding the hiring of a

forensic expert, or what that expert purportedly determined.  Mr. Barney and PatentRatings deny

the remaining allegations of Paragraph 34.

35.     In addition to completely wiping the hard drive of the Laptop, Barney, upon information and belief, made a copy of the Laptop's hard drive before erasing it. That copy has not been provided to OT. Upon information and belief, Barney continues to access and use data on the copied hard drive, including OT's confidential financial and business information.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 35.

## Barney Refuses OT's Request for Compliance with the Employment Agreement and the CAP Agreement

36.     Upon receiving the Laptop back from Barney and learning from its hired forensic expert that the hard drive on the Laptop had been wiped clean, OT sent a letter to Barney on July 6, 2011 reminding him of his contractual obligations in the Employment Agreement and in the CAP Agreement. (A copy of the July 6, 2011 correspondence is attached hereto as Exhibit D.)

ANSWER:     Mr. Barney and PatentRatings admit that, on or about July 6, 2011, Ocean

Tomo transmitted the letter attached as Exhibit D to the Amended Complaint.  Mr. Barney and

PatentRatings deny the remaining allegations of Paragraph 36.

37.     In the July 6, 2011 letter, OT requested that Barney explain the circumstances surrounding the destruction of data on the Laptop; identify and return all OT files, data, and information remaining in his possession (whether originals or copies); and disclose the means by which Barney had access to OT's files, data, and information since his resignation from OT.

ANSWER: Mr. Barney and PatentRatings admit that Ocean Tomo made demands in the letter attached as Exhibit D to the Amended Complaint. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 37.

38. To date, Barney has not responded to OT's July 6, 2011 letter, nor has he complied with any of the requests made by OT in that letter.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 38.

### Barney and PR's Solicitation of OT's Potential Customer

39. Starting at least as early as in approximately February 2012, Barney and PR began directly soliciting the business of NTT Data, a potential customer and business partner of OT with whom OT expected to conduct business.

ANSWER: Mr. Barney and PatentRatings admit that NTT Data contacted Barney and PatentRatings in or about February 2012 and that they communicated with NTT Data regarding a license request by NTT Data. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 39.

40. Further, Barney and PR directly solicited the business of NTT Data in contravention of a license agreement entered into between OT and PR (the "License Agreement," which provided OT, *inter alia*, with a limited exclusive, royalty-free, worldwide license to distribute, sell, license, or display PatentRatings analysis to third parties for a fee. (Copies of the September 1, 2004 License Agreement, the December 31, 2004 amendment to the License Agreement, the May 2, 2005 amendment to the License Agreement, and the July 19, 2007 amendment to the License Agreement are attached hereto as Exhibit E, Exhibit F, Exhibit G, and Exhibit H, respectively.)

ANSWER: Mr. Barney and PatentRatings admit that copies of the License Agreement and the amendments thereto are attached as Exhibits E, F, G, and H to the Amended Complaint. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 40.

41. Since at least February 2012, Barney and PR have engaged in licensing and other discussions with NTT Data to develop and market patent analysis tools, algorithms, software and data for Japanese patents. In addition, Barney and PR have offered to indemnify NTT Data against any claims asserted by OT for damage arising from Barney and PR's attempt to divert business away from OT and to PR.

ANSWER: Mr. Barney and PatentRatings admit that they communicated with NTT Data regarding a requested license. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 41.

42. Despite being informed of OT's business expectancy in its relationship with NTT Data, along with the limited exclusive, royalty-free, worldwide license given to OT under the License Agreement, Barney and PR have persisted in soliciting the business of NTT Data.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 42.

## Injunctive Relief Is Required

43. Injunctive relief is necessary to prevent the further loss of OT's valuable confidential information. OT has sustained and will continue to sustain irreparable and unfair competitive injury resulting from Barney's ongoing breaches of his contractual and fiduciary obligations.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 42.

44. In Section 5.4 of the Employment Agreement with OT, Barney agreed that OT will be irreparably harmed and that OT will not have an adequate remedy at law if he violated the non-disclosure obligation contained in the agreement.

ANSWER: Mr. Barney and PatentRatings admit that the Employment Agreement contains the language referenced in Paragraph 44. Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 44.

45. Barney has already showed his willingness to disregard his contractual and fiduciary obligations to OT by destroying all of OT's confidential and proprietary information contained on the Laptop's hard drive and by soliciting OT's potential customer and business partner. Moreover, upon information and belief, Barney has shown a complete disregard for his fiduciary, contractual, and statutory obligations by making a copy of the Laptop's hard drive and using the confidential information (which had been acquired during his employment relationship with OT) contained thereon.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 45.

46. Further injunctive relief is necessary to prevent further damage to OT.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 46.

**COUNT I**
**BREACH OF CONTRACT – EMPLOYMENT AGREEMENT**
**(BARNEY)**

47.     OT restates and realleges Paragraph Nos. 1 through 46 as and for this Paragraph No. 47 of Count I.

ANSWER:     Mr. Barney and PatentRatings incorporate by reference their responses to Paragraph 1 through 46 as though fully set forth herein.

48.     The Employment Agreement attached as Exhibit A is a valid and enforceable contract.

ANSWER:     Mr. Barney and PatentRatings admit that Mr. Barney has a right to enforce the Employment Agreement.  Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 48.

49.     In exchange for the contractual obligations set forth in the Employment Agreement, Barney received adequate and sufficient consideration, including, without limitation, employment, compensation, and bonus eligibility.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 49.

50.     OT has at all times performed and fulfilled its obligations under the Employment Agreement.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 50.

51.     Barney has breached Section 5.2 of the Employment Agreement by destroying and failing to safeguard OT's confidential information in his possession, refusing to return OT's confidential information in his possession, custody, or control to OT, and using and disclosing OT's confidential information for his benefit and PR's benefit.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 51.

52.     The foregoing breaches and continuing breaches of Barney's Employment Agreement with OT have proximately caused and, unless restrained and enjoined, will continue to cause OT severe, immediate and irreparable harm, damage and injury.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 52.

