IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

OCEAN TOMO, LLC,

            Plaintiff-Counter Defendant,

v.

JONATHAN BARNEY and
PATENTRATINGS, LLC,

           Defendants-Counter Plaintiffs.

No. 12 C 8450

JURY TRIAL DEMANDED

Hon. Joan B. Gottschall

## OCEAN TOMO, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS COUNTS I, III, IV AND V

### I.    INTRODUCTION

This Court has original subject matter jurisdiction over two claims alleged in this action pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* ("CFAA"), one brought by Ocean Tomo, LLC ("OT"), the other by Defendants Jonathan Barney ("Barney") and PatentRatings, LLC ("PR"; joint with Barney, "Defendants"). Defendants have also alleged four other claims that arise under state law, including claims for breach of contract and tortious interference with prospective economic advantage. Because there is no diversity among the parties,[1] this Court may only exercise supplemental jurisdiction over Defendants' remaining state law counterclaims if those claims are so related to the CFAA claims that they form part of the same case or controversy. In this case, they do not. Defendants' CFAA claim is limited in time and evidentiary scope to events in May 2013. Defendants allege that, at that time, OT dismantled certain computer servers and eliminated Defendants' access to the information

---

[1] Mr. Barney is a Member of both OT and PR and, therefore, all parties are citizens of California, which is Mr. Barney's domicile.

located on these servers. The discovery and evidence related to this claim will primarily be focused and limited to the following issues: who owned the servers, was OT's access to the servers authorized, did OT engage in any unauthorized conduct and have Defendants suffered any damage as a result. Defendants seemingly recognize the limited evidentiary scope of this claim. Of their recently served 117 document requests and 41 interrogatories, only one request relates to Defendants' CFAA claim.

In sharp contrast, the discovery and evidence related to Defendants' remaining state law claims is broader in both time and scope. Defendants allege breaches of four different agreements dating as far back as 2004. Significantly, the alleged conduct that supports Defendants' CFAA claims does not support any of their remaining claims. Simply put, there is no overlap between Defendants' CFAA and state law claims such that these claims should be tried together.

Because Defendants' CFAA claim arises from a different set of operative facts than their state law claims, this Court may not assert supplemental jurisdiction over those claims, and they should be dismissed pursuant to Federal Rules 12(b)(1) and 12(h)(3).

## II.    BACKGROUND

### A.    The Parties' Relationship

In 2000, Barney formed PR, which allegedly uses the PatentRatings system, a patent data, rating and analysis system that uses algorithms to assess the quality and relative value of patents and patent portfolios. [Docket No. 59, ¶¶ 6–7.] In 2004, PR and OT entered into negotiations for OT to license the PatentRatings system and ultimately entered into a License Agreement dated as of September 1, 2004 whereby, among other things, PR licensed to OT the right to use the PatentRatings system. (*Id.* ¶ 9.) At or around the same time that OT and PR entered into the License Agreement, OT and Barney entered into the Equity Exchange

-2-

Agreement dated as of December 31, 2004, whereby OT acquired 25% of the equity in PR from Barney, and Barney acquired equity in OT. (*Id.*) As a member of OT, Barney was party to an operating agreement, the current version of which is the Second Amended and Restated Operating Agreement of Ocean Tomo, LLC dated as of January 1, 2008 (the "Operating Agreement"). (*Id.* ¶ 11.) Barney also had an Employment Agreement with OT. (*Id.* ¶ 9.) Barney was employed by OT until February 2011, at which time he resigned from his employment. (*Id.* ¶ 24.)

### B. Ocean Tomo's Claims

This action began when OT filed an action against Barney in the Circuit Court of Cook County related to two discrete issues. [Docket No. 1.] The first issue relates to Barney's treatment of an OT-owned computer and the confidential information on that computer. [Docket No. 1-3, ¶¶ 47–83.] After Barney resigned his employment, OT made repeated demands that Barney return the OT-owned laptop that had been issued to him. (*Id.* ¶¶ 30–32.) Barney refused those demands. (*Id.*) When Barney finally returned the laptop, all of the information, including certain OT confidential information, had been permanently erased from the laptop. (*Id.* ¶¶ 33–35.) OT alleged claims arising out of Barney's conduct for breach of contract, breach of fiduciary duty, violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.*, conversion, and violation of the CFAA. (*Id.* ¶¶ 47–83.)

