UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OCEAN TOMO, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 8450 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| JONATHAN BARNEY and | ) | |
| PATENTRATINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION & ORDER**

Ocean Tomo, LLC sued its former managing director, Jonathan Barney, and his company, PatentRatings, LLC, for claims arising out of Barney's alleged failure to return a laptop computer after he left the company in 2011. Barney asserted state-law counterclaims for breach of contract and tortious interference, alleging that Ocean Tomo failed to pay Barney his proper share of Ocean Tomo's profits, disclosed Barney's confidential patent-rating system to third parties, and refused Barney access to Ocean Tomo's books and records. He also asserted a federal claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* (the "CFAA"), alleging that Ocean Tomo intentionally accessed his computers without permission.

Ocean Tomo has moved to dismiss Barney's state-law counterclaims, arguing that the court lacks supplemental jurisdiction over them. For the reasons stated below, the motion to dismiss is denied.

**I. BACKGROUND**

Jonathan Barney was a former managing director of Ocean Tomo, a Chicago-based "Intellectual Capital Merchant Banc firm" that provides "financial products and services related to expert testimony, valuation, investments, risk management, and transactions throughout the

United States and overseas." (Am. Compl. ¶ 11, ECF No. 1-3.) Ocean Tomo hired Barney in 2004 so that it could use a system Barney had developed to rate the value of patents. When he was hired, Barney became a "member" of Ocean Tomo, meaning that he held equity in the firm and was a party to the firm's operating agreement.

The operating agreement governed how profits and losses would be allocated among Ocean Tomo's members. According to Barney, the agreement provided that Ocean Tomo's board of managers had discretion to allocate 75% of Ocean Tomo's "net profits from operations." The remaining 25% "net profits from operations" were to be allocated pro rata in accordance with each member's ownership interest. Other profits not constituting "net profits from operations" were also to be allocated pro rata.

According to Barney, he soon learned after joining Ocean Tomo that the environment at the company was "rife with conflict, back-biting, and shady business and accounting practices." (Second Am. Countercls. ¶ 17, ECF No. 59-1.) He alleges that Ocean Tomo attempted to freeze him out, deprive him of certain benefits he had been promised, and destroy him financially so that Ocean Tomo could steal his patent-ratings system.

For example, in 2009, Ocean Tomo sold one of its businesses to a third party. Barney alleges that the profits from that sale, which totaled approximately $10 million, constituted profits other than "net profits from operations" and thus were required to be distributed among members like Barney pro rata in accordance with their ownership interests. But Ocean Tomo treated the profits as "net profits from operations," so Barney did not receive a share of the profits equal to his pro rata share. He alleges that Ocean Tomo engaged in these "shady accounting practices" on at least three separate occasions.

By February 2011, Barney claims that the working environment at Ocean Tomo became so intolerable that he had no choice but to resign. After he did so, Ocean Tomo sued Barney in state court, alleging that he had breached various agreements by failing to return his laptop computer. Ocean Tomo also brought a federal claim against Barney under the CFAA, which prohibits, among other things, "intentionally access[ing] a computer without authorization . . . and thereby obtain[ing] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(c).

Barney removed the case to this court based on the federal claim. He then filed counterclaims against Ocean Tomo, including a claim under the CFAA, alleging that Ocean Tomo had "intentionally, and without authorization, accessed computer servers and related hardware . . . located in the Irvine, California data center that housed the PatentRatings system." (Second Am. Countercls. ¶ 86.) He also asserted four state-law counter-claims, comprising Counts I, III, IV, and V of his second amended counterclaims.

In brief, Count I asserts that Ocean Tomo breached the operating agreement by failing to pay Barney his proper share of the company's profits, by refusing to provide him with access to the books and records of Ocean Tomo after he resigned, and by deciding that he would no longer be entitled to receive dividend allocations after he left the company.

Count III asserts that Ocean Tomo breached an equity exchange agreement between Ocean Tomo and Barney. In that agreement, Ocean Tomo represented that there were "no [c]ontracts relating to the issuance, sale, or transfer of any equity securities of [Ocean Tomo]." (Second Am. Countercls. ¶ 32.) Barney alleges that, in fact, Ocean Tomo had a "secret agreement" with a man named Michael Lasinski under which Ocean Tomo had promised to transfer a significant number of shares in Ocean Tomo to Mr. Lasinski.

