IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

OCEAN TOMO, LLC,

        Plaintiff-Counter Defendant,

v.

JONATHAN BARNEY and
PATENTRATINGS, LLC,

        Defendant-Counter Plaintiffs.

No. 12 C 8450

Judge:  Joan B. Gottschall
Magistrate:  Judge Mary M. Rowland

## SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

As and for its Second Amended and Supplemental Complaint for Injunctive Relief, Declaratory Judgment and Damages against Defendants Jonathan Barney ("Barney") and PatentRatings, LLC ("PR") (collectively, "Defendants"), Plaintiff Ocean Tomo, LLC ("OT"), by and through its attorneys, Vedder Price P.C., states and alleges as follows:

## NATURE OF ACTION

1.      This action arises out of a soured business relationship between OT, on the one hand, and PR and Barney, on the other hand.  Barney created PR, a company that owns and develops proprietary objective computer-generated metrics for determining the quality and relevance of issued United States patents.  Barney is the Chief Executive Officer and the majority owner of PR.

2.      In approximately 2004, OT and PR entered into a License Agreement pursuant to which, among other things, PR provided to OT certain proprietary computer-generated metrics for determining the quality and relevance of patents.  As part of the business relationship, Barney became a Member of OT, and OT became a Member of PR, assuring that each company would

have a vested interest in the future performance of the other. Over the years, OT has made substantial capital investments and loans for the development of this technology, secured by PR's assets.

3. In 2007, a dispute arose between the parties regarding amounts loaned by OT to PR. In settlement of that dispute and other issues, on July 19, 2007 the parties entered into an amendment to the License Agreement, a security agreement and promissory note pursuant to which, *inter alia*, the amount of the disputed loan was set at $1,500,000 and the revenue share payable by OT to PR was altered.

4. Nonetheless, disputes between the parties continued to arise, and in early 2012 PR purported to wrongfully terminate the agreements between the parties based upon nonmaterial breaches which, if they are even breaches in the first place, have been cured by OT in accordance with the License Agreement. In addition, PR has attempted to rescind the 2007 amendment, security agreement and promissory note based on unsupported allegations of fraudulent misrepresentations and concealments.

5. By this action, OT seeks a declaration from this Court that: 1) OT is not, and never was, in breach of its contracts with PR; 2) in the alternative to the foregoing, to the extent any breach of the License Agreement occurred, any and all such breaches are nonmaterial or have been subsequently cured by OT; 3) to the extent PR contends that there are other uncured breaches, PR has not provided adequate notice thereof and therefore has not met the contractual precondition to termination of the License Agreement; 4) to the extent PR seeks to rescind any of the parties' agreements for fraud and/or failure of consideration, PR's asserted grounds for rescission are without merit and are barred; and 5) the parties' agreements remain in full force and effect, and OT retains its rights thereunder.

CHICAGO/#2637741.4

6. In addition, OT brings a number of claims arising out of Barney's improper behavior while the parties' relationship was deteriorating. Barney was a Member and Managing Director of OT, and as such, he was intimately involved in the development and marketing of OT's services and was given access to detailed knowledge of OT's confidential information relating to financial data, business plans, business methods and practices, and client identities, needs and preferences. Additionally, Barney was provided access to sensitive and confidential information about OT's financial and client data related to OT's clients (including historical and realized revenues, and profit margins), strategic plans, business development efforts, proprietary products and valuation methods, and client requirements.

7. Because he was provided access to OT's confidential information and client relationships and as a condition of his employment, Barney executed an employment agreement (the "Employment Agreement") that prohibited him from using or disclosing OT's confidential information for his own benefit or the benefit of anyone other than OT.

8. During the course of his employment with OT, Barney was provided with a laptop for business use (the "Laptop"). The Laptop contained OT's confidential information relating to financial data, business plans, business methods and practices, and client identities, needs and preferences. Further, Barney executed a Computer Asset Policy Agreement (the "CAP Agreement") during his employment with OT that prohibited him from modifying, altering or upgrading any hardware or software provided to him by OT.

9. Barney resigned from OT on or about February 14, 2011. At that time, he did not return the Laptop to OT. Despite multiple demands by OT for the return of the Laptop, Barney refused to turn over the Laptop until on or about June 14, 2011. Upon receiving the Laptop from Barney, OT hired a forensic expert, who analyzed the Laptop and determined that the hard drive

-3-

on the Laptop had been intentionally overwritten or wiped, which permanently deleted and destroyed all of OT's confidential and proprietary information from the Laptop.

10.     In addition to completely wiping the hard drive of the Laptop, Barney, upon information and belief, made a copy of the Laptop's hard drive before erasing it. This copy has not been provided to OT. Upon information and belief, Barney continues to access and use data from the copied hard drive, including OT's confidential business and financial information.

11.     Further, starting at least as early as in approximately February 2012, Barney and PR began contacting, and continue to contact, NTT Data, a potential customer and business partner of OT, in order to divert NTT Data's business away from OT and to PR. Barney and PR have attempted to solicit business from NTT Data despite knowing that OT has a valid business expectancy in its relationship with NTT Data.

12.     As such, OT asserts claims for breach of contract, breach of fiduciary duty, violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA"), violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), conversion, and tortious interference with prospective economic advantage, arising out of Barney's destruction, copying and use of OT's confidential information and trade secrets, along with his and PR's attempt to divert a business opportunity away from OT. OT likewise seeks a declaratory judgment establishing that it is not tortiously interfering with Defendants' business expectancies or relationships.

13.     OT seeks preliminary and permanent injunctive relief to restrain and enjoin Barney's continued breaches of the Employment Agreement, which have caused and continue to cause irreparable injury to OT, including injunctive relief enjoining Barney from (i) using or disclosing OT's confidential information for his own benefit or the benefit of anyone other than

-4-

OT and (ii) tortiously interfering with OT's business expectancies and relationships. OT further seeks an order compelling Barney to return all OT trade secrets, confidential information, and all other proprietary information and property belonging to OT, including without limitation, the copy of the Laptop hard drive believed to be in Barney's possession.

14.     In addition to injunctive and declaratory relief, OT has incurred damages from Barney's ongoing misconduct and seeks compensatory damages, punitive and exemplary damages, and such other relief as the Court deems just and proper.

## **PARTIES**

15.     OT is an Illinois limited liability company with its principal place of business in Chicago, Illinois. OT, the leading Intellectual Capital Merchant Banc firm, provides, among other things, financial products and services related to expert testimony, valuation, investments, risk management and transactions throughout the United States and overseas. Most of OT's high-level executives are located in the Chicago, Illinois area. OT's corporate activities and critical decision-making take place at the corporate headquarters located in Chicago, Illinois.

16.     Barney is an individual who, upon information and belief, resides at 312 Signal Road, Newport Beach, California 92663. Barney was a Managing Director at OT and was the head of OT's PatentRatings® ("OTPR") group at the time of his resignation on or about February 14, 2011. Barney was and currently is one of only three equity owners of OT. Barney is currently the Chief Executive Officer and majority owner of PR.

17.     PR is a California limited liability company, with its principal place of business in Irvine, California, that owns and develops proprietary objective computer-generated metrics for determining the quality and relevance of issued United States patents.

