IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

OCEAN TOMO, LLC,

              Plaintiff-Counter Defendant,

v.

JONATHAN BARNEY and
PATENTRATINGS, LLC,

          Defendants-Counter Plaintiffs.

No. 12 C 8450

Judge:  Joan B. Gottschall
Magistrate:  Judge Mary M. Rowland

## **PLAINTIFF-COUNTER DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 101**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................ 1

II.  DEFENDANTS HAVE NOT ESTABLISHED A GENUINE ISSUE OF
     MATERIAL FACT AS TO THE VALIDITY OF THE PATENTS-IN-SUIT ................. 1

     A.   The Claims of the Patents-in-Suit Analyzed by OT and Its Expert are
          Representative of All the Claims of the Patents-in-Suit ........................................ 2

     B.   Defendants' Contention That § 101 Should Be Construed and Applied
          Liberally Is Not Supported by Case Law .............................................................. 3

     C.   Defendants Have Proffered No Legitimate Basis for Giving the Thomas
          Declaration "Little or No Weight" ........................................................................ 4

     D.   Defendants' Arguments That the Patents-in-Suit are Patent Eligible under
          Alice Have No Merit ............................................................................................ 7

          1.   Novelty and Utility Are Not Relevant to a § 101 Analysis ....................... 7

          2.   The Patents-in-Suit Fail Both Prongs of the Alice Framework ................. 8

               a.   The Patents-in-Suit Are Directed to Abstract Ideas ...................... 8

               b.   The Patents-in-Suit Merely Implement an Abstract Idea on
                    a Generic Computer .................................................................... 10

                    (i)   The Methods Claimed Can Be Carried Out in the
                          Mind or with Pen and Paper ............................................ 11

III. DEFENDANTS FAIL TO DEMONSTRATE THAT OT'S SECOND
     AFFIRMATIVE DEFENSE OF PATENT INVALIDITY FAILS AS A MATTER
     OF LAW ................................................................................................................ 12

     A.   OT Is Entitled to Summary Judgment to the Extent PR's Claims are
          Premised on Any Breaches of the License Agreement .......................................... 12

     B.   OT Need Not Establish That the Validity of the Patents-in-Suit Was
          Material to the License Agreement ..................................................................... 13

IV.  DEFENDANTS FAIL TO DEMONSTRATE THAT OT'S THIRD
     AFFIRMATIVE DEFENSE OF PATENT MISUSE FAILS AS A MATTER OF
     LAW ..................................................................................................................... 15

V.   DEFENDANTS HAVE NOT RAISED A GENUINE ISSUE OF MATERIAL
     FACT THAT OT SHOULD BE BARRED FROM ASSERTING INVALIDITY
     UNDER THE DOCTRINE OF EQUITABLE ESTOPPEL ......................................... 16

     A.   That OT Played a Role in the Prosecution of the Patents-in-Suit Is
          Irrelevant, as Alice Changed the Landscape ....................................................... 17

     B.   Defendants' Argument that OT Should Be Estopped from Asserting
          Invalidity Because OT "Substantially Benefitted" from the Patents Is
          without Support .................................................................................................. 18

## TABLE OF CONTENTS
(continued)

**Page**

    C.    Defendants' Unproven Allegations That OT Failed to Pay Revenues, Even If True, Would Not Estop OT from Asserting Invalidity ................................... 18

    D.    Defendants' Unproven Allegations of Fraud Are Irrelevant to Any Issue in This Motion......................................................................................................... 20

VI.    DEFENDANTS HAVE NOT RAISED A GENUINE ISSUE OF MATERIAL FACT THAT OT SHOULD BE BARRED FROM ASSERTING INVALIDITY UNDER THE DOCTRINE OF ASSIGNOR ESTOPPEL ............................................ 22

    A.    OT Is Not an Assignor of the Patents-in-Suit ...................................................... 22

    B.    OT Is Not In Privity with Barney ....................................................................... 23

VII.    DEFENDANTS HAVE NOT RAISED A GENUINE ISSUE OF MATERIAL FACT THAT OT SHOULD BE BARRED FROM ASSERTING INVALIDITY UNDER THE DOCTRINE OF JUDICIAL ESTOPPEL ................................................ 24

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
  134 S. Ct. 2347 (2014) ........................................................................................ passim

*Baladevon, Inc. v. Abbott Laboratories, Inc.* ........................................................... 13, 14

*Bilski v. Kappos*,
  130 S. Ct. 3218 (2010) ................................................................................... 3, 5, 7, 9

*Brulotte v. Thys Co.*,
  379 U.S. 29 (1964) ................................................................................... 12, 13, 14, 15

*Bucciarelli-Tieger v. Victory Records, Inc.*,
  488 F. Supp. 2d 702 (N.D. Ill. 2007) .................................................................... 21

*California Institute of Technology v. Hughes Communications, Inc.*,
  59 F. Supp. 3d 974 (C.D. Cal. 2014) ..................................................................... 9

*Chromalloy American Corp. v. Fischmann*,
  716 F.2d 683 (9th Cir. 1983) ............................................................................... 12

*Content Extraction & Transmission LLC v. Wells Fargo Bank*,
  776 F.3d 1343 (Fed. Cir. 2014) ............................................................................ 2, 3

*DDR Holdings, LLC v. Hotels.com L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) ................................................................... 1, 2, 5, 6

*Depuy Orthopaedics, Inc. v. Orthopaedic Hosp.*,
  No. 3:12-CV-299-CAN, 2015 U.S. Dist. LEXIS 18757 (N.D. Ind. Feb. 13, 2015) ............. 25

*Diamond Scientific Co. v. Ambico, Inc.*,
  848 F.2d 1220 (Fed. Cir. 1988) ........................................................................... 17

*Diamond v. Deihr*,
  101 S. Ct. 1048 (1981) ...................................................................................... 8, 9

*Gen-Probe Inc. v. Vysis, Inc.*,
  359 F.3d 1376 (Fed. Cir. 2004) ........................................................................... 16

*HWB, Inc. v. Braner, Inc.*,
  No. 92 C 5900, 1994 WL 447530 (N.D. Ill. Aug. 17, 1994) ...................................... 23

*I/P Engine, Inc. v. AOL Inc.*,
  576 F. App'x 982 (Fed. Cir. 2014) ........................................................................ 4

*Intellectual Ventures, LLC v. Symantec Corp*,
  2015 WL 1869690 (D. Del 2015) .......................................................................... 7

*Jarrard v. CDI Telecomms., Inc.*,
  408 F.3d 905 (7th Cir. 2005) ............................................................................... 24

*Kinetic Concepts, Inc. v. Wake Forest Univ. Health Sciences*,
  SA-11-CV-163-XR, 2014 WL 1612648 (W.D. Tex. Apr. 22, 2014) .............................. 24

*Kroy IP Holdings, LLC v. Safeway, Inc.*,
  No. 2:12-cv-00800, 2015 WL 3452469 (E.D. Tex. May 29, 2015) ............................... 11

*Lear, Inc. v. Adkins*,
  89 S.Ct. 1902 (1969) ...................................................................................... passim

*Meehan v. PPG Indus., Inc.*,
  802 F.2d 881 (7th Cir. 1986) ............................................................................... 15

*Modern Telecom Systemms LLC v. Earthlink, Inc.*
  2015 WL 1239992 (C.D. Cal 2015) ........................................................................ 7

# TABLE OF AUTHORITIES
(continued)

**Page**

*Natural Alternatives, LLC v. JM Farms*,
No. 5:12-CV-333-KKC, 2014 WL 6774497 (E.D. Ky. Dec. 2, 2014) .............................. 14, 19

