# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| OCEAN TOMO, LLC, ) <br> ) <br> Plaintiff and Counter-defendant, ) <br> ) <br> v. ) <br> ) <br> JONATHAN BARNEY and ) <br> PATENTRATINGS, LLC, ) <br> ) <br> Defendants and Counter-plaintiffs. ) | No. 12 C 8450 <br><br> Hon. Joan B. Gottschall <br><br> Hon. Mary Rowland |

### JONATHAN BARNEY'S AND PATENTRATINGS, LLC'S SUPPLEMENTAL BRIEF PURSUANT TO THE COURT'S ORDER DATED SEPTEMBER 3, 2015

In connection with the pending Motion for Summary Judgment of Invalidity (the "Motion") brought by Plaintiff and Counter-Defendant Ocean Tomo, LLC ("Ocean Tomo" or "OT"), and pursuant to this Court's Order dated September 3, 2015, Defendants and Counter-plaintiffs Jonathan Barney ("Barney") and PatentRatings, LLC ("PatentRatings" or "PR") respectfully submit this supplemental brief responding to the two questions posed by the Court:

1. Given § 5.1, can Ocean Tomo argue that the License Agreement is still in force yet challenge the validity of the patents that are within the ambit of the License Agreement?

2. If the court accepts (without deciding) that the License Agreement was terminated in 2012 for the purposes of the motion for summary judgment, it appears that the parties' agreement that Ocean Tomo would not challenge the patents' validity (either in perpetuity or for three years, depending on how the License Agreement is read; the result would be the same either way since this case was filed in 2012) survives any termination. In this circumstance, can Ocean Tomo raise an invalidity challenge?

For the reasons set forth below, Barney and PR respectfully submit that the answer to the Court's first question is *no*—OT is estopped from challenging the validity of the patents within the ambit of the License Agreement because of, among other things, its assertions that the License Agreement "remain[s] in full force and effect."

The answer to the Court's second question also is *no*—although, as Barney and PR explain below, they do not contend that the License Agreement has been terminated.

## ARGUMENT

**I.  OT IS ESTOPPED FROM CHALLENGING THE VALIDITY OF THE PATENTS THAT ARE WITHIN THE AMBIT OF THE LICENSE AGREEMENT.**

In its Motion and its pleadings, OT repeatedly asserts that "the License Agreement remains in full force and effect and that OT continues to have the right to use the PatentRatings Tools in accordance with the terms of the License Agreement." (*See, e.g.*, Dkt. 83 ¶ 110; Dkt. 95, at 2.) In its Rule 56.1 Statement in support of the Motion, OT asserts that it is *undisputed* that its "license to use the 'PatentRatings Tools' [is] subject to the terms and conditions set forth in [the License Agreement]." (Dkt. 96 ¶ 7.)

One of the terms and conditions set forth in the License Agreement is § 5.1 (the "No-Challenge Clause"), which provides, in relevant part:

> LICENSEE further agrees not to challenge, or to assist or encourage any third party in challenging, the validity or enforceability of the Licensed Rights [which include the PatentRatings Patents] in any court or other tribunal anywhere in the world.

(Dkt. 116-6 § 5.1.) OT asserts, and Barney and PR do not dispute, that the "PatentRatings Patents" referenced in Section 5.1 include all of the patents that are the subject of the pending Motion. (Dkt. 96 ¶¶ 7-9.)

Having taken the position that the License Agreement remains "in full force and effect," OT should not be allowed to now argue that it is not bound by all of the terms and conditions set forth in the License Agreement, including the No-Challenge Clause. "It is a 'well-settled rule that a party is bound by what it states in its pleadings.'" *Help at Home Inc. v. Med. Capital, LLC*, 260 F.3d 748, 753 (7th Cir. 2001) (quoting *Soo Line R.R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d

481, 483 (7th Cir. 1997)). This Court should bar OT from contradicting its earlier contentions and now arguing that Section 5.1 of the License Agreement is *not* in "full force and effect."

Barney and PR anticipate OT will argue it is not bound by either its own pleadings or Section 5.1 of the License Agreement because the No-Challenge Clause allegedly is unenforceable on public policy grounds. As Barney and PR demonstrate below, however, under the facts of this case, Section 5.1 should be enforced against OT, and the Motion should be denied.

