### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

OCEAN TOMO, LLC,

         Plaintiff,

         v.

PATENTRATINGS, LLC; JONATHAN
BARNEY,

         Defendants.

No. 12 C 8450

Judge Thomas M. Durkin

### MEMORANDUM OPINION AND ORDER

Jonathan Barney, through his company PatentRatings, LLC, created, patented, and developed software for analyzing and evaluating patents. Ocean Tomo, LLC, provides financial services related to intellectual property, including patent analytics. In 2004, the parties reached an agreement that provided for (1) licensing PatentRatings's software to Ocean Tomo; (2) giving Ocean Tomo an ownership interest in PatentRatings; and (3) giving Barney an ownership interest in, and a management position with, Ocean Tomo. The relationship among the parties soured, giving rise to amendments to the agreements in 2007, and eventually this litigation in 2012.

PatentRatings and Barney have made counterclaims against Ocean Tomo alleging breaches of various contracts governing the parties' business relationship (Counts I-III); tortious interference with prospective economic advantage (Count IV); violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count V);

fraud (Count VI); and seeking various declaratory judgments regarding the contracts governing the parties' relationship (Count VII). R. 175. Ocean Tomo has filed a motion seeking summary judgment on Count I for breach of the "Operating Agreement"; Count VI for fraud; and Count III for breach of contract of the "License Agreement." R. 238. For the following reasons, the motion is denied in part and granted in part.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

### I.  Count I – Breach of the Operating Agreement

As a member of Ocean Tomo, Barney is a party to Ocean Tomo's Operating Agreement. Under the Operating Agreement, the Ocean Tomo Board of Managers has discretion to determine whether profits from a transaction are "Net Profits from Operations" or "Other Net Profits." R. 241-5 at 7. The full relevant provision of the Operating Agreement provides the following:

> "Net Profits from Operations" and "Net Losses from Operations" shall mean, for each Fiscal Year or other period, such portion of the Company's Net Profits (or Net Losses) attributable to the ordinary course operation of the Company's business for such period; provided that, (1) such amount shall exclude any Net Profits or Net Losses resulting from the sale of all or substantially all of the Company's assets, and (2) such amount shall be subject to any other modification (including any modification that would otherwise be inconsistent with the definition set forth in this paragraph) as determined by the Board of Managers (but shall not in any event include profits from the sale of all or substantially all of the Company's assets). The portion of the Company's Net Profits (or Net Losses) constituting Net Profits from Operation (or Net Losses from Operations) shall be determined by the Board of Managers in its sole discretion and such determination shall be conclusive on the Members.

*Id.* The determination of whether profits from a transaction constitute "Net Profits from Operations" or "Other Net Profits" is important because different types of profits are allocated to Ocean Tomo's members in different ways. "Other Net Profits" are "allocated among the Members for each Fiscal Year in accordance with their respective Percentage Interest." *Id.* at 20. The Operating Agreement does not appear to directly state how "Net Profits from Operations" should be allocated. But

3

according to Barney's allegations, "75% of 'Net Profits from Operations' shall be allocated among the members as determined by the Board of Managers, and the remaining 25% of 'Net Profits from Operations' shall be allocated among the members in accordance with their respective percentage interest." R. 175 ¶ 13. At least for purposes of this motion, Ocean Tomo does not appear to dispute this characterization of the process for allocation of "Net Profits from Operations."

### A. Performance Under the Operating Agreement

Barney alleges that Ocean Tomo's Board of Managers improperly determined that the revenue from two particular transactions—the sales of Ocean Tomo subsidiaries ICAP and IPXI—were "Net Profits from Operations" rather than "Other Net Profits," thereby depriving Barney of income. R. 175 ¶ 72. Barney also argues that the Board of Managers exercised its discretion to make these decisions in violation of the covenant of good faith and fair dealing. R. 254 at 15-16. Ocean Tomo argues that summary judgment is appropriate because the Operating Agreement provides that allocation of profits is within the Board of Managers' discretion. R. 239 at 7-8.

### 1. Interpretation of the Contractual Language Providing the Board of Managers' Discretion

Barney argues that even though the provision of the Operating Agreement defining "Net Profits from Operations" grants the Board of Managers' discretion to classify profits, the definition also limits that discretion, in that

> to the extent that the Board of Managers have discretion
> to modify, the modification can only be to "such amount,"
> which refers to the amount in the preceding clause—i.e.,

> "such portion of the Company's Net Profits . . .
> attributable to the ordinary course operation of the
> Company's business . . . ." Thus, the Board of Managers
> does not have discretion to modify the classification of any
> other portion of Ocean Tomo's Net Profits.

