```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3      OCEAN TOMO, LLC,                  )   Docket No. 12 C 8450
                                          )
 4               Plaintiff/              )   Chicago, Illinois
                 Counterdefendant,        )   June 26, 2017
 5                                        )   2:03 p.m.
                      v.                  )
 6                                        )
        JONATHAN BARNEY and               )
 7      PATENTRATINGS, LLC,               )
                                          )
 8               Defendants/             )
                 Counterplaintiffs.       )
 9

10                               VOLUME 1-B
                    TRANSCRIPT OF PROCEEDINGS - Bench Trial
11                 BEFORE THE HONORABLE THOMAS M. DURKIN

12
        APPEARANCES:
13

14      For the Plaintiff/     SPENCEPC by
        Counterdefendant:      MR. WILLIAM C. SPENCE
15                             MR. BRIAN J. BECK
                               405 N. Wabash Avenue, Suite P2E
16                             Chicago, IL 60611

17
        For the Defendants/    JENNER & BLOCK LLP by
18      Counterplaintiffs:     MR. DAVID C. LAYDEN
                               MS. KATHARINE R. CILIBERTI
19                             353 N. Clark Street
                               Chicago, IL 60654-3456
20

21      Court Reporters:       KATHLEEN M. FENNELL, CSR, RMR, FCRR
                               SANDRA M. MULLIN, CSR, RMR, FCRR
22                             Official Court Reporters
                               219 S. Dearborn Street, Room 1432
23                             Chicago, IL 60604
                               312.435.6053
24                             laura_renke@ilnd.uscourts.gov

25
```

114

```
              1        (Proceedings heard in open court:)
              2            THE COURT:  All right.  Ready to proceed?
              3            MR. LAYDEN:  Your Honor, just one initial matter
              4    before we do that -- sorry to interrupt, Cory.  We considered
02:03:34      5    what you said about the exclusion of Mr. Lutzker, and we would
              6    like to have him excluded for the witness testimony.  I didn't
              7    have a problem having him during the opening, but given that
              8    he will be a witness in the case and these are going to touch
              9    on the areas that he will be asked about.
02:03:44     10            THE COURT:  Any objection?
             11            MR. SPENCE:  Well, I guess our concern is that
             12    Mr. Barney has practically been counsel in this case as well.
             13    He's been at every deposition.  He's been at hearings.  He's
             14    argued things.  He knows the facts as well as anybody.
02:03:54     15            THE COURT:  He's a party.
             16            MR. SPENCE:  Mr. Lutzker has done the same thing.
             17            THE COURT:  Well, Ocean Tomo sued Barney.  Mr. Barney
             18    sued Ocean Tomo.  There's no individual defendants otherwise,
             19    right?
02:04:02     20            MR. LAYDEN:  That's correct.
             21            MR. SPENCE:  But he is counsel of record in this
             22    case.  They've never raised this as an issue until now.
             23            THE COURT:  Well, who's the first witness?
             24            MR. SPENCE:  Ms. Johnson.
02:04:11     25            THE COURT:  And is Ms. Johnson going to testify about
```

115

1    something that Mr. Lutzker is involved with?

2        MR. SPENCE:  No.  I mean, she's going -- she's in the

3    Expert Services Group.  She's going to testify about her work

4    in Expert Services.

02:04:27    5        THE COURT:  What's Mr. Lutzker going to testify

6    about?

7        MR. SPENCE:  We don't have him as a witness.  They

8    called him as a witness.

9        THE COURT:  Oh.  Why are you calling him?

02:04:36    10        MR. LAYDEN:  Your Honor, we're going to call him

11    about a lot of issues related to the royalties, as well as

12    other issues just relating to the background.  Mr. Lutzker's

13    been very involved in a lot of the events and acts relating to

14    this case.

02:04:45    15        THE COURT:  Yeah, but I didn't realize you're calling

16    him, not him.  I'm going to deny the motion to exclude.

17        Okay.  Call your first witness.

18        MR. LAYDEN:  Thank you, your Honor.

19        MR. SPENCE:  Ocean Tomo calls Joanne Johnson to the

02:05:01    20    stand.

21        THE CLERK:  If you could step up to the witness stand

22    over here, please.

23        (Witness sworn.)

24        THE CLERK:  You may be seated.

02:05:19    25        THE COURT:  All right.  You may begin.

Johnson - direct

116

| | | |
|---|---|---|
| | 1 | JOANNE JOHNSON, PLAINTIFF'S WITNESS, DULY SWORN, |
| | 2 | DIRECT EXAMINATION |
| | 3 | BY MR. SPENCE: |
| | 4 | Q. Good morning, Ms. Johnson, how are you? |
| 02:05:22 | 5 | A. Good. |
| | 6 | Q. Could you please state your full name for the record. |
| | 7 | A. Sure. Joanne Johnson. |
| | 8 | Q. Ms. Johnson, could you explain to the judge where you |
| | 9 | work. |
| 02:05:29 | 10 | A. I work at Ocean Tomo. I'm a director in the Financial |
| | 11 | Expert Testimony Practice Group. |
| | 12 | Q. What type of work do you do? |
| | 13 | A. I'm in the ET, Expert Testimony Practice Group, and we're |
| | 14 | focused on quantifying damages in a litigation context. |
| 02:05:45 | 15 | Q. What do you mean? Quantifying damages in a litigation |
| | 16 | context, what does that mean? |
| | 17 | A. So typically, it amounts to coming up with what we think |
| | 18 | is the proper amount of damages, typically in lost profits or |
| | 19 | reasonable royalty that should be due based on the specific |
| 02:06:02 | 20 | facts of the case. |
| | 21 | Q. And let me just back up for a second because I do notice |
| | 22 | that you're pregnant and I didn't notice that before we |
| | 23 | started today. So to the extent you do need a break or need |
| | 24 | some water, please do let me know. |
| 02:06:14 | 25 | A. Sure. |

Johnson - direct

117

1    Q.  Let me talk to you about your positions prior to working
2    at Ocean Tomo.  What did you do at that time?
3    A.  Prior to working?
4    Q.  What was your last job before Ocean Tomo?
02:06:21    5    A.  So I've been with Ocean Tomo since undergrad.  I interned
6    with the firm in 2007 and then joined full-time in 2008.  I
7    started as an analyst, moved up to an associate and am now a
8    director.
9    Q.  Where did you go to undergrad?
02:06:34    10   A.  I went to the University of Illinois, where I graduated
11   with a dual degree in accounting and finance.
12   Q.  And other than the dual degrees in accounting and finance,
13   do you have any other certifications that relate to your work
14   at Ocean Tomo?
02:06:47    15   A.  Yes.  I'm also a registered CPA in the state of Illinois.
16   Q.  Now, in addition to the role you played with Ocean Tomo
17   with the Expert Services Group, do you have any other role
18   within Ocean Tomo?
19   A.  Yes, I do.  I have some administrative responsibilities,
02:07:01    20   as well as some management responsibilities.  My admin tasks
21   could include putting together and sending out invoices to
22   clients, as well as taking a large role in training new hires
23   that come to the firm.
24              And in regards to management responsibilities, I
02:07:19    25   manage junior staff I work with.  I also put together

Johnson - direct

118

1   presentations about the business that I provide to the entire

2   firm.

3   Q.  Anything else?

4   A.  I think that's primarily it.

02:07:32   5   Q.  Now, you mentioned that you started with Ocean Tomo right

6   out of college.  How many years ago was that?

7   A.  Close to nine now.

8   Q.  Okay.  So you've been with Ocean Tomo for nine years?

9   A.  Nine years, yes.

02:07:42   10   Q.  Based on your work with Ocean Tomo for the last

11   nine years, can you explain for the Court what Ocean Tomo

12   does.

13   A.  Sure.  We're a financial consulting service firm that is

14   focused on various types of intellectual property.

02:07:55   15   Q.  You mentioned various types of intellectual property.  Is

16   there a specific type of IP, or is it more general?

17   A.  Well, we really do have expertise in all types of

18   different IP.  That would be trade secrets, trademarks,

19   copyrights and many more, but really our primary focus tends

02:08:11   20   to be on patents.

21   Q.  Okay.  I believe that you said that Ocean Tomo provides

22   consulting services.  What types of consulting services does

23   it provide?

24   A.  So our verticals, the name of our verticals may have

02:08:24   25   changed over time.  Currently we have three verticals.  It's

Johnson - direct

119

1    our opinion services, management services and advisory, and

2    then there's different practice groups that would fall within

3    those verticals.

4    Q.  Okay.  Let take the opinion services vertical first.  What

02:08:40
5    sort of work does -- takes place within that opinion vertical?

6    A.  Sure.  So that would include the Expert Testimony Practice

7    Group, which I am a part of, and it's the largest practice

8    group within the firm, as well as the Evaluation Practice

9    Group.

02:08:49
10   Q.  Any other groups?

11   A.  No, that would be it.

12   Q.  Okay.  Then second you mentioned a management practice

13   vertical; is that correct?

14   A.  That's correct.

02:08:56
15   Q.  What type of work does Ocean Tomo perform within that

16   vertical?

17   A.  That's typically our Strategy Practice Group, and a

18   component of that would be risk management services, as well

19   as patent analytics services.

02:09:13
20   Q.  And what's your understanding of risk management services?

21   A.  That's really focusing on identifying, mitigating and

22   managing primarily the liability that companies might face

23   with future patent infringement lawsuits.

24   Q.  And then you mentioned a second group within the strategy

02:09:31
25   group.  Is that a management group?

Johnson - direct

120

1    A.   Can you repeat that?

2    Q.   Sure.  I thought that you said within the strategy group,

3    there are really two different functions that are performed?

4    A.   Oh, so the second one was patent analytics.

02:09:43    5    Q.   Patent analytics.  And can you explain to me what type of

6    work is involved in patent analytics?

7    A.   Sure.  That's helping clients understand the quality of

8    the portfolio that they currently own and how they compare to

9    others in that particular field.

02:09:55    10   Q.   Okay.  And then I think mentioned the third vertical is

11   the advisory services?

12   A.   Correct.

13   Q.   And what type of work takes place within that advisory

14   services vertical?

02:10:05    15   A.   Sure.  So that would be our investments practice group, as

16   well as our transactions practice group, which I think

17   currently is going by the name of IP brokerage.

18   Q.   Anything else?

19   A.   I believe that's it.

02:10:14    20   Q.   So you mentioned that you're a director in Ocean Tomo's

21   Financial Expert Testimony Group; is that right?

22   A.   That's correct.

23   Q.   And is there a way that you refer to that group?  That's a

24   mouthful.  Is there a way that you refer to that group more

02:10:30    25   generally within Ocean Tomo?

1    A.   Sure.  So we typically refer to it as ET, Expert

2    Testimony, but the name of the group has changed throughout my

3    tenure there.  We've been financial services, expert services,

4    expert testimony, financial testimony, some combination

02:10:45    5    thereof, but most typically you'll hear it referred to as

6    Expert Testimony, or ET.

7    Q.   Okay.  If I refer to it as Expert Testimony today, will

8    you understand what I'm referring to?

9    A.   Yes.  I'll assume that it means the practice group that's

02:10:56    10    focused on quantifying financial damages in litigations.

11    Q.   Okay.  Now, specific to your function at Ocean Tomo, what

12    do you do within that Expert Testimony Group?

13    A.   So most of my work is focused on coming up with what we

14    think is the proper damages number in primarily patent

02:11:17    15    infringement cases, and there's a lot of work with coming up

16    with the final number.

17         Typically, the first step that we do in any case is

18    our fact-finding investigation.  And I did prepare a

19    demonstrative that shows the type of work that we typically

02:11:30    20    do.

21         MR. SPENCE:  Dave, could you pull up PD 81.

22    BY MR. SPENCE:

23    Q.   Is this the demonstrative that you prepared?

24    A.   I don't have my screen here, but, yes, I can see it over

02:11:42    25    here.

Johnson - direct

122

1          THE COURT:  Hang on one second.  I'll get it up.

2     BY THE WITNESS:

3     A.  Yes, it is.  And this is a demonstrative that we typically

4     use when we're presenting our findings in a trial setting, and

02:11:54  5     it's really just laying out the amount of work that goes into

6     coming up with our expert opinion.

7          So we're reviewing the court filings, legal

8     documents.  We review the patents that are at issue, the

9     relevant case law, which will dictate what types of damages

02:12:07  10    are appropriate.  We also have access to all internal company

11    documents that were produced as part of the discovery.

12         And within that, we review license agreements that we

13    think are relevant.  We review other agreements that might

14    have bearing on the case.  We've looked through a tremendous

02:12:23  15    amount of financial documents.  We review depositions, all the

16    transcripts, all the exhibits.  It's really a lot of

17    information that we process when we're coming up with our

18    expert opinion.

19    BY MR. SPENCE:

02:12:34  20    Q.  And as part of your work at Ocean Tomo, have you actually

21    testified before?

22    A.  I have issued -- I've been the testifying expert on two

23    reports, and I've given one deposition.

24    Q.  Have you testified at trial before?

02:12:45  25    A.  No.  This is my first time.

