```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3    OCEAN TOMO, LLC,                    )  Docket No. 12 C 8450
                                         )
 4              Plaintiff/               )  Chicago, Illinois
                Counterdefendant,        )  July 27, 2017
 5                                       )  1:30 p.m.
                v.                       )
 6                                       )
      JONATHAN BARNEY and                )
 7    PATENTRATINGS, LLC,                )
                                         )
 8              Defendants/              )
                Counterplaintiffs.       )
 9

10                              VOLUME 15
                     TRANSCRIPT OF PROCEEDINGS - Bench Trial
11                   BEFORE THE HONORABLE THOMAS M. DURKIN

12
      APPEARANCES:
13

14    For the Plaintiff/     SPENCEPC by
      Counterdefendant:      MR. WILLIAM C. SPENCE
15                           405 N. Wabash Avenue, Suite P2E
                             Chicago, IL 60611
16

17    For the Defendants/    JENNER & BLOCK LLP by
      Counterplaintiffs:     MR. DAVID C. LAYDEN
18                           MS. KATHARINE R. CILIBERTI
                             353 N. Clark Street
19                           Chicago, IL 60654-3456

20
      Court Reporter:        SANDRA M. MULLIN, CSR, RMR, FCRR
21                           Official Court Reporter
                             219 S. Dearborn Street, Room 1432
22                           Chicago, IL 60604
                             312.435.6053
23                           laura_renke@ilnd.uscourts.gov

24

25
```

1    (Proceedings heard in open court:)

2         THE COURT:  All right.  Are we ready to proceed?

3         MR. SPENCE:  We are, your Honor.

4         THE COURT:  Okay.  Let's have the witness re-take

5    the stand.  Mr. Layden, you had no additional questions;

6    correct?

7         MR. LAYDEN:  That's correct, your Honor.

8         THE COURT:  Sir, you're still under oath.

9         Mr. Spence, you may begin.  Is there a binder for

10   the cross?

11        MR. SPENCE:  There is, your Honor.

12        THE COURT:  Okay.  I'm not welcoming it, but I

13   expected there would be.  So I just wanted to make sure

14   before we get started.

15        MR. SPENCE:  I will represent we're not going to

16   get through all these.

17        THE COURT:  You're not going to go through them or

18   not going to --

19        MR. SPENCE:  We might not get through all of them,

20   but they're there in case we need them.  I don't want you to

21   think we're going to go through two binders of documents.

22        THE COURT:  All right.  Off the record.

23     (Discussion had off the record.)

24        THE COURT:  Back on the record.  You may begin.

25     MICHAEL PAKTER, DEFENDANT'S WITNESS, PREVIOUSLY SWORN,

1          CROSS-EXAMINATION

2   BY MR. SPENCE:

3   Q.   Mr. Pakter, good to see you again.

4   A.   And you too, Mr. Spence.

5   Q.   So I'd like to start, if I could, with your capital

6   account report.  Okay?

7   A.   Sure.

8   Q.   That's one of the two expert reports that you provided

9   in this case; right?

10  A.   Correct.

11  Q.   Let's take a look at PX-185, please.  Now, this is that

12  report; correct?

13  A.   Is that the same as DX-611?

14  Q.   PX-185 -- you know, we probably don't have the binders

15  to you yet.  That's going to be difficult.  It should be on

16  the screen too, but at any time if it's easier to look on the

17  screen --

18  A.   I can't pick that up, Mr. Spence, please.

19  Q.   No problem.  I'll be happy to help you.  And if at any

20  time you need me to come over and help, just let me know.  I

21  do remember from our deposition you had a back surgery, so if

22  there is anything I can do to facilitate, I'm happy to do so.

23  I'll take that one from you.

24  A.   Certainly.  Thank you for your help.

25  Q.   I will sit it right here, in case you need it.

1   A.   Appreciate it.

2   Q.   As I said, I will put most of these on the screen for

3   you, Mr. Pakter, so if it's easier to look at the screen,

4   feel free to do that.  But I want you to have the full

5   document in case there is something more that you want to

6   look at.

7   A.   Thank you for that.

8   Q.   So what you see on the screen now is PX-185.  Do you see

9   that?

10  A.   I do.

11  Q.   And that's your -- one of your two expert reports in

12  this case; right?

13  A.   It is.  It's -- I'm just turning it up in the binder.

14  Q.   Sure.  Let me know when you get there.

15  A.   I'm there.

16  Q.   So this report concerns your attempt to reconstruct

17  Mr. Barney's capital account; correct?

18  A.   I don't know about an attempt, but I did reconstruct the

19  capital account.

20  Q.   And if you take a look at Page 18 with me, again, we

21  will put it on the screen, but feel free to turn to the page.

22  A.   Okay.

23  Q.   You see here on Page 18 at the top:  "I concluded that

24  Ocean Tomo LLC, A, should have categorized the gain on the

25  2009 ICAP sale transaction as other net profits under the

1  operating agreement."  Right?

2  A.   That's correct.

3  Q.   Other net profits?

4  A.   That's correct.

5  Q.   And then you say B was correct of categorized the gain

6  in the 2009 ICAP sale as net profits from operation.  Was

7  incorrect, rather.  Right?

8  A.   It was incorrect of categorized the gain on the ICAP

9  sale transaction as from operations.

10  Q.   All right.  So the issue here is, with regard to that

11  ICAP transaction, should it be categorized as other net

12  profits or net profits from operations; right?

13  A.   Correct.

14  Q.   And it's your position that that should have been

15  categorized as other net profits?

16  A.   Correct, not from operations.

17  Q.   Let's take a look at Page 12 of your report.  Now, as

18  part of your work to develop your expert opinion, you looked

19  at a number of documents; right?

20  A.   That's right.

21  Q.   One of the documents, or one of the sets of documents

22  you looked at, is a consolidated financial statement of Ocean

23  Tomo for fiscal years ended December 31st, 2009, and 2008.

24  Do you see that?

25  A.   I do.

1    Q.   And you have a footnote next to there, Footnote 26;

2    right?

3    A.   I do.

4    Q.   Now, that footnote says, "Which annual financial

5    statements were audited by Ernst & Young."  Right?

6    A.   Correct.

7    Q.   If we take a look at PX-81, please.  Again, we will pull

8    it up on the screen.  If you'd like to look at it in the

9    binder, feel free to do so.  These are those financial

10   statements; correct?

11   A.   They are.

12   Q.   From Ernst & Young?

13   A.   Correct.

14   Q.   Was the audit from Ernst & Young a clean audit?

15   A.   It was.

16   Q.   They didn't raise any issues with the way that Ocean

17   Tomo categorized that ICAP transaction; correct?

18   A.   If you please turn one more page, I will double check,

19   but I believe they issued a clean audit opinion.

20   Q.   Sure.  Can we go to the next page please, Dave?

21   A.   You just go to the audit report.  The audit report

22   concludes:  "Present fairly in all material respects."

23             MR. SPENCE:move to admit PX-81, your Honor.

24             THE COURT:  Any objection?

25             MR. LAYDEN:  No, your Honor.

1           THE COURT:  It's admitted.

2           (PX-81 admitted into evidence.)

3    BY MR. SPENCE:

4    Q.   Now, also on Page 13 of your report, this is going back

5    now to PX-185, you refer to the Ocean Tomo LLC consolidated

6    financial statements for fiscal years ended December 31,

7    2010, and 2009.  Do you see that?

8    A.   I do.

9    Q.   And, again, there is a footnote, Footnote 29.  This is

10   on Page 13 of your report.

11   A.   I agree.

12   Q.   If we go down to that footnote, it says, "Which annual

13   financial statements were audited by Blackman Kallick?"  Do

14   you see that?

15   A.   I do.

16   Q.   Did Blackman Kallick issue a clean audit?

17   A.   I believe so, but we could just look to double check.

18   Q.   Sure.  Let's take a look at PX-107, please.

19   A.   And if you would kindly turn to the audit report page.

20   I agree it is what is known as a clean opinion.

21   Q.   And the ICAP transaction was material?

22   A.   It was.

23   Q.   True for both of those audited financial statements;

24   right?

25   A.   True.

1   Q.   No issues raised, again, with the way that Ocean Tomo

2   categorized those proceeds from the ICAP transaction; is that

3   fair?

4   A.   There is no separate disclosure in either audit report

5   flagging the ICAP transaction.

6           THE COURT:  Would you have expected there to be

7   some flagging of it if the transaction was somehow

8   miscategorized?

9           THE WITNESS:  If in the view of those auditors they

10  viewed it as improperly financially reported, they ought to

11  have added an explanatory paragraph.

12          THE COURT:  And is it traditional for a public

13  accountant reviewing the financial statements of a company

14  they're auditing to look at legal documents that deal with

15  categorizing transactions that find their way onto the

16  financial statements?

17          THE WITNESS:  It's usual.  I would expect they

18  would have looked at that transaction.

19          THE COURT:  I think you testified yesterday you

20  often look at legal documents, accountants -- auditors look

21  at legal documents as part of their auditing function to

22  understand why a company does what they do when they

23  categorize certain things on their financial statements;

24  correct?

25          THE WITNESS:  Correct.

1              MR. SPENCE:  Your Honor, move to had admit PX-107.

2              THE COURT:  Any objection?

3              MR. LAYDEN:  No, your Honor.

4              THE COURT:  It's admitted.

5         (PX-107 admitted into evidence.)

6    BY MR. SPENCE:

7    Q.   So, in any event, you disagree with the way that Ocean

8    Tomo categorized those proceeds as net profits from

9    operations rather than other net profits; correct?

10   A.   I disagree with the allocation of the net profit for

11   purposes of allocating it between the members, as well as I

12   disagree with the financial reporting in the financial

13   statements.

14   Q.   One of the bases for that disagreement is that you don't

15   believe Ocean Tomo should have categorized those proceeds

16   from ICAP as other net profits; right?

17   A.   Yes, there is a difference between the allocation and

18   the financial reporting.  I believe they're both incorrect.

19   Q.   Okay.  Now, to look at what you think should have been

20   done, you actually reconstructed the capital member accounts;

21   right?

22   A.   I did.

23   Q.   Let's take a look at Page 27 of your expert report.

24   This is still staying with PX-185.

25              THE COURT:  Can I follow up on your last statement.

1    You disagree with the financial reporting, so you're

2    basically disagreeing with Blackman Kallick and Ernst &

3    Young; correct?

4            THE WITNESS:  Correct.

5            THE COURT:  All right.  The allocation, is that

6    something that is contained in the financial reports where

7    your opinion is at odds with Kallick -- Blackman Kallick and

8    EY, or is it something that isn't necessarily encompassed in

9    their opinion?

10           THE WITNESS:  It's not encompassed in their

11   opinion.  It's a separate decision how you allocate member's

12   net profits and how you disclose the profits of the year.

13   Essentially they are two different questions.  There is

14   actually a third question; and that is, how does the treasury

15   account for the actual proceeds.  But treasury, financial

16   reporting and the allocation between members are three

17   separate decisions.

18           THE COURT:  All right.  You disagree with the

19   accounting firms on the financial reporting.

20           THE WITNESS:  Correct.

21           THE COURT:  Your opinion as to allocation does not

22   require -- or does it require you to disagree with the

23   accounting firms?

24           THE WITNESS:  No, that's -- that's why I'm not

25   always understanding the linkage between the issues.  They're

1    unlinked, really.

2    BY MR. SPENCE:

3    Q.   Okay.  Mr. Pakter, let's talk about the allocations

4    portion of that that you just discussed.  Okay?

5    A.   Okay.

6    Q.   Now, if we go to Page 27 of your expert report, based on

7    your opinion that ICAP proceeds are other net profits, you

8    attempt to reconstruct Mr. Barney's capital account at Ocean

9    Tomo; correct?

10   A.   Yeah.  I'm going to quibble with you every time you say

11   "attempt."

12   Q.   Okay.

13   A.   But apart from that, yes, I reconstructed the capital

14   accounts.

15   Q.   Thank you.  It's unintended, so if I do it again, please

16   feel free to raise it.

17            What you did, then, is you came up with a variety

18   of methods; correct?

19   A.   Correct.

20   Q.   Five methods -- I think five methods, to be specific?

21   A.   Correct.

22   Q.   Those are Methods 1, 2, 1A, 2A and Method 3; right?

23   A.   Correct.

24   Q.   Now, you understand that Method 3 is something that

25   defendants don't intend to pursue in this litigation;

1  correct?

2  A.    I do understand that.

3  Q.    So that leaves us with four methods; right?

4  A.    I agree.

5  Q.    Let's take a look at DX-581, please.  This is a

6  demonstrative that you prepared; correct?

7  A.    Correct.

8  Q.    And it essentially summarizes the differences between

9  these five methods that we discussed; right?

10  A.    Correct.

11  Q.    And so let's look at Method No. 1, the first column

12  there.  You make a number of assumptions; is that right?

13  A.    Correct.  I do.

14  Q.    Those assumptions are listed in the four rows containing

15  texts?

16  A.    Correct.

17  Q.    So one of those assumptions you make in the second row

18  for Method No. 1 is that Ocean Tomo was permitted to cancel

19  Mr. Barney's 23.1 membership units in June, 2011; right?

20  A.    Correct.

21  Q.    And there is a difference between Method 1 and Method 2,

22  in at least the fact that you change your assumption; right?

23  A.    Correct.

24  Q.    You now make the assumption that Ocean Tomo was not

25  permitted to cancel Mr. Barney's 23.1 membership units in

1   June 2011; right?

2   A.   Correct.

3   Q.   What's the basis for that assumption?

4   A.   The basis for the assumption is that I don't believe

5   it's my place to decide whether or not it was proper or

6   improper to cancel Mr. Barney's 23.1 membership units.  And

7   essentially I'm deferring to the court to make that final

8   decision.  I'm not making it.

9   Q.   Okay.  But you have to have some basis for including it

10  as an assumption in your opinion; correct?

11  A.   Well, that's only one of two options.  Either the

12  23.1 units were or were not canceled.  And so in Method 1 and

13  1A, I'm assuming they were permitted to be canceled; and 2

14  and 2A, I'm assuming not.  But I am not making a final

15  decision here.

16  Q.   So there is no agreement that you're depending upon to

17  make that assumption; is that right?

18  A.   I'm not opining whether it was proper or improper to

19  cancel the 23.1 units.

20  Q.   I understand that, but at some point you had to come to

21  the understanding, or you had to accept somebody's

22  representation, that that option, that assumption, was even

23  possible; right?

24          MR. LAYDEN:  Objection, form, compound.

25          THE COURT:  What was the second thing you said?

1               MR. LAYDEN:compound.

2               THE COURT:  Overruled.

3     BY THE WITNESS:

4     A.    Are you asking me where I even started to come up with

5     this decision tree?

6     BY MR. SPENCE:

7     Q.    Right.  So how did you even decide that this was an

8     assumption that you should include in your opinion?

9     A.    Thank you.  I got that from either the complaint or the

10    counterclaim, together with a request from retaining counsel

11    to make a decision -- to develop a decision tree for the

12    court doing down one path or the other path.

13    Q.    Anything else?

14    A.    It's my belief that that's an issue that will have to be

15    decided by the court; and, therefore, the court needs the

16    calculations either way.

17    Q.    Okay.  If that assumption turns out to be incorrect, I'm

18    talking about the assumption here in the second row in the

19    second column, that assumption turns out to be incorrect,

20    then this methodology would be incorrect; right?

21    A.    Well, it's either-or.  So, in any event, it either takes

22    place or doesn't take place.  If the question didn't exist at

23    all, then the court would go down the not-permitted-to-cancel

24    road.

25    Q.    Correct.  And if the court goes -- let's say the court

1    decides that Ocean Tomo was permitted to cancel Mr. Barney's

2    23.1 membership units in June of 2011.  If the court decides

3    that, then Method 2 isn't accurate; is it?

4    A.    Method 2 would be not applicable and the court would

5    disregard it.

6    Q.    Let's talk about method -- the next method over,

7    Method 1A.

8    A.    Okay.

9    Q.    Now, here what you've done is you've essentially taken

10   Method 2 and you've added an additional assumption at the

11   bottom.  Is that fair?

12   A.    I think I took Method 1 and added an additional

13   assumption in the last row.

14   Q.    Okay.  Thank you for the clarification.  So you took

15   Method 1 and you added the additional assumption shown here

16   at the bottom, the fourth row?

17   A.    Correct.

18   Q.    And there it says, "Mr. Barney was entitled to his

19   percentage interest of the 25 percent dividend allocation;

20   right?

21   A.    Correct.

22   Q.    And the additional assumption that you make here is that

23   he is also entitled to a percentage interest of the firm

24   credit portion of the bonus pool.  Do you see that?

25   A.    I do.

1   Q.   I'm going to ask you the same question.  What is that

2   assumption based on?

3   A.   It is based on, one, the framing of the argument in the

4   complaint or counterclaim, to which I understand that this is

5   a dispute between the parties.  It is also based on retaining

6   counsel's request for a scenario with and without the

7   calculation.  And it's also based on my understanding that,

8   in the period 2011 through 2016, Mr. Barney remained a member

9   and so would have been entitled to either the 25 percent

10  dividend allocation and/or the firm credit portion of the

11  bonus pool, multiplied by his then percentage membership

12  interest.

13  Q.   Okay.  Other than what you testified about so far, is it

14  based on any other agreement that you know about?

15  A.   I would also have to say it is based on my review of

16  what is known as the comp plan, which I viewed as an integral

17  part of understanding the overall allocation of member's

18  profits in these scenarios.

