**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| OCEAN TOMO, LLC, | |
| Plaintiff, | No. 12-cv-08450 |
| v. | Hon. Thomas M. Durkin |
| JONATHAN BARNEY and PATENTRATINGS, LLC, | Hon. Mary M. Rowland |
| Defendants. | *Document electronically filed* |

**PLAINTIFF AND COUNTER-DEFENDANT OCEAN TOMO, LLC'S**
**AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# Table of Contents

**Proposed Findings of Fact** ..................................................................................................... **1**

I.    The Parties ....................................................................................................... 1

    A.    Ocean Tomo, LLC ................................................................................ 1

    B.    Jonathan Barney .................................................................................. 1

    C.    PatentRatings, LLC ............................................................................ 1

II.    The OT-PR Relationship Begins (2003-2004). ............................................. 2

III.    2004 Contracts between OT, PR, and Barney. .............................................. 3

    A.    Relevant terms of the 2004 License Agreement. ................................. 3

        1.    Scope of the License ............................................................... 3

        2.    Exclusivity ............................................................................. 4

        3.    Royalties and Payments to PR ............................................... 5

        4.    Ownership of Improvements to the PR Tools.......................... 5

        5.    Non-Compete Provision.......................................................... 6

        6.    2004 License Agreement's Effect on Third Parties ................ 6

    B.    Relevant terms of the Employment Agreement. .................................. 7

IV.    OT begins promoting its PatentRatings division, OTPR (2004-2005). ........ 8

    A.    OT immediately discovers problems with the PR technology................ 8

    B.    While the parties worked to fix the system, OT continued to promote OTPR and planned to expand the OTPR business................................. 8

V.    The parties sign the Supplemental License Agreement (2006) to expand OT's rights. ............................................................................................................. 9

VI.    OT continues promoting its OTPR division while fixing the PR software (2005-2007)................................................................................................... 10

    A.    OT continues to promote the OTPR division, but OT's initiatives fail to show a profit due to problems with the PR system................................. 10

    B.    Under OT's management, Barney represents that the PR system has been made automated. .................................................................................. 11

VII.    The 2007 Amendment to the Parties' Agreements .................................... 11

VIII.    OT and Barney sign additional agreements governing Barney's relations with OT: The Computer Asset Policy and the Operating Agreement (2007)..................... 12

    A.    Relevant provisions of the Computer Asset Policy Agreement........... 12

    B.    Relevant provisions of the Operating Agreement.............................. 13

i

IX.    OT continues selling OTPR products and begins negotiations with potential
       partners for foreign joint ventures (2007-2010) ......................................................... 13

  A.    The PR System is not in fact ready for primetime, and OT brings in
        additional resources to fix the system. .................................................................. 13

  B.    OT faces competitors charging significantly lower prices, but PR refuses
        to enforce the Licensed Patents. ............................................................................ 14

  C.    OT sends Barney to Paris to finish a detail with Caisse des Depots
        ("CdC"), a French company with whom OT intended to form a joint
        venture to develop and sell European patent ratings. .......................................... 14

     1.    Barney's assignment to Paris. ........................................................................ 14

     2.    Negotiations between OT and CdC ................................................................. 15

     3.    The planned joint venture between OT and CdC ............................................. 15

     4.    Barney interferes with the CdC deal at the last minute. ................................. 16

     5.    Barney's interference ultimately kills the CdC joint venture. ......................... 16

X.     OT learns that the PR software is deeply flawed, leading to a rift between the
       parties (2010-2011). ................................................................................................... 17

XI.    Barney resigns from OT in February 2011. ................................................................. 17

XII.   Barney becomes openly hostile to OT after his resignation, defaming the
       company to industry publications. ............................................................................. 18

XIII.  Barney returns his OT laptop forensically wiped of all data, in violation of OT
       policy and his Employment Agreement. ...................................................................... 18

  A.    After resigning, Barney initially fails to return his OT-issued laptop. ................. 18

  B.    Barney returns the OT Laptop four months later. .................................................. 19

  C.    The evidence indicates that Barney or someone at Barney's direction
        erased the OT Laptop before returning it. ............................................................. 19

  D.    Damages from wiping the laptop. .......................................................................... 20

XIV.   Before resigning, Barney copies OT confidential information to a laptop
       owned by PR; he retains that confidential information today. .................................... 20

  A.    Barney admits that he copied OT files onto a personal laptop, and retained
        those files after his resignation from OT. ............................................................. 20

  B.    Weil's forensic analysis of the T410 Laptop and X1C Laptops. ......................... 21

  C.    Barney's unjust enrichment. .................................................................................. 23

XV.    Shortly after his resignation, Barney blocks negotiation of the NTT deal, and
       then attempts to divert the deal to PR. ...................................................................... 24

  A.    OT's relationship with NTT dates back to 2005; over the following years,
        OT develops a plan to form a joint venture with NTT for Japanese patent
        ratings. .................................................................................................................... 24

B.  OT begins negotiating a joint venture agreement to create a Japanese patent ratings system with NTT in 2010. ............................................................. 25

C.  Before Barney's resignation but after the AnswerMine presentation, Barney refuses to confirm PR's consent to the NTT deal, forcing a cancellation of a critical meeting with NTT in February 2011. ............................ 26

D.  Unbeknownst to OT at the time, Barney began speaking to NTT in March 2011 about working with PR on a deal that excludes OT. ................................... 27

E.  OT brings in a new employee, Elvir Causevic, to turn around the OTPR business and manage the NTT deal. ....................................................................... 27

F.  In mid-2012, OT discovers that NTT had been emailing Barney separately, and that Barney had been telling NTT that OT has no right to develop or assist others in developing patent ratings systems. ............................. 28

G.  Barney refuses to consent to the OT-NTT deal, and NTT ends negotiations in October 2012 ................................................................................................. 29

H.  Damages to OT from losing the NTT deal. ........................................................... 30

XVI.  Barney continues to compete with OT to this day, using the confidential information he improperly copied to a PR laptop and still retains. .......................... 31

A.  In 2014-2015, Barney attempted to rebuild a "JBPR" patent rating system to compete with OT. ............................................................................................. 31

B.  Barney continues to possess OT confidential information, and evidence suggests that he continues to use it. ...................................................................... 31

C.  PR filed with the USPTO an Intent-to-Use trademark application for "PATENTRATINGS," indicating an intent to compete with OT. ....................... 32

D.  The PR website currently promotes PR competing services ............................... 33

XVII.  OT payments to Barney ................................................................................................. 33

XVIII. OT provides expert testimony showing the licensed patents to be invalid for claiming unpatentable subject matter and as obvious. ................................................. 33

A.  Each of the Licensed Patents is directed to ineligible subject matter. ................. 34

B.  Each of the Licensed Patents is invalid as obvious under 35 U.S.C. § 103 .......... 37

C.  Prior Art Considered ............................................................................................. 37

D.  Person Having Ordinary Skill in The Art ............................................................. 40

E.  The Prior Art Renders the Licensed Patents Obvious .......................................... 41

F.  The Licensed Patents are Unenforceable Due to Patent Misuse and the Anticompetitive Provisions of the 2004 License Agreement are Unenforceable ......................................................................................................... 42

**Proposed Conclusions of Law** ................................................................ **43**

I.    OT has proven its breach of fiduciary claim against Barney by a preponderance of the evidence. ................................................................ 43

    A.    Legal standards and burden of proof. ................................................ 43

    B.    OT has proven that Barney had a fiduciary duty of loyalty to OT as an employee, director, and member exercising managerial control. ................ 43

    C.    OT has proven that Barney breached his fiduciary duty of loyalty through retention and use of OT confidential information and by usurping OT's business opportunity with NTT. ................................................ 45

        1.    OT has proven that Barney breached his fiduciary duty by copying OT confidential information to a personal laptop and using it to benefit PR. ................................................................ 45

        2.    OT has proven by a preponderance of the evidence that Barney breached his duty of loyalty by interfering with and usurping OT's business opportunity with NTT. ................................................ 47

    D.    Barney's breaches of fiduciary duty proximately caused injury to OT. ............... 49

        1.    Barney's breach of his fiduciary duty by taking and using OT confidential information for his personal benefit proximately damaged OT. ................................................................ 49

        2.    Barney's breach of his fiduciary duty by usurping and interfering with the NTT business opportunity proximately damaged OT. ................ 50

II.    OT has proven by a preponderance of the evidence that Barney and PR willfully misappropriated trade secrets in violation of the Illinois Trade Secrets Act. ................................................................ 51

    A.    Legal standards and burden of proof. ................................................ 51

    B.    OT has proven by a preponderance of the evidence the existence of trade secrets. ................................................................ 52

    C.    OT has proven by a preponderance of the evidence that Barney willfully misappropriated the trade secrets. ................................................ 53

    D.    OT suffered damages as a result of Barney's misappropriation of trade secrets. ................................................................ 54

    E.    OT is entitled to an injunction ordering Barney to return or destroy all OT files in his possession. ................................................ 55

III.    OT has proven by a preponderance of the evidence that Barney breached the Employment Agreement. ................................................................ 55

    A.    Legal standards and burden of proof. ................................................ 55

    B.    The Employment Agreement is plainly valid and enforceable. ................ 56

    C.    Plaintiff substantially performed under the contract. ................................ 56

iv

D.     Barney breached the Employment Agreement. ................................... 56

     1.     Barney breached Section 5.2 of his Employment Agreement regarding Confidential Information. ................................................ 56

     2.     Barney breached Section 5.1 of his Agreement by competing and interfering with the NTT joint venture during the Noncompetition Period. ................................................ 57

E.     OT suffered damages as a result of Barney's breaches. ....................... 58

IV.     OT has proven by a preponderance of the evidence that Barney converted the OT Laptop and the confidential information contained on it. ................................... 58

    A.     Legal standards and burden of proof. .................................................... 58

    B.     OT had a right to the OT Laptop, and an absolute and unconditional right to the immediate possession of the OT Laptop. ................................... 58

    C.     Ocean Tomo made a demand for possession of the OT Laptop. ......................... 59

    D.     OT has proven by a preponderance of the evidence that Barney wrongfully and without authorization assumed control, dominion, or ownership of the OT Laptop. ................................... 59

    E.     OT suffered damages as a result of Barney's conversion of the OT Laptop. ....... 60

V.     OT has proven by a preponderance of the evidence that Barney violated the Computer Fraud and Abuse Act ("CFAA")................................... 60

    A.     Legal standards and burden of proof. .................................................... 60

    B.     Barney violated 18 U.S.C. § 1030(a)(2)(c) and (a)(5) through his wiping of the OT Laptop and wrongful copying of OT confidential information. ........... 60

    C.     Barney's conduct violating the CFAA caused OT damage. ................................ 62

    D.     Barney's conduct caused a loss aggregating over $5,000 in value. ...................... 62

VI.     OT has proven by a preponderance of the evidence that Barney breached the CAP Agreement. ................................... 62

    A.     Legal standards and burden of proof. .................................................... 62

    B.     The CAP Agreement is a valid and enforceable contract. ................................... 63

    C.     OT substantially performed under the contract. ................................................ 63

    D.     Barney breached the CAP Agreement. ............................................................. 63

    E.     OT was damaged by Barney's breach of the CAP Agreement............................ 63

VII.     OT has proven by a preponderance of the evidence that Barney and PR tortiously interfered with OT's prospective business advantage in the NTT joint venture. ................................... 64

    A.     Legal standards and burden of proof. .................................................... 64

B.     OT proved by a preponderance of the evidence that it had a reasonable expectancy of a valid business relationship with NTT. ........................................ 64

C.     Defendants admit that Barney knew of OT's valid business relationship. ............ 64

D.     Barney intentionally interfered with the NTT joint venture, causing it to fail. ................................................................................................ 65

E.     Barney and PR's interference with the NTT joint venture damaged OT. ............ 66

F.     Barney and PR were not privileged to compete against OT. ............................... 66

VIII.  OT has proven by clear and convincing evidence that the Licensed Patents are invalid and/or unenforceable ...................................................................... 67

A.     Legal standards and burden of proof. ................................................... 67

B.     The Licensed Patents are invalid as directed to patent-ineligible subject matter. ................................................................................................ 67

C.     The Licensed Patents are invalid as obvious under 35 U.S.C. § 103. .................. 69

    1.     Prior art for the Relevance Patents. ................................................ 70

    2.     Prior art analysis for the Ratings Patents. ...................................... 71

    3.     Prior art analysis for the Valuation Patent. .................................... 72

    4.     Prior art analysis for the Obsolescence Patent. .............................. 72

    5.     All the Licensed Patents are invalid as obvious. ............................ 73

D.     The Licensed Patents are unenforceable for patent misuse. ................................ 73

# Proposed Findings of Fact

## I.     The Parties

### A.     Ocean Tomo, LLC

1.     Ocean Tomo, LLC ("Ocean Tomo or OT") is an Illinois limited liability company located in Chicago. (Dkt. No. 396 at ¶ 17). OT was co-founded by James Malackowski and Andrew Carter in 2003. Malackowski is the firm's CEO and majority owner. (DX052 at OT_00005292; Dkt. 336 at 868:10–18; PX931 at OT_00000996–997.) OT is a financial consulting service firm focused on intellectual property—primarily patents. (Dkt. 333 at 118:10–20).

### B.     Jonathan Barney

2.     Jonathan Barney is a patent attorney currently living in Newport Beach, California. (Dkt. No. 175 at ¶ 2, Dkt. 346 at 2636:15–2636:16). Since 2004, Barney has owned a minority interest in OT. (Dkt. No. 175 at ¶ 2). Barney was also an employee of OT with the title of Managing Director from January 1, 2005, until he resigned from OT effective February 25, 2011. (PX038 at OT_E_00466738; PX434 at OT_E_00466738).

3.     Barney is a named inventor on a set of ten patents related to analysis of patents using statistical tools: U.S. Patents Nos. 6,556,992 ("the '992 Patent"), 7,657,476 ("the '476 Patent"), 7,716,226 ("the '226 Patent"), 7,949,581 ("the '581 Patent"), 7,962,511 ("the '511 Patent"), 8,131,701 ("the '701 Patent"), 8,504,560 ("the '560 Patent), 8,818,996 ("the '996 Patent"), 9,075,849 ("the '849 Patent"), and 9,177,349 ("the '349 Patent") (collectively "the PR Patents" or "Licensed Patents") (PX238 at ¶ 2).

### C.     PatentRatings, LLC

4.     PatentRatings, LLC ("PatentRatings or PR") is a California limited liability company located in Irvine California and was founded by Barney in 2000 to market his automated platform for analyzing U.S. Patents. Its principal place of business is in Irvine, California. (Dkt.

No. 175 at ¶ 3, 7, Dkt. 336 at 695:14–21, PX022 at JB–PR000000207919). In 2004, OT acquired a 25% interest in PR, and still retains that interest. (Dkt. No. 175 at ¶ 9; Dkt. 336 at 727:3–11).

## II. The OT-PR Relationship Begins (2003–2004).

5.     In 2004, Malackowski learned of PR and arranged to meet with Barney. (Dkt. 336 at 674:14–677:25; 682:17–683:10). At their meeting and in subsequent discussions, Malackowski and Barney shared a vision for expanding the patent ratings system globally, leveraging the OT brand. (Dkt. 336 at 688:9–14; 693:20–694:8; PX22 at JB-PR000000207890; PX21 at 15).

6.     In June 2004, OT, Barney, and PR executed a term sheet for the parties' business relationship. (PX438). The deal had three basic parts: (1) an exchange of equity wherein OT would receive a 25% interest in PR and Barney would receive a 6.8% interest in OT; (2) OT would hire Barney as an employee of OT with the title of Managing Director of a new Ocean Tomo Patent Ratings ("OTPR") division[1]; and (3) PR would license its patented technology to OT. (PX438 at OT_E_00164988, OT_E_00164990; Dkt. 336 at 766:12–15).

7.     Prior to OT's negotiation of its agreements with Barney and PR, PR had licensed its patented technology to another company in which Barney had a majority interest, Rosebay Capital Management, LLC ("Rosebay"). This license was limited to use in making stock investments. (Dkt. 336 at 698:20–699:12; Dkt. 345 at 2452:19–22; DX566).

8.     OT wanted an exclusive and worldwide license to the patented PR technology so that it could build a global patent ratings system. (Dkt. 336 at 703:21–704:5).

---

[1] Throughout these Proposed Findings of Fact and Conclusions of Law, Defendant PatentRatings will be referred to as "PatentRatings" or "PR," while the Ocean Tomo Patent Ratings division will be referred to as "OTPR." This is consistent with the terminology the parties used at trial. (Dkt. 334 at 332:23-333:5).

### III.    2004 Contracts between OT, PR, and Barney.

9.      OT and PR entered into a License Agreement effective September 1, 2004 ("the 2004

License Agreement"). (PX29). The initial draft of the License Agreement was prepared by PR.

(Dkt. 340 at 1881:12–1881:15).

10.     OT hired Barney under a January 1, 2005 Employment Agreement ("the Employment

Agreement") at a starting base salary of $190,000 a year which increased over time (PX38; Dkt.

336 at 739:1–19; PX288 at OT E 00466719; PX38 at OT_E_00466726–27).

11.     OT, Barney, and PR also entered into an Equity Exchange Agreement dated December

31, 2004 providing the swap of equity ownership between the parties. The Equity Exchange

Agreement was admitted into evidence as PX35.

### A.    Relevant terms of the 2004 License Agreement.

#### 1.    Scope of the License

12.     Paragraph 3.1 of the 2004 License Agreement states that:

> "LICENSOR [PR] hereby grants to LICENSEE [OT]… a limited exclusive,
> royalty-free, worldwide, non-transferable (except as provided in Article 11)
> license to: (a) reproduce, install, and use the PatentRatings Tools and
> Improvements at Licensed Sites for LICENSEE's internal use only and for the
> other uses expressly permitted herein, and (b) distribute, sell, license or other
> transfer for use (or offer to sell, license or otherwise transfer for use), and display
> PatentRatings Analysis to third parties for a fee." (PX29 at OT_E_00005110–
> 111).

13.     Paragraph 1.11 of the 2004 License Agreement defines "PatentRatings Tools" as:

> "LICENSOR's technology, know-how, software (computer algorithms,
> techniques, for statistically analyzing, rating, mapping and valuing patents and/or
> other intellectual property assets, and including any documentation and research
> relating to such software) and other LICENSOR intellectual property relating to
> the foregoing (including the PatentRatings Patents, PatentRatings Copyrights and
> PatentRatings Marks). (PX29 at OT_E_00005110).