## COUNT II
## BREACH OF CONTRACT – COMPUTER ASSET POLICY AGREEMENT
## (BARNEY)

53.     OT restates and realleges Paragraph Nos. 1 through 46 as and for this Paragraph No. 53 of Count II.

ANSWER:     Mr. Barney and PatentRatings incorporate by reference their responses to Paragraph 1 through 46 as though fully set forth herein.

54.     The CAP Agreement attached as Exhibit C is a valid and enforceable contract.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 54.

55.     In exchange for the contractual obligations set forth in the CAP Agreement, Barney received adequate and sufficient consideration, including, without limitation, access to and use of software and hardware belonging to OT, including the Laptop.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 55.

56.     OT has at all times performed and fulfilled its obligations under the CAP Agreement.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 56.

57.     Barney has breached the CAP Agreement by overwriting and permanently destroying all data on the hard drive of the Laptop.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 57.

58.     As a direct and proximate result of Barney's breach of the CAP Agreement, OT has expended resources in excess of $5,000 to investigate the foregoing misconduct and to conduct a forensic examination of the Laptop used by Barney to ascertain the scope of his misconduct, and to perform certain remedial measures to the Laptop due to the misconduct.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 58.

## COUNT III
## BREACH OF FIDUCIARY DUTY
## (BARNEY)

59.     OT restates and realleges Paragraph Nos. 1 through 46 as and for this Paragraph No. 59 of Count III.

ANSWER:     Mr. Barney and PatentRatings incorporate by reference their responses to Paragraph 1 through 46 as though fully set forth herein.

60.     As a Managing Director at OT, Barney owed OT fiduciary duties, including, but not limited to, a duty to act at all times with the utmost good faith, loyalty, honesty and fair dealing towards OT, to avoid self-dealing, conflicts of interest and acting for his own personal benefit to the exclusion of OT's interest, and to act in the best interest of OT in all matters relating to its business. Barney also owes heightened fiduciary duties to OT as an equity owner and Member of OT.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 60.

61.     OT reposed trust and confidence in Barney that he would abide by his fiduciary duties.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 61.

62.     Barney has breached his fiduciary obligations to OT by, among other things, (i) destroying OT's confidential information on the Laptop's hard drive, (ii) making a copy of the Laptop's hard drive – which contained confidential information acquired during the course of Barney's employment with OT and prior to his resignation from OT – before erasing it, and (iii) disclosing and using OT's confidential information – which had been acquired during the course of his employment with OT and prior to his resignation from OT – from the copied hard drive for his own benefit and PR's benefit.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 62.

63.     These breaches of fiduciary duty have proximately caused and, unless restrained and enjoined, will continue to cause OT severe, immediate and irreparable harm, damage and injury for which OT has no adequate remedy at law.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 63.

64.     These breaches of fiduciary duty were knowing, intentional, and reckless, and were of such an aggravated character as to warrant the imposition of punitive damages.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 64.

## COUNT IV
## VIOLATION OF ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/1 *ET SEQ.*
## (BARNEY)

65.     OT restates and realleges Paragraph Nos. 1 through 46 as and for this Paragraph No. 65 of Count IV.

ANSWER:     Mr. Barney and PatentRatings incorporate by reference their responses to

Paragraph 1 through 46 as though fully set forth herein.

66.     Certain of OT's business practices and methods, and information relating to its products, clients, practice areas, suppliers, and contacts, including, without limitation, valuation report templates, research tools, financial information, collections, revenues, profit margins, business plans, business development efforts, proprietary products, client requirements, business plans and strategies, pricing, fees, profitability factors, marketing materials, training materials, marketing strategies, personnel information, including personnel lists, resumes, salary information, organizational structure and performance evaluations are proprietary and confidential to OT and constitute protectable trade secrets under the ITSA, 765 ILCS 1065/1 *et seq.*

ANSWER:     Mr. Barney and PatentRatings are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66.

67.     OT has taken reasonable efforts to protect and maintain the secrecy and confidentiality of its trade secrets.

ANSWER:     Mr. Barney and PatentRatings are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67.

68.     OT's trade secrets are not generally known in the industry or to the general public, and their secrecy confers substantial economic advantage and benefit to OT. Knowledge of this information would also confer a substantial economic benefit to OT's competitors.

ANSWER:     Mr. Barney and PatentRatings are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68.

69.     The circumstances of Barney's employment with OT gave rise to fiduciary duties and contractual obligations to maintain the secrecy of OT's trade secrets and confidential information and to strictly limit their use to OT business activities and for OT's exclusive benefit.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 69.

70.     Barney, through improper means and without authorization, either directly or indirectly, misappropriated, misused, and/or disclosed OT's trade secrets to and for his own benefit. Upon information and belief, Barney has misappropriated and retains copies of OT's trade secrets. Investigation into Barney's theft of OT's confidential information and trade secrets continues and may yet reveal additional information that Barney misappropriated.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 70.

71.     As a direct and proximate result of Barney's deliberate, willful, and malicious misappropriation of OT's trade secrets, OT has sustained and will continue to sustain severe,

immediate and irreparable harm, damage and injury to the value of its trade secrets and competitive advantage, which OT has expended significant time, effort and money to secure.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 71.

## COUNT V
## VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. §1030
## (BARNEY)

72. OT restates and realleges Paragraph Nos. 1 through 46 as and for this Paragraph No. 72 of Count V.

ANSWER: Mr. Barney and PatentRatings incorporate by reference their responses to Paragraph 1 through 46 as though fully set forth herein.

73. The Laptop was used in interstate commerce and constitutes a "protected computer" under the CFAA, 18 U.S.C. § 1030(e)(2)(b).

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 73.

74. Without authorization or by exceeding authorized access, Barney intentionally accessed the Laptop with the intent to defraud OT and violated Sections 1030(a)(2)(c), (a)(4), and (a)(5) of the CFAA by:

(a) Deleting electronic files from the Laptop;

(b) Destroying the hard drive on the Laptop; and

(c) Copying the Laptop's hard drive, which contained OT's trade secrets and confidential information for his benefit and PR's benefit.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 74.