The second issue raised by OT's Complaint relates to Barney's interference with OT's prospective business relationship with a Japanese company, NTT Data. (*Id.* ¶¶ 84–98.) Ocean Tomo attempted to enter into a business arrangement with NTT Data for patent quality analysis software. (*Id.* ¶¶ 39–42.) Barney interfered with this relationship and prevented it from coming to fruition. (*Id.*) OT asserts a claim for tortious interference with prospective economic advantage and seeks declaratory relief related to Barney's misconduct. (*Id.* ¶¶ 84–98.)

### C.      Summary of the Counterclaims

Barney and PatentRatings removed this action to this Court based on the presence of Ocean Tomo's CFAA claim. [Docket No. 1.] Defendants subsequently asserted Counterclaims against Ocean Tomo. In the Counterclaims, Defendants assert five causes of action: 1) Breach of the Operating Agreement (Count I); 2) Breach of the Equity Exchange Agreement (Count III); 3) Breach of the License Agreement and the Supplemental License Agreement (Count IV); 4) Tortious Interference with Prospective Economic Advantage (Count V); and 5) Violation of the CFAA (Count VI).[2] [Docket No. 59.]

In Count I of Defendants' Counterclaims, Barney has asserted a claim for breach of the Operating Agreement. (*Id.* ¶¶ 53–63.) In particular, Barney alleges that OT breached its obligations under the Operating Agreement in the following ways: (i) by failing to allocate proceeds from OT's 2009 sale of a business named ICAP among the members of OT in accordance with their percentage interests; (ii) by deciding in or about August 2012 that Barney was no longer entitled to receive dividend allocations attributable to his ownership interest in OT due to his breach of Section 13.17 of the Operating Agreement; (iii) by engaging in other misallocations of profits and losses; (iv) by refusing to provide Barney with access to OT's books and records following Barney's resignation from OT in February of 2011; and (v) by improperly treating the proceeds from the business sale as "Net Profits from Operations" under the Operating Agreement so that those proceeds would not have to be allocated in accordance with members' ownership interests. (*Id.* ¶¶ 20–24, 47–52.)

In Count III, Barney asserts a claim for breach of the representations and warranties section of the Equity Exchange Agreement. (*Id.* ¶¶ 64–69.) Specifically, Barney alleges that OT

---

[2] The Court dismissed Barney's previous Count II (breach of good faith and fair dealing) and required Defendants to replead the claim as part of their breach of contract claim.

breached the Equity Exchange Agreement in 2004 by entering into a secret arrangement with Mike Lasinski under which OT allegedly promised to transfer a significant number of equity units in OT to Mr. Lasinski.  (*Id.* ¶¶ 33, 66.)

In Count IV, PR asserts a claim for breach of the License Agreement and the Supplemental License Agreement.  (*Id.* ¶¶ 70–77.)  PR alleges that OT has committed the following breaches of those agreements:  (i) disclosing PR's Confidential Information (as defined in Section 7.1 of the License Agreement) to third-party software developers for the purpose of reverse engineering PR's algorithms; (ii) using PR's Confidential Information to develop OT's own system for rating patents in concert with the Shenzhen United Property and Share Rights Exchange in China in or about August of 2012; (iii) using PR's Confidential Information to develop a statistical patent scoring system marketed under OT's brand; (iv) modifying PR's proprietary software platform by removing some or all of PR's branding and trademarks and replacing them with OT branding; and (v) using information taken from PR's computer servers in September, 2012 in order to reverse engineer PR's algorithms and related software for OT's benefit.  (*Id.* ¶¶ 36–37, 72–75.)

In Count V, Defendants assert a claim for tortious interference with prospective economic advantage with respect to Defendants' alleged expectation of entering into a licensing arrangement with the Japanese company NTT Data.  (*Id.* ¶¶ 78–84.)  Specifically, Defendants contend that OT committed tortious interference in or about July of 2012 in the following ways: (i) by falsely representing to NTT Data that the prospective licensing arrangement with Defendants would violate the License Agreement and the Supplemental License Agreement; (ii) by threatening to bring legal action against NTT Data; and (iii) by inducing NTT Data to violate its nondisclosure agreement with PR.  (*Id.* ¶ 49, 81.)

CHICAGO/#2508892.8

Finally, in Count VI, PR alleges that OT violated the CFAA in or about May of 2013 by accessing PR's computer servers, copying Confidential Information and data contained on those servers, and transferring PR's Confidential Information and data to OT's own servers for its use and benefit.  (*Id*. ¶¶ 85–88.)