Count IV asserts that Ocean Tomo misappropriated PatentRatings' confidential information in violation of a license agreement between Ocean Tomo and PatentRatings. That agreement required Ocean Tomo to hold PatentRatings' confidential information "in strict confidence" and "not to use it commercially for its own benefit." (*Id.* ¶ 36.) Barney alleges that, in September 2012, Ocean Tomo accessed PatentRatings's computer servers and copied its confidential information to "reverse engineer[] PatentRatings'[s] algorithms and related software and to create its own competing patent rating system" in violation of the license agreement. (*Id.* ¶ 37.) He further alleges that Ocean Tomo disclosed PatentRatings's algorithm to various third-party software developers so that they could reverse engineer the algorithms for Ocean Tomo's benefit.

Finally, Count V asserts that Ocean Tomo tortiously interfered with Barney's prospective business relationship with a Japanese company, NTT Data. Barney says that he expected to sign an agreement with NTT Data and that Ocean Tomo falsely represented to NTT Data that the prospective agreement would violate the license agreement between Ocean Tomo and PatentRatings.

Ocean Tomo moved to compel arbitration or, alternatively, to dismiss certain of Barney's counterclaims. This court denied the motion to compel arbitration but granted the motion to dismiss, with leave to amend. *See Ocean Tomo, LLC v. Barney*, No. 12 C 8450, 2013 WL 4804980 (N.D. Ill. Sept. 9, 2013). Barney then amended his counterclaims to comply with the court's order.

Ocean Tomo now moves to dismiss Counts I, III, IV, and V of Barney's second amended counterclaims under Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3), arguing that the court lacks supplemental jurisdiction over those claims.

## II. LEGAL STANDARD

Under Rule 12(b)(1), the court must dismiss a claim if it lacks subject-matter jurisdiction over it. To survive a Rule 12(b)(1) motion to dismiss, the party bringing the claim bears the burden of establishing that the court has jurisdiction. *United Phosphorous, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (en banc), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc). The court takes the allegations in the claim as true, viewing all facts and any reasonable inferences in the light most favorable to the party bringing the claim. *See, e.g.*, *Scott Air Force Base Props. v. Cnty. of St. Clair, Ill.*, 548 F.3d 516, 519 (7th Cir. 2008). The standard for a Rule 12(b)(1) motion to dismiss differs from that governing a Rule 12(b)(6) motion only in that the court "'may properly look beyond the jurisdictional allegations of the [claim] and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (quoting *Evers v. Astrue*, 563 F.3d 651, 656-57 (7th Cir. 2008) (additional citations omitted)).

Rule 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

## III. ANALYSIS

Because federal courts are courts of limited jurisdiction, Barney's state-law counterclaims do not automatically fall within the court's original jurisdiction. For this court to have jurisdiction over these claims, they must fall within the court's supplemental jurisdiction. District courts, in their discretion, have supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Thus, a federal court may exercise supplemental

5

jurisdiction where the state and federal claims derive from a "common nucleus of operative facts." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). The Seventh Circuit has held that "[a] loose factual connection between the claims is generally sufficient" to satisfy § 1367(a). *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995).

In *Royal Towing, Inc. v. City of Harvey*, 350 F. Supp. 2d 750 (N.D. Ill. 2004), the plaintiffs alleged that after they supported the City of Harvey's former mayor during his failed reelection attempt, the new mayor retaliated against them by denying their towing company a contract with the city. *Id.* at 752. The plaintiffs argued that the mayor's actions violated their civil rights under federal law. *Id.* One of the plaintiffs also filed a claim against the new mayor, alleging that the mayor played a role in denying him pension benefits. *Id.* The plaintiff brought that claim under state law, and the mayor moved to dismiss, arguing that the state and federal claims did not derive from a common nucleus of operative fact. *Id.*

In denying the motion to dismiss, the court noted that the federal and state claims were bound by "claims of retaliation and enmity between the new Harvey administration and [the] plaintiff." *Id.* at 754. The court found that the mayor's retaliatory motive was "directly relevant" to both claims. *Id.* Because the claim of retaliation was an "operative fact" in each count, the court concluded that the counts "derive[d] from a common nucleus of operative facts" and that it could therefore exercise supplemental jurisdiction. *Id.* at 755. The court noted that "for supplemental jurisdiction to exist, the state and federal claims need not repeat the same grounds for recovery." *Id.* at 754. And it rejected the mayor's argument that the temporal relationship between the state and federal claims was too distant, recognizing that "[w]hen there are allegations of an ongoing pattern of hostilities that occurs over a period of time, an extended temporal relationship is to be expected." *Id.* at 755.