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 with respect to OT's claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  With respect to the remaining claims, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1367.

19.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(a), in that a substantial portion of the events giving rise to OT's claims arose in this district.

## GENERAL ALLEGATIONS

### OT's Business

20.     OT, the Intellectual Capital Merchant Banc firm, provides, among other things, expert testimony, investment advice, risk management, transaction assistance and valuation services related to intellectual property assets.

21.     One of OT's business units is OTPR, which is responsible for the marketing and sale of Ocean Tomo PatentRatings® products and services based upon the data provided under agreement with PR.  PR has exclusively licensed to OT and has contracted to supply OT with data and tools based upon PR's computer-generated metrics for determining the quality and relevance of issued United States patents.  Barney owns a controlling interest in PR, and OT owns a minority interest of 25% in PR.

22.     Due to its vast research and development initiatives, and cultivation of long-standing business relationships, OT has developed certain trade secrets and confidential information pertaining to its business, including, but not limited to:  valuation report templates, research tools, financial information, collections, revenues, profit margins, business plans, business development efforts, proprietary products, client requirements, business plans and strategies, pricing, fees, profitability factors, marketing materials, training materials, marketing

strategies, and personnel information, including personnel lists, resumes, salary information, organizational structure and performance evaluations. These trade secrets and confidential information provide a substantial economic and competitive advantage to OT and, if known to a competitor, would negatively impact OT in the marketplace.

### The PatentRatings Tools

23. Barney is an attorney and inventor of intellectual property and data used for the evaluation and analysis of United States patents. Barney created PR, which developed technology and a database that, using algorithms and regression analysis, measures the relative strength and quality of a particular patent. Using more than 60 factors, PR's technology can grade a patent with an IPQ® patent quality score, which is a numerical estimation of the patent's quality.

24. Because a substantial portion of OT's business involves business and financial strategies concerning intellectual property assets, OT became interested in utilizing PR's patent-rating metrics.

25. As such, in 2004 OT approached PR about entering into a business arrangement whereby OT would acquire rights to access and use PR's technology and database, and to distribute and resell the information and reports derived therefrom (the "PatentRatings Analysis").

26. OT and PR entered into negotiations regarding the use of PR's technology in summer 2004.

### The License Agreement and Barney's Employment by OT

27. Following negotiations, OT and PR entered into that certain License Agreement effective as of September 1, 2004 (the "License Agreement"). OT and PR also entered into amendments to the License Agreement on December 31, 2004, May 2, 2005 and July 19, 2007.

True and correct copies of the License Agreement, the December 31, 2004 amendment, the May 2, 2005 amendment and the July 19, 2007 amendment are attached hereto as **Exhibit A**, **Exhibit B**, **Exhibit C** and **Exhibit D**, respectively.

28.     Pursuant to the License Agreement, PR granted OT access to the PatentRatings Tools at OT's offices and a limited exclusive license to "reproduce, install, and use the PatentRatings Tools [and] distribute, sell, license or other transfer for use (or offer to sell, license or otherwise transfer for use), and display PatentRatings Analysis to third parties for a fee," subject to other terms and conditions. (Ex. A §§ 2.1 and 3.1(a)–(b).) The "PatentRatings Tools" as used herein shall have the same meaning as in the License Agreement, which defines the PatentRatings Tools as follows:

> "PatentRatings Tools" means LICENSOR's technology, know-how, software (, [*sic*] computer algorithms, techniques, for statistically analyzing, rating, mapping and valuing patents and/or other intellectual property assets, and including any documentation and research relating to such software) and other LICENSOR intellectual property relating to the foregoing (including the PatentRatings Patents, PatentRatings Copyrights and PatentRatings Marks).

29.     OT had the royalty-free right to use the PatentRatings Tools for internal purposes, but the License Agreement required OT to pay to PR 100% of OT's revenues resulting from its sales of the PatentRatings Analysis. (Ex. D §§ 4.1, 4.3, 4.4(a).)

30.     Among other things, the License Agreement permits PR to inspect OT's records related to payments to PR upon reasonable notice. (Ex. A § 4.5(c).)

31.     To the extent a party to the License Agreement contends that the other party has breached the agreement, the License Agreement requires that a party send written notice of the alleged breach and permit the alleged breaching party 30 days to cure the alleged breach. Specifically, the License Agreement provides that the agreement will terminate only "upon

written notice of termination by either party to the other if the other party has committed a material breach of this [License] Agreement which has not been cured within 30 days following written notice to [the breaching] party specifying such breach and demanding that the same be cured." (Ex. A § 10.2(a).)

32.     The term of the License Agreement is "the longest term permitted by law." (Ex. C § 10.1.)

33.     OT's initial use of the PatentRatings Tools revealed several problems with the database and technology, and significant amounts of capital were necessary to utilize the essential functions of the PatentRatings Tools.

34.     As such, on May 31, 2005 the parties entered into a Management Services Agreement pursuant to which OT provided, *inter alia*, extensive management services to PR and a substantial infusion of capital (in excess of $1,500,000) to upgrade the PatentRatings Tools. A copy of the Management Services Agreement is attached hereto as **Exhibit E**.

35.     In or around the first half of 2007, OT and PR engaged in discussions regarding revision of their relationship. As part of those discussions, PR disputed the amounts advanced by OT as a loan under the Management Services Agreement. In settlement of that dispute and other issues, on July 19, 2007, the parties entered into the July 19, 2007 Amendment (Ex. D) pursuant to which the amount of the disputed loan was set at $1,500,000, the Management Services Agreement was terminated and the revenue share payable by OT to PR was altered.

36.     In order to repay the $1,500,000 loaned by OT to PR pursuant to the terms of the Management Services Agreement, on July 19, 2007, PR also entered into a Secured Promissory Note pursuant to which PR undertook an unconditional obligation to repay to OT the amount of $1,500,000 (the "Note"). A copy of the Note is attached hereto as **Exhibit F**.

CHICAGO/#2637741.4

37.     To secure PR's promise to pay under the Note, PR granted OT a first priority lien upon, and security interest in, all of PR's assets. (Ex. F § 5.)

38.     In conjunction with the security interest granted OT by PR pursuant to the Note, PR and OT also entered into the Intellectual Property Security Agreement on July 19, 2007 (the "Security Agreement"). A copy of the Security Agreement is attached hereto as **Exhibit G**.

39.     Pursuant to the terms of the Security Agreement, and in order to "secure its obligations under the Note and under any other agreement now existing or hereafter arising between PR and OT," PR granted and pledged to OT a security interest in all of PR's intellectual property, much of which was specifically identified in three schedules to the Security Agreement. (Ex. G.)

40.     Through the course of OT's relationship with PR, OT has infused substantial time and capital into the upgrade and maintenance of the PatentRatings Tools. Without OT's commitment to the PatentRatings Tools, they would not be functional today.

**OT's Hiring of Barney and His Access to Confidential Information**

41.     In connection with the negotiation of the License Agreement, OT hired Barney to act as Managing Director for the OTPR business unit effective as of January 2005. Also, at that time, Barney became an equity owner of OT. Barney currently remains one of three such equity owners of OT.