*Nordion Int'l, Inc. v. Medi-Physics, Inc.*,
No. 95 C 1323, 1995 WL 519798 (N.D. Ill. Aug. 30, 1995)............................................ 12, 13

*Piersons v. Quality Archery Designs, Inc.*,
No. 3:06-CV-0408, 2009, U.S. Dist. LEXIS 131352 (N.D.N.Y. Feb. 26, 2009).................... 22

*Pitney–Bowe's, Inc. v. Mestre*,
701 F.2d 1365 (11th Cir. 1983) ..................................................................................... 12

*Princo Corp. v. International Trade Commission*,
616 F.3d 1318 (Fed. Cir. 2010)..................................................................................... 15

*Roberts v. Sears, Roebuck & Co.*,
573 F.2d 976 (7th Cir. 1978) ................................................................................... 17, 20

*Shamrock Techs., Inc. v. Medical Sterilization, Inc.*,
903 F.2d 789 (Fed. Cir. 1990)....................................................................................... 23

*Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.*,
112 F.3d 1561 (Fed. Cir. 1997).................................................................................. 13, 19

*Sybron Transition Corp. v. Nixon, Hargrave, Devans & Doyle*,
770 F. Supp. 803 (W.D.N.Y. 1991) ................................................................................ 14

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014)............................................................................ 1, 4, 8, 9

*Wang Lab. v. Oki Elec. Indus. Co.*,
15 F. Supp. 2d 166 (D. Mass. 1998) .............................................................................. 13

## Statutes

35 U.S.C. § 101 .......................................................................................................... passim
35 U.S.C. § 102 ............................................................................................................... 8
35 U.S.C. § 103 ............................................................................................................... 8

## Other Authorities

*A Look At Everything The Fed. Circ. Has Said About Alice* (June 2, 2015) ................................. 2

## I.    INTRODUCTION

Based upon the framework recently mandated by the Supreme Court in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014), OT presented a narrowly tailored summary judgment motion (the "Motion") asking this Court to decide the legal issue of whether Defendants' patents-in-suit are directed to patent-ineligible subject matter under 35 U.S.C. § 101. OT's motion demonstrated that as, a matter of law, Defendants' patents are directed to the abstract idea of using fundamental statistical and bibliometric techniques to analyze patent data on a wholly generic computer platform.  The patents' claims cover "an abstraction – an idea, having no particular concrete or tangible form," which is not rendered patent eligible by implementation on conventional computer hardware.  *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014).  In response, Defendants essentially ignore the two-step test set forth in *Alice,* misstate the law of patent misuse and assert three separate and legally insufficient forms of estoppel in a desperate attempt to prevent this Court from deciding the straightforward legal issue of eligibility under § 101.  However, as detailed below, there is no estoppel, none of the purported factual issues asserted is material to the legal issues at hand and Defendants' misstatements of law are unavailing.

## II.    DEFENDANTS HAVE NOT ESTABLISHED A GENUINE ISSUE OF MATERIAL FACT AS TO THE VALIDITY OF THE PATENTS-IN-SUIT

Defendants' contention that the patents-in-suit are valid under the two-part *Alice* test appears only in the last eighteen (18) pages of their forty-eight (48) page Response.  Defendants' argument boils down to the assertion that the patents are software patents "necessarily rooted in computer technology" and hence fall within the ambit of *DDR Holdings, LLC v. Hotels.com. L.P.*, 773 F.3d 1245 (Fed. Cir. 2014) (of its six post-*Alice* decisions regarding the eligibility of computer implemented inventions, *DDR* is the only decision in which the Federal Circuit has

found § 101 to be satisfied; see *A Look At Everything The Fed. Circ. Has Said About Alice* (June 2, 2015)[1]).  This argument fails as the patents neither disclose, nor claim, software, and the statistical and bibliometric techniques they claim are readily separable from computer technology.[2]

### A. The Claims of the Patents-in-Suit Analyzed by OT and Its Expert are Representative of All the Claims of the Patents-in-Suit

Defendants attempt to diminish OT's Motion by arguing that OT failed to do a claim-by-claim analysis of all 192 claims of the patents-in-suit.  [Docket No. 119 pp. 30–31.]  The Federal Circuit, however, has confirmed that such an exhausting and wasteful effort is not required.  In *Content Extraction & Transmission LLC v. Wells Fargo Bank*, the Court held that "addressing each claim of the asserted patents was unnecessary."  776 F.3d 1343, 1348 (Fed. Cir. 2014).  In particular, the Court found no fault in the district court's determination that the identified claims were representative because all the claims were "substantially similar and linked to the same abstract idea."  *Id.* (quotations and citations omitted).  Here, Defendants argue that OT failed to address every claim, but they do not actually differentiate any claims from those identified as representative.  [Docket No. 119 pp. 30–31.]  As the Court in *Content Extraction* noted:

> If CET disagreed with PNC's or the district court's assessment, CET could have identified claims in its opposition brief that it believed would not be fairly represented by claims 1 of the '855 and '416 patents for purposes of PNC's § 101 challenge.  Regardless, we have reviewed all the claims of CET's asserted patents, and agree with the district court that, for the purposes of PNC's § 101 challenge, 1) the claims of the asserted patents are substantially similar in that they recite little more than the same abstract idea, and 2) claim 1 of the '855 patent and claim 1 of the '416 patent are representative.

---

[1] Article available at this web address:
http://www.law360.com/ip/articles/662776?nl_pk=063a3bdc-d272-4185-a6e4-6021385b0917&utm_source=newsletter&utm_medium=email&utm_campaign=ip.

[2] Unlike here, in *DDR* the patent claims were directed to a method which "overrides the routine and conventional sequence of events" in a computer network so that the network does not "operat[e] in its normal, expected manner."  *DDR*, 773 F.3d at 1258.  Nothing remotely similar is found in the methods claimed by the patents-in suit.

*Id.  See also Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) (finding that 11 claims in patent application were invalidly abstract after analyzing only two representative claims in detail).

Moreover, Defendants acknowledge that OT's expert Dr. Patrick Thomas did in fact identify representative claims for each of the patents-in suit in his Declaration.  [Docket No. 97-1 ¶¶ 79–162.]  Defendants do not actually argue that the claims relied upon by Dr. Thomas and Plaintiff are not representative of the claims set forth in each of the patents-in-suit.[3]  Absent any argument by Defendants that the cited claims are not representative, and consistent with the decision in *Content Extraction*, the representative claims analyzed by OT and Dr. Thomas are sufficient for this Court to address patent eligibility under § 101 for each of the patents-in-suit.

## B.      Defendants' Contention That § 101 Should Be Construed and Applied Liberally Is Not Supported by Case Law

Defendants next argue that eligibility under § 101 "should be construed and applied liberally subject to judicial exceptions" under *Alice*.  [Docket No. 119 pp. 31–32.]  To the extent that Defendants suggest that the exclusion of abstract ideas from eligibility under § 101 should be construed narrowly, *Alice* is to the contrary:

> Laws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work.  Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws.  We have repeatedly emphasized this concern that patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity.

134 S. Ct. at 2354 (internal quotations and citations omitted).  The Court was explicit that monitoring eligibility under § 101 is imperative to protect the integrity of the patent laws:

---

[3] Significantly, each of the representative claims directed to the Relevance Patents includes the claim element "Probabilistically quantifying a degree of relatedness . . ., based on analyzing indirect citations occurring at generations higher than the first generation," which is the element that Defendants assert solves the problem addressed by the claims.  [Docket No. 119 p. 39.]