    **A.    OT SHOULD BE BARRED FROM RAISING ITS INVALIDITY CHALLENGE BECAUSE IT PROMISED NOT TO CHALLENGE THE PATENTS UNDER CIRCUMSTANCES GIVING RISE TO CONTRACTUAL ESTOPPEL.**

OT should not be allowed to raise its invalidity challenge in this case because: (1) OT clearly and unambiguously promised "not to challenge" the patents, and (2) that promise was made under circumstances giving rise to contractual estoppel.

    **1.    *Lear* Does Not Preclude The Enforcement Of No-Challenge Clauses In Every Situation.**

In the seminal case of *Lear*, the United States Supreme Court overruled the doctrine of licensee estoppel, which barred patent licensees from contesting the validity of a licensed patent. *See, e.g., Lear, Inc. v. Adkins*, 395 U.S. 653 (1969). Following *Lear*, courts have generally permitted licensees to challenge the validity of patents—even in the face of a no-challenge clause—due to the "important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain." *See, e.g.*, *Kraly v. National Distillers & Chemical Corp.*, 502 F.2d 1366, 1369 (7th Cir. 1974); *Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 468 F.2d 225, 232 (7th Cir. 1972); *Business Forms Finishing Service, Inc. v. Carson*, 452 F.2d 70, 75 (7th Cir. 1971).

*Lear*, however, "does not grant every licensee in every circumstance the right to challenge the validity of the licensed patent." *Gen-Probe Inc. v. Vysis, Inc.*, 359 F.3d 1376, 1381 (Fed. Cir. 2004), *abrogated on other grounds*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). *Lear* also did not address "whether (or under what circumstances) informed persons, acting from positions of substantial parity and benefitting from the advice of counsel, may negotiate a contract that, consequent upon the exchange of a valuable consideration, knowingly, intelligently, explicitly, and voluntarily waives the right to challenge a patents validity." *Mayo Clinic Jacksonville v. Alzheimer's Institute*, 683 F. Supp.2d 1292, 1296 n. 7 (M.D. Fla. 2009).

The Federal Circuit has recognized that a clear and unambiguous promise not to challenge a patent may be enforced against the promisor, if the promise was made under circumstances giving rise to contractual estoppel. For example, in *Flex-Foot, Inc. v. CRP, Inc.* 238 F.3d 1362 (Fed. Cir. 2001), the Federal Circuit held that a party who had entered into a prior litigation settlement agreement that contained a no-challenge clause was estopped from subsequently challenging the validity of the patent because "the important policy of enforcing settlement agreements and res judicata [outweighed] the federal patent laws' prescription of full and free competition in the use of ideas that are in reality a part of the public domain." *Id.* at 1368. *See also Hemstreet v. Spiegel, Inc.*, 851 F.2d 348, 350 (Fed. Cir. 1988) (holding that a party must pay royalties under a settlement/license agreement even though the patent was held unenforceable in another court because "[t]he enforcement of settlement of litigation involves another public policy totally absent in *Lear*: the encouragement of settlement of litigation and the need to enforce such settlements in order to encourage the parties to enter into them"); *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 476 (Fed. Cir. 1991) (holding that *Lear* does not control where a

party enters into a consent decree not to challenge patent validity because "the Supreme Court in *Lear* did not consider the policy concerns evoked when preserving the finality of a judgment").

Although these cases (and the other cases to date finding contractual estoppel) all have arisen in the context of settlement of litigation, this is not the only possible context in which contractual estoppel may arise. In fact, in *Baseload Energy, Inc. v. Roberts*, 619 F.3d 1357, 1363 (Fed. Cir. 2010), the Federal Circuit observed that the contractual estoppel doctrine does not require a specific fact pattern or even a prior dispute and litigation as to invalidity giving rise to the settlement agreement:

> [W]hile the absence of a prior dispute and litigation as to invalidity is pertinent, we do not think that a settlement agreement is ineffective to release invalidity claims unless the exact circumstances described in *Flex-Foot* are present. Each case must be examined on its own facts in light of the agreement between the parties. In the context of settlement agreements, as with consent decrees, clear and unambiguous language barring the right to challenge patent validity in future infringement actions is sufficient, even if invalidity claims had not been previously at issue and had not been actually litigated.