R. 254 at 15. In other words, Barney argues that the Board does not have discretion

to classify profits as "Net Profits from Operations," because the contract already

sets forth that definition as "Net Profits . . . attributable to the ordinary course

operation of the Company's business." Barney argues that the Board's discretion

does not apply to this initial classification as "Net Profits from Operations," but only

to a subsequent "modification" of this already determined "amount."

This interpretation flies in the face of the plain language of the provision.

There is no dispute that "Net Profits from Operations" are defined as "Net Profits . .

. attributable to the ordinary course operation of the Company's business." Barney's

argument ignores three important phrases. First, the phrase "provided that"

appears immediately after the definition of "Net Profits from Operations." This

shows that the clause giving the Board the right to "modify" the "amount" is not an

additional modification on the initial classification of "Net Profits from Operations,"

but is the process of classifying "Net Profits from Operations" in the first place.

This interpretation is further confirmed by the second phrase Barney's

argument ignores, namely that the "modifications" the Board is permitted to make

are permitted to be "inconsistent with the definition set forth in this paragraph." In

other words, even if the clause does provide for a two-step process for determining

"Net Profits from Operations"—i.e., (1) the initial classification according to the

definition set forth in the contract, and (2) any "modification" by the Board—the Board also has the power to "modify" the initial classification definition. This power moots the limitation Barney's interpretation would place on the Board's discretion.

And third, the last clause of the provision states, "The portion of the Company's Net Profits . . . constituting Net Profits from Operations . . . shall be determined by the Board of Managers in its sole discretion and such determination shall be conclusive on the Members." To the extent Barney has identified any ambiguity in the preceding clauses (of which there is none), this clause removes it. The Operating Agreement unambiguously grants the Board of Managers "sole discretion" to classify Net Profits from Operations, and Barney's interpretation of the contract's language does not serve to defeat Ocean Tomo's motion.

## 2.    Good Faith and Fair Dealing

However, "[w]hen one party to a contract is vested with contractual discretion," as the Board of Managers is here, "it must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties." *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 884 (7th Cir. 2000). Yet, the duty of good faith and fair dealing "cannot override an express term of a contract." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 396 (7th Cir. 2003). It "is not an independent source of duties for the parties to a contract," but rather is "used as a construction aid in determining parties' intent" with respect to the duties or obligations imposed by the contract's terms. *Wilson v. Career Educ.*

6

*Corp.*, 729 F.3d 665, 687 (7th Cir. 2013); *see also Cromeens*, 349 F.3d at 395 ("Illinois courts use the covenant to determine the intent of the parties where a contract is susceptible to two conflicting constructions."); *VC Mgmt., LLC v. Reliastar Life Ins. Co.*, 195 F. Supp. 3d 974, 995 (N.D. Ill. 2016) ("an independent duty of good faith and fair dealing does not appear to exist under Illinois law").

Here, as discussed, the provision granting "sole discretion" to the Board of Managers to determine whether certain profits constitute "Net Profits from Operations" is unambiguous. The covenant of good faith and fair dealing does not serve to impose a limitation on the discretion granted by this provision in and of itself.

But Barney points out that the Operating Agreement provides, with respect to "return of Capital Contributions or as to Net Profits, Net Losses or distributions," that "no Member shall have priority over any other Member." R. 241-5 at 16 (§ 6.05). This provision could reasonably be understood to impose a limitation on the Board of Managers' discretion with respect to classifying profits, to the extent that profits cannot be classified in a manner that gives one member "priority over" another. "Priority," however, is not defined in the Operating Agreement, leaving the intent of the parties with respect to the meaning of the term, and the provision's relation to the contract as a whole, "susceptible to conflicting constructions." The Seventh Circuit has applied the covenant of good faith and fair dealing in similar circumstances. *See Wilson*, 729 F.3d at 676 ("[E]ven though the termination clause also says [the defendant] has the right to terminate the Plan for any reason, the fact

that the parties anticipated that [the defendant] might have to terminate the Plan 'for regulatory compliance purposes' implies that the parties had a reasonable expectation about how [the defendant] would exercise its discretion in this very situation."); *Interim Health*, 225 F.3d at 884 (applying the covenant of good faith and fair dealing where the contract provided one party the right to "withhold some account leads, but the contract is vague about which leads it may withhold, and what justifies withholding"). The ambiguity present when the section concerning "priority of members" is applied to the Board's discretion to classify "Net Profits from Operations," is similar to that in *Wilson* and *Interim Health*, and so opens a space for the covenant of good faith and fair dealing to play a role.

In that regard, Barney points to the following email between Ocean Tomo's majority owners as evidence that the Ocean Tomo Board of Managers did not exercise its discretion with respect to determining Net Profits from Operation in good faith:

> There is one other way to do it: treat the sale like an operating item instead of a sale item. An argument could be made for that too. If we did that I'd bet we get a number close to the above because you own so much of the firm and because our ET value generation is not far off of our ownership percentages. If anything, you'll gain at JB's expense.