Johnson - direct

123

```
            1   Q.  I'm guilty of this, too, so I'm not casting any blame, but

            2   it would probably help the court reporter a great deal if

            3   you'd just slow down a little bit with your answers.

            4   A.  Oh, sure.

02:12:55    5   Q.  And I'll slow down as well, absolutely.  We're all guilty

            6   here.

            7            Beyond reviewing the documents that you talked about,

            8   is there anything else you do as part of your work in the

            9   Expert Testimony group?

02:13:05   10   A.  Sure.  And that would include the final two items noted on

           11   the circle, where we will conduct interviews with who we

           12   think is -- who's really the most relevant people that we

           13   should be talking to within the company.

           14            So that could be, you know, financing individuals,

02:13:23   15   marketing, sales, technical personnel who have expertise on

           16   the particular patent that's being litigated or the product

           17   that's at issue.  And then if the case warrants, we also do

           18   our own independent market research, our own independent fact

           19   finding.

02:13:39   20   Q.  And how do you determine if the case warrants it?

           21   A.  It's if you need additional background for the information

           22   and if you have to put the broader -- if you need broader

           23   context to the damages that you're claiming.

           24   Q.  Now, you've listed a lot of different items in fact

02:13:53   25   finding.  What's the purpose of doing all this work?
```

```
02:14:05
```

1    A.  Sure.  So with all this fact finding that we understand

2    what are the issues of the case.  You know, what are the

3    damages that are the most appropriate.

4             And with that, we can begin to start drafting the

5    expert report and putting together the financial model.

6    Q.  And how long does this fact finding typically take?

7    A.  It really does depend on the size of the case obviously,

8    but it's pretty typical for it to take a few months where

9    that's our primary focus.

10   Q.  Do you have any idea as to how many hours, how many man

11   hours might be involved during that fact finding?

12   A.  You know, I've never done the calculation, but I'm sure

13   it's too many.

14   Q.  What does your team do once they've completed the fact

15   finding?

16   A.  So as I alluded to earlier, that's when we start to put

17   pen to paper, start drafting the expert reports, start putting

18   together the financial model.

19            And, you know, the expert report is really our effort

20   of summarizing the most relevant information from what could

21   be hundreds of thousands of pages of information that we

22   reviewed in the fact-finding process to summarize and support

23   what we think is the proper amount of damages.

24            And very similarly with our financial model, we're

25   taking a large amount of financial data and drilling it down

(02:14:19, 02:14:32, 02:14:41, 02:14:58 appear as timestamps beside lines 10, 15, 20, 25)

Johnson - direct

125

1    to one number of what we think are the proper damages.

2    Q.  Okay.  With respect to patents in particular, what are the

3    factors you consider to get to that final number?

4    A.  So there -- so you have to remember we're calculating

02:15:13    5    damages in a litigation setting, so a lot of our methodologies

6    are dictated by the relevant case law, and there's two cases

7    that we typically review, and that would be the *Panduit* case

8    and *Georgia-Pacific*.

9         So some of the factors we would consider, the first

02:15:28   10    is from the *Panduit* case is are lost profits appropriate?  And

11    there's four factors that you'd consider underneath that.  And

12    then we also look at the *Georgia-Pacific* factors, which I know

13    I brought a demonstrative just laying out the 15 factors.

14         MR. SPENCE:  Sure.  And, Dave, could you pull up PD

02:15:44   15    82.

16    BY THE WITNESS:

17    A.  So this is a screen shot of the actual case, but I do have

18    a second demonstrative which makes it more readable.

19         MR. SPENCE:  Dave, pull up PD 83.  Thank you.

20    BY MR. SPENCE:

21    Q.  Is this the demonstrative that you prepared?

22    A.  Yes.

23    Q.  And would this assist you in your testimony today?

24    A.  It would.

02:16:04   25         So I'm sure you've heard of these factors before.

1    THE COURT:  I have.  And unless there's a need to go

2  through them, I don't need to hear them again.  I've used them

3  in cases when I was a lawyer, so --

4  BY MR. SPENCE:

02:16:17    5  Q.  Good.  Let me ask you about profitability at Ocean Tomo.

6  Based on the nine or so years you've been employed there, do

7  you have any idea of the profitability of the company as a

8  whole?

9  A.  Yes.  I know that the firm is generally profitable.

02:16:30   10  Q.  Now, with respect to the specific verticals or the

11  specific groups that you've talked about within Ocean Tomo, do

12  you have any understanding as to the profitability of the

13  groups versus the company as a whole?

14  A.  Yes.  I know that the Expert Testimony Practice Group is

02:16:41   15  typically the most profitable practice group within the

16  company.

17  Q.  How do you know that?

18  A.  As I've mentioned, I've put together presentations that

19  I've given to the entire firm where I discuss our results, so

02:16:54   20  I've had access to the underlying financial data.

21    And then I think also just being part of the Expert

22  Testimony Practice Group, you're aware that you're providing

23  the lion's share of work.

24  Q.  What's your understanding of the proportion of revenue

02:17:09   25  driven by the Expert Testimony Group versus the remainder of

1    Ocean Tomo?

2    A.  So it's varied over time and on an annual basis, it can

3    be -- it can be different, but it's pretty typical for ET to

4    be within 60 to 75 percent of total revenue, profits.

02:17:24    5    THE COURT:  Of all of Ocean Tomo.

6    THE WITNESS:  Of all of Ocean Tomo.

7    THE COURT:  Okay.

8    BY MR. SPENCE:

9    Q.  Now, you've mentioned that you've been with Ocean Tomo

02:17:32   10    since 2008.  Based on that time that you've been with the

11    company, are you familiar with PatentRatings?

12    A.  I am.

13    Q.  What is your understanding of PatentRatings?

14    A.  So I understand that PatentRatings technologies or

02:17:44   15    software was one of our service offering at a point in time.

16    Q.  And what, if anything, do you understand about that

17    software?

18    A.  Sure.  So I understand that that software pulls patent

19    data from various sources and compiles them into algorithms to

02:17:58   20    make really two predictions.  The first, it's predicting

21    whether a specific patent is likely to be maintained, and we

22    originally call that an IPQ score, kind of being a play off of

23    IQ score, and then eventually it was rebranded to OTR score,

24    but really if you hear IPQ or OTR, it's going back to the idea

02:18:19   25    of what's the likelihood of the patent being maintained.

Johnson - direct

128

1    Q.   In your work in the Expert Testimony Group at Ocean Tomo,

2    do you use PatentRatings in any way?

3    A.   Typically, we do not use it.

4    Q.   And so you personally don't use it; is that right?

02:18:32    5    A.   Correct.  I do recall putting in some patent numbers in

6    the software back when I was an analyst and an associate, but

7    it was never used in any kind of client deliverables, never

8    used in any analysis that we provided.

9    Q.   Okay.  Are you personally aware of anyone else at Ocean

02:18:51    10   Tomo using the PatentRatings software, PatentRatings product,

11   in any of the expert testimony work at Ocean Tomo?

12   A.   So I'm personally aware of one situation.  It was a

13   particular case where we provided our typical financial

14   damages work, and then we included the appendix, PatentRatings

02:19:10    15   output that was part of a patent and royalty trust, which is

16   one of our risk management products.

17   Q.   Do you recall the name of that engagement?

18   A.   Yes, it was Hewlett-Packard-Nomadix.

19   Q.   Do you recall any others?

02:19:23    20   A.   No, it's the only one I know from my personal experience.

21   Q.   You testified that you personally don't use PatentRatings

22   in your work in Expert Testimony at Ocean Tomo.  Why not?

23   A.   There's several reasons for that.  One, it goes back to

24   we're doing this in a litigation setting so we have to abide

02:19:41    25   by what the relevant case law is and what methodologies are

1    allowed by the courts.

2            And the PatentRatings system is essentially a black

3    box.  If we were ever asked to explain, you know, why is this

4    score falling out this way versus another, we would never be

02:19:56    5    able to explain that, so there was always a concern that it

6    wouldn't pass the standards set by the relevant case law.

7            Secondly, Expert Testimony work is typically focused

8    on one patent or a small handful, and even then, it's just the

9    few claims that are being asserted.  And really PatentRatings'

02:20:16   10    technology seems to be better suited for large patent

11    portfolios, as opposed to our analysis, which really is

12    focused on just one or a handful of patents.  So just the need

13    isn't there.

14            And then, thirdly, this goes back to the fact finding

02:20:32   15    that we do as part of our practice group.  You know, we really

16    do have access to information that was specifically produced

17    that speak to the accused products at issue, to the patent at

18    issue.  We have access to personnel who know the ins and out

19    of the technology and of the accused products.  We review all

02:20:50   20    the depositions, all the documents.  We really do have the

21    best information available at our fingertips, so there's no

22    need for us to rely on an algorithm.

23            MR. SPENCE:  No further questions, your Honor.

24            THE COURT:  All right.  Cross-examination.

02:21:03   25                    CROSS-EXAMINATION

Johnson - cross

130

BY MS. CILIBERTI:

Q.  Good afternoon, Ms. Johnson.

        So you described a moment ago that Ocean Tomo is segmented into different business units; is that right?

02:21:30   A.  Yes.

Q.  For instance, some of the ones you mentioned, expert testimony, valuation, strategy, risk management; is that right?

A.  Correct, and others.

02:21:44   Q.  Right.  Up until roughly sometime in 2015, the PatentRatings analysis was used in the valuation business unit, right?

A.  I believe it was sometimes used in the valuation business unit.

02:22:03   Q.  And up about sometime at the end of 2015, maybe into 2016, the PatentRatings analysis was used in the strategic analysis or the strategy business unit as well, right?

A.  Correct.  There were times where it would be used and times where it would not be used, correct.

02:22:24   Q.  Also, until 2016, the PatentRatings analysis was used in Ocean Tomo's investment group, right?

A.  Yes, in a similar way that I just described.  Sometimes it would be used, and sometimes it would not be used.

Q.  And as you noted, PatentRatings data analysis has been

02:22:43   used in the expert group as well, correct?

Johnson - cross

131

1    A.  I think there's been a few exceptions where it has been

2    used, correct.

3              MS. CILIBERTI:  Okay.  So I want to go back to the

4    valuation business unit, and could you pull up Defendants'

02:23:00    5    Exhibit 183, please.

6              Excuse me, I'll bring you a binder.

7              Your Honor, may I approach?

8              THE COURT:  You may, although it's up on the screen

9    now, so if it's easier just to use it.

02:23:23    10             MS. CILIBERTI:  We're going to be flipping through

11   kind of a lot of pages, so I thought it might be easier.

12             THE COURT:  That's fine.

13        (Tendered.)

14             THE WITNESS:  Thank you.

02:23:32    15             MS. CILIBERTI:  Do you want a copy as well?

16             THE COURT:  Sure.

17        (Tendered.)

18             THE COURT:  Thank you.

19             MS. CILIBERTI:  Sure.

02:23:37    20   BY MS. CILIBERTI:

21   Q.  Okay.  So I recognize you're not on the cover e-mail of

22   this exhibit, but I'm not going to be asking you about the

23   cover e-mail.  If you could just turn to the second -- well,

24   the third page, where we see the Ocean Tomo logo.  And I

02:24:11    25   believe this same report continues on for 30 pages or so, but

Johnson - cross

1    if you would just take a quick look and tell me whether you've

2    seen this document before.

3    A.  I have not seen this document in my role as an employee

4    and as a fact witness within Ocean Tomo.  I believe I may have

02:24:36    5    seen this document in my role as a rebuttal expert to

6    Mr. Pakter.

7    Q.  Okay.  So when -- when was that when you last saw this

8    document?

9        MR. SPENCE:  Your Honor, just want to object on basis

02:24:51    10    of scope.  She's here as a fact witness.  We may call her as a

11    rebuttal witness later in the case.  She can't answer

12    questions as a rebuttal witness until we know what

13    Mr. Pakter's testimony will be at trial.

14        MS. CILIBERTI:  May I respond?

02:25:04    15        THE COURT:  Sure.

16        MS. CILIBERTI:  We don't intend to get into any of

17    the expert testimony here.  She was designated as a corporate

18    representative on topics such as the Ocean Tomo work product

19    and the PatentRatings' use in the work product, so we're just

02:25:16    20    going to go through the -- her knowledge of the facts in that

21    regard.

22        THE COURT:  All right.  Well, if she's only seen this

23    document, though, in the context of being a rebuttal expert

24    witness, I'm not sure how far you can go with this document.

02:25:31    25    But if she was the 30(b)(6) witness on a number of topics

```
       1    that -- the ones you just stated, that's fine.
       2           What is she -- what is Ms. Johnson going to be an
       3    expert witness on?
       4           MR. SPENCE:  She's going to respond to Mr. Pakter's
02:25:44   5    damages report.
       6           THE COURT:  All right.  His damage report deals with
       7    the royalties that the defendant says were not paid to him.
       8           MR. SPENCE:  To be more precise, he has two different
       9    reports.  One is on royalties and one is on
02:26:01  10    payment distributions or allocations.
      11           THE COURT:  All right.  And which one of those is
      12    Ms. Johnson going to be the rebuttal to Mr. Pakter?
      13           MR. SPENCE:  Royalties.
      14           THE COURT:  Royalties, all right.
02:26:12  15           Well, go ahead.  We'll see how it goes.
      16           MS. CILIBERTI:  Okay.  Thank you, your Honor.
      17    BY MS. CILIBERTI:
      18    Q.  So, Ms. Johnson, do you recall when was the last time you
      19    saw this document roughly?
02:26:29  20    A.  Within the last month or two, month and a half perhaps.
      21    Q.  Does it appear to be in substantially the same condition
      22    as the last time that you saw it?
      23    A.  You know, I don't know.  I reviewed thousands of documents
      24    as part of my work as a rebuttal witness, and I couldn't tell
02:26:46  25    you if this is in the same form or not.
```

Johnson - cross

134

1  Q.  Just skimming through it, does anything look different to

2  you?

3  A.  I honestly couldn't tell you because, you know, again, I

4  reviewed thousands of documents and thousands upon thousands

02:27:02  5  of pages of documents, so, you know, I have no reason to

6  believe that this isn't the complete document, but I have no

7  recollection if this would be the same document that I

8  reviewed.

9          THE COURT:  Are you trying to lay a foundation to get

02:27:14  10  it admitted?