19  Q.   What comp plan are you referring to?

20  A.   I'm referring to a comp plan which I itemized in my

21  report, or I believe I did.  So if you'll look at Page 24 of

22  my report, I have reference to a compensation agreement.  And

23  to the best of my recollection, that is described in either

24  Footnote 52 or 53.  I just want to see if I can find the

25  footnote here.  It's either the document at Footnote 52 or

1    the document at Footnote 53.  I don't immediately recall.

2    Q.   Okay.  And unfortunately I don't have those available, I

3    don't think, right now, but we will find those during the

4    break, and we will go back to this topic.

5         Let me ask you another question related to this.

6    What legal claim is that assumption related to?

7    A.   I submit that calls for a legal conclusion.  I'm doing

8    an accounting here, I'm not making legal claims.

9    Q.   Would you say the same with respect to this issue of

10   whether or not Ocean Tomo was permitted to cancel

11   Mr. Barney's membership units, ask you what legal claim is

12   that related to, would you give me the same answer?

13   A.   I'm not articulating the legal claim here, I am making

14   an accounting based on the existence of that legal claim

15   which the court will evaluate and rule on.

16        MR. SPENCE:  And, your Honor, just as a remainder,

17   so there was some significant changes made to Mr. Pakter's

18   report that we didn't have a chance to depose him on.  So

19   this cross-examination is going to be a little bit

20   untraditional in the sense that we're going to be taking some

21   deposition-like questions as well as some typical

22   cross-examine-like questions.  I'm not trying to be obtuse on

23   this, but I don't understand what legal claim this issue of

24   cancellation of shares relates to.

25        THE COURT:  Well, I think the witness has answered

1   he can't help you on that either.  Presumably the -- we will

2   be enlightened through closing arguments.

3           MR. LAYDEN:  Your Honor, I will just point out,

4   just to be very clear, everything Mr. Pakter has testified to

5   so far and has shown in his chart about 23.1 membership units

6   being canceled --

7           THE COURT:  Slow down.

8           MR. LAYDEN:  About the membership units being

9   canceled and about the firm credit that Mr. Spence has

10  referred to he has described in his expert report that was

11  issued on May 1st.  It's not something that was disclosed in

12  these revised schedules, so.

13          THE COURT:  This isn't hard.  I do have to decide

14  certain hypothetical -- I have to decide whether actions

15  taken by Ocean Tomo were correct and within their legal

16  boundaries.  If they were, certain facts -- parts of this

17  chart will be applicable.  If they weren't, parts of this

18  chart will not be applicable.  That's how I view it.  If

19  that's wrong, you should explore that question more, or

20  enlighten me in closing arguments.  But that's how I view

21  this.  I don't think it's that difficult a set of constructs

22  to work out of, so.

23  BY MR. SPENCE:

24  Q.   So, again, with respect to this Method 1-A that was just

25  discussed, is that assumption that you make, that Mr. Barney

1    would be entitled to a percentage of interest of a firm

2    credit, if that assumption turns out to be incorrect, then

3    Method 1-A would be inaccurate; right?

4    A.   If the court concluded other than I have stated for 1-A,

5    then 1-A would not apply.

6    Q.   Okay.  Then, without going into it in detail, if we go

7    over to 2-A, you combine some of those assumptions we've

8    already talked about; right?  In the second row you see that

9    you assume that Ocean Tomo was permitted to cancel

10   Mr. Barney's 23.1 membership units; right?

11   A.   That's correct.

12   Q.   And then under that you say, "He is also entitled to his

13   percentage of interest in the firm credit."  Right?

14   A.   That's correct.

15   Q.   And so, again, if one of those assumption turns out to

16   be incorrect, that method would be incorrect; right?

17            THE COURT:  I think you said all these -- it may be

18   inapplicable.

19   BY MR. SPENCE:

20   Q.   Inapplicable, sorry.  That method wouldn't be applicable

21   if one or more of those assumption turns out to be incorrect;

22   right?

23   A.   I think I'll go with what the court just said a minute

24   ago.  These are a set of constructs that enable the court to

25   make decisions at some point and then run down the applicable

1    scenarios.  Clearly if the court concludes that something

2    doesn't work or doesn't apply, the court will ignore that

3    whole column.

4            THE COURT:  And, Mr. Spence, if I find that certain

5    of these assumptions are not correct and the methods are

6    inapplicable and there is no applicable method, then I have

7    to decide whether or not, if damages are awarded, I can

8    arrive at a damage figure based on math I do, or whether I'm

9    not in a position to do that.  But that's how damages work.

10           MR. SPENCE:I don't disagree, your Honor.

11           THE COURT:  Okay.  We're all on the same page on

12   that.

13           MR. SPENCE:  I was just hoping to point out some of

14   the assumptions to help your Honor reach a decision.

15           THE COURT:  Understood.

16   BY MR. SPENCE:

17   Q.   So now let's talk about your calculations when you tried

18   to reconstruct Mr. Barney's capital account.  Okay?

19   A.   I'm going to quibble with you again about the "try to."

20   Q.   Sorry.  Let's go through some of the calculations in

21   your efforts to reconstruct Mr. Barney's capital account;

22   fair enough?

23           MR. LAYDEN:  Objection, your Honor, form.

24           THE COURT:  Overruled.  It's not even a question.

25   He is just providing a book end to what he is about to get

1  into, so.

2         MR. LAYDEN:  Fair enough.

3         THE COURT:  The objection is overruled.

4  BY MR. SPENCE:

5  Q.   I'm going to write on the board here to help me as much

6  as you, frankly, Mr. Pakter.  So what we're talking about

7  here are two concepts; right?  We have other net -- net

8  profits, and then we have net profits from operations; right?

9  Do you agree with me those are the two main concepts that are

10  discussed in your report on capital accounts?

11  A.   I agree with you that the net profits for the year of

12  Ocean Tomo are divided between net profits from operations

13  and other net profits as part of the final decision of

14  member's allocation of net profits.

15  Q.   Okay.  Let's go back to your report, PX-185.  And I want

16  to direct you to Page 4.  In your first paragraph here on

17  Page 4, Mr. Pakter, you say, "I was engaged to reconstruct

18  Jonathan Barney's member's capital account and to calculate

19  Jonathan Barney's undistributed profits defined later."

20  Right?

21  A.   Correct.

22  Q.   "And distributions owed to Jonathan Barney under the

23  Ocean Tomo LLC operating agreement defined later."  Do you

24  see that?

25  A.   I do.

1    Q.    And then if we go to Page 7?

2    A.    And related matters.

3    Q.    I'm sorry?

4    A.    And related matters.

5    Q.    Thank you.  If we go to Page 7.  I'm sorry, rather than

6    Page 7, go to Item 7 on Page 4 -- Page 5, perhaps.  Are you

7    with me?

8    A.    I am.

9    Q.    It says here, in Item 7, you prepared a financial

10   analysis reconstructing Jonathan Barney's capital account and

11   calculating his undistributed profits and unpaid

12   distributions from January 1st, 2008, through December 31st,

13   2016.  Right?

14   A.    Correct.

15   Q.    And then it says, "Based on alternative methodologies

16   and/or assumptions."  Right?

17   A.    Correct.

18   Q.    Those are the five alternative methods that we just

19   discussed?

20   A.    Correct.

21   Q.    Then if we go to Page 10 of your report, you provide a

22   definition here for undistributed profit amounts; right?

23   A.    I do.

24   Q.    What I would like, Mr. Pakter, if you would, just help

25   me walk through this calculation.  Okay?

1    A.    Okay.

2    Q.    So beginning with the definition of undistributed

3    profits amounts, it says here, "For each member, an amount

4    equal to the amount shown on the books and records of the

5    company as of January 1, 2008."  Right?

6    A.    Correct.

7    Q.    And it says, "But prior to allocations of net profits

8    from operations."  Right?

9    A.    Right.

10   Q.    Plus, "A, cumulative allocations of net profits from

11   operations."  Right?

12   A.    Right.

13   Q.    And that's under Section 9.01A?

14   A.    Right.

15   Q.    "Minus cumulative distributions made to such member."

16   Do you see that?

17   A.    I do.

18   Q.    And so when we're talking about undistributed profits

19   amounts, it's a pretty simple formula; right?

20   A.    Simplicity is subjective.

21   Q.    So if I want to calculate undistributed profits amounts,

22   I begin with what's the value on the book; right?

23   A.    Correct.

24   Q.    So I begin with his balance.  And then from that

25   balance, I add something; right?

1    A.    Correct.

2    Q.    I add, "allocations of net profits from operations."

3    Right?

4    A.    Correct.

5    Q.    And then I subtract something; don't I?

6    A.    Correct.

7    Q.    And what I subtract is the distributions; correct?

8    A.    Correct.

9    Q.    That's the money paid, in other words.  And if I do

10   that, if I begin with the value that's on the books and I add

11   the net profits from operations and I subtract the

12   distributions, then that gives me the undistributed profits

13   amounts; correct?

14   A.    Correct.

15   Q.    And that's what you did; right?

16   A.    I did.

17   Q.    And this definition that we just went through, that's

18   taken directly from the operating agreement; correct?

19   A.    Correct.

20   Q.    Now, you provided your detailed accounting, your

21   calculations, in a variety of schedules to your report; isn't

22   that right?

23   A.    Correct.

24   Q.    And let's take a look, please, at PX-241.  And we have

25   to go a ways into the document here, all the way to Page 67,

1    if you would.  Again, we will pull it up on the screen for

2    you, Mr. Pakter, if it's easier.

3    A.    Either way.

4    Q.    If we go to Page 67, we see your Schedule 14; right?

5    A.    Yes.

6    Q.    Do you need a moment?

7    A.    I'm okay.

8    Q.    And Schedule 14 is titled, "Undistributed Profits,

9    Baseline Method."  Do you see that?

10   A.    I do.

11   Q.    This was your re-creation of undistributed profits

12   amounts?

13   A.    Yes.

14   Q.    What we just defined; right?  Based on allocations and

15   distributions actually reported by Ocean Tomo; correct?

16   A.    Yes, before the application of my methodology.

17   Q.    Before, I'm sorry, what?

18   A.    Before the application of the various assumptions.

19   Q.    All right.  And so, in other words, this is done without

20   any modifications to the numbers based on your opinion that

21   the proceeds from ICAP should have been categorized in a

22   different manner; right?

23   A.    It's based on none of my alternative scenarios or

24   constructs.

25   Q.    Based on your review of the financial documents, this is

1    the way that you think Ocean Tomo actually did it; correct?

2    A.   I believe so, yes.

3    Q.   And if I look at undistributed profits as of

4    January 1st, 2008, it's one of the first lines there to the

5    left.  Do you see that?

6    A.   I do.

7    Q.   Then you show a number of figures; right?  For

8    Mr. Malackowski, approximately $1.5 million; correct?

9    A.   Yes.

10   Q.   And then Mr. Carter, 980,000, and Mr. Barney, 91,000;

11   right?

12   A.   Correct.

13   Q.   And next to those figures you have a Footnote 2.  Do you

14   see that?

15   A.   I do.

16   Q.   And if we look at that Footnote 2 on the next page, you

17   indicate here that you take those numbers from the second

18   amended and restated operating agreement; right?

19   A.   I do.

20   Q.   And then you repeat those numbers there.  Those are the

21   numbers that you start with; correct?

22   A.   Correct.

23   Q.   So, in other words, when we talk about this definition

24   for undistributed profits amounts, those are -- that's the

25   balance; right?

1    A.    Correct.

2    Q.    That's their starting point.  And then what you do in

3    the Schedule 14 for each year after is you added allocations

4    from net profits from operations; right?

5    A.    Yes.

6    Q.    That's the second part of our definition right here;

7    correct?

8    A.    Yes.

9    Q.    And then you subtracted the distributions?

10   A.    Yes, and in the baseline, as Ocean Tomo did it before

11   scenarios.

12   Q.    And you do that for every year from 2008 to 2016; don't

13   you, Mr. Pakter?

14   A.    Correct.  Yes.

15   Q.    Now let's go to Schedule 15.  So this is on Page 70 of

16   Plaintiff's Exhibit 241.  And, again, on the top, right-hand

17   corner here you see a reference to undistributed profits,

18   Method 1; right?

19   A.    I do.

20   Q.    So this is your Method 1 reconstruction for Mr. Barney's

21   undistributed profits amount; right?

22   A.    Correct.

23   Q.    And as you described earlier, your Method 1

24   reconstruction was to treat those proceeds from the ICAP

25   transaction not as net profits from operations, but as other

1    net profits; right?

2    A.    No.   I treated those as allocable to Mr. Barney based on

3    his membership percentage interest for that year.

4    Q.    It's your opinion in this case those should have been

5    categorized as other net profits; isn't that right?

6    A.    It's my opinion that Ocean Tomo should have allocated

7    the ICAP transaction as other, but my final conclusion and

8    opinion for 2009, is that all of the 2009, net profits should

9    have been allocated based on Mr. Barney's membership

10   percentage interest because there were also losses that year;

11   and, but for the ICAP transaction, the year would have been a

12   loss.  So my final opinion is that all of 2009 is allocated

13   by member's percentage interest.

14   Q.    True.  So I understand your final opinion.  But remember

15   I asked you, I wanted you to walk through this with me one

16   step at a time.  Will you continue to do that with me?

17   A.    Yes, but not if you're going to mischaracterize my

18   conclusion.

19   Q.    Well, let's be very clear on your basis for your

20   conclusion.  Let's go back to Page 18.

21            THE COURT:  Before we get there, let's go off the

22   record for a minute.

23            (Discussion had off the record.)

24            THE COURT:  All right.  We are back on the record,

25   and you may continue.

1   BY MR. SPENCE:

2   Q.   Okay.  Mr. Pakter, so during that short break we went

3   through your Schedule 14; correct?

4   A.   We did.

5   Q.   And that was your effort to reconstruct Mr. Barney's

6   undistributed profits amounts; correct?

7   A.   That was my reconstruction of undistributed profits in

8   Method 1.

9   Q.   Great.  And now we're on Schedule 15; correct?

10  A.   We are.

11  Q.   And just before we had a technical difficulty, you said

12  you didn't want me to change any of your conclusions in this

13  case; right?  Is that what you told me?

14  A.   No, I told you that I had concluded that the 2009, ICAP

15  sale transaction should have been allocated to Mr. Barney

16  based on his percentage interest.

17  Q.   Absolutely, Mr. Pakter, and I get that loud and clear.

18  But what I want you to do is walk through with me and explain

19  why.  Can you do that?

20  A.   Sure.

21  Q.   So we looked at Page 18 of your capital account report,

22  correct, PX-185?

23  A.   We did.

24  Q.   And on Page 18, remember you agreed with me that you had

25  concluded that Ocean Tomo should have categorized the gain on

1   the 2009 ICAP sale transaction as other net profits; right?

2   A.   Right.

3   Q.   That was your conclusion?

4   A.   Right.

5   Q.   Under the operating agreement; right?

6   A.   Right.

7   Q.   This one right here, so we're all on the same page;

8   right?

9   A.   Right.

10  Q.   Not net profits from operations; correct?

11  A.   They should not have done -- they should not have

12  categorized it as other than from operations.

13  Q.   They should have categorized it as other net profits.

14  That's your conclusion?

15  A.   Yes.

16  Q.   Now, based on that conclusion, that those proceeds

17  should have been categorized as other net profits, I want to

18  go back to Schedule 15.  This is Plaintiff's Exhibit 241.

19  A.   Okay.

20  Q.   Now we're back to Page 70, if you would.

21  A.   Okay.

22  Q.   And just so we're all on the same page, literally and

23  figuratively, you see "other" on the top, left corner says,

24  Undistributed Profits Method 1."  Right?

25  A.   Correct.

1    Q.    This is your attempt -- this is your effort to

2    reconstruct Mr. Barney's capital account using your Method 1.

3    Is that fair?

4    A.    This is my reconstruction of undistributed profits

5    Method 1.

6    Q.    Okay.  Now, when we looked at Schedule 14, we started

7    with undistributed profits as of January 1st, 2008; right?

8    A.    Correct.

9    Q.    That's on the top, left-hand corner?

10   A.    Correct.

11   Q.    And then we went to the right, and we read those numbers

12   off; right?

13   A.    Correct.

14   Q.    And we referenced that Footnote No. 2; didn't we?

15   A.    We did.

16   Q.    And that Footnote No. 2 referred to the operating

17   agreement; correct?

18   A.    Correct.

19   Q.    That was your starting point for your calculations in

20   Schedule 14; right?

21   A.    Correct.

22   Q.    And you have the same starting point here as

23   Schedule 15; don't you?

24   A.    Correct.

25   Q.    And you did the same thing; right?  You started from

1    that point, the balance, and then you added net profits from

2    operations; right?

3    A.    Correct.

4    Q.    You didn't -- you didn't add other net profits; right?

5    You added net profits from operations?

6    A.    No, what I did now was add Mr. Barney's membership

7    percentage interest of 2009.  You're missing a step in my

8    report.  On Page 21 of my report, in the last paragraph, I

9    come to a final conclusion about 2009.  And it is my final

10   conclusion in 2009, that the 2009 profit should have been

11   allocated to Mr. Barney based on his percentage interest.

12   Q.    Okay.  And, again, I know you want to go right to that

13   final conclusion, Mr. Pakter, but before we get there, let's

14   just walk through the steps.  Okay?

15   A.    Sure.

16   Q.    So here we are on Schedule 15; right?

17   A.    Yes.

18   Q.    You start with the undistributed profits as of

19   January 1st, 2008; correct?

20   A.    Correct.

21   Q.    And then for 2008, year-end 2008, you do two things;

22   right?  You first add the net profits from operations for

23   2008; right?