3

14. Paragraph 1.10 of the 2004 License Agreement defines "PatentRatings Patents" as

"all patent applications and patents, and all continuations, continuations-in-part, divisionals, and foreign counterparts of such patents and patent applications that are owned by LICENSOR." (PX29 at OT_E_00005110).

15. Paragraph 1.7 of the 2004 License Agreement defines "PatentRatings Analysis" as

"any information or report including or using the data output of one or more PatentRatings Tools, including patent rating reports (e.g., IPQ scores and related analysis), portfolio mapping analysis, strategic analysis and recommendations, and patent valuation (collectively, 'PatentRatings Analysis')…" (PX29 at OT_E_00005109).

16. "IPQ scores" (a statistical measure of the likelihood that a patent will be maintained)

(PX1165 at 24) and "Relevancy scores" (a statistical measure of the likelihood that a patent will

cite to another patent) (PX 1165 at 28; DX459 at 1) are the primary statistical outputs of the PR

Tools. (Dkt. 333 at 127:16–25, 146:18–21; Dkt. 334 at 242:22–243:9; Dkt. 340 at 1809:5–13;

1825:17–1826:1).

## 2. Exclusivity

17. Paragraph 3.1 of the 2004 License Agreement grants OT exclusivity:

The licensed rights granted above under Article 3.1(a) shall be exclusive to LICENSEE during the term of this Agreement for the specific business of IP Merchant Banking as defined herein. The licensed rights granted above under Article 3.1(b) shall be exclusive to LICENSEE during the term of this agreement for the unique products and services developed by or for LICENSEE incorporating the PatentRatings Analysis. (PX29 at OT_E_00005111).

18. Paragraph 1.4 of the 2004 License Agreement defines "IP Merchant Banking" as:

"merchant banking services with intellectual property being the secured or target asset underlying one or more merchant banking services, including: asset lending; debt collateralization; sale-lease-back; risk management; investment banking; other products and services offered by LICENSEE now or in the future." (PX29 at OT_E_00005109).

19. The definition of "IP Merchant Banking" in the 2004 License Agreement encompasses

all of OT's business then or in the future. (Dkt. 336 at 731:10–732:10). OT rejected PR's efforts

to insert the word "similar" before "other products and services," keeping the definition broad. (PX29 at OT_E_00005109; DX5; Dkt. 387 at 3667:25–3669:20).

### 3. Royalties and Payments to PR

20. Paragraph 4.1 of the 2004 License Agreement states: "Except as provided in Section 10.3(a) with respect to an Extension Agreement, the Technology License is royalty-free." (PX29 at OT_E_00005111).

21. However, other provisions in the agreement (Sections 4.2 and 4.3) imposed revenue sharing obligations on OT. These provisions allowed OT to use the PR Tools for internal use royalty-free, while requiring OT to pass through to PR revenues earned for selling PR data to clients. OT would indirectly profit from those revenues as a 25% shareholder in PR. (PX29 at OT_E_00005111–12, Dkt. 336 at 704:6–705:2).

### 4. Ownership of Improvements to the PR Tools

22. Paragraph 5.3 of the 2004 License Agreement states:

> "All Improvements will be owned by LICENSOR. Should LICENSEE or its Affiliates develop, either solely or jointly with LICENSOR, any Improvement, LICENSEE will communicate to LICENSOR all Improvements developed by LICENSEE or its Affiliates as and when developed. LICENSOR will, at its own option and expense, file and obtain letters patent or other protections for Improvements, and LICENSEE agrees to cooperate with LICENSOR in executing all necessary documents for obtaining any letters patent or copyrights for such Improvements. All Improvements developed by LICENSEE will automatically become part of the Technology License without any further consideration." (PX29 at OT_E_00005113).

23. PR insisted on provision 5.3 as a condition to entering the license. (Dkt. 337 at 977:22–978:19).

24. Paragraph 1.3 of the 2004 License Agreement defines "Improvement" as "any revisions, updates, upgrades, new versions or releases of the PatentRatings Tools." (PX29 at OT_E_00005109).

### 5. Non-Compete Provision

25. Paragraph 6.1 of the License Agreement prohibits OT from developing competing tools and products:

> "During the term(s) of this Agreement and for a period of three years thereafter, neither LICENSEE, nor any Affiliate of LICENSEE, will make, cause to be made, or assist others to make any statistical patent analytics tools, patent ratings or associated products that are derivative of, or substantially similar to the PatentRatings Tools or the PatentRatings Analysis." (PX29 at OT_E_00005114).

PR insisted on this provision as a condition to entering the license. (Dkt. 345 at 2485:12–2485:23).

### 6. 2004 License Agreement's Effect on Third Parties

26. Paragraph 1.7 of the 2004 License Agreement, discussed in paragraph 15 *supra*, states that PR Analysis does not include sublicensing of the PR Tools. (PX29 at OT_E_00005110).

27. Paragraph 3.2(a) of the 2004 License Agreement states that OT "will not be authorized to assign, transfer, sublicense, or divide any of the rights granted herein or any of its obligations without the express written authorization of LICENSOR." (PX29 at OT_E_00005111).

28. Paragraph 3.1(b) of the 2004 License Agreement authorizes OT to "license … or offer to … license … PatentRatings Analysis to third parties for a fee." (PX29 at OT_E_00005111).

29. Paragraph 1.1 of the 2004 License Agreement defines "Affiliate" as:

> "any person, natural or otherwise, who is an agent, representative, distributor, division, or subsidiary, whether wholly owned or otherwise, of the party to this Agreement or who is controlled or directed by such party. For purposes of this definition, the term 'control' will mean the power to direct or cause the direction of the management or policies of such person or, with respect to a person that is a corporation, the right to exercise, directly or indirectly, more than 50% of the voting rights attributable to the shares of the capital stock of such corporation." (PX29 at OT_E_00005108–09).

30. The combined effect of Paragraphs 1.1 and 3.2(a) and (b) of the 2004 License Agreement is that OT is not allowed to sublicense the PR Tools to a third party, but **is** allowed to license PR

Analysis to third parties and to form joint ventures with third parties in which OT has a controlling interest. Those joint ventures as Affiliates of OT will be part of the License. (Dkt. 336 at 835:20–836:7; Dkt. 337 at 926:6–18; Dkt. 340 at 1875:2–5, 1876:18–1877:2; Dkt. 387 at 3689:24–3690:17).

**B.    Relevant terms of the Employment Agreement.**

31.    Section 5.2 of the Employment Agreement states:

"The Executive [Barney] understands and acknowledges that during his employment with the Company he will be exposed to Confidential Information that is proprietary and that rightfully belongs to the Company. The Executive agrees that he will not use or cause to be used for his own benefit, directly or indirectly, or disclose any of such Confidential Information at any time, either during or after his employment with the Company, whether or not such Confidential Information is developed by the Executive, except (a) to the extent that such disclosure or use is directly related to and required by Executive's performance of his duties to the Company; (b) with the prior written consent of the Company; or (c) in response to a subpoena or similar legal process or to discovery proceedings . . . The term 'Confidential Information' means any information not generally available to the public that was obtained from the Company, or any of its Affiliates or that was learned as a result of the performance of any services by the Executive to or on behalf of the Company . . ." (PX38 at OT_E_00466730).

32.    All OT employees were required to sign agreements with confidentiality provisions similar to that in the previous paragraph. (Dkt. 335 at 525:15–528:17).

33.    Section 5.1(b) of the Employment Agreement states:

"Except as otherwise expressly provided in his agreement, the Executive agrees that during the Noncompetition Period (as hereafter defined) the Executive will not, directly or indirectly . . . be employed by, carry on, be engaged in, concerned with or interested in, or render services or advice to, or own, lend money to, guarantee the debts or obligations of, share in the earnings of, or invest in the stock, bonds or other securities of any Person (other than the Company and its subsidiaries and/or its Affiliates) engaged in, concerned with or interested in (directly or through its Affiliates) any business in which the Company ( or any of its Affiliates) is engaged at the time of termination of the Executive's employment hereunder (a "Competing Business"); . . . For purposes of this Agreement, 'Noncompetition Period' means the period commencing on the date of this Agreement and ending on the first anniversary of the termination of the Executive's employment under this Agreement." (PX38 at OT_E_00466729–30).

34.     Section 5.1(c) of the Employment Agreement states:

"The Executive [Barney] further covenants and agrees that during the Noncompetition Period he will not, directly or indirectly, whether for his own account or for the account of any other Person: (i) interfere with the relationship of the Company or any of its Affiliates with any executive, employee, customer, supplier or creditor of the Company or any of its Affiliates, or party with whom the Company or any of its Affiliates has a material business relationship, . . . or (iv) take any action that is intended to or could reasonably be expected to divert from the Company or any of its Affiliates any business opportunity that would be within the scope of any business then conducted by the Company or any of its Affiliates. (PX38 at OT_E_00466730).

35.     Section 5.4(a) of the Employment Agreement states:

"The Company and the Executive agree and declare that it is impossible to measure in monetary terms the damages that may accrue to the Company by reason of the Executive's breach of his obligations under Sections 5.1, 5.2, or 5.3 and that any breach of Sections 5.1, 5.2 or 5.3 will cause the Company irreparable injury." (PX38 at OT_E_00466731).

## IV.     OT begins promoting its PatentRatings division, OTPR (2004–2005).

### A.     OT immediately discovers problems with the PR technology.

36.     Once the three agreements were signed, OT began promoting the OTPR business internally, and established an office in Irvine, California for Barney and the OTPR division. (Dkt. 336 at 761:17–762:22). However, within six months, Malackowski learned that the PR system needed substantial development work to make it web-enabled, scalable, and automatic. (Dkt. 336 at 767:12–25; PX285 at JB-PR00000058968–69).

37.     OT agreed to lend PR funds for this work and to provide management services governed by a Management Services Agreement ("MSA"). (PX044).

### B.     While the parties worked to fix the system, OT continued to promote OTPR and planned to expand the OTPR business.

38.     Based on Barney's assurance that OT's infusion of funding would fix the system, OT continued to promote the OTPR business internally, and externally through conferences, direct-mailing, and speaking to media. (Dkt. 336 at 774:2–775:10; PX317 at 2–3).

39. In early 2005, OT also began developing business in Japan in the hopes of finding a partner for a Japanese joint venture as part of OT's planned global patent ratings system. (Dkt. 336 at 786:12–787:5).

**V.      The parties sign the Supplemental License Agreement (2006) to expand OT's rights.**

40. Because the 2004 License Agreement included a carve-out for Rosebay's use of PR Analysis for investment purposes, OT needed another agreement to be able to build an investment index using PR Analysis. So, OT began to negotiate a new agreement with Barney, PR, and Rosebay. (Dkt. 336 at 777:15–778:15).

41. Those negotiations resulted in a Supplemental License Agreement between OT and PR dated May 18, 2006. (PX51).

42. Section 2.2 of the Supplemental License Agreement grants to:

> "OT and its Affiliates … a perpetual, limited exclusive, non-transferable (except under Section 11.2) right and license in the Territory to install, use, copy, distribute, transmit, display, make have made, sell, offer to sell, import, and otherwise exploit the Licensed Technology, Licensed Data and Data Updates in the OT Near Exclusive Field of Use." (PX51 at OT_E_00005137).

43. The Supplemental License Agreement defines "OT Near Exclusive Field of Use" as:

> "the use of the Licensed Technology and Licensed Data for the purpose of: creating or managing public securities investment funds and accounts for Persons; creating or managing a public stock index; selling securities-related information to third-party investment analysts; and generally engaging in the buying, selling and trading of any security (as defined in the Securities Act of 1933, as amended)." (PX51 at OT_E_00005136).

44. The Supplemental License Agreement defines the term "Licensed Technology" as:

> "PR's proprietary PatentRatings™ software platform, U.S. Patent No. 6,556,992; US Patent Application Numbers 60/754, 525, 11/236,965, 2004/0010393 and 2004/0220842 and any patents issuing therefrom or related thereto; Improvements to any of the foregoing; and any copyright, trade secret, and other intellectual property rights inherent therein and appurtenant thereto." (PX51 at OT_E_00005136).

9

45.     The Supplement License Agreement defines the term "Territory" as "the entire World." (PX51 at OT_E_00005136).

## VI.     OT continues promoting its OTPR division while fixing the PR software (2005–2007).

### A.     OT continues to promote the OTPR division, but OT's initiatives fail to show a profit due to problems with the PR system.

46.     While OT worked to develop the PR system under the MSA, Malackowski continued to secure good publicity for several OT initiatives that involved PR data, but none of them were ultimately successful. (Dkt. 387 at 3721:24–3723:18, see ¶¶ 48–51, *infra*, for specific examples).

47.     As part of this publicity effort, an article titled "The Patent Machine" in July 2006 profiled OT. The article discussed OT's planned OT 300 index, its first patent auction held in April 2006 and its planned auction in October 2006, and anticipated funding from Perot Investments. The article says that "Malackowski calls Patent Ratings the glue that holds Ocean Tomo together."[2] (PX317 at JB-PR000000001957; Dkt. 336 at 775:16–776:24).

48.     The OT 300 index resulted in a small amount of income to OT, on the order of tens of thousands of dollars, but over time the index's performance degraded. The OT 300 index declined and was ultimately discontinued. OT spent over $700,000 on direct marketing for the OT 300 index, and so lost money on it. (Dkt. 387 at 3720:12–3721:20).

49.     The Perot Investments funding also failed to show a profit. OT used the PR Tools to identify four investment opportunities for the Perot fund. After the Perot fund did further diligence, it rejected all four opportunities, and then closed the fund without making any investment. (Dkt. 387 at 3721:21–3722:14).

---

[2] As demonstrated in paragraphs 47-51, 62-66, and 79-83, the glue ultimately failed and made a sticky mess.

50. OT attempted to use its patent auctions to promote PR IPQ scores. However, the market participants did not find the IPQ scores useful, and the scores were only advertised in one or two auctions. (Dkt. 387 at 3723:4–18).

51. The primary revenue generating uses of the PR data were the sales of data subscriptions, sales of PR data, and sales of "Analytics" reports, which comprised PR data with accompanying data description and analysis. (Dkt. 336 at 805:3–806:16; PX763; Dkt. 386 at 3568:14–3569:3; 3573:4–18; 3615:2–12; PX1138). However, the revenue generated did not exceed expenses and the OTPR division was unprofitable. (PX822 at 10; Dkt. 336 at 833:13–22; Dkt. 337 at 918:15–919:1; Dkt. 343 at 1248:7–14; Dkt. 339 at 1569:11–20, 1570:23–1571:2; Dkt. 387 at 3841:21–25; Causevic 1/12/2017 Dep Tr. 117:23–118:3).

**B.      Under OT's management, Barney represents that the PR system has been made automated.**

52. By June 2007, OT's loans to PR under the MSA reached over $1.5 million. OT had directly spent $1.8 million under the MSA plus another $400,000 of OT overhead allocated to the OTPR division. (Dkt. 336 at 790:9–791:18).

53. Barney proposed that the parties go back to a non-managed service relationship. (PX281; Dkt. 336 at 791:19–792:17). Malackowski was skeptical that the system was ready and offered to extend OT's loan further. Barney responded that the additional loan was not needed and the system was ready. (PX281; Dkt. 336 at 793:6–794:9).

**VII.      The 2007 Amendment to the Parties' Agreements**

54. The parties reached an agreement dated July 19, 2007, titled "Amendment" (the "2007 Amendment"). (PX437). The 2007 Amendment made modifications to the 2004 License Agreement, but made no changes to the Supplemental License Agreement. (PX437).

55. OT negotiated a reduction of the control required under the "Affiliate" definition from 50% as provided in the 2004 License Agreement to 35%. OT sought this reduction because it anticipated that the global expansion of the licensed ratings system would be pursued through joint ventures and that OT's equity interest in these ventures could be less than 50%. Accordingly, the Affiliate definition was modified to assure that these joint ventures would be within the scope of the 2004 License Agreement. (PX437 at ¶ L, Dkt. 336 at 799:22–800:23).

**VIII. OT and Barney sign additional agreements governing Barney's relations with OT: The Computer Asset Policy and the Operating Agreement (2007)**

56. In 2007, OT was also revising its computer policy and its Operating Agreement. After revisions, Barney signed a Computer Asset Policy Agreement ("CAP Agreement") on April 27, 2007, (PX54), and signed the Second Amended and Restated Operating Agreement of OT (the "Operating Agreement"), dated January 1, 2008 (DX52).

**A.    Relevant provisions of the Computer Asset Policy Agreement.**

57. The CAP Agreement was a standard agreement generally signed by all OT employees. (Dkt. 334 at 213:23–215:2). It states:

> "No alterations, upgrades, or modifications should be made to hardware and software purchased by the organization and provided to the employee. The organization retains ownership of all hardware and software provided to the employee. The employee should ensure the hardware devices and software programs provided by the organization are protected from theft and physical damage using reasonable precautions." (PX54).

58. The CAP Agreement also states, above Barney's signature:

> "By signing below, I agree to the following terms: I received and read the Computer Asset Policy. I understand and agree that any hardware equipment and software programs provided to me by the organization remains the property of the organization. I understand I am not to modify, alter, or upgrade any hardware or software programs provided to me by the organization. I understand I must make reasonable efforts to protect all organization provided hardware equipment and software from theft and physical damage." (PX54).

### B.    Relevant provisions of the Operating Agreement.

59.    Section 13.17(a) of the Operating Agreement contains a provision similar to the confidentiality provision of the Employment Agreement which applies for so long as a Member owns Units (DX52 at OT_00005285).

60.    Section 13.17(b) of the Operating Agreement contains a provision similar to the non-compete provision of the Employment Agreement which also applies for as long as the Member owns Units (DX52 at OT_00005285–86).

61.    Section 13.17(d) of the Operating Agreement states that:

> "The parties hereto agree that money damages would be an inadequate remedy for any breach of this Section 13.17, and, therefore, in the event of a breach or threatened breach of this Section 13.17, the Company may, in addition to other rights and remedies existing in its favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security)." (DX52 at OT_00005286, emphasis in original).

### IX.    OT continues selling OTPR products and begins negotiations with potential partners for foreign joint ventures (2007–2010).