75. By engaging in the foregoing misconduct for the purpose of misappropriating OT's trade secrets and confidential information, Barney breached various contractual and fiduciary duties and obligations owed to OT. As the foregoing misconduct occurred after Barney resigned from OT, there is no employment or agency relationship or any other legal basis upon which Barney could claim authorization or authority for accessing and destroying files on the Laptop. Moreover, under no circumstances was Barney authorized to delete information from the Laptop's hard drive.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 75.

76. Barney intentionally and recklessly caused damage and loss to OT in excess of $5,000 because his conduct impaired the integrity of OT's protected computer and required OT to expend resources in excess of $5,000 to investigate the foregoing misconduct, conduct

forensic examination of the Laptop used by Barney to ascertain the scope of his misconduct, and perform certain remedial measures to OT's protected computer due to the misconduct.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 76.

77. As a further direct and proximate cause of the foregoing misconduct, OT has been damaged and suffered loss in an amount in excess of $5,000 to the extent Barney accessed, deleted, destroyed, and copied electronic files containing OT's trade secrets and other confidential and proprietary client and business information belonging to OT for his personal use and/or that of PR.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 77.

## COUNT VI
## CONVERSION
## (BARNEY)

78. OT restates and realleges Paragraph Nos. 1 through 46 as and for this Paragraph No. 78 of Count VI.

ANSWER: Mr. Barney and PatentRatings incorporate by reference their responses to

Paragraph 1 through 46 as though fully set forth herein.

79. OT has a right to immediate possession of any OT documents and materials in Barney's possession.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 79.

80. Barney has assumed control, dominion, and ownership over OT documents and materials to which OT has an absolute and unconditional right to immediate possession.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 80.

81. Barney has not returned or has destroyed the documents and materials that rightfully belong to OT.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 81.

82. Barney's conduct was and is deliberate, willful, and malicious.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 82.

83. The foregoing conduct has proximately caused and, unless restrained and enjoined, will continue to cause OT severe, immediate and irreparable harm, damage and injury.

ANSWER: Mr. Barney and PatentRatings deny the allegations of Paragraph 83.

## COUNT VII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
## (BARNEY & PR)

84.     OT restates and realleges Paragraph Nos. 1 through 46 as and for this Paragraph No. 84 of Count VII.

ANSWER:     Mr. Barney and PatentRatings incorporate by reference their responses to

Paragraph 1 through 46 as though fully set forth herein.

85.     OT has a valid business expectancy in relationships with its potential customers and business partners through the expenditure of substantial time, money, and effort. Further, OT has a valid business expectancy in such relationships with potential customers and business partners due to the fact that OT was granted, *inter alia*, a limited exclusive, royalty-free, worldwide license to distribute, sell, license, or display PatentRatings analysis to third parties for a fee in the License Agreement.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 85.

86.     As a result of Barney's employment with OT and membership in OT, Barney has knowledge of OT's business expectancy in such relationships with potential customers and business partners, including NTT Data.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 86.

87.     Defendants also have knowledge of OT' business expectancy in such relationships with potential customers and business partners, including NTT Data, due to the fact Barney is the majority owner of PR and PR granted OT, *inter alia*, a limited exclusive, royalty-free, worldwide license under the License Agreement.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 87.

88.     Barney and PR have intentionally and unjustifiably interfered with OT's business expectancies by soliciting potential customers and attempting to divert customers from OT to PR.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 88.

89.     Specifically, and without limitation, Defendants' actions have interfered with OT's business expectancy with NTT Data in that OT has now been unable to obtain business from NTT Data as expected.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 89.

90.     Defendants' actions are not privileged because Defendants solicited the business of NTT Data in contravention of the License Agreement. Moreover, Defendants have used unfair

means to interfere with OT's relationship with NTT Data, including the disparagement of OT's goods, services, and reputation.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 90.

91.     As a direct and proximate result of Defendants' actions, OT has sustained, and will continue to sustain, unless enjoined, severe and irreparable injury to its customer business expectancies and relationships.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 91.

92.     By reason of Defendants' deliberate, willful, and malicious conduct, OT is entitled to exemplary damages in such amount as the public good requires to punish Defendants and to deter them and others from the commission of like acts.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 92.

## COUNT VIII
## DECLARATORY JUDGMENT
## (BARNEY & PR)

93.     OT restates and realleges Paragraph Nos. 1 through 46 as and for this Paragraph No. 93 of Count VIII.

ANSWER:     Mr. Barney and PatentRatings incorporate by reference their responses to

Paragraph 1 through 46 as though fully set forth herein.

94.     Upon discovering that Barney and PR were soliciting the business of NTT Data in contravention of the License Agreement entered into between OT and PR, OT contacted NTT Data to determine the scope of Defendants' interference with OT's business expectancy in its relationship with NTT Data.

ANSWER:     Mr. Barney and PatentRatings are without knowledge or information

sufficient to form a belief as to the truth of the allegations of Paragraph 94.

95.     A present and actionable controversy now exists between OT and Defendants concerning whether OT is tortiously interfering with Defendants' business expectancy with respect to NTT Data by virtue of OT's contact with NTT Data.

ANSWER:     Mr. Barney and PatentRatings admit that Ocean Tomo has tortiously

interfered with PatentRatings' business expectancy with respect to NTT Data.  Mr. Barney and

PatentRatings deny the remaining allegations of Paragraph 95.

96.     Specifically, OT contends that it is not tortiously interfering with Defendants' business expectancy with respect to NTT Data because the License Agreement provided OT, *inter alia*, with a limited exclusive, royalty-free, worldwide license to distribute, sell, license, or display PatentRatings analysis to third parties for a fee. (*See* Exhibit E.)

ANSWER:     Mr. Barney and PatentRatings admit that Ocean Tomo purports to make the contentions set forth in Paragraph 96.  Mr. Barney and PatentRatings deny the remaining allegations of Paragraph 96.

97.     Defendants, on the other hand, contend that the License Agreement does not apply to the business contemplated by NTT Data and that, as a result, OT is tortiously interfering with Defendants' business expectancy in its relationship with NTT Data.

ANSWER:     Mr. Barney and PatentRatings admit that they have, among other things, made the contentions referenced in Paragraph 97.

98.     A declaration by this Court is necessary to resolve this impasse and to determine the respective rights of the parties under the License Agreement and whether OT is tortiously interfering with Defendants' business expectancy with respect to NTT Data.