## III.   LEGAL STANDARD

### A.   When Jurisdiction Is Lacking, This Court May Dismiss Pursuant to Federal Rules 12(b)(1) or 12(h)(3)

Under Federal Rule 12(b)(1), a motion to dismiss may raise the Court's lack of subject matter jurisdiction.  *MaClean-Fogg Co. v. Edge Composites, L.L.C.*, 08 C 6367, 2009 WL 1010426, at *1 (N.D. Ill. Apr. 14, 2009).  Furthermore, "Rule 12(h)(3) not only allows, but requires a court to dismiss an action '[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.'"  *Thomas v. Spencer W. Schwartz & Assocs., P.C.*, No. 94 C 5114, 1996 WL 277616, at *2 (N.D. Ill. May 21, 1996) *citing* Fed. R. Civ. P. 12(h)(3).  While well-pleaded allegations are accepted as true, "motions to dismiss for lack of subject matter jurisdiction…may rely on evidence outside the pleadings."  *Id*. (citing, *inter alia*, *Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999)).  "Plaintiffs bear the burden of establishing jurisdiction and proper venue."  *Id*. (citing *Purdue Research Found.*, 338 F.3d 773, 782 (7th Cir. 2003)).  Flaws in subject matter jurisdiction cannot be waived by the actions of the parties and can be raised at any time.  *Airport Surface Techs., L.L.C.*, 268 F. Supp. 2d 999, 1003 (N.D. Ill. 2003) (citing *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)).

**B.      Defendants' State Law Claims Must Arise from the Same Set of Operative Facts as Defendants' CFAA Claim in Order for This Court to Exercise Supplemental Jurisdiction**

"Federal courts are courts of limited jurisdiction." *Thomas v. Spencer W. Schwartz & Assocs., P.C.*, No. 94 C 5114, 1996 WL 277616, at *1 (N.D. Ill. May 21, 1996) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)).  "There is no right to 'make a federal case' out of every claim for relief."  *Id.*  "A plaintiff may bring a suit in federal court only if a Congressional statute authorizes the federal courts to hear that type of suit.  In other words, a federal district court may only entertain a lawsuit if that federal court has subject matter jurisdiction."  *Id.*

28 U.S.C. § 1367(a), provides that "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  *Spaulding Moving & Storage, Inc. v. Nat'l Forwarding Co., Inc.*, No. 07 C 4095, 2008 WL 781929, at *1 (N.D. Ill. Mar. 20, 2008).  "Accordingly, the court's judicial power to 'hear both state and federal claims exists where the federal claim has sufficient substance to confer subject matter jurisdiction on the court, and the state and federal claims derive from a common nucleus of operative facts.'"  *Thomas*, 1996 WL 277616, at *1 (citing *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995)).  "If the Court determines that the state and federal claims do not involve a common nucleus of operative facts, the court must dismiss the purported supplemental claims, as it is without the power to hear such claims."  *Id.* (citing *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969)).

"The burden is on [the claimant] to establish that there is supplemental jurisdiction over the counterclaim."  *Spaulding Moving & Storage*, 2008 WL 781929, at *2.  Even if the

requirement is met, "it is still within the district court's discretion as to whether or not to exercise supplemental jurisdiction." *Id*. at *2.

Here, the basis for this Court's jurisdiction arises pursuant to 28 U.S.C. § 1311 (federal question jurisdiction) as a result of the parties' respective CFAA claims. Defendants, however, have asserted a wide array of state law claims, some of which rely on events that occurred in 2004 and none of which are related to either party's CFAA claim.

If Defendants had asserted their state law claims independently, there would be no basis for this Court to exercise subject matter jurisdiction over those claims. Thus, in order for this Court to exercise jurisdiction over Defendants' state law claims, Defendants must establish that those claims arise from the same set of operative facts as its CFAA claim.

## IV.    ARGUMENT

### A.    Defendants' State Claims Plainly Arise from Different Operative Facts Than Its Single Federal Claim

Of the five claims asserted by Defendants, four of them arise under state law. These four claims are factually distinct from Defendants' lone federal claim. The state law claims arise out of disputes regarding the inception of the parties' business relationship in 2004 and various alleged breaches between 2004 and 2012. Conversely, Defendants' CFAA claim pertains to OT's allegedly wrongful access of computer servers in or about May of 2013.