6

*Adams Street Joint Venture v. Harte*, 231 F. Supp. 2d 759 (N.D. Ill. 2002) also involved a challenge to the court's supplemental jurisdiction over state-law counterclaims. In that case, the plaintiffs sued their former accountant, alleging that he wrongfully diverted more than $400,000 of their funds for his personal use in violation of federal law. *Id.* at 760. The accountant filed three counterclaims, alleging that (1) the plaintiffs breached their severance agreement with him by terminating his benefits after they discovered the accountant's alleged wrongdoing, (2) the plaintiffs owed him unpaid bonuses, and (3) the plaintiffs beached a separate contract by not paying him for work done on their behalf. *Id.* at 761. The plaintiffs moved to dismiss the counterclaims on subject-matter jurisdiction grounds.

As in *Royal Towing*, the *Adams Street* court denied the motion to dismiss. *Id.* at 763. The court found that the accountant's counterclaims "center[ed] around [the accountant's] failure to receive payment for the work he did prior to his resignation" and therefore "necessarily involve[d] an inquiry into [his] behavior during his period of employment with the plaintiffs." *Id.* The plaintiffs' and the defendant's claims "require[d] the [c]ourt to examine the nature of the relationship between [the accountant] and his employers." *Id.* Recognizing that it was possible that the plaintiffs "believed [the accountant's] allegedly wrongful diversion of money excused them from honoring their contractual obligations," the court found that the plaintiffs' federal claim and the defendant's counterclaims "both stem[med] from a common nucleus of operative facts." *Id.* (internal citations omitted).

In this case, Ocean Tomo argues that Barney cannot even establish the kind of "loose factual connection between the claims" that existed in *Royal Towing* and *Adams Street*. It argues that Barney's state counterclaims are "factually distinct" from the parties' federal CFAA claims. For example, Barney's CFAA claim, Ocean Tomo argues, is limited to "(1) what action, if any,

7

[Ocean Tomo] took with respect to the servers and (2) whether or not any such action was wrongful." (Pl.'s Br. 10, ECF No. 63.) The state-law claims, by contrast, involve contract negotiations that took place in 2004; alleged breaches of those contracts that took place throughout Barney's seven-year employment; and the harm suffered by Barney as a result of those breaches. Thus, Ocean Tomo argues, "[i]n light of the narrow factual scope of [Barney's] lone federal claim, coupled with its remoteness in time from [Barney's] state law claims, Defendants' CFAA claim arises from different operative facts than the state law claims . . . ." (*Id.* at 10.)

The court disagrees. To be sure, Barney's state claims involve a broader set of facts than the parties' more narrow CFAA claims. But the factual connection between the state and federal claims does not appear to be any looser than the connections found to be sufficient in *Royal Towing* and *Adams Street*. As Barney points out, whether Ocean Tomo's access of PatentRatings's was "authorized" or undertaken with "intent to defraud" is relevant to his CFAA claim. To prove that Ocean Tomo accessed the computers with intent to defraud, Barney intends to present evidence of Ocean Tomo's "long-running and continuing scheme by Ocean Tomo to steal the PatentRatings System"—evidence that would also be relevant to Barney's state claims. (Defs.' Br. 13, ECF No. 67.) Thus, as in *Royal Towing*, Ocean Tomo's alleged motive is relevant to both the federal and state claims. And, as in *Adams Street*, both the federal and the state claims will "require the [c]ourt to examine the nature of the relationship between [Barney] and his employer[]." 231 F. Supp. 2d at 763. That connection was sufficient to satisfy the common nucleus of operative facts test in *Royal Towing* and *Adams Street*, and the court finds the connection to be sufficient here as well.

Ocean Tomo disputes that its alleged scheme to defraud Barney is relevant to Barney's CFAA claim, arguing that (i) Barney has not alleged a claim pursuant to the "intent to defraud" prong of the CFAA; and (ii) any alleged scheme is irrelevant to whether Ocean Tomo's access was "authorized" under the CFAA. With respect to the first argument, although Ocean Tomo asserts that Barney's CFAA claim is limited to §§ 1030(a)(2)(C) and 1030(a)(5)(C) of the CFAA, which do not require an intent to defraud, the counterclaims themselves do not include any such limitation. The counterclaims cite § 1030 generally, and Barney's response brief suggests that he *does* plan to argue that Ocean Tomo violated § 1030(a)(4) of the CFAA, which does require an intent to defraud.