42.     As Managing Director for OTPR, Barney was responsible for managing and overseeing the marketing and sale of Ocean Tomo PatentRatings® products and services, including IPQ® patent quality scores and patent relevance scores. As of the time of his resignation, Barney's annual salary was $210,000, and he also received profit-sharing payments.

43.     In his position with OT, and subject to strict confidentiality obligations, Barney was provided access to OT's confidential information. Barney was provided access to nearly all

-10-

of OT's business information, including information about OT's overall financial performance; the performance of each of OT's practice areas; collections and revenue; business plans; opportunities for business development and growth; and other sensitive and confidential information belonging to OT.

44.     As part of his employment with OT, Barney was provided with the Laptop.  The Laptop contained OT's confidential information, trade secrets and other proprietary information relating to OT's financial data, business plans, business methods and practices, and client identities, needs and preferences.  Furthermore, the Laptop also contained OT's high-level confidential business information, which included information and data regarding overall financial performance; the performance of each of OT's practice areas; collections and revenue; business plans; opportunities for business development and growth; and other sensitive and confidential OT information.

### OT's Agreements with Barney

45.     Because OT was providing Barney with access to OT's confidential information and client relationships, OT required Barney, as a condition of employment, to execute and agree to the Employment Agreement.  Barney signed the Employment Agreement on or about January 1, 2005.  A true and correct copy of the Employment Agreement is attached hereto as **Exhibit H**.

46.     In the Employment Agreement, Barney agreed that, as part of his employment, he would be exposed to OT's confidential information and that he would maintain the confidentiality of that information, would not use such information for his own benefit, directly or indirectly, and would not disclose that information.  Specifically, Barney agreed as follows:

> Section 5.2.  Confidential Information.  The Executive understands and acknowledges that during his employment with the Company he will be exposed to Confidential Information that is proprietary and that rightfully belongs to the Company.  The Executive agrees that he will not use or cause to be used for his

-11-

own benefit, directly or indirectly, or disclose any of such Confidential Information at any time, either during or after his employment with the Company, whether or not such Confidential Information is developed by the Executive . . . The Executive shall take all commercially reasonable steps to safeguard Confidential Information that is within his possession or control and to protect such information against disclosure, misuse, loss or theft . . . The term "Confidential Information" means any information not generally available to the public that was obtained from the Company, or any of its Affiliates or that was learned as a result of the performance of any services by the Executive to or on behalf of the Company, and which falls within the following general categories: (a) information concerning trade secrets of the Company or any of its Affiliates; (b) information concerning existing or contemplated products, services, technology, designs, processes, research or product developments of the Company or any of its Affiliates; (c) information concerning business plans, sales or marketing methods, methods of doing business, customer lists, customer usages and or requirements, or supplier information of the Company or any of its Affiliates; (d) information concerning the identity, needs purchase and payment patterns of, and credit terms, pricing of special relations with, the customers of the Company or any of its Affiliates; (e) information concerning the identity, net prices and credit terms of, and special relations with, the suppliers of the Company or any of its Affiliates; or (f) any other confidential information which the Company or any of its Affiliates may reasonably have the right to protect by patent, copyright or by keeping it secret and confidential.

47.     OT and Barney later negotiated an Amendment to the Employment Agreement (the "Amendment"), which revised Section 6.9 of the Employment Agreement but made no changes to Section 5.2. Barney executed the Amendment on or about July 28, 2008. A true and correct copy of the Amendment is attached hereto as **Exhibit I**.

48.     Barney is also party to the CAP Agreement, which he executed on or about April 27, 2007, wherein he agreed that "[n]o alterations, upgrades, or modifications should be made to hardware and software purchased by the organization and provided to the employee." A true and correct copy of the CAP Agreement is attached hereto as **Exhibit J**. Barney further agreed that OT retained ownership of all hardware and software provided to him.

-12-

**OT's Additional Measures to Maintain the Confidentiality of Its Information**

49.     In order to maintain the confidentiality of its information, OT, as a matter of practice and policy, requires employees to execute agreements containing confidentiality provisions the same as or nearly identical to the one in Barney's Employment Agreement.

50.     In addition, OT restricts access to its confidential information to certain key individuals and only on a need-to-know basis. For example, OT's financial information and strategic business plans are distributed only to OT's Managing Directors. Customer-related confidential information is provided only to employees who work with that particular customer.

**Barney's Departure from OT and Destruction of the Laptop's Hard Drive**

51.     On or about February 14, 2011, Barney resigned from OT as a Managing Director.

52.     Notwithstanding the fact that OT owned the Laptop, Barney did not return the Laptop to OT at the time of his resignation.

53.     On multiple occasions, OT demanded that Barney return the Laptop. Barney refused to comply with any of these requests.

54.     On or about June 14, 2011, approximately four months after he resigned from OT, Barney finally returned the Laptop to OT.

55.     Upon receiving the Laptop from Barney, OT hired a forensic expert, who analyzed the Laptop and determined that the hard drive on the Laptop had been intentionally overwritten or wiped with hexadecimal "00" values. By overwriting or wiping the hard drive's data storage area on the Laptop, Barney rendered the data on the entire hard drive unrecoverable, which thereby destroyed all the data on the hard drive. As such, Barney permanently destroyed and rendered inaccessible all OT information on the Laptop's hard drive, including, without

limitation, OT's confidential information regarding OT's strategic plans, financial performance, and customers.

56.     In addition to completely erasing the hard drive of the Laptop, Barney, upon information and belief, made a copy of the Laptop's hard drive before erasing it.  That copy has not been provided to OT.  Upon information and belief, Barney continues to access and use data from the copied hard drive, including OT's confidential financial and business information.

## Barney Refuses OT's Request for Compliance with the Employment Agreement and the CAP Agreement

57.     Upon receiving the Laptop back from Barney and learning from its hired forensic expert that the hard drive on the Laptop had been wiped clean, OT sent a letter to Barney on July 6, 2011 reminding him of his contractual obligations in the Employment Agreement and in the CAP Agreement.  A true and correct copy of the July 6, 2011 correspondence is attached hereto as **Exhibit K**.

58.     In the July 6, 2011 letter, OT requested that Barney explain the circumstances surrounding the destruction of data on the Laptop; identify and return all OT files, data and information remaining in his possession (whether originals or copies); and disclose the means by which Barney had access to OT's files, data and information since his resignation from OT.

59.     To date, Barney has not responded to OT's July 6, 2011 letter, nor has he complied with any of the requests made by OT in that letter.

## PR's Initial Allegations of Breach

60.     On January 5, 2012, PR sent to OT a demand to inspect OT's books and records pursuant to Section 4.5(c) of the License Agreement on January 19, 2012.  A true and correct copy of the January 5, 2012 demand is attached hereto as **Exhibit L**.

61.     Despite PR's demand, OT and PR representatives convened on January 19, 2012, but PR did not engage in the requested inspection or even raise the issue.

62.     Despite this, on January 26, 2012, PR sent a letter to OT in which PR asserted that OT was in breach of the License Agreement for failure to comply with Section 4.5(c) of the License Agreement.  A true and correct copy of PR's January 26, 2012 letter is attached hereto as **Exhibit M**.