> Accordingly, in applying the §101 exception, we must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention. The former would risk disproportionately tying up the use of the underlying ideas, and are therefore ineligible for patent protection. The latter pose no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws.

134 S. Ct. at 2354–55 (internal quotations and citations omitted).

Likewise, the Federal Circuit has stressed that a "robust application" of § 101 ensures "that patent protection promotes, rather than impedes, scientific progress and technological innovation." *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014) (Mayer, J., concurring). Indeed, the Federal Circuit has directed that a stringent and early application of § 101 will conserve judicial resources:

> From a practical perspective, addressing section 101 at the outset of litigation will have a number of salutary effects. First, it will conserve scarce judicial resources. Failure to recite statutory subject matter is the sort of basic deficiency, that can, and should, be exposed at the point of minimum expenditure of time and money by the parties and the court.

*Ultramercial*, 2014 WL 5904902, at *8 (internal citations and quotations omitted).

Thus, contrary to Defendants' contention, numerous federal courts including the Supreme Court have clearly signaled that a rigorous application of § 101 is required to prevent the usurpation of the basic building blocks of human ingenuity.

### C. Defendants Have Proffered No Legitimate Basis for Giving the Thomas Declaration "Little or No Weight"

Defendants next argue that the Court should give "little or no weight" to Dr. Thomas's Declaration because it is "replete with legal opinions and conclusions that Dr. Thomas is demonstrably not qualified to offer." [Docket No. 119 p. 34.] Dr. Thomas is a science and technology analyst who specializes in intellectual property analytics and has over two decades of experience with patent metrics, citation data and statistical models. (*Id.* ¶ 3.) He obtained a B.S.

in Management Science, an M.S. in Computer Science and a Ph.D. in Management Science and Statistics before embarking on his career in intellectual property metrics in 1998. (*Id*. ¶¶ 5–6.)

Defendants do not contest that Dr. Thomas is a statistics and bibliometrics expert qualified to provide useful testimony regarding the analytical techniques claimed by the patents-in-suit and their relationship to basic and long-established building blocks of statistics and bibliometrics. [Docket No. 119 pp. 34–37.] Dr. Thomas does not purport to be an attorney or a legal expert. Indeed, he explicitly states in his Declaration that he is "not an attorney." [Docket No. 97-1 ¶ 63.] Dr. Thomas's Declaration makes clear, however, that he works "extensively with patent data" and tracks "closely any significant events related to patents, since these events may effect [his] current and future client engagements." (*Id*.)

To that end, Dr. Thomas provides his Declaration in the context of his "understanding of current patent law related to software and business method patents," namely, the import of the "machine-or-transformation test" following *Bilski* and the two-part test set forth in *Alice*. (*Id*. ¶¶ 64–69.) Defendants do not dispute that Dr. Thomas's understanding of this legal framework as set forth in his Declaration is correct.

Defendants claim only that Dr. Thomas' "conclusions regarding the law governing patent eligibility of software-implemented inventions are incorrect" based upon a single answer in Dr. Thomas's deposition testimony that the "inventive step" under the second prong of the *Alice* framework requires "some improvement or enhancement to a physical process or a tangible outcome beyond just simply the abstract idea." [Docket No. 119 p. 35.] Defendants claim that Dr. Thomas's statement is incorrect because it would "preclude patent eligibility of all software-implemented inventions, which is not the law," citing to *DDR Holdings*. (*Id*.) Defendants fail to apprise the Court of the full scope of Dr. Thomas's testimony on the subject, which spans over

20 pages and which makes clear that Dr. Thomas recognized that software which improves the technical performance of a computer may be patent eligible, a view entirely consistent with *DDR Holdings*. (*See* Declaration of Joel Lutzker "Lutzker Aff." Ex. H at 63–84.) In any event, this theoretical point is immaterial to the issues at hand, because there is no software disclosed or claimed in the patents-in-suit.

Dr. Thomas' expertise in statistical and bibliometric analysis qualifies him to testify regarding the application of the *Alice* factors to technologies such as those claimed in the patents-in-suit. Dr. Thomas was clear, for example, that he could not conceive of a "patent-eligible process that uses a computer" in the fields of his expertise (bibliometrics and statistics) because "in bibliometrics, you are simply relating one abstract input to one abstract input" and "in statistics, again, you are simply measuring the relationship between an input and an output, using standard mathematical relationships." (Lutzker Aff. Ex. H at 83:8–84:22.)

Defendants also argue that OT's reliance on Dr. Thomas's Declaration is "misplaced" because he refers to certain "concepts or processes" which were not patented until after certain of the patents-in-suit. [Docket No. 119 pp. 35–37.] Specifically, Defendants identify Dr. Thomas's references to the Hirsch Index, Linked, Facebook, PatentCafe's Patent Factor Index and 1790 Analytic's Patent Evaluation Scores as examples that postdate certain of the patents-in-suit. (*Id.*)

Dr. Thomas did not cite to these as examples of systems that predate the patents-in-suit. Instead, those systems were cited as examples of the wide use of the same basic statistical and bibliometric tools as are claimed by the patents-in-suit. [*See* Docket No. 97-1 ¶ 33 ("Citation-based metrics such as [the Hirsch Index] are widely quoted, and are frequently used in hiring and tenure decisions for academic researchers."), ¶ 91 (noting that the "idea that documents with strong indirect citations links would be more likely to have a direct citation link . . . is in reality a

feature of any network, not just a citation network."), ¶ 130 ("A system that can identify the most valuable patents is of interest to a wide range of stakeholders, . . . The PatentRatings system is asserted to be one such system. However, it is far from the only one."). This is relevant to the second prong of the *Alice* test. *Alice*, 134 S. Ct. at 2357–58.

To be sure, Dr. Thomas's Declaration also provides numerous references to the use of these same basic statistical and bibliometric tools, which long predate the applications for the patents-in-suit. [Docket No. 97-1 ¶¶ 12–55, 74–75, 89, 129.] Given his undisputed expertise in statistical and bibliometric models such as those claimed in the patents-in-suit, Dr. Thomas is qualified to provide useful testimony in light of the framework set forth in *Bilski* and *Alice*.

### D. **Defendants' Arguments That the Patents-in-Suit are Patent Eligible under** *Alice* **Have No Merit**

*Alice* sets forth a two-step test for determining patent-eligible subject matter under 35 U.S.C. § 101. That test requires courts to determine 1) whether the claims are directed to an abstract idea; and, if so, 2) whether the additional elements transform the nature of the claim into a patent-eligible concept.[4] *Alice*, 134 S. Ct. at 2354. Here, Defendants do not properly apply the analysis required under *Alice*. Rather, Defendants merely identify purported problems with preexisting technologies, which problems they argue are solved by the patents-in-suit. [Docket No. 119 pp. 38–39.]

---

[4] Defendants also argue that a clear and convincing evidence standard should apply to the issue. [Docket No. 119 p. 30.] While it is, at a minimum, unclear whether the clear and convincing evidence standard has a place in deciding the legal issue of patent eligibility (See, e.g. *Intellectual Ventures, LLC v. Symantec Corp,* 2015 WL 1869690 (D. Del 2015); *Modern Telecom Systemms LLC v. Earthlink, Inc.* 2015 WL 1239992 (C.D. Cal 2015), since Defendants have presented no competent or material evidence in opposition to OT's motion, regardless of what burden is imposed, the motion should be granted.