Thus, contractual estoppel must be evaluated based on the particular facts and circumstances of each case by weighing competing considerations of equity and other important public policy interests against the federal patent laws' prescription of full and free competition in the use of ideas that are in reality a part of the public domain.

### 2. Contractual Estoppel Arises Because The Amendment Was A Pre-Litigation Settlement Of A Legal Dispute Between The Parties Concerning The Subject Matter Of The License Agreement.

It is undisputed that OT and PR executed the July 19, 2007 Amendment to the License Agreement (the "Amendment") (Dkt. 114 ¶ 6.) OT admits in its pleadings, and Barney and PR do not dispute, that the Amendment was executed "[i]n settlement of [a] dispute" between the parties. (Dkt. 83 ¶ 35; Dkt. 90 ¶ 35.) Moreover, the Amendment expressed the parties' "desire to continue performing uninterrupted under the terms and conditions of the [License Agreement];

5

provided, however, that certain terms and conditions of the [License Agreement] are modified [according to] this Amendment." (Dkt. 83-4 at 1.) The Amendment did not purport to affect any rights or obligations under §§ 5.1 or 10.4 of the License Agreement. Thus, the parties intended that the No-Challenge Clause would remain in full force and effect.

At the time OT entered into the Amendment in July 2007, it had extensive knowledge of the subject matter disclosed and claimed in PR's patents; indeed, OT controlled the *ex parte* prosecution of at least several of those patents before the Patent Office. (Dkt. 138 ¶¶ 19-21; Dkt. 136 ¶¶ 27-29; Dkt. 121-27; Dkt. 121-28; Dkt. 121-29 through 121-32.) OT is a sophisticated party well-versed in the intricacies of patent law and patent licensing practices and was represented by competent counsel who negotiated and drafted the Amendment settling the parties' legal disputes.

While the facts and circumstances presented above are not "the exact circumstances described in *Flex-Foot*," *see Baseload Energy*, 619 F.3d at 1363 (*e.g.*, pre-litigation settlement vs. post-litigation settlement), *Flex-Foot* stands for the proposition that "[s]ettlement agreements must be enforced if they are to remain effective as a means for resolving legal disagreements" and that "[u]pholding the terms of settlement agreements encourages patent owners to agree to settlements and promotes judicial economy." *Flex-Foot,* 238 F.3d at 1370.

Barney and PR respectfully submit that the facts of this case fall under the rationale of *Flex-Foot* and also exemplify the type of circumstances described in *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224-25 (Fed. Cir. 1988), *cert. dismissed*, 487 U.S. 1265 (1988), in which "the equities of the contractual relationships between the parties should deprive one party . . . of the right to bring [a validity] challenge."

### 3. Contractual Estoppel Arises Because The No-Challenge Clause Was A Necessary And Integral Part Of The Equity Exchange Agreement.

It is undisputed that PR, OT and Barney entered into the Equity Exchange Agreement. (Dkt. 128 ¶¶ 3-4.) Execution and delivery of the License Agreement—which included the No-Challenge Clause—was a condition precedent to the Equity Exchange Agreement and "a necessary and integral part of the transactions contemplated." (Dkt. 116-5 at 1, §§ 2.3(a)(iv), 2.3(d).) The Equity Exchange Agreement was supported by consideration because, among other things, OT acquired a 25% equity interest in PR, PR agreed to provide OT with proprietary computer-generated metrics that OT incorporated into its client deliverables, and Barney agreed to be employed by OT to start up its quantitative patent analysis business. (Dkt. 128 ¶¶ 4, 6-8, 10.) As part of the Equity Exchange Agreement, OT further represented and warranted that "OT's Closing Documents [which included the executed License Agreement] will constitute the legal, valid, and binding obligations of OT, enforceable against OT in accordance with their respective terms." (Dkt. 116-5 § 4.2(a).)