R. 254-9 at 2. Ocean Tomo does not address this email in its brief. With its references to "treating a sale like an operating item instead of a sale item," "ownership percentages," and "gaining at JB's expense," this email could be evidence that the Ocean Tomo Board of Managers exercised its discretion to

prioritize the majority owners' interests over Barney's with respect to classifying profits. On the basis of this evidence, a reasonable jury could find that Ocean Tomo did not exercise its discretion in good faith. Therefore, Ocean Tomo's argument regarding the Board of Managers' discretion under the Operating Agreement is not a basis to grant its motion for summary judgment on Count I.

### B. Profits from the IPXI Transaction

With respect to the IPXI transaction in particular, Ocean Tomo contends that it did not receive profits from that transaction, and thus, the Board of Managers could not have abused its discretion in allocating profits that did not exist. In support of this contention, Ocean Tomo cites an amended tax return stating that Ocean Tomo did not receive a "net long-term capital gain (loss)" from this transaction. But Ocean Tomo also admits that its two majority owners received "adjustments to [their] partner capital accounts as a result of a change in the value of Ocean Tomo's partial ownership of IPXI." R. 262 at 10-11 (¶¶ 18-19). Ocean Tomo argues that Barney did not receive these adjustments "because he was not entitled to receive distributions as a result of his breach of the confidentiality and non-compete provisions of the Operating Agreement." *Id.*; *see also* R. 257 at 7 ("Mr. Barney's K-1s from 2013 and 2014 show no adjustment because as a Former Member in breach of his non-compete and confidentiality requirements, he was not entitled to any distributions."). These arguments, however, imply that Ocean Tomo *did* receive profits from the IPXI transaction that would have been distributed to Barney but for Ocean Tomo's contention that he was in breach of the Operating

Agreement. It may be that Barney was in breach of the Operating Agreement, and that Barney's breach was a justification for Ocean Tomo to disregard the agreement. But that question has not been briefed on this motion. Since there is evidence that Ocean Tomo may have received profits from the IPXI transaction, and that Barney did not receive a share of those profits, the Court denies summary judgment to Ocean Tomo on Barney's claim for breach of the Operating Agreement in Count I.

## II.    Count VI – Fraud

The relationship between Ocean Tomo and Barney quickly deteriorated after the initial agreements were reached in 2004. By 2007, an amendment to the agreements was necessary to address certain disputes that had arisen. Barney alleges that Ocean Tomo (through its officers) made the following fraudulent representations to induce him to agree to the amended contracts on behalf of PatentRatings in 2007:

1) Ocean Tomo would assume the obligation for all further expenses associated with Ocean Tomo's use and continued development of the PatentRatings System, and that PatentRatings would have no further obligation for such expenses.

2) Ocean Tomo had not used and was not using the PatentRatings Analysis (as defined in the License Agreement) to provide information or reports to any external clients of Ocean Tomo as part of any products or services provided by its business units known as Expert Services, Appraisals, Valuations, Investments, Risk Management, and Corporate Finance.

3) Ocean Tomo had only used and was only using the PatentRatings Analysis to provide information or reports

10

to external clients of Ocean Tomo as part of the products or services provided by its business units known as Analytics and Ocean Tomo PatentRatings.

4) [A]ll revenues invoiced or collected by Ocean Tomo in connection with the sale of any products or services that used or incorporated any PatentRatings Analysis had been reported to PatentRatings in accordance with the terms of the License Agreement.

5) [T]here were no other revenues invoiced or collected by Ocean Tomo prior to July 19, 2007 in connection with the sale of any products or services that used or incorporated any PatentRatings Analysis.

R. 175 ¶ 40.

## A. Representation 1

Ocean Tomo argues that the first representation is a representation of future intent and is not actionable. *See Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 853 (7th Cir. 2007) ("[P]romissory fraud, involving a false statement of intent regarding future conduct, is generally not actionable under Illinois law unless the plaintiff also proves that the act was a part of a scheme to defraud."). PatentRatings relies on the exception to the rule that false statements of future intent are not actionable when the statement is a part of a fraudulent scheme. "To invoke the scheme exception, the plaintiff must allege and then prove that, at the time the promise was made, the defendant did not intend to fulfill it." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012). "Such evidence would include a pattern of fraudulent statements, or one particularly egregious fraudulent statement." *Id.*

PatentRatings argues that the "scheme exception" applies here because

11

> Ocean Tomo implemented [a royalty-cheating scheme] across all its practice groups. This was an elaborate scheme whereby Ocean Tomo would artificially depress the price of bundled products and services that were royalty bearing, while artificially elevating the price of other bundled products and services that were allegedly non-royalty-bearing and which were sold as part of the same client engagement/transaction. Ocean Tomo would issue separate invoices for each portion (a small invoice and a large invoice) but only report the small invoice to PatentRatings.