11          MS. CILIBERTI:  Yes, your Honor.

12          THE COURT:  Oh.  Is there any objection to its

13  admission?  Other than relevance, which won't become evident

14  to me until later in the trial, but there's no foundation

02:27:25  15  objection, I assume.

16          MR. SPENCE:  Yes, I apologize, your Honor.  I was

17  originally offered a copy and declined it, but if we can look

18  at it for purposes of admitting it, I'd like to see a copy.

19          THE COURT:  All right.  It's a multi-page document.

02:27:39  20  Looks like it's in order, so last page has a signature of

21  Ocean Tomo.

22          MR. SPENCE:  So, your Honor, with respect to DX 183,

23  the only objection would be to the e-mail from Mr. Evan Lee,

24  there's no foundation for.

02:28:25  25          THE COURT:  Sure.  DX 183 is admitted, absent the

Johnson - cross

135

1    e-mail, which is something this witness can't lay a foundation

2    for.

3              And as to its relevance, I'll have to judge that as I

4    get deeper into the case.  So the rest of the -- other than

02:28:39    5    the e-mail, DX 183 is admitted.

6              (Defendants' Exhibit No. 183 was received in evidence.)

7              MR. SPENCE:  And the other issue we may need to

8    address, your Honor, and frankly I don't know offhand, but

9    many of these engagements are subject to confidentiality or

02:28:52    10   protective orders, so we may need to do something to place it

11   under seal.

12             THE COURT:  We'll deal with that off line.  You'll

13   deal with the other side off line.  It occurred to me when I

14   heard the opening, there's an awful lot of fairly what I would

02:29:05    15   think clients would view as very sensitive information that's

16   being put of public record, but that's the price, as I've said

17   in court, that's the price you pay for doing this as a federal

18   trial in open court, as opposed to a private arbitration.  I'm

19   not sure there's much I can do about that.  I'm not going to

02:29:23    20   lock the courtroom.

21             So this is admitted, and you can deal with protective

22   order issues off line.

23             MR. SPENCE:  Thank you.

24             THE COURT:  Go ahead.

02:29:31    25             MS. CILIBERTI:  Thank you, your Honor.

Johnson - cross

136

BY MS. CILIBERTI:

Q. Ms. Johnson, if you could please turn to Page 4 of this report.

A. Yes.

02:29:43  Q. And by the way, I should have asked you before. Do you know what this document is?

A. It looks to be a valuation report concerning certain IP assets owned by PrinterOn Corporation that was issued back in May of 2011.

02:30:13  Q. Okay. And so now flipping back to Page 4, heading 3.2 says quality of patent portfolio. Do you see that?

A. I do.

Q. And the first sentence there says, "Ocean Tomo's PatentRatings system uses advanced econometric-based

02:30:35  algorithms incorporating over 35 independent variables applied to its proprietary database of the U.S.-issued patent universe."

Did I read that correctly?

A. Yes.

02:30:43  Q. Isn't it true that this section of the report, which appears to continue on to the next page, was -- incorporates a PatentRatings analysis?

A. Yes, it appears to.

Q. And over on Page 5 where we see Table 1, that table also

02:31:09  incorporates a PatentRatings analysis, correct?

Johnson - cross

137

1  A.  Correct.  It contains an IPQ score for a particular

2  patent.

3  Q.  Ms. Johnson, is this an example of how the PatentRatings

4  system is used in Ocean Tomo's valuation business?

02:31:25  5        MR. SPENCE:  Just object on the basis of foundation.

6        THE COURT:  If she knows.

7        Go ahead.

8  BY THE WITNESS:

9  A.  Well, it appears to be the way it is used.

02:31:34  10  BY MS. CILIBERTI:

11  Q.  Now, if you'll flip ahead in this same document about

12  halfway through, you'll come to another cover page looks like.

13        THE COURT:  What page?

14        MS. CILIBERTI:  Well, the numbering restarts, your

02:31:51  15  Honor, so it's after Page 36.

16        THE COURT:  Oh, I see.  All right.  And on the

17  renumbered pages, what page is it?

18        MS. CILIBERTI:  Actually -- the cover page actually

19  doesn't have a number.

02:32:06  20        THE COURT:  Oh, I see, Provisional Assessment of

21  Palm, Incorporated?

22        MS. CILIBERTI:  Yes.

23        THE COURT:  Are you there?

24        THE WITNESS:  I am.

02:32:14  25        THE COURT:  Okay.  Go ahead.

Johnson - cross

138

1    BY MS. CILIBERTI:

2    Q.  Ms. Johnson, if you could flip through and let me know

3    whether you've seen this document before?

4    A.  Again, I would expect that I have not seen this as my

02:32:31    5    personal capacity within Ocean Tomo, but perhaps that I have

6    seen it as part of my role as a rebuttal witness in this case.

7    Q.  And when would have been the last time that you saw it?

8    A.  If this is one of the documents I've listed in my rebuttal

9    expert report, I would have seen it in the last month,

02:32:54    10    month-and-a-half timeframe.

11    Q.  Okay.  And this is another example of a valuation report,

12    correct?

13    A.  Yes, it appears to be.

14    Q.  This is for a different client though, correct, it's Palm,

02:33:19    15    Inc.?

16    A.  Correct.

17    Q.  Okay.  If you'll turn to Page 5 of this report, you'll see

18    Table 3.

19    A.  Yes.

02:33:32    20    Q.  And Table 3 is titled Palm Patents Issued By Class Year;

21    is that right?

22    A.  Yes.

23    Q.  And isn't it true that the data in this table is a product

24    of the PatentRatings system?

02:33:48    25    A.  I see no indication that it's a product of the

1  PatentRatings system.  I'm trying to see what sources are

2  cited here, looking at the lead-in paragraph.

3       I have no reason to believe one way or the other if

4  this is an outlet from the PatentRatings system, as opposed to

02:34:17  5  from some other source.

6  Q.  Okay.  If you'll flip to the following page, Figure 1.

7  A.  Yes.

8  Q.  It says, "Age of Palm's U.S. patents."

9       Isn't it true that the data in this figure is a

02:34:34  10  product of the PatentRatings system as well?

11  A.  Again, I don't see anything that indicates whether it is

12  or is not.  I would imagine that this information could be

13  compiled without the use of the PatentRatings system.

14       THE COURT:  Which table are you on?

02:34:55  15       THE WITNESS:  Figure 1.

16       THE COURT:  Oh, Figure 1.

17       THE WITNESS:  On Page 6.

18  BY MS. CILIBERTI:

19  Q.  But you don't know whether the data in this report was

02:35:05  20  gathered using the PatentRatings system; is that right?

21  A.  Correct.  This report does not indicate the PatentRatings

22  system as being a source for the information in this table.

23       THE COURT:  Well, Table 4 has an IPQ score.

24  That's --

25       MS. CILIBERTI:  I was going there next, your Honor.

Johnson - cross

140

1      THE WITNESS:  Figure 1?

2      THE COURT:  Yeah, I'm just going to Table 4, the next

3  page.  I'm jumping ahead a little bit, but clearly there's

4  multiple references to the IPQ score as you page through the

02:35:33    5  rest of the document.

6      THE WITNESS:  Agreed.

7      THE COURT:  And if it says IPQ score, is that the

8  PatentRatings system --

9      THE WITNESS:  Correct.

02:35:39   10      THE COURT:  -- as far as you know?

11      Okay.  I get it.  Off the record for a minute.

12     (Discussion held off the record.)

13      THE COURT:  Let's go on the record.

14      Sorry, I raised the issue with the parties of this

02:36:20   15  document, which has now been admitted into evidence in this

16  case, was a document that was commissioned by Finnegan

17  Henderson, where they apparently retained Ocean Tomo to do an

18  analysis.  It's marked privileged and confidential, prepared

19  at the direction of counsel.

02:36:39   20      I don't know if this became part of a lawsuit and was

21  made public in a lawsuit.  I'd be kind of surprised if it was.

22  Has anyone addressed the privilege issues on this during Judge

23  Rowland -- was it addressed or discussed during the discovery

24  process with Judge Rowland?

02:36:57   25      MR. LAYDEN:  Your Honor, there -- and I'll speak to

Johnson - cross

1    that because Ms. Ciliberti was not as involved in the

2    discovery process as I was.

3            Ocean Tomo had raised at different points in time

4    objections based upon confidentiality and I believe even work

02:37:11    5    product.  I don't believe that issue was actually expressly

6    addressed in front of Judge Rowland.  I don't think she

7    actually reached it.  These documents were produced in the

8    case by Ocean Tomo, which is why we're using them.

9            THE COURT:  All right.  Well, confidentiality is one

02:37:23    10    thing.  That's covered by a protective order.  Privilege is

11    something different, but I didn't know if it was something the

12    parties were concerned about, but --

13            MR. SPENCE:  The issue, unfortunately, is one much

14    more complex even than you're acknowledging, because remember

02:37:36    15    Mr. Barney has many of these documents, has produced them to

16    us, and so in many cases they're not even from our own

17    production.

18            THE COURT:  Well, I don't see -- is there a Bates

19    number on this?

02:37:46    20            MR. LAYDEN:  This one is an Ocean Tomo document.

21            MR. SPENCE:  This particular document is an Ocean

22    Tomo document.

23            THE COURT:  Okay.  I see it.

24            MR. SPENCE:  But as I've alluded to, in many cases

02:37:55    25    you'll see other documents throughout this case that have been

Johnson - cross

142

1    produced to us where we don't have the opportunity to address

2    the issue, frankly.

3              THE COURT:  Well, I guess it's another reason why I

4    encouraged you many, many times to settle this case, but

02:38:05   5    please proceed.

6              MR. LAYDEN:  Thank you, your Honor.

7              MS. CILIBERTI:  Thank you.

8    BY MS. CILIBERTI:

9    Q.  Ms. Johnson, if you could now turn to Exhibit 458.

02:38:20   10   A.  Yes, I'm there.

11   Q.  Have you seen this document before?

12   A.  I believe my answer would be similar to my prior answers

13   where I have not seen this document in my role as director in

14   Expert Testimony, but to the extent that it's in the rebuttal

02:38:48   15   expert report listed on the document index, then I may have in

16   that capacity.

17   Q.  Does it appear to be in substantially the same condition

18   as the last time you saw it?

19   A.  Again, you know, I really couldn't tell you.  I have no

02:39:00   20   reason to believe that this isn't the same document if I had

21   reviewed it, but I can't tell you definitively one way or the

22   other.

23             MS. CILIBERTI:  Your Honor, we submit Defendants'

24   Exhibit 458 to be admitted.

02:39:15   25             THE COURT:  You're moving for the admission of DX

Johnson - cross

143

1    458.   Any objection?

2         MR. SPENCE:  Your Honor, it's just really the same

3    concern, and I'll note that most of the production in this

4    case was done by predictive coding so in many cases we're

02:39:41    5    seeing documents for the first time.  We haven't had a chance

6    to review some of these documents.

7         I don't know if this is one such document, but we

8    have raised issues of confidentiality and privilege throughout

9    this litigation.  I just don't know if this is governed by a

02:39:52    10   protective order such that we need to take any action, but

11   we'll certainly look at that and, as you've noted with the

12   earlier exhibit, address that off the record if necessary.

13        THE COURT:  All right.  DX 458 is admitted.  Go

14   ahead.

02:40:04    15        (Defendants' Exhibit No. 458 was received in evidence.)

16   BY MS. CILIBERTI:

17   Q.  Ms. Johnson, this report is an example of work product

18   from the strategic analysis group of Ocean Tomo; is that

19   right?

02:40:17    20   A.  I don't know if it's part of the Strategy Practice Group

21   or if it was a valuation project that had strategy

22   recommendations without seeing the invoices or the engagement

23   letter that ties this to a specific managing director.  I

24   couldn't tell you definitively whether it would be the

02:41:06    25   Strategy Practice Group or some other group.

1  Q.  The title is Mobile Communications IP Strategy, correct?

2  A.  That is correct.

3  Q.  Doesn't IP strategy seem to suggest that it's from the

4  strategic analysis group?

02:41:21  5           MR. SPENCE:  Objection.  Calls for speculation.

6           THE COURT:  If she knows.

7           Overruled.

8  BY THE WITNESS:

9  A.  I mean, it's one indication that it could be within that

02:41:28  10  practice group, but I also know that the valuation practice

11  group would have strategy recommendations as part of their

12  valuations, potentially same with the risk management practice

13  group, they would have strategic recommendations.

14           So that one word alone is not enough for me to make

02:41:44  15  the determination that's within the practice group, and I can

16  admit that there are strategic recommendations in this

17  document, but I can't pinpoint it to a particular group.

18  BY MS. CILIBERTI:

19  Q.  Okay.  If you could turn to Page 16, please.

02:42:06  20  A.  Yes.

21  Q.  And do you see there heading 5 says IP Landscape Analysis,

22  correct?

23  A.  Correct.

24  Q.  And then if you'll flip ahead to Page 21, please, there's

02:42:21  25  another heading that this says 5.2 SQM.

Johnson - cross

145

1   A.  Yes.

2   Q.  And the second sentence under the SQM heading says, "IP

3   landscape surrounding the iPass-owned patents for service

4   quality, monitoring and network categorization is crowded with

02:42:39   5   relevant intellectual property as can be seen in Exhibit 1,

6   the portfolio analysis report."

7       Did I read that correctly?

8   A.  Yes.

9   Q.  Isn't it true that a portfolio analysis report is a piece

02:42:50   10  of work product that is generated by the PatentRatings system?

11  A.  It's true that there is PatentRatings output that is

12  included in a portfolio analysis report, but the reports I've

13  seen that are PARs for short also include some consulting

14  services as well.  It depends on -- on the actual underlying

02:43:12   15  PAR.