24   A.    Right.

25   Q.    And then you subtract from that the 2008 distributions

1    and tax payments; isn't that right?

2    A.   Right.

3    Q.   And you do that for each of Mr. Malackowski, Mr. Carter

4    and Mr. Barney; right?

5    A.   Right.

6    Q.   And, for example, with Mr. Barney, that gives you a

7    year-end 2008 undistributed profits of $40,568; right?

8    A.   Correct.

9    Q.   And just like you did in Schedule 14, you continue that

10   year after year on Schedule 15; right?

11   A.   Correct.

12   Q.   Except when we get to the next line here, when we get to

13   your calculations for year-end 2009 undistributed profits,

14   the numbers are different from Schedule 14; aren't they?

15   A.   Correct.

16   Q.   And they're different because, if we go to that 2009 net

17   profits from operations line --

18          And, Dave, if you could just highlight, it's seven

19   lines down there, where it says the $4,389,516.  So the line

20   just above that, if you could.  If you could highlight that

21   whole line for me.

22          Do you see that on the screen, Mr. Pakter?

23   A.   I do.

24   Q.   Now, what that is, it's the gain from the ICAP

25   transaction; isn't it?

1    A.   No, it's not.

2    Q.   Those aren't ICAP proceeds that you identified here on

3    that line?

4    A.   No, it is the entirety of 2009 net profits.

5    Q.   And does that include any proceeds received from the

6    ICAP transaction?

7    A.   It includes the gain on sale of ICAP.

8    Q.   And that's why it's different; isn't it, Mr. Pakter?

9              MR. LAYDEN:   Objection, form, your Honor.

10             THE COURT:   Overruled.

11   BY THE WITNESS:

12   A.   I didn't understand your question.

13   BY MR. SPENCE:

14   Q.   Well, let's go to Schedule 14 real quick.

15   A.   Oh, that's 15.

16   Q.   Page 68.  Do you see that?

17   A.   14, yes.

18   Q.   So if we are on Schedule 14, I'm sorry, we look at

19   Page 67.

20             And, Dave, if you could just highlight that same --

21   that same line for me there.

22             And so in Schedule 14, what you're doing is you're

23   doing it based on your review of the financial records at

24   Ocean Tomo; right?

25   A.   Excuse me?

1    Q.    In Schedule 14?

2    A.    Yes.

3    Q.    You're reconstructing the capital account based on the

4    records at Ocean Tomo; right?

5    A.    I'm reconstructing the undistributed profits on a

6    baseline method without any of my assumptions or scenarios.

7    Q.    Correct.  And part of that includes the proceeds from

8    the ICAP transaction; right?

9    A.    That includes the allocations of portions of the ICAP

10   transaction according to member percentages and portions, not

11   according to member percentages.

12   Q.    Right.  And if we look at that line right there, this is

13   on Schedule 14 now, you see a different number for

14   Mr. Barney; right?

15   A.    I thought you showed me 14 on screen.

16   Q.    I'm sorry?

17   A.    I thought we were looking at 14 on screen.

18   Q.    Right.  My point is there is a different number that you

19   use in Schedule 15 versus what you use in Schedule 14; isn't

20   that right?

21   A.    That is correct.

22   Q.    You don't -- when you're calculating the undistributed

23   profits amounts, you use a different number to get to the

24   total for that year; right?

25   A.    The 2009 allocation to Mr. Barney is different in the

1    baseline than in Method 1.

2    Q.   And it's different because you're including in that the

3    proceeds from the ICAP transaction; right?

4    A.   No, it's different because now there are three line

5    items that are allocated based on the member's percentage

6    interest versus two previously.

7    Q.   Because you're adding in the ICAP proceeds in Schedule

8    15; aren't you?

9    A.   There are also ICAP proceeds in 14.

10   Q.   Which -- but you're allocating those to Mr. Barney in

11   Schedule 15; right?

12   A.   They're allocated portions to Mr. Barney in 14 and in

13   15.

14   Q.   Right.  But in Schedule 15, you're including that

15   allocation in his undistributed profits amounts; aren't you?

16   A.   I'm including it at a different percentage.

17   Q.   Right.  And you're doing that because you classified

18   that as net profits from operations.  Is that why?

19   A.   No, because now I'm taking the entirety of 2009, as

20   Ocean Tomo did it, except I'm now giving Mr. Barney his

21   entire 8.7 percent of all allocations.

22   Q.   Right because it's your opinion that Mr. Barney should

23   have been allocated all of his percentage interest of ICAP

24   proceeds; isn't it?

25   A.   It's my opinion Mr. Barney should have been allocated

1   all of his member's percentage in 2009.

2   Q.   And you have that opinion because it should be

3   considered other net profits.  Is that why?

4   A.   No, I have that opinion because the ICAP transaction

5   should have been allocated based on member's percentage

6   interest taken together with the losses for the year.

7   Q.   But you agree with me, don't you, Mr. Pakter, that the

8   only thing you should be adding to undistributed profits

9   amounts is net profits from operations; right?

10  A.   In the schedule I have, the net profits for the year.

11  Q.   And this is the only thing you should be adding; right?

12           MR. LAYDEN:   Objection, form, your Honor.

13           THE COURT:   He is saying --

14           MR. LAYDEN:   He is saying this.  I don't know what

15  he is referring to.

16  BY MR. SPENCE:

17  Q.   Net profits from operations is the only thing you should

18  be adding with you trying to calculate the undistributed

19  profit amounts for Mr. Barney; right?

20  A.   This is a schedule of undistributed profits based on all

21  of '09 being undistributed based on his member's percentage

22  interests.

23  Q.   I understand, Mr. Pakter.  But when you're doing that

24  calculation in Schedule 15, right, when you're trying to

25  calculate undistributed profits amounts, the only thing you

1    should be adding year after year is net profits from

2    operations.  Isn't that a fact?

3    A.    That is the definition of undistributed profits in the

4    definition section of the operating agreement.

5    Q.    Correct.  And based on that definition in the operating

6    agreement, when you run that calculation, the only thing you

7    add is net profits from operations; right?

8    A.    That's what it says, and I have added the entirety of

9    '09 for purposes of this undistributed profits calculation.

10   Q.    Understood.  You didn't do that, did you, Mr. Pakter?

11   You also included what you want to categorize what your

12   conclusion is in this litigation, proceeds from sale of ICAP,

13   and that's other net profits, but your conclusion is it,

14   Mr. Pakter?

15   A.    No, you missed my conclusion at the end of the ICAP

16   section on Page 21 of my report.

17   Q.    And, again, Mr. Pakter before we get to the end, I want

18   to get to the process about how you got there.  Okay?

19   A.    Okay.

20   Q.    So if we go to Page 18, again, this is your expert

21   report in this case; correct?

22   A.    Correct.

23   Q.    This is PX-185, Page 18.  In black and white it says, "I

24   concluded that Ocean Tomo should have categorized the gain on

25   the 2009 ICAP sale transaction as other net profits."  Is

1    that your conclusion in this case, Mr. Pakter?

2    A.    It is.

3    Q.    And if those proceeds, Mr. Pakter, are categorized as

4    you concluded in this litigation as other net profits, then

5    under the operating agreement they should never be added to

6    undistributed amounts; should they?

7              MR. LAYDEN:  Objection, your Honor, asked and

8    answered.

9              THE COURT:  Overruled.

10   BY THE WITNESS:

11   A.    There is another path for those profits to be allocated,

12   and that is as firm credits through to the total, which is

13   why I made a decision to allocate 2009 in total to the

14   schedule of undistributed profits.

15   BY MR. SPENCE:

16   Q.    And you did that even though you categorized those

17   proceeds from the ICAP transaction as other net profits;

18   correct?

19   A.    No, I said in one case I'm saying they shouldn't have

20   done that.  But then I reached a final conclusion that I keep

21   on pointing you to final conclusion, which I understand you

22   keep on not wanting to go to.

23   Q.    Well, let's just go to the agreement itself, and we can

24   solve this problem very quickly.

25              MR. LAYDEN:  I hate to interrupt, but we lost the

1    realtime again.

2              THE COURT:  I just e-mailed Laura.  You can either

3    continue, or you can wait until we get it re-fixed.

4              MR. LAYDEN:  I don't want to break up Mr. Spence's

5    cross.  If you want to continue, that's fine.

6              THE COURT:  That's fine.

7              MR. LAYDEN:  Noted for the record.

8              THE COURT:  All right.  Do you have a preference?

9              MR. SPENCE:  Two-minute break, your Honor.

10             THE COURT:  All right.  Two-minute break it is.  If

11   anybody needs to leave the room, go ahead.

12        (Recess taken.)

13             THE COURT:  Okay.  Let's continue.  Sir, are you

14   ready?

15             THE WITNESS:  I am.

16             THE COURT:  Okay.  Please have a seat and we can

17   continue.

18   BY MR. SPENCE:

19   Q.  All right.  Mr. Pakter, so I told you that we would get

20   to the operating agreement.  So let's take a look at that.

21   And this is DX-052.

22             There may not be a copy in your folder, in your

23   binder, your Honor, but it's in the direct binder,

24   Mr. Pakter.

25             THE COURT:  That's fine.

```
1              MR. SPENCE:  DX-52, if I said the wrong number.
2    Thank you.  5-2.
3              THE COURT:  0-5-2?
4              MR. SPENCE:  Correct.
5              THE COURT:  Do you want to stand?
6              THE WITNESS:  Because the document is over there.
7              THE COURT:  That's fine.  He is going to put it on
8    the screen, too.
9              THE WITNESS:  I'll turn it around.
10   BY MR. SPENCE:
11   Q.   Would you like to look at a hard copy of that as well?
12   A.   I'm good.  I'm good.  I'm good.
13   Q.   If you need it, let me know.
14   A.   I'm good.
15   Q.   So what we're looking at here in DX-52 is the operating
16   agreement; correct?
17   A.   Correct.
18   Q.   This is the agreement that you replied upon for your
19   calculations to reach your final conclusion on undistributed
20   profits amounts; right?
21   A.   Correct.
22   Q.   Let's take a look at Section 9.01.
23              If we could, Dave.
24              Let's look at 9.01, where it says, "Allocations of
25   Net Profits and Net Losses."  Do you see that?
```

1    A.    I do.

2    Q.    Net profits are discussed in 9.01-A; right?

3    A.    Correct.

4    Q.    Net profits from operations.  Do you see that?

5    A.    I do.

6    Q.    So this is 9.01-A.  And if you look at the next section

7    down, this is 9.01-B.  This is where you get net losses from

8    operations; right?

9    A.    Correct.

10   Q.    And then 9.01-C, other net profits; right?

11   A.    Correct.

12   Q.    Just so we don't lose track of this, let's go back to

13   other net profits.  This is 9.01-C.  Do you agree?

14   A.    I do.

15   Q.    Now let's go to, I think it's Page 10, probably, of the

16   operating agreement.  At the top, do you see the definition

17   there for undistributed profits amounts; right?

18   A.    I do.

19   Q.    And that's what you calculated for Mr. Barney, right,

20   undistributed profits amounts?

21   A.    I did.

22   Q.    Now, that definition says, "Undistributed profits means

23   for each member an amount equal to the amount shown on the

24   books and records of the company as of January 1, 2008."

25   Right?

1    A.    Correct.

2    Q.    And that's set forth in Schedule 1.  Do you see that?

3    A.    Correct.

4    Q.    And that Schedule 1 is where you took those starting

5    numbers for Schedule 14 and 15; right?

6    A.    Correct.

7    Q.    And then it says from that starting number you do two

8    things.  No. 1, you add cumulative allocations of net profits

9    from operations.  Right?

10   A.    Correct.

11   Q.    And then, No. 2, you subtract the cumulative

12   distributions made to each such member; right?

13   A.    Correct.

14   Q.    So take the balance, add the net profits from

15   operations, subtract the distributions.  Fair enough?

16   A.    Correct.

17   Q.    And when it references net profits from operations, I'm

18   on the third line from the bottom here, it says under Section

19   9.01-A.  Do you see that?

20   A.    I do.

21   Q.    9.01-A is what we looked at before; right?  This is the

22   provision dealing with net profits from operations; right?

23   A.    I agree.

24   Q.    Now, no where in that definition do you see any

25   reference to 9.01-C; right?

1   A.   I agree.

2   Q.   That's something different altogether?

3   A.   I agree.

4   Q.   So if the ICAP proceeds are treated as other net profits

5   and they're allocated under this Section 9.01-C, they would

6   never be included in your undistributed profit amounts; would

7   they?

8   A.   But that's not what Ocean Tomo did.  They allocated it

9   as net profits from operations based according to the

10  member's percentage interest.

11  Q.   Mr. Pakter, I'm asking you for your opinion in this case

12  and your basis for arriving at that opinion, not what Ocean

13  Tomo did.  You shouldn't have put that number in there,

14  should you have?

15  A.   Oh, I absolutely should put the number.

16  Q.   Under the contract, it only provides for the addition of

17  net profits from operations under 9.01-A.  You agree with

18  that; right?

19  A.   I do, but you're glossing over my final conclusion and

20  my final allocation.

21  Q.   I understand.  You're going to walk through this with me

22  step by step.  So we're not there yet, Mr. Pakter.

23  A.   Okay.

24  Q.   That calculation is not supposed to include other net

25  profits; is it?

1   A.   The operating agreement does not include other net

2   profits in undistributed profits calculation.

3   Q.   That's exactly right.  Thank you.  And so let's go back

4   to your Schedule 15 now.  This is, again, the schedule based

5   on your Method 1.

6   A.   Correct.

7   Q.   And what I want to focus you on is this number here

8   where it says, "2009 Net Profits from Operations."  Do you

9   see that?

10  A.   I do.

11  Q.   And, Dave, if you could just highlight that line again,

12  where it shows $579,747 for Mr. Barney.  If you could just

13  highlight that whole line there.  Thank you.

14           And so that number isn't accurate if you do the

15  calculations under the operating agreement; is it,

16  Mr. Pakter?

17  A.   That's not true.

18  Q.   Mr. Pakter, why is it that you're including proceeds

19  from the ICAP transaction in your calculation for

20  undistributed profits amounts?

21  A.   I am taking the three amounts that were reflected as

22  making up the 579,747, and I am allocating each of them

23  according to the member's percentage; whereas previously,

24  only two of the three line items were treated.  And either

25  they process as member's percentage interest or they go

1    through from credit and get allocated as dividend.  So I took

2    the total of 2009, and allocated based on the member's

3    percentage interest.

4    Q.   And did that total?

5            THE COURT:  Hang on for one second, please.  Off

6    the record.

7            (Discussion had off the record.)

8            THE COURT:  Okay.  All right.  Back on the record.

9    Mr. Spence, are you ready to proceed?

10           MR. SPENCE:  I am, your Honor.

11           THE COURT:  All right.

12   BY MR. SPENCE:

13   Q.   So, Mr. Pakter, just before we took a break, you

14   mentioned something about firm credit.  Can you show me where

15   you talk about firm credit in the section of your report

16   dealing with your opinion on treatment of the ICAP proceeds?

17   And I'll direct you, if you want, to Pages 18 and 21.  These

18   are the portions of your report dealing with that issue.

19   A.   After I completed my analysis of the ICAP transaction, I

20   reached the conclusion taken as a whole that it should be

21   allocated -- that 2009, should be allocated based on member's

22   percentage interest.  I then took those three numbers, which

23   I discussed during my direct examination, and allocated the

24   third one based on a member's percentage interest as the

25   first two were.  I included the aggregate of those three

1   numbers at the member's percentage interest in my calculation

2   of undistributed profits.

3   Q.   What three numbers are you talking about?

4   A.   The three numbers that are shown on the profit

5   allocation in a document -- it's -- I don't remember the

6   bates number.  It's the document that Mr. Layden forgot to

7   raise, and in his catch-all question he said, anything else?

8   And I said, yes, one more document.

9   Q.   Does any of those -- do any of those three numbers

10  include any of the proceeds from ICAP?

11  A.   Well, they do.

12  Q.   They do?

13  A.   Yes.

14  Q.   So you're including proceeds from the sale of ICAP into

15  your calculation for undistributed profits amounts?

16  A.   I'm including all of '09 as allocatable based on

17  member's percentage interest.

18  Q.   Including the proceeds from sale of ICAP; correct?

19  A.   Including both the ICAP transaction and the loss for the

20  year taken in aggregate.

21  Q.   Okay.  And just so that we're clear, those sales from --

22  those proceeds from the ICAP transaction -- when you talk

23  about the proceeds from the ICAP transaction, those are the

24  proceeds that you concluded in your expert opinion should be

25  classified under the operating agreement as other net

1   profits; right?  That's your conclusion?

2   A.    It's my conclusion that they should have been treated as

3   other in order to be allocated to Mr. Barney based on his

4   membership percentage interest.  But if that's not done that

5   way, there was another path through the diagram to allocate

6   it through from credit to Mr. Barney, also based on the

7   member's percentage interest.  And so I resolved the issue by

8   simply allocating the year based on a member's percentage

9   interest.

10  Q.    Okay.  Now, I understand you want to say there is

11  another method for doing it, but that's not the method that

12  you used in your expert report in this case; is it, Mr.

13  Pakter?

14  A.    The method that I used was to take the year as a whole

15  times the member's percentage interest as a whole.