### A.    The PR System is not in fact ready for primetime, and OT brings in additional resources to fix the system.

62.    Though Barney said the PR system was salable and scalable as of the 2007 Amendment, OT discovered it still was not. OT then hired additional technical employees, Jason Cohen and Vily Dardanes, to fix the system. (Dkt. 336 at 824:19–826:24, 827:24–828:16, 828:23–829:2; PX285 at pp. 2–3).

63.    OT repeatedly started projects to secure the PR code base or to move information in case of an emergency. Barney blocked each of those projects with last-minute objections or failure to cooperate. (Dkt. 334 at 236:3–238:5; Dkt. 335 at 548:19–550:9; Dkt. 336 at 829:6–16; PX267).

**B.     OT faces competitors charging significantly lower prices, but PR refuses to enforce the Licensed Patents.**

64.     In November 2009, Cohen met with representatives of a company named Innography. He reported back that Innography had a ratings and relevance engine, provided a ratings score, and allowed users to bucket a list of patents and compare companies. Innography was charging 1/10 of what OTPR charged for its ratings. (PX250 at JB-PR000000471814).

65.     OT asked Barney to take action to enforce the Licensed Patents against Innography. Barney never did so; he did not send any cease and desist letter or file any patent infringement lawsuit against Innography. (Dkt. 346 at 2645:13–2646:1)

66.     Innography was not OTPR's only infringing competitor. OT notified PR of multiple suspected infringers of the Licensed Patents. Barney and PR did nothing about them. (Dkt. 336 at 819:9–821:11; PX176 at 2–3; PX525; PX685; PX686; PX695).

**C.     OT sends Barney to Paris to finish a detail with Caisse des Depots ("CdC"), a French company with whom OT intended to form a joint venture to develop and sell European patent ratings.**

**1.     Barney's assignment to Paris.**

67.     In September 2008, Malackowski offered to send Barney to Paris to finish a deal with Caisse de Depot ("CdC"), a French government bank, to create a joint venture to develop and sell European patent ratings. (PX288 at OT_E_00466718, PX544 at OT_00005886, OT_00005889). Barney accepted the offer. (PX288 at OT_E_00466725; Dkt. 336 at 831:2–832:6; Dkt. 334 at 302:9–11).

68.     OT's directive to Barney for his assignment to France was to complete the joint venture with CdC. (Dkt. 336 at 834:20–835:5; PX544 at OT_00005886, OT_00005889).

### 2. Negotiations between OT and CdC

69.     In late 2008, there were management meetings between Barney, Cohen, and Willy Manfroy, an outside consultant, to discuss the planned joint venture between OT and CdC. During those meetings, Barney fully endorsed the plan to expand the PR system to Europe through the joint venture. (Dkt. 334 at 226:4–228:23).

70.     In October 2008, Malackowski sent an email to Cohen detailing goals for 2008. The first listed goal was a "Global OTPR platform and integration including EU and one or more Asian patent databases." (DX65). Barney was aware of OT's goal of building a global patent rating system including Europe and voiced no objection. (Dkt. 334 at 231:23–233:16).

### 3. The planned joint venture between OT and CdC.

71.     On June 17, 2009, OT and CdC signed a Memorandum of Agreement ("MOA) to create a joint venture. (Dkt. 336 at 837:11–838:15; PX761 at JB-PR00000017191–17208). According to the MOA, a new company would be created and OT and CdC would each own 50%. (PX761 at JB–PR00000017202). As a 50% OT owned entity, the joint venture would be an Affiliate under both the 2004 License Agreement (as amended) (PX437 ¶ L) and the Supplemental License Agreement (PX051 at OT_E_00005135).

72.     The parties contemplated that CdC would invest funds to build the European patent ratings system and have the right to sell US patent ratings in Europe; OTPR would have the right to resell European patent ratings in the United States. (Dkt. 336 at 836:12–23; PX544 at OT_00005886–887; PX854 at 6–7, 20).

73.     On February 8, 2010, OT and CdC entered into a more detailed term sheet establishing the main terms and conditions for the joint venture. (PX854; DX516). Barney and PR also signed the term sheet. (DX516 at JB-PR000000046055)

### 4. Barney interferes with the CdC deal at the last minute.

74. As the parties moved forward in finalizing the joint venture in accordance with the MOA, Barney belatedly raised "concerns" about the economics of the CdC transaction and the need for PR to sign off—concerns that he had never raised before or during discussions of the CdC deal or the many months of his work in Paris. (Dkt. 336 at 838:17–841:13).

75. On January 27, 2010, Barney emailed Malackowski and OT's general counsel Joel Lutzker alleging eight legal concerns about the CdC term sheet. (PX414 at JB-PR000000430419–421). Malackowski responded that

> "it is disappointing that you did not raise the license concerns during the months of negotiation with CdC. Going back to them now will result in significant delay and potentially end the relationship. Importantly, your suggestion on changing the economics is completely unacceptable." (Dkt. 336 at 838:17–841:13; PX414 at JB-PR000000430418–419).

### 5. Barney's interference ultimately kills the CdC joint venture.

76. OT continued pursuing the joint venture with CdC. Then, on February 18, 2011 (after Barney sent his resignation letter but while he remained an OT employee), OT received an email from Patrick Terroir, the lead negotiator of CdC, saying:

> I was shocked and disappointed to learn that OT and PR have a deep disagreement concerning the scope of the licenses granted by PR to OT in relation with the OTPR, especially since OT repeatedly represented to CDC that OT's IP rights relating to the OTPR were secured and that the strong relationship between OT and PR would be the foundation for a successful partnership, such that CDC finally agreed to a certain contractual scheme in consideration of these representations." (PX769 at JB-PR000000278192; Dkt. 336 at 842:21–843:6; PX434).

77. No one at OT had told CdC about any disagreement between OT and PR as of February 18, 2011, so Malackowski concluded that Barney must have told CdC of the disagreement. Terroir and Manfroy later confirmed that they had learned of the disagreement from Barney. (Dkt. 336 at 843:7–23).

78. The CdC deal could not be salvaged, and OT, PR, and CdC ultimately entered into a WIPO mediation settlement to resolve the dispute resulting from the failure of the joint venture deal. (PX548 at JB-PR000000046126).

## X. OT learns that the PR software is deeply flawed, leading to a rift between the parties (2010–2011).

79. In 2010, OT hired a President, Jake Geleerd, and charged him with making the OTPR business profitable. Geleerd's approach began with bringing in expert consultants to assess the problems with the PR software. (Dkt. 337 at 902:4–903:6).

80. On December 31, 2010, Malackowski sent an email to Barney asking him to develop "a more realistic plan" to turn around the OTPR business, and to provide a plan by mid-January. Barney never came up with one. (PX245; Dkt. 336 at 660:1–661:6; Dkt. 337 at 908:16–910:18).

81. As Barney still had no plan to fix the OTPR system, OT sent Barney a letter on January 19, 2011, stating that PR was in breach of the license agreements because it had failed to maintain PR Tools that "accurately and correctly perform the functions they were designed to accomplish." (PX451 at OT_E_00206773; Dkt. 336 at 662:20–663:1).

## XI. Barney resigns from OT in February 2011.

82. OT proposed that the parties jointly go to arbitration to determine who would be responsible for maintaining the PR software. Barney refused, and so OT filed a request to arbitrate on its own. (Dkt. 337 at 920:13–921:6).

83. On February 14, 2011, Barney delivered a letter to OT stating that he was resigning from OT effective February 25, 2011. (PX434; Dkt. 335 at 531:6–16; PX326).

84. Malackowski responded to Barney's letter of resignation by email the next day, writing:

> I look forward to working with you in your capacity as CEO of PatentRatings, LLC. As you know, OT remains committed to building the PatentRatings business and we will work hard to further your vision for a global ratings market.

17

. . . I look forward to dinner and a fine glass of wine together when all the transition dust settles." (PX326).

## XII. Barney becomes openly hostile to OT after his resignation, defaming the company to industry publications.

85. Shortly after Barney's resignation, Intellectual Asset Management magazine ("IAM"), published an article titled "Lawsuit follows departure of key Ocean Tomo partner." (PX489). IAM is the most popular blog in OT's industry. (Dkt. 336 at 664:17–22). The article revealed confidential information about OT's business plans disclosed by Barney. (PX489).

86. Lutzker sent Barney an email the next day advising Barney that his comments to IAM breached the confidentiality provisions of the Employment Agreement and Operating Agreement. He also asked that Barney confirm there will be no further violations. (PX259).

87. Barney responded to Lutzker, writing:

> Everything I disclosed to Joff in this article… was 100% factually accurate and did not breach any confidentiality obligations owed to either OT or CdC. . . . In the meantime, and for the record, I do not plan to stop speaking the *truth* about Jim or Ocean Tomo and will continue to do so at every opportunity to the fullest extent allowed by law. Just because Jim wants to behave like an *ass* does not mean I have to keep it secret or confidential. Last time I checked, being an *ass* is not a protectable trade secret." (PX259, emphasis in original).

## XIII. Barney returns his OT laptop forensically wiped of all data, in violation of OT policy and his Employment Agreement.

### A. After resigning, Barney initially fails to return his OT-issued laptop.

88. As part of his employment with OT, Barney had been issued a laptop owned by OT, a Lenovo T400 ("the OT Laptop"). (Dkt. 343 at 1307:5–1307:8, PX753 at ¶2.a.). Barney's laptop maintained extensive records regarding the day-to-day business of OT, its business strategies and its finances. (PX822 at 32; Dkt. 335 at 532:12–20).

89. OT had a general policy of conducting exit interviews with all OT employees as part of their termination. (Dkt. 335 at 534:7–17). OT's Human Resource Director, Chuinard, traveled

from Chicago to Irvine, California but Barney did not show up to meet with her. During a subsequent telephone exit interview, Chuinard requested that Barney return the OT Laptop. (Dkt. 335 at 539:4–19, 553:21–555:1, 594:8–13; PX116). Barney did not do so at that time. (Dkt. 335 at 558:6–8).

### B. Barney returns the OT Laptop four months later.

90. Despite repeated requests, Barney's laptop was not returned until June 14, 2011. (PX122, DX162; PX116; Dkt. 335 at 553:21–555:1, 594:8–13). Upon receipt, Chuinard immediately delivered the laptop to Michael Weil, a forensic analyst with Huron Consulting. (Dkt. 335 at 558:23–25, 561:14–24).

91. Analysis determined that the OT laptop was forensically wiped clean with hexadecimal zeroes, making it impossible to recover any data from the laptop. (PX753 at ¶ 23; Dkt. 335 at 605:18–606:9, 609:23–613:2; Crouse Dep Tr. 22:24–23:8). This is consistent with an intentional effort to hide data. (Crouse Dep Tr. 28:10–29:10).

92. The hard drive could not have been overwritten entirely with hexadecimal "00" bytes without special software. Merely reformatting the hard drive or deleting the files through the Windows operating system would not result in such a wiped hard drive. Similarly, physical or magnetic damage would not result in a hard drive written entirely with hexadecimal "00" bytes. (Dkt. 335 at 613:15–619:24; Crouse Dep. Tr. 51:20–53:11, 55:5–22, 57:7–20).

### C. The evidence indicates that Barney or someone at Barney's direction erased the OT Laptop before returning it.

93. OT does not permit OT employees to wipe laptops with hexadecimal zeroes. Cohen testified that as Chief Technology Officer, he never instructed any OT employee to wipe a laptop or forensically delete information. (Dkt. 334 at 216:11–217:2; 218:19–219:4).

94.     OT's standard practice for the return of a laptop from departing directors and managing directors is to retrieve the laptop and lock it in the office of OT's CTO or chief administrative officer for preservation until OT's CEO or General Counsel determines that there are no potential issues or litigation related to the employee and the materials on the laptop. (PX 753 at 12–13; Dkt. 335 at 533:25–534:6).

95.     PR's expert Crouse did not dispute OT's practice and is aware of other companies with similar practices. (Crouse Dep Tr. 39:3–16; 40:9–41:3. 42:6–42:17)

96.     Weil testified that in his experience as a forensic analyst, it is unlikely that a company in OT's position would direct employees to wipe a hard drive with hexadecimal zeroes before examining its content. (Dkt. 335 at 624:2–626:9; PX753 at ¶ 32).

97.     The foregoing evidence shows that OT did not direct anyone to wipe the OT Laptop. As it is unlikely that someone else would have wiped the Laptop on their own initiative, it is more likely than not that Barney wiped the OT Laptop or directed another person to do so.

### D.     Damages from wiping the laptop.

98.     OT expended $40,045 in costs for Weil's forensic investigation of the OT Laptop, including follow-up investigations in December 2011 and March 2012, as a result of Barney's wiping of the laptop. (Dkt. 339 at 1603:16–1604:1; PX822 at 34–35)

## XIV.  Before resigning, Barney copies OT confidential information to a laptop owned by PR; he retains that confidential information today.

### A.     Barney admits that he copied OT files onto a personal laptop, and retained those files after his resignation from OT.

99.     Unbeknownst to OT, in Fall 2010, Barney purchased a laptop with his own personal funds, a Lenovo T410 (the "T410 Laptop"). He then copied all his user files from the OT Laptop to the T410 Laptop. (Dkt. 342 at 2078:25–2080:14).

20

100.    The files Barney copied included essentially every email he sent or received as an OT employee, which were all archived on the OT laptop. (Dkt. 342 at 2081:15–2082:21).

101.    Barney's copying was accomplished through use of a USB device that remains in Barney's possession. (Dkt. 342 at 2083:7–2084:1, 2120:14–2121:2; Crouse Dep Tr. 70:24–71:10).

102.    After copying all of the files from the OT Laptop to the T410 Laptop, Barney admits he permanently deleted all those files from the OT Laptop. (Dkt. 342 at 2084:13–2085:3). He claims that he did so to protect personal and other companies' confidential information, but he did not take any steps to preserve OT documents on the OT Laptop. (Dkt. 342 at 2085:11–19).

103.    Over a course of years, Barney migrated files from the T410 Laptop to two other personal computers, an X1 Carbon laptop he purchased in 2013 ("the 2013 X1C Laptop") and then another X1 Carbon laptop he purchased in 2015 ("the 2015 X1C Laptop"). (Dkt. 342 at 2117:19–2118:24; Crouse Dep. Tr. 80:14–81:18).

104.    Barney used the T410 Laptop as an active computer (as opposed to an archive) after his resignation, and that he used the X1C Laptops as active computers as well. He still uses the 2015 X1C Laptop to this day. (Dkt. 342 at 2117:19–2120:13; Crouse Dep Tr. 67:20–68:19). Despite Ocean Tomo's requests, Barney has never agreed to return or destroy the Ocean Tomo files on his computers. (Dkt. 342 at 2112:9–24; Dkt. 346 at 2670:18–2671:1).

105.    Crouse testified that copying files to a computer that remains in use on a regular basis is "counterproductive" if the goal is to back up or preserve the data. (Crouse Dep Tr. 83:16–85:11).

   **B.    Weil's forensic analysis of the T410 Laptop and X1C Laptops.**

106.    OT retained Weil again in 2016 to perform a forensic analysis of the T410 Laptop and of forensic images of the X1C Laptops. (PX753 at 2–4; Dkt. 343 at 1328:19–1328:24).

107. Weil's forensic analysis discovered that all of the OT files copied from the OT laptop were found on the T410 Laptop, 511 were on the 2013 X1C Laptop, and 235 were on the 2015 X1C Laptop. The decrease in files showed that (1) Barney copied OT files from the T410 Laptop to the X1C Laptops that he continued to use, and (2) he chose which OT files he copied to the successive laptops. (Dkt. 335 at 633:25–635:5; PX753 at ¶¶ 58–59).

108. Weil's analysis showed significant access to OT Information after February 25, 2011. (PX753 at ¶¶ 14–20; Dkt. 335 at 633:25–634:24).

109. Weil found specific OT confidential documents on Barney's computer, among them a June 2010 "Dashboard" Excel spreadsheet admitted as PX314, an April 2010 Financial Reporting Package admitted as PX90, an "OTPR Restructuring Memo" dated January 15, 2011, admitted as PX111, and many others. (Dkt. 335 at 635:6–639:13; PX753 at ¶¶ 60, 63, 79). Crouse agreed with Weil's findings. (Crouse Dep. Tr. 94:12–95:5; 95:20–97:3; 98:22–99:6; 102:14–103:2; 113:16–114:3). Weil testified, and Crouse confirmed, that these documents were stored in the "My Documents" folder where a PC user regularly accesses files. (Dkt. 343 at 1329:2–8, 1329:25–1330:15; Crouse Dep. Tr. 97:14–99:6).

110. The June 2010 "Dashboard" spreadsheet, PX314, is exceedingly valuable, containing the "keys to the [OT] castle." It included every current marketing lead and its status. (Dkt. 337 at 987:7–989:22).

111. The 2011 "OTPR Restructuring Memo," PX111, describes OT's roadmap for developing the global OTPR system. As such, it provides Mr. Barney valuable competitive information to the detriment of OT. (Dkt. 337 at 991:1–20).

112. The April 2010 Financial Reporting Package, PX90, contained detailed financial information about the cost, income, and contribution margin of each OT practice area. It too

provides valuable information to Mr. Barney in setting pricing for a competing system now or in the future. (Dkt. 337 at 991:21–992:21).

113.    The other information that Weil found on Barney's X1C laptops also had great value. It included information confidential to OT's clients, and in some cases privileged information from OT's clients. (Dkt. 337 at 992:22–993:24).

114.    OT takes a comprehensive approach to protecting its confidential information. OT requires each of its employees to sign confidentiality agreements, educates its employees on protecting confidential information, labels documents as confidential, and restricts access to its network drive on a need-to-access basis. (Dkt. 337 at 993:7–14; Dkt. 335 at 525:17–528:17).

### C.    Barney's unjust enrichment.

115.    OT retained Steve Sherman as an expert to calculate recovery due OT under its various claims, including the value of the information that Barney copied. (PX 822 at 1, 11–12, 32). Sherman is a Managing Director at Loop Capital Financial Consulting Services. He was at the global accounting firm, KPMG LLP for over thirty years, including eight years leading their Global Valuation Services business. He served six years as Chairman of the Standards Board of the International Valuations Standards Council, globally recognized as the leading standards setter for the valuation profession. (PX822 at 3; Dkt. 343 at 1394:19–1395:17)

116.    Sherman calculated the value of OT confidential information retained by Barney on his laptop. (Dkt. 339 at 1575:24–1576:14). Sherman performed his valuation using a common approach of determining the cost for a third party to create those intangible assets. (Dkt. 339 at 1576:17–1577:16, 1581:6–1583:17, 1587:3–1589:22, 1597:19–1599:7; PX822 at 35–39).