ANSWER:     Mr. Barney and PatentRatings deny the allegations of Paragraph 98.

## AFFIRMATIVE DEFENSES

For their affirmative defenses to Ocean Tomo's claims, Mr. Barney and PatentRatings allege as follows:

1.     Ocean Tomo's claims are barred, in whole or in part, by a failure of consideration.

2.     Ocean Tomo's claims are barred, in whole or in part, by fraud, as described in Mr. Barney's and PatentRatings' Counterclaims.

3.     Ocean Tomo's claims are barred, in whole or in part, by laches.

4.     Ocean Tomo's claims are barred, in whole or in part, by *res judicata* and/or collateral estoppel.

5.     Ocean Tomo's claims are barred, in whole or in part, by its unclean hands.

6.    Mr. Barney and PatentRatings reserve the right to assert additional affirmative defenses as investigation and discovery go forward.

## PRAYER FOR RELIEF

Jonathan Barney and PatentRatings respectfully request that this Court enter judgment in their favor and against Ocean Tomo, LLC with respect to all of Ocean Tomo's claims, award Mr. Barney and PatentRatings their attorneys' fees and expenses, and provide such other and further relief as is just and equitable.

## COUNTERCLAIMS

For their counterclaims against Ocean Tomo, LLC ("Ocean Tomo"), Jonathan Barney ("Mr. Barney") and PatentRatings, LLC ("PatentRatings") allege as follows:

## NATURE OF THE ACTION

1.    This action arises from Ocean Tomo's malicious, underhanded campaign to wrongfully oppress and freeze out one of its minority owners, Jonathan Barney, to cheat Mr. Barney out of the substantial benefits that Ocean Tomo promised to Mr. Barney in 2004 when Ocean Tomo induced him to exchange an ownership interest in his company, PatentRatings, LLC, for a minority ownership interest in Ocean Tomo, and to attempt to destroy Mr. Barney and PatentRatings financially so that Ocean Tomo could steal the very valuable PatentRatings system and the underlying patents, data, algorithms, and other valuable intellectual property owned by PatentRatings.  Mr. Barney and PatentRatings bring the claims described below to recover the significant damages they have suffered because of Ocean Tomo's breaches of contract, breaches of the implied covenant and fair dealing, fraud, tortious interference with prospective economic advantage, and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA"), to recover punitive damages to punish Ocean Tomo for its willful,

malicious, and fraudulent conduct, and to compel Ocean Tomo to provide access to the books and records of the company.

## PARTIES

2. Counterplaintiff Jonathan Barney ("Mr. Barney") lives in Newport Beach, California. He is a member of Ocean Tomo, owning a minority interest in the company. On information and belief, Mr. Barney currently owns approximately 9% of the outstanding units in Ocean Tomo.

3. Counterplaintiff PatentRatings, LLC ("PatentRatings") is a California limited liability company, with its principal place of business in Irvine, California.

4. Counterdefendant Ocean Tomo, LLC ("Ocean Tomo") is an Illinois limited liability company, with its principal place of business in Chicago, Illinois.

## JURISDICTION

5. This Court has jurisdiction over these counterclaims under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

## ALLEGATIONS COMMON TO ALL COUNTS

### Mr. Barney Invents the PatentRatings System, and Forms PatentRatings, LLC

6. Mr. Barney is an accomplished engineer, inventor, entrepreneur, and patent lawyer. One of Mr. Barney's inventions is the PatentRatings system, which is among the most advanced statistical patent data, rating, and analysis systems in the world. The statistical rating algorithm underlying the PatentRatings system has been awarded multiple patents by the United States Patent and Trademark Office and is used by, among others, major global corporations to assess the quality and relative value of their patent portfolios (and the portfolios of competitors

and potential acquisition targets), relevant patents and technologies, competition, and relevant trends.

7.     In 2000, Mr. Barney formed a company, PatentRatings, LLC, to implement the PatentRatings system, and bring it to the marketplace.  Mr. Barney invested enormous amounts of his time, energy, skill, and creativity – and significant amounts of his own funds – in PatentRatings, LLC.

**Mr. Barney Agrees To Sell Ocean Tomo An Interest In**
**PatentRatings, LLC in Exchange For A Minority Interest in Ocean Tomo**

8.     Word of Mr. Barney's innovative PatentRatings system quickly spread in the industry.  A number of people and entities who were interested in the system reached out to Mr. Barney.  One of them was Ocean Tomo, LLC, a Chicago-based firm.

9.     Ocean Tomo wanted to be able to take advantage of the PatentRatings system for the benefit of Ocean Tomo, and claimed that, in exchange, it was willing to provide Mr. Barney with a number of significant benefits, including the right to share in Ocean Tomo's profits (and losses).  Mr. Barney and Ocean Tomo ultimately negotiated a transaction that involved a license agreement and an equity exchange agreement.  The License Agreement between PatentRatings and Ocean Tomo (the "License Agreement") was dated as of September 1, 2004.  Under the Equity Exchange Agreement dated as of December 31 2004, Ocean Tomo acquired 25% of the equity in PatentRatings from Mr. Barney, and Mr. Barney acquired 6.8% of the equity in Ocean Tomo from Ocean Tomo.

10.     In order to induce Mr. Barney into entering into the License Agreement and the Equity Exchange Agreement, Ocean Tomo promised Mr. Barney, among other things, that: (a) Mr. Barney would have employment as a high-level executive at Ocean Tomo; (b) Mr. Barney would receive additional earned equity in Ocean Tomo; and (c) there were no

outstanding contracts or promises relating to the issuance, sale, or transfer of any equity securities of Ocean Tomo, which was important to Mr. Barney, because any existing, undisclosed agreements to give Ocean Tomo shares to anyone else would dilute the value of the Ocean Tomo shares Mr. Barney was to receive.

**The Operating Agreement**

11.     As a member of Ocean Tomo, Mr. Barney was a party to the operating agreement for the company, which was amended from time to time.  On information and belief, the current version of the operating agreement is the Second Amended and Restated Operating Agreement of Ocean Tomo, LLC dated as of January 1, 2008 (the "Operating Agreement").