Specifically, three of the state law claims contained in the Counterclaims involve alleged breaches of four different contracts between the parties: 1) the Operating Agreement; 2) the Equity Exchange Agreement; 3) the License Agreement; and 4) the Supplemental License Agreement. Establishing these contractual claims, and the defenses thereto, will be limited to 1) interpretation of the agreements themselves; 2) to the extent the terms of the contracts are deemed ambiguous, the negotiations of the agreements and other relevant past conduct of the

CHICAGO/#2508892.8

parties; 3) the parties' respective performance and/or non-performance of their obligations thereunder; and 4) the extent to which the respective parties have been damaged by any breaches.

With respect to Barney's claim for breach of the Operating Agreement, the operative facts are limited in time by the allegations of Defendants' Counterclaims. These begin with the negotiations which led to Barney becoming a member of OT through the Equity Exchange Agreement dated September 1, 2004, which also made him a party to the Operating Agreement. [Docket No. 59, ¶¶ 9, 11.] Defendants allege that OT breached the Operating Agreement at the following times: (1) following OT's sale of ICAP in 2009, (*Id.* ¶ 20); (2) following Barney's resignation in February 2011 when OT allegedly refused Barney access to OT's books and records, (*Id.* ¶¶ 27–30); and (3) in August 2012 when OT allegedly decided Barney was no longer entitled to receive dividends. (*Id.* ¶ 51.)

With respect to Barney's claim for breach of the Equity Exchange Agreement, Defendants' allegations indicate that the operative facts are limited to the negotiation of the Equity Exchange Agreement executed on or around September 1, 2004, as Defendants' allege that certain of the representations and warranties contained in the contract were untrue. (*Id.* ¶¶ 9, 33, 66.)

With respect to PR's claim for breach of the License Agreement and Supplemental License Agreement, the Counterclaims indicate that the operative facts relate to the following time periods: (1) August 2012 when OT allegedly entered into an agreement with Shenzen United Property and Share Rights Exchange, (*Id.* ¶ 39); and (2) September of 2012 when OT allegedly accessed PR's servers to copy Confidential Information. (*Id.* ¶ 37.)

The other state law claim asserted in the Counterclaims is a claim for tortious interference with prospective economic advantage. In this claim, Defendants contend that OT interfered with

Defendants' prospective licensing arrangement with a Japanese company called NTT Data by "falsely representing to NTT Data that the prospective license agreement contemplated by NTT Data, Mr. Barney, and [PR] would violate the License Agreement and [the Supplemental License Agreement,] threatening to bring legal action against NTT Data [and by inducing NTT Data to provide to OT] copies of confidential written communications between NTT data and [PR]." [Docket No. 59, ¶ 81.]

The operative facts out of which these claims arise are unrelated to Defendants' claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. In this count, Defendants allege that OT wrongfully accessed "computer servers and related hardware (the "Servers") located in the Irvine California data center that housed the PatentRatings system [and] dismantled and permanently removed those Servers without authorization, and over the strong objections of [PR]." (*Id.* ¶ 86.) The operative facts out of which this claim arises are straightforwardly limited to 1) what action, if any, OT took with respect to the servers and 2) whether or not any such action was wrongful. Furthermore, Defendants' CFAA claim is remote in time from the state law claims, as it is based upon OT's alleged actions in May 2013, as opposed to the alleged contractual breaches, which are alleged to have taken place, variously, in 2004, 2009, 2001, and 2012. (*Id.* ¶ 86.)[3]

In light of the narrow factual scope of Defendants' lone federal claim, coupled with its remoteness in time from Defendants' state law claims, Defendants' CFAA claim arises from different operative facts than the state law claims, and supplemental jurisdiction cannot be exercised over those state law claims. *See Thomas v. Spencer W. Schwartz & Assocs., P.C.*, No.

---

[3] There is also no evidentiary overlap between Defendants' state law claims and Ocean Tomo's CFAA claim, which relates solely to Barney's deletion of information from the Ocean Tomo-owned laptop.

94 C 5114, 1996 WL 277616, at *2 (N.D. Ill. May 21, 1996) (holding that federal and state claims involved "time periods and fact scenarios too attenuated and unrelated to form the same case or controversy" where the time frames for the different claims were distinct).