With respect to the second argument, the court disagrees with Ocean Tomo that its allegedly fraudulent scheme is irrelevant to whether Ocean Tomo's access was "authorized" under the CFAA. As Ocean Tomo acknowledges, the authorization inquiry turns in part on the parties' license agreement, which specifies under which conditions Ocean Tomo may access PatentRatings's confidential information. One of those conditions is that Ocean Tomo was "not to use [PatentRatings's confidential information] commercially for its own benefit or the benefit of anyone else, and not to use [it] for the purpose of developing or improving a product or method for anyone except [PatentRatings] . . . ." (Second Am. Countercls. ¶ 71.) Thus, if Barney's allegations are true that Ocean Tomo accessed PatentRatings's computer servers as part of a fraudulent scheme to steal PatentRatings's confidential information and then disclose it third-party software developers, then such a use would appear to be "unauthorized."

Because Barney alleges a continuous, fraudulent scheme, the cases cited by Ocean Tomo are distinguishable. In *Maclean-Fogg Co. v. Edge Composites, L.L.C.*, No. CIV.A. 08 C 6367, 2009 WL 1010426 (N.D. Ill. Apr. 14, 2009), the plaintiffs owned a patent for composite rim

9

bicycle wheels. *Id.* at *1. When their former employees began selling composite rim bicycle wheels themselves, the plaintiffs sued their former employees for patent infringement under federal law. *Id.* They also asserted state claims for breach of contract and violation of the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. 1065/1, *et seq. Id.* The state-law claims were based on a theory that the former employees had disclosed confidential information to third parties. *Id.* at *3. In holding that the court lacked supplemental jurisdiction over the state claims, the court noted that the plaintiffs had "provide[d] no basis to support a conclusion that [the confidential information] relates to [the] purported infringement of the . . . patent[,]" so the federal and state claims shared no operative facts. *See id.* at *3. Here, by contrast, the federal and state claims are linked because Ocean Tomo's alleged motive is the same for both claims.

Similarly, in *Thomas v. Spencer W. Schwartz & Assocs., P.C.*, 94 C 5114, 1996 WL 277616 (N.D. Ill. May 21, 1996), the court found that the plaintiff's claim that her employer failed to pay her overtime wages in violation of the Fair Labor Standards Act and her claim that she was retaliated against for filing a worker's compensation claim "involve[d] time periods and fact scenarios too attenuated and unrelated to form the same case or controversy." *Id.* at *2. Again, however, the plaintiff did not allege that the employer failed to pay overtime and retaliated against the plaintiff for the same reason. *See id.*

Finally, Ocean Tomo cites two cases in its reply brief where district courts in other circuits have declined to exercise supplemental jurisdiction over state-law claims based on an asserted relationship with a CFAA claim. *See Dedalus Found. v. Banach*, No. 09 CIV. 2842 (LAP), 2009 WL 3398595 (S.D.N.Y. Oct. 16, 2009); *Zurich Am. Ins. Co. v. Bowman*, No. 2:10-CV-00988-RLH, 2010 WL 5239239 (D. Nev. Dec. 16, 2010). In both of those cases, however, the courts acknowledged that the CFAA claims and the state claims *did* form part of the same

10

case or controversy. *See Dedalus*, 2009 WL 3398595, at *4 ("Here, the Court could assert supplemental jurisdiction over Dedalus's state law claims because they are part of the same case or controversy as the federal CFAA claim."); Zurich, 2010 WL 5239239, at *2 (D. Nev. Dec. 16, 2010). In declining to exercise supplemental jurisdiction, the courts were exercising their discretion under 28 U.S.C. § 1367(c).

Under that provision, a district court may decline to extend jurisdiction over a state claim if it falls into one of four exceptions:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Here, the state claims do "substantially predominate" over the federal claim, so the court *may* decline to exercise supplemental jurisdiction over those claims under § 1367(c)(2). Nevertheless, the court finds that considerations of judicial economy weigh in favor of retaining jurisdiction. This court has already decided two motions to dismiss in this case, and the magistrate judge has been supervising discovery since December 2012. There would thus be a considerable economy to having this court retain jurisdiction over the state claims rather than having the parties start afresh in state court. *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172 (1997) (instructing district courts to consider "principles of economy, convenience, fairness, and comity" in deciding whether to exercise supplemental jurisdiction). Accordingly, the motion to dismiss is denied.

## IV. CONCLUSION

Because Ocean Tomo's alleged motive is the same for both the federal and state claims, the court concludes that it may exercise supplemental jurisdiction over the state claims. The motion to dismiss is denied.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 12, 2014