63.     On January 26, 2012, PR sent a second notice alleging that OT had breached Section 4.3 of the License Agreement by failing to pay royalties on 12 specific reports in which OT used the PatentRatings Analysis.  A true and correct copy of PR's second January 26, 2012 letter is attached hereto as **Exhibit N**.

### OT Addresses PR's Allegations Regarding Allegedly Withheld Payments

64.     OT promptly responded to PR's accusations of breach by letter dated January 30, 2012, a true and correct copy of which is attached hereto as **Exhibit O**.

65.     In the January 30, 2012 letter, OT explained to PR that 10 of the 12 reports identified in PR's January 26, 2012 letter were "intellectual property appraisals" which, under the License Agreement as amended on July 19, 2007, were not subject to any revenue-sharing obligation.  (Ex. O.)

66.     With respect to one of the other two reports identified in PR's January 26, 2012 letter, OT explained that "no invoice was charged or revenues received" for the report, noting that the report was prominently marked as a "SAMPLE."  (Ex. O.)

67.     With respect to the final report, OT acknowledged "an inadvertent failure to pay a revenue share," enclosed the invoice at issue and assured PR that the error would be promptly corrected.  (Ex. O.)

68.     OT made it clear that there was no evidence of a "systematic and deliberate breach," as alleged by PR in the January 26, 2012 letter, and expressed OT's understanding that the January 30, 2012 letter resolved any and all asserted breaches under the License Agreement alleged by PR.  (Ex. O.)

69.     On February 6, 2012, OT and PR held a meeting in which a number of issues pertaining to the parties' business relationship were discussed, including the License Agreement.

70.     In response to OT's January 30, 2012 letter, and in follow-up to the February 6, 2012 meeting, PR e-mailed OT on February 8, 2012.  A true and correct copy of the February 8, 2012 correspondence is attached hereto as **Exhibit P.**

71.     In the February 8, 2012 e-mail, PR disputed OT's interpretation of OT's revenue-sharing obligations with respect to the use of PatentRatings Tools in association with OT's appraisal business.  PR did not address any claimed breaches of the License Agreement except for the appraisal issue.  (Ex. P.)

72.     While OT continued to disagree with PR's position on this issue, in consideration of the long-standing business relationship between the parties and in the spirit of good faith, OT paid under protest all revenues (totaling $9,046.83) claimed by PR with respect to the use of the PatentRatings Tools in association with OT's appraisal business.

73.     Following OT's payment of these disputed amounts, OT is not in breach of the License Agreement with respect to the use of PatentRatings Tools in association with OT's appraisal business.  In other words, OT has paid royalties to PR for all reports for which PR claims it is due royalty payments.

### OT Addresses PR's Allegations Regarding PR's Audit and Inspection Rights

74.     In response to PR's other asserted breach of the License Agreement, OT's purported refusal to allow PR to exercise its right to inspect and audit OT's records pertaining to

the PatentRatings Tools, on February 24, 2012 (within the 30-day cure period), OT provided PR with a royalty analysis pertaining to all the reports identified in the January 26, 2012 letter. A true and correct copy of the February 24, 2012 e-mail transmitting this information is attached hereto as **Exhibit Q**.

75.     PR responded to OT's February 24, 2012 communication via an e-mail dated February 25, 2012 in which PR:

- inquired as to whether the reports addressed in the analysis transmitted by OT on February 24, 2012 represented the entire universe of reports for which PR was owed a share of the revenues;

- requested an explanation of an overpayment deduction included in the analysis transmitted on February 24, 2012; and

- proposed that OT needed to recalculate an overpayment adjustment included in the analysis transmitted on February 24, 2012.

76.     OT promptly responded to each of PR's inquiries via e-mail dated February 28, 2012, a true and correct copy of which is attached hereto as **Exhibit R**, as follows:

- OT confirmed that it knew of no additional reports subject to an unfulfilled revenue-sharing obligation under the License Agreement and reemphasized OT's preparedness to make records available for inspection and audit in accordance with the License Agreement;

- OT explained that the overpayment deduction was the result of $39,000 in commissions paid to a reseller that should have been taken into account by OT but was not; and

- OT agreed with PR's proposed recalculation of the application of the overpayment and agreed to transfer the additional $2,440.47 owed to PR according to the correct calculation by the close of business that day.

(Ex. R.)

77.     Following the February 28, 2012 e-mail, no representative of PR has identified any additional reports that are subject to an unfulfilled revenue-sharing obligation under the License Agreement.

78.     By e-mail dated February 29, 2012, PR thanked OT for agreeing to "make [OT's] records available for [PR's] inspection and audit in accordance with the provisions of the 2004 License Agreement," acknowledging that OT was in compliance with Section 4.5(c) of the License Agreement. A true and correct copy of this February 29, 2012 e-mail is attached hereto as **Exhibit S**.

79.     Because the information transmitted by OT on February 24, 2012 and OT's February 28, 2012 e-mail addressed any and all concerns regarding OT's purported refusal to allow PR to exercise its right to inspect and audit OT's records, PR cannot claim that OT remains in breach of the License Agreement.

## PR's Wrongful Attempted Termination of the License Agreement

80.     Despite OT having addressed all the asserted breaches identified in PR's January 26, 2012 letter, on the evening of February 28, 2012, PR sent a Notice of Termination of the License Agreement. A true and correct copy of the Notice of Termination is attached hereto as **Exhibit T**.

81.     In the Notice of Termination, PR vaguely rehashes its previously asserted grievances, asserting that "OT is and remains in breach of the [License] Agreement by failing to account for, report and pay past-due royalties and by refusing to allow PR to exercise its audit rights as provided for under the [License] Agreement." (Ex. T.) PR then purports "to terminate the [License] Agreement in its entirety." (Ex. T.)

82.     PR fails, however, to point to a single specific violation of the License Agreement that remains uncured.

83.     Indeed, OT has promptly and thoroughly responded to each purported breach identified by PR since PR's issues were first raised on January 26, 2012. Specifically, OT paid royalties for all reports for which PR claimed royalties were due, despite OT's belief that it was

not required to make such payment. Moreover, as PR has acknowledged, OT has offered to make its books and records available for inspection in accordance with the License Agreement.

84.     As such, PR has not provided notice of any breach that remains uncured, and PR's attempted termination of the License Agreement is wrongful.

### PR Continues Improper Attempts to Terminate after Commencement of Litigation

85.     In light of the foregoing, on March 2, 2012 OT filed suit in the Circuit Court of Cook County, Case Number 12, CH 7704 (the "Illinois State Court Litigation").[1] to address the disagreements outlined above, seeking a declaration from the Court that: 1) OT is not, and never was, in breach of the License Agreement; 2) in the alternative to the foregoing, to the extent any breach of the License Agreement by OT occurred, those breaches (which involve payment of less than $10,000) are nonmaterial, and OT has cured any and all such breaches within the applicable cure periods; 3) to the extent PR contends that there are other uncured breaches, PR has not provided adequate notice thereof and therefore has not met the contractual precondition to termination of the License Agreement; and 4) the License Agreement remains in full force and effect, and OT continues to have the right to use the PatentRatings Tools, in which OT has invested more than $1,500,000 for maintenance and upgrades, in accordance with the License Agreement.