### 1. Novelty and Utility Are Not Relevant to a § 101 Analysis

Defendants' argument with respect to the first prong of the *Alice* framework focuses on the assertion that the claims of the patents-in-suit are novel. [Docket No. 119 pp. 38–40, 43–46.] However, novelty is irrelevant to that issue. *Diamond v. Deihr*, 101 S. Ct. 1048, 1058 (1981) (holding that "the novelty of any element or steps in a process . . . is of no relevance" in § 101 analysis). Defendants devote several pages to contending that the patents-in-suit are unique, "solve or mitigate" problems or have received praise from others. [Docket No. 119 pp. 38–40, 43–46.] None of this is relevant to whether the patents-in-suit are directed to patent-eligible subject matter. Instead, it is directed to the irrelevant subject of novelty and non-obviousness under §§ 102 and 103 and has no application to prong one of *Alice*. 134 S. Ct. at 2355–57.

Like the patent owner in *Ultramercial*, who unsuccessfully contested the first prong of *Alice* arguing that the relevant claims were not "routine," "long prevalent," or "conventional," Defendants argue that certain elements of the claims here are not "widespread, long-standing [or] well-known." [Docket No. 119 p. 39.] This argument was rejected by the Federal Circuit in *Ultramercial*, and should be rejected here. *Ultramercial*, 772 F.3d at 715 ("We do not agree with Ultramercial that the addition of merely novel or non-routine components to the claimed idea necessarily turns an abstraction into something concrete. In any event, any novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis"). Defendants' conclusory statement that the patents-in-suit are not directed to an abstract concept based on these arguments simply cannot form the basis for a genuine issue of material fact on the legal question of whether the patents-in-suit are directed to an abstract idea.

### 2. The Patents-in-Suit Fail Both Prongs of the *Alice* Framework

#### a. The Patents-in-Suit Are Directed to Abstract Ideas

In *Ultramercial,* the court found that the

> ordered combination of steps recites an abstraction—an idea, having no particular concrete or tangible form. The process of receiving copyrighted media, selecting an ad, offering the media in exchange for watching the selected ad, displaying the ad, allowing the consumer access to the media, and receiving payment from the sponsor of the ad all describe an abstract idea, devoid of a concrete or tangible application.

*Id*. at 715. Here, each of the patents-in suit recites an ordered combination of steps constituting an abstract idea—application of basic statistical and bibliometric tools to data to determine probabilities of certain events or relationships.[5] [*See* Docket No. 97-1 ¶ 101.] As in *Ultramercial*, this is simply an abstract idea, with no particular or concrete form.

Defendants take issue with OT's characterization of the patents-in-suit. However, OT's approach of determining the import of the relevant claims is consistent with the approach taken by the Supreme Court in *Alice* when it characterized the claims in that case as using "a third party to mitigate settlement risk." *Alice*, 134 S. Ct. at 2356. The Supreme Court in *Bilski* and *Mayo* took the same approach. As noted in *California Institute of Technology v. Hughes Communications, Inc.*:

> The *Deihr* majority took the correct approach of asking what the claim was trying to achieve, instead of examining the point of novelty. Courts should recite a claim's purpose at a reasonably high level of generality. Step one is a sort of "quick look" test, the object of which is to identify a risk of preemption and

---

[5] The patents themselves concede that these tools were well known and conventional. For example, the '701 Patent admits:

> ***Multiple regression modeling is a well-known statistical technique for examining the relationship between two or more predictor variables (PVs) and a criterion variable (CV).*** In the case of the present invention the predictor variables (or independent variables) describe or quantify the selected relevant characteristics of a particular patent population, e.g., class/sub-class, number of independent claims, number of patent citations, length of specification etc. Criterion variables (or dependent variables) measure a selected quality of a particular patent population, such as likelihood of successful litigation (either validity or infringement). ***Multiple regression modeling allows the criterion variable to be studied as a function of the predictor variables in order to determine a <u>probabilistic relationship</u> between selected variables***. This data, in turn, can be used to predict the presence or absence of the selected quality in other patents or related documents of interest.

[Docket No. 97-3 ('701 Patent) Col. 13, ln. 55 to Col. 14, ln. 4.]

ineligibility. If a claim's purpose is abstract, the court looks with more care at specific claim elements at step two.

59 F. Supp. 3d 974, 991–92 (C.D. Cal. 2014).

But even utilizing the rubric urged by Defendants, the claims fail prong one of *Alice*. For example, with respect to the Relevance Patents, Defendants argue that the claimed invention is directed to "probabilistically quantifying a degree of relatedness between citationally or contextually related documents by determining an event probability of a direct . . . citation based on analyzing indirect citations occurring at generations higher than the first generation." [Docket No. 119 p. 39.] This description is no less abstract under the *Alice* standard than the description offered by Dr. Thomas and OT.

> **b.** **The Patents-in-Suit Merely Implement an Abstract Idea on a Generic Computer**

The second step of the *Alice* framework requires the court to "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." 134 S. Ct. at 2355. The relevant question in *Alice* was "whether the claims here do more than simply instruct the practitioner to implement the abstract idea of intermediated settlement on a generic computer." *Id.* at 2359. The Court in *Alice* concluded that the second step was not satisfied because the function performed by the computer at each step of the claims was "purely conventional." *Id.*

Here, the patents-in-suit simply direct the user to implement the abstract idea on a generic computer. The computer in each of the patents-in suit simply carries out generic functions of calculating, counting, storing and displaying. [Docket No. 97-1 ¶ 101.]

As the Eastern District of Texas recently held in connection with a finding of invalidity, "nothing in the claims purports to improve the functioning of the computer itself, and the computer-related elements of the claim add nothing that is not already present in the steps of the

claimed system and methods, other than the speed and convenience of basic computer functions such as calculation, communication, and the display of information." *Kroy IP Holdings, LLC v. Safeway, Inc.*, No. 2:12-cv-00800, 2015 WL 3452469, at *13 (E.D. Tex. May 29, 2015). The same is true of the claims of the patents-in-suit.

### (i) The Methods Claimed Can Be Carried Out in the Human Mind or with Pen and Paper

Defendants dispute that the claimed inventions could be carried out by humans, arguing that OT did not "identify any known human capable of probabilistically quantifying, even with pencil and paper, a degree of relatedness among millions of potentially relevant documents in a way that solves the identified problems associated with conventional search engines." [Docket No. 119 p. 42.] However, the claims of the patents-in-suit are not limited to data compilations in the millions, and humans can carry out the functions on a smaller scale. This issue was also recently addressed in *Kroy*:

> Kroy disputes that the claimed functions recited in the…claims could be performed by humans. In making that argument, however, Kroy relies on the presumed volume of information and speed required in large, commercial incentive award programs, which a human armed with only a pencil and paper could not keep up with. But the claims apply to incentive award programs without regard to their size, and there is no room for doubt that if the incentive program were small, humans could perform each of the tasks that the claims assign to computers without the need for processing assistance.

> Computers can, or course, be useful in managing a large volume of transactions, doing so at great speed, and efficiently communicating the results of those transactions to system users. But the basic functions recited in the…patent— selecting awards based on consumers' demographic and psychographic preferences, ensuring that those awards are available in inventory, and directing the consumers to a particular location to redeem their awards—all constitute conventional conduct that could be performed by a human being. The greater efficiency with which the computer can perform tasks that a human could perform does not render the inventions patentable.

*Kroy*, 2015 WL 3452469, at *13 (citations omitted).