In light of these facts, OT is contractually estopped from challenging the patents in violation of the No-Challenge Clause. Enforcing the No-Challenge Clause does not impose any undue hardship on OT because it knowingly and voluntarily waived the right to challenge the patents in exchange for valuable consideration. While enforcing the No-Challenge Clause may impose some *indirect* cost on the public in the sense that the *Lear* policies may not be fully carried out, this cost is small compared to the important interests sought to be advanced by the strong public policies favoring freedom of contract between sophisticated purchasers and sellers of ownership interests in privately-held companies and the equally important interest in fairly balancing the equities in those contractual relationships. Finally, the No-Challenge Clause is reasonable in terms of its scope and duration—it only applies to the patents that are licensed to

7

OT and it terminates once all of OT's license rights (including any surviving license rights under § 10.4) terminate.[1]

> **B. OT'S CLEAR AND UNAMBIGUOUS PROMISE NOT TO CHALLENGE THE PATENTS, WHETHER ENFORCEABLE OR NOT, SHOULD BE WEIGHED IN DETERMINING WHETHER THE DOCTRINES OF EQUITABLE ESTOPPEL AND/OR ASSIGNOR ESTOPPEL PRECLUDE OT FROM RAISING ITS INVALIDITY CHALLENGE.**

Even if OT's promise not to challenge PR's patents does not independently give rise to contractual estoppel, it should at least be weighed as an additional important factor in determining whether the doctrines of equitable estoppel and/or assignor estoppel should preclude OT from raising its invalidity challenge. Barney and PR respectfully submit that the particular facts of this case, including the equities of the contractual relationships between the parties, support a finding of equitable estoppel and assignor estoppel. (*See* Dkt. 136 at 17-26.)

For all of the forgoing reasons, Barney and PR respectfully submit that there are, at the very least, genuine disputes of material fact with respect to whether the No-Challenge Clause is enforceable and whether OT should be estopped from challenging the patents.

**II. BARNEY AND PR ARE NOT CONTENDING THAT THE LICENSE AGREEMENT HAS BEEN TERMINATED; BUT EVEN IF THE LICENSE AGREEMENT HAD BEEN TERMINATED, OT SHOULD NOT BE ALLOWED TO CHALLENGE THE VALIDITY OF THE PATENTS FOR A PERIOD OF THREE YEARS FOLLOWING THE DATE OF TERMINATION.**

Barney and PR agree with OT that the License Agreement has not been terminated. Barney and PR contend OT is in material breach of the License Agreement and that PR has a *right* to terminate the License Agreement on that basis. However, PR does not contend it has

---

[1] With respect to the temporal scope of § 10.4, Barney and PR believe the correct interpretation is to group the surviving provisions as follows: "[(i)] Section 3.1(b), 4.5, 5.1[,] 7.1 and 7.3 (for a period of 3 years), [(ii)] ARTICLE 6 (until the last to expire of the PatentRatings Patents), and [(iii)] this Section 10.4 [(the longest term permitted by law)]." Intent to group may be inferred from the non-sequential ordering of the provisions (*e.g.*, "6" occurs *after* "7.3").

exercised that right. OT's license under Section 3.1(b) and its obligations under Section 5.1 would survive termination for a period of three years pursuant to Section 10.4.

PR and OT *do* dispute whether the Amendment to the License Agreement has been rescinded. On or about April 6, 2012, PR notified OT that PR had rescinded the previously-executed Amendment on the grounds of fraudulent misrepresentation and material failure of consideration. (Dkt. 84 ¶ 111.) However, OT has refused to recognize that rescission. (*Id.*)

Even if the Amendment has not been validly rescinded, as OT contends, the Amendment does not purport to affect any rights or obligations under §§ 5.1 or 10.4 of the License Agreement. The status of the Amendment thus does not impact the questions posed by the Court in its September 3rd Order. As demonstrated above, OT is estopped from challenging the validity of the patents that are within the ambit of the License Agreement.

## CONCLUSION

WHEREFORE, for all of the reasons set forth above and in their previous filings, Jonathan Barney and PatentRatings, LLC respectfully request that this Court enter an Order denying the Motion in its entirety, and granting such other and further relief as is just and proper.

Dated: September 8, 2015

JONATHAN BARNEY and
PATENTRATINGS, LLC

By: /s/ *David C. Layden*
      One of their attorneys

David C. Layden
JENNER & BLOCK LLP
353 North Clark Street
Chicago, Illinois 60654
(312) 222-9350
(312) 840-7796 (fax)