R. 255 ¶ 26. To support this argument, PatentRatings offers a declaration by Barney, *see* R. 254-1 ¶ 38, and an expert report, *see* R. 254-8. The expert report concludes that Ocean Tomo withheld royalties from PatentRatings. Barney's declaration explains the deceptive mechanism by which the royalties were withheld.

There are two primary problems with this argument with respect to the first alleged misrepresentation. First, the first representation concerns PatentRatings's obligation to finance the continued development of the PatentRatings technology, but the alleged scheme concerned concealment of royalties. The Court fails to see how a scheme to conceal royalties is evidence of intent not to keep a promise regarding PatentRatings's financial obligations with respect to development of its technology. Second, Barney's declaration states that the scheme started in 2012. R. 254-1 ¶ 39. The Court also fails to see how a scheme that started in 2012 could be evidence of Ocean Tomo's intent in 2007 when the allegedly false statements were made. Therefore, summary judgment is granted in Ocean Tomo's favor with respect to Count VI as it pertains to the first representation.

### B. Representations 2 & 3

Apparently it was important to the parties that the PatentRatings technology only be used to provide services to clients in certain of Ocean Tomo's business units. With representations 2 and 3, PatentRatings alleges that Ocean Tomo falsely made assurances that the PatentRatings technology was only to be used in the business units known as "Analytics" and "Ocean Tomo PatentRatings," and not in the business units known as "Expert Services," "Appraisals," "Valuations," "Investments," "Risk Management," and "Corporate Finance."

Ocean Tomo argues that these representations are contradicted by a provision of the 2007 Amendment, and "it cannot possibly be reasonable to rely on a statement that is directly contradicted by the contract the parties signed." R. 239 at 11. In support of this argument, Ocean Tomo cites the following provision of the 2007 Amendment:

> "External Data Usage" means any usage or inclusion of PatentRatings Analysis or any derivative thereof by [Ocean Tomo], which facilitates the provision of information or reports actually delivered to [Ocean Tomo's] external clients or customers as part of [Ocean Tomo's] consulting services such as currently used by its practice unit presently known as the "Analytics Practice Group." For the avoidance of doubt, "External Data Usage" shall not mean the internal use of PatentRatings Analysis such as currently used by [Ocean Tomo] as part of its services presently known as Expert Services, Appraisals, Investments, Risk Management and/or Corporate Finance.

R. 241-4 at 2. Ocean Tomo argues that the last sentence of this provision shows that Barney knew Ocean Tomo was using the PatentRatings technology in its "Expert

13

Services, Appraisals, Investments, Risk Management and/or Corporate Finance" business units, such that it would have been unreasonable for Barney to rely on representations 2 and 3 that Ocean Tomo was *not* using the PatentRatings technology in those business units. Representations 2 and 3, however, specifically promised not to use the PatentRatings technology in those business units to serve "external clients." By contrast, the sentence from the 2007 Amendment on which Ocean Tomo relies only permits Ocean Tomo to use the PatentRatings technology in those business units "internally." The term "internally" is juxtaposed in the 2007 Amendment to the "external clients and customers" for whom Ocean Tomo is permitted to use the PatentRatings technology in the "Analytics" business unit. Thus, contrary to Ocean Tomo's argument, the 2007 Amendment can be reasonably interpreted to conform to (rather than contradict) the promise in representations 2 and 3 that Ocean Tomo would not use the PatentRatings technology to serve external clients in its "Expert Services, Appraisals, Investments, Risk Management and/or Corporate Finance" business units. On this interpretation, the 2007 Amendment does not serve to undermine Barney's reliance on representations 2 and 3. For this reason, the Court denies Ocean Tomo's motion for summary judgment with respect to Count VI as it pertains to representations 2 and 3.

## C.    Representations 4 & 5

The fourth and fifth representations concern Ocean Tomo's reporting of revenue that might generate royalties to PatentRatings. Barney stated in his declaration, and Defendants have presented an expert report showing, that Ocean

Tomo failed to pay royalties beginning in 2005, which would make representations four and five false. Ocean Tomo has not made any contrary argument. Thus, the Court denies Ocean Tomo's motion for summary judgment on Count VI as it pertains to representations four and five.