16  Q.  And the discussion of IP landscape, that also refers to

17  subject matter that incorporates PatentRatings analysis,

18  correct?

19  A.  Well, IP landscape is a broader term.  I understand that

02:43:31   20  there's one PatentRatings output that provides for landscape

21  charts, but if you just see the term IP landscape, that could

22  include analysis that has nothing to do with the PatentRatings

23  system, but it could as well.  It would depend on the context.

24  Q.  In this context where it's referring to Exhibit 1, the

02:43:51   25  portfolio analysis report, isn't it reasonable to conclude

Johnson - cross

146

1    that it is referring to PatentRatings data and analysis?

2    A.  Again, I mean, it might be -- I would really have to see

3    the underlying portfolio analysis report.  While I understand

4    that PatentRatings has a report that is called portfolio

02:44:12    5    analysis report, that is also a description of an analysis

6    that you could do that could or could not rely on

7    PatentRatings technology.

8        So while it could be an indicator that PatentRatings

9    technology was used, it's not definitive one way or the other.

02:44:29    10    Q.  Okay.  If you could turn to Page 24, there's a chart at

11    the top of the page listing a number of companies' active

12    patent counts and relevant patent counts, et cetera.

13        Isn't it true that the data in this chart also came

14    from the PatentRatings system, Ms. Johnson?

02:44:52    15    A.  There's nothing in the text that would lead me to know

16    one way or the other if this came from the PatentRatings

17    system.

18    Q.  So patent relevance isn't something that is analyzed

19    through the PatentRatings system?

02:45:18    20    A.  The PatentRatings system, as I understand, gives out a

21    relevance score.  I don't know if that was the underlying

22    metric that was used to compile the relevant U.S. patent count

23    or if that was done through a technical review of all the

24    patents.

02:45:37    25        You know, it may have been.  It's just not clear by

1    looking at the pages that you indicated for me.

2    Q.  Ms. Johnson, you recall being designated a corporate

3    representative in this for the 30(b)(6) deposition of Ocean

4    Tomo in this case?

02:46:09    5    A.  I do.

6    Q.  Do you remember being designated the corporate

7    representative for the topic described products and services

8    sold by Ocean Tomo that included, reported, used, relied upon

9    and/or considered any PatentRatings analysis including data

02:46:25    10    subscriptions, report products and related services concerning

11    patent appraisals, valuations, expert testimony, strategic

12    analysis, research, consulting, investment analysis and

13    transactions?

14    A.  I lost the first part of your sentence.  Was it --

02:46:43    15    Q.  Understandable.

16    A.  -- do I recall?

17    Q.  Do you recall being designated as the corporate

18    representative for that topic?

19    A.  I obviously don't have a perfect recollection of that

02:46:52    20    topic as you stated, but that sounds right.

21    Q.  If you would turn, please, to Exhibit 455.  Have you seen

22    this document before?

23    A.  Again, I don't recall seeing this document within my role

24    within Expert Testimony.  To the extent that it would be

02:47:37    25    listed in my documents considered in the rebuttal expert

Johnson - cross

148

1  report, I may have.

2  Q.  Does it appear to be in substantially the same condition

3  as the last time you saw it, or do you have reason to believe

4  that it is not?

02:47:49  5  A.  Similar to before, I couldn't tell you definitively if

6  it's in the same form, but I have no reason to doubt that it

7  is.

8  MS. CILIBERTI:  Your Honor, we move to admit

9  Defendants' Exhibit 455.

02:48:07  10  THE COURT:  All right.  Any objection beyond those

11  already stated?

12  MR. SPENCE:  Same objections already stated,

13  relevance and foundation.

14  THE COURT:  All right.  DX 455 is admitted.

02:48:21  15  (Defendants' Exhibit No. 455 was received in evidence.)

16  BY MS. CILIBERTI:

17  Q.  Ms. Johnson, this report is titled Project Liberty,

18  Intellectual Property Sensitivity Analysis, correct?

19  A.  Correct.

02:48:28  20  Q.  Does this appear to be an example of work product from the

21  investment business unit?

22  THE COURT:  What is the relevance of the unit that

23  these reports are derived from?

24  MS. CILIBERTI:  Your Honor, Ocean Tomo is trying to

02:48:56  25  make the point that they only use the PatentRatings in one

Johnson - cross

149

1  particular area or a small portion of their business, whereas

2  the reports from various different business units incorporate

3  PatentRatings analysis.

4          THE COURT:  Well, I think the witness admitted that

02:49:08  5  it's used occasionally in a variety of their businesses, not

6  very much in Expert Testimony for reasons she stated, but it's

7  used in three or four other areas occasionally.  It's used in

8  the valuation business, used in the strategy business, used in

9  the investment group, a few times used for Expert Testimony.

02:49:27  10          So, I mean, it's billed out one way or the other.

11  I'm not sure of the relevance of which unit it is, it's a

12  knowable fact.

13          Go ahead, but I'm just not sure it's necessarily a

14  fact I'm going to have to focus on to make a decision on the

02:49:44  15  case.  But go ahead with your questions.  I just wanted to

16  make that observation.

17          MS. CILIBERTI:  Okay, your Honor.

18          THE WITNESS:  Can you repeat your question?

19          THE COURT:  Which unit?

02:49:54  20          THE WITNESS:  Which unit?  Again, I couldn't tell you

21  definitively without seeing the invoices or the charge codes

22  or the engagement letter.  It could be within the investment

23  practice group.  I just don't know one way or the other.

24  BY MS. CILIBERTI:

02:50:09  25  Q.  Okay.  If you will flip to Slide 3, please, titled

Johnson - cross

1   Conclusions.

2   A.   Yes.

3   Q.   The third bullet down says, "The PCR space is highly

4   competitive.  Purely from a quantitative perspective, many

02:50:34   5   competitors have higher quality IP portfolios than LIFE."

6           LIFE appears to be the client who this work product

7   was provided to, correct?

8   A.   It appears to be one of the companies that's referenced.

9   I don't know if it's the client or the target company that was

02:50:53   10   analyzed, but it's -- it's a relevant company in this

11   document.

12   Q.   Okay.  The quality of IP portfolios, which is referenced

13   in the third bullet point there, is ranked using the

14   PatentRatings system, correct?

02:51:19   15   A.   There's nothing in this bullet point that indicates that

16   it's the PatentRatings system versus something else.  Again,

17   it may have been from the PatentRatings system.  I would have

18   to look at more of the document potentially to know

19   definitively.

02:51:33   20   Q.   My question was a little more general, and that is that

21   the PatentRatings system ranks quality of patents in IP

22   portfolios, correct?

23   A.   That is one of the outputs or one of the metrics that you

24   can use the PatentRatings system to perform, but I believe

02:51:54   25   there are other ways to also rate quality of IP portfolios

1   outside of the PatentRatings technology.

2   Q.  Understood.

3       If you'll flip to Slide 8, please.

4   A.  Yes.

02:52:09   5   Q.  We have a table here, and the fourth column from the left

6   says AV OTR, and I'm assuming that means average OTR, correct?

7   A.  I'm sorry, where -- oh, the third column, yes.

8   Q.  Fourth.

9   A.  Fourth column, yes.  I would assume that also means

02:52:30   10   average OTR.

11   Q.  And as you testified before, OTR is just another branding

12   of the PatentRatings system, correct?

13   A.  Correct.  That is one of the terms that we use for either

14   IPQ scores or OTR scores.

02:52:45   15   Q.  And on the very next slide, we have competitor landscape.

16   This also is data that comes from the PatentRatings system,

17   correct?

18   A.  Yes.  As it references the OTR scores on the bottom of

19   that landscape, I would assume that this is from the

02:53:03   20   PatentRatings system.

21   Q.  Okay.  And I'm not going to go through this lengthy

22   document, but if you just flip through, isn't it true that

23   there's quite a few landscape maps that we've seen in some of

24   the other documents and tables with OTR scores?

02:53:25   25   A.  Yes.  That appears to be true.  I've seen at least two

1    more landscape maps as I flipped through and a chart that has

2    the OTR scores, and there's more as I continue flipping.

3    Q.  Okay.  Let's turn to Exhibit 239, Defendants' Exhibit 239,

4    please.

02:53:44    5    A.  Sure.

6            Yes, I'm there.

7    Q.  Have you seen this document before?

8    A.  It would be a similar answer in that, you know, I may

9    have, as part of my role as a rebuttal witness in this case,

02:54:08   10    but potentially not within my role within Expert Testimony as

11    a director.

12    Q.  Does it appear to be in substantially the same condition

13    as the last time that you saw it, or do you have any reason to

14    think it is not?

02:54:28   15    A.  I have no reason to think that it's not.

16            MS. CILIBERTI:  Okay.  Your Honor, we move to admit

17    Defendants' Exhibit 239.

18            THE COURT:  All right.  Same objection?

19            MR. SPENCE:  Just the same objections, your Honor.

02:54:38   20            THE COURT:  All right.  It's admitted.

21    Defendants' 239 is admitted.

22        (Defendants' Exhibit No. 239 was received in evidence.)

23    BY MS. CILIBERTI:

24    Q.  And this is an expert report, right, Ms. Johnson?

02:54:45   25    A.  Yes.  This is an expert report of Dr. Elvir Causevic that

1    he delivered as part of the strategic advisory services

2    practice.

3    Q.  I'm sorry, where do you see the strategic advisory

4    practice?

02:55:03    5    A.  On Page 1 of the document.  It states that -- the first

6    sentence states, "My name is Elvir Causevic, and I'm a

7    managing director of Ocean Tomo strategic advisory services

8    practice and the company's chief technologist."

9    Q.  Okay.  Thank you.  Thanks for pointing that out.  The

02:55:22    10   front page, though, it says expert report of Dr. Elvir

11   Causevic, right?

12   A.  As well as some other things on the front page, but yes.

13   Q.  Some other things like the Ocean Tomo logo, correct?

14   A.  Correct.

02:55:33    15   Q.  And the date?

16   A.  And the date and privileged and confidential.

17   Q.  Thank you.

18        If you'll turn with me to Page 25, please.

19   A.  Yes, I'm there.

02:55:51    20   Q.  Okay.  Heading 8.4.2.1.  It's titled, Landscape of Patents

21   Relevant to the '311 Patent Based On Citation Relationships,

22   correct?

23   A.  Yes.

24   Q.  And I'm skipping -- I'm looking at the first sentence, but

02:56:12    25   the second half of it, it says, "I performed an analysis to

Johnson - cross

154

1   identify relevant intellectual property.  My analysis was

2   performed using the Ocean Tomo PatentRatings system which

3   identifies relevant patents through a four-generational

4   citational search across the entire patent landscape of the

02:56:30   5   U.S.-issued patents," correct?

6   A.  Correct.

7   Q.  This is referring to an analysis using the PatentRatings

8   system, right?

9   A.  Correct.

02:56:39   10   Q.  And if you look down to footnote 89 as well, it says,

11   "Patents that were deemed to be relevant to the '311 patent

12   were identified through the use of Ocean Tomo's proprietary

13   PatentRatings tool," correct?

14   A.  Correct.

02:56:51   15   Q.  So the PatentRatings tool was used in the process of

16   creating this report, correct?

17   A.  Correct.  It appears that the PatentRatings tools were

18   used within this report.

19   Q.  Okay.  As you noted before, this isn't the only instance

02:57:14   20   that the PatentRatings tool has been used in an expert report

21   situation, right?  You referred earlier to the HP-Nomadix

22   engagement, correct?

23   A.  I view that case as being very different than the report

24   that we have in front of us.  I know that this is titled an

02:57:34   25   expert report, but Mr. Causevic was not part of the Expert

Johnson - cross

155

1    Testimony Practice Group, so I think of this as being

2    fundamentally different than the HP-Nomadix matter that was

3    raised earlier.

4    Q.  Okay.  I wasn't necessarily comparing the two and going

02:57:51    5    through their similarities, but the function of the Expert

6    Testimony Group is to, or at least one of the functions is to

7    produce expert reports, correct?

8    A.  Correct, that quantify damages in a litigation setting.

9    Q.  Okay.  Thank you.

02:58:08    10          Ms. Johnson, I'm done with this exhibit.  You can put

11    that away.

12    A.  Okay.

13    Q.  Isn't it true that in the past, Ocean Tomo has used a

14    PatentRatings system as a method of promoting the entire

02:58:24    15    company?

16    A.  I believe that to be true, correct.

17    Q.  And are you aware that Mr. Malackowski once described

18    PatentRatings as the glue that holds Ocean Tomo together?

19    A.  I am aware of that as part of my role as -- as an expert

02:58:39    20    in this case.  I don't know if I was personally aware of that

21    prior to this case.

22    Q.  Are you aware that Mr. Malackowski has gone on CNBC

23    multiple times to tout and provide opinions based on the

24    PatentRatings tool and analyses?

02:58:53    25    A.  I don't know that specifically, but it wouldn't be

1   surprising if he had.

2   Q.  And isn't it true that the Ocean Tomo website, up until

3   relatively recently, used to have numerous references to the

4   PatentRatings tools?

02:59:10   5   A.  I'm not sure what you mean by relatively recently.  I know

6   there were spans of time where we did have references to the

7   PatentRatings tool on the website.

8   Q.  And are you -- have you heard of OT 300, Ms. Johnson?

9   A.  Yes, I have.

02:59:27   10   Q.  And isn't -- that is Ocean Tomo's index, correct, or

11   patents index, intellectual property index?

12   A.  Yes.

13   Q.  Okay.  And isn't it true that that was -- involved the use

14   of the PatentRatings system?

02:59:43   15   A.  Correct.