16  Q.    In other words, you took some portion of those proceeds

17  from the ICAP transaction, and after you concluded they

18  should be categorized as other net profits under 901-C, you,

19  nonetheless, included them in your calculation for

20  undistributed profits amount; isn't that the truth,

21  Mr. Pakter?

22  A.    For the reasons I explained, they are ultimately

23  included in 2009, as the profits for the year.

24  Q.    Okay.  Well, you're not doing it under the definition

25  provided in the operating agreement; right?

1    A.    I am following now the ultimate allocation of 2009, as

2    an undistributed profits amount.

3    Q.    I understand your conclusion, and I know you want to get

4    there.  I want to know how you get there, Mr. Pakter.

5    A.    I'm already there.  Okay.

6    Q.    I want to know how you got there, Mr. Pakter.  You

7    didn't do it under this definition provided in the operating

8    agreement; did you?

9              MR. LAYDEN:  Objection, your Honor, asked and

10   answered.

11             THE COURT:  It is getting repetitive.  You can

12   answer this last question.  Go ahead.

13   BY MR. SPENCE:

14   Q.    Yes or no, did you do it under this definition provided

15   in the operating agreement?

16   A.    I did, under the undistributed profits amount

17   calculation in the operating agreement.

18   Q.    Can you show me which provision of the operating

19   agreement you relied upon to include proceeds from sale of

20   the ICAP transaction in your calculation for undistributed

21   profits amounts?  Can you please show me that provision in

22   the operating agreement?

23   A.    Undistributed profits amount on Page 10 of the agreement

24   means an amount equal to the amount shown on the books and

25   records of the company.  I took the amounts from the books

1    and records of the company for 2009, and allocated based on

2    the member's percentage interest.

3    Q.   And did you do that pursuant to the definition provided

4    here for undistributed profits amounts on Page 10 of the

5    operating agreement?

6    A.   I did it based on that schedule which included in the

7    accounting books and records of the company the final amounts

8    of 2009, profits.

9    Q.   Mr. Pakter, with all due respect, that's not my

10   question.  Did you, or did you not, do it pursuant to the

11   definition provided here for undistributed profits amount on

12   Page 10 of the operating agreement?  It's a simple yes or no

13   question.

14           MR. LAYDEN:  Objection, asked and answered and

15   argumentative.

16           THE COURT:  Sustained.

17   BY MR. SPENCE:

18   Q.   Okay.  Mr. Pakter, let's assume that these proceeds from

19   ICAP are as you concluded, other net profits.  So now we're

20   under 901-C.  If your conclusion is correct, Mr. Pakter,

21   wouldn't you agree that those profits should not be included

22   in this calculation, as this definition is provided here?

23   Nothing here includes 901-C; does it?

24   A.   Nothing there includes 901-C.

25   Q.   So if we go back to your Schedule 15, we need to make a

1   change to it, don't we, to make it consistent with this

2   definition provided here under the operating agreement.

3   Don't you think that's fair, Mr. Pakter?

4   A.   I don't think that's fair, and I don't agree.

5   Q.   So you don't agree with me that the change you would

6   have to make if you wanted to properly calculate

7   undistributed profits under the operating agreement is that,

8   on your line here showing 2009, Net Profits from Operations,

9   and where it shows $579,747 for Mr. Barney, you don't agree

10  that you'd have to subtract that number out; right?

11  A.   No, because I'm now going to the accounting books and

12  records of the company for 2009, and allocating the pieces in

13  the books and records according to the member's percentage

14  interest.

15  Q.   Okay.  Well, let's see what happens if we do subtract

16  that number out.  Let's say that that's what you have to do

17  to make this calculation consistent with the definition

18  provided in the operating agreement.  If we subtract that

19  out, we get to different numbers here for year end 2009;

20  correct?

21  A.   If you subtract anything from the 579,000

22  mathematically, you will alter the subtotals.

23  Q.   Okay.  So if we took -- let's just start with

24  Mr. Malackowski, for example.  Where it says year end 2009,

25  undistributed profits, do you see the total there is

1   $5,000,033 -- sorry, $5,033,230; right?

2   A.   I see it.

3   Q.   And if we are going to change this so that we're not

4   including any of the ICAP proceeds as net profits from

5   operations, then we'd have to take out that $4,389,516.  Do

6   you see that?

7   A.   If you are removing all of the 2009 profits, then, yes,

8   the balance after that would go down.

9   Q.   Let me ask you this very simple question because we

10  talked about this at deposition.  But for including those

11  proceeds from the ICAP transaction as net profits from

12  operations, Ocean Tomo would have been operating at a loss

13  that year; right?

14  A.   Correct.

15  Q.   Okay.  So there wouldn't have been any amount of money

16  here if it were treated as other profits; right?  It's only

17  because we're treating it as net profits from operation that

18  you get to this $4 million figure; isn't that right?

19  A.   Two different questions.  But for the ICAP transaction,

20  2009, would have been a loss.  And if you don't include any

21  part of 2009, in this calculation, then the 5 million would

22  go down by the 4.3 million.

23  Q.   Exactly.  And that would leave you with about $600,000;

24  wouldn't it, Mr. Pakter?

25  A.   Under your scenario, yes.

1  Q.  And with Mr. Carter we could do the same thing; couldn't
2  we?
3  A.  We could.
4  Q.  So if we did this pursuant to the definition provided in
5  the operating agreement, we'd have to take Mr. Carter's
6  balance of 1.575 million for year end 2009, undistributed
7  profits.  Do you see that?
8  A.  I do.
9  Q.  And we'd have to subtract the 1.697 million; right?
10  A.  Correct.
11  Q.  And that would leave him with a number under zero;
12  correct?
13  A.  It would leave a negative, correct.
14  Q.  A negative number.  And if we did the same thing for
15  Mr. Barney, we'd have to take his $590,000 shown here as year
16  end 2009, undistributed profits.  Do you see that?
17  A.  Yes.
18  Q.  And we'd have to subtract out the $579,000; right?
19  A.  Right.
20  Q.  And that would leave you with about $10,000; wouldn't
21  it?
22  A.  It would -- it would leave you with about 20,000, yes.
23  Q.  And that number would be carried down throughout all of
24  your calculations; right?
25  A.  Correct.  Meaning nobody got any 2009 money.

1    Q.    And the effective change, if we go to Page 71, the next

2    page here, the effective change, if I subtracted out that

3    $579,000 from what you end up with here in year end 2016, do

4    you see that?

5    A.    I do.

6    Q.    If I subtracted that amount from the $898,000 shown

7    here, I would end up with about $318,000; right?

8    A.    Right, because you miraculously evaporated ICAP from the

9    accounting books and records.

10   Q.    Right.   I would have taken out the ICAP proceeds, and I

11   would have not included it in my calculation for

12   undistributed profits because I was categorizing it as other

13   net profits; right?

14   A.    And you are also assuming that there is no other way to

15   allocate it back to the members.

16   Q.    That's right.   I'm assuming under the operating

17   agreement that I have to do it the way it's said, right, the

18   way it's stated?

19   A.    You're also assuming away any other means of allocating

20   the ICAP profits back in the accounting books and records and

21   from credit or by dividend pool, or any other way.

22   Q.    And do you know any other way?   Can you point me to any

23   other provision in the operating agreement that allows you to

24   include profits that are 901-C profits in the amount of

25   undistributed profits amounts?   Are you aware of any such

1    provision in that operating agreement that allows you to do

2    that?

3    A.    Sir, if you look at Section 901, allocation of profits

4    and losses, you could always allocate the entirety of the

5    ICAP transaction to the dividend allocation portion, and it

6    gets back to being allocated to the member's percentage

7    interest.  And if you look to the comp plan, that would be a

8    firm credit basis.

9    Q.    So show me where you are in 901.

10   A.    I'm looking at 901-A, net profits from operation.  And

11   I'm looking at now all of the profits for 2009, going through

12   75 percent being allocated through to the members.

13   Q.    Right, Mr. Pakter.  And if you do that, then, in fact,

14   you're treating all of those profits for the year as net

15   profits from operations; aren't you?

16   A.    You asked me for another path, and I'm explaining to you

17   they would -- as -- as Ocean Tomo actually did.  It took all

18   of the amounts for '09, allocated them, base net profits for

19   operation, allocated to two of the three of the line items as

20   member's percentage interest, but not the third.  And you

21   asked me for another path to the answer, and I'm saying, yes,

22   there is another path; that is, all three of those line items

23   get allocated on a member's percentage interest, and that

24   would comply with the operating agreement.

25   Q.    And to get there, to go down that other path, Mr.

1    Pakter, all of those profits from the year would have to be

2    net profits from operations; isn't that right?

3    A.    In order not to make that understated accounting books

4    and records amount that you went through in your

5    hypothetical.

6    Q.    In order to adhere to the operating agreement, in fact;

7    right?

8    A.    Right.  You asked me for this other path that would be

9    possible in the operating agreement.  I believe I described

10   it.

11   Q.    Okay.  And if you wanted to go down that other path,

12   then you couldn't categorize any proceeds from sale of ICAP

13   as anything but net profits from operations; could you?

14                MR. LAYDEN:  Objection, asked and answered.

15                THE COURT:  Sustained.

16   BY MR. SPENCE:

17   Q.    Let's look at the operating agreement and talk about

18   distributions now.  And so we've talked about the change to

19   the calculation where we end up with Mr. Barney having about

20   $13,000 as undistributed profits amounts.  Let's talk about

21   how that would get distributed.  And where I want to point

22   you to is Section 9.03.  Are you there with me yet?  Let me

23   know when you get there.

24   A.    I'm pretty close to being there.  Okay.

25   Q.    Now, under 9.03, this is how distributions get made to

1  members; right?

2  A.   Correct.

3  Q.   In other words, this is how members get cash from Ocean

4  Tomo; right?

5  A.   Correct.

6  Q.   And if you look at 9.03-A, it provides that, "If money

7  is distributed."  Do you see that?

8  A.   Yes.

9  Q.   "It's distributed in such aggregate amounts and at such

10  times as determined by the board in its sole discretion."  Do

11  you see that?

12  A.   I do.

13  Q.   So you agree the board of managers have discretion to

14  decide how much is distributed in each year; right?

15  A.   That's a layperson's reading of this.  I'm not making a

16  legal conclusion.

17  Q.   Well, when you wrote your expert report, did you assume

18  that that provision would give the board discretion to decide

19  how much could be distributed each year?

20         MR. LAYDEN:  Your Honor, I'm just going to object

21  on the basis it's mischaracterizing the document.

22         THE COURT:  Well, he can answer the question, if he

23  made such as an assumption.  Overruled.

24  BY THE WITNESS:

25  A.   The assumption that I made regarding distributions was

1  to take the actual distributions actually made in my

2  reconstruction.  And, yes, I understand that the operating

3  agreement talks about discretion.  The application of that

4  discretion is something that I believe to be a legal

5  conclusion, not something that I opine on.

6  Q.   Do you also agree that, if you look at 9.03, it says,

7  that money is distributed, sorry, "If money is distributed,

8  it goes first to the members having a positive undistributed

9  profits amount."  Do you see that?

10 A.   I do.

11 Q.   "Which distributions for the avoidance of doubt shall be

12 made on a pro rata basis."  Do you see that?

13 A.   I do.

14 Q.   And that's pro rata in proportion, again, to the

15 positive undistributed profits amounts.  Do you see that?

16 A.   I do.

17 Q.   Not pro rata in accordance with any sort of ownership at

18 Ocean Tomo; right?

19          MR. LAYDEN:  Your Honor, I'm just going to object

20 on the basis there was an objection made by Mr. Spence during

21 direct to Mr. Pakter testifying about distributions.  If he

22 is opening the door, I'll certainly go back into this on

23 redirect.  But I just want to make my position clear.  I

24 think he has opened the door by going into this topic, after

25 having made the objection and me having withdrawn my question

1  based on his objection.

2          THE COURT:  I do recall that was -- I do recall

3  that objection during direct.  Go ahead and do distributions

4  at your peril, that's fine.

5  BY MR. SPENCE:

6  Q.   So that means after the tax distributions in 903B, a

7  member with a positive undistributed profit amount would

8  always receive distributions before a member who doesn't have

9  a positive undistributed profits amount; right?

10 A.   One more time, please.

11 Q.   Sure.  So under 903B -- and maybe you didn't rely on

12 this at all.  Did you rely on 903B for your expert report in

13 any way?

14 A.   Well, and I don't know what you mean by rely.  In my

15 calculations, I used the actual distributions made to the

16 members in my reconstruction.

17 Q.   Did you consider whether those actual distributions were

18 made pursuant to the operating agreement?

19 A.   I did not re-compute whether those distributions as

20 historically made complied or did not comply with 9.03 of the

21 operating agreement.

22 Q.   Okay.  So if I understood you correctly, then all you

23 really did was look at the actual distributions made by Ocean

24 Tomo; is that right?

25 A.   My reconstruction only takes into account the actual

1    distributions made.

2    Q.   Okay.  Let's move on, then.  We won't go into that topic

3    at all.  Let's change topics now, and I want to ask you about

4    the audit that you performed, if I could.

5            Now, there was a royalty audit that you testified

6    about having conducted on behalf of PatentRatings; right?

7    A.   That's correct.

8    Q.   And you were retained in 2002, 2012, rather?

9    A.   Correct.

10   Q.   And in 2012, PatentRatings hired you to do royalty audit

11   of Ocean Tomo's royalties owed to PatentRatings; right?

12   A.   More specifically Mr. Layden engaged me on behalf of

13   PatentRatings.

14   Q.   Thank you for the clarification.  And that engagement

15   resulted in you issuing a preliminary audit report on May 14,

16   2014; right?

17   A.   That's correct.

18   Q.   And I understand that there were two different phases to

19   your audit.  Is that fair?

20   A.   That's correct.

21   Q.   The first phase was really looking at whether the

22   payments had been made correctly, based on a review of the

23   financial records.  Is that an accurate description?

24   A.   The accuracy of the reported payments was the first

25   phase, yes.

1    Q.    So really focused on whether or not Ocean Tomo paid the

2    right amount of money?

3    A.    And whether I could trace that reported amount of money

4    back through the accounting books and records.

5    Q.    Okay.  And then the second phase you really got into

6    looking more at the issue of whether or not Ocean Tomo had

7    paid on all the engagements that it should have paid on; is

8    that right?

9    A.    I was looking for the completeness of revenue assertion.

10   Q.    Okay.  And Phase 2, rather than focus on those financial

11   documents that you talked about, your focus was really on --

12   at that point on the sampling of client engagements at Ocean

13   Tomo; right?

14   A.    I was engaged in sampling under protest.

15            THE COURT:  So it's clear, the issue on the audit

16   isn't necessarily the conclusion he reached as opposed to

17   whether or not he got the records that Mr. Barney thinks he

18   should have gotten under the license agreement; is that

19   correct?

20            MR. SPENCE:  That's correct, your Honor.

21            MR. LAYDEN:  Well, your Honor, I think that's

22   right.  Although, I will note that in the past, Ocean Tomo

23   has argued that the audit showed there was very little

24   royalties owed.  I think we moved past that point.

25            THE COURT:  I think we have because there is an

1   expert report on that, and I'm assuming there would be

2   contrary expert testimony on that issue.  But I don't know

3   that we need to focus on the -- unless you want to -- on the

4   numbers derived from that audit as opposed to the -- I

5   thought the only thing they're raising on the defense side is

6   we didn't get everything we're supposed to get.

7           MR. SPENCE:  And that's what I'm about to get into,

8   your Honor.  Exactly that point.

9           THE COURT:  Very good.  Okay.  Fair enough.  Sorry

10  to jump the gun.

11          MR. SPENCE:  No problem.

12  BY MR. SPENCE:

13  Q.   So let's look at some of the correspondence related to

14  that audit, if we could.

15          Let's start with Plaintiff's Exhibit 801.  And,

16  again, we will pull these up on the screen.  If you need to

17  look at them in paper form, please do so, but we will try to

18  move through this pretty quickly.

19          Do you recognize Plaintiff's Exhibit 801 as an

20  e-mail thread?

21  A.   Would it be in the binder in front of me?

22  Q.   It should be.  Would you like to look at the paper

23  version of it?

24  A.   Please.

25          THE COURT:  It's in Volume 2.

1   BY MR. SPENCE:

2   Q.   Would you like me to help you?

3   A.   Yes, please.  802?

4   Q.   801, please.

5   A.   Okay.

6   Q.   So do you recognize this as an e-mail thread between you

7   and Ocean Tomo's general counsel, Mr. Lutzker?

8   A.   It is one of many, yes.

9   Q.   And the last e-mail on that thread I think is dated

10   September 10th of 2012; right?

11   A.   Correct.

12   Q.   And if we scroll down, I think it's to page -- do you

13   see the bates number on the bottom there, OTE-408165.  Do you

14   see that?

15   A.   I do.

16   Q.   There, there is an e-mail from you to Mr. Lutzker, dated

17   July 26, 2012; right?

18   A.   Correct.

19   Q.   And that continues on to the next page, I think.  It

20   looks like it ends there.  In that e-mail, it says, "As you

21   know, Gould & Pakter Associates LLC was on site at Ocean Tomo

22   during the week of June 11, 2012."  Do you see that?

23   A.   I do.

24   Q.   And you continue to say, "We performed certain financial

25   analyses directed towards verifying royalties due

1  PatentRatings."  Do you see that?

2  A.   I do.

3  Q.   Then you say, "At that time you provided us with the

4  following categories of information and/or documentation."

5  Right?

6  A.   Correct.

7  Q.   And then you go on to list these five categories of

8  information?

9  A.   Correct.

10  Q.   Do you see that?  And four of those categories relate to

11  the documents that you really relied upon to provide your

12  opinion in Phase 1 of the audit; right?