117.    Sherman's analysis resulted in a detailed calculation of the cost to develop each of six categories of OT documents found on Barney's laptop: Business Documents, Customer Information and Pipeline, Company Finance, Proprietary Models, Competitive Analysis, and

23

Outside Advisor and Consultants. That calculation is contained in Sherman's expert report, admitted as PX822, and summarized on an exhibit to Sherman's report admitted as PX219.

118.    Defendants offered no expert testimony to rebut Sherman's analysis of the value of OT's confidential information.

119.    The summary of Sherman's conclusions as to the value of each of these categories of documents is reproduced in the chart below. (PX219):

| Summary - Cost Approach | | |
|---|---|---|
| Confidential/Trade Secret | Cost | |
| | Low | High |
| Business Documents | $        280,000 | $        350,000 |
| Customer Information and Pipeline | 1,250,000 | 2,130,000 |
| Company Finance | 310,000 | 470,000 |
| Proprietary Models | 210,000 | 290,000 |
| Competitive Analysis | 150,000 | 210,000 |
| Outside Advisor and Consultants | 260,000 | 530,000 |
| Total | $    2,460,000 | $    3,980,000 |

## XV.    Shortly after his resignation, Barney blocks negotiation of the NTT deal, and then attempts to divert the deal to PR.

### A.    OT's relationship with NTT dates back to 2005; over the following years, OT develops a plan to form a joint venture with NTT for Japanese patent ratings.

120.    NTT Data ("NTT") is a sophisticated Japanese technology company (Dkt 337 at 919:19–20; Dkt. 339 at 1528:14–1529:8; PX254 at 2; Causevic Trial Tr 31:12–22). OT's relationship with NTT dates back to 2005. (Dkt. 337 at 945:5–8). OT later, in May 2007, engaged an NTT entity as a client. (Dkt. 337 at 945:5–946:2; PX473; PX822 at 21).

121.    In a 2008 business plan, OT explained that its "long-term business vision" was "to be a key player in building a global intellectual property marketplace." (PX931 at OT_00000984). To that end, OT intended to build out its OTPR business to its "three-legged stool," the three legs being the United States, Europe, and Asia. (Dkt. 387 at 3661:1–3662:11; PX931 at OT_00000984–985; PX254 at 2; PX544 at OT_00005889.).

24

122.     As Managing Director of the OTPR division, Barney was instrumental in developing

OT's business plan. Contemporaneous documents show that Barney was a key player in

developing OT's plans to build the three-legged stool in the U.S., Europe, and Asia through local

partners. (Dkt. 387 at 3662:24–3666:9; PX265; PX1060; PX931 at OT_00000976).

   **B.     OT begins negotiating a joint venture agreement to create a Japanese patent
            ratings system with NTT in 2010.**

123.     Barney did not, himself, initiate OT's discussions with NTT in early 2010 regarding

creating a Japanese patent rating system. (Dkt. 345 at 2586:3–2587:14).

124.     On February 10, 2010, OT and NTT entered into a Preliminary Memorandum of

Understanding ("MOU") for developing a "Japan PatentRatings business." (PX254; Dkt. 337 at

946:10–18). The MOU contemplated that "NTT Data and OTPR would like to work

collaboratively to build PatentRatings for Japanese patents in a spirit of partnership and then

jointly market this along with related services for the Japan market and as part of the planned

worldwide PatentRatings network." It set forth that the parties' plan was an "Initial JV structure

or 3 party ownership (e.g., NTT Data, OTPR, Investors or new special purpose entity)." (PX254

at 1, 3; Dkt. 337 at 946:19–948:1).  As an OT joint venture, this business would be an Affiliate

under both the 2004 License Agreement (as amended) (PX437 at ¶ L) and the Supplemental

License Agreement (PX051 at OT_E_00005135).

125.     Steve Lee—Barney's right-hand man—signed the MOU as President of "PatentRatings, a

division of Ocean Tomo, LLC," together with Takeshi Yokota, Senior Executive Manager of

NTT. (Dkt. 337 at 948:2–9; PX254). Barney approved the MOU. (Dkt. 387 at 3672:14–24).

126.     A July 2010 email from Lee to Malackowski, Barney, Cohen, and Geleerd states that the

NTT deal will proceed in two stages, and the final stage will involve a joint venture between

NTT and OT. (PX334).

127.    In late 2011, Chihara wrote to Lutzker that "NTT DATA explained that we would like to start patent rating business by NTT DATA ourselves with assistance from Ocean Tomo for launching business quickly" and that the parties "decided to go over suitable business structure including joint venture in future after Business launching successfully." (DX575 at 24–25).

### C.    Before Barney's resignation but after the AnswerMine presentation, Barney refuses to confirm PR's consent to the NTT deal, forcing a cancellation of a critical meeting with NTT in February 2011.

128.    In early 2011, OT was scheduled to host NTT for a meeting in the United States to further the OT-NTT joint venture plans. (Dkt. 337 at 952:6–8; PX243; DX 575 at 26).

129.    Before that meeting could occur, however, Barney raised issues that frustrated the process. (Dkt. 337 at 951:8–952:21; PX243). On January 25, 2011, Geleerd emailed Barney, copying Malackowski, writing:

> "I am disappointed that despite your intimate involvement in this process, you are frustrating its progress and refuse to formally confirm PR's consent to the contemplated arrangement with NTT. Under these circumstances, it makes no sense to proceed with the this [sic] opportunity and meeting as scheduled. I will instruct Steve to discontinue discussion with NTT and to cancel the scheduled meeting." (PX243).

130.    Malackowski had asked Geleerd to cancel the meeting because, as he had done with CdC, Barney was raising last-minute objections to the NTT venture. So, rather than sit down with NTT again and risk Barney derailing the deal at the last minute, Malackowski wanted to resolve the issue before continuing negotiations with NTT. (Dkt. 337 at 952:9–21; DX 575 at 26).

131.    There were no anticipated problems with the NTT venture until Barney's interference. (Malackowski 3/23/2017 Dep Tr. 84:21–87:11; Causevic Trial Tr. 32:3–33:12).

**D.      Unbeknownst to OT at the time, Barney began speaking to NTT in March 2011 about working with PR on a deal that excludes OT.**

132.    On March 17, 2011, Barney emailed Malackowski, Lee, Geleerd, and Lutzker, proclaiming that "PR has begun to consider its own options for working with NTT directly (without OT)." (PX547).

133.    As OT and PR were in arbitration at that point, Lutzker responded to the email by writing to Barney's attorney, William Halle, to put him on notice that a contemplated relationship between PR and NTT would breach the parties' license agreements, and that OT would seek redress and remedies for any actions PR took which wrongfully interfere with OT's contractual rights and business relationships. (PX547).

134.    On March 21, 2011, Barney and Reiko, an NTT employee, spoke by phone. Barney told Reiko "that PR has the exclusive rights to develop any new ratings systems (including ratings for Japanese patents)." (Dkt. 344 at 2248:13–21; PX261 at JB-PR000000281243).

**E.      OT brings in a new employee, Elvir Causevic, to turn around the OTPR business and manage the NTT deal.**

135.    After Barney's resignation, OT hired Elvir Causevic to run the OTPR division. As part of his duties, Causevic was charged with managing the relationship between OT and NTT. (Dkt. 337 at 958:16–959:23, Causevic Trial Tr. 21:10–15, 34:3–13).

136.    On May 17, 2011, OT and NTT signed an amendment to the preliminary MOU extending the parties' negotiations to December 31, 2011, and otherwise keeping the same terms as the initial MOU. (PX272; Dkt. 337 at 958:23–959:5).

137.    Despite the formal expiration of the extended MOU, on February 22, 2012, Chihara emails Lutzker, Malackowski, and Causevic indicating that NTT still has "aspirations" of starting up a Japanese Patent Ratings business (DX575 at 18–19, PX272). Discussions productively continued through mid-2012:

a. On April 9, 2012, Masaki emailed Causevic, Lutzker and Malackowski indicating that NTT wishes to proceed with the negotiation with OT. (DX575 at 9).

b. On July 13, 2012, Lutzker emailed Reiko about arbitration findings confirming OT's rights and that OT looks forward to an upcoming call. (DX575 at 4).

c. On July 29, 2012, Reiko emails Lutzker and Causevic with an executed copy of a new NDA. (DX575 at 1).

d. On July 30, 2012, Causevic executes the NDA for OT. (DX575 at 1).

**F.    In mid-2012, OT discovers that NTT had been emailing Barney separately, and that Barney had been telling NTT that OT has no right to develop or assist others in developing patent ratings systems.**

138.    Negotiations started falling apart when OT learned that NTT and Barney were negotiating directly with each other. (Causevic Trial Tr. 52:10–53:24). On August 21, 2012, Ken Chihara of NTT forwarded to Causevic emails between NTT and Barney. (PX134).

139.    The email thread revealed that at least as early as February 2012, NTT and Barney were negotiating directly. On February 14, 2012, Barney wrote to NTT to support a deal cutting out OT: "From your proposal below I understand NTT desires to license the intellectual property from PR on the royalty terms as stated. PR is willing to negotiate a license with NTT along the along the [sic] lines you have outlined." (PX134 at OT_E_00252189).

140.    On June 3, 2012, Barney wrote to Chihara that PR was "prepared to move forward with an agreement along the lines we have outlined." (PX134 at OT_E_00252171–172).

141.    After further discussion, on June 19, 2012, Chihara wrote to Barney:

May I confirm one thing regarding the Arbitration decision and award? Actually I haven't found the exact or right expression that OT does not have a worldwide exclusive license, which they may threaten our execution of our business. I think this is essential for our business and need to be cleared." (PX134 at OT_E_00252157).

28

142.     Barney responded on June 21, 2012, that "the existing license does not allow OT to block or prevent PR from licensing NTT to develop and commercialize a Japanese patent ratings system along the lines as we have discussed" (PX134 at OT_E_00252155–56). Barney also offered to indemnify NTT from legal action brought by OT if it agreed to a deal cutting out OT. (PX134 at OT_E_00252157).

143.     Chihara wrote back to Barney on July 27, 2012, to say that NTT's attorney said it would not be able to make an agreement with PR without OT based on their reading of the Arbitration award and license agreements. (PX134 at OT_E_00252151–2152).

144.     Barney responded on July 31, 2012, that "OT has no right to develop a rating system for JP patents or to impede PR from doing so (with our [sic] without NTT), and again offered to indemnify NTT against OT. (PX134 at OT_E_00252150–151).

145.     Chihara wrote to Barney on August 22, 2012, to tell him that NTT's top management had made a final decision to give up the Japanese patent ratings business unless a deal including OT is finalized by the end of September 2012. (PX134 at OT E 00252147–148).

       **G.     Barney refuses to consent to the OT-NTT deal, and NTT ends negotiations in October 2012.**

146.     In September 2012, in an effort to salvage the NTT relationship, Causevic attempted to discuss a three-way agreement between OT, PR, and NTT. (PX155 at 5, 9). Later that month, Chihara sent Causevic a term sheet and set a deadline of September 28 for NTT's final decision. (PX155 at 4). And on September 28, 2012 Causevic emailed NTT's Reiko and advised that OT had no material changes to the term sheet. Reiko was able to get NTT management to allow another two weeks to conclude the deal (PX155 at 2–3).

147.     On October 12, 2012, Causevic wrote to Reiko that OT had delivered a draft of a full agreement to Barney to review, but had not received his consent. (PX155 at 1).

29

148.    Finally, on October 15, 2012, Reiko ended negotiations, writing to Causevic that "we cannot spend any time further for this matter since, as I wrote in the previous email, we could not reach a basic agreement with PR's approval within this extended 2 weeks." (PX155 at 1). The evidence leads to the conclusion that Barney's communications with NTT from early 2011 through mid-2012 more likely than not caused NTT to back away from concluding an agreement with OT and to insist on a three-way deal including PR. Barney then sought to leverage this position to entirely exclude OT and refused to proceed even with the three–way arrangement that his actions had caused NTT to seek.

###    H.    Damages to OT from losing the NTT deal.

149.    Sherman performed an expert analysis to calculate the profits OT lost as a result of the NTT deal's failure. (PX822 at 25). Sherman used an income approach, which is customary for calculating such lost profits. (Dkt. 343 at 1416:17–1417:13; PX204).

150.    Sherman considered OT's and NTT's business expectations regarding the Japanese venture as memorialized in the contemporaneous projections, which were jointly prepared by OT and NTT, and included estimated sales, costs, and profit from FY 2010 through FY 2016. (PX822 at 25; PX204; PX514; Dkt. 387 at 3695:5–7).

151.    These projections leverage earlier projections jointly developed by OT and CdC for the European joint venture. These European projections were diligenced and validated by Ernst & Young, an independent firm engaged by CdC for this purpose. These projections were then leveraged for the NTT opportunity by adjusting them for the size of the Japanese patent market. OT relied on these projections in its business decision to move forward with the joint venture opportunity. (Dkt. 387 at 3691:7–3692:19, 3696:19–3697:7, 3699:1–3703:3).

152.    After applying the terms of the deal and a reasonable discount rate, Sherman concluded that OT would have received at least $1.8 million in profits (present valued to 2011) over the

time period from 2011 through 2017 had the NTT deal been signed. (Dkt. 343 at 1417:4–1420:3, 1424:17–1427:24, 1432:6–24, 1416:11–21; PX194; PX204; PX822 at 25).

153.    Defendants offered no expert testimony to rebut Sherman's analysis of lost profits from the NTT deal. The evidence establishes that OT's lost profits were at least $1.8 million.

**XVI.    Barney continues to compete with OT to this day, using the confidential information he improperly copied to a PR laptop and still retains.**

    **A.    In 2014-2015, Barney attempted to rebuild a "JBPR" patent rating system to compete with OT.**

154.    Starting in 2013, Barney took steps to rebuild the PR database. Barney hired Jianming "Jimmy" Xing as a consultant to install copies of the PR database on new PR servers. (Dkt. 346 at 2611:9–2612:11; Xing Dep. Tr. 88:17–89:5). Xing was an OT employee in the OTPR division while Barney was employed at OT. Xing and Barney were responsible for updating the PatentRating system data at OT. (Xing Dep. Tr. 29:5–19; 42:9–43:2). Xing's work continued through early 2015 and was successful in creating a new database called JBPR on a new server purchased by Barney. (PX167; Xing Dep. Tr. 99:2–100:17, 106:14–25, 125:20–126:2; PX173).

    **B.    Barney continues to possess OT confidential information, and evidence suggests that he continues to use it.**

155.    Barney admits using the OT information on his laptops in the conduct of this litigation through self-help discovery. (Dkt. 344 at 2330:19–2331:18; Dkt. 346 at 2685:8–15).

156.    Contrary to Barney's denials, the evidence shows additional use. As part of Weil's forensic analysis of the X1C laptops, Weil prepared a spreadsheet, appended as Exhibit 12 to his expert report, showing OT files stored on the X1C Laptops. (PX234).

157.    OT filtered the spreadsheet to only show files that were last accessed on the X1C laptops on May 18, 2015. (PX940; Dkt. 387 at 3740:24–3741:25).

158.    Because May 18, 2015 was not the date of any of Barney's batch copying for archiving or transferring files between X1C laptops, the access of a subset of files on May 18, 2015, indicates that Barney used the files for some purpose other than routine backup. (Dkt. 344 at 2327:24–2329:19; Dkt. 387 at 3741:17–3743:21).

159.    Malackowski testified that the files shown as having been accessed from the X1C laptops on May 18, 2015 included a report on the Intellectual Property Bank of Japan, a competitor to NTT; a document from 2005 that provides the recipe for how to build PR work product; and other similar documents. (Dkt. 387 at 3742:1–3746:5; PX940, PX1148, PX1149, PX1150, PX1151, PX1152, PX1157).

160.    The only reason PR would need to access the 2005 "how-to" file would be to build its own patent rating system to compete with OT. (Dkt. 387 at 3744:3–17).

### C.    PR filed with the USPTO an Intent-to-Use trademark application for "PATENTRATINGS," indicating an intent to compete with OT.

161.    On April 11, 2017, PR filed an application with the US Patent and Trademark Office for the trademark "PATENTRATINGS." In making the application, Barney represented to the United States Patent and Trademark Office a bona fide intent to use the mark in commerce in connection with the following identified goods and services:

> Software as a service (SaaS) services featuring software used for modeling, scoring, analytics, risk management, statistical forecasting, and analysis, and for providing a composite score and reports, related to intellectual property; Providing a web-based system featuring on-line non-downloadable software that enable users to access information regarding intellectual property and intellectual property valuation via reports, numerical scores and information with respect to a scoring methodology for intellectual property assets; Software as a service (SaaS) services featuring software for use in predictive modeling for assessing the quality, value, competition and trends with respect to intellectual property; intellectual property consultation." (PX1180).

162.    Barney testified that the description of goods and services in the trademark application PX1180 was an "accurate description for the goods and services that [he] intended to have this mark represent." (Dkt. 389 at 4188:8–21).

### D.    The PR website currently promotes PR competing services

163.    The PR website describes PR as "an independent ratings agency that provides unique research, ratings and statistical valuations of U.S. and international patents." (PX496; Dkt. 337 at 994:11–22). It later states that "PRI licenses its patents, algorithms and other unique information and proprietary tools to our partners and clients throughout the world." These services directly compete with OT. (PX496; Dkt. 337 at 994:4–22).

## XVII.  OT payments to Barney

164.    To provide an accounting of all payments OT made to Barney from 2005 through 2016, Sherman reviewed Barney's IRS Form K-1 from OT's annual tax returns for 2005 to 2015 and W-2 wage forms for 2005 and 2006. OT paid Barney $1,801,216 in salary and benefits from 2005–2012, with Barney receiving $339,227 in 2010, $55,152 in 2011, $18,296 in 2012, and nothing thereafter. (PX786, Dkt. 339 at 1571:3–17; PX822 at 39–41)

## XVIII. OT provides expert testimony showing the licensed patents to be invalid for claiming unpatentable subject matter and as obvious.