12.     The Operating Agreement included provisions relating to, among other things, the allocations of profits and losses among the members of Ocean Tomo, the issuance of additional equity units to members, and the rights of members to have access to the books and records of Ocean Tomo.

13.     With respect to the allocation of profits and losses among the members, the Operating Agreement provides that, subject to certain adjustments: (a) 75% of "Net Profits from Operations" shall be allocated among the members as determined by the Board of Managers, and the remaining 25% of "Net Profits from Operations" shall be allocated among the members in accordance with their respective percentage interests; and (b) "Net Profits (Other than Net Profits from Operations)" shall be allocated among the members in accordance with their respective percentage interests.  These provisions meant that the Board of Managers purportedly had the ability to exercise discretion with respect to the allocation of 75% of the net profits from operations, but had no such purported discretion with respect to net profits other than net profits from operations.

14. As Ocean Tomo had promised Mr. Barney in 2004 when he agreed to exchange equity in PatentRatings, LLC for an minority interest in Ocean Tomo, the Operating Agreement also provided, in Section 10.06, that each member of Ocean Tomo (including Mr. Barney) would receive an additional 10 equity units each year.

15. With respect to members' right to have access to the books and records of Ocean Tomo, Section 6.04 of the Operating Agreement provides: "The Board of Managers shall maintain and preserve, during the term of the Company, the accounts, books and relevant Company documents described in Section 9.09. Each Member shall have the right, at a time during ordinary business hours, as reasonably determined by the Board of Managers, to inspect and copy, at the requesting Member's expense, the books and records of the Company described in Section 9.09 hereof, and such other documents which the Board of Managers, in its discretion, deems appropriate." Section 9.09, in turn, states that, "At the expense of the Company, the Board of Managers shall maintain records and accounts of the operations and expenditures of the Company," and then identifies the minimum records that the Company shall keep at its principal place of business.

16. The books and records of Ocean Tomo that are referenced in Section 9.09 of the Operating Agreement include, but are not limited to, detailed monthly and quarterly financial reporting packages, and "equity bonus tracker" reports.

**After Ocean Tomo Obtains Access to and Leverage Over PatentRatings,**
**Mr. Barney Learns That It Has No Interest In Complying With Its Promises**

17. After entering into the transactions with Ocean Tomo in 2004, and becoming a senior executive of the company, Mr. Barney soon learned what others before (and after) him also discovered – the environment at Ocean Tomo was rife with conflict, back-biting, and shady business and accounting practices.

18.     Even in the face of such a profoundly negative environment, however, Mr. Barney did his best to try to make his partnership with Ocean Tomo a success, and consistently devoted his time, talent, energy, and creativity to the company.

19.     Ocean Tomo repaid Mr. Barney's hard work, dedication, and good faith by embarking on a campaign to freeze Mr. Barney out of Ocean Tomo, to deprive Mr. Barney of the significant benefits he had been promised and was entitled to receive, and to attempt to destroy Mr. Barney and PatentRatings financially so that Ocean Tomo could steal the very valuable PatentRatings system and the underlying patents, data, algorithms, and other valuable intellectual property owned by PatentRatings.

**Ocean Tomo Uses "Creative" Accounting**
**To Avoid Its Obligation to Share Pro Rata With Mr. Barney**
**The Proceeds From The Sale Of The ICAP Business**

20.     For example, iIn 2009, Ocean Tomo completed the sale of one of its businesses, ICAP.  The profits from that sale, which totaled approximately $10 million, constituted net profits other than "Net Profits From Operations," and therefore were required to be distributed among the members of Ocean Tomo *pro rata* in accordance with their ownership interests.

21.     Remarkably, however, Ocean Tomo apparently treated the profits from the ICAP sale as "Net Profits From Operations," in order to attempt to justify Ocean Tomo's failure to allocate those profits *pro rata* in accordance with the members' ownership interests, as the Operating Agreement required.

22.     By doing so, Ocean Tomo not only violated accounting principles (and common sense), but also representations that were made to Mr. Barney by James Malackowski, the President of Ocean Tomo, before and after the ICAP transaction closed, regarding the allocation of the profits from that transaction.

23.     On information and belief, Ocean Tomo appears to have engaged in similar chicanery with respect to the proceeds resulting from the sale of shares of its IPXI business to new investors.

**Ocean Tomo Forces Mr. Barney To Resign To Freeze Him Out**
**And To Deny Him The Salary,  Benefits, and Equity Interests He Was Promised**

24.     Ultimately, Ocean Tomo created intolerable working conditions and severe conflicts of interests with the goal of forcing Mr. Barney to resign his employment from Ocean Tomo – which resignation Ocean Tomo intended to use as an excuse for depriving Mr. Barney of the significant benefits that Mr. Barney had been promised and was entitled to receive.

25.     By forcing Mr. Barney to resign in February 2011, Ocean Tomo intended to avoid paying Mr. Barney his salary and benefits as a senior executive at Ocean Tomo.  The position as a senior executive, and the salary and benefits package associated with it, was one of the significant benefits that Mr. Barney was promised in 2004 when he agreed to exchange equity in PatentRatings for a minority interest in Ocean Tomo.

26.     Moreover, after forcing Mr. Barney to resign, Ocean Tomo also purported to exercise purported rights to redeem – without paying any consideration whatsoever – a substantial portion of the additional equity units that Mr. Barney had received.  On information and belief, Ocean Tomo's desire to deprive Mr. Barney of those equity units was one of the motivating factors that led it to force Mr. Barney to resign.

**In An Effort To Conceal Its Wrongdoing, Ocean Tomo**
**Refuses To Allow Mr. Barney Reasonable Access To**
**The Books and Records Of Ocean Tomo**

27.     As described above, Ocean Tomo forced Mr. Barney to resign his employment from Ocean Tomo in February 2011.

28.     Following his resignation, Mr. Barney made repeated requests for access to the books and records of Ocean Tomo.

29.     Ocean Tomo has denied those requests without any legitimate justification.

30.     On information and belief, Ocean Tomo has denied Mr. Barney access to the books and records of the company in an effort to frustrate Mr. Barney's efforts to discover further information about Ocean Tomo's wrongdoing. Mr. Barney anticipates that discovery in this action will reveal significant wrongdoing by Ocean Tomo (and possibly others) in addition to what is alleged here, and reserves his rights to amend his pleading to assert claims arising from all such wrongdoing.