*MaClean-Fogg* is instructive here. In that case, the plaintiffs sued two defendants for patent infringement, breach of contract, and violation of the Illinois Trade Secrets Act in the Northern District of Illinois. *MaClean-Fogg*, 2009 WL 1010426, at *1. The plaintiffs alleged that the corporate defendant's manufacture and sale of a carbon fiber bicycle wheel infringed plaintiffs' patent, and that one of plaintiffs' former employees had violated a confidentiality agreement and disclosed trade secrets after he left plaintiffs to join the corporate defendant. *Id*. The former employee defendant moved to dismiss pursuant to Rule 12(b)(1), arguing that the Northern District did not have supplemental jurisdiction over the state law claims. *Id*. at *3.

While the plaintiffs argued that there was sufficient factual overlap between the patent infringement and state law claims, the court disagreed, citing the clear disconnect between the allegations supporting the patent claim and those supporting the state law claims:

> Plaintiffs allege the state law claims derive from Defendants' activities in manufacturing, selling, and/or offering to sell wheels. The patent infringement claim alleges [the corporate defendant] manufactures and sells carbon fiber wheels that infringe the [patent at issue]. The state law claims allege [the] former employee [defendant], who is now a member of [the corporate defendant's] management, disclosed confidential information as defined by the confidentiality agreement, and the confidential information are protected trade secrets.

*Id*. (citations and quotations omitted).

Ultimately, the court found that the plaintiffs had provided "no basis to support a conclusion that [the information allegedly disclosed and the misappropriated trade secrets] relates to [the corporate defendant's] purported infringement of the [patent at issue], or that the claims involve overlapping operative facts." *Id*. Finding that the plaintiffs had failed to establish supplemental jurisdiction over the state law claims, the court dismissed those claims. *Id*. *See*

-11-

*also Scovill Mfg. Co. v. Dateline Elec. Co., Ltd.*, 319 F. Supp. 772, 776–77 (N.D. Ill. 1970) (holding that state and federal claims were not sufficiently connected, noting that there "are no common elements of proof in establishing a right of recovery for trademark infringement arising out of conduct occurring in Chicago in January, 1970, and damages incident to a breach of contract occurring in October, 1969, in England, Connecticut or New York"); *Thomas*, 1996 WL 277616, at *2.

Similarly, the operative facts forming the basis for Defendants' CFAA claim are straightforward: Defendants allege that in May, 2013 OT wrongfully dismantled computer servers in Irvine, California and removed Defendants' Confidential Information. These allegations are completely distinct from those underpinning Defendants' state law claims for breach of contract and tortious interference, many of which relate to events occurring nearly 10 years ago.

A trial involving the parties' respective CFAA would be limited and focused. The evidence related to OT's CFAA claim would relate to Barney's misconduct in connection with the OT-owned laptop. The evidence related to Defendants' CFAA would relate to OT's access of the servers in May 2013. In contrast, the evidence related to Defendants' state law claims would relate to at least the following:

- The negotiation of the Equity Exchange Agreement in 2004;

- The accounting and profit allocation, if any, in connection with OT's sale of ICAP in 2009;

- OT's decision in 2012 that Barney was no longer entitled to receive profit distributions as a result of his disclosure of OT's confidential information and breach of his contractual and fiduciary duties to OT;

- Barney's right to access OT's books and records and whether he was wrongfully denied access to those records in 2011;

- OT's accounting procedures and standards for the allocation of Net Profits from Operations;

- Whether OT has attempted to "reverse engineer" the PatentRatings product and whether OT has used Defendants' confidential information to do so; and

- Whether Defendants had a reasonable expectation to entering into a business relationship with NTT Data and, if so, whether OT tortiously interfered with that expectation.

Simply put, the operative facts underpinning Defendants' state law and CFAA claims do not overlap, and as such, this Court may not assert supplemental jurisdiction over Defendants' state law claims, and those claims should be dismissed.[4]

### B.  Defendants' Discovery Confirms that the Federal Claims Arise Out of a Different Set of Operative Facts from the State Law Claims

The discovery propounded by Defendants in this case highlights the factually distinct nature of Defendants' CFAA claim from their state law claims.  On October 25, 2013, both Barney and PR served Interrogatories and Requests for Production on OT.  True and correct copies of Barney's First Set of Interrogatories, Barney's First Set of Requests for Production, PR's First Set of Interrogatories and PR's First Set of Requests for Production are attached hereto as **Exhibit A**, **Exhibit B**, **Exhibit C** and **Exhibit D,** respectively.