86.     Initially, rather than respond to OT's original complaint, PR requested, and OT agreed to, a thirty (30) day extension of its time to respond, up to and including May 9, 2012.

87.     In the interim, on April 6, 2012, PR sent OT a Notice of Rescission purporting to rescind the July 19, 2007 Amendment to the License Agreement, as well as the Note and the Security Agreement. A true and correct copy of the April 6, 2012 notice is attached hereto as

---

[1] The parties have since agreed to consolidate the Illinois State Court Litigation with the related, above-captioned matter.

CHICAGO/#2637741.4

**Exhibit U**.  This notice was received by OT on April 9, 2012 and requested "a response within ten (10) days from the date of this letter," failing which PR stated that it "shall take the necessary legal steps to enforce our rights."   Rather than wait for a response, on the same day that OT received the notice, PR commenced an action against OT for fraud and rescission in the Superior Court of the State of California, Orange County (the "California Litigation").   A copy of the complaint in that action is attached hereto as **Exhibit V**.

88.     As its asserted grounds for rescission, PR accuses OT of the following:

- falsely representing that PR would have no obligation to repay, reimburse or incur any debt for costs expended by OT after July 19, 2007 for maintaining, updating and further developing the "OTPR system";

- falsely representing that OT was not, as of July 19, 2007, utilizing PR products in OT's expert services business;

- fraudulently concealing the fact that OT had been utilizing PR products in OT's expert services business before July 19, 2007; and

- fraudulently concealing revenues received by OT for the sale of expert valuation services and products, and failing to report and pay royalties owed.

(Exs. U, V.)

89.     Based upon these accusations, PR claims a failure of consideration with respect to all three agreements, claims that it has suffered consequential damages and seeks to rescind all three agreements pursuant to California Civil Code § 1689.[2]  (Exs. U, V.)

90.     PR's purported grounds for rescission have no basis in law or in fact and are barred by doctrines of res judicata, collateral estoppel and mandatory joinder of claims.

---

[2] California Civil Code § 1689 is California's codification of the common-law remedy of rescission.  To the extent, however, there is any conflict between California law and Illinois law with respect to all the agreements at issue, PR and OT agreed that Illinois law governs these agreements.  (*See* Ex. A § 12.4; Ex. F § 6(c).)

91.     OT disputes the factual accuracy of each and every one of PR's accusations in the April 6, 2012 notice and the California Complaint and contends that PR's claimed bases for rescission are without merit.[3]

92.     Moreover, PR's allegation that OT fraudulently concealed revenues and refused "to report and pay royalties owed" is simply an alleged breach of Section 4.3 of the July 19, 2007 Amendment to the License Agreement.  (Ex. D § 4.3.)

93.     In light of the foregoing, by this Second Amended Complaint OT seeks a declaration from this Court that: 1) OT is not, and never was, in breach of the License Agreement, as amended; 2) in the alternative to the foregoing, to the extent any breach of the License Agreement by OT occurred, those breaches (which involve payment of less than $10,000) are nonmaterial, and OT has cured any and all such breaches within the applicable cure periods; 3) to the extent PR contends that there are other uncured breaches, PR has not provided adequate notice thereof and therefore has not met the contractual precondition to termination of the License Agreement; 4) PR has asserted no appropriate basis for rescission of the July 19, 2007 Amendment, Security Agreement or Note, and PR's claims of rescission are barred under doctrines of res judicata, collateral estoppel and mandatory joinder of claims; 5) the License Agreement, as amended, remains in full force and effect, and OT continues to have the right to use the PatentRatings Tools, in which OT has invested more than $1,500,000; and 6) the Note and the Security Agreement remain in full force and effect, and OT continues to have the right to repayment of its substantial loans to PR in accordance with the Note, secured by PR's assets in accordance with the Note and the Security Agreement.

---

[3] OT moved to stay the California Litigation pending the outcome of the Illinois State Court Litigation, and that motion was granted on October 11, 2012.  A true and correct copy of the Notice of Ruling Granting OT's Motion for Stay is attached hereto as **Exhibit W**.

CHICAGO/#2637741.4

94.     On June 23, 2012, PR sent a letter withdrawing its January 26, 2012 Notice of

Breach pursuant to Section 4.3 of the License Agreement and February 28, 2012 Notice of

Termination pursuant to Section 10.2(a) of the License Agreement.  A true and correct copy of

the June 23, 2012 letter is attached hereto as **Exhibit X**.

95.     Even so, the parties' disputes under the License Agreement have persisted.

96.     On October 19, 2012, PR sent another Notice of Breach, a true and correct copy

of which is attached hereby as **Exhibit Y**, claiming that OT was in breach of Sections 4.2, 4.3,

4.4, 4.4(c), 4.5(b) and 4.5(a) by:

(a)     "failing to promptly identify and report revenues invoiced and collected by OT and royalties payable to [PR] in connection with reports, products and services sold to its clients or customers that used or included PatentRatings Analysis";

(b)     "failing to keep accurate records in sufficient detail so as to enable PR to accurately determine the amount of royalties owed";

(c)     "refusing to promptly pay royalties owed on relevant revenues invoiced and collected by OT";

(d)     "improperly taking unauthorized deductions from royalty payments otherwise owed to PR"; and

(e)     "charging unreasonably low fees to its clients and customers for access and use of PR Analysis."

(Ex. Y.)

97.     On November 16, 2012, OT responded to PR's October 19, 2012 Notice of

Breach, a true and correct copy of which is attached hereto as **Exhibit Z**, noting as follows:

(a)     PR's allegations regarding revenue reporting are false, duplicative of PR's previously withdrawn allegations on this issue, and the subject of an audit being conducted by an auditor chosen by PR with OT's full cooperation;

(b)     PR's allegations regarding OT's record keeping practices are unsubstantiated, as OT keeps records in accordance with standard business practices and uses widely accepted accounting software as confirmed by PR's own auditor;

(c)     With respect to PR's allegations regarding royalty payments, PR's October 19, 2012 Notice of Breach failed to identify any royalty payments which have not been paid, as OT previously provided documentary support for the deductions referenced by PR and OT paid a 25% royalty with respect to the Korea University engagement, not the 13.25% as alleged by PR;

(d)     With respect to PR's allegation that OT improperly deducted commissions paid to Ed Research in violation of Section 4.4(c) of the License Agreement, Section 4.3 expressly defines "Revenues" as consideration received "net of any commissions or other sales charges payable to any non-affiliates of OT," so these commissions were properly deducted; and

(e)     With respect to PR's allegation that OT charges unreasonable fees in its "Valuation" and "Analytics" practices, OT sets prices based upon market conditions, and PR's allegation that OT reduced fees to harm PR is unsubstantiated and absurd, as such reductions would cause far more harm to OT than PR.

(Ex. Z.)

98.     It is OT's position that its November 16, 2012 letter fully addresses the allegations contained in OT's October 19, 2012 Notice of Breach, and therefore constitutes a "cure" under Section 10.2(a) of the License Agreement, however, PR continues to assert that OT is in breach of the License Agreement.

**Barney and PR's Solicitation of OT's Potential Customer**

99.     Starting at least as early as approximately February 2012, Barney and PR began directly soliciting the business of NTT Data, a potential customer and business partner of OT with whom OT expected to conduct business.