-11-

Here, the claims of the patents-in suit use a conventional computer to carry out generic computer functions. That a computer can carry out the claimed method more quickly is of no moment. Consequently, Defendants have failed to demonstrate under the second prong of *Alice* that the abstract idea includes an inventive concept.

## III. DEFENDANTS FAIL TO DEMONSTRATE THAT OT'S SECOND AFFIRMATIVE DEFENSE OF PATENT INVALIDITY FAILS AS A MATTER OF LAW

### A. OT Is Entitled to Summary Judgment to the Extent PR's Claims are Premised on Any Breaches of the License Agreement

Defendants attempt to conflate the relief sought by OT, arguing that the cases cited by OT "do not support the [allegedly] novel proposition urged by OT: that a finding of invalidity of a patent automatically and absolutely absolves a party of all liability for breaches of contract and fraud." [Docket No. 119 p. 12.] This is not what OT argues.

Agreements requiring licensees to pay royalties to patent licensors after the patent has been declared invalid are illegal *per se* under the Supreme Court's decision in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964). This is true for pure patent licenses as well as so-called "hybrid" agreements containing provisions "for a single royalty payment for use of both a patent and other non-patent assets, such as trade secrets." *See, e.g., Nordion Int'l, Inc. v. Medi-Physics, Inc.*, No. 95 C 1323, 1995 WL 519798, at *3 (N.D. Ill. Aug. 30, 1995); *Chromalloy American Corp. v. Fischmann*, 716 F.2d 683, 685–86 (9th Cir. 1983); *Pitney–Bowe's, Inc. v. Mestre*, 701 F.2d 1365, 1371–72 (11th Cir. 1983). Under this well-established precedent, if the patents-in-suit are declared invalid, the License Agreements are rendered illegal *per se*. Count III of Defendants' Counterclaims is a claim for breach of the License Agreement, and Count VI is a claim for fraud premised on allegations that, *inter alia*, the "consideration promised to [PR] by [OT] has failed in material respect due to [OT's] willful default in the reporting and payment of revenues owed

-12-

to [PR] under the Agreement." [Docket No. 84 ¶¶ 87–91, 108.] As set forth in the Motion, if the License Agreement is rendered invalid, OT is entitled to summary judgment on its Second and Third Affirmative Defenses. [Docket No. 109 pp. 2–4.]

Defendants are correct that patent invalidity is not a defense to recovery of royalties under the License Agreement *before* the licensee repudiated the patents at issue. *See Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.*, 112 F.3d 1561, 1568 (Fed. Cir. 1997).[6] OT has never argued to the contrary. However, raising invalidity in an answer is sufficient to "repudiate" patents and put the patent-holder on notice that subsequent royalties incurred are at issue. *Wang Lab. v. Oki Elec. Indus. Co.*, 15 F. Supp. 2d 166, 180 (D. Mass. 1998) (citations omitted). Here, OT first raised invalidity as an affirmative defense on December 21, 2012. (Lutzker Aff. Ex. A, p. 9.) As such, a holding of invalidity is a complete defense to contract-based claims arising after December 21, 2012 and will materially streamline this case.

**B.** **OT Need Not Establish That the Validity of the Patents-in-Suit Was Material to the License Agreement**

Defendants next wrongly claim that parties seeking to establish invalidity as a defense to a breach-of-contract action must establish the materiality of the patent's validity to the agreement at issue. [Docket No. 119 p. 13.] This is incorrect, and the law on this issue could not be clearer: under *Brulotte* and its progeny, agreements requiring licensees to pay royalties to patent licensors after the patent has been declared invalid are illegal *per se*. *Nordion*, 1995 WL 519798, at *3.

In support of their argument, Defendants cite three plainly inapplicable cases. In *Baladevon, Inc. v. Abbott Laboratories, Inc.*, there were "two crucial factors which support enforceability of [the] hybrid royalty agreement" at issue despite the precedents of *Lear* and

---

[6] Even so, the *Shell Oil* case did not hold, as Defendants argue, that all patents covering the licensed product need to be declared invalid to absolve a licensee of an obligation to pay license fees following a challenge; rather, only "the relevant patent claims" need to be declared invalid. *Shell Oil*, 112 F.3d at 1562.

*Brulotte*. 871 F. Supp. 89, 95 (D. Mass. 1994). First, it was undisputed in that case that "the contract [at issue] took the form of an assignment rather than a licensing arrangement." *Id*. This distinction is crucial because while *Lear* definitively abolished licensee estoppel, "[t]he weight of authority holds that the doctrine of assignee estoppel survived *Lear*." *Id*. Defendants do not, and cannot, argue that the License Agreement is an assignment rather than a license.

Second, in *Baladevon* "the assignment agreement provided a mechanism for reducing the royalties to reflect competition in the marketplace should the patent not issue or prove invalid." *Id*. As the court recognized, "agreements which specifically provide for separate allocation of payments of royalties for patent and non-patent rights may well survive after expiration or invalidity of the patents despite the *Brulotte* rule of *per se* invalidity." *Id*. at 94 (citations omitted). Here, the License Agreement contains no such mechanism. Instead, it merely lumps the patents-in-suit in with other licensed material for a single royalty. [*See* Docket No. 116-6 § 1.5.]

*Sybron* also involved an assignment rather than a license, and the Court specifically found that *Lear* was inapplicable as a result. *Sybron Transition Corp. v. Nixon, Hargrave, Devans & Doyle*, 770 F. Supp. 803, 807–8 (W.D.N.Y. 1991). *Sybron* does not even mention *Brulotte*. *Id*.

In *Natural Alternatives, LLC v. JM Farms*, the defendant did "not assert patent invalidity as an affirmative defense to [plaintiff's] breach claim." No. 5:12-CV-333-KKC, 2014 WL 6774497, at *2 (E.D. Ky. Dec. 2, 2014). Instead, it argued contract frustration, but even there, it did "not argue that the *invalidity* of the two patents frustrates the purpose of the agreement." *Id*. (emphasis in the original). The issues in *Natural Alternatives* hence were notably different from those here. In any event, the cited portion of the opinion relied upon by Defendants is dicta

contained in a footnote without any citation to authority explaining its apparent conflict with *Lear* and *Brulotte*. *Id.* at *2, n.1. In sum, Defendants' argument is unsupported and directly contradicted by well-settled, binding Supreme Court precedent.[7]

## IV. DEFENDANTS FAIL TO DEMONSTRATE THAT OT'S THIRD AFFIRMATIVE DEFENSE OF PATENT MISUSE FAILS AS A MATTER OF LAW

Defendants next argue that OT has failed to establish the affirmative defense of patent misuse by failing to "identify even a single instance of alleged 'misuse'" and "show resulting anticompetitive effects in a relevant market." [Docket No. 119 p. 16.] Defendants' again rely on plainly inapplicable case law in support of this theory. The case law is crystal clear that charging royalties for invalid patents constitutes misuse: "Under *Brulotte* when royalty payments extend unchanged beyond the life of a patent, patent leverage has been abused and the agreement is unlawful *per se*." *Meehan v. PPG Indus., Inc.*, 802 F.2d 881, 886 (7th Cir. 1986).