## III.    Count III – Breach of the License Agreement

Ocean Tomo seeks summary judgment on PatentRatings's claim for royalties under the License Agreement arguing that the patents at issue are invalid, which would mean Ocean Tomo is not liable for royalties. PatentRatings argues that Ocean Tomo is precluded from making this argument by a "no-challenge" clause in the License Agreement (entered into in 2004), which was reaffirmed by the 2007 Amendment. The no-challenge provision in the License Agreement provides as follows:

> [Ocean Tomo] further agrees not to challenge, or to assist or encourage any third party in challenging, the validity or enforceability of the Licensed Rights in any court or other tribunal anywhere in the world.

R. 241-1 at 7 (§ 5.1).

### A.    Enforceability of the No-Challenge Clause

Although the parties do not discuss it, the no-challenge clause in the 2004 License Agreement is unenforceable. Prior to the Supreme Court's decision in *Lear, Inc. v. Adkins*, a patent license agreement (even without a no-challenge clause) served to estop a licensee from denying the validity of the patent as a defense to a lawsuit for royalties. 395 U.S. 653 (1969). In *Lear*, the Supreme Court abolished this doctrine and held instead that the "important public interest in permitting full

15

and free competition in the use of ideas" required permitting licensees to challenge a patent's validity. *Id.* at 670. Subsequent to *Lear*, courts have found *Lear's* reasoning to mean that "no-challenge" clauses in license agreements are unenforceable. *See* Alfred C. Server & Peter Singleton, *Licensee Patent Validity Challenges Following Medimmune: Implications for Patent Licensing*, 3 HASTINGS SCI. & TECH. L.J. 243, 403 (2011) ("[V]irtually every post-*Lear* court and commentator that has considered the matter has concluded that, in a typical licensing arrangement, an explicit licensee 'no-challenge' clause is invalid and unenforceable under *Lear*.") (citing cases and commentaries); Richard W. Goldstucker, *Stop the Bleeding:* MedImmune *Ends the Unjustified Erosion of Patent Holders' Rights in Patent Licensing Agreements*, 16 J. INTELL. PROP. 137, 141 (2008-2009) ("[T]he Supreme Court's decision in *Lear* has guided courts to strike down no-challenge clauses in license agreements."); *id.* at 139 ("Licensees can negotiate a patent license and face no risk in challenging the validity of the patent.").

Federal courts also agree, however, that no-challenge clauses in agreements and consent decrees settling litigation of claims for royalties *are* enforceable. *See Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1369-70 (Fed. Cir. 2001); *Rates Tech. Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 169-71 (2d Cir. 2012). In *Flex-Foot*, the Federal Circuit explained that no-challenge clauses are enforceable in these circumstances because *Lear's* concern with the "full and free competition in the use of ideas" is trumped by two other principles: (1) "the importance of res judicata and its hierarchical position in the realm of public policy"; and (2) the "compelling public

16

interest and policy in upholding and enforcing settlement agreements voluntarily entered into because enforcement of settlement agreements encourages parties to enter into them—thus fostering judicial economy." 238 F.3d at 1369.[1] The court held that the licensee was barred from further challenges to the patent's validity because

> [o]nce an accused infringer has challenged patent validity, has had an opportunity to conduct discovery on validity issues, and has elected to voluntarily dismiss the litigation with prejudice under a settlement agreement containing a clear and unambiguous undertaking not to challenge validity and/or enforceability of the patent in suit, the accused infringer is contractually estopped from raising any such challenge in any subsequent proceeding.

*Id.* at 1370.

Although the Second and Ninth Circuits agree with the Federal Circuit that no-challenge clauses in agreements settling litigation are enforceable, they will not enforce no-challenge clauses in *pre*-litigation agreements. These courts have reasoned that "it [is] unimportant that . . . the [no-challenge clause in a pre-litigation settlement agreement] is part of a settlement agreement rather than of a typical patent licensing agreement," because it would be "easy to couch licensing

---

[1] In a previous opinion in this case, Judge Gottschall applied the law of the Federal Circuit to this issue. *See* R. 147 at 18 (*Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1119 (N.D. Ill. 2015)). The parties have not sought reconsideration of that holding on this motion, and the Court also sees no reason to do so. *See Baseload Energy, Inc. v. Roberts*, 619 F.3d 1357, 1361 (Fed. Cir. 2010) ("the question of whether a settlement agreement bars a party from challenging the validity of a patent in a subsequent action is intertwined with the substance of enforcement or a patent right" which is governed by Federal Circuit precedent); *Flex-Foot*, 238 F.3d at 1365 ("[W]hether public policy precluding patent license estoppel should extend to a waiver of validity challenges in a settlement agreement[ ] is intimately related with the substance of enforcement of a patent right. Therefore, we will apply our law to these issues.").

arrangements in the form of settlement agreements," thereby "undermin[ing] [*Lear's* concern with] the public interest in discovering invalid patents." *Rates Tech.*, 685 F.3d at 171-72 (quoting *Massillon-Cleveland-Akron Sign Co. v. Golden State Adver. Co.*, 444 F.2d 425, 427 (9th Cir. 1971)).