16          THE COURT:  What's an IP index?

17   BY THE WITNESS:

18   A.  The OT 300 was essentially a restructuring of the S&P 500,

19   I believe, where it re-weighted the -- how much you would

03:00:00   20   invest in a particular stock based on the IP portfolio of that

21   company.  So it was using the IPQ scores as part of the

22   weighting within the distribution of the companies within the

23   index.

24          THE COURT:  I see.  All right.

03:00:17   25          MS. CILIBERTI:  I have no further questions.

1    THE COURT:  Any redirect?

2    MR. SPENCE:  Very short redirect, your Honor.

3    REDIRECT EXAMINATION

4 BY MR. SPENCE:

03:00:26
5 Q.  Ms. Johnson, do you have any understanding as to whether

6 the Ocean Tomo -- I'm sorry, strike that question.

7    Do you have any understanding as to whether or not

8 PatentRatings is currently used within Ocean Tomo today?

9 A.  No.  The technology was discontinued or practice group was

03:00:39
10 disbanded when we stopped using the technology in late 2015.

11 Q.  Okay.  I ask because earlier I maybe misunderstood, but I

12 thought you said there was some use of PatentRatings within

13 Ocean Tomo in 2016.  Did I misunderstand you?

14 A.  I believe so.  I believe we discontinued the PatentRatings

03:00:58
15 technology in 2015.  I know that we are currently relying on a

16 different firm to provide patent analytics, but it's not the

17 same technology.

18 Q.  What firm does Ocean Tomo rely on today?

19 A.  Innography.

03:01:10
20 Q.  What do you know about Innography?

21 A.  Not too much.  I just know that it's another firm that

22 provides patent quality scores in landscape analysis.

23 Q.  Anything else that they provide, to your knowledge?

24 A.  No, nothing that comes to mind right now.

03:01:29
25 Q.  Earlier you were asked about a bunch of documents.  Do you

1  have any personal involvement in the creation of any of those

2  documents?

3  A.  None of the ones that were shown to me today, no.

4  Q.  To your knowledge, were any of those documents created by

03:01:41  5  anyone within the ET Group at Ocean Tomo?

6  A.  I don't know definitively if there was any assistance from

7  anyone from the Expert Testimony Group.  I don't know.

8  Q.  When you looked through those documents that you were just

9  asked about, did you recognize any of those documents as

03:01:57  10  expert reports from the ET Group?

11  A.  No.  None of them followed what we -- our traditional

12  template that we use within Expert Testimony.

13          MR. SPENCE:  No further questions, your Honor.

14          THE COURT:  Any recross?

03:02:12  15      (Counsel conferring.)

16          MS. CILIBERTI:  No, your Honor.

17          THE COURT:  All right.  Ms. Johnson, next time you

18  testify, you can now say you've testified once in federal

19  court.

03:02:23  20      (Laughter.)

21          THE WITNESS:  Great.

22          THE COURT:  All right.  You're excused.  Thank you.

23          THE WITNESS:  Thank you.

24          THE COURT:  Please call your next witness.

03:02:32  25          MR. LAYDEN:  Your Honor, if we can just confer.

1          THE COURT:  Sure, all right.

2          (Counsel conferring.)

3          MR. LAYDEN:  Your Honor, the only issue, Ocean Tomo

4     is going to call Mr. D'Souza next.

03:02:53    5          THE COURT:  Mr. Who?

6          MR. LAYDEN:  Mr. D'Souza, who's an employee of Ocean

7     Tomo.  We had been told he was going to testify third today.

8     I understand, I'm not accusing Mr. Spence of anything, they've

9     got issues in trying to get witnesses here.  We're still

03:03:02   10     getting the binders prepared for his cross, so I don't know

11     whether we can take a break after the direct or whatever --

12          THE COURT:  How long is his direct?

13          MR. SPENCE:  It will be very short, 20 minutes.

14          THE COURT:  Let's do his direct.  That will be time

03:03:13   15     for the break anyway.  We'll take our break after his direct.

16          MR. LAYDEN:  Thank you, your Honor.

17          THE COURT:  All right.  Call him in.

18          All right, sir, if you can come up here, please.

19          MR. SPENCE:  Your Honor, I do have a set of documents

03:04:02   20     for you that's hole punched, if you'd like them.

21          (Tendered.)

22          THE COURT:  Sir, please raise your right hand.

23          (Witness sworn.)

24          THE COURT:  All right.  Have a seat, please.

25           ROYSTON D'SOUZA, PLAINTIFF'S WITNESS, DULY SWORN,

D'Souza - direct

160

1          DIRECT EXAMINATION

2     BY MR. SPENCE:

3     Q.  Good afternoon, Mr. D'Souza.

4     A.  Good afternoon, Mr. Spence.

03:04:23    5     Q.  Could you please state your full name for the record?

6     A.  Royston D'Souza, and I go by Roy.

7     Q.  Where do you currently work?

8     A.  I work for Ocean Tomo, LLC.

9     Q.  How long have you worked there?

03:04:31    10    A.  A little over seven years.

11    Q.  What do you do at Ocean Tomo?

12    A.  I'm a managing director responsible for leading the IP

13    valuation and IP management practices.

14    Q.  Have you always been a managing director at Ocean Tomo?

03:04:44    15    A.  Yes.

16    Q.  And have you always been responsible for managing those

17    same practices?

18    A.  I've always been responsible for managing the valuation

19    practice, and I took over the management of the management

03:04:54    20    practice about a year and a half ago.

21    Q.  Could you describe, just in general terms, what the

22    valuation practice at Ocean Tomo does?

23    A.  Sure.  We provide independent intellectual property

24    valuation reports for our clients, and the intellectual

03:05:10    25    property we cover is a mix of patents, trademarks, copyrights,

D'Souza - direct

1    trade secrets, assets of that nature.

2          We also perform in certain instances some business

3    and equity valuations.

4    Q.  You mentioned various forms of intellectual property.

5    Does Ocean Tomo's valuation group routinely work with one type

6    of intellectual property more than the others?

7    A.  I would say that we value patents and patent portfolios

8    more than 50 percent of the time.

9    Q.  You also mentioned you're a managing director of the

10   management group; is that correct?

11   A.  That's correct.

12   Q.  What does the management group at Ocean Tomo do?

13   A.  We typically work with companies that have larger

14   intellectual property portfolios, and we work with them to

15   advise them on different ways to better monetize those assets.

16   It could be through avenues of increasing revenues, decreasing

17   costs, just acting as an advisor to better manage those

18   assets.

19   Q.  I'm sorry, did you say better manage or better monetize

20   those assets?

21   A.  Both.

22   Q.  Okay.  With respect to monetizing of assets, can you give

23   me some examples of what you're talking about?

24   A.  Sure.  Asset monetization includes buying or selling

25   intellectual property assets.  It includes licensing or

D'Souza - direct

162

1 potentially litigating, and also raising capital.

2 Q.  Anything else?

3 A.  Generally, that's it.

4 Q.  Let me step back for a moment.  Prior to your work at

03:06:39  5 Ocean Tomo, what did you do?

6 A.  I worked for a company called AccuVal Associates that was

7 based out of Wisconsin.

8 Q.  What did that company do?

9 A.  That was an appraisal company, and I led the corporate

03:06:48  10 services valuation practice for the firm.

11 Q.  Did that company value IP?

12 A.  It did.

13 Q.  How, if at all, were the services at AccuVal different

14 from Ocean Tomo?

03:07:00  15 A.  I would say that they were similar in some regard, and,

16 for example, a lot of the work that we did was in regard to

17 supporting capital-raising efforts, which we also do at Ocean

18 Tomo, and some of the work was related to more what I would

19 call accounting and tax valuations that we really don't do at

03:07:17  20 Ocean Tomo.

21 Q.  What do you mean by capital-raising efforts?

22 A.  Typically when, for example, a lender is considering

23 making a loan to a company, it will want an independent

24 advisor to give an opinion on the estimated value of that

03:07:32  25 collateral.

D'Souza - direct

163

1  Q.  Okay.  And is that collateral sometimes intellectual
2  property?
3  A.  It is.
4  Q.  And so in that instance, you would be valuing the
5  intellectual property for purposes of securing the loan; is
6  that right?
7  A.  That's correct.
8  Q.  Okay.  Prior to your work at AccuVal, what did you do?
9  A.  I worked at KPMG and KPMG Consulting between 1994 and
10 2005.
11 Q.  What type of work did you do for KPMG or KPMG Consulting?
12 A.  During my first tenure at KPMG, which was from '94 through
13 2000, I worked in their tax consulting practice.  So
14 specifically I worked on matters of property taxation, so
15 dealing with valuation issues, and then from 2000 to 2005,
16 between KPMG Consulting and again KPMG, I worked full-time in
17 their valuation practice.
18 Q.  Okay.  And did that work for -- the valuation practice
19 involve any intellectual property?
20 A.  It did.
21 Q.  How so?
22 A.  For example, I did a lot of work in the energy industry
23 where we would value contracts, long-term and short-term
24 contracts, where a portion of that value was attributable to
25 intellectual property, things of that nature.

03:07:39
03:07:54
03:08:12
03:08:22
03:08:35

D'Souza - direct

164

1    Q.  Any other way?

2    A.  That was primarily it, maybe some customer list valuation,

3    things of that nature, but that was primarily the manner in

4    which I valued it.

03:08:49    5    Q.  What, if anything, did you do for work prior to KPMG?

6    A.  Prior to KPMG, I worked at Coopers & Lybrand, and I was

7    there from 1991 through 1994.  And I worked in their tax

8    consulting practice, also on taxation matters, and we also

9    worked very closely with the valuation team there.

03:09:06    10   Q.  And did that also involve intellectual property?

11   A.  In some instances, yes.

12   Q.  What did you do before Coopers & Lybrand?

13   A.  I worked for a company called Comdisco, Incorporated.

14   That was a computer hardware leasing company, and I worked

03:09:21    15   there for four years, two years while in school and then my

16   first two years out of school.

17   Q.  And you mentioned school.  Did you go to college?

18   A.  I did.

19   Q.  And graduate?

03:09:27    20   A.  Yes.

21   Q.  Where did you graduate from?

22   A.  From DePaul University here in Chicago.

23   Q.  And what did you study there?

24   A.  Finance with a minor in accounting.

03:09:35    25   Q.  Okay.  Let's go back to your work at Ocean Tomo.  So you

1  mentioned that you're a managing director in the IP Valuation

2  Practice Group, is that correct?

3  A.  That's correct.

4  Q.  Can you explain what does the IP Valuation Practice Group

03:09:48  5  do specifically?

6  A.  So what we do is our clients will approach us when they

7  are typically in the middle of a negotiation or about to

8  approach a negotiation.  They may be looking to buy a set of

9  assets or sell a set of assets.  They may be in the middle of

03:10:02  10  a licensing negotiation or litigation matter, and they feel

11  that an independent opinion will help support their

12  decisionmaking process and their diligence process in the

13  negotiation that they're going through.

14  Q.  Are there any other reasons that a client might come to

03:10:17  15  Ocean Tomo and specifically to the valuations group?

16  A.  It could be a variety of reasons.  For example, we do

17  perform valuations sometimes for litigation support purposes.

18  So, for example, I've performed business and equity valuations

19  in the context of shareholder dissent cases where I've had to

03:10:35  20  testify to that work product.

21  Q.  Okay.  Now within the IP valuations practice at Ocean

22  Tomo, what do the typical fees look like?

23  A.  The typical fees, I would say, fall into two tranches, to

24  support capital raising commonly between I would say 15,000

03:10:50  25  and 75,000, and then for the other forms of monetization like

1    I mentioned for buying and selling, licensing and litigating,

2    most commonly between 15,000 and 250,000, and sometimes in

3    excess of that.

4    Q.  Okay.  With respect to the capital-raising work that you

03:11:08    5    do at the IP valuation group, what type of specific activities

6    would a client receive for payment of that fee?

7    A.  What they're concerned about a potential lender is really

8    two things, they're certainly hoping that they make the loan

9    and the client is a strong, going-concern company, so they

03:11:25    10   want to know what that success would look like from monetizing

11   the IP in that manner, but they also want to know if the

12   company ends up in distress and if the collateral has to be

13   claimed and sold, what is an estimate of the value of that

14   collateral on a just pure, you know, cash-today money.

03:11:40    15   Q.  Okay.  You mentioned the fees in the other area can be

16   much higher, correct?

17   A.  They can be.

18   Q.  And so why would the fees be higher in other areas?

19   A.  I think it goes to just sometimes the types of entities

03:11:53    20   involved and the size of the patent portfolios.

21          Typically, for collateral-based lending, public

22   companies usually aren't going that route.  They have

23   different forms of financing available because of the strength

24   of their cash flows.

03:12:07    25          So usually for lending, they're more -- they tend to

1    be more private companies, more cash flow constrained, so the

2    portfolios tend to be smaller and the fees smaller, whereas on

3    the other forms, you can have everything from a small company

4    to a very large Fortune 500 company where the assets are

03:12:24    5    numerous and the fees are larger.

6    Q.  What's the typical amount of time that you would spend on

7    an engagement at Ocean Tomo in the IP valuation group?

8    A.  Our most common timeframe is about four weeks.  We have to

9    typically produce a full draft valuation report within four

03:12:40    10    weeks of getting started.  We occasionally get longer, but

11    most common is about four weeks.

12    Q.  And I'm sure it varies, but in general how many people

13    might work on that engagement during those four weeks?

14    A.  It's typically a team of three, so it's myself and usually

03:12:53    15    two other individuals.  Usually we have a Chicago team and a

16    San Francisco team, and we usually have teams of three on each

17    job.

18    Q.  And what type of backgrounds do the other individuals have

19    on that team typically?