13  A.   In part, yes.  They would be used in the second phase as

14  well.

15  Q.   Sure.  And so Category 1 is really the quarterly royalty

16  reports that you ended up relying upon; right?

17  A.   Correct.

18  Q.   And then Category B is the quarterly revenue reports

19  that you ended up relying upon; right?

20  A.   It doesn't say that exactly.

21  Q.   It's essentially the income ledger that you were relying

22  upon; right?

23  A.   That's true.

24  Q.   And then in Category C, this is the customer balance

25  detail reports that you are relying upon; right?

1   A.   That's true.

2   Q.   And that's -- the accounts receivable would be another

3   way of saying that.  Is that fair?

4   A.   That's fair.

5   Q.   And then finally, in Category D, it's the invoices

6   themselves; right?

7   A.   That's fair.

8   Q.   And then you next write, "Since June 11, 2012, Gould &

9   Pakter has analyzed that data in some detail.  We've

10  concluded that, but for a few minor items, we were able to

11  follow the audit trail and reconcile from Category A data to

12  Category B data."  Do you see that?

13  A.   I do.

14  Q.   And then you go on to say, "However, we're unable to

15  follow the audit trail of and reconcile from Category B data

16  to Category C data to Category D data."  Do you see that?

17  A.   I do.

18  Q.   And that refers to the way in which you did the first

19  part of this audit; right?

20  A.   It refers to the first phase of the audit, yes.

21  Q.   And during that first phase, you were essentially trying

22  to track from the royalty reports to the revenue to the

23  balance detail, the accounts receivable, and to the invoices;

24  right?

25  A.   Correct.

1   Q.   And then in this e-mail you say that you were able to
2   follow the trail from the PatentRatings royalty statements to
3   Ocean Tomo's ledger; right?
4   A.   I was able to go from A to B.
5   Q.   From A to B; correct?
6   A.   Correct.
7   Q.   But you couldn't follow the trail from the ledger, which
8   is B, to the customer balance detail sheet or from customer
9   balance detail sheet to Ocean Tomo's invoices.  Is that what
10  that says?
11  A.   Correct.  The accounting system broke down at that
12  point.
13  Q.   So, in other words, you could go from A to B, but you
14  couldn't go from B to C or from C to D?
15  A.   That's correct.
16  Q.   And now let's look at OTE-408164 is the next page, going
17  forward.  And here there is an e-mail from Mr. Lutzker to you
18  dated August 9, 2012; right?
19  A.   Correct.
20  Q.   And he explains that he provides -- he explains, I
21  guess, and he provides a sample of documents on how to
22  reconcile the documents in Category, B, C, and D; right?
23  A.   He understands -- yes, what he thought would allow a
24  reconciliation of B, C and D.
25  Q.   He is trying to help you to do that tracing that you

1   earlier told him you weren't able to do; right?

2   A.   He was endeavoring to meet his responsibilities to show

3   a solid order trail within Ocean Tomo's accounting books and

4   records.

5   Q.   So you agree at this point he is assisting you to do the

6   audit; is that right?

7   A.   At this point, he is doing what he was obligated to do.

8   Q.   He is cooperating with you; right, Mr. Pakter?

9   A.   At this point, he was providing information which didn't

10  pan out to be able to reconcile both by my staff who spent

11  the time, and when I asked Mr. Lutzker to have his staff do

12  it, they were unable to do it either.

13  Q.   Okay.  Well, we'll flip through that correspondence and

14  we'll get to that.

15       So in addition to offering some documents and

16  offering an explanation, he also offers a procedure for

17  verifying that you have everything you need; right?

18  A.   He does offer an approach.

19  Q.   And he says, specifically, "We will provide you with a

20  list of all billable matters, other than auction, by year,

21  for 2007 to 2011."  Do you see that?

22  A.   I see.

23  Q.   And he goes on to say, "Subject to dealing with any

24  confidentiality and/or protective order issues, we will

25  provide you with reasonable access to client deliverables and

1    other materials reasonably necessary for your verification

2    for a reasonable sample set drawn from that list."  Do you

3    see that?

4    A.    I do.

5    Q.    And if we go to the e-mail just before that, you end up

6    responding to him on September 5th; right?

7    A.    I do.

8    Q.    And in that e-mail, you say that you're unable to

9    reconcile other transactions using the same method; right?

10   A.    I was unable to reconcile Categories B, C and D, and nor

11   was Mr. Lutzker, or his accounting staff.

12   Q.    Right.  You also thank him for the explanation that he

13   provided; right?

14   A.    We endeavored to be cordial during the process.

15   Q.    And Ocean Tomo was always cordial during this process;

16   right?

17   A.    Cordialities doesn't mean responsiveness or accuracy or

18   providing all that you're supposed to.

19   Q.    Understand your position, Mr. Pakter, but they were

20   cordial; weren't they?

21   A.    I hope we were cordial during the process.

22   Q.    And you also said that the documents that you provided

23   actually helped to reconcile some of these categories for at

24   least one of the issues you were having; right?

25   A.    There was a little bit of help, yes.

1    Q.    And then Mr. Lutzker responds to that e-mail on

2    September 10th of 2012; right?

3    A.    He does.

4    Q.    And, again, he offers to provide the reconciliations of

5    Categories B, C and D for you.  Do you see that?

6    A.    He is happy to consider it.

7    Q.    And he is also considering providing the listing of

8    matters for your sampling; right?

9    A.    Mr. Lutzker was always prepared to consider whatever I

10   wrote.

11   Q.    And not just consider, actually sent you documents from

12   time to time; didn't he?

13            MR. LAYDEN:  Objection, argumentative, your Honor.

14            THE COURT:  Overruled.  But could you put up on the

15   screen for my benefit the exact section of the license

16   agreement that deals with the requirement of cooperation on

17   an audit?  Is there -- I assume there is such a section, and

18   I'd like to have it up there, unless this is an amorphous

19   issue of cordiality and cooperation.  But I'm hoping --

20            MR. LAYDEN:  Your Honor?

21            THE COURT:  -- it's something specific.

22            MR. LAYDEN:  I'm sorry to interrupt, your Honor.  I

23   don't know if you have the exhibit number handy.  It's DX-3.

24   It's the license agreement, if it's helpful to pull that up.

25            THE COURT:  Yeah, put it up on the screen and then

1  go to the section that deals with -- it will be a good way

2  to -- all right.  This is Exhibit 3, Defense 3; right?

3           MR. LAYDEN:  That's three, yes, your Honor.

4           THE COURT:  It's section what?

5           MR. SPENCE:  4.5.  I think it's C; is that right?

6           MR. LAYDEN:  Yes, that's right.

7           THE COURT:  All right.  Just give me a moment to

8  read it.  So it is -- the operative language is, "Licensee

9  agrees to permit licensor to inspect or audit licensee's

10 records from time to time provided reasonable notice must be

11 given.  And it has got to be done during normal business

12 hours and only to the extent necessary to determine or verify

13 any royalty payments required hereunder; and agrees not to

14 conduct more than one inspection or audit each calendar year.

15          How do you suggest I'm supposed to judge whether or

16 not Ocean Tomo -- what's the standard?  Because it seems as

17 if there is just an agreement to permit audit and inspection

18 of records from time to time.  I'm not -- I'm assuming you're

19 not quibbling about reasonable notice or number of audits.  I

20 hope you're not.  If you are, then we have even more issues.

21 But what is the standard by which I ought to be judging the

22 fulsomeness of Ocean Tomo's response to the requests of

23 Mr. Packer?

24          MR. LAYDEN:  Your Honor, I would submit that the

25 argument we made, and I think what the standard should be, is

1    whether we were allowed to inspect or audit the records.  And

2    the point that we have tried to make through the evidence,

3    and I think what the evidence will show, is that there were

4    records that we requested to inspect in audit that we were

5    not provided, and that was the breach of that provision.

6          THE COURT:  And what if Ocean Tomo didn't think the

7    records you were requesting were -- in their judgment were

8    necessary for your auditor to do what he was trying to do?

9    This just says, inspect or audit records from time to time.

10   Nothing about in the discretion of the licensor or the

11   discretion of the licensee.  So your position is he needed

12   more, it was his testimony, he needed more than he had, and

13   that Ocean Tomo should have given him more records than they

14   did.

15         MR. LAYDEN:  And, your Honor, the larger point here

16   and the way this fits into the rest of the case is that this

17   was just -- this was something Mr. Pakter was trying to do in

18   connection with the audit right, and what we believe the

19   discovery issue has shown is that in fact, you know, the

20   reason these records weren't provided is because they

21   actually showed a lot of royalties were owing.  So it fits

22   into the larger pattern of royalties being owed, and we think

23   that that is -- so, your Honor, we're not saying that --

24         THE COURT:  All right.  I'll give Mr. Spence a

25   chance to respond.  But your claim is you, Ocean Tomo, owe

1    me, Jonathan Barney, some royalties.

2              MR. LAYDEN:  Actually PatentRatings, your Honor,

3    but, yes.

4              THE COURT:  Or PatentRatings owe some royalties.

5              MR. LAYDEN:  Yes.  Correct.

6              THE COURT:  This is just flavor to the argument

7    that they didn't give me enough records so I can determine.

8    It's -- you're arguing this is circumstantial evidence that

9    they didn't pay the correct amount of royalties to

10   PatentRatings.

11             MR. LAYDEN:  It's partly that, your Honor.  It's

12   also there we are, as you know, we're seeking termination of

13   the license agreement under the declaratory relief, and this

14   is one of the breaches that supports that.

15             THE COURT:  This is an enumerated breach that

16   allows for --

17             MR. SPENCE:  Not just a breach, they allege it's a

18   material breach, your Honor.

19             MR. LAYDEN:  In the notice to breach, your Honor,

20   it is.  And then there is also, part of the damages we are

21   seeking is the cost of the audit, small part, but it's the

22   cost of the audit.  So that's how it fits in, your Honor.

23             THE COURT:  Okay.  And Mr. Spence?

24             MR. SPENCE:  So unfortunately, with that position,

25   we're forced to go through a series of correspondence because

1    what this correspondence shows is that this preliminary

2    audit, as they call it, took place over about two years and

3    he --

4           THE COURT:  But my -- I agree, Mr. Spence, and here

5    is the question.  Are there any of the exhibits you intend to

6    use that are different than the ones already used by --

7           MR. SPENCE:  Yes.

8           THE COURT:  -- the defense?

9           MR. SPENCE:  They show our reasonableness because

10   they've obviously cherry-picked ones to try to show that we

11   were somehow not providing documents.  And the reality is the

12   opposite is true.  No matter what we provided, they wanted

13   more.  And it got to the point where you get to the end of

14   this correspondence, the very last e-mail from Mr. Pakter is,

15   not only do I want everything related to Issue A, but I want

16   everything to prove a negative.  So, at that point, he

17   essentially wants all of Ocean Tomo's documents.  And we

18   don't think that's reasonable, nor is it a material breach to

19   deny that.

20          THE COURT:  All right.  Can't, though, I simply

21   take the stack of e-mails that defense has used and the

22   additional ones you want to use, some of which are common,

23   but you have additional ones, read them myself, make a

24   determination on that, as to -- read them from start to

25   finish, determine whether or not one side -- PatentRatings is

1    being picky or you're being obstructive?

2            MR. SPENCE:  Absolutely, your Honor.

3            THE COURT:  And do that without having to basically

4    have a witness read e-mails.

5            MR. SPENCE:  I would invite and appreciate that.

6            THE COURT:  And then whatever inference, whether

7    that's -- whether I find there that's a material breach and

8    ends up being a basis to cancel the license agreement, I can

9    make that determination based on arguments.  I can use it as

10   possible circumstantial evidence to say you didn't pay

11   PatentRatings what they should have paid, if that's going to

12   be the argument.  And I just don't see, if Mr. Lutzker, who

13   is -- sounds like the person on the opposite end of most of

14   these e-mails isn't going to testify, all we really have

15   is -- I can read these e-mails as well as anybody.  Well, as

16   well as some people.

17           MR. LAYDEN:  I think it's your reading that's going

18   to matter, whether it's better than somebody else's or not,

19   but.

20           THE COURT:  But, anyway, Mr. Spence, you know, I'm

21   just thinking that may be a way to get around this issue

22   because we're not even there to the big royalty issue, which

23   is a complicated issue, as I listened to the testimony

24   yesterday.  And I fear that this may be an area you can rely

25   on me just to look it over and then make your arguments.

1            MR. SPENCE:  Absolutely, your Honor.

2            THE COURT:  All right.  If that's acceptable, why

3    don't you move on to the royalty issues itself.  At some

4    point, move to admit the additional exhibits, you don't have

5    to do it now, but move to admit the additional exhibits, and

6    then both sides can tell me, look at the stack, and that will

7    be the audit -- or the audit issue that I can look at.  Does

8    that sound reasonable to you?

9            MR. SPENCE:  It does sound reasonable, your Honor.

10           THE COURT:  How about the defense?

11           MR. LAYDEN:  It's certainly fine, your Honor.  You

12   know, if Mr. Spence wants to either himself or have one of

13   his colleagues just send me a list of the exhibits they seek

14   to admit, I assume they're all e-mails between Mr. Lutzker

15   and Mr. -- I'm sure I won't have a problem, but I will

16   certainly let him know.

17           THE COURT:  Good enough.

18           MR. SPENCE:  There are also very small number of

19   deposition designations on this point.  We can just designate

20   and provide those to your Honor.

21           THE COURT:  That's fine.  This seems like a good

22   way to handle this particular issue.  All right.  Please

23   proceed.

24           MR. SPENCE:  If I could take a short break, your

25   Honor?

1    THE COURT:  All right.  Let's take a ten-minute

2  break so you can reorganize and launch right into what I

3  hope, I assume, is your royalty cross-examination.

4    MR. SPENCE:  Correct.  Yes.

5    THE COURT:  Okay.  Ten minutes, and we will be back

6  to do that.

7    (Recess taken from 3:38 PM to 3:50 PM.)

8  BY MR. SPENCE:

9  Q.   Mr. Pakter, let's go back to -- let's go to your report,

10 which is DX-609, please.  Do you need help with that, or do

11 you have it out?

12 A.   I don't have it.  Can you tell me if it's in Volume 1 or

13 2?

14 Q.   DX-609.

15 A.   Okay.  I'm there.

16 Q.   Okay.  So this is now the second of two reports that you

17 provided in this litigation; right?

18 A.   Correct.

19 Q.   And if you would turn with me to Page 17, here you

20 provide a number of definitions; right?

21 A.   Correct.

22 Q.   First you provide a definition for external data sales.

23 Do you see that?

24 A.   I do.

25 Q.   And then below that there is a definition for external

1  data usage; right?

2  A.   Correct.

3  Q.   And both of those definitions come from the 2007

4  amendment; right?

5  A.   That is correct.

6  Q.   Now, right before you provide those definitions, you

7  write above, quote, "My basis for determining whether the

8  royalty rate was 25 percent for external data sales or

9  13.25 percent for external data usage was based on my reading

10  and understanding of the corresponding definitions provided

11  in Section 4.3 of the amendment; right?

12  A.   Correct.

13  Q.   And then you provide those definitions below?

14  A.   Correct.

15  Q.   And here you say, "External data sales means any sale of

16  PatentRatings analysis by licensee."  That's Ocean Tomo;

17  right?

18  A.   Yes.

19  Q.   "That are actually delivered."  Do you see that?

20  A.   Yes.

21  Q.   "To licensee's external clients or customers."  Right?

22  A.   Correct.

23  Q.   And, similarly, if you look below that, you say, "An

24  external data usage means any usage or inclusion of

25  PatentRatings analysis or any derivatives thereof by licensee

1   which facilitates the provision of information of reports,

2   again, actually delivered to Ocean Tomo's external clients or

3   customers."  Right?

4   A.   Yes.

5   Q.   That phrase, "actually delivered to licensee's external

6   clients or customers," is present in both definitions;

7   correct?

8   A.   It is.

9   Q.   And so that you would agree with me, then, if nothing is

10  actually delivered to Ocean Tomo's customers or clients, then

11  it wouldn't be an external data sale or an external data

12  usage; right?

13  A.   And I believe that is ultimately a legal conclusion.

14           THE COURT:  Well, did you include -- did you

15  analyze, when you determined the deficiencies in the

16  royalties, was it part of your analysis on whether or not any

17  of these work products of Ocean Tomo were actually delivered

18  to clients?

19           THE WITNESS:  I did take into account delivered to

20  clients.  But due to the incomplete nature of the production,

21  I also assumed that if a customer paid for an engagement that

22  they received delivery of products or advice or documents.

23           THE COURT:  Okay.  All right.  Proceed.  Please

24  proceed.

25  BY MR. SPENCE:

1    Q.   When -- in fact, Mr. Pakter, you gave deposition

2    previously in this case; correct?

3    A.   I did.

4    Q.   And you testified under oath, and at that deposition,

5    did I ask you this question and did you give this answer?

6         Question:  "Let's go back to the idea of external

7    data sales.  Is it your understanding that to be an external

8    sale of data you have to actually have a PatentRatings report

9    subscription, license, or similar report actually delivered

10   to the Ocean Tomo client?"

11        Answer:  "It would appear to me that actual

12   delivery is an element of the definition of external data

13   sales, as I read that as an accountant.  But it's not a legal

14   conclusion."

15        Question:  "So, in other words, your understanding,

16   as an accountant, is that if Ocean Tomo were to actually

17   deliver an IPQ score to an Ocean Tomo client, that would be,

18   in your understanding, an external data sale; is that right?"