165.    OT presented expert testimony from Patrick Thomas, a science and technology analyst with expertise in data mining and intellectual property analytics who has worked with patent metrics, citation data, and statistical models for over two decades. (Dkt. 334 at 343:23–346:10, 352:21–355:9; PX239). His expert report was admitted into evidence as PX238.

166.    The Licensed Patents generally relate to the field of bibliometrics, a basic tool of social sciences research. Bibliometrics is defined as the process of extracting measurable data through the statistical analysis of document contents, plus information about how the texts are being

33

accessed and used by subsequent researchers. The use of bibliometric tools can be traced back to at least as early as the 1950's. (Dkt. 334 at 363:19–365:17; PX238 at 18).

167.    An example of bibliometric patent data is citation. Computerized citation data for patents was first made available in 1975. This enabled companies to develop patent citation databases which included citation links between generations of patents and permitted. For example, a 1991 paper disclosed use of patent citation links as an indicator of industrially important patents. (Dkt. 334 at 365:18–366:17, 367:5–368:18; PX1; PX4; PX5; PX238 at 18–19, Ex. 7.2).

168.    Other widely known and used bibliometric patent data include patent ownership, technology class, claim count, length of claims, expiration date, examination group, patent renewal and inventor citizenship. The use of these metrics for bibliometric analysis is disclosed in research papers and patents predating all of the Licensed Patents. (Dkt. 334 at 374:8–375:2; PX8; PX10; PX238 at 24–26, Ex. 7.6, 7.7, 7.8, 7.9).

169.    The Licensed Patents are directed to methods for using quantitative bibliometrics to measure or forecast different characteristics or outcomes related to patent document sets. These methods use long-known, fundamental statistical tools known as logistic (or logit) regression and probit regression to perform their bibliometric analysis. These regression techniques are used to estimate the probability that an entity will fall into one of two binary categories based on a number of other factors. For example, a set of independent variables (age, gender, qualifications, profession, etc.) can be used to determine the likelihood that a person will vote Democrat or Republican. Both of these statistical techniques have a long history dating back to at least 1944. (Dkt. 334 at 372:2–373:4; PX18 at THOMAS 00185, 00187; PX238 at 27–31).

    A.    **Each of the Licensed Patents is directed to ineligible subject matter.**

170.    Dr. Thomas concluded that all of the Licensed Patents are invalid as abstract ideas under 35 U.S.C. § 101. (Dkt. 334 at 360:19–25, 375:9–400:22; PX238 at 6, 33–64).

34

171.     Thomas reviewed Barney's deposition testimony as part of his analysis. Barney testified at his deposition that multiple regression—the primary method claimed in each of the Licensed Patents—was an old and widely used tool. Barney also testified that he used commercial off-the-shelf software to build his regression models. (Dkt. 334 at 373:5–15; PX238 at 28–29, Ex. 9.5).

172.     Thomas categorized the Licensed Patents into four groups: the Ratings Patents (the '992 Patent, the '511 Patent, and the '349 Patent); the Relevance Patents (the '226 Patent, the '560 Patent, the '996 Patent, and the '849 Patent); the Valuation Patent (the '476 Patent); and the Obsolescence Patent (the '581 Patent). (PX238 at ¶ 2).

173.     Thomas analyzed the claims of each group of patents and found that each (1) are directed to an abstract idea and (2) contain nothing in the claim limitations, individually or taken as an ordered combination, that transforms the claims into something more than claiming an abstract idea. (Dkt. 334 at 377:4–382:9; PX238 at 49–59 (the Ratings Patents); Dkt. 334 at 382:11–387:7; PX238 at 59 (the Valuation Patent); Dkt. 334 at 387:8–389:8; PX238 at 33–48 (the Obsolescence Patent); Dkt. 334 at 390:3–400:22; PX238 at 63 (the Relevance Patents)).

174.     The claims of the Ratings Patents are directed to the abstract idea of utilizing bibliographic metrics to rate patents using statistical regression models. The use of regression to relate metrics to outcomes is a fundamental practice in statistics and data analysis. (Dkt. 334 at 378:2–380:3; PX238 at 52–54, 56, 58–59).

175.     The claims of the Ratings Patents are directed to the implementation of this abstract idea through a generic computer and the claimed methods could be implemented by a human without access to electronic equipment at all. They do not claim or disclose any improved computer technology or processing. (Dkt. 334 at 380:4–381:20; PX238 at 54, 56, 58–59).

176.    The claims of the Valuation Patent are directed to the abstract idea of utilizing bibliographic metrics to rate patents using statistical regression models across multiple jurisdictions. The use of regression to relate metrics to outcomes is a fundamental practice in statistics and data analysis. (Dkt. 334 at 382:10–386:7, 387:1–6; PX238 at 52–54, 60–61).

177.    The claims of the Valuation Patent are directed to the implementation of this abstract idea through a generic computer and the claimed methods could be implemented by a human without access to electronic equipment at all. They do not claim, nor do the Ratings Patents disclose any improved computer technology or processing. (Dkt. 334 at 386:8–25; PX238 at 61–62).

178.    The claims of the Obsolescence Patent are directed to the abstract idea of fitting curves to citation data to predict future depreciation. The use of curve fitting is a basic and commonplace practice in statistics and data analysis. (Dkt. 334 at 387:1–388:21; PX238 at 63–64).

179.    The claims of the Obsolescence Patent are directed to the implementation of this abstract idea through a generic computer and the claimed methods could be implemented by a human without access to electronic equipment at all. They do not claim or disclose any improved computer technology or processing. (Dkt 334 at 388:22–389:8; PX238 at 64).

180.    The claims of the Relevance Patents are directed to the abstract idea of using indirect citation links to generate a score to estimate the probability that two documents have a direct citation link. They use probability to rank entities according to a given characteristic is a fundamental practice in statistics and data analysis. (Dkt. 334 at 395:5–396:11, 397:18–399:19, 400:9–400:14; PX238 at 39–48).

181.    The claims of the Relevance Patents are directed to the implementation of this abstract idea through a generic computer and the claimed methods could be implemented by a human

36

without access to electronic equipment. They do not claim or disclose any improved computer technology or processing. (Dkt. 334 at 396:12–397:15, 399:20–400:22; PX238 at 39–48).

182.    Defendants offered no expert testimony on invalidity to rebut Dr. Thomas's testimony.

**B.    Each of the Licensed Patents is invalid as obvious under 35 U.S.C. § 103.**

183.    Thomas also performed an analysis of whether each of the Licensed Patents is invalid as obvious. He concluded that they were. (Dkt. 334 at 361:1–5, 402:4–411:2).

**C.    Prior Art Considered**

184.    With regard to the Relevance Patents, U.S. Patent No. 7,433,884 ("Breitzman") discloses a method for identifying potential licensees for a given patent or patent portfolio. This method is based on tracing multiple generations of forward and backward citations from the selected patent (or portfolio), with citation links weighted according to their generation. (PX238 at 65, Ex. 9.1).

185.    With regard to the Relevance Patents, PCT Application WO 97/08604 ("Liddy") discloses a method for multilingual document retrieval. This method matches documents to user queries using a combination of indicators. These indicators are combined via a logistic regression model, with the resulting coefficients used to assign relevance scores to documents. In tum, documents are ranked based on these scores, and the highest scoring documents returned to the user in response to the query input. (PX238 at 65, Ex. 9.2).

186.    With regard to the Relevance Patents, *Visualizing Science by Citation Mapping*, 50 Journal of the American Society For Information Science 799–813 (1999) ("Small 1999") discloses fractional counting of citations in papers. (PX238 at 68, Ex. 9.4; PX291).

187.    With regard to the Relevance Patents, *Inventive Progress* Measured *by Multi-Stage Patent Citation Analysis* by Iwan von Wartburg ("von Wartburg"), specifically Figure 7. This figure depicts clustering of patent documents based on their relatedness (as measured via citations). It is similar to Figure 6 in the PR Relevance patents. (PX238 at 74, Ex. 9.9, 2.5)

188.    With regard to the Ratings Patents, U.S. Patent No. 7,813,944 ("Luk") discloses a method for identifying insurance policies suspected of premium fraud. The method is based on a predictive model designed to differentiate between fraudulent and non-fraudulent policies using metrics derived from different characteristics of insurance policy documents. Metrics are included in the model based on an analysis of existing insurance policies. Given a newly-presented policy, the output of the model is a score indicative of the likelihood of premium fraud associated with this policy. (Dkt. 334 at 404:19–405:18; PX103: PX238 at 77, Ex. 9.11).

189.    With regard to the Ratings Patents, U.S. Patent 5,999,907 ("Donner") discloses a method for generating a quantitative and/or qualitative valuation for an intellectual property portfolio. The method is based on a model that takes as inputs a series of indicators designed to measure different characteristics of items of intellectual property, notably patents. These indicators are then weighted based on their relationship with patent portfolios having known values. Given a newly-presented portfolio, the model locates existing portfolios with known values that have the most similar indicator values, and then assigns a value to the subject portfolio based on this comparison. (Dkt. 334 at 405:19–406:2; PX15; PX238 at 77, Ex. 9.12).

190.    With regard to the Ratings Patents, U.S. Patent No. 5,991,751 ("Rivette") describes methods for managing databases of patent and non-patent information, and also for integrating these two types of information. This integration includes mapping groups of patents to products, and further determining the relevance of these patents by mapping products to the overall corporate entity. (PX238 at 85, Ex. 9.23)

191.    With regard to the Valuation Patent, Mr. Barney's own published application US 2004/0220842 ("Barney Ratings Publication") discloses a method for rating intangible assets such as patents based on patent metrics, with these ratings further used to place valuations on

38

patents. In particular, the Barney Ratings Publication discloses a statistical model that takes as inputs a variety of metrics designed to measure different characteristics of patents. Metrics are selected for inclusion in the model based on their relationship with outcomes such as patent renewal and litigation, as established through analysis of existing patents with known outcomes. Newly presented patents are scored by the model; these scores can be used to rank patents according to their likelihood of a given outcome, such as payment of maintenance fees, with high scoring patents being at the head of the ranking. The Barney Ratings Publication also discloses a method for using these rankings to place a valuation on patents by establishing a value distribution curve for all patents and calculating the area under the curve. The rankings are used to locate each patent at a given point on the value distribution curve, and so establish an estimated value for a selected patent. (PX238 at 86–88, Ex. 9.17).

192.     With regard to the Valuation Patent, the 1997 publication, *The Value of International Patent Rights* by Jonathan Putnam ("Putnam") discloses a method for estimating the domestic and global value of patent rights across countries based on a combination of country-specific and non-country-specific factors. Examples of the former include market size and the strength and cost of enforcing patent protection. Examples of the latter include the underlying invention quality. Putnam states that this combination of factors means that the value of holding a patent right on the same invention varies across countries. (PX238 at 87–88, Ex 9.18).

193.     Putnam also discloses using value distribution curves to estimate valuations for patents depending on their position on these curves. In tum, this facilitates calculation of estimated valuations for cohorts of patents, for example the top N% of patents in the distribution. Putnam's model also facilitates comparisons of patent valuations across jurisdictions. This enables Putnam

39

to conclude, for example, that a patent originating in the U.S. is on average worth about 47% more than a patent originating in Italy. (PX238 at 87–89, Ex. 9.18).

194.    With regard to the Obsolescence Patent, the 1996 publication: "Flows of Knowledge from Universities and Federal Labs: modeling the flow of patent citations over time and across institutional and geographic boundaries" by Adam Jaffe and Manuel Trajtenberg ("Jaffe") discloses the use of patent citations to model obsolescence. (PX238 at 91, Ex. 9.20).

195.    With regard to the Obsolescence Patent, the 1979 publication: "The Rate of Obsolescence of Knowledge, Research Gestation Lags, and the Private Rate of Return to Research Resources" by Ariel Pakes and Mark Schankerman ("Pakes"), discloses the use of patent renewal data to model economic returns to patent holders over time, accounting for both technology diffusion and obsolescence. (PX238 at 91, Ex. 9.21).

### D.    Person Having Ordinary Skill in The Art

196.    A person having ordinary skill in the art ("PHOSITA") to which the Licensed Patents pertain would have at least (i) an advanced degree in a quantitative field such as economics, statistics, mathematics ( or equivalent quantitative work experience) and (ii) familiarity with patent prosecution or patent valuation sufficient to understand the various metrics common to patents and how such metrics can impact a patent's value. (Dkt. 334 at 402:11–21; PX238 at 16).

197.    Alternatively, a PHOSITA would have at least (i) a law degree with professional legal experience focusing on patent prosecution or patent litigation and (ii) familiarity with quantitative subjects sufficient to be able to apply statistical techniques (including regression analysis) to patent data metrics and equivalent concepts. Barney possesses a level of education and applicable skill consistent with this second category. (Dkt. 334 at 402:22–25; PX238 at 16).

198.    In either case, the PHOSITA would have high level of ordinary skill. The Licensed Patents purport to pertain to a highly specialized field combining statistical analysis with patent

metrics where there are few practitioners. The goal of automated patent evaluation is to reduce reliance on time consuming mental processes traditionally carried out by patent attorneys working with highly skilled market and technical experts. Automating this result requires the input of individuals with highly sophisticated skills. (Dkt. 334 at 403:11–404:6; PX238 at 17).

### E.    The Prior Art Renders the Licensed Patents Obvious

199.    Each claim of the Relevance Patents is rendered obvious based on Breitzman in view of Liddy (and in the case of claim 19 of the '996 Patent, in further view of von Wartburg and the "citation credit" claims of the '226 Patent, in further view of von Wartburg). It would have been obvious to any PHOSITA to combine the citation linkage teachings in Breitzman with the logistic regression teachings in Liddy in order to optimize the coefficients associated with different generations of citation linkages. It further would have been obvious to display results in a self-organizing map as disclosed by von Wartburg and to utilize "citation credit" as disclosed in Small 1999. (PX238 at 65–76, Exs. 9.3, 9.6, 9.7, 9.8, 9.10).

200.    Each claim of the Ratings Patents is rendered obvious based on Luk in view of Donner (and in the case of the '349 Patent, in further view of Rivette). It would have been obvious to a PHOSITA to combine the predictive modeling techniques disclosed in Luk to patent data as disclosed in Donner to develop a predictive model, via a technique such as multiple regression, that takes patent metrics as inputs, and generates rankings and valuations of newly presented patents and patent portfolios via optimized combinations of these metrics, with this optimization achieved via analysis of existing patents and patent portfolios. (Dkt. 334 at 404:10–18, 406:3–409:14; PX238 at 77–86. Exs. 9.13, 9.15, 9.16; PX306).

201.    The obviousness of the claims of the Ratings Patents is confirmed by the teachings of September 1999 NBER publication, *The Quality of Ideas: Measuring Innovation with Multiple Indicators,* Lanjouw and Schankerman (1999) ("Lanjouw 1999"). This paper uses probit

41

regression, using several patent metrics as independent variables. The dependent variables are whether they are litigated, and whether they are renewed via payment of maintenance fees. These independent and dependent variables are essentially indistinguishable from those employed in the Ratings Patents. This suggests that, at the time the first Ratings Patents were filed, it was obvious for a PHOSITA to develop a regression model using patent metrics to forecast litigation and renewal. (Dkt. 334 at 409:15–411:2; PX13; PX238 at 32, 80, Exs. 7.2, 9.14; PX307).

202.    Each claim of the Valuation Patent is rendered obvious based on the Barney Ratings Publication in view of Putnam. It would have been obvious to a PHOSITA to combine the teachings of Putnam regarding comparing patent valuation across jurisdictions with the Barney Publication's teachings regarding ratings-based patent valuations, in order to produce ratings-based valuations across different jurisdictions. (PX238 at 87–90, Ex. 9.19).

203.    Each claim of the Obsolescence Patent is rendered obvious based on Jaffe in view of Pakes. It would have been obvious to a PHOSITA to combine curve fitting teachings of Jaffe with the technology obsolescence teachings of Pakes to generate a model that generates an obsolescence and depreciation schedule for patents. (PR238 at 91–94, Ex. 9.22).

**F.    The Licensed Patents are Unenforceable Due to Patent Misuse and the Anticompetitive Provisions of the 2004 License Agreement are Unenforceable**

204.    Paragraphs 6.1 and 5.3 of the 2004 License Agreement leverage the Licensed Patents to extend their exclusionary scope. Paragraph 6.1 seeks to prevent OT from developing or assisting others in the development of competitive technologies whether or not they are within the scope of the Licensed Patents or other PR Tools. Paragraph 5.3 seeks to require OT to assign to PR all competitive technologies whether or not they are within the scope of the Licensed Patents or other PR Tools. PR insisted on these provisions as a condition to entering the license. (PX29; PX1056; Dkt. 345 at 2485:13–22; Dkt. 337 at 977:22–981:2; Dkt. 386 at 3504:24–3508:10).

205.    These provisions have unreasonably impaired OT's ability to develop competing technologies. (Dkt. 337 at 977:10–981:9; Dkt. 386 at 3505:1–3509:24). Indeed, PR has invoked these provisions to claim ownership in OT's U.S. Patent Application No. 2015-0206069. OT's application uses a fundamentally different approach from that disclosed or claimed by the Licensed Patents. (Dkt. 334 at 412:10–416:9; PX 172; PX238 at 96–98, Ex. 11.1).

206.    PR has offered no rationale for paragraphs 6.1 or 5.3 that could reasonably support their inclusion in the 2004 License Agreement.

## Proposed Conclusions of Law

### I.    OT has proven its breach of fiduciary claim against Barney by a preponderance of the evidence.

#### A.    Legal standards and burden of proof.

To prevail on a claim for breach of fiduciary duty in Illinois, the plaintiff must prove by a preponderance of the evidence: "(1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that such breach proximately cased the injury of which the party complains." *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 433, 2012 IL 112530, ¶ 69; *Gross v. Town of Cicero*, No. 03-cv-9465, 2006 U.S. Dist. LEXIS 47285, at *15 (N.D. Ill. June 28, 2006), *rev'd in part on other grounds*, 619 F.3d 697 (7th Cir. 2010).

#### B.    OT has proven that Barney had a fiduciary duty of loyalty to OT as an employee, director, and member exercising managerial control.

Defendants do not dispute that Barney was employed by OT as a Managing Director from January 1, 2005, through February 25, 2011. Facts[3] at ¶¶ 2, 10, 83.