**Mr. Barney Discovers Ocean Tomo's False Representations**
**Regarding The Issuance, Sale, Or Transfer of OT Interests**

31.     After being forced out of Ocean Tomo – and deprived of any meaningful access to the books and records of the company – Mr. Barney discovered that Ocean Tomo's representations to Mr. Barney in 2004 that there were no contracts relating to the issuance, sale, or transfer of equity securities of Ocean Tomo were false.

32.     In fact, Mr. Barney recently learned that, at the time it made those representations to Mr. Barney, there was an existing secret agreement between Ocean Tomo and Mike Lasinski under which Ocean Tomo had promised to transfer at a later date a significant number of equity units in Ocean Tomo to Mr. Lasinski. (Ocean Tomo and Mr. Lasinski entered into that agreement because Mr. Lasinski was bound by a covenant not to compete with his former employer, and therefore could not "publicly" become a member of Ocean Tomo.)

33.     In light of Ocean Tomo's agreement with Mr. Lasinski, Ocean Tomo's representations in 2004 to Mr. Barney that there were no contracts relating to the issuance, sale,

or transfer of equity securities in Ocean Tomo were false, and Ocean Tomo was aware that they were false.

34.     Mr. Barney reasonably relied on those false representations in agreeing to enter into the license agreement and equity exchange agreement with Ocean Tomo. If Ocean Tomo had disclosed to Mr. Barney the truth about its agreement with Mr. Lasinski, Mr. Barney would not have agreed to enter into the License Agreement and the Equity Exchange Agreement, and/or would have demanded materially different terms before he would do so.

**Ocean Tomo Wrongfully Discloses and**
**Misappropriates PatentRatings' Confidential Information**

35.     Ocean Tomo's depredations have not been limited to cheating Mr. Barney and PatentRatings out of the benefits they bargained for when they entered into the transactions with Ocean Tomo in 2004. Ocean Tomo also has wrongfully disclosed and misappropriated PatentRatings' confidential information, in violation of the License Agreement and the law.

36.     In Paragraph 7.1 of the License Agreement, Ocean Tomo agreed that the "Licensed Technology contains certain confidential information, trade secrets, and know-how related to statistical patent analysis, mapping and valuation ("Confidential Information") that is proprietary to [PatentRatings]. [Ocean Tomo] agrees to hold such Confidential Information in strict confidence, not to use it commercially for its own benefit or the benefit of anyone else, and not to use the Confidential Information for the purpose of developing or improving a product or method for anyone except [PatentRatings], except as authorized herein."

37.     In violation of the License Agreement and Illinois law, Ocean Tomo has disclosed PatentRatings' Confidential Information (as defined in the License Agreement) to third parties. For example, on information and belief, Ocean Tomo has disclosed PatentRatings' Confidential Information to AnswerMine and other third-party software developers for the purpose of reverse

engineering the PatentRatings algorithms and developing similar algorithms and products based thereof for the benefit of Ocean Tomo, its affiliates, partners and customers.

38.     In addition, Ocean Tomo has breached the License Agreement and violated the law by using PatentRatings' Confidential Information (as defined in the License Agreement) to develop Ocean Tomo's own patent ratings system and related products for its own benefit and the benefit of its affiliates, partners and customers.  In or about August 2012, Ocean Tomo entered into a joint technology transfer service agreement with the Shenzhen United Property and Share Rights Exchange (UPEX) in China.  On information and belief, Ocean Tomo used or provided PatentRatings' Confidential Information to UPEX and thereby assisted UPEX to develop a rating system for Chinese patents and the creation of the US China IP 200™ Index based thereon.

39.     Moreover, as part of its scheme to misappropriate Confidential Information of PatentRatings, in or about September 2012, Ocean Tomo wrongfully accessed PatentRatings' computer servers located in Irvine, California and wrongfully copied Confidential Information and data contained on those servers and transferred the Confidential Information and data to its own servers for purposes of reverse engineering PatentRatings' algorithms and related software for Ocean Tomo's benefit.

**Ocean Tomo Wrongfully Interferes With PatentRatings'
Business Opportunity With NTT Data**

40.     Mr. Barney and PatentRatings had an expectation of entering into a license agreement with NTT Data, a Japanese company that had expressed interest in obtaining a license from PatentRatings to allow NTT Data to develop a patent ratings system for Japanese patents.

41.     In or about July 2012, Ocean Tomo interfered with Mr. Barney's and PatentRatings' business expectancy with respect to NTT Data by, among other things, falsely

representing to NTT Data that the prospective agreement contemplated by NTT Data, Mr. Barney, and PatentRatings would violate the License Agreement and a Supplemental License Agreement between Ocean Tomo and PatentRatings dated May 18, 2006 (the "Supplemental License Agreement") and, on information and belief, threatening to bring litigation against NTT Data if it concluded a license agreement with PatentRatings.

42.     The truth, as Ocean Tomo was well aware, is that the prospective business venture contemplated by NTT Data, Mr. Barney, and PatentRatings would not have violated the License Agreement, the Supplemental License Agreement, or any other agreement between Mr. Barney, PatentRatings, and Ocean Tomo.  Ocean Tomo nevertheless made its false representations to NTT Data, with the goal of destroying Mr. Barney's and PatentRatings' business opportunities, and furthering Ocean Tomo's scheme to destroy Mr. Barney and PatentRatings financially to that Ocean Tomo could steal the PatentRatings system and the underlying patents, data, algorithms and other valuable intellectual property.

**Ocean Tomo Diverts Profits Owed to Mr. Barney, Based**
**On False Accusations of Wrongdoing by Mr. Barney**

43.     In or about August 2012, Ocean Tomo purported to decide that, as a result of Mr. Barney's alleged noncompliance with Section 13.17 of the Operating Agreement, Mr. Barney would no longer be entitled to receive "all or any portion of the Dividend Allocation" attributable to Mr. Barney's ownership interest in Ocean Tomo.