All told, Defendants propounded forty-one (41) Interrogatories and one hundred seventeen (117) Requests for Production upon OT.  Aside from being numerous, many of Defendants' discovery requests are remarkably broad and far reaching.[5]  For example, Barney has requested the following documents from OT:  1) minutes of all meetings of OT's members and written consents for any action by OT's members without a meeting (Ex. B ¶ 26); 2) all

---

[4] There is no doubt that Defendants could bring these claims in state court.  In fact, Defendants already have breach of contract claims pending against Ocean Tomo in the action captioned, Ocean Tomo, LLC v. PatentRatings, LLC, No. 12 CH 07704, currently pending in the Circuit Court of Cook County.  A copy of Defendants' Counterclaim in the Cook County action is attached as **Exhibit E**.

[5] For the avoidance of doubt, by referencing the breadth of Defendants' discovery, OT does not waive its right to object to Defendants' discovery on any grounds.

"minutes, memoranda, notes, resolutions, or other documents relating to any [OT] Board of Managers meetings or actions occurring in the time period from June 30, 2004 to the present that relate to any of the allegations contained in the Complaint or the Counterclaim" (Ex. B ¶ 27); 3) "[w]ritten terms and conditions of any secured or unsecured loans or loan guarantees made by any [OT] Member to [OT]" (Ex. B ¶ 28); 4) OT's "federal, state and local income tax returns and reports, if any, for the three (3) most recent years, including Form K-1's issued to each [OT] Member" (Ex. B ¶ 31); and 5) "[m]inutes of every meeting of the Managers or written consents for any actions taken by the Managers without a meeting." (Ex. B ¶ 33.) By way of interrogatory, Defendants also asked OT to 1) "[i]dentify and describe all revenues, profits, losses, or gains realized by [OT] or any Member of [OT] from or in connection with any transaction occurring in the time period from 2009 to the present involving the sale, distribution or disposal of any asset, business, equity interest, profit interest, or debt interest owned or controlled at any time by [OT] or any affiliate or subsidiary of [OT]" (Ex. A ¶ 4); 2) "[i]dentify each and every [OT] executive who has participated in discussions and/or decision-making related to the acts and events alleged in the Complaint and the Counterclaim" (Ex. C ¶ 6); and 3) to "[i]dentify by date, place, topic, and attendees all meetings of [OT's] executives that occurred, either in-person or by telephone, during the time period from 2010 to the present during which any discussions took place or any decisions were made concerning or affecting [PR and/or Barney]." (Ex. C ¶ 7.)

Of Defendants' one hundred fifty-eight (158) discovery requests, many of which are extremely broad and arguably overreaching, it appears that only a single request for the production of documents was specifically geared towards proving Defendants' federal CFAA claim. Specifically, PR requested documents "constituting, relating to, or referencing any

communications, discussion, plan, or decision whether to access and copy data and information from [PR's] computer servers or data storage devices located in Irvine, California (including any computer servers or data storage devices that [OT] contends it owns), including but not limited to in or about September 2012." (Ex. D ¶ 12.) None of Defendants' one hundred fifty-seven (157) other discovery requests was specifically directed towards proving the federal claim. This aptly demonstrates that Defendants' CFAA claim arises from a small set of operative facts distinct from Defendants' broader state claims, the latter of which constitute the vast majority of facts put at issue in Defendants' Counterclaims.

**V.    CONCLUSION**

  For all the foregoing reasons, OT respectfully requests that this Court grant its Motion to Dismiss Counts I, III, IV and V of Defendants' Counterclaims with prejudice.

Dated: November 13, 2013     Respectfully submitted,

                 OCEAN TOMO, LLC

                 By:   s/ Jeremy R. Heuer
                   One of Its Attorneys

M. Derek Zolner
Jeremy R. Heuer
Rachel T. Copenhaver
Vedder Price P.C.
222 North LaSalle Street
Suite 2600
Chicago, IL 60601-1003
T: (312) 609-7500
F: (312) 609-5005
dzolner@vedderprice.com
jheuer@vedderprice.com
rcopenhaver@vedderprice.com

CHICAGO/#2508892.8

## CERTIFICATE OF SERVICE

I, Jeremy R. Heuer, an attorney, hereby certify that on November 13, 2013, I caused to be electronically filed the foregoing OCEAN TOMO, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS COUNTS I, III, IV AND V with the Clerk of the Court using the Court's Case Management/Electronic Case Files (CM/ECF) system, which will send notifications of such filing to the following counsel of record:

David C. Layden                         DLayden@jenner.com


                                        /s/ Jeremy R. Heuer

CHICAGO/#2508892.8