100.     Further, Barney and PR directly solicited the business of NTT Data in contravention of the License Agreement, which provided OT, *inter alia*, with a limited exclusive, royalty-free, worldwide license to distribute, sell, license or display PatentRatings analysis to third parties for a fee.  (*See* Exs. A–D.)

101. Since at least February 2012, Barney and PR have engaged in licensing and other discussions with NTT Data to develop and market patent analysis tools, algorithms, software and data for Japanese patents. In addition, Barney and PR have offered to indemnify NTT Data against any claims asserted by OT for damage arising from Barney and PR's attempt to divert business away from OT and to PR.

102. Despite being informed of OT's business expectancy in its relationship with NTT Data, along with the limited exclusive, royalty-free, worldwide license given to OT under the License Agreement, Barney and PR have persisted in soliciting the business of NTT Data.

**<u>Injunctive Relief Is Required</u>**

103. Injunctive relief is necessary to prevent the further loss of OT's valuable confidential information. OT has sustained and will continue to sustain irreparable and unfair competitive injury resulting from Barney's ongoing breaches of his contractual and fiduciary obligations.

104. In Section 5.4 of his Employment Agreement with OT, Barney agreed that OT will be irreparably harmed and that OT will not have an adequate remedy at law if he violated the non-disclosure obligation contained in the agreement.

105. Barney has already showed his willingness to disregard his contractual and fiduciary obligations to OT by destroying all of OT's confidential and proprietary information contained on the Laptop's hard drive and by soliciting OT's potential customer and business partner. Moreover, upon information and belief, Barney has shown a complete disregard for his fiduciary, contractual and statutory obligations by making a copy of the Laptop's hard drive and using the confidential information (which had been acquired during his employment relationship with OT) contained thereon.

106. Further injunctive relief is necessary to prevent further damage to OT.

-24-

## COUNT I
## DECLARATORY JUDGMENT
## (PATENTRATINGS)

107.     OT restates and realleges Paragraph Nos. 1 through 101 as and for this Paragraph No. 102 of Count I.

108.     A present and actionable controversy exists between OT and PR concerning the construction and interpretation of the License Agreement (as amended), the Note and the Security Agreement, the existence of a breach of the License Agreement by OT, OT's cure of any asserted breach of the License Agreement, whether PR is entitled to rescission of the July 19, 2007 Amendment to the License Agreement, the Note or the Security Agreement, and the parties' rights under the License Agreement, the Note and the Security Agreement going forward.

109.     Specifically, OT contends that it is not, and never has been, in breach of the License Agreement, or that to the extent such a breach occurred, OT cured such breach within the 30-day cure period set forth in the License Agreement.  OT further contends that the alleged breaches, which involve payments totaling $9,046.83, are nonmaterial in the context of the parties' respective obligations under the License Agreement.

110.     OT further contends that the License Agreement remains in full force and effect and that OT continues to have the right to use the PatentRatings Tools in accordance with the terms of the License Agreement.

111.     PR, on the other hand, contends that OT breached the License Agreement as set forth in its October 19, 2012 Notice of Breach, that those breaches remain uncured.  PR contends that OT's alleged breaches are material, and it purports to reserve its right to terminate the License Agreement in its entirety and/or seek other remedies.

CHICAGO/#2637741.4

112.     PR also contends that it has the right to rescind the July 19, 2007 Amendment to the License Agreement, as well as the Note and the Security Agreement, by virtue of OT's alleged fraudulent misrepresentations and concealments, as well as failure of consideration.

113.     OT contends that the asserted grounds for rescission of the July 19, 2007 Amendment to the License Agreement, as well as the Note and the Security Agreement, identified in the April 6, 2012 notice are without merit and provide no basis for rescission.

114.     OT further contends that, in addition to the License Agreement, the Note and the Security Agreement remain in full force and effect, and OT continues to have the right to repayment of its substantial loans to PR in accordance with the Note, secured by PR's assets in accordance with the Note and the Security Agreement.

115.     A declaration by this Court is necessary to resolve this impasse and to determine the respective rights of the parties under the License Agreement, as amended, the Note and the Security Agreement.

**WHEREFORE**, OT respectfully requests that this Court enter a declaratory judgment in OT's favor on Count I declaring as follows:

(a)     OT is not, and never was, in breach of the License Agreement, as amended;

(b)     in the alternative to the foregoing, to the extent any breach of the License Agreement by OT occurred, those breaches (which involve payment of less than $10,000) are nonmaterial, and OT has cured any and all such breaches within the applicable cure periods, and to the extent PR asserts other uncured breaches of the License Agreement, PR has not complied with the notice and cure provisions of the License Agreement;

(c)     PR's bases for seeking to rescind the July 19, 2007 Amendment to the License Agreement, the Note and the Security Agreement are without merit and are barred, and PR is not entitled to rescind these agreements;

(d)     the License Agreement, as amended, remains in full force and effect, and OT retains all rights under the License Agreement, including, without limitation, the right to use the PatentRatings Tools, in which OT has invested more than $1,500,000, in accordance with the License Agreement;

(e)     the Note and the Security Agreement remain in full force and effect, and OT retains all rights under those Agreements, including, without limitation, the right to repayment of its substantial loans to PR in accordance with the Note, secured by PR's assets in accordance with the Note and the Security Agreement; and

(f)     OT is entitled to any other relief this Court deems just and proper, including preliminary and permanent injunctive relief enjoining PR from continued pursuit of the California Litigation.

## COUNT II
## BREACH OF CONTRACT—EMPLOYMENT AGREEMENT
## (BARNEY)

116.    OT restates and realleges Paragraph Nos. 1 through 110 as and for this Paragraph No. 111 of Count II.

117.    The Employment Agreement is a valid and enforceable contract.

118.    In exchange for the contractual obligations set forth in the Employment Agreement, Barney received adequate and sufficient consideration, including, without limitation, employment, compensation and bonus eligibility.

-27-

119.     OT has at all times performed and fulfilled its obligations under the Employment Agreement.

120.     Barney has breached Section 5.2 of the Employment Agreement by destroying and failing to safeguard OT's confidential information in his possession, refusing to return OT's confidential information in his possession, custody or control to OT, and using and disclosing OT's confidential information for his benefit and PR's benefit.

121.     The foregoing breaches and continuing breaches of Barney's Employment Agreement with OT have proximately caused and, unless restrained and enjoined, will continue to cause OT severe, immediate and irreparable harm, damage and injury.

**WHEREFORE**, OT respectfully requests this Court to enter judgment in its favor on Count II and award the following relief:

(a)     permanent injunction to enjoin Barney from using or disclosing OT's confidential information and trade secrets;

(b)     mandatory injunction to compel Barney to return all OT trade secrets, confidential information, and all other proprietary information and property belonging to OT, including without limitation, any copy of the Laptop's hard drive;

(c)     compensatory damages in an amount to be determined at trial;

(d)     reasonable attorneys' fees and costs; and

(e)     such other relief as this Court deems just and proper.