Defendants cite to *Princo Corp. v. International Trade Commission* for the proposition that "leverage" must be demonstrated to sustain a finding of patent misuse. [Docket No. 119 p. 16, *citing* 616 F.3d 1318, 1328 (Fed. Cir. 2010).] Defendants drastically misstate the reasoning of *Princo*. In the cited excerpt, the Court was merely reciting the history of the misuse defense, and it specifically acknowledged *Brulotte*'s holding that "licenses requiring the payment of licensing fees after the expiration of the licensed patent and thus having the effect of extending the life of the patent beyond the statutory period" constitute patent misuse. *Id.* at 1327. The Court explained that the facts at issue in *Princo* presented "a completely different scenario from the cases previously identified by the Supreme Court and by this court as implicating the

---

[7] Defendants' argument that the payments required under the License Agreement "are not 'royalties' paid in *quid pro quo* exchange for a 'patent license,'" but instead part of a larger transaction, is nothing more than a red herring having no support in the transaction documents relied upon. Once again, Defendants cite to no authority in support of this proposition or to overcome the well-established rule under *Lear* and *Brulotte* that agreements requiring licensees to pay royalties to patent licensors after the patent has been declared invalid are illegal *per se*.

doctrine of patent misuse." *Id.* Accordingly, *Princo* provides no basis for departing from the bright-line rule established by the Supreme Court in *Brulotte* and its progeny.

## V. DEFENDANTS HAVE NOT RAISED A GENUINE ISSUE OF MATERIAL FACT THAT OT SHOULD BE BARRED FROM ASSERTING INVALIDITY UNDER THE DOCTRINE OF EQUITABLE ESTOPPEL

Defendants next argue that "there are, at the very least, genuine disputes of material fact as to whether OT is barred by [equitable estoppel] from asserting alleged invalidity in this case." [Docket No. 119 p. 17.] Defendants acknowledge that, under *Lear, Inc. v. Adkins*, 89 S.Ct. 1902 (1969), "patent validity challenges may be raised as an affirmative defense to a contract claim for payment of royalties," but make the novel argument that courts faced with validity challenges must somehow balance the equities between licensees and licensors before making a determination as to validity.

Defendants first cite to *Gen-Probe Inc. v. Vysis, Inc.*, 359 F.3d 1376, 1381 (Fed. Cir. 2004), for the proposition that *Lear* "does not grant every licensee in every circumstances the right to challenge the validity of the licensed patent." [Docket No. 119 p. 18.] The issue in *Gen-Probe*, however, was whether or not in the absence of a breach of contract claim by licensor, there was a justiciable controversy sufficient to support declaratory-judgment jurisdiction. *Gen-Probe*, 359 F.3d at 1380. The court merely acknowledged that there were certain situations in which, despite *Lear's* repudiation of licensee estoppel, a case or controversy did not exist. The court did not create a new equitable-estoppel defense to invalidity claims. *Id.* at 1381.[8]

---

[8] Regardless, *Gen-Probe*'s holding was explicitly abrogated by the Supreme Court in *Medimmune, Inc. v. Genentech, Inc.*, in which the Court held that the "actual case or controversy" requirement was satisfied "even though petitioner did not refuse to make royalty payments under the license agreement." 549 U.S. 118, 119 (2007). The Supreme Court specifically referenced *Lear* in support of its decision. *Id.* at 124. Therefore, Defendants' representation that *Gen-Probe* was "abrogated on other grounds" is simply incorrect. [*See* Docket No. 119 p. 18.]

-16-

Defendants next cite to *Diamond Scientific Co. v. Ambico, Inc.* and *Roberts v. Sears, Roebuck & Co.* for the proposition that, despite *Lear*, "there are still circumstances in which the equities of the contractual relationships between the parties should deprive one party . . . of the right to bring that challenge." [Docket No. 119 p. 18, *citing* 848 F.2d 1220, 1224–25 (Fed. Cir. 1988) & 573 F.2d 976, 982 (7th Cir. 1978).] Defendants again conveniently ignore that both cases dealt with assignments rather than licenses. *Diamond*, 848 F.2d at 1222; *Roberts*, 573 at 982. As the *Diamond* court expressly acknowledged, "*Lear* resolved the issue of licensee estoppel by writing its obituary; but for courts wrestling with assignor estoppel it was less clear whether *Lear* had also sounded the death knell for that doctrine." *Id*. at 1223.

In sum, Defendants have failed to cite a single case which supports its argument that this Court needs to "balance the equities" among the parties before deciding the present Motion.

## A. That OT Played a Role in the Prosecution of the Patents-in-Suit Is Irrelevant, as *Alice* Changed the Landscape

Their failure to provide any legal authority for their equitable-estoppel arguments notwithstanding, Defendants next argue that OT should be estopped from asserting invalidity of the patents-in-suit because OT "controlled" and "encouraged" the prosecution of "at least four of the eight patents it now seeks to invalidate." [Docket No. 119 pp. 19–20.] Defendants cite no authority in support of their argument that such participation should preclude OT from challenging the patents-in-suit. [Docket No. 119 pp. 19–20.]

Regardless, any role OT played in the prosecution of the patents-in-suit is completely irrelevant to the present Motion, as it concerns actions taken years before *Alice*. As OT makes clear in its Motion, *Alice* "represents a sea change regarding the eligibility of claims involving abstract ideas." [Docket No. 95 pp. 2, 7.] Because the *Alice* decision had not yet "raised the bar for patentability," any positions previously taken or advocated by OT with respect to eligibility

-17-

of the patents-in-suit under § 101 have no bearing on OT's current validity challenge, which is based upon the current, drastically altered, legal framework.[9]  [*See* Docket No. 95 pp. 2–3, citing *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2354 (2014).]

### B.    Defendants' Argument that OT Should Be Estopped from Asserting Invalidity Because OT "Substantially Benefitted" from the Patents Is without Support

Defendants next argue that "precluding OT from challenging the patents on the basis of patent eligibility under § 101 would not frustrate the policies of *Lear*" because OT benefitted from the patents-in-suit.  [Docket No. 119 pp. 20–21.]  Defendants do not specifically assert that this argument provides a basis for denying the Motion, nor do Defendants cite to any cases in which a court rejected an invalidity challenge because a licensee benefitted from the patents at issue.  (*Id.*)  Regardless, the *Lear* Court explicitly observed that while "[u]nder ordinary contract principles the mere fact that some benefit is received is enough to require the enforcement of the contract, regardless of the validity of the underlying patent," any such benefit was outweighed by the importance of permitting licensees to challenge patents.  *Lear*, 89 S. Ct. at 1911 (1969).  As such, Defendants provide no reason to depart from the well-settled precedent of *Lear*.[10]

---

[9] For the avoidance of doubt, each of the "claim amendments and arguments" cited by Defendants pertain positions taken well before *Alice* was decided in 2014.  [*See* Docket No. 116-33 (dated April 7, 2010); Docket No. 116-34 (dated February 4, 2009); Docket No. 116-35 (dated November 23, 2009); Docket No. 116-36 (dated June 9, 2009).]

[10] Furthermore, the only purported evidence Defendants cite in support of their argument that OT has benefitted, and continues to benefit, from the patents-in-suit is a letter dated July 18, 2014 in which OT notified PR of suspected infringement and requested that PR take action against the suspected infringer.  [Docket No. 119 p. 21, citing Docket No. 116-44.]  Defendants fail to mention that PR *refused* to take action in response to this letter and, in fact, OT's Tenth Affirmative Defense asserts that OT has been denied the benefits of the licenses precisely because Defendants have taken no steps to curtail third-party infringement.  (Lutzker Aff. ¶ G, p. 1; Docket No. 89 p. 42.)