Unlike the Second and Ninth Circuits, the Federal Circuit has not had occasion to rule definitively on no-challenge clauses in pre-litigation settlement agreements. But in *Baseload Energy, Inc. v. Roberts*, the Federal Circuit stated the following in dicta:

> [The licensee] argues that [the *Flex-Foot*] factors are determinative, and that the Settlement Agreement in this case is inadequate to release its patent invalidity claims, because the prior litigation between the parties did not involve patent invalidity issues or actual litigation on those issues. We disagree. Contrary to [the licensee's] argument, while the absence of a prior dispute and litigation as to invalidity is pertinent, we do not think that a settlement agreement is ineffective to release invalidity claims unless the exact circumstances described in *Flex-Foot* are present. Each case must be examined on its own facts in light of the agreement between the parties. In the context of settlement agreements, as with consent decrees, clear and unambiguous language barring the right to challenge patent validity in future infringement actions is sufficient, even if invalidity claims had not been previously at issue and had not been actually litigated.

619 F.3d at 1363. The court held that the release provision in *Baseload* did not serve to bar patent validity challenges because (1) the release was ambiguous in that regard, and (2) the fact that the settlement included only an option for a license demonstrated that the parties had not intended to bar claims of patent infringement or the defense of patent invalidity (since the patent holder who does

18

not grant a license presumably would want to retain the right to prosecute infringement). But *Baseload's* statement that a "clear and unambiguous" no-challenge clause might be enforceable "even if invalidity claims had not been previously at issue and had not been actually litigated," lead Judge Gottschall, and at least two other district courts, to hold that a no-challenge clause in a pre-litigation settlement agreement "can be enforceable." R. 147 at 21 (*Ocean Tomo*, 133 F. Supp. 3d at 1121); *see also TMI Prod., Inc. v. Rosen Elecs., L.P.*, 2013 WL 12114078, at *5 (C.D. Cal. Nov. 27, 2013) ("Although Baseload's comments on Flex-Foot appear to be dicta, the Court finds them persuasive."); *Kee Action Sports, LLC, v. Shyang Huei Indus. Co., Ltd*, 2015 WL 9581808, at *6 (D. Or. Dec. 30, 2015) ("*Baseload* make[s] clear that no-challenge clauses can be enforceable under Federal Circuit law, depending on the facts of each case."). Other courts, however, have emphasized that the statement at issue is dicta and recognized that "the Federal Circuit did not actually reach or decide the issue of whether a pre-litigation no-challenge provision is enforceable." *Ford Motor Co. v. Versata Software, Inc.*, 2016 WL 6650380, at *4 n.1 (E.D. Mich. Nov. 10, 2016); *see also Rates Tech.*, 685 F.3d at 174.

PatentRatings argues that the Court should enforce the no-challenge clause and deny Ocean Tomo's summary judgment motion, based on the dicta in *Baseload*, even though the parties had not litigated patent validity issues prior to the 2007 Amendment, and there is no indication that the disputes that were settled in 2007 had anything to do with patent validity. According to PatentRatings, what matters

19

is that the 2007 Amendment constituted a "settlement" of certain disputes the parties had, and that the "settlement" included a reaffirmation of a clear and unambiguous bar to challenges of patent invalidity. PatentRatings contends that *Baseload's* statement that no-challenge clauses can be enforceable even if patent validity had not previously been litigated or disputed shows that the no-challenge clause in this case should be enforced. Ocean Tomo, on the other hand, contends that the 2007 Amendment is not a "settlement agreement" for purposes of *Baseload's* reasoning because it did not end any litigation. Ocean Tomo argues that PatentRatings' application of *Baseload* to this case cannot be correct, for "[i]f a business negotiation of the type between Ocean Tomo and Defendants in 2007 could trigger a settlement exception, the exception would swallow the *Lear* rule." R. 239 at 14.

Although the parties and courts have speculated based on *Baseload's* dicta that the Federal Circuit would enforce no-challenge clauses in pre-litigation settlement agreements as long as the language of the clause was clear and unambiguous, the meaning of that dicta is not clear. The *Baseload* court noted that, "in the context of settlement agreements," it was unnecessary for "invalidity claims [to have] been previously at issue and [to have] been actually litigated," a statement that clearly requires that the parties had to have previously disputed issues regarding patent invalidity. But whether the court intended by that statement to say that a settlement that does not end pending litigation qualifies for an exception to the *Lear* rule against no-challenge clauses is not as obvious. To the Court's

20

knowledge, no court has ever held that a pre-litigation settlement qualifies for the *Lear* exception.