03:13:04    20    A.  It's a mix of technical and business.  So, for example, in

21    Chicago, the two individuals I work with have material science

22    engineering backgrounds as well as finance study, and then the

23    team in San Francisco, they have business backgrounds.

24    Q.  Now, in your course of your work in the IP Valuations

03:13:20    25    Group at Ocean Tomo, have you ever contributed to reports

D'Souza - direct

168

1    drafted by the ET or Expert Testimony Group?

2    A.  No.  The way that I would define it is the first vertical

3    we have at our company is what's called our opinion vertical.

4    We do expert services and valuation.

03:13:35    5    So the Expert Services Group, they really focus on

6    intellectual property infringement cases, where they're

7    looking at damages, and that's more backward looking.  And

8    what we do in valuation is really more current and forward

9    looking.  And so sometimes we do litigation-ready work.  It's

03:13:51   10    just for a different purpose than the separate expert services

11    group.

12    Q.  Okay.  In other words, you might be doing work in advance

13    of litigation, is that right?

14    A.  Yes, or in the context of and during.

03:14:00   15    Q.  Okay.

16    A.  Yeah.

17    Q.  Let's discuss what actually goes into creating one of

18    these valuation reports that you've discussed.  What's the

19    first step in the creation of such a report?

03:14:10   20    A.  Typically, the first two steps in our process is we always

21    want to start with what is the exact group of intellectual

22    property that you're asking us to appraise as of a given date,

23    given that these can be very fluid portfolios.

24    So what is it exactly, what is the status of those

03:14:25   25    assets, and then we get into the purpose and the scope because

D'Souza - direct

169

1    people rarely come to us and say randomly I wonder what my

2    assets are worth, right?  They have a very specific use for

3    the appraisal so we want to understand assets and use and

4    audience, and that's always the first step in the process.

03:14:41    5    Q.  And what do you do next?

6    A.  From there, typically we produce an information request,

7    and what our focus is there, once again, confirming the assets

8    that we're valuing, and then we want to know certain

9    information about the assets, such as have they been

03:14:53    10   previously licensed, are they currently in litigation or

11   previously been litigated and what have those outcomes been.

12         We also want to understand have the assets been

13   commercialized; do they have projections for products and

14   services that are supported by these assets, and do they have

03:15:10    15   independent market reports that can help us because usually

16   we're working under a pretty tight timeframe.

17   Q.  What types of market reports are you referring to?

18   A.  These would be by various third-party providers that will

19   produce very significant and detailed reports in certain

03:15:26    20   technology -- in certain technology segments.

21   Q.  Do you know what you typically might pay for such a market

22   report?

23   A.  Typically between -- for a high quality report, typically

24   paying for an independent report between 4,000 and 6,000.

03:15:37    25   Q.  Okay.  And who ends up paying for that report when you're

1   doing one of these valuation reports for an Ocean Tomo client?

2   A.  In almost all instances, the client ends up paying.  So

3   we'll approach them in advance and let them know of the cost,

4   and then we bill them back at the end of the project.  We

03:15:53   5   also -- I'm sorry.

6   Q.  Go ahead.

7   A.  We also subscribe to -- we have a couple of subscription

8   services where we have a variety of reports available through

9   those services.  Sometimes Ocean Tomo will eat that cost, and

03:16:05   10   sometimes it's passed through.

11   THE COURT:  Mr. Spence, is the purpose of this

12   testimony to show that the patent rating in this area of Ocean

13   Tomo's work, there's a lot of work that goes in that is --

14   that does not relate to the patent rating score?

03:16:21   15   MR. SPENCE:  I'm glad to see that my questioning

16   isn't lost.  That's part of it.  Also to show they work with a

17   variety of other third parties and routinely purchase reports

18   and they separately bill for those reports.

19   THE COURT:  All right.  That's not part of the bill

03:16:33   20   that Ocean Tomo sends, but is that bill paid for by the -- by

21   the client directly to the vendor, or is it something where

22   the advance goes to Ocean Tomo and then Ocean Tomo pays it?

23   MR. SPENCE:  My understanding is the latter, but you

24   are welcome to question the witness about that.  My

03:16:52   25   understanding it's the latter.

1    THE COURT:  Well, go ahead, you can ask.  The reason

2    I do this in a bench is I'm --

3         MR. SPENCE:  Understood.

4         THE COURT:  -- there are certain points I get with

03:16:59    5    certain questions.  There may be some cross that raises issues

6    you want to respond to on redirect, but I get the point of

7    what you're trying to raise.

8         Go ahead.

9    BY MR. SPENCE:

03:17:07   10    Q.  Let me ask you about use of PatentRatings, do you use

11    PatentRatings in any way in the IP Valuations Group?

12    A.  We did in the past in certain instances.

13    Q.  When did you stop doing so?

14    A.  In roughly September of 2015.

03:17:20   15    Q.  Why?

16    A.  At that time, we made a switch to a tool called

17    Innography.

18    Q.  What does Innography do?

19    A.  Innography is a similar tool to PatentRatings in that it

03:17:33   20    provided independent patent quality scores and competitive

21    landscape maps.

22    Q.  Prior to ceasing the use of PatentRatings within Ocean

23    Tomo, how, if at all, did you use it within the IP Valuations

24    Group?

03:17:47   25    A.  What we would -- we would use it really in two ways.

1    First sometimes from a business development perspective, we
2    would let potential clients know about the access that we had
3    to the tool.
4          We were responsible for promoting it and in certain
5    instances told the clients of what the output would look like,
6    showed them sample reports, and let them know that that was a
7    service that was available.
8    Q.  What do you mean when you say you were responsible for
9    promoting it?
10   A.  Well, it was -- it was a software tool that we had access
11   to through a license, and we certainly wanted our clients to
12   know that that was available, for example, separate from the
13   monetary valuation that we were doing, and if they felt that
14   this could be beneficial to their process, then it was
15   available.
16   Q.  Okay.  Now, were you involved in the specific billing of
17   engagements to clients while at Ocean Tomo?
18   A.  Yes.
19   Q.  How so?
20   A.  For example, at the completion of a project, we would
21   prepare an invoice or invoices to -- that would match to the
22   engagement letter terms.  Then I would send those invoices
23   directly to our accounting department and then send certainly
24   a copy directly to the client.
25   Q.  Okay.  In any of those engagements where you were

03:18:02
03:18:13
03:18:31
03:18:37
03:18:56

1    personally involved in billing the client, did that involve

2    the use of PatentRatings?

3    A.  Yes.

4    Q.  In those engagements, how did you bill the client for

03:19:07    5    PatentRatings, if at all?

6    A.  I'm sorry.

7    Q.  Would you like some water?

8    A.  Yeah, would you mind?

9            Sorry, your Honor.

03:19:20    10            THE COURT:  No, go ahead.  Take your time.

11        (Tendered.)

12            THE WITNESS:  Thank you.

13            I'm sorry, could you repeat the question?

14    BY MR. SPENCE:

03:19:31    15    Q.  Sure.  So I think that my question was in those

16    engagements where PatentRatings was used in your work in IP

17    valuations, how did you bill the client for that PatentRatings

18    work?

19    A.  So typically what we would do is it would start with the

03:19:44    20    scoping and engagement letter process, where the client would

21    say, for example, I have this portfolio of patents.  Can you

22    give me a fee for including it in the overall scope?  What

23    would the price be for producing a report that would have

24    scores and these landscape maps?  And then I would go to

03:20:02    25    typically the PatentRatings team or the rate card and price

D'Souza - direct

1    that.

2    Q.  And feel free to take a break and grab some water if you

3    need to.  We've been up speaking a long time as well, so I

4    feel your pain.

03:20:16    5    A.  Thanks.

6    Q.  Okay.  What was the next step after putting that into the

7    engagement letter?

8    A.  In terms of putting it into the engagement letter, what we

9    would do then is once that was finalized, we would certainly

03:20:27    10    work on the project and then deliver the project, and then at

11    the conclusion of the engagement, the PatentRatings work could

12    have been part of a valuation deliverable, for example, as an

13    appendix, or it could have been a stand-alone report.

14          Either way, our goal was to try to price that work

03:20:45    15    separately and then invoice it in that manner.  Either we

16    would produce two different invoices, one for the valuation,

17    one for the PatentRatings, or one invoice with the fee split

18    if we could.

19    Q.  Okay.  And how did you determine the appropriate pricing

03:21:00    20    for the PatentRatings portion of that client deliverable?

21    A.  What we would most commonly do is present those assets and

22    the type of output the client was looking for and present that

23    to the PatentRatings team.  So I would have conversations, I

24    would send an e-mail and then have a follow-up conversation

03:21:17    25    with the PatentRatings team members that were based

1    predominantly in Irvine, California, and we would walk through

2    what the assets were, what the client was asking for, and then

3    they would produce a fee and a timing request, and then I

4    would relay that to the potential client and put that in the

03:21:32    5    letter.

6    Q.  And who were those PatentRatings teams members that you

7    referred to?

8    A.  It was a few different individuals.  There was Kimberly

9    Na.  Last name is spelled N-A.  Art Romero, Steve Lee were

03:21:47    10    several of the folks that I spoke to.

11    Q.  Other than getting pricing from one of the PatentRatings

12    team members out in California, was there any other way that

13    you determined pricing for use in engagement letters?

14    A.  No, because, I mean, we had a rate card that we had access

03:22:06    15    to; but even with the rate card, I still was having

16    conversations with that team that had to produce the

17    deliverable, so --

18          MR. SPENCE:  Can we pull up PX 655.

19    BY MR. SPENCE:

03:22:42    20    Q.  You should be able to see in front of you PX 655.  Do you

21    see that?

22    A.  Yes.

23    Q.  Do you recognize this document?

24    A.  I do.

03:22:48    25    Q.  What is it?

D'Souza - direct

1    A.  It is essentially a rate card for a PatentRatings output,

2    and we -- this was prepared in 2013.

3    Q.  How, if at all, did you use this document in your work at

4    Ocean Tomo?

03:23:03   5    A.  It was very common once it was provided to us that this

6    was the starting point in looking at pricing, but still

7    regardless, my goal was to never price it on my own because I

8    wasn't the one doing the work.  So I would very commonly look

9    at this rate card, calculate roughly what the price would be,

03:23:23  10    but then I would go to the PatentRatings team for the final

11    scope in pricing.

12    Q.  Okay.  Is this a true and accurate copy of the rate card

13    that you used while at Ocean Tomo?

14    A.  Yes, it is.

03:23:36  15            MR. SPENCE:  Your Honor, we move PX 655 in evidence.

16            THE COURT:  Any objection?

17            MR. LAYDEN:  No objection.

18            THE COURT:  PX 655 is admitted.

19        (Plaintiff's Exhibit No. 655 was received in evidence.)

03:23:42  20    BY MR. SPENCE:

21    Q.  Other than what you testified about so far, did you use

22    PatentRatings in any other way in your work at Ocean Tomo?

23    A.  I mean, not specifically.  You know, we -- we produced it

24    when it was helpful and when our clients were requesting that

03:23:59  25    type of output as part of an engagement or as a stand-alone

1    report, and that's how we used it.

2    Q.  Did you ever have a client engagement where you provided

3    the deliverable to the client and you also included an

4    Innography score landscape as part of that engagement?

03:24:17    5    A.  I think over the last couple of years, there have been

6    instances, for example, specifically I also mentioned I manage

7    the IP management practice, and, for example, in those

8    engagements specifically, we've produced the Innography

9    output.

03:24:30    10    I think in valuation engagements, honestly, much less

11    and less.  It's not common for us to include that information

12    anymore necessarily in a report.  Sometimes we use it as

13    background information to identify technology clusters,

14    potentially others patenting in the space, things of that

03:24:46    15    nature, but it's not -- not as commonly used in report

16    deliverables.

17    Q.  In those deliverables where you did use Innography, how

18    did you bill the client for the inclusion of the Innography

19    product or service in that report?

03:24:59    20    A.  With certain clients, we will sometimes include, for

21    example, in the billing a $500 fee because we pay it on a

22    subscription basis, so sometimes we'll include a $500 expense

23    charge to help cover the cost of our subscriptions because

24    there's typically multiple databases that we use in client

03:25:21    25    deliverables.

1    Q.  Are you familiar with the subscription that Ocean Tomo has

2    to Innography?

3    A.  I think I've seen a copy of the contract maybe when it was

4    initially signed, but it's not something that I regularly

03:25:39    5    refer to.

6    Q.  Do you have any understanding of the general terms under

7    which Ocean Tomo has access to Innography?

8    A.  I'm almost certain we pay a fixed fee for a set number of

9    seats, and those individuals have log-ins, and it's

03:25:53    10    essentially what you would call all-you-can-eat pricing.  For

11    a fixed fee for a certain number of seats, those individuals

12    can access the system 24 hours a day and use the information.

13    Q.  Okay.  And so if my understanding is correct, then Ocean

14    Tomo essentially pays Innography for access to its products

03:26:09    15    and services; is that right?

16    A.  Correct.

17    Q.  And then Ocean Tomo turns around and sometimes bills its

18    clients for the Innography products and services; is that also

19    right?

03:26:18    20    A.  Yes.  In certain instances when we've used the tool, for

21    example, if it's in a report, then we invoice for the fee.

22    Q.  In your experience working at Ocean Tomo, does that appear

23    as a separate line item, or is it separate from Ocean Tomo's

24    other work on that engagement?

03:26:32    25    A.  Typically as part of the expense line, it will say, for

1  example, third-party database access charges, and we'll list

2  sometimes many of the tools that we're using and we used in

3  the engagement so the client is aware of it.

4  Q.  Okay.  Let me ask you about client development efforts at

03:26:44  5  Ocean Tomo.  Are you involved in client development?