19        Answer:  "An actual delivery of a report, including

20   an IPQ score would, from an accounting point of view, appear

21   to me to meet the standard of an external data sale."

22        You were asked those questions and you gave those

23   answers; right, Mr. Pakter?

24        MR. LAYDEN:  Your Honor, I'm going to object.  I

25   don't have a page, a line he is referring to.  I think it's

1    improper impeachment.  But I just note that for the record.

2               THE COURT:  What?

3               MR. LAYDEN:  I don't know what he is reading from.

4    He hasn't given a page, a line, I don't have it in front of

5    me, and it's improper impeachment anyway.  But I will just

6    note that for the record.  Mr. Pakter can certainly answer

7    the question.

8               MR. SPENCE:  I'm trying to streamline the process,

9    your Honor, but I'm happy to go through a formal impeachment,

10   if you'd like.

11              THE COURT:  Well, you should always give him a page

12   and line.  You don't need to do it here.  I'm assuming you

13   read it accurately.  But for counsel's sake so he can make

14   sure it's in context, the next impeachment you do, give him a

15   line and a page.

16              Okay.  Do you recall saying that?

17              THE WITNESS:  I do.

18              THE COURT:  Okay.

19   BY MR. SPENCE:

20   Q.   And also in these definitions you see that in the

21   definition for external data sales it says, "for the

22   avoidance of doubt..."  do you see that?

23   A.   I do.

24   Q.   "External data sales shall not mean the internal use of

25   PatentRatings analysis by Ocean Tomo, even if such internal

1   use facilitates the provision or sale of consulting, auction,

2   or other services or products to Ocean Tomo's clients or

3   customers."  Do you see that?

4   A.   I do.

5   Q.   And then also for external data usage, it says, "For

6   avoidance of doubt, external data usage shall not mean the

7   internal use of PatentRatings analysis, such as currently

8   used by Ocean Tomo as part of its services known as expert

9   services, appraisals, investments, risk management, and/or

10  corporate finance."  Do you see that?

11  A.   You have read it correctly.

12  Q.   And both of those definitions include internal use;

13  right?

14  A.   I don't understand that question.

15  Q.   Both of those definitions include the term internal use;

16  right?

17           MR. LAYDEN:  Objection, form, your Honor.

18           THE COURT:  The words "internal use" are in both.

19  I acknowledge that.

20  BY MR. SPENCE:

21  Q.   So you understand, don't you, Mr. Pakter, that if it's

22  an internal use of PatentRatings data or analysis, then it

23  isn't royalty-bearing; right?

24  A.   So that is ultimately a legal conclusion for the court

25  to reach.  I don't believe that I have any calculation which

1  refers to internal use in my calculations.

2  Q.   All right.  So, in other words, your understanding as an

3  accountant is that an internal use isn't royalty-bearing; is

4  that fair?

5  A.   It's my understanding as an accountant that an Ocean

6  Tomo customer does not pay Ocean Tomo for Ocean Tomo's

7  internal use of PatentRatings analysis.

8  Q.   And when you attempted to calculate the royalties owing

9  from Ocean Tomo to PatentRatings, if there was anything that

10  was an internal use, you didn't include a royalty on that;

11  right?

12  A.   I can only tell you I have based it on the revenue

13  actually collected by Ocean Tomo, and I'm assuming that no

14  customer of Ocean Tomo paid Ocean Tomo for its internal use

15  of PatentRatings analysis.

16  Q.   Right.  But you reviewed a variety of engagement letters

17  in your work; right?

18  A.   I reviewed a significant amount of Ocean Tomo engagement

19  letters to its customers, yes.

20  Q.   And you reviewed a significant number of client

21  deliverables; isn't that right?

22  A.   I reviewed thousands of pages of clients' deliverables

23  from Ocean Tomo to its customers.

24  Q.   And invoices; right?

25  A.   And invoices and payments and revenues from those

1  customers paying Ocean Tomo, yes.

2  Q.  And a significant number of other associated documents

3  associated to those engagements to those client deliverables;

4  right?

5  A.  Yes.

6  Q.  And so when you did your review of those, if you, as an

7  accountant, determined that something was an internal use of

8  PatentRatings information, then you did not apply royalty;

9  did you?

10  A.  I only applied a royalty to revenue received from an

11  external customer.  I don't see how the external customer

12  would be paying Ocean Tomo for Ocean Tomo's internal use.

13  Q.  Okay.  So, in other words, when you prepared your

14  opinion, you did work to determine whether or not Ocean Tomo

15  actually delivered PatentRatings analysis to a customer;

16  right?

17  A.  I did work to determine the revenues that Ocean Tomo

18  received from its external customers, determined whether they

19  were royalty-bearing and the royalty rate.

20  Q.  And to determine whether or not something was

21  royalty-bearing, Mr. Pakter, you did work to determine

22  whether Ocean Tomo actually delivered PatentRatings analysis

23  to a customer; right?

24  A.  Part of my work considered the delivery of a document

25  because so much of the document production was incomplete or

1   drafts.  I also had to rely on the collection of revenue from

2   an external Ocean Tomo client.

3   Q.   Okay.  And to determine whether or not Ocean Tomo

4   actually delivered PatentRatings scores, reports or other

5   products to an Ocean Tomo customer, you base that on an

6   accountant's read of the information and/or documents

7   assembled by and/or provided to you; right?

8   A.   Including but not limited to the revenue proceeds from

9   those engagements.

10  Q.   And, furthermore, if the record indicated that a

11  document was addressed to an Ocean Tomo client, then you

12  consider that to be reasonably appropriate to regard it as a

13  delivery; right?

14  A.   And payment was received.

15  Q.   All right.  So, in other words, you were looking to see

16  if a record indicated that a document was addressed to an

17  Ocean Tomo client; right?

18  A.   And payment was received.

19  Q.   And then you were looking to see if there was an e-mail

20  interchange between Ocean Tomo client and Ocean Tomo

21  personnel; right?

22  A.   And payment was received.

23  Q.   And you assume that if a customer paid, then a product

24  was actually delivered; right?

25  A.   From an accountant's point of view, I assumed payment

1  equated delivery of goods and services.

2  Q.   Okay.  So those were the three things you did as you

3  were trying to determine whether or not a royalty was owed.

4  You looked to see was something actually delivered, you

5  looked to see was there an e-mail interchange between Ocean

6  Tomo and a client, and you looked to see whether any

7  customers had paid; right?

8  A.   You're picking three items out of a very much longer

9  process that I went through.  It's almost like you started in

10 the middle.  So it's very difficult for me to answer that

11 question.

12 Q.   Well, your first step -- I'm sorry, go ahead.  I didn't

13 mean to cut you off.

14 A.   I had a process for this.  My process included reviewing

15 the amendment to the license agreement.  It included

16 reviewing descriptions of PatentRatings analysis and

17 PatentRatings tool.  It included collecting a body of

18 knowledge, obtaining understanding of what a deliverable was.

19 Some document sets were different from other document sets,

20 and I looked at the totality of the document set.  I learned

21 what the process was.  I learned how Ocean Tomo described it,

22 and I looked at the revenues collected.  As part of that

23 process, yes, I looked at e-mails, engagement letters,

24 deliverables, some complete and acknowledged by customers,

25 some in draft.

1    Q.    Okay.  When you saw those documents and you saw a

2    reference to PatentRatings in some way, then that focused

3    your investigation further; right?

4    A.    The appearance of PatentRatings tools and/or

5    PatentRatings analysis informed my judgment whether the

6    engagement was royalty-bearing and the rates to be applied to

7    the revenues.

8    Q.    Okay.  So you made this initial determination that there

9    is some indicia on these documents related to PatentRatings.

10    Is that fair?

11    A.    That was part of my process.  That's fair.

12    Q.    And then once you made that initial determination that

13    there is some indicia in these documents, then you looked

14    further to see were those documents actually delivered to an

15    Ocean Tomo customer, or client; right?

16    A.    Including looking to see if a payment was made.

17    Q.    Correct.  And also including to see if there was an

18    exchange of e-mail between Ocean Tomo and the client in that

19    engagement; right?

20    A.    That was a factor, but I gave greater weight to the

21    collection of revenue.

22    Q.    Okay.  You didn't ask any Ocean Tomo customers or

23    clients whether they had actually used any PatentRatings

24    product or service; right?

25    A.    I did not interview any Ocean Tomo customers.

1   Q.   And you don't remember asking Mr. Barney if a

2   PatentRatings analysis had actually been delivered to an

3   Ocean Tomo client; right?

4   A.   From time to time Mr. Barney was consulted about aspects

5   of the body of knowledge relating to whether an engagement

6   was royalty-bearing or not.

7   Q.   Did you ever testify differently?

8   A.   To the best of my knowledge and belief, I would have

9   described to you the same process during my deposition as I'm

10  testifying to the court today.

11  Q.   If we could pull up Mr. Pakter's May 19, 2017,

12  deposition, Page 203, please.

13          If you look with me at Line 10.  Do you see that,

14  Mr. Pakter?

15  A.   Yes.

16  Q.   Do you remember me asking you this question and you gave

17  this answer?

18          Question:  "Did you ask Mr. Barney whether or not a

19  PatentRatings analysis -- "

20          THE COURT:  I think the wrong one is up on the

21  screen.

22  BY MR. SPENCE:

23  Q.   Sorry, this should be the June 6, 2017, deposition.  I

24  gave you the wrong date.

25          Thank you.  Lines 10 to 14.

1    Mr. Pakter, did I ask you this question, and did

2    you give this answer?

3         Question:  "Did you ask Mr. Barney whether or not a

4    PatentRatings analysis had been delivered by Ocean Tomo to

5    one of its customers or clients?"

6         Answer:  "I don't recall one way or the other, as I

7    sit here today."

8         Did I ask you that question, did you give that

9    answer?

10   A.   Yes, you asked it, and, yes, I gave that answer.

11   Q.   And so other than looking at the documents that we just

12   discussed, you didn't do anything to verify whether or not

13   PatentRatings analysis was actually delivered to the

14   customer; did you?

15        MR. LAYDEN:  Objection.  Mischaracterizes his

16   testimony.

17        THE COURT:  Sustained.

18   BY MR. SPENCE:

19   Q.   For external data usage, you considered a consulting or

20   a valuation report that indicated that Ocean Tomo had used

21   PatentRatings product in some way to be an external data

22   usage; didn't you?

23   A.   I didn't follow that question.

24        MR. LAYDEN:  Objection, form, your Honor.

25        THE COURT:  The witness says he needs to have the

1  question rephrased.

2  BY MR. SPENCE:

3  Q.   For external data usage, you considered a consulting or

4  a valuation report that indicated that Ocean Tomo had used

5  PatentRatings analysis in some way as an external data usage;

6  right?

7                MR. LAYDEN:  Objection, form.

8                THE COURT:  Overruled.  If the witness understands.

9                THE WITNESS:  I don't, your Honor.

10               THE COURT:  Okay.  It looks like you have to

11  rephrase it, Mr. Spence, or break it up; or if you're leading

12  to an answer in a deposition, maybe just go right to the

13  deposition.

14  BY MR. SPENCE:

15  Q.   So you considered, Mr. Pakter, an example of external

16  data usage to be where Ocean Tomo personnel provides a

17  consulting or valuation report to one of its customers or

18  clients and reflects within the documents that it used

19  PatentRatings analysis as part of its work; right?

20  A.   I'm sorry, I don't understand your question.

21  Q.   What don't you understand about it?

22  A.   You said external data sales?

23  Q.   Sure.  With respect to external data -- if I did, I

24  misspoke.  With respect to external data usage, you provided

25  as an example of external data usage, where Ocean Tomo

1   personnel provides a consulting or valuation report to one of

2   its customers or clients and reflected within the document

3   that it used PatentRatings analysis as part of its work;

4   right.

5   A.   I can see having said that, yes.

6   Q.   That was one of the examples that you considered to be

7   external data usage; right?

8   A.   Yes, there is a consulting report by Ocean Tomo and it

9   uses PatentRatings analysis.  That is an example.

10  Q.   And so when you did your analysis for determining

11  whether there was an external data usage, it didn't matter

12  whether or not Ocean Tomo had actually provided the

13  PatentRatings analysis to the customer; right?

14  A.   It's my understanding that the test under the amendment

15  is the usage or inclusion of PatentRatings analysis which

16  facilitates the provision of information to the customer.

17  Q.   In other words, it didn't matter whether Ocean Tomo

18  actually delivered that PatentRatings analysis to the

19  customer; right?

20           MR. LAYDEN:  Objection, asked and answered.

21           THE COURT:  Overruled.

22  BY THE WITNESS:

23  A.   I would have looked to see if there was delivery of the

24  PatentRatings analysis.  I would have looked to see if there

25  was use of the PatentRatings analysis.  That was part of my

1  process.

2  Q.    But in at least some instances it didn't matter to you

3  whether or not the PatentRatings analysis was actually

4  delivered to the customer; right?

5        MR. LAYDEN:  Your Honor, now I'm going to object,

6  asked and answered.

7        THE COURT:  Sustained.

8        MR. SPENCE:  Well, I don't think he has answered

9  the question, your Honor.

10       THE COURT:  He said earlier, I understand him to

11 say that, yes, he did consider whether it got delivered and

12 he analyzed whether the client paid for it, whether there was

13 e-mails reflecting the fact of delivery.  There were some

14 other evidence of delivery, among other factors.  That's how

15 I understand it.  If you have a point where he has given an

16 inconsistent statement on that, I don't know what your expert

17 is going to say.  If your expert is going to say that there

18 were a number of, or some number, of these reports that never

19 got delivered, so be it.

20       You know, I read this definition of it has got to

21 get delivered.  If they worked on it and it didn't go to a

22 client, then there shouldn't be a royalty charged on it.  If

23 they worked on it and it did go to a client, there should be

24 a royalty charged on it.  And whether it's 25 percent or

25 13-and-a-quarter percent, or the so-called split amount is a

1   matter I have to determine.  And if your, you know, Mr.

2   Pakter has -- has a set of charts on how he came up with

3   this, and I'm assuming your expert is going to say some of

4   these didn't get delivered, and if they didn't get delivered,

5   I don't think anybody should be paying on it.  I don't know

6   why anybody would pay.  I don't know why you would pay a

7   royalty, Ocean Tomo would pay a royalty, to Mr. Barney if

8   they didn't get paid by a client for it, it didn't get

9   delivered to a client.  Not get paid, but didn't get

10  delivered to a client.

11          That's how I view the evidence.  If I'm wrong on

12  that, correct me, and then, you know, we will go through

13  witnesses.  But if that's where -- you know, where I'm at.

14  And if you need to ask further questions on this in light of

15  where I'm at, you know, then go ahead.

16  BY MR. SPENCE:

17  Q.   So Mr. Pakter, when you said that something had to be

18  delivered for it to be an external data usage, what is it

19  that had to be delivered?

20  A.   I don't recall saying it had to be delivered.

21  Q.   So, in other words, it's your position that a royalty

22  could be owing even if no PatentRatings analysis was

23  delivered to the customer or client?

24  A.   I'm going back to what it says here.  "External data

25  usage means any usage or inclusion of the PatentRatings which

1   facilitates the provision of information or reports actually

2   delivered to external customers." And I regard payment for

3   those as payment for the provision of information or reports.

4   A client can get information even if they don't get a

5   document.

6   Q.   So that's the issue I'm trying to get to. Because, in a

7   minute, we're going to go through a number of examples. And

8   before we look at those examples, I'm trying to figure out

9   how you made your determination as to whether or not a

10  royalty was owing. Do you understand that?

11          MR. LAYDEN:  Your Honor, objection, form. It's

12  argumentative.

13          THE COURT:  Yeah, just get to the questions.

14          MR. SPENCE:  I'm trying to understand the basis for

15  this expert's opinion. He says certain things are

16  royalty-bearing and certain things aren't, and I can't

17  frankly determine how he made those determinations. And

18  before I show him examples, I want to know what the rules

19  were that he applied.

20          THE COURT:  Well, sir, did you assess royalties,

21  say that royalties were owed, due and owing, for any reports

22  that you found were not delivered?

23          THE WITNESS:  I have occasions when there is a

24  draft report. That is the only document available to me.

25  And I have revenue where the Ocean Tomo customer pays Ocean

1   Tomo.

2          THE COURT:  All right.  So the point is, you

3   either -- you assessed royalties, if it was delivered, or if

4   all you have is a draft, you use the fact of revenue being

5   paid as some corroborative evidence for the fact that a final

6   got delivered -- final report got delivered.

7          THE WITNESS:  Or consulting information, yes, your

8   Honor.

9          THE COURT:  All right.  Okay, well, Mr. Spence, I'm

10  sorry, were you able to hear that interchange?

11         MR. SPENCE:  Just give me a second, your Honor.

12         THE COURT:  Yeah go ahead.  Take a look at it.

13         MR. SPENCE:  So I think the issue that we're still

14  struggling with is we don't understand what it is that had to

15  be delivered in order for it to be considered royalty-bearing

16  within Mr. Pakter's report.

17         THE COURT:  All right.  Well, ask your questions.

18  I hesitate sometimes to interfere with --

19         MR. SPENCE:  Sure.

20         THE COURT:  -- a set of questions of people who

21  have studied this longer than I have.  And I don't want to

22  interrupt your flow.  I just, at some points where it's not

23  relevant to me or it's not important to me, I'd rather tell

24  you where it's at -- where I'm at on it, and you can correct

25  me if I'm misunderstanding the relevance or importance of a

1  particular issue.