Under Illinois law, corporate officers "owe a fiduciary duty of loyalty to their corporate employer not to (1) actively exploit their positions within the corporation for their own personal

---

[3] All citations to "Facts at ¶ __" refer to the Proposed Findings of Fact provided in this document at pages 1-43.

43

benefit, or (2) hinder the ability of a corporation to continue the business for which it was developed." *Veco Corp. v. Babcock*, 611 N.E.2d 1054, 1059, 243 Ill. App. 3d 153, 160 (1st Dist. 1993).

Those fiduciary duties continue post-employment if extended by a valid contract such as a confidentiality agreement or a restrictive covenant. *See Jostens, Inc. v. Kauffman*, 842 F. Supp. 352, 354–355 (C.D. Ill. 1994).

Barney also has fiduciary duties to OT as a Member under the confidentiality and non-compete provisions of the Operating Agreement. Barney has been a Member of OT since December 31, 2004. Facts at ¶¶ 6, 11. OT's Operating Agreement imposes fiduciary duties of loyalty on Members through Section 13.17's confidentiality and noncompete provisions. Facts at ¶¶ 56, 59, 60; *see Thorpe v. Levenfeld*, No. 04-cv-3040, 2005 U.S. Dist. LEXIS 22050, at *11–*12 (N.D. Ill. Sept. 29, 2005) (the operating agreement may modify provisions of the LLC Act governing relations among the members, including those related to fiduciary duties).

That OT is a manager-managed LLC does not negate Barney's fiduciary duties as a director and employee. While 805 ILCS 180/15-3(g)(1) provides that "a member who is not a manager owed no duties to the company or to the other members solely by reason of being a member," Barney's duties arise by reason of his (1) employment, (2) being a Managing Director, and (3) contractual confidentiality and non-compete. This Court explained in interpreting similar Delaware law that if fiduciary duties are not owed by employees of LLCs, "imagine the egregious acts that would be countenanced by the law." *Act II Jewelry, LLC v. Wooten*, No. 15-cv-6950, 2018 U.S. Dist. LEXIS 41680, at *22 (N.D. Ill. Mar. 14, 2018).

**C.** **OT has proven that Barney breached his fiduciary duty of loyalty through retention and use of OT confidential information and by usurping OT's business opportunity with NTT.**

**1.** **OT has proven that Barney breached his fiduciary duty by copying OT confidential information to a personal laptop and using it to benefit PR.**

An officer or director breaches a fiduciary duty of loyalty by "using the company's confidential business information for the new business, either before or after [their] departure." *Cooper Linse Hallman Capital Mgmt. v. Hallman*, 856 N.E.2d 585, 589, 368 Ill. App. 3d 353, 357 (1st Dist. 2006) (emphasis added).

The following facts regarding Barney's copying of OT documents are undisputed:

- Barney copied all the user files on the OT Laptop to the T410 Laptop around September 2010, while he was still employed at OT. Facts at ¶¶ 99–102.

- The user files that Barney copied to the T410 Laptop around September 2010 included OT confidential information. Facts at ¶¶ 109–113.

- Barney retained the T410 Laptop after he resigned from OT. Facts at ¶ 104.

- Barney copied user files, including OT confidential information, from the T410 Laptop to the 2013 X1C Laptop. Facts at ¶¶ 103, 107.

- After copying files to the 2013 X1C Laptop, Barney continued to use the 2013 X1C Laptop as his personal computer. Facts at ¶ 104.

- In 2015, Barney copied user files, including OT confidential information, from the 2013 X1C Laptop to the 2015 X1C Laptop. Facts at ¶¶ 103, 107.

- Barney continues to use the 2015 X1C Laptop as his personal computer to this day. Facts at ¶ 104.

OT presented unrebutted evidence that valuable OT confidential information was stored on Barney's T410 Laptop and X1C Laptops. Weil testified that the "Dashboard 6 22 10.xls" file, PX314; the "April Reporting Package.pdf" file, PX90; and the "OTPR Restructuring Memo, Jan 15 2011.docx" file, PX111, were all found on at least the T410 Laptop. Facts at ¶ 107, 109. Defendants' forensic expert Andrew Crouse (who served a rebuttal expert report to Weil's report

45

but did not testify at trial) confirmed that these files remained on Barney's personal laptops in 2016. *Id*. Malackowski testified that the "Dashboard 6 22 10.xls" file was the "keys to [OT's] castle," containing detailed information about every existing and potential client of the company. Facts at ¶ 110. Malackowski also testified that the other files that Weil determined, and Crouse confirmed, were on Barney's laptops, were both confidential and valuable to OT. Facts at ¶¶ 111–113.

Testimony from Weil and Crouse further shows that Barney used confidential information from OT after the termination of his employment on February 25, 2011. Weil testified that Barney copied some, not all, of the OT files from the T410 Laptop to the 2013 X1C Laptop, and then copied some, not all, of the OT files on the 2013 X1C Laptop to the 2015 X1C Laptop. Facts at ¶ 107. Metadata on the forensic images of the T410 Laptop and X1C Laptops confirmed that OT files were accessed on dates after February 25, 2011. Facts at ¶¶ 108, 155–158. Weil testified, and Crouse confirmed, that the file paths in which these files were stored on the T410 Laptop and X1C Laptops were consistent with Barney accessing and using the files after February 25, 2011. Facts at ¶ 109. Barney admits that he continuously used OT data from the laptop for self-help discovery in this litigation. Facts at ¶ 155. The evidence also shows that Barney accessed confidential information in May 2015, more likely than not to assist with his rebuilding the JBPR system around the same time. Facts at ¶¶ 156–160.

Based on the evidence discussed above, OT has met its burden to prove, by a preponderance of the evidence, that Barney breached his duty of loyalty by using OT confidential information, copied from an OT computer to a personal computer during his employment, to further his personal business interests after the end of his employment.

2.     **OT has proven by a preponderance of the evidence that Barney breached his duty of loyalty by interfering with and usurping OT's business opportunity with NTT.**

An officer or director also breaches a fiduciary duty to his company by taking advantage of a business opportunity in which the company has an interest, and where the officer's actions "would hinder or defeat plans and purposes of the corporation in carrying on or developing legitimate business for which it was created." *Comedy Cottage, Inc. v. Berk*, 495 N.E.2d 1006, 1011, 145 Ill. App. 3d 355, 360 (1st Dist. 1986). Even if a director's fiduciary duties end after the termination of his employment, the director remains liable if the transactions "began during the existence of the relationship or were founded on information acquired during the relationship." *Id.*

The following facts regarding OT's expected joint venture with NTT, and Barney's interference with that joint venture, are undisputed:

- An NTT entity first became an OT client in 2007, during Barney's employment. Facts at ¶ 120.

- Barney was aware from the start of his employment that OT intended to expand the OTPR division globally, including to Asia. Facts at ¶¶ 5, 8, 39, 121–122.

- Barney helped develop OT's business plan in 2008, PX931, that discussed OT's plan to work with partners to build patent ratings systems for Europe and Asia. Facts at ¶¶ 121–122.

- OT began discussions in early 2010 with NTT to work together to create a Japanese patent rating system. Facts at ¶¶ 124–127.

- In February 2010, OT and NTT entered into a Preliminary MOU for developing a "Japan PatentRatings business." Facts at ¶ 124.

- In March 2011, Barney spoke to an NTT employee, Reiko, and told her that PR has the exclusive rights to develop any new ratings systems, including ratings for Japanese patents—and that by implication, OT had no such rights. Facts at ¶ 134.

- OT continued negotiating the NTT deal until October 2012. Facts at ¶¶ 135–137, 146–148.

- In February 2012, Barney wrote to another NTT employee, Chihara, that PR was willing to negotiate a license with NTT that excluded OT. Facts at ¶ 139.

47

- Throughout June and July 2012, Barney repeatedly told NTT that OT had no right to develop a Japanese patent ratings system or to block PR's proposal to develop a Japanese patent ratings system. Facts at ¶¶ 140–144.

- NTT ultimately ended discussions with OT in October 2012 after Barney refused to consent to an agreement between OT, NTT, and PR. Facts at ¶¶ 146–148.

To the extent Barney disputes these facts, OT has proven them by a preponderance of the evidence. Each fact is based on contemporaneous documents, the authenticity of which Barney does not dispute. Moreover, OT presented evidence that Barney routinely agreed to a set of terms, then at the last minute withdrew consent or interfered with OT's business to extract additional financial gain. Facts at ¶¶ 67–78; *see* Fed. R. Evid. 406. These facts show that Barney had a habit, defined by the Advisory Committee Notes to Fed. R. Evid. 406 as "a person's regular practice of meeting a particular kind of situation with a specific type of conduct," of interfering with business deals in an effort to use leverage for personal gain. "[H]abit evidence is highly persuasive as proof of conduct on a particular occasion," here as proof of his conduct regarding the NTT deal. Advisory Committee Notes to Fed. R. Evid. 406.

As a whole, these facts show that Barney, at a minimum, "hinder[ed] . . . plans and purposes of the corporation in carrying on or developing legitimate business for which it was created." *Comedy Cottage*, 495 N.E.2d at 1011, 145 Ill. App. 3d at 360. OT began planning its joint venture with NTT in early 2010; it had planned to expand its patent ratings business to Japan as early as 2005. Barney professed support for Japanese expansion generally and the NTT deal specifically, and then as the deal took form, engaged in efforts to usurp it for himself. Barney would not have known about NTT but for OT's origination of the business opportunity. His fiduciary duty of loyalty to OT included a duty to not divert to himself an OT business opportunity generated and learned about through his employment; Barney breached that duty.

### D. Barney's breaches of fiduciary duty proximately caused injury to OT.

#### 1. Barney's breach of his fiduciary duty by taking and using OT confidential information for his personal benefit proximately damaged OT.

Barney's breach of his fiduciary duty in taking and using OT's confidential information for his own benefit proximately caused three categories of damages: (1) costs incurred in investigating and discovering Barney's breach; (2) costs and attorney fees incurred in litigation necessary to order Barney to return or destroy OT's confidential information; and (3) salary and benefits paid to Barney after his breach.

The first category of damages is straightforward. Had Barney not taken OT's confidential information by copying it from the OT Laptop, OT would not have had to perform a forensic investigation of the Laptop, including follow-up forensic audits that Weil conducted in December 2011 and March 2012. Facts at ¶¶ 90–91, 98. OT incurred $40,045 in out-of-pocket costs as a result of Barney's misconduct in connection with the OT Laptop. Facts at ¶ 98.

The second category of damages is costs and attorneys' fees incurred by OT in seeking injunctive relief. Barney admitted that he still retains OT confidential information on his 2015 X1C Laptop to this day. Facts at ¶ 104. Whether or not Barney is already competing with OT, Barney intends, should he prevail in this lawsuit, to rebuild PR and compete with OT in the future. Facts at ¶¶ 161–162, 163. Barney has refused to return or destroy the OT files on his computers, forcing OT to pursue this lawsuit to prevent him from competing with OT confidential information taken in breach of his fiduciary duty.

An award of attorneys' fees for Barney's continuing retention of confidential information is also appropriate as a matter of public policy. Barney cannot improperly retain OT confidential information without using it, in anticipation of using it once the lawsuit is complete, and then avoid damages because OT may not yet have suffered a significant injury. The Court should follow *SKF*

*USA, Inc. v. Bjerkness*, No. 08-cv-4709, 2011 U.S. Dist. LEXIS 110275, at *11-*12 (N.D. Ill. Sept. 27, 2011), in which the court awarded over $1 million in attorneys' fees for willful misappropriation even though the plaintiff only had about $40,000 in direct damages, noting the plaintiff's explanation that recovering damages was not the "initial primary goal" of the litigation.

Finally, disgorgement of salary and benefits is an appropriate remedy for breach of fiduciary duty, at least for the period during which the breach occurred. *ABC Trans Nat'l Transport, Inc. v. Aeronautics Forwarders, Inc.*, 413 N.E.2d 1299, 1315, 90 Ill. App. 3d 817, 837–838 (1st Dist. 1980). Barney admitted that he copied information from the OT Laptop to a personal laptop in Fall 2010; his breach of fiduciary duty thus began in Fall 2010 and continues through the present day. Facts at ¶ 99. Sherman performed an accounting of OT payments to Barney from 2005 to 2015, and found that Barney received $339,227 in 2010, $55,152 in 2011, $18,296 in 2012, and nothing going forward. Facts at ¶ 164. Taking a third of Barney's 2010 received salary and benefits because Barney was only in breach for the last third of the year, OT is entitled to damages of $186,523.67 in disgorgement.

### 2. Barney's breach of his fiduciary duty by usurping and interfering with the NTT business opportunity proximately damaged OT.

But for Barney's attempt to usurp OT's business opportunity with NTT, OT would have entered into a joint venture with NTT. Sherman provided unrebutted expert testimony as to the value of that deal based on projections that OT and NTT agreed to be accurate. Facts at ¶ 150. Based on Sherman's calculations, including conservative discount rates used for estimation, the NTT deal had a net present value to OT in 2011 of over $1.8 million. Facts at ¶ 152.

Sherman's damages calculations are based on sufficiently reasonable projections and are not precluded by the "new business rule." Malackowski testified, without contradiction, that the NTT projections that Sherman used were based on projections prepared for the CdC deal, adjusted

to the size of the Japanese market. Facts at ¶ 151. He also testified, again without contradiction, that the CdC projections were based on an independent market assessment by Ernst & Young— which was hired by CdC, not OT. Facts at ¶ 151. Expert estimation of lost profits based on actual products sold in the marketplace is not based on speculation or conjecture, and thus is not barred by the Illinois new business rule. *See Milex Prods., Inc. v. Alra Labs., Inc.*, 603 N.E.2d 1226, 1236, 237 Ill. App. 3d 177, 192 (2d Dist. 1992). The Illinois Supreme Court has explained that "[a]ll the law requires . . . is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages." Sherman's conclusions based on OT and NTT's market analysis meet that standard. *Schatz v. Abbott Labs., Inc.*, 281 N.E.2d 323, 326, 51 Ill. 2d 143, 148 (1972). A strict rule barring any sort of damages based on estimated projections would effectively immunize defendants from interfering with business expectancies. *Compare to id.* ("If that were the law, contracts of the kind here involved could be violated with impunity.").

## II.    OT has proven by a preponderance of the evidence that Barney and PR willfully misappropriated trade secrets in violation of the Illinois Trade Secrets Act.

### A.    Legal standards and burden of proof.

To prevail on its claim for a violation of the Illinois Trade Secrets Act ("ITSA"), OT must establish by a preponderance of the evidence (1) existence of a "trade secret" and (2) "misappropriation" of that trade secret. *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 873 (N.D. Ill. 2001). A party may recover damages for misappropriation including "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 765 ILCS 1065/4(a). If "willful and malicious misappropriation exists," the court may award exemplary damages and reasonable attorney's fees to the prevailing party. 765 ILCS 1065/4(b); 765 ILCS 1065/5.

**B.** **OT has proven by a preponderance of the evidence the existence of trade secrets.**

The documents that Barney copied from the OT Laptop to his personal laptop, and that he retains to this day, contain OT trade secrets. The ITSA defines a "trade secret" as "[i]nformation . . . that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). OT presented unrebutted testimony from Malackowski that the exemplary OT documents—the "Dashboard" document PX314, the April 2010 Financial Reporting Package PX90, and the OTPR Restructuring Memo PX111—contained information that derives economic value from not being generally known to competitors. Facts at ¶¶ 110–113. The "Dashboard" document, in particular, is plainly a trade secret: it is a list of every actual and potential OT customer. *See*, *e.g.*, *RKI*, 177 F. Supp. 2d at 874.

Sherman's unrebutted expert testimony also established the value of OT's trade secrets. Sherman divided OT's documents into six categories: business documents, customer information and pipeline, company finances, proprietary models, competitive analysis, and outside advisors and consultants. Facts at ¶¶ 115–118. By determining the cost to create each category of assets, Sherman's valued the information at a range from $150,000 to $2,130,000 for each category. Facts at ¶ 119.

OT also took efforts reasonable under the circumstances to protect its trade secrets. All OT employees are required to sign confidentiality agreements; certain documents are only available to employees who need to access them; and OT employees receive training and instruction on protecting confidential information. Facts at ¶ 32, 114. Defendants have offered no evidence to suggest that OT failed to take reasonable efforts to protect its trade secrets.

52

### C.    OT has proven by a preponderance of the evidence that Barney willfully misappropriated the trade secrets.

"Misappropriation" includes "acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means," "disclosure or use of a trade secret of a person without express or implied consent by another person who used improper means to acquire knowledge of the trade secret," or such disclosure or use by another person who knew or had reason to know that it was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." 765 ILCS 1065/2(b).

Barney has admitted to the first type of misappropriation, acquisition of OT's trade secret by another person (Barney) who knew that the trade secrets were acquired by improper means. Barney admitted to copying all the OT files from the OT Laptop to the T410 Laptop. Facts at ¶¶ 99–102. Barney had signed an Employment Agreement and an Operating Agreement, both of which contained provisions requiring him to keep OT information confidential. Facts at ¶¶ 10–32, 56, 59. No reasonable person would believe it was appropriate to copy all files from a company-issued computer to a personal computer and retain those files after the end of his employment.

It is more likely than not that Barney has also used OT trade secrets, having acquired them using improper means or at least having acquired them under circumstances giving rise to a duty to limit its use. First, if Barney did not use OT's trade secrets in any way, he would not have had any reason to keep them on his personal computer. Second, Barney has competed with OT by trying to sublicense his patents directly to NTT. Facts at ¶¶ 132, 134, 138–144. While doing so, he had OT files on his computer to use to develop his negotiating position. Facts at ¶¶ 111, 159. Third, Weil's forensic analysis showed that Barney copied only a subset of OT documents from the T410 Laptop to the 2013 X1C Laptop, and a subset of those from the 2013 X1C Laptop to the 2015 X1C Laptop. Facts at ¶ 107. That analysis is inconsistent with copying entire files as a form of archiving

or backup. Instead, it is consistent with deliberately selecting files to keep for use. Finally, Weil's forensic analysis showed that Barney accessed a subset of files on May 18, 2015, a date not associated with any archiving or litigation activity. Facts at ¶¶ 156–158. Those files included how-to information for generating patent rating reports. Facts at ¶ 159. The evidence also showed that Barney was working with Xing at that time to build a JBPR database to create patent rating reports. Facts at ¶ 154. The most reasonable inference from those facts is that Barney accessed files he improperly copied from the OT Laptop to use in assembling a new PR database, which he would then use to compete with OT. Facts at ¶ 160

D.    **OT suffered damages as a result of Barney's misappropriation of trade secrets.**

OT is entitled to recover damages for misappropriation arising from "the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 765 ILCS 1065/4(a). Courts interpreting similar trade secret provisions have held that unjust enrichment can be calculated by determining the value of the misappropriated trade secrets. *E.g.*, *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536–539 (5th Cir. 1974). Sherman provided unrebutted testimony that the value of the trade secret information in this case was in the range of $2,460,000 to $3,980,000. Facts at ¶¶ 115–119.