44.     There is no factual basis for Ocean Tomo's purported findings that Mr. Barney breached Section 13.17 of the Operating Agreement.  Instead, that finding is founded upon false allegations, which Ocean Tomo knows are false, but nevertheless has made to further its goals of cheating Mr. Barney out of the benefits that he bargained for in 2004, and trying to destroy Mr.

Barney and PatentRatings financially so that Ocean Tomo can steal the PatentRatings system and associated intellectual property.

### COUNT I – BREACH OF CONTRACT
### (BY MR. BARNEY AGAINST OCEAN TOMO)

45.     Mr. Barney incorporates by reference the allegations in Paragraphs 1 through 44.

46.     Mr. Barney and Ocean Tomo entered into the Operating Agreement.

47.     Under the terms of the Operating Agreement, Ocean Tomo was required to allocate net profits other than "Net Profits From Operations" among the members of Ocean Tomo *pro rata* in accordance with their percentage interests.

48.     Ocean Tomo breached its obligations under the Operating Agreement by, among other things, treating the proceeds of the ICAP transaction as "Net Profits From Operations," and not allocating those proceeds among the members of Ocean Tomo *pro rata* in accordance with their percentage interests.

49.     In addition, in or about August 2012, Ocean Tomo breached the Operating Agreement by purporting to decide that, as a result of Mr. Barney's alleged noncompliance with Section 13.17 of the Operating Agreement, Mr. Barney would no longer be entitled to receive "all or any portion of the Dividend Allocation" attributable to Mr. Barney's ownership interest in Ocean Tomo.

50.     There is no factual basis for Ocean Tomo's purported findings that Mr. Barney breached Section 13.17 of the Operating Agreement.  Instead, those "findings" are founded upon false allegations, which Ocean Tomo knows are false.

51.     On information and belief, Ocean Tomo also has engaged in other misallocations of profits and losses that also violate the Operating Agreement and also have caused Mr. Barney to suffer damages.

52.     Ocean Tomo also has breached its obligations under the Operating Agreement (and under the Illinois Limited Liability Company Act) by refusing to provide Mr. Barney with access to the books and records of Ocean Tomo.

53.     Mr. Barney performed, or was excused from performing, all of his obligations under the Operating Agreement.

54.     As a result of Ocean Tomo's breaches of the Operating Agreement, and its oppression of Mr. Barney, Mr. Barney has suffered damages in an amount to be proven at trial, and is entitled to other relief under Illinois law.

### COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (BY MR. BARNEY AGAINST OCEAN TOMO)

55.     Mr.  Barney incorporates by reference the allegations in Paragraphs 1 through 44.

56.     In addition to the express provisions of the Operating Agreement, Ocean Tomo also owed obligations to Mr. Barney under the implied covenant of good faith and fair dealing. Under that implied covenant, Ocean Tomo is required to perform its obligations under the Operating Agreement fairly and in good faith, and to refrain from acting to deprive Mr. Barney of the benefits of the contract.

57.     Ocean Tomo breached the implied covenant of good faith and fair dealing by improperly treating the proceeds from the ICAP sale as "Net Profits From Operations" rather than as net profits other than "Net Profits From Operations."

58.     Ocean Tomo breached the implied covenant of good faith and fair dealing by purporting to decide that, as a result of Mr. Barney's alleged noncompliance with Section 13.17 of the Operating Agreement, Mr. Barney would no longer be entitled to receive "all or any

portion of the Dividend Allocation" attributable to Mr. Barney's ownership interest in Ocean Tomo.

59.     Ocean Tomo also breached the implied covenant of good faith and fair dealing by improperly refusing Mr. Barney's requests for access to the books and records of Ocean Tomo.

60.     Mr. Barney performed, or was excused from performing, all of his obligations under the Operating Agreement.

61.     Ocean Tomo also duties to Mr. Barney under the implied covenant of good faith and fair dealing relating to the Employment Agreement.  Ocean Tomo breached the implied covenant of good faith and fair dealing relating to the Employment Agreement by, among other things, creating intolerable working conditions and severe conflicts of interests with the goal of forcing Mr. Barney to "voluntarily" resign his employment from Ocean Tomo – which resignation Ocean Tomo intended to use as an excuse for depriving Mr. Barney of the significant benefits that Mr. Barney had been promised and was entitled to receive, including salary, benefits, and severance.

62.     Ocean Tomo's breaches of the implied covenant of good faith and fair dealing has caused Mr. Barney to suffer damages in an amount to be determined at trial.

## COUNT III – FRAUD
## (BY MR. BARNEY AND PATENTRATINGS AGAINST OCEAN TOMO)

63.     Mr.  Barney and PatentRatings incorporate by reference the allegations in Paragraphs 1 through 44.

64.     In order to induce Mr. Barney and PatentRatings to enter into the License Agreement and Equity Exchange Agreement, in 2004, Ocean Tomo made a number of representations to Mr. Barney, including: (a) a promise that Mr. Barney would be employed as a senior executive at Ocean Tomo, and would enjoy the salary and benefits commensurate with

that position; (b) a promise that Mr. Barney would receive over time additional equity units in Ocean Tomo; and (c) a representation that there were no contracts relating to the issuance, sale, or transfer of any equity securities of Ocean Tomo.

65. On information and belief, when it made the promises about Mr. Barney's employment as a senior executive and his receipt of additional equity units in Ocean Tomo, Ocean Tomo did not intend to perform them.

66. Moreover, when it made the representation that there were no contracts relating to the issuance, sale, or transfer of any equity securities of Ocean Tomo, Ocean Tomo was aware it was false.

67. Ocean Tomo made each of those promises and representations with the intent of inducing Mr. Barney and PatentRatings to rely upon them by, among other things, entering into the License Agreement and the Equity Exchange Agreements.

68. Mr. Barney and PatentRatings reasonably relied on those promises and representations by, among other things, entering into the License Agreement and the Equity Exchange Agreement.