**COUNT III**
**BREACH OF CONTRACT—-COMPUTER ASSET POLICY AGREEMENT**
**(BARNEY)**

122.     OT restates and realleges Paragraph Nos. 1 through 116 as and for this Paragraph No. 117 of Count III.

123.    The CAP Agreement attached as Exhibit C is a valid and enforceable contract.

124.    In exchange for the contractual obligations set forth in the CAP Agreement, Barney received adequate and sufficient consideration, including, without limitation, access to and use of software and hardware belonging to OT, including the Laptop.

125.    OT has at all times performed and fulfilled its obligations under the CAP Agreement.

126.    Barney has breached the CAP Agreement by overwriting and permanently destroying all data on the hard drive of the Laptop.

127.    As a direct and proximate result of Barney's breach of the CAP Agreement, OT has expended resources in excess of $5,000 to investigate the foregoing misconduct and to conduct a forensic examination of the Laptop used by Barney to ascertain the scope of his misconduct, and to perform certain remedial measures to the Laptop that were required as a result of the misconduct.

**WHEREFORE**, OT respectfully requests this Court to enter judgment in its favor on Count III and award the following relief:

(a)    compensatory damages in an amount to be determined at trial;

(b)    reasonable attorneys' fees and costs; and

(c)    such other relief as this Court deems just and proper.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
## (BARNEY)

128.    OT restates and realleges Paragraph Nos. 1 through 122 as and for this Paragraph No. 123 of Count IV.

129.    As a Managing Director at OT, Barney owed OT fiduciary duties, including, but not limited to, a duty to act at all times with the utmost good faith, loyalty, honesty and fair

-29-

dealing towards OT, to avoid self-dealing, conflicts of interest and acting for his own personal benefit to the exclusion of OT's interest, and to act in the best interest of OT in all matters relating to its business. Barney also owes heightened fiduciary duties to OT as an equity owner and Member of OT.

130.    OT reposed trust and confidence in Barney that he would abide by his fiduciary duties.

131.    Barney has breached his fiduciary obligations to OT by, among other things, (i) destroying OT's confidential information on the Laptop's hard drive, (ii) making a copy of the Laptop's hard drive—which contained confidential information acquired during the course of Barney's employment with OT and prior to his resignation from OT—before erasing it, and (iii) disclosing and using OT's confidential information—which had been acquired during the course of his employment with OT and prior to his resignation from OT—from the copied hard drive for his own benefit and PR's benefit.

132.    These breaches of fiduciary duty have proximately caused and, unless restrained and enjoined, will continue to cause OT severe, immediate and irreparable harm, damage and injury for which OT has no adequate remedy at law.

133.    These breaches of fiduciary duty were knowing, intentional, and reckless, and were of such an aggravated character as to warrant the imposition of punitive damages.

**WHEREFORE**, OT respectfully requests this Court to enter judgment in its favor on Count IV and award the following relief:

(a)    permanent injunction to enjoin Barney from using or disclosing OT's confidential information and trade secrets;

(b)     mandatory injunction to compel Barney to return all OT trade secrets, confidential information, and all other proprietary information and property belonging to OT, including without limitation, any copy of the Laptop's hard drive;

(c)     compensatory damages in an amount to be determined at trial;

(d)     punitive damages in an amount to be determined at trial; and

(e)     such other relief as this Court deems just and proper.

**COUNT V**
**VIOLATION OF ILLINOIS TRADE SECRETS ACT, 765 ILCS 1065/1 *ET SEQ*.**
**(BARNEY)**

134.    OT restates and realleges Paragraph Nos. 1 through 128 as and for this Paragraph No. 129 of Count V.

135.    Certain of OT's business practices and methods, and information relating to its products, clients, practice areas, suppliers and contacts, including without limitation, valuation report templates, research tools, financial information, collections, revenues, profit margins, business plans, business development efforts, proprietary products, client requirements, business plans and strategies, pricing, fees, profitability factors, marketing materials, training materials, marketing strategies and personnel information, including personnel lists, resumes, salary information, organizational structure and performance evaluations, are proprietary and confidential to OT and constitute protectible trade secrets under the ITSA, 765 ILCS 1065/1 *et seq.*

136.    OT has taken reasonable efforts to protect and maintain the secrecy and confidentiality of its trade secrets.

CHICAGO/#2637741.4

137.    OT's trade secrets are not generally known in the industry or to the general public, and their secrecy confers substantial economic advantage and benefit to OT. Knowledge of this information would also confer a substantial economic benefit to OT's competitors.

138.    The circumstances of Barney's employment with OT gave rise to fiduciary duties and contractual obligations to maintain the secrecy of OT's trade secrets and confidential information and to strictly limit their use to OT business activities and for OT's exclusive benefit.

139.    Barney, through improper means and without authorization, either directly or indirectly, misappropriated, misused, and/or disclosed OT's trade secrets to and for his own benefit. Upon information and belief, Barney has misappropriated and retains copies of OT's trade secrets. Investigation into Barney's theft of OT's confidential information and trade secrets continues and may yet reveal additional information that Barney misappropriated.

140.    As a direct and proximate result of Barney's deliberate, willful and malicious misappropriation of OT's trade secrets, OT has sustained and will continue to sustain severe, immediate and irreparable harm, damage and injury to the value of its trade secrets and competitive advantage, which OT has expended significant time, effort and money to secure.

**WHEREFORE**, OT respectfully requests this Court to enter judgment in its favor on Count V and award the following relief:

       (a)    permanent injunction to enjoin Barney from using or disclosing OT's confidential information and trade secrets;

       (b)    mandatory injunction to compel Barney to return all OT trade secrets, confidential information, and all other proprietary information and

property belonging to OT, including without limitation, any copy of the Laptop's hard drive;

(c)     compensatory damages in an amount to be determined at trial pursuant to 765 ILCS 1065/4(a);

(d)     exemplary damages pursuant to 765 ILCS 1065/4(a) in an amount equaling twice the compensatory damages;

(e)     reasonable attorneys' fees pursuant to 765 ILCS 1065/5; and

(f)     such other relief as this Court deems just and proper.

## COUNT VI
## VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030
## (BARNEY)

141.    OT restates and realleges Paragraph Nos. 1 through 135 as and for this Paragraph No. 136 of Count VI.

142.    The Laptop was used in interstate commerce and constitutes a "protected computer" under the CFAA, 18 U.S.C. § 1030(e)(2)(b).

143.    Without authorization or by exceeding authorized access, Barney intentionally accessed the Laptop with the intent to defraud OT and violated Sections 1030(a)(2)(c), (a)(4) and (a)(5) of the CFAA by:

(a)     deleting electronic files from the Laptop;

(b)     destroying the hard drive on the Laptop; and

(c)     copying the Laptop's hard drive, which contained OT's trade secrets and confidential information, for his benefit and PR's benefit.

144.    By engaging in the foregoing misconduct for the purpose of misappropriating OT's trade secrets and confidential information, Barney breached various contractual and

fiduciary duties and obligations owed to OT. As the foregoing misconduct occurred after Barney resigned from OT, there is no employment or agency relationship or any other legal basis upon which Barney could claim authorization or authority for accessing and destroying files on the Laptop. Moreover, under no circumstances was Barney authorized to delete information from the Laptop's hard drive.