**C.** **Defendants' Unproven Allegations That OT Failed to Pay Revenues, Even If True, Would Not Estop OT from Asserting Invalidity**

Defendants next argue that OT's validity challenge should be barred based on Defendants' allegations that "OT concealed and/or failed to adequately report revenues owed to PR." [Docket No. 119 p. 21.] This argument is directly contradicted by *Lear* and its progeny. Numerous courts have explicitly held that, under *Lear*, invalidity is a defense to the payment of past-due royalties. *Natural Alternatives, Inc. v. JM Farms*, No. 5:12-CV-333-KKC, 2015 U.S. Dist. LEXIS 55271, at *2 (E.D. Ky. Apr. 28, 2015) *citing Lear*, 89 S.Ct. at 1913 ("When a licensee…is sued for failing to pay royalty payments due under a license agreement, it can assert as an affirmative defense that the licensed patents are invalid."). Regardless, Defendants once again fail to cite any authority supporting their position.

Specifically, Defendants cite to *Shell Oil* for the proposition a "licensee that materially breaches a license agreement by failing to adequately report and pay revenues owed cannot rely on *Lear* to avoid the liabilities stemming from those very breaches." [Docket No. 119 p. 21.] As set forth above, the issue in *Shell Oil* was not whether a licensee's purported failure to pay revenues would bar the licensee's validity challenge, but rather, whether licensees should be responsible for royalties incurred before the licensee challenges the validity of the patents. *Id.* at 1566–67. *Shell Oil*, however, in no way overruled or diminished *Lear*, which announced a clear policy in favor of allowing licensees to challenge the validity of patents and rejecting any common-law estoppel against licensees. *See Lear*, 89 S. Ct. at 1911.[11]

---

[11] It is also worth noting that Defendants' only support for its factual contention that OT "concealed and/or failed to adequately report revenues owed to PR" is one paragraph in Mr. Barney's Declaration and an e-mail attached as an exhibit thereto which refer to a royalty underpayment of $9,046.83, which Mr. Barney admits, and the exhibit confirms, OT acknowledged and paid in early 2012 after it was brought to OT's attention. [Docket No. 119 p. 21, citing Docket No. 116-1 ¶ 45 & Docket No. 116-40.] While Mr. Barney claims in his Declaration that "OT failed to identify other unreported revenues and refused to investigate or

### D. Defendants' Unproven Allegations of Fraud Are Irrelevant to Any Issue in This Motion

Defendants next argue that OT's invalidity challenge should somehow be barred by OT's "other fraudulent acts." [Docket No. 119 pp. 21–22.] Defendants' reliance on the decision in *Roberts* for this point is to no avail. Not only did it involve "a complete assignment of plaintiff's patent rights," rather than a license, it did not involve patent invalidity as a defense to a claim for patent royalties. 573 F.2d at 982.[12] Their failure to cite any applicable authority notwithstanding, Defendants' allegations of fraud are completely unsupported and, regardless, were previously rejected in an arbitration between the parties. The only purported "evidence" submitted by Defendants in support of their statement that "OT committed . . . fraudulent acts" is one paragraph of Mr. Barney's Declaration in which he asserts, without documentary support, that OT fraudulently promised 1) that OT would assume the obligation for all further expenses associated with OT's use and development of the PRS; and 2) that OT had paid and would continue to pay all revenues due under the License Agreement. [Docket No. 119 p. 22 *citing* Docket No. 116-1 ¶ 37.]

Defendants' first alleged ground for fraud was already rejected by the American Arbitration Association (the "AAA"). In early 2011, OT commenced arbitration proceedings against PR before the AAA captioned *In the Matter of the Arbitration between Ocean Tomo, LLC and PatentRatings, LLC*, 73 117 Y 000047 11 NOLG, to resolve a dispute regarding PR's liability for certain costs incurred by OT in connection with its use of the PRS (the

---

correct the systematic under-reporting that PR had identified," Defendants cite to no evidence in support of this claim. [Docket No. 116-1 ¶ 45.]

[12] The *Roberts* court explicitly acknowledged how critical the license/assignment distinction is: "[W]e deal here with a complete assignment of plaintiff's patent rights to Sears. Thus, the primary evil that the Court in *Lear* sought to end that the public might have to pay a tribute to a 'would-be monopolist' is completely irrelevant to this case." 573 F.2d at 982 (internal citations omitted).

"Arbitration"). (Lutzker Aff. ¶ 4, Ex. B ¶ 6.) The parties explicitly disagreed as to which party bore responsibility for OT's continued development of the PRS. (*Id.* ¶¶ 5–6, Ex. C ¶ 19, Ex. D ¶ 19.) PR specifically accused OT of asserting "false claims of financial liability against PatentRatings" regarding "data production and maintenance costs." (*Id.* ¶ 5, Ex. C ¶ 19.) In its "First Claim For Relief" in the Arbitration Counterclaim, PR sought a declaration from the arbitration panel that OT's "payment demands and its pursuit of the claims it asserts in this Arbitration" constituted a breach of the License Agreement justifying PR's termination of the same. (*Id.* ¶ 5, Ex. C ¶¶ 21–23.)

On May 24, 2012, the Arbitration panel issued its Award, finding "no persuasive evidence that any notice of breach or of termination *was given in bad faith or with the intent to wrongfully deny obligations under any contract.*" (*Id.* ¶ 7, Ex. E, p. 8) (emphasis added). In sum, the arbitration panel already determined that OT's assertion that it was owed reimbursement for expenses incurred in maintaining the PRS was not made in bad faith, let alone fraudulent. PR cannot now prevent OT's validity challenge based on purported allegations of fraud that have already been rejected by a tribunal of competent jurisdiction.[13]

Defendants' second purported ground for fraud, specifically OT's alleged failure to pay revenues due under the License Agreement, amounts to nothing more than an allegation that OT fraudulently breached the License Agreement. It is well settled, however, that "[a] breach of contract is not sufficient to find fraud." *Bucciarelli-Tieger v. Victory Records, Inc.*, 488 F. Supp. 2d 702, 711 (N.D. Ill. 2007). Under Illinois law, "injury from fraud must be more than just damages arising from a breach of contract." *Bucciarelli-Tieger*, 488 F. Supp. 2d at 711. In light of the foregoing, even if Defendants could point to applicable equitable estoppel cases, their

---

[13] Indeed, it is OT's position that PR's claims are barred, in whole or in part, by *res judicata* as a result of the Award. [*See* Docket No. 90 p. 51.]

unsupported, already-adjudicated allegations would not satisfy their burden to prove equitable estoppel by a preponderance of the evidence. *See Piersons v. Quality Archery Designs, Inc.*, No. 3:06-CV-0408, 2009 U.S. Dist. LEXIS 131352, at *33 (N.D.N.Y. Feb. 26, 2009).

## VI. DEFENDANTS HAVE NOT RAISED A GENUINE ISSUE OF MATERIAL FACT THAT OT SHOULD BE BARRED FROM ASSERTING INVALIDITY UNDER THE DOCTRINE OF ASSIGNOR ESTOPPEL

### A. OT Is Not an Assignor of the Patents-in-Suit

Defendants next claim that "there is, at the very least, a genuine dispute of material fact with respect to whether OT is barred by assignor estoppel from challenging the validity of the patents." [Docket No. 119 p. 22.] This argument fails, however, because the very evidence relied upon by Defendants establishes that OT is not an assignor.