The underlying logic of the Federal Circuit's decision, and the decisions of the Second and Ninth Circuits Neither party addresses, which neither party addresses, sheds some light on this subject. The exception to *Lear's* prohibition of no-challenge clauses in license agreements was founded upon the public policy favoring settlement agreements (as well as res judicata with respect to consent decrees). As the Federal Circuit noted in *Flex-Foot*, public policy favors settlements because they foster judicial economy. Read in light of Flex-Foot's emphasis on judicial economy as the justification for the settlement exception, *Baseload's* dicta should not be understood as an endorsement of a pre-litigation settlement exception to *Lear*. Since pre-litigation settlements are not as certain to have preserved judicial resources as settlements that end pending litigation, they do not trigger the conditions that justify the exception. Moreover, as the Second and Ninth Circuits have recognized, permitting the possibility that pre-litigation settlements can include enforceable no-challenge clauses would encourage patent holders to couch "license agreements" as "settlement agreements," thereby undermining *Lear's* concern with protecting the ability of licensees to challenge patent validity. As those courts have said, such an exception would swallow the rule.

Therefore, the Court holds that as a provision in a pre-litigation agreement—regardless of whether it is properly considered a "settlement" agreement—the no-challenge clause in this case is not enforceable. Thus, the no-challenge clause

cannot serve as a basis to deny Ocean Tomo's motion for summary judgment on the invalidity of the patents as PatentRatings argues. Furthermore, since the Court has held that the no-challenge clause is unenforceable as a matter of law, the Court has reconsidered the earlier ruling in this case that a trial is necessary to determine whether the no-challenge clause is enforceable. That issue will no longer be a part the trial.

**B.    Other Forms of Estoppel**

PatentRatings also argues that Ocean Tomo should be estopped from challenging the validity of the patents under "the doctrines of equitable estoppel, assignor estoppel, and judicial estoppel." R. 254 at 20.[2]

**1.    Equitable Estoppel**

PatentRatings contends that "there are . . . circumstances in which the equities of the contractual relationships between the parties should deprive one party . . . of the right to [challenge potentially invalid patents]." R. 113 at 18 (quoting *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1225 (Fed. Cir. 1988)); *see also Roberts v. Sears, Roebuck & Co.*, 573 F.2d 976, 982 (7th Cir. 1978) (holding that *Lear* does not bar a plaintiff's recovery where "[t]here is no balance of equities between [defendant/licensee] and plaintiff in their contractual relations"). However, both of the cases PatentRatings cites to support its argument for

---

[2] In support of these arguments, PatentRatings referenced its briefs on the prior summary judgment motion in this case. Ocean Tomo argues that this is improper, and requests permission for additional briefing should the Court reach these issues. The Court has reviewed the earlier briefing on these issues. Since the Court rejects PatentRatings's arguments, Ocean Tomo has not suffered any prejudice and no further briefing from Ocean Tomo is necessary.

"equitable estoppel" concerned "assignees" of patent rights, as opposed to licensees like Ocean Tomo. *Roberts* held that an assignee of a patent could not challenge the patent's validity because "the primary evil that the [Supreme Court] in *Lear* sought to end, that the public might have to pay tribute to a 'would-be monopolist' [in the form of a patent holder whose patent's validity could not be challenged], is completely irrelevant" when there has been a "complete assignment" of the patent rights at issue. 573 F.2d at 982. Additionally, *Diamond Scientific* expressly applied "assignor estoppel" and did not contemplate a separate doctrine of "equitable estoppel" relevant to patent litigation as PatentRatings contends. 848 F.2d at 1225 ("Appellants argue that assignor estoppel is necessarily a variation of estoppel by conduct and should be governed by the traditional elements of equitable estoppel. But the Supreme Court has never analyzed assignor estoppel by reference to the elements of equitable estoppel and has explicitly recognized assignor estoppel to be the functional equivalent of estoppel by deed."). Thus, to the extent that Ocean Tomo can be equitably estopped from challenging the patents' validity, PatentRatings has not cited any authority outside of the context of assignment. The Court will address that authority next.

## 2. Assignor Estoppel

The Federal Circuit has explained that

> Assignor estoppel is an equitable doctrine that is mainly concerned with the balance of the equities between the parties. Those in privity with the assignor partake of that balance; hence, extension of the estoppel to those in privity is justified.

> What constitutes "privity" varies, depending on the purpose for which privity is asserted.
>
> Privity, like the doctrine of assignor estoppel itself, is determined upon a balance of the equities. If an inventor assigns his invention to his employer company A and leaves to join company B, whether company B is in privity and thus bound by the doctrine will depend on the equities dictated by the relationship between the inventor and company B in light of the act of infringement. The closer that relationship, the more the equities will favor applying the doctrine to company B.