6  A.  Yes, I am.

7  Q.  And have you ever used PatentRatings in any client

8  development while at Ocean Tomo?

9  A.  Yes, we have.  I mean, sometimes we would, as a starting

03:26:55  10  point in understanding the assets that a company has,

11  certainly we provided -- we'll get a list provided by the

12  company, but normally that's a data dump, an Excel

13  spreadsheet, whereas if we use the PatentRatings tool or even

14  Innography we get the information in a much more organized

03:27:12  15  fashion that we can customize to what we need, and then that

16  helps us understand the fields of use of the technology,

17  really the make-up of the portfolio a little bit better, and

18  that helps us price the engagement.

19  Q.  Has the PatentRatings ever enabled you to get a client in

03:27:26  20  to Ocean Tomo that you wouldn't be able to bring to Ocean Tomo

21  otherwise?

22  A.  I can't think of an instance where it directly influenced

23  someone's decision to hire Ocean Tomo for a valuation

24  engagement.

03:27:40  25           MR. SPENCE:  No further questions, your Honor.

D'Souza - by the Court

180

1          EXAMINATION

2    BY THE COURT:

3    Q.  Can you explain again the billing process when you use

4    PatentRatings either -- when you did use it, if it was a page

03:27:51    5    or two or three of a report you did or if it was something

6    that a client requested independently as the only aspect of

7    what they requested, what would the bills look like for each

8    of those?

9    A.  Sure.

03:28:03   10          So looking at the more recent history, for example,

11   when we were going off of the rate card, what we would do is

12   our goal was in scoping the engagement when we created the

13   engagement letter with the client is that we would have a fee

14   for the valuation, a fee for the ratings work.  We would

03:28:22   15   produce two separate reports, and if at all possible, we would

16   also produce two separate invoices.

17          Sometimes a client would say, well, the PatentRatings

18   fee is a small fee, can I just have one invoice?  I just want

19   to cut one check.  And then on the detail page we would

03:28:36   20   include the fee for the valuation, the fee for the ratings

21   work and a total, and they would pay that.  But our goal was

22   to always separate the fee if we could between the valuation

23   fee and the ratings fee.

24   Q.  And what about -- so you'd price out what the ratings fee

03:29:00   25   would be if it -- I've seen some exhibits already where the

D'Souza - by the Court

181

1  PatentRatings work is a page or two out of a multi-page

2  report.

3  A.  Right.

4  Q.  What would you do then?

03:29:16  5  A.  Typically that would go -- say, for example, if it was one

6  page in a report and it was a list of 20 patents with the

7  scores.

8  Q.  Right.

9  A.  Then we would have, based upon either the rate card or my

03:29:30  10  conversation directly with the PatentRatings employees, they

11  would tell me here's our standard pricing for producing 20

12  scores, and then that would be the pricing for that report.

13  Q.  And that would be broken out in the invoice, either it's

14  two bills or a single bill with the breakout of the patent

03:29:45  15  rating fee and then the rest of the work you did.

16  A.  To the best of my recollection, yes.  Over the course of

17  seven-plus years I've been there, there may be instances where

18  maybe that didn't occur and it was in the engagement letter

19  but not that way on the invoice.  There may have been some

03:30:00  20  inconsistencies, but generally that was always our goal.

21  Q.  All right.  But do you think there may have been instances

22  where the client gets a single bill, $20,000, and in it is all

23  your work, all the patent rating work, and anything else that

24  Ocean Tomo was charging?

03:30:15  25  A.  It could have been, but then the separation of the fee,

D'Souza - by the Court

182

1    for example, may have been in the engagement letter, but the

2    invoice may have said one number.

3    Q.  All right.  But either way, there would be some

4    memorialization, either an engagement letter or the bill

03:30:28   5    itself which would break out the ratings fee that was being

6    charged to the client, at least vis-a-vis your section's work?

7    A.  That's correct.  To the best of my recollection, yes.

8            THE COURT:  Okay.  All right.

9            Any additional questions by plaintiff?

03:30:42  10            MR. SPENCE:  None, your Honor.

11            THE COURT:  All right.  Let's take our afternoon

12    break, about perfect timing, about ten-minute break.

13            MR. SPENCE:  Thank you.

14        (Recess taken.)

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings heard in open court.)

2    THE COURT:  Okay.  Please be seated.  All right.

3    Are we ready for cross-examination?

4    MR. LAYDEN:  We are, your Honor.

5    THE COURT:  All right.  Proceed.

6    CROSS-EXAMINATION

7    BY MR. LAYDEN:

8    Q.  Good afternoon, Mr. D'Souza.

9    A.  Good afternoon, Mr. Layden.

10   Q.  Nice to see you again.

11   A.  You too.

12   Q.  Now, Mr. D'Souza, when you testified before the break,

13   you gave some testimony regarding Ocean Tomo's practice of

14   sending two invoices to a client in connection with an

15   engagement.  Do you recall that testimony?

16   A.  Yes, I do.

17   Q.  Now, that wasn't always the way it was when you were at

18   Ocean -- during your time at Ocean Tomo; right?

19   A.  That was not always the case.

20   Q.  In fact, there was a time during your employment at

21   Ocean Tomo when Ocean Tomo would only send one invoice to

22   clients in any given month for a valuation matter; right?

23   A.  To the best of my recollection, yes.

24   Q.  And that changed right around the -- the -- sometime in

25   late 2011; correct?

```
 1                    THE COURT:  Late 2000 what?
 2                    MR. LAYDEN:  2011, your Honor.
 3                    THE COURT:  '11, okay.
 4    BY THE WITNESS:
 5    A.   I don't remember the exact timeframe, but sometime after
 6    I started.
 7    BY MR. LAYDEN:
 8    Q.   Do you recall -- well, that change occurred -- let's try
 9    to orient this time.  That change occurred after Mr. Barney
10    left his employment at Ocean Tomo; right?
11    A.   I would be going off of memory, but I believe so.
12    Q.   Now, we also heard some testimony this morning, or,
13    sorry, earlier this afternoon, Mr. D'Souza, about a rate card
14    that Mr. Spence showed you.  I'm going to go ahead and --
15    here you go, Cory.
16                    MR. SPENCE:  Thank you.
17    BY MR. LAYDEN:
18    Q.   I'm going to come up and hand you a copy of a different
19    document.  This is going to be --
20                    This is, your Honor, if I haven't given away the
21    one with the number on it.  Did I give you the one with the
22    number on it, Cory?  I didn't.  Sorry.  Oh, this is DX-233,
23    your Honor.
24                    I'll hand one to you, Mr. D'Souza.
25                    THE WITNESS:  Okay.
```

```
 1            MR. LAYDEN:  One for your Honor.
 2    BY MR. LAYDEN:
 3    Q.   I'm going to have you take a look at this document,
 4    Mr. D'Souza, and tell me if you recognize it -- what it is.
 5    I'm going to represent to you that it's a series of e-mails
 6    in which you were one of the addressees.
 7    A.   Okay.  I don't remember this exact e-mail, but I
 8    understand the context of it.
 9    Q.   Do you have any reason to doubt that you received this
10    e-mail on or about August 17th of 2012?
11    A.   No reason to doubt that.
12    Q.   And if you look, there is an attachment to the e-mail.
13    If you look at the very top of the e-mail, it says, "Attached
14    is the policy, or, rather, "rate card" for OTR reports."
15            If you then look at the third page of the exhibit,
16    you will see something called pricing for Ocean Tomo
17    ratings -- Ocean Tomo PatentRatings.  Do you see that?
18    A.   I do.
19    Q.   Do you have any reason to doubt that that is the rate
20    card that was attached to this e-mail?
21    A.   I do not.
22            MR. LAYDEN:  Your Honor, I move the admission of
23    Defendant's 233.
24            THE COURT:  Any objection?
25            MR. SPENCE:  No objection to the rate card itself,
```

1   but an objection to the e-mail, to the extent there is no

2   foundation for -- it's actually a compilation of four

3   different e-mails.

4            THE COURT:  I think he is on all of them, though.

5   He is certainly on three of the four, three of the five.  And

6   it appears to be an e-mail string which -- and he is on the

7   last of them so it's logical to assume he would be on the

8   earlier one.  So objection overruled.  DX-233 is admitted.

9            (DX-233 admitted into evidence.)

10  BY MR. LAYDEN:

11  Q.   Now, Mr. D'Souza, you will see there that the original

12  e-mail, if you turn to Page 2 of the exhibit, sir, you will

13  see the original e-mail is from Elvir Causevic.  Do you see

14  that?

15  A.   I do.

16  Q.   And who was -- who is -- let's start with who is.  Who

17  is Mr. Elvir Causevic?

18  A.   Elvir Causevic was a managing director at Ocean Tomo.

19  He was employed as a part-time employee before coming a full

20  time managing director.

21  Q.   And in August of 2012, he was a managing director?

22  A.   I believe so.

23  Q.   You will see that Mr. Causevic, or Dr. Causevic, I

24  suppose, is sending his -- the e-mail initially to Kimberly

25  Na and Arturo Romero.  Do you see that?

1    A.   I do.

2    Q.   Now, you mentioned both their names before on your

3    responses to Mr. Spence's questions, and you describe them

4    several times as PR employees, do you remember saying that,

5    PatentRatings employees?  Do you remember saying that?

6    A.   Yes.

7    Q.   Now, at this point in time, in 2012, Ms. Na is an Ocean

8    Tomo employee; isn't she?

9    A.   I don't know that.  I mean, there was Ocean Tomo LLC and

10   PatentRatings LLC.  I'm not sure who her employment agreement

11   was with or who was paying her.  So she could have been

12   technically an employee of either.

13   Q.   So you just don't know one way or the other?

14   A.   I don't.

15         THE COURT:  Well, look right above it, how she

16   identifies herself, at least.

17   BY THE WITNESS:

18   A.   Sure, and, per the identification on this e-mail, yes,

19   it's an Ocean Tomo employee.

20   BY MR. LAYDEN:

21   Q.   And we don't have -- we don't have a similar e-mail for

22   Mr. Romero, but Mr. Romero at this time was an Ocean Tomo

23   employee; right?

24   A.   He worked directly with Ms. Na in that practice.  So if

25   you're making an assumption about that, then, yes.

1    Q.   Sure.  And it's not just, really, just my assumption,
2    I'm just trying to see, do you have any reason to believe
3    that either Ms. Na or Mr. Romero were actually PatentRatings
4    employees at this point in time?
5    A.   I don't have a definitive reason to make that statement.
6    Q.   I want to direct your attention back to a document that
7    Mr. Spence showed you.  This is Plaintiff's Exhibit 655.  I
8    don't know if you still have it in front of you, Mr. D'Souza.
9    A.   I don't.  It was just on the screen before.
10   Q.   Oh, it was on the screen.  All right.
11          Well, can we pull it up on the screen, John?  I'm
12   taxing -- I'm taxing you on that because that's not what I
13   had you working on.  All right.  This is a document that
14   Mr. -- thanks, John?
15          This is a document Mr. Spence showed you before.
16   Do you remember seeing this as part of your testimony?
17   A.   I do.
18   Q.   And you identified this as a rate card for Ocean -- for
19   the -- for PatentRatings; is that right?
20   A.   That's correct.  It's labeled as OT rate card.  But,
21   yes, interpretation is it's a PatentRatings rate card.
22   Q.   Got it.  I just want to direct you -- first of all,
23   let's just orient ourselves in time.  So the prior e-mail we
24   looked at, DX-233, that's dated August of 2012; right?
25   A.   Yes.

1     Q.   And that's a year and a half after Mr. Barney left;

2     right?   I'll represent to you Mr. Barney resigned in

3     employment in February of 2011.

4     A.   Yes.

5     Q.   Does that sound right?

6     A.   Yes.

7     Q.   And then if we look at this document, we look down at

8     the bottom of PX-655, and the date is June 17, 2013; right?

9     A.   That's correct.

10    Q.   Now, and I'll note that there is obviously an effective

11    date of June 14th.   There is a few different dates on this

12    document.   Let's look there on the first page.   There are

13    space for four different approvals here.   The first approval,

14    the name is Joel Lutzker.   Who is Mr. Lutzker?

15    A.   Mr. Lutzker is general counsel and patent attorney for

16    Ocean Tomo LLC.

17    Q.   And he is the one who signed this document, PX-655,

18    approving the rate card for PatentRatings -- I'm sorry, for

19    the OT rate card; right?

20    A.   I see a signature there below his printed name.   I'll

21    assume that it's his.

22    Q.   You have no reason to doubt that's Mr. Lutzker's

23    signature; right?

24    A.   No.

25    Q.   So just to be clear, there was a change between -- and

1  now I want to get back to the invoicing practice.  So when

2  you started at Ocean Tomo in the valuation practice, the

3  practice was to send out one invoice to the customer in a

4  month; right?  Per month?

5  A.   To the best of my recollection, yes.

6  Q.   Okay.  And then at some point after Mr. Barney left, the

7  practice became to send out two invoices to customer in a

8  month.  And you talked about that with Mr. Spence; right?

9  A.   That's right.

10  Q.   Now, you never had a customer negotiate with you the

11  pricing of the Ocean -- of the PatentRatings work that was

12  being done; right?

13  A.   I don't recall for certain if a client ever negotiated

14  the price.  It's certainly possible.  I would say it wasn't

15  common, but I can't say definitively that that never

16  happened.

17  Q.   Well, do you recall giving a deposition in this matter,

18  Mr. D'Souza?

19  A.   Uh-huh.

20  Q.   Do you recall that in that deposition you were under

21  oath?

22  A.   Yes.

23        MR. LAYDEN:  Your Honor, do you want a copy of the

24  transcript?