2          MR. SPENCE:  Sure.

3          THE COURT:  That's why I interfere.  Maybe.  Maybe

4  I shouldn't.

5          MR. SPENCE:  It's helpful, your Honor.  You're

6  invited to help anytime.

7  BY MR. SPENCE:

8  Q.  Mr. Pakter, how did you determine whether or not the

9  thing, the item that was delivered met the definition under

10  the 2007 amendment?

11  A.  As an accountant, I give greatest weight to payment

12  received, revenue received from an Ocean Tomo customer.  If

13  an Ocean Tomo customer paid Ocean Tomo when there was use or

14  inclusion of PatentRatings in a report or draft report, I am

15  making what I believe to be a reasonable assumption that the

16  customer was provided with information or reports that led to

17  them writing a check to Ocean Tomo for the engagement.

18  Q.  Okay.  So you did so based on that check being written

19  but not on the use or inclusion of the PatentRatings report

20  actually going to the client; is that right?

21          MR. LAYDEN:  Objection.  Mischaracterizes his

22  testimony.

23          THE COURT:  Yeah, he just gave a long paragraph of

24  what he considered, and you're condensing it to a single

25  sentence.  And you can ask it again, but he is going to give

1   you the paragraph again.

2   BY MR. SPENCE:

3   Q.   I'm just trying to understand -- you had to make a

4   determination, right, Mr. Pakter?

5            MR. LAYDEN:  Objection, form.

6            THE COURT:  Overruled.

7   BY THE WITNESS:

8   A.   Yes, I had to make a determination on an

9   engagement-by-engagement basis.

10  BY MR. SPENCE:

11  Q.   Okay.  So let's say that Ocean Tomo studied some of this

12  PatentRatings data regarding a client and then Ocean Tomo

13  subsequent to studying that data advised the client and

14  requested a fee for that advice.  Is that an external data

15  use, as the way you understand it?

16  A.   So I think that would meet the definition read in the

17  following way:  "External data usage means any usage or

18  inclusion of the PatentRatings analysis which facilitates the

19  provision of information actually delivered to the external

20  customer."

21  Q.   So I think that helps.  So it's your understanding that

22  anytime someone at Ocean Tomo considers any information from

23  the PatentRatings system, and subsequently provides any kind

24  of a service to a client in exchange for a fee, that's an

25  external data usage, in your mind; is that right?

1    MR. LAYDEN:  Objection.  Mischaracterizes his

2    testimony.

3    THE COURT:  Overruled.  He can correct it.

4    BY THE WITNESS:

5    A.   I did not say that.

6    BY MR. SPENCE:

7    Q.   Explain, then, because I'm not understanding,

8    Mr. Pakter.

9    A.   I regard each engagement as a body of knowledge.

10   Included in the body of knowledge that I have for each

11   engagement is the fact that revenue was collected or, in a

12   rare instance, there was an accounts receivable reflected.  I

13   then go on to look at the engagement letter for that

14   particular engagement to see whether it refers to

15   PatentRatings analysis or usage of or sale of or derivatives

16   of the patent rating.  After that, I am faced with the

17   document set, which I received.  Some of that document set

18   includes a final expert report.  I don't know whether an

19   expert report was delivered or whether somebody provided the

20   testimony to the court.  Sometimes I see draft reports.

21   Sometimes I see a draft Excel.  Sometimes I see an e-mail

22   indicating that an Ocean Tomo customer accessed the system.

23   I have to make a body of knowledge decision based on the body

24   of knowledge that I have and which I provided in the context

25   accompanying my report.

1    Q.   How did you do so reliably?

2    A.   I did it primarily based on the revenue, and I did it

3    following the following rule.  The rule that I followed was,

4    former Rule 201, Paragraph D:  "Obtain sufficient relevant

5    data -- "

6               THE COURT:  Where are you reading from?

7               THE WITNESS:  I'm sorry, your Honor, Page 3.

8               THE COURT:  Of your report?

9               THE WITNESS:  Page 3 of my report at Footnote 2.

10   It's the AICPA Code of Professional Conduct and Bylaws,

11   Section ET1.300.001, formerly known as Rule 201.

12              THE COURT:  All right.  There is no need to read

13   it.  I can read it.

14              THE WITNESS:  Thank you.

15   BY MR. SPENCE:

16   Q.   Okay.  So I understand the amount of rigor that you

17   attempted to apply, but how did you make a reasonable

18   determination from a substantive point of view?  What were

19   the factors?  What were the things that you were looking for?

20   A.   The factors and things that I was looking for included

21   but not limited to the revenue that was collected --

22              THE COURT:  Okay.  Stop, please.  I've heard this.

23   I've heard this.  Mr. Spence, sometimes expert witnesses will

24   not agree with you.  That happens.  In fact, rarely will they

25   agree with the cross-examiner.

1          MR. SPENCE:  I'm actually asking him to agree, your

2     Honor.

3          THE COURT:  If this is truly -- let me finish.

4          MR. SPENCE:  Sure.

5          THE COURT:  If this is truly a discovery-type

6     issue, where you're trying to find out information, that's

7     fine, I gave you leeway to do this.  But trying to get an

8     expert to agree with you, they don't.  They never do.  You

9     make your point by pointing out inconsistencies, pointing out

10    errors, and then your expert gets up and basically takes a

11    shot at his report, and then I decide which one I think is

12    more credible.  But having cross-examined expert witnesses

13    myself for 25 years, they don't often -- it's a rare Perry

14    Mason moment they go your way.

15         MR. SPENCE:  Your Honor, this is a discovery issue,

16    as I said.

17         THE COURT:  Okay.  If it's a discovery issue,

18    that's fine.  But we have been, for the last 15, 20 minutes,

19    going over this same issue.

20         Now, sir, you have as -- as I recall from

21    yesterday, you have a chart where you have given, in the far,

22    right column, the bases upon which you decided to attribute

23    this as a delivered report; is that correct?

24         THE WITNESS:  That is correct.

25         THE COURT:  All right.  And that, Mr. Spence, may

1    be where you want to go.  Maybe you are going there.  But

2    there is a multi-page report with names of all the clients

3    and why -- and what factors he relied upon to decide to

4    include it or not include it.  That was what I took from

5    yesterday.  So, go ahead.  But if --

6              MR. SPENCE:  So that's a great example, your Honor.

7    So all of those answers are answers we never saw until a day

8    before his testimony.

9              THE COURT:  All right.  Well --

10             MR. SPENCE:  And so I'm trying to figure out -- he

11   had to apply some set of rules to make determinations.  So,

12   for example, let's say that the engagement letter mentions

13   PatentRatings but there is nothing else in any of the other

14   documents that shows anything ever went to the client.

15             THE COURT:  Well, I think you need to -- you need

16   to either point out examples to him and have him explain why

17   the absence of certain things he still made a determination

18   that's contrary to what you think it should have been or not.

19             MR. SPENCE:  Well, the problem is, if I give him

20   those examples, he is going to then have flexibility to make

21   up rules as he goes.  I want to know what rules he applied

22   first, and then I'll put the examples in front of him and see

23   if those examples are consistent with the rules as he applied

24   them.

25             THE COURT:  I think he has told you the rules

1   probably four times.  I've heard them that way.  Maybe there

2   is nuances that I've missed.  But I think he has told you the

3   rules he has applied repeatedly to what factors he considered

4   in determining whether or not it ought to be included.  It's

5   probably time -- well, it's your call.  It's probably time to

6   get to the examples where those rules were applied

7   inconsistently or in an irrational way, or, knowing those

8   factors, for your expert to get up, then, and point out using

9   the factors he has testified to, his report is wrong.

10  BY MR. SPENCE:

11  Q.   Okay.  Let me ask it this way, Mr. Pakter.  If Ocean

12  Tomo looked at some IPQ scores internally and provided a

13  valuation report to the client but never reported anything

14  about those IPQ scores to the client and the client

15  subsequently paid for that report, do you think that would be

16  an external data usage?

17  A.   Based solely on that hypothetical, I believe that meets

18  the definition of external data usage.

19  Q.   And you had this understanding, didn't you, that Ocean

20  Tomo does a lot of valuation work for its clients; right?

21  A.   I understand that Ocean Tomo calculates fair market

22  value under USPAP and other valuation rules.

23  Q.   And it did that even prior to having any kind of

24  relationship with PatentRatings; right?

25  A.   I don't understand that question.

1    Q.    It did so even before the 2004, license agreement;

2    correct?

3    A.    I do not know the extent of Ocean Tomo's valuation

4    practice prior to the license and/or amendment.

5    Q.    Well, was it your understanding that Ocean Tomo couldn't

6    do any valuation work on a patent without using the

7    PatentRatings system?

8    A.    In this hypothetical you're asking me, it's possible

9    that Ocean Tomo can do a valuation report, though the ones

10   that I reviewed and included list the use of PatentRatings.

11   And that was part of my body of knowledge.

12   Q.    So, in other words, it's your understanding that every

13   time Ocean Tomo provides a valuation for a patent that it has

14   to be using the PatentRatings system; is that right?

15            MR. LAYDEN:  Objection.  Mischaracterizes his

16   testimony.

17            THE COURT:  Overruled.  He can say.

18   BY THE WITNESS:

19   A.    I did not say that.

20   BY MR. SPENCE:

21   Q.    Mr. Pakter, you gave a deposition in this case on

22   June 6, 2017; right?

23   A.    I don't remember the date, but I remember the

24   deposition.

25   Q.    Can we go to Page 231, Line 4, please.  Mr. Pakter,

1  during that deposition, do you remember me asking this

2  question, and did you give this answer?

3          Question:  "Are you assuming that Ocean Tomo can't

4  provide a valuation for a patent without use of the

5  PatentRatings system?"

6          Answer:  "I'm not assuming that they couldn't, but

7  it's my general understanding that they didn't."

8          Did I ask that question, and did you give that

9  answer?

10  A.   I did -- you did, I did.

11  Q.   Let's take a look at one of your schedules, DX-560,

12  please.  And this is your list of royalty owing broken down

13  by each Ocean Tomo client; right?

14  A.   Correct.

15  Q.   And so if we go to No. 18 on this list, do you see that?

16  A.   I do.

17  Q.   It says IBM, 2008; right?

18  A.   I see it.

19  Q.   And for that you list $289,202.  Do you see?

20  A.   As a revenue, yes.

21  Q.   And based on that revenue, it's your opinion that a

22  13.25 percent royalty should be applied; right?

23  A.   Based on the body of the knowledge and my review and

24  analysis of that, I concluded that the applicable royalty

25  rate was 13.25 percent.

1   Q.   Right.  That's based on your methodology that you

2   applied to determine whether or not royalties were owing;

3   right?

4   A.   Correct.

5   Q.   Based on your review of the documents related to this

6   IBM engagement; correct?

7   A.   Correct.

8   Q.   Let's take a look at PX-416.  Now, PX-416 is a list of

9   documents that you provided showing that specific client

10  engagements should be royalty-bearing under your analysis;

11  right?

12  A.   It is a subset of my full list.

13  Q.   Well, this is the entirety of the documents that you

14  relied upon with the exception of two that you recently

15  added; right?

16          MR. LAYDEN:  Objection.  Mischaracterizes his

17  testimony.

18          THE COURT:  Overruled.

19  BY THE WITNESS:

20  A.   This is a subset of all of the documents that I relied

21  on in an effort to identify those which related to each

22  particular engagement.  It could be another document.  For

23  example, I also relied on the prior royalty paid as part of

24  my body of knowledge.

25  BY MR. SPENCE:

1    Q.    Have you ever testified differently?

2    A.    Not to the best of my recollection and belief.

3    Q.    Okay.  Let's take a look at your June 6th deposition

4    transcript.  Again, this is on Page 224, starting at Line 4.

5          Question:  "So you recall in your deposition on

6    May 19th I asked you about specific documents that you were

7    relying upon to make the determination that a specific client

8    engagement was royalty-bearing; right?"

9          Answer:  "That's right."

10          Question:  "And in that definition you weren't able

11    to identify those documents for me at that time; right?"

12          Answer:  "Well, I couldn't identify them for you in

13    every bit."

14          Question:  "You couldn't tell me for a specific

15    client engagement which documents, if any, you relied upon to

16    make the determination that it was a royalty -- that it was

17    royalty-bearing; is that fair?"

18          Answer:  "I could not with the data in my -- with

19    the data at hand in my deposition at that time cross

20    reference the Ocean Tomo clients and the bates numbers."

21          Question:  "And so after that May 19th deposition,

22    you and Mr. Layden agreed to undertake the task of

23    identifying for each specific client engagement that you

24    contend is royalty-bearing all of the documents upon which

25    you relied to make that determination; correct?"

1    A.   Correct.

2    Q.   "That's correct."

3    A.   Right.

4    Q.   Question:  "And you did so; right?"

5              Answer:  "That's correct."

6              Question:  "Actually, Plaintiff's Exhibit 85, which

7    I will represent to you is PX-416, is the full index of

8    documents that you relied upon for your determination of

9    whether or not a specific Ocean Tomo client engagement would

10   be royalty-bearing, or not; right?"

11             Answer:  "Plus the license and the amendment, yes."

12             Did I ask those questions, and did you give those

13   answers?

14   A.   You did, I did.

15   Q.   And so if we look back at PX-416, this list of all the

16   documents that you relied upon, we see it's alphabetical.  So

17   you have to go through to page -- actually, there is not a

18   page number.  If you go alphabetically down, you see an entry

19   for IBM 2008.

20   A.   Yes.

21   Q.   And the only document that you identify here for IBM

22   2008 is with the bates number OTE-00390663; right?

23   A.   I do.

24   Q.   So this is the only document that you found showing that

25   this IBM engagement should be royalty-bearing; correct?

1   A.   It is possible that there are other documents.

2   Q.   Right.  But I asked you for a list of everything that

3   you found, and you provided it, and that's here in 416;

4   right?

5   A.   And that was my best effort at coming up with a subset.

6   It is possible that there are more documents.

7   Q.   Understood.  So let's take a look at the document that

8   you identified.  Let's pull up PX-811, please.  And so this

9   document is in your binder, but it's 742 pages, so we've

10  actually put a few pages in the binder, but we've got the

11  document pulled up on the screen for you as well, Mr. Pakter.

12          And PX-811 is bates-numbered OTE-00390663, which is

13  the document identified in PX-416; right?

14  A.   One more time, please.

15  Q.   Sure.  I'll represent to you, actually, to make this

16  more simple, that this document you're looking at,

17  OTE-390663, is PX-811.  Okay?

18  A.   Okay.

19  Q.   And what this appears to be is an unformatted amount of

20  PatentRatings data; right?

21  A.   Correct.

22  Q.   And in the header line there is a reference to IPQ.  Do

23  you see that?

24  A.   Correct.

25  Q.   And in the assignee column in every row to the far right

1    it says, International Business Machines Corporation; right?

2    A.    I see.

3    Q.    That's IBM.

4    A.    Correct.

5    Q.    And, again, this is the only document that you relied

6    upon as a basis for saying that this IBM engagement should be

7    royalty-bearing; correct?

8              MR. LAYDEN:  Objection, asked and answered.

9              THE COURT:  Overruled.

10   BY THE WITNESS:

11   A.    I may also have looked at a prior royalty report for the

12   reporting, and I would look at the revenue collected.

13   BY MR. SPENCE:

14   Q.    Well, you certainly didn't identify any of those

15   additional documents in PX-416, did you, Mr. Pakter?

16   A.    Well, I didn't identify the royalty report which relates

17   to every quarter.

18   Q.    And you agree with me that this document, PX-811, is not

19   addressed to any Ocean Tomo client; is it?

20   A.    It does not have an address label.  It is not an e-mail

21   or a letter.

22   Q.    Right.  It's not one of the e-mail interchanges as you

23   referred to it; right?

24   A.    It is not.

25   Q.    And you don't cite any other documents in PX-416 to

1   suggest that this was ever delivered to an Ocean Tomo

2   customer or client; right?

3   A.   No, only I suggested that the client paid for services.

4   Q.   Which client are you referring to?

5   A.   In this case, IBM.

6   Q.   And you assume that because the document says IBM all

7   over it; right?

8   A.   I'm assuming that because revenue was collected from

9   IBM.

10  Q.   And also because the document itself shows IBM all over

11  it; right?

12  A.   And it was produced pursuant to document requests

13  relating to requests for documents relating to the royalty

14  documents.

15  Q.   Okay.  Let's take a look at PX-948, please.  And if you

16  just scroll down for me.  You see here PX-948.  I will show

17  it on the screen too, if it's helpful to you, Mr. Pakter.  Do

18  you see the PX-948 has a bates number OTE-390660; right?

19  A.   I do.

20  Q.   And if you go back up to the top it's dated April 6,

21  2008; right?

22  A.   Yes.

23  Q.   April 16, 2008, rather.  Do you see that?

24  A.   I do.

25  Q.   It's from Mr. Art Romero; right?

1   A.   Yes.

2   Q.   And it's to an e-mail address, do you see that,

3   sj5.kim@samsung.com.  Do you see that?

4   A.   I do.

5   Q.   Now, the samsung.com domain name, doesn't that suggest

6   to you that that's a Samsung employee?

7   A.   It does.

8   Q.   And if we look at the body of the e-mail, it says:

9   "Good morning," I believe it's, "Sejin," S-e-j-i-n.  Please

10  find attached the zipfile containing all the Excel

11  spreadsheets of the requested company's IPQ scores."  Do you

12  see that?

13  A.   I do.

14  Q.   And there is an attached zipfile.  Do you see that as

15  well?