The evidence also shows that Barney's misappropriation was willful and malicious, warranting an award of exemplary damages and attorneys' fees to OT. Both "intentional misappropriation" and "misappropriation resulting from the conscious disregard of the rights of another" qualify as willful and malicious misappropriation under Illinois law. *Mangren Research & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 946 (7th Cir. 1996). The evidence here shows that after Barney's termination, he immediately showed open hostility to OT and conscious disregard for his confidentiality obligations by publicizing OT's business plans through the IAM article.

54

Facts at ¶ 85. When OT demanded that he comply with his confidentiality obligations, he responded with a childish taunt and a promise that he did "not plan to stop speaking the *truth* about Jim or Ocean Tomo." Facts at ¶¶ 86–87. Barney then refused to return or destroy the OT files on his computers for the six years that this litigation has been pending, forcing OT to spend significant time and resources to protect its trade secrets. Facts at ¶ 104. These facts, together with Barney's other misconduct related to confidential information and the NTT negotiation, warrant a finding of willful and malicious misappropriation and an award of exemplary damages and attorneys' fees.

### E. OT is entitled to an injunction ordering Barney to return or destroy all OT files in his possession.

In addition to damages, OT is entitled to a permanent injunction to protect its trade secrets. The ITSA authorizes injunctions in trade secret cases. 765 ILCS 1065/3(a). A party seeking a permanent injunction must show that "it possesses a clear protectable interest for which there is no adequate remedy at law and that irreparable injury would result if the relief is not granted. *Engineering Resources v. CRS Steam*, No. 94-cv-6970, 1997 U.S. Dist. LEXIS 6101, at *16–*17 (N.D. Ill. Apr. 29, 1997). OT has no adequate remedy at law if Barney is allowed to retain OT confidential information, because OT has no way to police his access or use of the information. The requested injunction also imposes no significant burden on Barney; he has no legitimate reason to retain those files.

### III. OT has proven by a preponderance of the evidence that Barney breached the Employment Agreement.

#### A. Legal standards and burden of proof.

"Under Illinois law, a breach of contract claim requires to prove the following elements by a preponderance of the evidence: '(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'"

*Susan Patterson Interiors, Inc. v. Tobias*, No. 11-cv-221, 2012 U.S. Dist. LEXIS 141239, at *8 (N.D. Ill. Oct. 1, 2012).

**B.      The Employment Agreement is plainly valid and enforceable.**

There is no question that the Employment Agreement includes an offer, acceptance, and consideration, satisfying the requirements for a valid and enforceable contract. The Employment Agreement is obviously supported by consideration: OT promised, *inter alia*, to pay Barney an annual salary of $190,000, while Barney promised to serve as a Managing Director of OT and perform assigned duties and responsibilities. Facts at ¶ 6, 10.

**C.      Plaintiff substantially performed under the contract.**

OT's primary obligation under the Employment Agreement, as the Employer, was to pay Barney's salary. OT did so, as evidenced by Barney's total payments from 2005–2011 set out in Sherman's calculations. Facts at ¶¶ 10, 164. Defendants have not identified any purported breach by OT of the Employment Agreement.

**D.      Barney breached the Employment Agreement.**

**1.      Barney breached Section 5.2 of his Employment Agreement regarding Confidential Information.**

Section 5.2 of the Employment Agreement provides that "[t]he Executive [Barney] agrees that he will not use or cause to be used for his own benefit, directly or indirectly, or disclose any of such Confidential Information at any time, either during or after his employment with the Company, whether or not such Confidential Information is developed by the Executive," with a few narrow exceptions that do not apply here. Facts at ¶ 31. "Confidential Information" is defined broadly to include not only trade secrets, but also information concerning existing or contemplated services or product developments of OT, information concerning business plans, information concerning customers, and any other confidential information. *Id.*

Barney disclosed or used Confidential Information in at least three ways. First, he disclosed OT's business plans regarding the CdC and NTT deals to the public through the IAM interview. Facts at ¶¶ 85–87. Second, he retained and used OT Confidential Information—which includes Confidential Information developed by Barney—that he copied to the T410 Laptop and his X1C Laptops. OT has shown that Barney more likely than not used that Confidential Information to support his business as set out in Sections I.C.1 and II.C, *supra*. But even if Barney did not use that Confidential Information to support the business of PR, he admitted that he used that Confidential Information to his advantage in this litigation, which is a use for Barney's own benefit and thus a breach of Section 5.2. Facts at ¶ 155. And third, OT's dealings with NTT were Confidential Information. Barney's use of that Confidential Information to his own benefit as described in Section I.C.1, *supra*, is a breach of Section 5.2.

### 2. Barney breached Section 5.1 of his Agreement by competing and interfering with the NTT joint venture during the Noncompetition Period.

Section 5.1(b) of the Employment Agreement prohibits Barney from engaging in "any business in which the Company (or any of its Affiliates) is engaged at the time of termination of the Executive's employment hereunder" during the Noncompetition Period. Facts at ¶ 33. The same section defines the Noncompetition Period as the period from the start of Barney's employment to the first anniversary of the termination of Barney's employment. *Id*. As Barney's employment terminated on February 25, 2011, the Noncompetition Period continued until February 25, 2012. Section 5.1(c) further requires that during the Noncompetition Period, Barney may not interfere with OT's relationship with any party with whom it has a business relationship, nor take any action intended to divert from OT any business opportunity. Facts at ¶ 34.

The evidence surrounding the OT-NTT joint venture negotiations, discussed *supra* at Section I.C.2, establishes that Barney breached Section 5.1(b) of the Employment Agreement. Barney interfered with the relationship of OT and NTT.

### E. OT suffered damages as a result of Barney's breaches.

The damages OT suffered from Barney's breaches of his Employment Agreement—damages as a result of Barney's misappropriation of confidential information and damages as a result of Barney's interference with the NTT joint venture—are the same as the damages OT has set forth in Sections I.D.1 and I.D.2, *supra*, respectively. In addition, Section 5.4(a) of the Employment Agreement acknowledges that breaches of Sections 5.1, 5.2 and 5.3 will cause irreparable injury. Facts at ¶ 35. Thus, an injunction is appropriate as a remedy for this breach of contract claim.

## IV. OT has proven by a preponderance of the evidence that Barney converted the OT Laptop and the confidential information contained on it.

### A. Legal standards and burden of proof.

To prove conversion, a plaintiff must establish by a preponderance of evidence that "(1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership of the property." *In re Karavidas*, 999 N.E.2d 296, 310, 2013 IL 115767, at ¶ 61; *Seymour v. Williams*, 618 N.E.2d 966, 972, 249 Ill. App. 3d 264, 272 (1st Dist. 1993).

### B. OT had a right to the OT Laptop, and an absolute and unconditional right to the immediate possession of the OT Laptop.

The OT Laptop was given to Barney subject to the CAP Agreement that he signed. Facts at ¶¶ 56–58. The agreement states that "[t]he organization retains ownership of all hardware and

software provided to the employee." Facts at ¶ 57. Because OT retained ownership of the OT Laptop, it also had an absolute and unconditional right to its immediate possession.

### C.   Ocean Tomo made a demand for possession of the OT Laptop.

Shortly after Barney's resignation in February 2011, Chuinard attempted to conduct an exit interview with Barney and requested return of his company laptop. Facts at ¶ 89.

When Barney had not returned the laptop by May 2011, Chuinard asked for the laptop again, as evidenced by email correspondence between her and Lee. Facts at ¶ 90. Defendants do not dispute that Chuinard demanded the OT Laptop back in May 2011 on OT's behalf.

### D.   OT has proven by a preponderance of the evidence that Barney wrongfully and without authorization assumed control, dominion, or ownership of the OT Laptop.

Weil's undisputed forensic analysis confirmed that when OT's Chicago office received the OT Laptop from the Irvine office, it had been wiped with hexadecimal zeroes. Facts at ¶ 91. The Laptop could not have been wiped in that way by accident; someone must have used special software to perform the erasing. Facts at ¶ 92. Because the OT Laptop had been wiped with hexadecimal zeroes, all information on it was destroyed and unrecoverable. Facts at ¶ 91.

A preponderance of the evidence shows that Barney either wiped the OT Laptop or directed another person to wipe the OT Laptop. Cohen testified that OT does not permit its employees to forensically wipe laptops as the OT Laptop was wiped. Facts at ¶ 93. Weil testified that based on his experience as an expert forensic analyst, it is unlikely that a company in OT's position would direct employees to wipe a hard drive of a former employee with hexadecimal zeroes before examining its content. Facts at ¶ 96. Defendants have offered no evidence that OT ordered any of its employees to wipe the Laptop.

By wiping the OT Laptop, Barney wrongfully assumed dominion over it; he destroyed all the information and turned it into a paperweight. Facts at ¶ 91.

### E.   OT suffered damages as a result of Barney's conversion of the OT Laptop.

As explained in Section I.D.1, *supra*, OT would not have had to spend substantial resources investigating Barney's computer activities had Barney not converted the OT Laptop. OT thus incurred $40,045 in out-of-pocket costs as a result of Barney's conversion. Facts at ¶ 98. Further, because Barney's conversion destroyed any record of his activity using the OT Laptop between October 2010 and June 2011, OT has no way of knowing if any of its confidential information was destroyed permanently as a result. Punitive damages are appropriate on a conversion claim "where the defendant acts willfully or with such gross negligence to indicate a wanton disregard of the rights of others." *Dubey v. Public Storage, Inc.*, 918 N.E.2d 265, 279, 395 Ill. App. 3d 342, 355 (1st Dist. 2009). Barney's wiping of the Laptop was a willful act showing a wanton disregard for OT's rights. The Court should thus award OT $40,045 plus an appropriate amount of punitive damages on its conversion claim.

## V.   OT has proven by a preponderance of the evidence that Barney violated the Computer Fraud and Abuse Act ("CFAA").

### A.   Legal standards and burden of proof.

To prevail on its CFAA claim, OT must show by a preponderance of evidence (1) damage or loss (2) caused by (3) a violation of one of the substantive provisions set forth in 18 U.S.C. § 1030(a), and (4) conduct involving one of the factors of harm set forth in § 1030(c)(4)(A)(i)(I)-(VI). *Tamlyn v. Bluestone Advisors, LLC*, No. 17-cv-8893, 2018 U.S. Dist. LEXIS 68473, at *3-*4 (N.D. Ill. Apr. 24, 2018); *Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*, 267 F. Supp. 2d 1268 (S.D. Fla. 2003).

### B.   Barney violated 18 U.S.C. § 1030(a)(2)(c) and (a)(5) through his wiping of the OT Laptop and wrongful copying of OT confidential information.

18 U.S.C. § 1030(a)(2)(C) states that a person violates the CFAA if he "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . .

60

information from any protected computer." Section (a)(5) states that a person violates the CFAA if he "(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." The term "protected computer" throughout the CFAA is defined as a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1830(e)(2)(B).

The OT Laptop is a "protected computer" under the CFAA. To show that a computer is a "protected computer," i.e., one used in or affecting interstate commerce, it is enough to show that "the computer was used for [a] business and the business operated in two different states." *Patrick Patterson Custom Homes, Inc. v. Bach*, 586 F. Supp. 2d 1026, 1032 (N.D. Ill. 2008). The OT Laptop was used for OT business, and OT operated in at least two states: Illinois and California. Facts at ¶¶ 1, 36. It is therefore a "protected computer."

Barney violated section (a)(2)(C) by copying OT confidential information to his personal computer. An employee who breaches a duty of loyalty to an employer is not authorized to access the employer's computers, and so violates section (a)(2)(C) by copying confidential information for an improper purpose. *Citrin*, 440 F.3d at 420–21; *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 767 (N.D. Ill. 2009).

Barney violated section (a)(5) by wiping the OT Laptop. The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). When an employee accesses a company-issued protected computer in a manner exceeding their authority, and uses software to permanently delete files, that employee

violates section (a)(5) of the CFAA. *Int'l Airport Centers v. Citrin*, 440 F.3d 418, 419–20 (7th Cir. 2006); *Patrick Patterson*, 586 F. Supp. 2d at 1034–35. As explained in Section IV.D, *supra*, OT proved by a preponderance of the evidence that Barney, without authorization from OT, either permanently deleted the information on the OT Laptop or caused someone else to do so, thereby "damaging" it as defined by the CFAA.

### C. Barney's conduct violating the CFAA caused OT damage.

Under the CFAA, costs incurred by an employer in investigating a former employee's misconduct involving a protected computer are compensable. *Patrick Patterson*, 586 F. Supp. 2d at 1036. As explained in Section I.D.1, *supra*, OT incurred $40,045 in costs to have Weil investigate Barney's computer-related misconduct and attempt to repair the damage. Facts at ¶ 98. That damage is compensable. OT also incurred additional costs in litigating this action and in Weil's 2016 forensic analysis, which are also compensable. *Motorola*, 609 F. Supp. 2d at 768.

### D. Barney's conduct caused a loss aggregating over $5,000 in value.

The last element of OT's CFAA claim is that Barney's conduct involve one of the factors of harm set forth in 18 U.S.C. § 1830(c)(4)(A)(i)(I)-(VI). Barney's conduct imposed losses over $5,000 in value, namely at least $40,045 in investigative costs. Facts at ¶ 98. Those investigative costs over $5,000 satisfy the CFAA's harm element. *Motorola*, 609 F. Supp. 2d at 768.

## VI. OT has proven by a preponderance of the evidence that Barney breached the CAP Agreement.

### A. Legal standards and burden of proof.

As noted above, for a breach of contract claim, OT is required to prove by a preponderance of the evidence "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Susan Patterson Interiors*, 2012 U.S. Dist. LEXIS 141239, at *8.

**B.      The CAP Agreement is a valid and enforceable contract.**

Barney admits that he signed the Computer Asset Policy Agreement on or about April 27, 2007. Dkt. No. 397 at ¶ 51; Facts at ¶ 56. By signing the CAP Agreement, Barney promised to not modify, alter, or upgrade any hardware or software programs provided by OT, and to make reasonable efforts to protect organization provided hardware equipment and software from theft and physical damage. Facts at ¶ 58.

**C.      OT substantially performed under the contract.**

The CAP Agreement provided that OT would provide Barney, as an OT employee, with hardware and software. OT did so by providing Barney with the OT Laptop loaded with OT confidential information. Facts at ¶ 88. Thus, OT performed under the CAP Agreement.

**D.      Barney breached the CAP Agreement.**

The CAP Agreement required that Barney not "modify, alter, or upgrade any hardware or software programs provided to [him] by [OT]" and that he "must make reasonable efforts to protect all organization provided hardware equipment and software from theft and physical damage." Facts at ¶ 58. By destroying all his files on the OT Laptop, either wiping or directing another to wipe the Laptop with hexadecimal zeroes before returning it as shown in Section IV.D, *supra*, and copying OT confidential information to a personal computer, Barney breached his promise to not alter the OT Laptop and to make reasonable efforts to protect its hardware and software from theft and physical damage.

**E.      OT was damaged by Barney's breach of the CAP Agreement.**

As explained in Section I.D.1, *supra*, OT would not have had to spend substantial resources investigating Barney's computer activities had Barney not breached the CAP Agreement by wiping his laptop and copying OT confidential information to a personal computer. OT thus

incurred $40,045 in out-of-pocket costs as a result of Barney's breach of the CAP Agreement. Facts at ¶ 98.

**VII.**  **OT has proven by a preponderance of the evidence that Barney and PR tortiously interfered with OT's prospective business advantage in the NTT joint venture.**

**A.**  **Legal standards and burden of proof.**

To prevail on a claim for tortious interference with prospective business advantage, OT must show by a preponderance of the evidence that: "(1) plaintiff must have a reasonable expectancy of a valid business relationship with a third party; (2) defendant must know of the prospective business relationship; (3) defendant must intentionally interfere with the prospective business relationship such that the prospective business relationship never materializes; and (4) the interference must damage the plaintiff." *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 886 (7th Cir. 2000).

**B.**  **OT proved by a preponderance of the evidence that it had a reasonable expectancy of a valid business relationship with NTT.**

"To demonstrate a reasonable business expectancy, a plaintiff need not prove that a contractual relationship existed with a third party, but it must show 'more than a mere hope' of future business dealings." *MPC Containment Sys. v. Moreland*, No. 05-cv-6973, 2008 U.S. Dist. LEXIS 60546, at *56 (N.D. Ill. July 23, 2008). OT had more than a mere hope of future business dealings with NTT. Facts at ¶¶ 124–127. OT and NTT had also jointly developed financial projections for the planned joint venture on which they based their anticipated contract. Facts at ¶¶ 151–152. OT thus met its burden to show a reasonable expectancy of a valid business relationship with NTT.

**C.**  **Defendants admit that Barney knew of OT's valid business relationship.**

In their Answer to OT's Third Amended Complaint, Defendants admitted that "while Mr. Barney was employed by OT he was aware of OT's attempts to form a business relationship with

NTT Data." Dkt. No. 397 at ¶ 176. OT further proved Barney's knowledge at trial. Facts at ¶¶ 125–126. This element is not in dispute.

### D. Barney intentionally interfered with the NTT joint venture, causing it to fail.

The facts showing that Barney intentionally interfered with the NTT joint venture and that his interference caused the failure are set forth in Section I.C.2, *supra*, in connection with OT's claim for breach of fiduciary duty. The evidence showed that Barney intentionally interfered with the NTT joint venture. He intentionally told NTT in March 2011 that OT had no right to develop a Japanese patent ratings system through a joint venture, and intentionally told NTT in February 2012 that PR wanted to sublicense its patents to NTT excluding OT. The evidence showed that NTT would have entered the agreement with OT but for Barney's interference. Facts at ¶¶ 128–131, 138–145, 148.