69. Ocean Tomo's fraud has caused Mr. Barney and PatentRatings to suffer damages in an amount to be determined at trial.

### COUNT IV – BREACH OF CONTRACT
### (BY PATENTRATINGS AGAINST OCEAN TOMO)

70. PatentRatings incorporates by reference the allegations in Paragraphs 1 through 44.

71. In Paragraph 7.1 of the License Agreement, Ocean Tomo agreed that the "Licensed Technology contains certain confidential information, trade secrets, and know-how related to statistical patent analysis, mapping and valuation ("Confidential Information") that is

proprietary to [PatentRatings]. [Ocean Tomo] agrees to hold such Confidential Information in strict confidence, not to use it commercially for its own benefit or the benefit of anyone else, and not to use the Confidential Information for the purpose of developing or improving a product or method for anyone except [PatentRatings], except as authorized herein."

72.     In violation of the License Agreement, Ocean Tomo has disclosed PatentRatings' Confidential Information (as defined in the License Agreement) to third parties. For example, on information and belief, Ocean Tomo has disclosed PatentRatings' Confidential Information to AnswerMine and other third-party software developers for the purpose of reverse engineering the PatentRatings algorithms and developing similar algorithms and products based thereof for the benefit of Ocean Tomo, its affiliates, partners and customers.

73.     In addition, Ocean Tomo has breached the License Agreement by using PatentRatings' Confidential Information (as defined in the License Agreement) to develop Ocean Tomo's own patent ratings system and related products for its own benefit and the benefit of its affiliates, partners and customers. In or about August 2012, Ocean Tomo entered into a joint technology transfer service agreement with the Shenzhen United Property and Share Rights Exchange (UPEX) in China. On information and belief, Ocean Tomo used or provided PatentRatings' Confidential Information to UPEX and thereby assisted UPEX to develop a rating system for Chinese patents and the creation of the US China IP 200™ Index based thereon.

74.     Moreover, as part of its scheme to misappropriate Confidential Information of PatentRatings, in or about September 2012, Ocean Tomo wrongfully accessed PatentRatings' computer servers located in Irvine, California and wrongfully copied Confidential Information and data contained on those servers and transferred the Confidential Information and data to its

own servers for purposes of reverse engineering PatentRatings' algorithms and related software for Ocean Tomo's benefit.

75.    PatentRatings has performed, or has been excused from performing, all of its obligations under the License Agreement.

76.    As a result of Ocean Tomo's breaches of the License Agreement, PatentRatings has suffered damages in an amount to be determined at trial.

**COUNT V – TORTIOUS INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE
(BY MR. BARNEY AND PATENTRATINGS AGAINST OCEAN TOMO)**

77.    Mr.    Barney and PatentRatings incorporate by reference the allegations in Paragraphs 1 through 44.

78.    Mr. Barney and PatentRatings had a reasonable expectation of entering into a license agreement with NTT Data, a Japanese company that had expressed interest in obtaining a license from PatentRatings to develop a patent ratings system for Japanese patents.

79.    Ocean Tomo was aware of Mr. Barney's and PatentRatings' expectation of a license agreement with NTT Data.

80.    In or about July 2012, Ocean Tomo intentionally and maliciously interfered with Mr. Barney's and PatentRatings' business expectancy with respect to NTT Data by, among other things, falsely representing to NTT Data that the prospective license agreement contemplated by NTT Data, Mr. Barney, and PatentRatings would violate the License Agreement and a Supplemental License Agreement between Ocean Tomo and PatentRatings dated May 18, 2006 (the "Supplemental License Agreement") and threatening to bring legal action against NTT Data.

81.    The truth, as Ocean Tomo was well aware, is that the prospective business venture contemplated by NTT Data, Mr. Barney, and PatentRatings would not have violated the

License Agreement, the Supplemental License Agreement, or any other agreement between Mr. Barney, PatentRatings, and Ocean Tomo. Ocean Tomo nevertheless made its false representations to NTT Data, with the goal of destroying Mr. Barney's and PatentRatings' business opportunities, and furthering Ocean Tomo's scheme to destroy Mr. Barney and PatentRatings to that Ocean Tomo could steal the PatentRatings system.

82. As a result of Ocean Tomo's intentional, malicious, and unjustified interference, Mr. Barney's and PatentRatings' expectancy of a license agreement with NTT Data was terminated.

83. As a result of Ocean Tomo's tortious interference with their business expectancy, Mr. Barney and PatentRatings have suffered damages in an amount to be determined at trial.

### COUNT VI – VIOLATION OF 18 U.S.C. § 1030
### (BY PATENTRATINGS AGAINST OCEAN TOMO)

84. PatentRatings incorporates by reference the allegations in Paragraphs 1 through 44.

85. As part of its scheme to misappropriate Confidential Information of PatentRatings, in or about September 2012, Ocean Tomo wrongfully accessed PatentRatings' computer servers located in Irvine, California (the "Servers"), wrongfully copied Confidential Information and data contained on the Servers, and transferred the Confidential Information and data to its own servers for purposes of reverse engineering PatentRatings' algorithms and related software for Ocean Tomo's benefit.

86. The Servers were used in interstate commerce and constituted "protected computers" under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

87. Without authorization or by exceeding authorized access, Ocean Tomo intentionally accessed the Servers with the intent to defraud PatentRatings, and violated 18

U.S.C. § 1030(a)(5) by copying PatentRatings trade secrets and confidential information that was stored on the Servers and transferring the trade secrets and confidential information to its own servers for its own benefit and use.

88.     As a result of Ocean Tomo's violations of the Computer Fraud and Abuse Act, PatentRatings suffered damages in excess of $5,000.

## PRAYER FOR RELIEF

Jonathan Barney and PatentRatings respectfully request that this Court enter judgment in their favor and against Ocean Tomo, LLC with respect to all of Mr. Barney's and PatentRatings' claims, award damages to Mr. Barney and PatentRatings in an amount to be determined at trial, award punitive damages, award Mr. Barney and PatentRatings their attorneys' fees and expenses, compel Ocean Tomo to provide Mr. Barney with immediate access to the books and records of Ocean Tomo, and provide such other and further relief as is just and equitable.

Dated:  November 16, 2012                    JONATHAN BARNEY and
                                             PATENTRATINGS, LLC


                                             By: _/s/ David C. Layden_____
                                                 One of their attorneys


David C. Layden
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
(312) 840-7796 (fax)