145.    Barney intentionally and recklessly caused damage and loss to OT in excess of $5,000 because his conduct impaired the integrity of OT's protected computer and required OT to expend resources in excess of $5,000 to investigate the foregoing misconduct, conduct forensic examination of the Laptop used by Barney to ascertain the scope of his misconduct, and perform certain remedial measures to OT's protected computer that were required as a result of the misconduct.

146.    As a further direct and proximate cause of the foregoing misconduct, OT has been damaged and suffered loss in an amount in excess of $5,000 to the extent Barney accessed, deleted, destroyed and copied electronic files containing OT's trade secrets and other confidential and proprietary client and business information belonging to OT for his personal use and/or that of PR.

**WHEREFORE**, OT respectfully requests this Court to enter judgment in its favor on Count VI and award the following relief:

(a)    permanent injunction to enjoin Barney from using or disclosing OT's confidential information and trade secrets;

(b)    mandatory injunction to compel Barney to return all OT trade secrets, confidential information, and all other proprietary information and

property belonging to OT, including without limitation, any copy of the Laptop's hard drive;

(c)     compensatory damages in an amount to be determined at trial pursuant to 18 U.S.C. § 1030(g);

(d)     punitive damages in an amount to be determined at trial; and

(e)     such other relief as this Court deems just and proper.

## COUNT VII
## CONVERSION
## (BARNEY)

147.    OT restates and realleges Paragraph Nos. 1 through 141 as and for this Paragraph No. 142 of Count VII.

148.    OT has a right to immediate possession of any OT documents and materials in Barney's possession.

149.    Barney has assumed control, dominion and ownership over OT documents and materials to which OT has an absolute and unconditional right to immediate possession.

150.    Barney has not returned or has destroyed the documents and materials that rightfully belong to OT.

151.    Barney's conduct was and is deliberate, willful and malicious.

152.    The foregoing conduct has proximately caused and, unless restrained and enjoined, will continue to cause OT severe, immediate and irreparable harm, damage and injury.

**WHEREFORE**, OT respectfully requests this Court to enter judgment in its favor on Count VII and award the following relief:

(a)     permanent injunction to enjoin Barney from using or disclosing OT's confidential information and trade secrets;

(b)     mandatory injunction to compel Barney to return all OT trade secrets, confidential information, and all other proprietary information and property belonging to OT, including without limitation, any copy of the Laptop's hard drive;

(c)     compensatory damages in an amount to be determined at trial;

(d)     punitive damages; and

(e)     such other relief as this Court deems just and proper.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE (BARNEY & PR)

153.    OT restates and realleges Paragraph Nos. 1 through 147 as and for this Paragraph No. 148 of Count VIII.

154.    OT has a valid business expectancy in relationships with its potential customers and business partners through the expenditure of substantial time, money and effort.  Further, OT has a valid business expectancy in such relationships with potential customers and business partners due to the fact that OT was granted, *inter alia*, a limited exclusive, royalty-free, worldwide license to distribute, sell, license or display PatentRatings analysis to third parties for a fee in the License Agreement.

155.    As a result of Barney's employment with OT and membership in OT, Barney has knowledge of OT's business expectancy in such relationships with potential customers and business partners, including NTT Data.

156.    Defendants also have knowledge of OT's business expectancy in such relationships with potential customers and business partners, including NTT Data, due to the fact

that Barney is the majority owner of PR and PR granted OT, *inter alia*, a limited exclusive, royalty-free, worldwide license under the License Agreement.

157.    Barney and PR have intentionally and unjustifiably interfered with OT's business expectancies by soliciting potential customers of OT and attempting to divert customers from OT to PR.

158.    Specifically, and without limitation, Defendants' actions have interfered with OT's business expectancy with NTT Data in that OT has now been unable to obtain business from NTT Data as expected.

159.    Defendants' actions are not privileged because Defendants solicited the business of NTT Data in contravention of the License Agreement.  Moreover, Defendants have used unfair means to interfere with OT's relationship with NTT Data, including the disparagement of OT's goods, services and reputation.

160.    As a direct and proximate result of Defendants' actions, OT has sustained, and will continue to sustain, unless enjoined, severe and irreparable injury to its customer business expectancies and relationships.

161.    By reason of Defendants' deliberate, willful and malicious conduct, OT is entitled to exemplary damages in such amount as the public good requires to punish Defendants and to deter them and others from the commission of like acts.

**WHEREFORE**, OT respectfully requests this Court to enter judgment in its favor on Count VIII and award the following relief:

(a)    preliminary injunction to enjoin Defendants from interfering with OT's business expectancies and relationships;

(b)      permanent injunction to enjoin Defendants from interfering with OT's business expectancies and relationships;

(c)      compensatory damages in an amount to be determined at trial;

(d)      punitive damages; and

(e)      such other relief as this Court deems just and proper.

**COUNT IX**
**DECLARATORY JUDGMENT**
**<u>(BARNEY & PR)</u>**

162.      OT restates and realleges Paragraph Nos. 1 through 156 as and for this Paragraph No. 157 of Count IX.

163.      Upon discovering that Barney and PR were soliciting the business of NTT Data in contravention of the License Agreement entered into between OT and PR, OT contacted NTT Data to determine the scope of Defendants' interference with OT's business expectancy in its relationship with NTT Data.

164.      A present and actionable controversy now exists between OT and Defendants concerning whether OT is tortiously interfering with Defendants' business expectancy with respect to NTT Data by virtue of OT's contact with NTT Data.

165.      Specifically, OT contends that it is not tortiously interfering with Defendants' business expectancy with respect to NTT Data because the License Agreement provided OT, *inter alia*, with a limited exclusive, royalty-free, worldwide license to distribute, sell, license, or display PatentRatings analysis to third parties for a fee. (*See* Ex. E.)

166.      Defendants, on the other hand, contend that the License Agreement does not apply to the business contemplated by NTT Data and that, as a result, OT is tortiously interfering with Defendants' business expectancy in their relationship with NTT Data.

167.     A declaration by this Court is necessary to resolve this impasse and to determine the respective rights of the parties under the License Agreement and whether OT is tortiously interfering with Defendants' business expectancy with respect to NTT Data.

**WHEREFORE**, OT respectfully requests that this Court enter a declaratory judgment in OT's favor on Count IX granting the following relief:

(a)     a declaration that OT is not tortiously interfering with Defendants' business expectancy with respect to NTT Data on account of the limited exclusive, royalty-free, worldwide license provided to OT in the License Agreement; and

(b)     such other relief as this Court deems just and proper.

DATED:  January 13, 2015

Respectfully submitted,

OCEAN TOMO, LLC

By:  /s/Jeremy R. Heuer
            One of Its Attorneys

M. Derek Zolner
Jeremy R. Heuer
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601-1003
(312) 609-7500

## <u>CERTIFICATE OF SERVICE</u>

I, Jeremy R. Heuer, an attorney, hereby certify that on January 13, 2015, I caused to be electronically filed the foregoing **Second Amended and Supplemental Complaint for Injunctive Relief, Declaratory Judgment And Damages** with the Clerk of the Court using the Court's Case Management/Electronic Case Files (CM/ECF) system, which will send notifications of such filing to the following counsel of record:

David C. Layden                 DLayden@jenner.com

/s/ Jeremy R. Heuer