Defendants do not argue that any actual assignments from OT to PR have been made with respect to any of the patents-in-suit, as there have been none. (Lutzker Aff. ¶ 8, Ex. F.) The indisputable records of the USPTO show only assignments from Mr. Barney to PR, mooting Defendants' arguments below. (*Id.*)

Regardless, under Section 5.3 of the Employment Agreement, the patents-in-suit were explicitly excluded from any obligation to assign Mr. Barney's inventions to OT: "Notwithstanding anything to contrary contained in this Agreement, the provisions of this Section 5.3. *shall not apply to the inventions and patents described in and licensed to the Company pursuant to the License Agreement*." [Docket No. 116-9 § 5.3] (emphasis added). There can be no dispute that this exclusion applies to the patents-in-suit, as the License Agreement explicitly includes "all patent applications and patents, and all continuations, continuations-in-part, divisionals, and foreign counterparts of such patents and patent applications that are owned by [PR]" and provides that "[a]ll Improvements will be owned by [PR]." [Docket No. 116-6 §§ 1.10, 5.3.] Because the patents-in-suit were subject to the License

Agreement and therefore excluded from any obligation to be assigned by Mr. Barney to OT in the first instance, Defendants' argument that they were somehow assigned from OT to PR fails.

### B. OT Is Not In Privity with Barney

Defendants also argue that OT should be barred from challenging validity because "OT was in privity with Barney." [Docket No. 119 p. 23.] Defendants cite to a line of cases in which assignor estoppel is held to bar validity challenges by companies that hired away inventors who had assigned patents to their former employer based on privity between the new employer and the inventor. [Docket No. 119 p. 22, citing, *inter alia*, *Shamrock Techs., Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990).] The *Shamrock* court described the purpose of applying assignor estoppel to those in privity with the assignor as follows:

> If an inventor assigns his invention to his employer company A and leaves to join company B, whether company B is in privity and thus bound by the doctrine will depend on the equities dictated by the relationship between the inventor and company B in light of the act of infringement. The closer that relationship, the more the equities will favor applying the doctrine to company B.

*Shamrock*, 903 F.2d at 793. In *Shamrock*, the former employee/inventor left the former employer/assignee for a competitor and was immediately put in charge of a brand new division within the competitor's business that infringed the patents at issue. *Id*. at 794. Assignor estoppel is intended to prevent this kind of injustice. Indeed, in *HWB, Inc. v. Braner, Inc.*, this District held that, in order for assignor estoppel to apply as a result of privity between the inventor and the competitor asserting invalidity, "this Court must conclude that [the competitor] availed itself of [the assignor-inventor's] 'knowledge and assistance' to conduct infringement." No. 92 C 5900, 1994 WL 447530, at *24–26 (N.D. Ill. Aug. 17, 1994) (citations omitted). Defendants have tendered no evidence to support such a conclusion here.

Seen in its proper light, Defendants' argument attempts to fit a round peg in a square hole. The only assignments here are by Mr. Barney to his closely held company, PR. Even

Defendants do not suggest, much less provide evidence to support, that these assignments were made by Mr. Barney under color of his status as an OT employee. Likewise, there is no argument or evidence that OT is unfairly benefiting from these assignments in any way. To the contrary, the record reflects that Mr. Barney's assignment of these patents to PR benefited PR at the expense of OT, as those patents entered the purview of the License Agreement, expanding the intellectual property for which OT would have to pay a license. [Docket No. 116-6 § 1.10.]

## VII. DEFENDANTS HAVE NOT RAISED A GENUINE ISSUE OF MATERIAL FACT THAT OT SHOULD BE BARRED FROM ASSERTING INVALIDITY UNDER THE DOCTRINE OF JUDICIAL ESTOPPEL

Defendants next argue that OT's validity challenge is barred by the doctrine of judicial estoppel based on allegedly inconsistent positions "that OT took and prevailed upon before the Patent Office." [Docket No. 119 pp. 28–29.] Judicial estoppel is inapplicable, however, where there has been a material change in the law: "Judicial estoppel should not be used to work an injustice, particularly when the defendants' change in position resulted from circumstances outside their control—namely, a change in controlling . . . law." *Jarrard v. CDI Telecomms., Inc.*, 408 F.3d 905, 915 (7th Cir. 2005). This is particularly true in the context of patent validity challenges in light of the federal policy in favor of the same. *See Kinetic Concepts, Inc. v. Wake Forest Univ. Health Sciences*, SA-11-CV-163-XR, 2014 WL 1612648, at *5 (W.D. Tex. Apr. 22, 2014) (declining to apply judicial estoppel to prevent party from changing "its overall position on validity," citing "the strong federal policy favoring validity challenges").[14]

---

[14] At least one district court within the Seventh Circuit has held that judicial estoppel does not apply to positions taken before the USPTO:

> The lack of adversarial opponents to patent seekers in patent prosecutions brings into question whether the policies at risk in ordinary litigation, which justify implementing judicial estoppel, can even be present in patent prosecution. Arguably then, patent validity challenges become the court's way of protecting the patent prosecution process and preserving its integrity. Consequently, this

OT makes clear in the Motion that *Alice* and its progeny "have substantially altered the landscape regarding process patents implemented on computers and raised the bar for patentability." [Docket No. 95 pp. 2, 7.] Defendants conceded that judicial estoppel requires, *inter alia*, a later position which is "clearly inconsistent" with an earlier position. [Docket No. 119 p. 28.] Because the *Alice* decision had not yet "raised the bar for patentability," any positions arguably taken by OT prior to *Alice* are not inconsistent with positions taken before this development in the law.[15]

Defendants also cite to responses to office actions containing arguments OT made with respect to the patentability of patents that are not at issue in this case. [Docket No. 119, *citing* Docket Nos. 116-45, 116-46.] Positions taken by OT with respect to completely different patents from the patents-in-suit cannot form the basis for judicially estopping OT from asserting invalidity with respect to the latter. Regardless, these submissions were also made before *Alice* altered the landscape for patentability under § 101. [*See* Docket No. 116-45 (September 8, 2011); Docket No. 116-46 (April 4, 2013).]

**VIII.** <u>**CONCLUSION**</u>

For the reasons stated above and in the Motion, each of the patents-in-suit cover nonpatentable subject matter under 35 U.S.C. § 101.

---

Court finds that federal policy favoring patent validity challenges outweighs the policies behind judicial estoppel regardless of the parties' factual disputes. *Depuy Orthopaedics, Inc. v. Orthopaedic Hosp.*, No. 3:12-CV-299-CAN, 2015 U.S. Dist. LEXIS 18757, at *22–24 (N.D. Ind. Feb. 13, 2015).

[15] Again, each of the submissions to the USPTO related to the patents-in-suit cited by Defendants pertain to positions taken well before *Alice* was decided in 2014. [*See* Docket No. 116-33 (dated April 7, 2010); Docket No. 116-34 (dated February 4, 2009); Docket No. 116-35 (dated November 23, 2009); Docket No. 116-36 (dated June 9, 2009).]

Respectfully submitted,

OCEAN TOMO, LLC

By:   /s/ Jeremy R. Heuer
          One of Its Attorneys

Thomas P. Cimino, Jr.
Robert S. Rigg
Jeremy R. Heuer
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 (312) 609 7500

Joel E. Lutzker
500 West Putnam Avenue
Suite 400
Greenwich, CT 06830
T:  + 1 (203) 542.7219

Dated:  June 8, 2015

## <u>CERTIFICATE OF SERVICE</u>

I, Jeremy R. Heuer, an attorney, hereby certify that on June 8, 2015, I caused to be electronically filed the foregoing **PLAINTIFF-COUNTER DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 101** with the Clerk of the Court using the Court's Case Management/Electronic Case Files (CM/ECF) system, which will send notifications of such filing to the following counsel of record:

David C. Layden            DLayden@jenner.com


                                    /s/ Jeremy R. Heuer