*Shamrock Tech., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990) (internal citations omitted). In other words, assignor estoppel "prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity." *Diamond Scientific*, 848 F.2d at 1224. The underlying rationale is that "an assignor should not be permitted to sell something and later to assert that what was sold is worthless, all to the detriment of the assignee." *Id.*

PatentRatings argues that assignor estoppel applies here because Barney assigned the patents to PatentRatings, and then after Barney joined Ocean Tomo, Ocean Tomo asserted that the patents are invalid. While the facts of this case superficially match the facts held by the Federal Circuit in *Shamrock* to implicate assignor estoppel, the underlying equities do not. Although Barney "joined" Ocean Tomo after assigning the patents to PatentRatings, Barney also never "left" PatentRatings. He remains its majority owner. And although Ocean Tomo's use of the patented technology coincided with Barney joining Ocean Tomo, Barney's presence at Ocean Tomo did not enable Ocean Tomo to begin infringing the patents

to PatentRatings's detriment. Rather, PatentRatings granted Ocean Tomo licenses to use the patents. Most important, although there might be privity between Ocean Tomo and Barney,[3] Ocean Tomo's challenge to the patents' validity cannot be imputed to Barney, which is the concern with privity in assignor estoppel. Rather, unlike the circumstances that implicate the equities associated with assignor estoppel, the assignor here (Barney) is not on the side arguing for invalidity, but instead through his majority ownership of PatentRatings is opposing Ocean Tomo's invalidity argument. Thus, the primary concern of the assignor estoppel argument—that the assignor would argue for invalidity after assigning the patent rights—is not present here. Accordingly, assignor estoppel is not a basis to deny Ocean Tomo's motion.

### 3. Judicial Estoppel

Lastly, PatentRatings also argues that Ocean Tomo should be judicially estopped from challenging the validity of certain of the patents at issue because Ocean Tomo participated in the patent prosecution proceedings before the Patent Office. Judicial estoppel only applies, however, when "the party's later position [is] clearly inconsistent with its earlier position." *In re Airadigm Comms., Inc.*, 616 F.3d 642, 661 (7th Cir. 2010). Here, Ocean Tomo's invalidity argument is based on the Supreme Court's decisions in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012), and *Alice Corp. Pty Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), which were rendered after the Patent Office proceedings for the patents at

---

[3] In light of the Court's holding, it is unnecessary for the Court to decide whether privity exists.

issue here. Since the legal basis for the patents' invalidity was not available at the time of the Patent Office proceedings, it was not inconsistent for Ocean Tomo to implicitly assert their validity at that time. Moreover, to the extent Ocean Tomo's invalidity argument here can be considered inconsistent with its argument during the Patent Office proceedings, judicial estoppel should not be applied "when the [party's] change in position resulted from circumstances outside their control— namely, a change in controlling . . . law." *Jarrard v. CDI Telecomms., Inc.*, 408 F.3d 905, 915 (7th Cir. 2005). Thus, the Court will not deny Ocean Tomo's motion for summary judgment on Count III on the basis of estoppel.

### C.   Patent Validity

Ocean Tomo argues that the patents at issue are invalid such that the Court should grant summary judgment in its favor on PatentRatings's royalty claims. Ocean Tomo concedes, however, that even if the Court were to find the patents invalid, Ocean Tomo could still be liable for royalties earned prior to December 21, 2012, the date when Ocean Tomo first raised the invalidity defense. *See* R. 239 at 3. For this reason, even if the Court were to hold the patents invalid, the trial would still have to address seven years' worth of allegedly "royalty-bearing revenues." *See* R. 254-1 ¶ 37 (according to Barney, "[d]iscovery obtained in this case has now confirmed that, from 2005 to 2016, Ocean Tomo systematically failed to report more than $8.25 million in royalty-bearing revenues"). It does not appear that deciding whether the patents are valid under *Alice* at this stage of the proceedings would materially reduce the amount of evidence presented at trial. Thus, the patent

26

validity issue is more relevant to damages than liability, and there is no need to address it now. The Court will address it if necessary during post-trial proceedings.

## Conclusion

For the foregoing reasons, Ocean Tomo's motion for summary judgement, R. 238, is denied with respect to Counts I and III. Ocean Tomo's motion also is denied with respect to Count VI as it pertains to the second, third, fourth, and fifth alleged misrepresentations in paragraph 40 of Defendants' Second Amended Counter-Claim. Ocean Tomo's motion is granted with respect to Count VI as it pertains to the first alleged misrepresentation in paragraph 40 of Defendants' Second Amended Counter-Claim.

ENTERED:

_Thomas M Durkin_
_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  June 14, 2017