25        THE COURT:  No.

1    BY MR. LAYDEN:

2    Q.   Mr. D'Souza, I asked you the following question in that

3    deposition, and I'm going to ask you if you recall -- you

4    recall your response.

5              And, Cory, this is on Page 98, Line 20.

6              Question:  "Do you have any recollection of a

7    client ever negotiating the amount that was an engagement

8    letter -- that was in an engagement letter for the

9    PatentRatings work?"

10             Answer:  "No."

11             Mr. D'Souza, I'm going to step up and hand you

12   another document.

13             Cory, this is DX-240.

14             There you go.

15   A.   Thanks.

16             MR. LAYDEN:  Your Honor, this is DX-240.

17             THE COURT:  All right.

18             MR. LAYDEN:  We will get them labeled in advance

19   tomorrow, so.

20   BY MR. LAYDEN:

21   Q.   Now, take a look at this, Mr. D'Souza, and tell me if

22   you recognize Defendant's Exhibit 240.

23   A.   Yes, I do.

24   Q.   What is it?

25   A.   It's an e-mail from me to -- to a gentleman at -- a

1    company by the name of OpinionLab on September the 5th of
2    2012.
3    Q.   And this is an e-mail you sent on or about that date to
4    the folks at OpinionLab?
5    A.   That's correct.
6    Q.   Okay.  And you will see that there is a -- in the line
7    of the e-mail that references attachment, there is a
8    PowerPoint presentation which is referenced there.  Do you
9    see that?
10   A.   I do.
11   Q.   And just take a quick look at the attachment.  Do you
12   have any reason to doubt that this document that is attached
13   to Defendant's Exhibit 240 is, in fact, the attachment you
14   sent along with the folks at OpinionLab on this day?
15   A.   No reason to doubt it.
16          MR. LAYDEN:  Your Honor, I move the admission of
17   Defendant's Exhibit 240.
18          THE COURT:  Any objection?
19          MR. SPENCE:  No objection, your Honor.
20          THE COURT:  It's admitted without objection.
21       (Defendant's Exhibit 240 admitted into evidence.)
22   BY MR. LAYDEN:
23   Q.   Now, Mr. Spence also asked you some questions about your
24   testimony -- asked you some questions about Innography and
25   how Ocean Tomo bills for the Innography services -- strike

1    that.  Asked you some questions about how Ocean Tomo pays for

2    the Innography services.  Do you remember that testimony in

3    that regard?

4    A.   I do.

5    Q.   And you talked about how Ocean Tomo has an arrangement

6    with Innography to basically buy seat licenses; right?

7    A.   Correct.

8    Q.   Now, you were aware, or you are aware, that Ocean Tomo

9    has a license agreement with PatentRatings; correct?

10   A.   I'm aware of that, yes.

11   Q.   Okay.  And you're aware that that license agreement --

12   you're not contending here that that license agreement

13   somehow applies provides for seat licenses; are you?

14   A.   I'm not aware of that specifically in the agreement.

15   Q.   And I'm not asking you to interpret the agreement.  I

16   know you're not a lawyer.  But you're aware that, under the

17   PatentRatings Ocean Tomo license agreement, there are royalty

18   obligations; right?

19   A.   Generally, yes.

20   Q.   Mr. D'Souza, I'm going to hand you what's been marked as

21   349A.

22          Your Honor, a copy for you.  That's DX-349A.

23          Mr. D'Souza, I'm going to represent to you that

24   DX-349A is excerpts taken from the Ocean Tomo LLC website.

25   We have actually marked as an exhibit the entire website, but

1  that would be many, many pages.  So what I've done to not

2  kill too many trees is just take a few pages out of it.

3      And I'm going to specifically ask you about pieces

4  of this website that relate to the valuation practice which

5  is, in fact, your practice at Ocean Tomo; right?

6  A.  That's correct.

7  Q.  So I assume you've been to the Ocean Tomo website;

8  correct?

9  A.  I have.

10  Q.  I would hope so.  If you could take a look at 349A and

11  tell me whether you have any reason to believe that this

12  document does not come -- does not come from the Ocean Tomo

13  website.  And to be clear, for the record, this was

14  downloaded on January 2nd, 2015.  I'll represent that to you.

15      So if you could just take a moment, Mr. D'Souza,

16  and tell me if you have any reason to believe that these

17  excerpts that I have put in front of you don't come from the

18  Ocean Tomo website.

19  A.  I believe that it does.

20  Q.  Okay.

21      MR. LAYDEN:  Your Honor, I would move the admission

22  of DX-349A.

23      THE COURT:  Any objection?

24      MR. SPENCE:  No objection, your Honor.

25      THE COURT:  All right.  It's admitted.

1          (DX-349A admitted into evidence.)

2     BY MR. LAYDEN:

3     Q.   Mr. D'Souza, I just want to direct your attention --

4     let's start with the first page of the document, which is the

5     "Welcome to Ocean Tomo" page.  And if you look there under

6     the "Welcome to Ocean Tomo" heading, go down to the third

7     paragraph.  And it talks about how Ocean Tomo is

8     headquartered in Chicago and has offices in Greenwich,

9     Houston, Irvine, San Francisco and Seattle.  It talks about

10    the subsidiaries of Ocean Tomo.

11          It then says, and I want to direct you to this,

12    "Ocean Tomo is the founder of the intellectual property

13    Exchange IPXI, Inc." -- Exchange International, sorry --

14    "IPXI Inc., creator of the live public open cry auction

15    marketplace for intellectual property, as well as the

16    exclusive source for Ocean Tomo ratings."  Do you see that?

17    A.   I do see that.

18    Q.   And Ocean Tomo ratings is the same system as

19    PatentRatings; right?

20    A.   That's my understanding.

21    Q.   All right.  Let's turn to the next page of this excerpt,

22    Mr. D'Souza.  And this is now -- now we're diving into the

23    website and we're now at the valuation section of the

24    website.  And what I want to show you there is, if you look

25    down to the middle of that page, it says, "valuation by asset

1    class."  Do you see that?

2    A.    Yes.

3    Q.    And Mr. Spence asked you some questions about the kind

4    of IP that you value, and you indicated that, you know, one

5    of the primary things that you do is value patents; correct?

6    A.    That's right.

7    Q.    You will see there under patents it reads, "Our

8    expertise in understanding the value of patents and patent

9    applications, both domestic and international, is unsurpassed

10   in the industry, due to our ability to leverage the knowledge

11   of every facet of our service model, including IP damages

12   analysis and litigation and our proprietary PatentRatings

13   system."  Do you see that?

14   A.    I do.

15   Q.    Now let's turn to the next page of this excerpt.  And

16   this is some project examples from the Ocean Tomo website.

17   And you will look down there, and there is -- I want to

18   direct you to the very bottom of the page, where it says,

19   "licensing strategy."  Do you see that?

20   A.    Yes.

21   Q.    It says, "A major financial services company began a

22   program to regularly review its IP portfolio to establish

23   modernization strategies to generate annuity revenue.  Ocean

24   Tomo first assessed the quality of the specified patents, as

25   well as relevant competitors in terms of comparability of

1   their IP portfolios, using its proprietary PatentRatings

2   system.  They utilized the output of these reports to make a

3   determination as to which patents have the strongest

4   licensing potential and engage our valuation practice to

5   complete current fair market value assessments."  Do you see

6   that?

7   A.   I do.

8   Q.   Let's go to the next page.  And this is, again, now

9   we're looking at a valuation page from the Ocean Tomo

10  website.  And you will see there that, you will look down

11  under, "Intellectual Property and Identifiable Intangible

12  Assets," the second section down is entitled, "Patents."  Do

13  you see that?

14  A.   Yes.

15  Q.   And it reads:  "Our expertise in understanding the value

16  of patent claims is unsurpassed in the industry due to our

17  ability to leverage the knowledge of every facet of our

18  service model, including IP damages analysis and litigation

19  and our proprietary Ocean Tomo rating system."

20       Do you see that?

21  A.   Yes.

22  Q.   Now, I want to turn to the next page.  It's the last

23  page of this exhibit.  This is the media room.  And this is a

24  copy of a press release on the Ocean Tomo website, or at

25  least an announcement on the Ocean Tomo website, which says,

1    "Ocean Tomo announces expanded valuation practice group."

2    And this is dated May 6th of 2010.  Do you see that?

3    A.   Yep.

4    Q.   And this talks about you; doesn't it?

5    A.   Yes, in part it does.

6    Q.   It says, in the third paragraph there, "New managing

7    director, Roy D'Souza, leads the valuation practice group."

8    Then goes on to talk about you.  And then it says -- here is

9    a quote from you.  And I am now in the fourth paragraph of

10   this page.  And it says, "I am excited to be in this

11   position," D'Souza proclaims.  "The Ocean Tomo's unique

12   position as a market maker and its proprietary PatentRatings

13   system allow for more efficient analysis grounded in real

14   world experience.  Other firms will need to re-invent

15   themselves to compete."  Do you see that?

16   A.   Yes, I do.

17              MR. LAYDEN:  Nothing further.

18              THE COURT:  All right.  Any redirect?

19              MR. SPENCE:  Short redirect, your Honor.

20                   REDIRECT EXAMINATION

21   BY MR. SPENCE:

22   Q.   Mr. D'Souza, prior to there being a rate card at Ocean

23   Tomo for pricing of patent ratings, how, if at all, did you

24   price patent ratings?

25   A.   Those typically would have been telephone conversations

1     directly with the PatentRatings team.

2     Q.   Who was in the PatentRatings team?

3     A.   Individuals such as Kimberly Na, Arturo Romero, Steve

4     Lee.

5     Q.   To whom do those individuals report?

6     A.   Jonathan Barney.

7                MR. SPENCE:  No further questions, your Honor.

8                THE COURT:  All right.  Anything else?

9                MR. LAYDEN:  Just a quick clarifying one, your

10    Honor.  You will probably guess what it is.

11                        RECROSS EXAMINATION

12    BY MR. LAYDEN:

13    Q.   Now, Mr. D'Souza, you're not testifying that prior --

14    after Mr. Barney's departure those folks reported to

15    Mr. Barney; right?

16    A.   That's not what I am testifying to.

17    Q.   You're talking about the period of time before

18    Mr. Barney departed Ocean Tomo as an employee; correct?

19    A.   That's correct.

20    Q.   And we're talking about Ms. Na and Mr. Romero; right?

21    A.   Yes.

22    Q.   And they were located in Ocean Tomo's, Irvine,

23    California office; right?

24    A.   That's right.

25    Q.   And far as you know, they were Ocean Tomo employees that

1   entire time; right?

2   A.   As far as I know.  I don't know what their employment

3   contract said, but I'm assuming so.

4   Q.   I don't think there is any dispute all those folks were

5   W-2 employees of Ocean Tomo.  But I suppose if there is, we

6   can deal with that later, but, I have no further questions.

7   Thank you.

8              THE COURT:  I have one question.

9                        EXAMINATION

10  BY THE COURT:

11  Q.   Before Mr. Barney left, you said that there were -- one

12  invoice was sent out to customers, typically?

13  A.   To the best of my recollection, your Honor, that's

14  correct.

15  Q.   Was a breakdown of the patent rating charge either in

16  the engagement letter or the detail of the bill, or was it

17  just a single number?

18  A.   The -- to the best of my recollection, the invoice was a

19  single number.  There may have been, for example, an e-mail

20  exchange with the client where we separated the fee, or it

21  may have been stated in the engagement letter, and that may

22  have been the practice.  I don't -- I don't recall

23  definitively.

24  Q.   All right.  I guess Ocean Tomo could do what law firms

25  could not do back then, was just send just the bill with one

1    number on it.  But that -- that was not the practice for law
2    firms.
3              So it was not broken out, as far as you know, in
4    the bill itself?  In other words, you just sent a bill for X
5    dollars.  Maybe you had internal accounting numbers to -- you
6    certainly had that, internal accounting numbers, to come up
7    with the bill, but you didn't break it out by person, by
8    hour, by expense, to a client?
9    A.   That would -- well, you --
10   Q.   I mean --
11   A.   So, for example, there were some engagements where we
12   would show the hourly rate detail, for example, in the
13   valuation work.  But the ratings work was always priced on a
14   fixed-fee basis.
15   Q.   Okay?
16   A.   So that could have been -- there could have been hours
17   detailed, but that would have been for the valuation.
18              THE COURT:  I see.  All right.  Thank you.  Any
19   additional questions by the parties?
20              MR. SPENCE:  No questions, your Honor.
21              MR. LAYDEN:  No, your Honor.
22              THE COURT:  All right.  Sir, you're excused.  Thank
23   you.
24              THE WITNESS:  Thank you.
25         (Witness excused.)

1           THE COURT:  Please call your next witness.

2           MR. SPENCE:  Your Honor, we actually have another

3    witness, but he is a former employee and not available.  I

4    didn't think we would get this far today.

5           THE COURT:  Pardon me?

6           MR. SPENCE:  We didn't anticipate getting this far

7    today.

8           THE COURT:  All right.  Well, it's a happy

9    occurrence that we get through more quickly than thought.

10          All right.  Well, then, we will break for today.

11   And why don't we go off the record, talk scheduling a little

12   bit.

13          (Trial adjourned at 4:21 PM.)

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3        We, KATHLEEN M. FENNELL and SANDRA M. MULLIN, certify that

4    the foregoing is a correct transcript of the record of

5    proceedings in the above-entitled matter.

6

7    /s/ KATHLEEN M. FENNELL                    August 17, 2017
     KATHLEEN M. FENNELL, CSR, RMR, FCRR
8    Official Court Reporter

9
     /s/ SANDRA M. MULLIN                        August 17, 2017
10   SANDRA M. MULLIN, CSR, RMR, FCRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25