16  A.   I do.

17  Q.   That zipfile is otprsccrequest4.16.zip; right?

18  A.   Yes.

19  Q.   And if we go to the native of this, please, and we open

20  up that attachment and you see a bunch of Excel files there;

21  right?

22  A.   I do.

23  Q.   And if you could just expand the name -- yes, there you

24  go.  You see one of those Excel files right there named IBM;

25  right?

1  A.   I do.

2  Q.   And if we open that IBM file, then I'll represent to

3  you, sir, this is the same file that we looked at, PX-811.

4          And, your Honor, I will just represent to the court

5  that this Excel document, PX-811, that's why the PX-948 has

6  the bates number OTE390660.  And PX-811 has bates number

7  OTE0030663.  But PX-811 is part of the attachment to PX-48?

8          THE COURT:  All right.  So the report that

9  Mr. Pakter prepared to show the support he had for including

10  these as revenue items, which is Plaintiff's 416 for the

11  selection of IBM, a 2008 engagement, he listed a bates

12  number.  That bates numbers corresponds back to Plaintiff's

13  811, which also corresponds to Plaintiff's 948?

14          MR. SPENCE:  That's right, your Honor.

15          THE COURT:  Okay.  And where is the work product?

16  Is it just that particular piece -- those pieces of paper?

17          MR. SPENCE:  The text -- so I can go through this

18  with questioning, or I can explain to you, Samsung happens to

19  be a subscription client to the Ocean Tomo PatentRatings

20  system.  So they're able to request this type of data from

21  Ocean Tomo on a regular basis.  They pay a monthly

22  subscription fee, and, in fact, those royalties have been

23  accounted for.

24          THE COURT:  All right.  Well, remind me on the

25  subscription basis, what is the royalty situation on those?

1      MR. SPENCE:  Treated as an external data sale.  So

2    a 25 percent royalty is paid.

3      THE COURT:  Okay.  All right.  Well, you can

4    continue, or, you know, however you want on that.  But that

5    explains where -- the process we're going through, so go

6    ahead.

7    BY MR. SPENCE:

8    Q.   If we just go back to DX-560.  So this is the list of

9    clients that we looked at earlier; right?

10   A.   Yes.

11   Q.   And you see Samsung is here listed fourth on the list?

12   A.   Yes.

13   Q.   And as I explained to the judge, there is a 25 percent

14   royalty.  Do you see that?

15   A.   I see that.

16   Q.   And that's because Samsung was a web subscription

17   client; right?  You understand that?

18   A.   I do.

19   Q.   And PatentRatings got paid the royalties for Samsung as

20   a subscription client; right?

21   A.   I understand.

22   Q.   So in this case your assumption was that any connection

23   between a client name and an IPQ score on a document plus a

24   payment is sufficient for you to determine that that should

25   be a royalty-bearing engagement; right?

1   A.   Not in isolation.  Again, I take the body of knowledge

2   that I have as a whole regarding the engagement as a whole.

3   Q.   And, in this case, based on that body of knowledge as a

4   whole, you determined that the IBM engagement should be

5   royalty-bearing; isn't that right?

6   A.   In this case, that was my conclusion, yes.

7   Q.   Let's look at another example.

8            THE COURT:  And just so I can complete this, how do

9   we get from IBM to Samsung?

10           MR. SPENCE:  So, again, Samsung is a subscription

11  client.  They're running reports on the OTPR system,

12  including looking at IBM patents.  I don't know why they're

13  looking at IBM patents.  IBM is the assignee on these

14  patents, so, in other words, the owner, at least at one time,

15  on at least each of these patents.

16           THE COURT:  Because there is revenue collected from

17  IBM, which is listed on Line 18 of DX-560.

18           MR. SPENCE:  Correct.

19           THE COURT:  And there is revenue collected from

20  Samsung.

21           MR. SPENCE:  Correct.  And so the point is that

22  that is a completely separate engagement that has nothing to

23  do with what Samsung is doing here by looking at these IBM

24  patents.  Yet, he has concluded that that IBM engagement

25  should somehow be royalty-bearing, in fact, based on Samsung

1    using the OTPR system to look at IBM patents.

2           THE COURT:  All right.  Well, the two clients,

3    Samsung and IBM, got charged -- both got charged money.

4           MR. SPENCE:  Sure, but the IBM engagement has

5    nothing to do at all with PatentRatings, and there is no

6    assertion other than this one document that it does.

7           THE COURT:  Well, that's why I wanted to see if

8    there is anything that -- it appears that the IBM 2008 --

9    I'll let you talk to your colleague, first make sure you're

10   on --

11          MR. SPENCE:  Sure.

12          THE COURT:  The IBM 2008 engagement that the

13   witness corresponded to a bates number goes back to a Samsung

14   engagement where they had a subscription agreement that's

15   being paid at 25 percent and that you assert was actually

16   paid to Mr. Barney.

17          MR. SPENCE:  Correct.

18          THE COURT:  Okay.  There is nonetheless somewhere

19   out there an IBM $290,000 engagement.  What was the work

20   product there?

21          MR. SPENCE:  So we've looked at all those

22   documents.  There is nothing at all that we found related to

23   PatentRatings in any, way shape or form and no documents have

24   been identified to us to suggest otherwise.

25          MR. LAYDEN:  Have those documents been produced?

1           THE COURT:  You're asking me?

2           MR. LAYDEN:  I'm actually asking counsel because,

3    your Honor --

4           MR. SPENCE:  This actually goes back to the audit

5    issue.

6           THE COURT:  One at a time, please.  One at a time.

7           MR. SPENCE:  This kind of goes back to the audit

8    issues, your Honor, which is no matter what we show them,

9    they just come back and say they want more documents, and

10   they won't be satisfied until they actually have access to

11   every single document within Ocean Tomo.  You know, this is a

12   critical concern for Ocean Tomo because they're a client

13   services firm that provides information a lot of times on a

14   privileged basis, certainly on a confidential basis.

15          MR. LAYDEN:  Your Honor, counsel just

16   represented --

17          THE COURT:  Hang on.  I would like to respond to

18   that.

19          MR. SPENCE:  And so to have them come in and look

20   at every single document throughout the entire company not

21   only would take an inordinate amount of time and money but

22   also raise some serious concerns with our clients.

23          THE COURT:  Well, if you have some concerns about

24   the clients, I suggested this Day 2 of this trial, that you

25   ought to do a private arbitration, not a public trial in a

1    courtroom like this.  You made the decision, both sides did,

2    to use the courtroom for this and the discovery tools allowed

3    for parties in discovery.

4          MR. SPENCE:  We did move to arbitrate, your Honor,

5    and we lost that motion.

6          THE COURT:  All right.  But I think you're

7    plaintiff in this case; correct?

8          MR. SPENCE:  In this case we happen to be, yes.

9          THE COURT:  All right.  We're back in court.

10   Again, if this is one example of, you know, potentially

11   hundreds, we -- as I said, I might as well just appoint a

12   special master and we might as well set this on a slow boat

13   because it's going to take forever.  And I think I made that

14   comment earlier in the case too.

15         There was an IBM engagement where IBM made

16   $290,000.  Was there any document produced by you to show

17   what IBM got for their $290,000?

18         MR. SPENCE:  Do you know offhand what was produced?

19   I don't know -- so, again, this goes back to the way that the

20   production was done as well, which is part of my involvement.

21   But the parties agreed to do what's called predictive coding

22   And so there is this massive exchange of terms, and they went

23   back and forth and tried to train a system to go through and

24   look at all of Ocean Tomo's documents and select the ones

25   based on the training that were relevant to the litigation.

1   That litigation went on for a number of years.  We got

2   involved.  At that point, the production is what it is.

3   We've tried to go back and find things the best we can.

4          We also have done sampling.  We've offered to do

5   not only the 25 initial engagements, but then a subsequent

6   25.  And I can't remember the exact number, but I think Judge

7   Rowland ended up, late in discovery, letting them have access

8   to maybe another 80, or so.  So this issue was in front of

9   the magistrate continuously.  We tried to resolve it the best

10  we could.  We allowed them to do sampling, and they certainly

11  could extrapolate from that sampling if they had done it in

12  the right way.

13         THE COURT:  Here is the answer, folks.  Discovery

14  is over.  Judge Rowland supervised discovery.  If she thought

15  that there was additional discovery that needed to be taken

16  or a different trial date that needed to be set in light of

17  the difficulties in getting discovery, that ship has sailed.

18  Defendant has the burden of proof as to whether or not proper

19  royalties were paid.  You are -- you got dealt the hand you

20  got dealt.  If you don't think you got the right amount of

21  records, then you should have gone in on a motion to compel.

22  And if you thought that moving forward on a trial date that I

23  set was unfair because you didn't get all the records you

24  were supposed to get, you know, your remedy is something that

25  that ship has sailed, too.  You all have to deal with the

1    evidence each of you gave to each other.  And, you know, if

2    there is no record of what IBM got for an engagement in 2008,

3    you know, that's a factor I have to take into consideration

4    of whether you've met your burden of proof as to whether or

5    not IBM's work product utilized the PatentRatings system.

6    And, you know, there is -- they picked one, they being Ocean

7    Tomo, picked one example where it's pretty clear that what,

8    based on his chart of what he relied upon, we got to where we

9    are right now.  I don't know how many more examples they have

10   of that.  I don't know if -- but the burden of proof is

11   yours, and you're going to have to just deal with the

12   evidence and the discovery you have now.

13          MR. LAYDEN:  Your Honor, if I could briefly

14   respond?

15          THE COURT:  You may.

16          MR. LAYDEN:  A couple things.  First of all, just

17   to add to something Mr. Spence said about discovery, and I

18   know he has acknowledged he wasn't involved during the time

19   most discovery was going on.  In addition to the predictive

20   coding exercise, which we went through, we made specific

21   requests for documents relating to a number of engagements,

22   including a number of the engagements in Mr. Pakter's report.

23          The second thing is, your Honor, you've already

24   seen some evidence in this trial, Ocean Tomo, in at least

25   some instances we know of from the discovery, destroyed

1    documents relating to these engagements, in some cases

2    relating to client requests.

3            And so the problem we have, your Honor -- and I

4    certainly recognize it's our burden of proof.  But in a

5    situation where we are here where we are, and Ocean Tomo has

6    refused to give us documents for these, either because they

7    don't have them or they just think it's too burdensome, and

8    for them then to come in and say, well, if you don't have an

9    actual deliverable to a client with an e-mail, I think that

10   is not a fair argument to make.

11           The other thing, your Honor --

12           THE COURT:  Well, they can make the argument.

13           MR. LAYDEN:  They can make the argument.

14           THE COURT:  I have to accept it or not.

15           MR. LAYDEN:  I understand.  That's why I said it

16   was unfair.  I'm not saying they can't make argument, but I

17   don't think it's a fair argument.

18           The second thing, your Honor, and this -- I want to

19   pick up something Mr. Spence just said, I maybe misunderstood

20   him.  He indicated they looked at some things, and my

21   question is, are all the things they've looked at been

22   produced.  Because if he is representing to the court

23   something about documents weren't produced, then I think we

24   have a right to get those documents.  I'm not suggesting that

25   we reopen discovery, but if there are documents that they've

1    looked at that haven't been produced, I don't think that's

2    appropriate either.

3            THE COURT:  Well, maybe you can ask those questions

4    of Ms. Johnson when she testifies.

5            MR. LAYDEN:  I certainly will.

6            THE COURT:  But, you know, there is an instruction

7    under the Seventh Circuit pattern instructions relating to

8    spoliation or destruction of evidence.  You need proof of it,

9    but I can take an adverse inference if I find by a

10   preponderance that a party intentionally destroyed evidence

11   or caused evidence to be destroyed.  If it's destroyed in the

12   ordinary course of business, if they don't keep a 2008 report

13   for IBM, I don't know if they do or not.

14           MR. LAYDEN:  Well, your Honor, though, the point,

15   briefly, is that -- and Judge Rowland actually raised a

16   concern about this in one of the conferences we had in front

17   of her.  The documents were destroyed after litigation

18   commenced.  So this is not Ocean Tomo destroying a document

19   in 2009.  There are e-mails in this case, some of which we

20   marked, and we will certainly provide additional examples to

21   the court, where Ocean Tomo, after this litigation was

22   pending and after we had served discovery requests relating

23   to these documents, destroyed the documents.  And they're

24   going to say they did it in response to discovery requests,

25   client request.  But our position is, they should have come

1   to Judge Rowland and said, hey, we have a client request to

2   destroy documents.  They didn't do.  That went ahead and

3   destroyed them.  We only found out about it in retrospect.

4           MR. SPENCE:  Just like Mr. Barney didn't do

5   anything other than wipe his computer before he gave it back

6   to us.

7           THE COURT:  Well, let's --

8           MR. SPENCE:  We can both make the same type of

9   allegations going each way, but it doesn't serve any purpose.

10  We have the discovery that we have.  We're doing the best we

11  can with it.  When I said I went through the documents, I'm

12  talking about I went through our production database.  We

13  have a relativity database, and we looked through the

14  documents, just like I assume opposing counsel does.

15          The fact of the matter is 99 percent of these

16  engagements have nothing to do with Ocean Tomo PatentRatings.

17  But Mr. Barney wants to use discovery as leverage to try to

18  get a settlement that he couldn't otherwise get based on the

19  value of PatentRatings.  You're talking about a system that

20  was developed back in 2004, and he wants to charge not just

21  the same price, but many times a multiple of the price that

22  he used to charge, you know, now 13 years ago.  That's not

23  how technology works.

24          THE COURT:  It might not be, but contracts and

25  license agreements work --

1    MR. SPENCE:  But then Ocean Tomo had the right not
2    to use it.

3    THE COURT:  Don't interrupt.  It might not be, but
4    license agreements and operating agreements that have -- that
5    are still in operation, don't have finite dates of sunset
6    clause, are what I have to interpret and what I have to
7    decide.

8    If -- I'm not going to reopen discovery.  If you or
9    Ms. Johnson, or you through your cross examination of this
10   witness or Ms. Johnson through her testimony, want to point
11   out that 99 percent of all these engagements didn't use
12   Mr. Barney's -- didn't use Mr. Barney's system as under the
13   definitions of external data use and external data -- give me
14   the other one -- external data sales and external data usage,
15   so be it.  That's what I have to decide.  And you can present
16   that through cross-examination or through Ms. Johnson's
17   testimony, or Mr. Malackowski's testimony.

18   MR. SPENCE:  To be clear my -- what I meant to say
19   is the -- 99 percent of our documents that they're trying to
20   get from us have nothing to do with Ocean Tomo PatentRatings.
21   But the only way that they get to a satisfaction in discovery
22   is they want access to every document.  There is something
23   called proportionality.  And they don't simply get to come in
24   and look at everything because they think that a few things
25   might be missing.

1       THE COURT:  Well, that's what I am going to review

2    as to whether or not there is cooperation on the audit.  The

3    overall issue about, they asked for more documents than they

4    should have in discovery, is exactly why I referred this to

5    Judge Rowland so I didn't have to deal with this issue.

6       MR. SPENCE:  And she ruled on those issues.

7    Counsel wants to keep arguing them.

8       THE COURT:  Well, she ruled the way she ruled, and

9    we are all here today to try the case.  If you think there

10   are records that got destroyed or would support your theory

11   and you have evidence of it, then there is a spoliation

12   argument you can make and an adverse inference that you'll

13   ask me to draw from the fact that the absence of records that

14   were in existence at one time and then are no longer in

15   existence.  If you think there are mistakes that this witness

16   made, you exploit them through cross examination or through

17   Ms. Johnson's testimony.  That's how cases are tried.  But

18   we're not going to re-visit discovery issues, other than the

19   parameters I just gave you.  We're not going to re-visit

20   those, and I'm not sympathetic to either side about the fact

21   of burdensomeness, the fact of confidential things being

22   disclosed because you made your bed by coming to court.  And

23   you're in federal court now.  I'm not trying to be

24   condescending.  That's what we do in court, and you know

25   that.  And that's what we have to do.  So we have to

1  concentrate on the matter at hand, which is working with what
2  you got, both sides.  This is not -- I'm looking at both of
3  you on this.

4          So we have -- it's 4:58.  Are you going to be done
5  in two minutes?

6          MR. SPENCE:  No, your Honor.

7          THE COURT:  Then we're going to continue tomorrow
8  morning at 9:30.  Anything else we need to put on the record?

9          MR. LAYDEN:  Your Honor, one quick thing, just so I
10 don't forget, we had a number of exhibits we identified last
11 night to see if we could get a stipulation on.  We can do it
12 tomorrow if you want to, your Honor.  But I can just read
13 them into the record.  It's up to you.

14         MR. SPENCE:  We actually also sent a number of
15 exhibits to them to ask for the same stipulations.  I don't
16 know if we have a response yet.

17         MR. LAYDEN:  Well, it came over five minutes before
18 I came to court.  So we will look at it tonight, your Honor.

19         THE COURT:  Yes, then jointly just give me --
20 rattle off a list that our court reporter can put into the
21 record and each side will say agreed, and I will say
22 admitted, and we will move from there.  But you can both do
23 it tomorrow.  Anything else on the record?

24         MR. LAYDEN:  No, your Honor.

25         MR. SPENCE:  No, your Honor.

1          C E R T I F I C A T E

2          I certify that the foregoing is a correct transcript of the

3    record of proceedings in the above-entitled matter.

4

5    /s/ SANDRA M. MULLIN                    August 29, 2017
     SANDRA M. MULLIN, CSR, RMR, FCRR
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25