Barney's statements to NTT asserting that OT was unable to proceed and that PR could cannot be justified as reasonable in light of the provisions of the 2004 License Agreement and Supplemental License Agreement. Both agreements give OT broad worldwide exclusive rights. Facts at ¶¶ 12, 17–19, 42–45. Both agreements recognize the scope of OT Affiliates as including the contemplated joint venture. Facts at ¶¶ 29–30, 42. Barney himself, in promoting and endorsing OT's international joint venture efforts (before wrongfully undermining them at the 11th hour) cannot credibly contend that OT did not have these rights. Facts at ¶¶ 67–73, 124–126. Having granted exclusive rights to OT, and not having reserved the right to practice in the licensed field, PR is precluded from pursuing or licensing others within the exclusively licensed fields. *See*, *e.g.*, *Penda Corp. v. United States*, 29 Fed. Cl. 533, 576 (1993) (crediting Malackowski's 1993 expert testimony that "if a licensee has an exclusive license, 'it will be permitted to [practice] the technology and no one else will.'").

65

**E.    Barney and PR's interference with the NTT joint venture damaged OT.**

Defendants' interference with the NTT joint venture agreement damaged OT by preventing it from realizing the profits it would have made from the joint venture. They are the same damages set forth with regard to the breach of fiduciary claim in Section I.D.2, *supra*.

**F.    Barney and PR were not privileged to compete against OT.**

Defendants cannot seek refuge from OT's tortious interference claim in the "privilege to compete" because Defendants were barred by contractual obligation from competing and interference with OT. Illinois follows the Restatement (2d) of Torts, § 768 in requiring that a party can only be privileged to compete if the parties are in competition with one another. *Enesco Corp. v. K's Merchandise Mart, Inc.*, No. 99-cv-1070, 2000 U.S. Dist. LEXIS 17326, at *36 (N.D. Ill. 2000). Barney was under both contractual and fiduciary duties not to compete with OT or to usurp OT's business expectancy with NTT. Facts at ¶¶ 34, 60. Barney therefore cannot be entitled to a privilege to compete because he was forbidden from competing (and if Barney attempts to rely on the privilege, he would as a result admit to competing against OT). *See Mannion v. Stallings Co.*, 561 N.E.2d 1134, 1141, 204 Ill. App. 3d 179, 191 (1st Dist. 1990) (no privilege to compete where plaintiff has exclusive right to perform the business). Further, a person who is under a fiduciary duty not to interfere with another's business expectancy has acted improperly, and thus tortiously, by interfering with the other person's business expectancy. *Dames & Moore v. Baxter & Woodman*, 21 F. Supp. 2d 817, 827 (N.D. Ill. 1998). And in any event, the privilege to compete does not allow competition through false representations and bad faith threats of litigation. *Zenith Elecs. Corp. v. ExZec, Inc.*, No. 93-cv-5041, 1997 U.S. Dist. LEXIS 20762, at *48 (N.D. Ill. Dec. 22, 1997). For all these reasons, Barney cannot evade liability based on a "privilege to compete."

**VIII.   OT has proven by clear and convincing evidence that the Licensed Patents are invalid and/or unenforceable.**

**A.      Legal standards and burden of proof.**

A party seeking to prove that a patent is invalid, either as ineligible subject matter under 35 U.S.C. § 101 or as obvious under 35 U.S.C. § 103, has the burden of proving invalidity by clear and convincing evidence. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). Unenforceability for patent misuse, however, requires only a showing "by a preponderance of the evidence, 'that the patentee has impermissibly broadened the physical or temporal scope of the patent with anti-competitive effect.'" *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04-cv-5312, 2008 U.S. Dist. LEXIS 4627, at *3 (N.D. Ill. Jan. 18, 2008) (quoting *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997).

**B.      The Licensed Patents are invalid as directed to patent-ineligible subject matter.**

"Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). In *Alice*, following up on its previous decision in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012), the Supreme Court set out a two-step framework for determine whether a patent claim is directed to patent-ineligible subject matter: (1) "determine whether the claims at issue are directed to one of those patent-ineligible concepts;" if so, (2) "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible invention.'" *Alice*, 134 S. Ct. at 2355.

OT's unrebutted expert testimony from Dr. Thomas establishes that the Licensed Patents are invalid under 35 U.S.C. § 101. Under the first step of the *Alice* framework, the Licensed Patents are all directed to abstract ideas. All of the Licensed Patents involve the use of basic statistical methods such as regression to relate bibliographic metrics to some quality of a patent; Barney

admitted, and Thomas testified, that regression is a widely used and fundamental method for statistics and data analysis. Facts at ¶¶ 169, 171. The Ratings Patents' claims are directed to the abstract idea of utilizing bibliographic metrics to rate patents using statistical regression models. Facts at ¶ 174. The Valuation Patent's claims are directed to the same abstract idea applied across multiple jurisdictions. Facts at ¶ 176. The Obsolescence Patent's claims are directed to the abstract idea of using curve fitting—another basic and commonplace practice in statistics and data analysis—to predict future depreciation using patent citation data. Facts at ¶ 178. And the Relevance Patents' claims are directed to the abstract idea of using indirect citation links to estimate the probability that two documents have a direct citation link. Facts at ¶ 180.

The Supreme Court and the Federal Circuit have made clear that the use of statistical methods to analyze data, as claimed by the Licensed Patents, is an abstract idea. Most recently in *SAP Am., Inc. v. InvestPic, LLC*, No. 17-2081, 2018 U.S. App. LEXIS 12590, at *11 (May 15, 2018), the Federal Circuit invalidated patent claims to performing statistical analyses on investment data. It did not matter that the claimed statistical analyses in *SAP* were limited to information about real investments; "even if a process of collecting and analyzing information is 'limited to particular content' or a particular 'source,' that limitation does not make the collection and analysis other than abstract." *Id.* (quoting *Elec. Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1353, 1355 (Fed. Cir. 2016)). Similarly, each of the Licensed Patents claims nothing more than using a common statistical algorithm to analyze some aspect of patent documents. The common statistical algorithm is an abstract idea, and limiting it to the field of patent bibliometrics makes it no less abstract. *Id.*; *see also Alice*, 134 S. Ct. at 2358.

At the second step of the *Alice* analysis, the Licensed Patents contain no additional claim elements that transform the claims into patent-eligible inventions. Each of the claims adds nothing

more to the abstract ideas of using statistical analysis to analyze patents beyond implementing them on a generic computer; the method claims of the Licensed Patents do not even go that far. Facts at ¶¶ 175, 177, 179, 181. "[S]imply implementing a mathematical principle on a physical machine, namely a computer, is not a patentable application of that principle." *Alice*, 134 S. Ct. at 2357–59.

Defendants offered no testimony, expert or otherwise, to rebut Dr. Thomas. Facts at ¶ 182. Defendants have conceded all factual disputes, if any remained, by failing to offer evidence.

**C.     The Licensed Patents are invalid as obvious under 35 U.S.C. § 103.**

35 U.S.C. § 103, in its pre-AIA form, stated that a patent could not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." To analyze obviousness, courts are required to apply the *Graham* factors, determining (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issues; (3) the level of ordinary skill in the pertinent art; and (4) any secondary considerations of non-obviousness such as commercial success, long felt but unsolved needs, failure of others, etc. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).

OT presented undisputed expert testimony that a person of ordinary skill in the relevant art to the Licensed Patents would have a high level of skill with both statistical methods and patent law. Dr. Thomas presented testimony that a person of ordinary skill in the relevant art would have at least an advanced degree in a quantitative field combined with familiarity with patent prosecution or valuation sufficient to understand common patent metrics; or in the alternative, a law degree with professional legal experience focusing on patent law and familiarity with quantitative subjects sufficient to be able to apply statistical technique to patent data metrics. Facts

69

at ¶¶ 196–197. In other words, the person of ordinary skill in the art would have an advanced degree in a field involving statistical technique combined with substantial familiarity with patent law, or an advanced degree in law (specializing in patent law) combined with substantial familiarity with statistical techniques. In either case, the person of ordinary skill would have a high level of skill, as the Licensed Patents relate to a highly specialized field in which there are few practitioners. Facts at ¶ 198.

The scope and content of the prior art, and the differences between that prior art and the claimed subject matter, differs slightly for each group of patents and so is addressed separately:

### 1.    Prior art for the Relevance Patents.

The primary prior art Dr. Thomas analyzed for the Relevance Patents were U.S. Patent No. 7,433,884 ("Breitzman") and PCT Application WO 97/08604 ("Liddy"). Facts at ¶¶ 184–185. Breitzman discloses a method of identifying potential licensees for a patent or patent portfolio by tracing multiple generations of forward and backward citations, weighing the citation links by generation. Facts at ¶ 184. Liddy discloses a method for multilingual document retrieval assigning relevance scores to documents using a logistic regression model, ranking those scores, and returning to the user the highest scoring documents. Facts at ¶ 185.

Dr. Thomas testified that a person of ordinary skill in the art would have found it obvious to combine Breitzman's method of tracing patent citations with Liddy's method of generating relevance scores using a logistic regression model to get the claims of the Relevance Patents. Facts at ¶ 199. In his report, Dr. Thomas explained that the logistic regression for relevance disclosed by Liddy requires a variable to use in optimizing, and a person of ordinary skill in the art would have found it obvious to use as that dependent variable the weighted citation counts of Breitzman. *Id.* Some later patent claims in the Relevance Patents claim displaying the results as a self-organizing map; a person of ordinary skill in the art would find it obvious to do so by combining

70

the Breitzman plus Liddy relevance system with the disclosure of *Inventive Progress* Measured *by Multi-Stage Patent Citation Analysis* by Iwan von Wartburg ("von Wartburg") to display such results as a self-organizing map. *Id.* Similarly, some Relevance Patent claims include as claim limitations "fractional counting" where co-authors receive partial credit in counting citation; that fractional counting is disclosed by *Visualizing Science by Citation mapping*, 50 Journal of the American Society For Information Science 799–813 (1999) ("Small 1999"). *Id.* Together, all the Relevance Patent claims are rendered obvious by the combination of Liddy and Breitzman, adding von Wartburg or Small 1999 if necessary. *Id.*

### 2. Prior art analysis for the Ratings Patents.

The prior art Dr. Thomas analyzed for the Ratings Patents were U.S. Patent No. 7,813,944 ("Luk"), U.S. Patent No. 5,999,907 ("Donner"), and U.S. patent No. 5,991,751 ("Rivette"). Facts at ¶¶ 188–190. Luk discloses a method for identifying insurance policies suspected of premium fraud using a predictive model constructed from metrics derived from characteristics of insurance policies. Facts at ¶ 188. Donner discloses a method for generating a valuation for an intellectual property portfolio based on a model that takes as inputs a series of patent metrics, weighted based on their relationship with patent portfolios having a known value. Facts at ¶ 189. Rivette describes methods for managing databases of patent and non-patent information, and for integrating them by mapping groups of patents to products, and to an overall corporate entity. Facts at ¶ 190.

Dr. Thomas testified, without rebuttal from Defendants, that all the claims of the Ratings Patents are obvious based on Luk in view of Donner, or in the case of the '349 Patent, Luk in view of Donner and Rivette. Generally, Dr. Thomas testified that Luk discloses the claimed system for building a predictive model to predict a characteristic of a document (*i.e.*, whether an insurance claim is fraudulent) based on comparing characteristics of a population of documents without that characteristic to a population of documents with that characteristic. By combining Luk's predictive

71

model with Donner's teaching of generating predictive models for patent data using patent document metrics, a person of ordinary skill in the art would have found it obvious to reach the Ratings Patents' generation of a model for predicting likelihood of patent maintenance by comparing patent metrics between two populations of patents, one in which patent maintenance fees were not paid and one in which they were. Facts at ¶ 200. While the '349 Patent adds claims to associating patents with commercial products, a person of ordinary skill in the art would find t obvious to combine the patent ratings system of Luk plus Donner with the teaching of Rivette to map patents to products, resulting in the '349 Patent claims.

### 3. Prior art analysis for the Valuation Patent.

The prior art Dr. Thomas analyzed for the Valuation Patent was Barney's own published application U.S. 2004/0220842 ("Barney Ratings Publication") and the 1997 publication *The Value of International Patent Rights* by Jonathan Putnam ("Putnam"). Facts at ¶¶ 191–192. The Barney Ratings Publication discloses the statistical model discussed previously for ranking patents according to their likelihood of a given outcome. Facts at ¶ 191. Putnam discloses a quantitative model that estimates global patent values based on country-specific and non-country-specific factor to facilitate comparison of patent valuations across jurisdictions. Facts at ¶¶ 192–193.

Dr. Thomas testified that it would have been obvious for a person of ordinary skill in the art to combine Barney's statistical model for rating patents with Putnam's quantitative model for comparing patent valuation across jurisdiction, resulting in the Valuation Patent's claimed system: using Barney's patent rating system to compare ratings-based valuations across different jurisdictions. Facts at ¶ 202.

### 4. Prior art analysis for the Obsolescence Patent.

The prior art Dr. Thomas analyzed for the Obsolescence Patent was a 1996 publication, "Flows of Knowledge from Universities and Federal Labs: modeling the flow of patent citations

over time an across institutional and geographic boundaries" by Adam Jaffe and Manuel Trajtenberg ("Jaffe"), and a 1979 publication, "The Rate of Obsolescence of Knowledge, Research Gestation Lags, and the Private Rate of Return to Research Resources," by Ariel Pakes and Mark Schankerman ("Pakes"). Facts at ¶¶ 194–195. The Jaffe publication discloses the use of patent citations to model obsolescence through curve fitting. Facts at ¶ 194. The Pakes publication discloses the use of patent renewal data to model economic returns to patent holders over time. Facts at ¶ 195.

Dr. Thomas testified that it would have been obvious to a person of ordinary skill in the art to create the claimed model for generating an obsolescence and depreciation schedule for patents by combining Jaffe's teaching of modeling obsolescence through curve fitting with Pakes's teaching of using patent renewal data for obsolesence models. Facts at ¶ 203.

### 5. All the Licensed Patents are invalid as obvious.

Defendants have offered no evidence to refute Dr. Thomas's testimony as to the scope and content of the prior art, its comparison to the claims of the Licensed Patents, or the level of ordinary skill in the art. Defendants have also offered no evidence of secondary considerations of non-obviousness. The only possible conclusion is that the Licensed Patents are all invalid as obvious.

### D. The Licensed Patents are unenforceable for patent misuse.

The Federal Circuit has generally characterized patent misuse as "impermissibly broaden[ing] the 'physical or temporal scope' of the patent grant with anticompetitive effect." *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (*en banc*). A holding of patent misuse renders the patent unenforceable until the misuse is purged. *C.R. Bard, Inc. v. M3 Sys.*, 157 F.3d 1340, 1373 (Fed. Cir. 1998).

First, the 2004 License Agreement is *per se* patent misuse by PR because it impermissibly restricts OT's activities after the Licensed Patents expire. The Supreme Court has held that "any

73

attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws." *Brulotte v. Thys Co.*, 379 U.S. 29, 31 (1964). As recently as 2015, the Supreme Court reaffirmed the *Brulotte* rule, explaining that "the core feature of the patent laws on which *Brulotte* relied remains just the same: Section 154 now, as then, draws a sharp line cutting off patent rights after a set number of years." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2410–11 (2015). Paragraph 6.1 of the License Agreement prohibits OT and its Affiliates from, "[d]uring the term(s) of this Agreement and for a period of three years thereafter, . . . mak[ing], caus[ing] to be made, or assist[ing] others to make any statistical patent analytics tools, patent ratings or associated products that are derivative of, or substantially similar to the PatentRatings Tools or the PatentRatings Analysis." Facts at ¶ 25. As a result, once the Licensed Patents expire, other companies are free to develop the claimed patent ratings systems but OT and its Affiliates are not. This post-expiration restriction is *per se* patent misuse.

Further, even if Paragraph 6.1 did not impose post-expiration restrictions, it imposes a *per se* unlawful restriction on OT's ability to develop competing products not covered by the Licensed Patents. "The courts have consistently taken the view that a provision in a patent license requiring a party not to deal in products that compete with the patented product constitutes misuse per se." 6 Chisum on Patents § 19.04[3][b] (2018). This Court held in *Krampe v. Ideal Indus.*, 347 F. Supp. 1384, 1385–86 (N.D. Ill. 1972), that a license agreement prohibiting the licensed vendor from selling any "products of other manufacture which are identical with or similar to [the patented device]" was *per se* misuse, even though the licensor had never attempted to enforce the provision. Here, Paragraph 6.1 prohibits OT from making any statistical patent analytics tools "substantially similar to the PatentRatings Tools or the PatentRatings Analytics," regardless of whether those

tools fall within the scope of the Licensed Patents. Facts at ¶ 25. Paragraph 5.3 similarly requires OT to grant back any "Improvements," defined broadly to include updates, upgrades, and new versions or releases of the PR Tools without regard to whether they are covered by the Licensed Patents. Facts at ¶¶ 22–24. Going further than the defendant in *Krampe*, PR has actually used Paragraph 6.1 to anticompetitive effect in two ways: (1) using Paragraph 6.1 as a basis to interfere with OT's NTT joint venture, even though none of the Licensed Patents—all United States patents—could possibly prohibit development work in Japan; and (2) alleging in this litigation that OT has breached its contract by not granting to PR U.S. Patent Application No. 2015-0206069, when PR has offered no evidence that the application is within the scope of the Licensed Patents. Facts at ¶¶ 134, 142, 144; Dkt. No. 175 at ¶ 92.

Dated: July 5, 2018                              Respectfully submitted,

                                                 */s/ William Cory Spence*
                                                 William Cory Spence (No. 6278496)
                                                 Brian J. Beck (No. 6310979)
                                                 SpencePC
                                                 515 N. State St., Suite 1801
                                                 Chicago, Illinois 60654
                                                 312-404-8882
                                                 William.Spence@spencepc.com
                                                 Brian.Beck@spencepc.com
                                                 *Counsel for Plaintiff and Counter-Defendant*
                                                 *Ocean Tomo, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 5, 2018, a copy of the foregoing was served on counsel of record by electronic means pursuant to the court's Electronic Case Filing (ECF) system.

<u>/s/ *William Cory Spence*          </u>