UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OCEAN TOMO, LLC, | |
| Plaintiff, | No. 12 C 8450 |
| v. | Judge Thomas M. Durkin |
| PATENTRATINGS, LLC; and JONATHAN BARNEY, | |
| Defendants. | |

FINDINGS OF FACT & CONCLUSIONS OF LAW

Jonathan Barney, through his company PatentRatings, LLC, created and patented a database and computer program (the PatentRatings "system") for analyzing and evaluating patents. Ocean Tomo, LLC, provides financial services and consulting related to intellectual property, including patent analytics. In 2004, the parties reached agreements providing for (1) licensing the PatentRatings system to Ocean Tomo; (2) giving Ocean Tomo an ownership interest in PatentRatings; and (3) giving Barney an ownership interest in, and a management position with, Ocean Tomo. The relationship among the parties soured, giving rise to amendments to the agreements in 2007, and eventually this litigation in 2012.

The case proceeded to a bench trial beginning on June 26, 2017. The were 16 trial days through July 28, 2017, at which point the Court's and the parties' schedules required that the trial be continued indefinitely. The trial resumed on April 23, 2018 and the parties completed their presentation of evidence on April 27, 2018. A total of 13 witnesses testified, including one who was called twice, and two who were called

three times each. Post-trial briefing was completed on August 17, 2018. Considering:

(1) this case is eight and half years old; (2) during the course of the case, the parties

briefed five pre-trial motions resulting in five memorandum opinions; (3) the parties

briefed motions in limine and *Daubert* motions; (4) the Court received evidence over

21 bench trial days; and (5) the Court has reviewed 380 pages of post-trial briefing

(not to mention several hundred pages of exhibits), the Court has determined that

closing arguments are unnecessary. The parties had more than sufficient opportunity

to raise any claims and make any supporting arguments in their post-trial briefs (as

well as periodic interim arguments by counsel throughout the trial proceedings). And

of course, closing arguments are not a vehicle to expand the evidentiary record.[1]

This memorandum sets forth the Court's findings of fact and conclusions of law

pursuant to Federal Rule of Civil Procedure 52(a). These findings are based on the

---

[1] In any case, there is no right to a closing argument in a civil bench trial. *See Matter of Generes*, 69 F.3d 821, 825 (7th Cir. 1995) ("Although closing arguments are required in a criminal case under the Sixth Amendment's right to effective assistance of counsel, [the appellant] has supplied no authority for the proposition that closing arguments are a constitutional right in civil cases and nor have we been able to find any. Indeed, Illinois courts have held that 'oral argument in a civil proceeding tried before a court without a jury is a privilege, not a right, which is accorded to the parties by the court in its discretion.' Further, [the appellant] has provided no historical argument or persuasive justification why the Due Process Clause of the Fifth Amendment should be read to require closing arguments at his trial: a four-hour hearing in bankruptcy court." (quoting *Korbelik v. Staschke*, 596 N.E.2d 805, 808 (Ill. 1992))); *Thomas v. N.Y. Life Ins. Co.*, 161 F.3d 8 (5th Cir. 1998) ("[d]enying closing arguments in a civil bench trial is within a . . . court's discretion."); *In re: Residential Capital, LLC*, 2016 WL 4126542, at *6 (S.D.N.Y. Aug. 2, 2016) ("the Bankruptcy Court did not abuse its discretion by declining Silber's request for closing arguments"); *Duncan v. Hartford Life & Acc. Ins. Co.*, 2013 WL 506465, at *1 (E.D. Cal. Feb. 8, 2013) (determining "that argument was unnecessary" for a civil bench trial).

documentary evidence and trial testimony. They are also based on the Court's credibility determinations after observing witnesses testify. All findings are by a preponderance of the evidence unless otherwise noted.

**Background:**
**The Relevant Agreements and**
**a Timeline of the Disputes**

### A.     Initial Agreements

Barney developed a computer program that uses regression analysis to measure the strength and quality of a patent relative to a database of information about patents that Barney compiled. *See* R. 412 ¶ 3; R. 396 ¶ 25. In 2004, Ocean Tomo approached Barney and his company PatentRatings to license this system. R. 412 ¶ 4; R. 416 ¶ 4. That year and early the following year, the parties entered into the following agreements: (1) a license agreement and subsequent amendment; (2) an equity exchange agreement; (3) a letter agreement; and (4) an employment agreement. R. 412 ¶ 4; R. 416 ¶ 4. The equity exchange agreement provided that Ocean Tomo would own 25% of PatentRatings, Barney would own about 6.8% of Ocean Tomo, and Barney would be employed as a manager of Ocean Tomo. R. 412 ¶ 6; 414 ¶ 6. The license agreement provided that Ocean Tomo would pay PatentRatings "any revenues received by [Ocean Tomo] . . . for access and use of PatentRatings Analysis." R. 403-9 at 5 (§ 4.3). The letter agreement specified that

3

PatentRatings "products will not be utilized by [Ocean Tomo's] expert services practice." R. 411-179 at 1.[2]

## B.    2007 Amendment and Note

Ocean Tomo was disappointed with the performance of the PatentRatings system and its profitability. *See* R. 414 ¶ 36. Barney was concerned that Ocean Tomo was failing to account properly for royalty-bearing revenues. *See* R. 412 ¶ 18. As a result, the parties amended the royalty terms in 2007. The 2007 amendment provides that Ocean Tomo will pay "25% of any revenues . . . collected solely from External Data Sales," and "13.25% of any revenues . . . collected solely from External Data Usage." R. 412-3 at 2 (§ 4.3(a), (b)). This is the current royalty provision.

On the same day the parties signed the amendment, PatentRatings signed a $1.5 million promissory note in Ocean Tomo's favor. *See* R. 412-15. Since the inception of the parties' business relationship, Ocean Tomo had spent money to improve the performance of the PatentRatings system. *See* R. 412 ¶¶ 16-17; R. 416 ¶¶ 16-17. The note was intended to reflect that PatentRatings had an obligation to repay these improvement expenses. *See* R. 412 ¶ 17; R. 416 ¶ 17. The amendment also provided that the parties agreed that "any Revenues owed to [PatentRatings] pursuant to . . .

---

[2] Ocean Tomo is organized into three service "verticals": opinion services; management services; and advisory services. *See* R. 333 at 6-7 (118:25–119:1). Each vertical is divided into practice groups. *See id.* at 7 (119:2-3). The "opinion services" vertical is divided into the "expert testimony practice group" and the "evaluation practice group." *See id.* (119:4-9). The "management services" vertical is divided into the "strategy practice group," "risk management services," and "patent analytics services." *See id.* (119:12-23). The "advisory services" vertical is divided into the "investments practice group" and the "transactions practice group." *See id.* at 8 (120:10-17).

the [2004 license agreement] that have accrued since the [effective date of the 2004 license agreement] have been credited to [PatentRatings] as reflected in the Principal amount of the Note." R. 412-3 at 3 (§ I). The parties refer to this provision as the "true-up."

### C. Disputes Over Specific Clients and Transactions

Despite reaching agreement on the 2007 amendment and note, the parties' relationship continued to deteriorate. A number of disputes arose or came to a head in 2010 regarding specific clients and transactions.

In January 2010, Barney raised concerns regarding the structure of a potential deal with a French bank. *See* R. 414 ¶¶ 74-78; R. 420 ¶¶ 74-78. By February 2011, Ocean Tomo came to believe that the deal failed because Barney told the bank that he and Ocean Tomo were disputing the scope of the license agreement. *See* R. 414 ¶¶ 76-77. During this same time period, the parties also argued over their respective client relationships with Boeing and the proper allocation of revenues from those relationships. *See* R. 412 ¶¶ 62-64; R. 416 ¶¶ 62-64.

In February 2010, Ocean Tomo entered into a memorandum of understanding with a Japanese company called NTT to create a Japanese patent rating system based on the PatentRatings system. R. 412 ¶ 82; R. 416 ¶ 82. Barney and PatentRatings initially approved of the deal. *See* R. 412 ¶ 83; R. 416 ¶ 83. But by January 2011, disputes had arisen between Ocean Tomo and Barney regarding the allocation of revenues under the license and operating agreements generally (which the Court describes further below). This led Barney to seek to restructure the potential deal

5

with NTT. *See* R. 412 at 24-25. The negotiations between Ocean Tomo and Barney regarding NTT became hostile. *See*, *e.g.*, R. 411-48 at 2. Additionally, both Ocean Tomo and Barney separately had negotiations with NTT that upset the other and are the basis for their dueling claims of tortious interference filed in this case. By October 2012, NTT finally scuttled the deal due to the unresolved disputes between Ocean Tomo and Barney. *See*, *e.g.*, R. 403-20.

In August 2010, another quarrel erupted between Ocean Tomo and Barney over characterization of profits from the $10 million sale of Ocean Tomo's intellectual property auction business to a company called ICAP. Specifically, they disputed whether Ocean Tomo's operating agreement required the profits from the sale to be split pro rata among ownership. *See* R. 412 at 33-34. Ocean Tomo ultimately determined that the operating agreement permitted Ocean Tomo's founder, majority owner, and CEO—James Malackowski—to receive a greater share of the sale profits, thus decreasing Barney's share by $133,156, relative to a straight pro rata allocation. *See* R. 412 ¶ 114; R. 416 ¶ 114.

### D. Revenue Disputes, Arbitration, and Audit

These client and transaction specific disputes occurred in the context of Ocean Tomo's continuing unhappiness with its financial arrangement with PatentRatings and the money it was investing in the PatentRatings system. *See* R. 412 at 7-8. In January 2011, Ocean Tomo requested that PatentRatings: (1) pay for future improvements; (2) assume as debt all past payments by Ocean Tomo for improvements (presumably meaning those incurred since the 2007 note and "true-

up"); and (3) defer royalties until the debt was repaid. *See* R. 412 ¶ 28; R. 416 ¶ 28. When PatentRatings refused this request, Ocean Tomo demanded in February 2011 that they resolve the dispute through arbitration. *See* R. 411-129; R. 411-24; R. 412 ¶ 29; R. 416 ¶ 29. Barney resigned from Ocean Tomo that same month, although he continues to own part of the company. The arbitrator eventually denied Ocean Tomo's claims on May 25, 2012.

Discovery during the arbitration proceeding revealed evidence that Ocean Tomo's "valuation" group was using the PatentRatings system. Barney testified that this surprised him because he considered the "valuation" group to be part of "expert services," and in the 2004 letter agreement Ocean Tomo had agreed not to use the PatentRatings system to provide "expert services." *See* R. 412 ¶ 32.[3] Based on the documents produced in the arbitration discovery, PatentRatings demanded royalty payments on "several" engagements, by letter dated January 26, 2012. *See* R. 412-16. Ocean Tomo initially refused, but eventually paid $14,423.31 on February 24, 2012. R. 412 ¶ 36; R. 416 ¶ 36.

Discovery of these unpaid royalties led PatentRatings to engage an auditor on March 7, 2012 and demand an audit pursuant to the license agreement. *See* R. 412 ¶ 40. The license agreement gives PatentRatings the right

> to inspect or audit [Ocean Tomo's] records from time to
> time, provided, however, that reasonable notice thereof will

---

[3] Although not materially relevant to the Court's decision, the Court assumes that Barney's reference to the "valuation group" means the "evaluation group" described in footnote 2 above, and Barney's reference to "expert services" means the "expert testimony practice group" within the "opinion services" vertical, also described above in footnote 2.

7

> be given and that [PatentRatings] will conduct any such inspection or audits during normal business hours and only to the extent necessary to determine or verify any royalty payments . . . and [PatentRatings] agrees not to conduct more than one such inspection or audit in each calendar year.

R. 403-9 at 6 (§ 4.5(c)). Ocean Tomo insisted that the audit be conducted on a sampling basis, although nothing in the agreement requires it. R. 412 ¶ 41; R. 416 ¶ 41. Ocean Tomo initially agreed to produce documentation regarding 25 client engagements.

The auditor determined Ocean Tomo had failed to pay royalties on one of the 25 client engagements in the amount of $6,625. R. 411-71 at 16. Having found unpaid royalties in the first sample, the auditor requested documentation for an additional 25 engagements. *Id.* at 17. Ocean Tomo agreed to produce only an additional 16. *Id.* In this second sample, the auditor found another two engagements with unpaid royalty-bearing work in the amount of $11,639.07. *Id.* at 18. Ocean Tomo then agreed to produce the "deliverables" for the highest 20 billing clients, while refusing to provide documentation for (1) matters for which there was no deliverable, and (2) matters for which a royalty was paid. *See* R. 419-4 at 2. Defendants objected that this documentation would be insufficient to test the accuracy of Ocean Tomo's royalty payments. *See* R. 434-99. The parties did not reach agreement on further production of records.

In addition to analyzing whether Ocean Tomo failed to pay royalties on the sample engagements, the auditor reviewed the documentation for the royalties Ocean Tomo had paid from 2008 through 2011. This auditor determined that Ocean Tomo had underpaid royalties on those engagements by $31,565.18. *See* R. 411-71 at 11-14.

Lastly, the auditor found that for certain clients, the revenue Ocean Tomo reported for purposes of determining royalties owed to PatentRatings was less than the total revenue received from the client. *See* R. 411-71 at 14. Ocean Tomo's records for these clients contained "notations that only a portion of the invoice was to be treated as royalty bearing." *Id.* The auditor reported his findings in a document dated May 14, 2014. For purposes of the May 2014 audit report, the auditor relied on Ocean Tomo's representations that this invoice splitting was proper.

But in this litigation, Defendants claim that Ocean Tomo's "split billing" practice violates the license agreement. Defendants reengaged the auditor to prepare an expert report for this case. *See* R. 411-146. Although the expert asserts that his report does not make "legal conclusions" nor render a "legal opinion," *see id.* at 8, he reached his conclusions by interpreting and applying the relevant provisions of the license agreements, the meanings of which are hotly contested by the parties in this case. The expert concluded that Ocean Tomo owes PatentRatings $2,044,413 in unpaid royalties. *See id.* at 20.

### E.    Lawsuits and Disputes about Hardware

About a year after Barney resigned from Ocean Tomo, in the midst of the arbitration proceedings, and about five weeks before Barney engaged the auditor, Ocean Tomo filed a complaint against Barney in Illinois state court on January 27, 2012. R. 1-2. Ocean Tomo alleged that Barney had improperly copied Ocean Tomo's confidential information and trade secrets from the laptop computer Ocean Tomo had issued to him. Ocean Tomo claimed that by copying and retaining the data, Barney:

(1) breached his fiduciary duty to Ocean Tomo; (2) breached his employment agreement with Ocean Tomo; (3) violated the federal Computer Fraud and Abuse Act; (4) violated the Illinois Trade Secrets Act; and (5) violated Illinois conversion law. *See* R. 1-1. Ocean Tomo also claimed that Barney breached Ocean Tomo's Computer Asset Policy Agreement by allegedly wiping the laptop's memory.

On October 9, 2012, Ocean Tomo sought leave to file an amended complaint in state court adding a claim of tortious interference regarding the NTT deal and adding PatentRatings as a defendant with respect to that new claim. *See* R. 1-3. Defendants appeared in the case shortly thereafter and removed the case to this Court on October 19, 2012. R. 1. Defendants filed counter-claims on November 16, 2012, for: (1) breach of the operating agreement with respect to allocation of the ICAP deal profits; (2) breach of the license agreement; (3) tortious interference with the NTT deal; and (4) violation of the federal Computer Fraud and Abuse Act for improperly disconnecting and retaining the servers containing the PatentRatings system. *See* R. 12.

In amended pleadings, Defendants added a claim for fraudulent inducement with respect to the 2007 amendment and note. *See* R. 84. Ocean Tomo filed second, third, and fourth amended complaints, *see* R. 83; R. 176; R. 396, which did not materially change the claims at issue in the case.

### Findings of Fact and
### Conclusions of Law
### on the Parties' Claims

While several iterations of the pleadings have been filed in the case, these findings address the claims for which the parties specifically seek relief in their post-trial briefs. Any other claims are waived.

Ocean Tomo claims: (1) breach of fiduciary duty (with respect to both (i) the information on Barney's laptop computer and (ii) the NTT deal); (2) violation of the Illinois Trade Secrets Act (laptop); (3) breach of Barney's employment agreement (laptop and NTT deal); (4) conversion (laptop); (5) violation of the Computer Fraud and Abuse Act (laptop); (6) breach of Ocean Tomo's Computer Asset Policy Agreement (laptop); (7) tortious interference (NTT deal); and (8) the patents at issue are invalid, as an affirmative defense to Defendants' claim for breach of the license agreement.

Defendants make the following counter-claims: (1) fraudulent inducement (with respect to the 2007 amendment and note); (2) breach of the license agreement (for non-payment of royalties, along with various other allegations); (3) tortious interference (with the NTT deal); (4) breach of the operating agreement (with respect to allocation of the ICAP deal profits); (5) violation of the Computer Fraud and Abuse Act (with respect to the PatentRatings servers); (6) breach of the supplemental license agreement; and (7) declaratory judgments that the license agreement and the supplemental license agreement are terminated (based on allegations addressed below). Barney also seeks relief in the form of forcing Ocean Tomo to repurchase his Ocean Tomo shares pursuant to 805 ILCS 180/35-1(a)(5). Some of the parties' claims

overlap factually, and some of the claims also serve as defenses. The Court addresses

them accordingly in the following order:

I.     Fraudulent Inducement
       A.    Reliance
       B.    Fraud and Intent
II.    Breach of the License Agreement: Royalties
       A.    Split Billing
       B.    "Facilitates"
       C.    Pre-2007 Amendment
       D.    Post-December 2012 Royalties
       E.    OPERS
III.   The NTT Deal
       A.    Ocean Tomo's Claims
             1.    Tortious Interference
             2.    Breach of the Employment Agreement
             3.    Breach of Fiduciary Duty
       B.    Defendants' Claim for Tortious Interference
IV.    Breach of the Operating Agreement
       A.    The ICAP Deal
       B.    Board Resolutions
       C.    Denial of Access to Records
V.     Violation of the Illinois Trade Secrets Act
VI.    Violation of the Computer Fraud and Abuse Act
       A.    Ocean Tomo's Claim
       B.    Ocean Tomo's Additional Related Claims
       C.    Defendants' Claim
VII.   Breach of the Supplemental License Agreement
VIII.  Declaratory Judgment that the License Agreement is Terminated
       A.    Branding
       B.    Ocean Tomo Ratings
       C.    Royalty Audit
       D.    Materiality
       E.    Termination of the Supplemental License Agreement
       F.    Patent Validity
IX.    Buy Out
X.     Attorneys' Fees

## I.     Fraudulent Inducement

Defendants claim that Ocean Tomo fraudulently induced Barney to agree to

the 2007 amendment and note. Barney testified that James Malackowski—Ocean

Tomo's founder, majority owner, and CEO—made the following statements about potential unpaid royalties that Barney relied upon in signing the 2007 amendment and note, which Defendants contend were false:

> (1) "the [Ocean Tomo] groups called Expert Services, Appraisals, Investments, Risk Management, and/or Corporate Finance 'did not use the PatentRatings [system] to deliver products and services to external clients'";
>
> (2) "there was no use of the [PatentRatings] System beyond (a) use in the Analytics group and (b) use that Barney was aware of through his work in [Ocean Tomo's PatentRatings] group"; and
>
> (3) "all the revenues that would be royalty-bearing had been reported to [PatentRatings] at that point, or that [Barney] was aware of them through [his] work in the PatentRatings Group."

R. 412 at 56 (citing Barney's trial testimony).

"In Illinois, fraudulent inducement requires proof of five elements: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003). These elements must be proven by clear and convincing evidence. *See id.*

## A.     Reliance

The parties focus their arguments on: whether Defendants have proven that Malackowski actually made the three statements; whether they were false; whether they were made with the intent to induce; and whether they caused damages. In three sentences, Ocean Tomo also argues that Defendants have failed to prove the reliance

element of their fraudulent inducement claim because they contend that past royalty disputes—the subject matter of the allegedly false statements—were not Barney's focus during negotiation of the 2007 amendment and note. *See* R. 416 at 60.

The parties, however, have overlooked the significance of the "true-up" provision, included in the 2007 amendment, to the reliance element of Defendants' fraudulent inducement claim. A fraudulent inducement claim alleges that a defendant orally misrepresented a certain fact in order to induce the plaintiff to perform some action. Here, Barney alleges that Ocean Tomo misrepresented what revenues had been reported, in order to induce Barney to agree to the amended royalty provisions and to take on the debt memorialized by the note. (Although Malackowski's first two alleged misrepresentations do not directly mention disclosure of royalty-bearing revenues, Defendants concede that these representations were only relevant to determining the "specific amount of accrued royalties in mind that were being credited against the loan balance" in the 2007 note. R. 412 at 56.)

The problem with Defendants' argument is that they expressly affirmed in writing—i.e., in the "true-up" provision—that Malackowski's alleged misrepresentations were *true*. In the true-up provision, Barney—on behalf of PatentRatings—"agreed" that the principal amount of the note "reflected" that "any revenues owed to [PatentRatings]" up to that point in time had "been credited to [PatentRatings]." R. 412-3 at 3 (§ I). This is not a representation by Ocean Tomo on which Defendants relied. Rather, it is a representation made by *Defendants* that any royalties they were owed had already been accounted for. This representation implies

14

that Defendants had satisfied themselves that this accounting was accurate, and implicitly waives any claims that the $1.5 million note amount failed to account for additional royalties owing.

Agreement to the true-up itself cannot be the action that was induced, because the true-up by its own terms ratifies the alleged misrepresentations. By agreeing to the truth of what Defendants now allege to have been misrepresentations, Defendants expressly disclaimed reliance on the misrepresentations. *See Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000) ("[It is] a doctrine long accepted in this circuit: that a person who has received written disclosure of the truth may not claim to rely on contrary oral falsehoods.").

Generally, when parties intend to disclaim reliance on prior oral representations they include a "no-reliance" clause in a contract. "[S]uch 'no-reliance' or 'disclaimer of reliance' clauses serve a legitimate purpose in closing a loophole in contract law' by heading off a suit for fraud used as a device for trying to get around the limitations that the parol evidence rule and contract integration clauses place on efforts to vary a written contract on the basis of oral statements made in the negotiation phase." *Judson Atkinson Candies, Inc. v. Kenray Assocs., Inc.*, 719 F.3d 635, 640 n.2 (7th Cir. 2013). In other words, such a provision negates the reliance element of a fraudulent inducement claim. *See Vigortone AG Prod., Inc. v. PM AG Prod., Inc.*, 316 F.3d 641, 645 (7th Cir. 2002) ("Since reliance is an element of fraud, the clause, . . . precludes a fraud suit[.]"). Sometimes such clauses do not use the word "reliance" in particular, but generally disclaim prior oral representations. *See*

*Rissman*, 213 F.3d at 383-84 (citing *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1285 (D.C. Cir. 1988) (the contract stated that it "supersedes any and all previous understandings and agreements")); *see also Boscia v. Monroe/Wabash Dev., LLC*, 2011 WL 10069624, at *4-5 (Ill. App. Ct. 1st Dist. May 31, 2011) ("no salesperson or employee of seller has authority to . . . make any representation or agreement not expressly contained in this purchase agreement or any exhibits attached hereto, and only those expressly contained herein shall be binding upon seller, or in any way affect the validity of this purchase agreement or form any part hereof. Purchaser acknowledges that, except as expressly stated herein, no representations have been made by seller, its agents or employees, in order to induce the purchaser to enter into this purchase agreement.").

The amended license agreement does not contain an express no-reliance clause, and the true-up does not generally disclaim reliance on prior oral representations. Rather, it is limited to the specific issue of the note's accounting of outstanding royalty payments. But that is the point: a claim of fraudulent inducement cannot be based on an alleged misrepresentation that is expressly disclaimed by the terms of the contract. The purpose of a fraudulent inducement claim is to permit a party to a contract to bypass the parol evidence rule and argue that the counter-party made a false oral representation that was *not* reflected in the contract itself. *See Judson Atkinson Candies*, 719 F.3d at 640 n.2. Here by contrast, the contract's express terms provide that Defendants agreed that the note amount

accounts for any potential royalties owed.[4] If the contract's express terms address the claim at issue, not even a fraudulent inducement theory permits the Court to look past the contract's express terms. This Court reached a similar conclusion in a previous case. *See In re Kindra Lake Towing, L.P.*, 2016 WL 3227303, at *2 (N.D. Ill. June 13, 2016) (finding that a contract provision which specifically agreed that no representation had been made on a certain issue (i.e., the "seaworthiness" of a ship) precluded a claim of reliance for purposes of a fraudulent inducement claim).

Defendants could have memorialized Ocean Tomo's representations about royalties in the contract, and then sued for breach of contract if those representations turned out to be false. Or, if Defendants were uncertain that the note reflected all royalties owing, and were in fact relying on Malackowski's oral representations, they could have signed the note but not included the true-up in the license agreement amendment, thereby preserving a fraudulent inducement claim. Instead, Defendants affirmed the truth of the facts (allegedly misrepresented by Malackowski) underlying the true-up provision and agreed that the amount of the note covered "*any*" royalties that might have been owing. This representation by Defendants serves to disclaim any reliance on prior representations by Ocean Tomo that might have otherwise formed the basis of a fraudulent inducement claim.

---

[4] *See* R. 412-3 at 3 (§ I) ("any Revenues owed to [PatentRatings] pursuant to . . . the [2004 license agreement] that have accrued since the [effective date of the 2004 license agreement] have been credited to [PatentRatings] as reflected in the Principal amount of the Note.").

B.     **Fraud and Intent**

In the alternative, even if the "true-up" did not disclaim reliance on representations regarding royalties owing, Defendants have failed to point to evidence indicating fraud or fraudulent intent sufficient to meet their burden. All three of Malackowski's alleged misrepresentations concerned Ocean Tomo's use of the PatentRatings system and royalties paid. For the Court to find that these statements were false, there must be clear and convincing evidence that Ocean Tomo intentionally failed to pay royalties on profits from client engagements that should have been royalty bearing; whether because the PatentRatings system was used by an Ocean Tomo group Barney understood was not using the PatentRatings system, or because Ocean Tomo hid the use of the PatentRatings system in some way and did not report the revenue to Defendants. But Defendants cite only eight engagements prior to the 2007 amendment on which they allege royalties were owed and not paid. *See* R. 430 at 7 (citing R. 419-10 (DX591) (Defendants' expert's demonstrative); R. 346 at 227 (2832:5-9) (DX591 shows the engagements "that still remain in the analysis from pre-2007 based on Mr. Barney's representation that they were not a part of his understanding of the true-up at the time") (expert testimony)).[5] Ocean Tomo asserts

---

[5] Defendants cite additional exhibits listing royalties owed and unpaid that could be construed as evidence that royalties from as many as 21 engagements before 2007 went unpaid. *See* R. 412 at 57 (referring to pages 9-11 (¶¶ 32-38), citing R. 411-209 (PX1035) (3 engagements)); DX625 (16 engagements for which PatentRatings was used, however no indication whether royalty went unpaid); 411-150 (DX624) (two engagements with one client). (Exhibit DX625 was provided to the Court in its native excel format and was not made available on the electronic docket.) But the documentary evidence for 16 of those engagements does not definitively show that royalties were owed and went unpaid. In any event, the Court understands

that its total number of client engagements is 550. *See* R. 416 at 55. Even if only a portion of that 550 were active before 2007, eight is too small a percentage to indicate by clear and convincing evidence that Ocean Tomo intended to deceive Defendants about the royalty revenue they were owed.

Moreover, even assuming that Malackowski made the statements Barney attributes to him, Defendants have failed to produce any evidence that Malikowski knew the statements were false when he made them.[6] The only evidence Defendants cite on this point are ten lines of Malackowski's trial testimony about the relationship between Ocean Tomo's "Expert Testimony" and "Valuation" groups. *See* R. 412 at 57-58 (citing R. 386 at 187 (3569:4-13)). The parties hotly contest the relationship between the "Expert Testimony" and "Valuation" groups and whether the use of the PatentRatings system by one or the other violates the license agreement. The Court addresses below whether Ocean Tomo's interpretation and application of the royalty provisions in the license agreement constitutes a breach of contract. But merely identifying a dispute about contractual terms does not demonstrate fraudulent intent

---

Defendants' expert's testimony and analysis cited in the main text as Defendants' bottom-line claim for pre-2007 engagements for which Ocean Tomo failed to pay royalties.

[6] Defendants' only evidence that Malackowski made these statements is Barney's trial testimony. *See* R. 412 at 56. Ocean Tomo argues that Defendants have failed to prove by clear and convincing evidence that Malackowski made the statements. *See* R. 416 at 59. It appears that Malackowski was not questioned about these alleged statements during his testimony. It is unnecessary for the Court to make a finding on whether Malackowski actually made these statements for the Court to decide Defendants' fraudulent inducement claim.

by a preponderance of the evidence, let alone the clear and convincing evidence standard applicable here.

Lastly, to the extent Defendants contend that certain use of the PatentRatings system after execution of the 2007 amendment and note demonstrates that Malackowki's alleged statements were false, the Court rejects this reasoning. The alleged misrepresentations are retrospective. The 2007 amendment sets forth new provisions regarding royalty-bearing use of the PatentRatings system. Even if Barney believed that Malackowki's statements were intended to explain the intent of the parties behind the 2007 amendment, royalty payments after the 2007 amendment were controlled by the amendment's express terms. Royalty payments governed by the 2007 amendment cannot be evidence of whether a statement about royalty payments made before the 2007 amendment were false.

For these reasons, the Court finds for Ocean Tomo on Defendants' fraudulent inducement claim.

## II.   Breach of the License Agreement: Royalties

Defendants claim that Ocean Tomo failed to pay royalties in violation of the license agreement by: (1) improperly determining that only a percentage of certain client revenues were attributable to use of the PatentRatings system and paying royalties only on that lesser amount—what the parties have referred to as "split billing"; and (2) improperly categorizing some uses of the PatentRatings system as non-royalty-bearing because they did not "facilitate" the client deliverable that generated the revenue. On the assumption that Defendants' interpretation of the

royalty provision in the 2007 amendment is correct, Defendants' expert found $3,692,388 royalties "owing," with $1,647,975 "payments received," leaving a deficiency of $2,044,413. R. 411-146 at 20. Ocean Tomo argues that the expert's opinion is faulty because: (1) the expert improperly included royalties incurred prior to the 2007 note and "true-up"; (2) Defendants' interpretations of the royalty provision in the 2007 amendment are incorrect; and (3) the expert improperly included royalties incurred after December 2012 when Ocean Tomo first asserted that the patents underlying the PatentRatings system are invalid.

The 2007 amendment requires Ocean Tomo to pay royalties in the amount of:

> (a) 25% of any revenues . . . actually collected by [Ocean Tomo] solely from External Data Sales . . .; and
>
> (b) 13.25% of any revenues . . . actually collected by [Ocean Tomo] solely from External Data Usage . . . .

R. 412-3 at 2 (§ 4.5). "External Data Sales" and "External Data Usage" are defined terms that describe different ways Ocean Tomo might use the PatentRatings system to serve clients:

> "External Data Sales" means any sale of PatentRatings Analysis by [Ocean Tomo] such as in the form of patent due diligence reports, patent score reports, patent scores, research maps, automated reports, data subscriptions, equity research reports or the like that are actually delivered to [Ocean Tomo's] external clients or customers. For the avoidance of doubt, "External Data Sales" shall not mean the internal use of PatentRatings Analysis by [Ocean Tomo], even if such internal use facilitates the provision or sale of consulting, auction or other services or products to [Ocean Tomo's] clients or customers.
>
> "External Data Usage" means any usage or inclusion of PatentRatings Analysis or any derivative thereof by

[Ocean Tomo], which *facilitates* the provision of information or reports actually delivered to [Ocean Tomo's] external clients or customers as part of [Ocean Tomo's] consulting services such as currently used by its practice unit presently known as the "Analytics Practice Group." For the avoidance of doubt, "External Data Usage" shall not mean the internal use of PatentRatings Analysis such as currently used by [Ocean Tomo] as part of its services presently known as Expert Services, Appraisals, Investments, Risk Management, and/or Corporate Finance. For the avoidance of doubt, "External Data Sales" shall not include [Ocean Tomo's] Analytics services directed towards tax advice, general strategy advice or similar advice that does not report, rely on nor consider PatentRatings Analysis.

R. 412-3 at 2 (§ 4.5) (emphasis added).

## A. Split Billing

Ocean Tomo contends that the term "solely from" permits it to split revenue into that which is "solely from" External Data Sales or External Data Usage, and thus is royalty-bearing, and that which is derived from Ocean Tomo's work that did not involve the PatentRatings system, and thus is not royalty-bearing. Defendants, by contrast, argue that "the total revenue collected from a client engagement involving an External Data Sale [or] an External Data Usage" is royalty-bearing. R. 412 at 40. The Court disagrees with Defendants' interpretation of this provision, as it is at odds with the plain language of the agreement.

Defendants argue that the words "'solely from' . . . convey only that 'External Data Sales' and 'External Data Usage' are mutually exclusive," and they "do not support dividing engagements into royalty-bearing and non-royalty-bearing portions." R. 430 at 25-26. But the word "solely" is not necessary to establish the

"mutual exclusivity" of "External Data Sales" and "External Data Usage." That they are mutually exclusive is readily apparent because they are defined terms in the agreement. The provision could have omitted the word "solely" and simply provided that royalties are a percentage of revenue "*from* External Data Usage" and "*from* External Data Sales,*" and achieved the same expression of "mutual exclusivity." Since it was unnecessary to use the word "solely" to express the "mutual exclusivity" of the definitions, the word "solely" must have some more substantive meaning to the terms of the contract. Otherwise, the word "solely" is surplusage.

Defendants also argue that the "broad" language used in the definition of "External Data Usage" indicates that royalties are intended to be "based on the revenues for the entire engagement." R. 412 at 41. But to the extent the language in the definition of "External Data Usage" can be characterized as "broad," it does not refer to the portion of revenue that is royalty-bearing. Rather, the definition of "External Data Usage" is focused on the type of client deliverable that is royalty-bearing—i.e., certain "information or reports actually delivered to . . . external clients." R. 412-3 at 2. The definition does not address whether the total revenue from a client engagement involving a client deliverable that meets the definition of "External Data Usage" is royalty-bearing, or whether only the portion of the revenue directly attributable to "External Data Usage" client deliverable generates royalties.

Defendants argue further that Ocean Tomo's interpretation of the royalty provision cannot be correct because "the 2007 [license agreement amendment] contains no provision on how to determine what subset of revenue collected from a

client engagement is subject to a royalty." R. 412 at 41. Defendants point out that "the words 'subset,' 'apportion,' 'divide,' 'separate,' 'portion,' 'split,' or 'rate card,' do not appear anywhere in the contract." *Id.* This may be true. But, in a provision the parties do not address, the 2007 amendment gives Ocean Tomo the discretion "to charge reasonable fees to its clients and customers for access and use of PatentRatings Analysis." R. 412-3 at 1 (§ 4.2). That section of the 2007 amendment provides further that "[s]uch reasonable fees will be no less than the lowest fee charged by [Ocean Tomo] for the same or similar products or services." *Id.* This provision makes it clear that Ocean Tomo had discretion (within certain parameters) to set the price charged for use of the PatentRatings system in client engagements. The Court sees no reason why these prices should not be understood to corollate to the revenue collected "solely from" "External Data Sales" or "External Date Use." Thus, while Defendants may be correct that the license agreement does not establish a detailed plan for apportioning royalty-bearing and non-royalty-bearing revenue, it addresses such apportionment through the parameters placed on Ocean Tomo's discretion to price the use of the PatentRatings system in client engagements.

Lastly, Defendants argue that Ocean Tomo did not consistently follow its split billing practice, and that this is evidence that Ocean Tomo did not genuinely believe that the split billing practice was the proper interpretation of the contact. It is unnecessary to delve into this argument, however, because it is based on evidence beyond the express terms of the contract. It is only proper to consider such extrinsic evidence if the contract terms are ambiguous. The Court finds no such ambiguity.

24

And in any event, an inconsistent course of conduct is unlikely to satisfy Defendants' burden of proof.

For these reasons, the Court finds that Ocean Tomo's split billing practice did not violate the license agreement.

### B. "Facilitates"

The parties also dispute what type of use of the PatentRatings system is royalty-bearing. The provisions of the license agreement relevant to this dispute are the definitions of "External Data Sales" and "External Data Usage" cited above. *See* R. 412-3 at 2 (§ 4.5).

There can be no dispute that the express terms of the 2007 amendment provide that "External Data Usage" is "use" of the PatentRatings system which "facilitates the provision of information or reports . . . [to] clients or customers." The parties dispute whether it is possible for Ocean Tomo to have used the PatentRatings system to create a client deliverable without that use "facilitating" the client deliverable. *See* R. 412 at 44-46; R. 416 at 47-49.[7] Defendants argue that "any" use of the PatentRatings system during the course of a revenue-generating client engagement should be understood to have "facilitated" the generation of revenue from that engagement. *See* R. 412 at 45 ("Therefore, 'internal use' means use that is unrelated to a revenue-generating client engagement, such as for prospecting auction

---

[7] Defendants' claim does not appear to be based on an allegation that Ocean Tomo improperly accounted for "External Data Sales." That definition more straightforwardly applies to stand-alone sales of PatentRatings Analysis, and expressly excludes use that "facilitates the provision or sale of consulting, auction or other services or products to [Ocean Tomo's] clients or customers."

attendees, screening patents offered for sale, and preparing for televised interviews."). But this interpretation contradicts the definition's express terms. "External Data Usage" is "any usage . . . which facilitates." Clearly, the definition is distinguishing between use that facilitates and use that does not facilitate. If the parties intended any use to be royalty-bearing they could have simply used the word "use" and not further narrowed the royalty-bearing use to use that "facilitates." Hence, Defendants' argument that revenue from *any* use is royalty-bearing is fundamentally at odds with the express terms of the 2007 amendment. This is a sufficient basis alone to reject this aspect of Defendants' claim and find for Ocean Tomo.

Even if it were necessary to further address Defendants' claim, investigation into the parties' intent regarding the meaning of the term "facilitate" does not change the outcome. Such investigation, of course, begins with the meaning of the word "facilitate." It is not defined in the license agreement. The Oxford English Dictionary defines "facilitate" to mean: "To make (an action, process, etc.) easy or easier; to promote, help forward; to assist in bringing about (a particular end or result)." *See* www.oed.com (last visited Mar. 14, 2019). But this dictionary definition is no help in determining, in this particular case, what "use" the license agreement envisions as "facilitating" a client deliverable. Thus, although the word "facilitate" has a commonly known dictionary definition, it is "susceptible to more than one meaning"—in other words, it is ambiguous—in the context of the license agreement. *See Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). This ambiguity permits the Court to review

26

"extrinsic evidence to ascertain the parties' intent." *Id.* Extrinsic evidence might include prior oral negotiation or subsequent course of conduct. *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999); *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 701 (7th Cir. 2002) ("When considering extrinsic evidence, the factfinder should focus, in descending order of importance, on: (1) the parties' negotiations over the contract at issue; (2) their course of performance; (3) their prior course of dealing; and (4) trade usage in the relevant industry.").

The evidence presented at trial on this issue consisted solely of Barney's and Malackowski's testimonies.[8] Neither witness pointed to particular prior negotiations or subsequent course of conduct that would elucidate what the parties meant by "facilitate." Rather, each witness simply testified to their interpretation of the contract. Barney's testimony was particularly unhelpful because he asserted that "any" use constituted "facilitation." *See* R. 340 at 204-05 (1894:22–1895:2) (according to "the 2007 amendment . . . . if the engagement uses the PatentRatings analysis in *any* way, we get paid the [13.25] percent," including when an "IPQ score [is] *slipped* into this big report") (emphasis added); R. 342 at 115 (2074:9-15) ("facilitates" includes any use that generated revenues, and only excluded "internal use . . . that

---

[8] The parties' expert witnesses created reports and testified about what client engagements they believed "facilitate[d] the provision of information or reports," but the experts simply applied the definitions supplied to them by each party, respectively. *See*, *e.g.*, R. 347 at 96 (2952:11-20), 101 (2957:11-18), 106-09 (2962:6– 2965:14) (Pakter's testimony tracking Defendants' interpretation). Their application of these interpretations does not help the Court determine which definition is the proper interpretation of the license agreement.

doesn't result in direct revenues to Ocean Tomo but is merely . . . marketing [etc.]"); R. 340 at 212 (1902:7-10) ("Let's just agree that we'll just set a flat rate and apply that rate to *any* engagement that uses, relies upon or, you know, considers the PatentRatings analysis.") (emphasis added); *see also id.* at 206-07 (1896:13–1897:3); R. 389 at 43-45 (4132:23–4134:14). As discussed, this is an interpretation contrary to the contract's express terms which the Court rejects.

Although Malackowski's testimony concurred with the Court's finding that not all "use" constitutes "facilitation," his testimony also offered no help in determining which uses in particular constitute "facilitation." *See*, *e.g.*, R. 386 at 240-41 (3449:16–3450:11). Nevertheless, the Court found Malackowski's description of the impractical economic consequences of Defendants' interpretation of the royalty provision to be credible and persuasive. According to Malackowski, paying PatentRatings 13.25% of the revenue from an entire engagement would amount to about "half" of the profit margin, which he described as "economic suicide." *See id.* at 241 (3450:8-11). In light of this entirely reasonable testimony regarding the economics of the business, Barney's testimony appears even more self-serving and less credible.

Defendants concede that, considered in isolation, their interpretation of "facilitation" puts Ocean Tomo in a difficult economic position. They argue, however, that Ocean Tomo's association with PatentRatings produced "tens or hundreds of thousands of dollars" of revenue "at little or no expense," and generated valuable, but "less easily measurable . . . publicity" which was recovered through royalties. R. 412 at 45-46. It is plausible that Ocean Tomo might have considered the value of its

relationship with PatentRatings in this way and baked it into the royalty rates. But the Court finds it unlikely that such a consideration would go unmentioned in the agreements establishing the parties' business relationship. For what is a relatively simple licensing agreement and partnership, Ocean Tomo and PatentRatings signed many detailed agreements. If the publicity and high revenue produced with low expenses generated by PatentRatings were a consideration, the Court would expect to see it in the license agreement.

At bottom, the Court does not believe that Ocean Tomo would have agreed to pay such a high royalty rate for the totality of the engagement fee on "any" use of the PatentRatings system, even if the use was minimal or incidental. For these reasons, the Court finds that Defendants have failed to meet their burden of proof, and so Court must find for Ocean Tomo on this aspect of Defendants' claim for breach of the license agreement.

### C. Pre-2007 Amendment: The Note and True-Up

In addressing Defendants' fraudulent inducement claim, the Court has already explained that the "true-up" served to disclaim any unpaid royalties incurred prior to the execution of the 2007 amendment and note. For this reason, any such royalties should not have been included in the expert's damages calculation.

*    *    *    *

Therefore, for these reasons discussed in the forgoing sections II.A, II.B, and II.C, the Court finds that Defendants have failed to prove their claim for breach of the license agreement and for unpaid royalties by a preponderance of the evidence.

### D.     Post-December 2012 Royalties

Ocean Tomo argues that the relevant patents are invalid so that it does not have to pay royalties after December 2012 when it first raised the invalidity defense. Defendants of course dispute this claim and argue that the parties' contract is not merely a patent license—which invalidity would undermine—but a contract for use of the PatentRatings system, which is not dependent on the validity of the associated patents. *See* R. 420 at 65-67.

The Court's finding for Ocean Tomo on Defendants' claim for breach of the license agreement changes the posture of Ocean Tomo's invalidity defense. It is unnecessary for the Court to reach the issue of patent validity as a defense to Defendants' particular arguments because the Court has rejected them on the merits.

It would be necessary to address Ocean Tomo's invalidity defense if Defendants alleged that Ocean Tomo failed to pay royalties for reasons other than the parties' disputes over the proper interpretation of the license agreement's royalty provisions. Of particular concern to the Court with respect to the need to address the invalidity defense, is the possibility that Ocean Tomo stopped paying royalties altogether at some point as an aspect of this litigation. In such a scenario, the Court's rejection of Defendants' interpretation of the royalty provisions would not necessarily absolve Ocean Tomo of the obligation to make up those payments, in which case it would be necessary to address Ocean Tomo's invalidity defense. But according to Defendants' expert's report, Ocean Tomo continued to make royalty payments through the time during which Defendants allege Ocean Tomo earned royalty-bearing revenue. The

report shows that Ocean Tomo last incurred royalties in the quarter ending in April 2016. *See* R. 411-135 at 4. (Some of these royalties might be rejected in accordance with the Court's interpretation of the royalty provisions. Nevertheless, this is the last time period for which Defendants seek royalties.) The report also shows that Ocean Tomo *paid* royalties the *following* quarter ending in July 2016. *See id.* at 5. In other words, Defendants do not claim that any royalties accrued after Ocean Tomo's last royalty payment. On the basis of this analysis, the Court understands that Defendants do not seek any unpaid royalties that are not within the scope of the Court's rejection of Defendants' interpretation of the royalty provisions in the license agreement.

Additionally, Defendants' expert conceded that if the Court rejected Defendants' interpretation of the royalty provisions the remaining royalties accrued would be approximately $1.33 million. *See* R. 434-47 at 1 (line A). Defendants' expert also determined that Ocean Tomo paid royalties of approximately $1.64 million. *See* R. 411-135. In other words, with the Court rejecting Defendants' claim for breach of the license agreement, Defendants' expert report shows that Ocean Tomo has over-paid royalties. The only reason to address Ocean Tomo's patent validity defense would be to save it from liability for unpaid royalties. Since the Court has determined (using Defendants' calculations) that no royalties are unpaid, it is unnecessary to determine whether the patents at issue are valid.[9]

---

[9] Defendants also claim that Ocean Tomo is not entitled to impose a 25% deduction towards repayment of the $1.5 million note on any repayment of unpaid royalties. Since the Court has rejected Defendants' claim for breach of the license agreement,

### E. OPERS

Defendants' arguments for breach of the license agreement addressed above in sections II.A-D were generally relevant to multiple client engagements. In addition to those generally applicable arguments, Defendants argue that Ocean Tomo failed to pay royalties for one client engagement—an entity known as OPERS—in violation of the license agreement for reasons particular to that engagement. Unlike the generally applicable arguments, Defendants do not claim that Ocean Tomo misinterpreted the license agreement's royalty provision with respect to OPERS. Rather, Defendants contend that Ocean Tomo incorrectly determined that the OPERS engagement was covered by a different royalty provision in the supplemental license agreement, and so did not pay royalties under the license agreement for that reason.

To address this argument, it is necessary to understand the relationship between the license agreement, the supplemental license agreement, and the 2007 amendment to the license agreement. The original 2004 license agreement included a carve-out for rights PatentRatings had previously granted to a company called Rosebay, of which Barney is the majority owner. *See* R. 345 at 96 (2452:21). That carve-out consisted of an agreement by Ocean Tomo not to use the PatentRatings system "to conduct or assist others to conduct securities pricing analysis of any publicly held companies or to buy or sell securities in any publicly held companies for

---

the Court is necessarily not awarding any unpaid royalties to which the 25% deduction should be applied.

its own accounts or the accounts of others based thereon." R. 403-9 at 4 (§ 3.2(c)). The rights to those uses were reserved to Rosebay.

In 2006, Rosebay agreed to "ease the restrictions on [Ocean Tomo]" intended to protect Rosebay's rights. *See* R. 403-13 at 1 (preamble). This allowed Ocean Tomo and PatentRatings to enter a supplemental license agreement permitting Oceean Tomo to use the PatentRatings system for the uses that had previously been prohibited by the carve-out in the license agreement. The supplemental license agreement defined these newly permitted uses as: "creating or managing public securities investment funds and accounts for Persons; or creating or managing a public stock index; selling securities-related information to third-party investment analysts; and generally engaging in the buying, selling and trading of any security." *Id.* at 2 (§ 1, definition of "OT Near Exclusive Field of Use"). The supplemental license agreement included a royalty provision that specifically applied to these uses of the PatentRatings system.

The next year, when Ocean Tomo and PatentRatings amended the license agreement, they apparently sought to acknowledge the separate royalty provision in the supplemental license agreement for uses that had previously been reserved to Rosebay by the carve-out. To that end, they included a section in the amendment providing "that the accumulation and payment of royalties owing to [PatentRatings] as a result of any and all revenue generated by [Ocean Tomo] or its Affiliates from using PatentRatings Analysis to engage in the *buying, selling and trading of any*

*securities* is governed by the [supplemental license agreement]." R. 412-3 at 2 (§ F (4.7)) (emphasis added).

Defendants focus on this language in the 2007 amendment to argue that since the OPERS engagement did not involve Ocean Tomo buying, selling, or trading securities, it is governed by the license agreement, not the supplemental license agreement. *See* R. 412 at 50. The problem with Defendants' argument is that the 2007 amendment incompletely describes the scope of the supplemental license agreement. The 2007 amendment notes that royalties from buying and selling securities are covered by the supplemental license agreement. This is true. But the scope of the supplemental license agreement (and hence the reach of its royalty provision) is broader. As reviewed above, the supplemental license agreement also covers "selling securities-related information to third-party investment analysts." It makes sense for the supplemental license agreement to have such a scope, since the intention of the agreement was to fill the Rosebay carve-out in the original license agreement, which had prohibited Ocean Tomo from using the PatentRatings system both (1) to "conduct securities pricing analysis," *and* (2) to "buy or sell securities in any publicly held companies." Since it is only under the terms of the supplemental license agreement that Ocean Tomo can use the PatentRatings system for the former—i.e., to conduct securities analysis—it makes sense that any royalties owed for that kind of use of the PatentRatings system are governed by the supplemental license agreement.

Ocean Tomo argues further that the OPERS engagement falls squarely within the supplemental license agreement's scope covering "selling securities-related

34

information to third-party investment analysts." Ocean Tomo relies on the OPERS engagement letter which describes the service to be provided as "provision of information pertaining to investment strategies." R. 411-65 at 2 (p.1, preamble). There can be no genuine dispute that the service described in the OPERS engagement letter constitutes "selling securities-related information to third-party investment analysts," which is covered by the supplemental license agreement. Therefore, Ocean Tomo's failure to pay royalties under the license agreement (as amended) is not a violation of the license agreement, and Defendants' claim for breach of the license agreement on the basis of the OPERS engagement fails.

## III.   The NTT Deal

Defendants and Ocean Tomo accuse each other of tortiously interfering with the NTT deal. Ocean Tomo also claims that Barney's conduct with respect to NTT breached (1) his employment contract with Ocean Tomo and (2) his fiduciary duty to Ocean Tomo.

The NTT deal concerned use and sub-licensing of the PatentRatings system. The parties' rights to the PatentRatings system are governed by the license agreement. The license agreement distinguishes between the rights to what are defined as "PatentRatings Tools" and "PatentRatings Analysis." "PatentRatings Tools" means the:

> technology, know-how, software (computer algorithms, techniques, for statistically analyzing, rating, mapping and valuing patents and/or other intellectual property assets, and including any documentation and research relating to such software) and other . . . intellectual property [owned by PatentRatings] relating to the foregoing (including the

> PatentRatings Patents, PatentRatings Copyrights and
> PatentRatings Marks).

R. 403-9 at 3 (§ 1.11). "PatentRatings Analysis" is:

> any information or report including or using the data
> output of one or more PatentRatings Tools, including
> patent rating reports . . . , portfolio mapping analysis,
> strategic analysis and recommendations, and patent
> valuation.

R. 403-9 at 2 (§ 1.7). The license agreement further provides that PatentRatings

Analysis:

> shall not include delivery or sublicensing of the
> PatentRatings Tools, including any formulas, software or
> algorithms, nor shall it include delivery or sublicensing of
> all or substantially all of the data underlying or produced
> by the PatentRatings Tools.

*Id.*

PatentsRatings licensed different rights to Ocean Tomo with respect to

"PatentRatings Analysis" and "PatentRatings Tools." PatentRatings granted Ocean

Tomo:

> a limited exclusive . . . worldwide . . . license to:
>
> (a) reproduce, install, and use the PatentRatings Tools and
> Improvements at Licensed Sites for [Ocean Tomo's]
> internal use only and for the other uses expressly
> permitted herein, and
>
> and
>
> (b) distribute, sell, license or other [sic] transfer for use (or
> offer to sell, license or otherwise transfer for use), and
> display PatentRatings Analysis to third parties for a fee.

R. 403-9 at 3-4 (§ 3.1). The rights to PatentRatings Tools are limited:

> The licensed rights granted above under [section (a)] shall be exclusive to [Ocean Tomo] . . . for the specific business of IP Merchant Banking . . . .
>
> "IP Merchant Banking" means merchant banking services with intellectual property being the secured or target asset underling one or more merchant banking services . . . .

*Id.* at 4 (§ 3.1) and 2 (§ 1.4). The rights to PatentRatings Analysis are also limited:

> The licensed rights granted above under [section (b)] shall be exclusive to [Ocean Tomo] . . . for the unique products and services developed by or for [Ocean Tomo] incorporating PatentRatings Analysis.

*Id.* at 4 (§ 3.1). The license agreement further limits the rights in general:

> neither [Ocean Tomo], nor any Affiliate of [Ocean Tomo], will make, cause to be made, or assist others to make any statistical patent analytics tools, patent ratings or associated products that are derivative of, or substantially similar to the PatentRatings Tools or the PatentRatings Analysis.

*Id.* at 7 (§ 6.1). Additionally, the agreement prohibits Ocean Tomo from sublicensing its rights without PatentRatings's consent. *See id.* at 4 (§ 3.2(a)).

### A. Ocean Tomo's Claims

#### 1. Tortious Interference

Tortious interference requires a plaintiff to prove by a preponderance of the evidence: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007)

37

(quoting *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996)). Ocean Tomo contends that Barney intentionally interfered with the NTT deal by (1) telling NTT that Ocean Tomo had no right to develop a Japanese patent ratings system, and (2) negotiating a sublicense from PatentRatings to NTT excluding Ocean Tomo. *See* R. 414 at 65. Ocean Tomo argues that Barney's actions "cannot be justified as reasonable in light of the [license agreement]," which gives Ocean Tomo "broad worldwide exclusive rights." *Id.*

Ocean Tomo's argument is undermined by its concession that it "is not allowed to sublicense the PatentRatings Tools to a third party." R. 414 at 6. Presumably for that reason, from the beginning of the NTT deal negotiations, the parties contemplated that PatentRatings would have to be a party to the deal with NTT because it involved licensing of PR Tools. *See* R. 411-198 at 1 ("including know-how"). There is no dispute that Barney, as the owner of PatentRatings, was involved in the negotiations with NTT from the beginning. Ocean Tomo claims that Barney "raised issues that frustrated the process." R. 414 at 26 (¶ 129). But these issues concerned Barney's willingness to make an agreement with Ocean Tomo to sublicense to NTT. The license agreement provided Barney the right not to agree. (As will be discussed below, the Court rejects Ocean Tomo's argument that Barney's status as an Ocean Tomo officer imposed upon him a fiduciary duty to agree.)

Ocean Tomo frequently emphasizes that it had an "exclusive, world-wide" license, but ignores the fact that its license for PatentRatings Tools is limited to "internal use" and does not permit it to provide PatentRatings Tools to third parties.

Presumably PatentRatings retained the right to determine who licenses PatentRatings Tools and on what terms. In light of this right, Ocean Tomo never explains why it was impermissible for Barney to engage with NTT about the terms of a deal that required licensing use of PatentRatings Tools—especially in the context of Ocean Tomo's prior and related negotiations.

Ocean Tomo argues that the supplemental license agreement[10] extended its PatentRatings license to its "affiliates," which would include the joint venture entity it intended to form with NTT. Maybe so. But Ocean Tomo does not contend that the deal with NTT would have made NTT an affiliate. And to the extent Ocean Tomo intended to use the joint venture as a vehicle to share PatentRatings Tools with NTT without Defendants' consent, such an action would have been prohibited by the license agreement. The supplemental license agreement's reference to licensing affiliates cannot be interpreted to the contrary.

Additionally, the license in the supplemental agreement is limited to the "OT Near Exclusive Field of Use" which limits the license provided by the supplemental agreement to "creating or managing public securities investment funds and account for Persons; creating or managing a public stock index; selling securities-related information to third-party investment analysts; and generally engaging in the

---

[10] The 2006 supplemental license agreement was signed primarily to address a carve-out in the 2004 license agreement for rights PatentRatings had previously granted to a company called Rosebay. *See* R. 403-9 at 4 (§ 3.2(c)). The supplemental agreement reflected Rosebay's agreement to suspend the license it had been granted by PatentRatings, thereby permitting PatentRatings to agree to "ease the restrictions on [Ocean Tomo]" with reference to Rosebay. *See* R. 403-13 at 1 (preamble of the supplemental agreement).

buying, selling and trading of any security." R. 403-13 at 2. Ocean Tomo does not address whether the subject matter of the NTT deal falls within this definition such that the supplemental agreement applies.

For these reasons, the Court finds that Ocean Tomo's tortious interference claim is based on a faulty interpretation of the license agreements, and the Court finds for Defendants on that claim.

### 2. Breach of the Employment Agreement

Ocean Tomo also claims that Barney's conduct with respect to NTT breached his employment agreement. Similar to the elements for the tortious interference claim just discussed, the employment agreement provides that Barney may not "interfere with the relationship of [Ocean Tomo] with any . . . party with whom [Ocean Tomo] has a material business relationship." R. 403-11 at 5 (§ 5.1(c)). But as discussed above, Ocean Tomo had no right under the license agreement to the business relationship with NTT at issue without PatentRatings's consent. Barney had a contractual right under the license agreement to be involved in Ocean Tomo's relationship with NTT as it concerns PatentRatings. Barney's exercise of this right cannot be "interference."

The same analysis applies to the provision in the employment agreement prohibiting Barney from taking "any action that is intended to or could reasonably be expected to divert from [Ocean Tomo] any business opportunity that would be within the scope of any business then conducted by [Ocean Tomo]." R. 403-11 at 5 (§ 5.1(c)). As discussed, the NTT deal was a "business opportunity" for Ocean Tomo only to the

extent that it could reach agreement with Barney. Barney's conduct cannot be considered to have "diverted" an "opportunity" from Ocean Tomo when Barney was necessarily a party to that opportunity.

Furthermore, to the extent Barney can be considered to have "diverted" the NTT deal, it was not "within the scope of any business then conducted by [Ocean Tomo]." Ocean Tomo's patent ratings business at the time of the NTT deal negotiations was limited to ratings of United States patents. The point of the NTT deal was to *expand* the scope of Ocean Tomo's business to include ratings of Japanese patents. Thus, the employment agreement did not prohibit Barney's diversion of that opportunity outside the scope of business "then conducted" by Ocean Tomo.

For these reasons, the Court find for Defendants on Ocean Tomo's claim for breach of the employment agreement.[11]

### 3. Breach of Fiduciary Duty

The foregoing analysis serves to demonstrate that Barney had a contractual right to negotiate with NTT. Ocean Tomo's breach of fiduciary duty claim boils down to the argument that Barney had to give up this right to his detriment in order to fulfill his fiduciary duty as an Ocean Tomo corporate officer. But Ocean Tomo has not

---

[11] Unrelatedly, Ocean Tomo also claims that an interview Barney gave to an industry publication violated the employment agreement because he disclosed Ocean Tomo's "business plans." R. 414 at 57. There was no mention of these facts in the complaint. *See* R. 414. Further, Ocean Tomo has not explained what specific aspects of that interview disclosed confidential information. This unpleaded and undeveloped argument is waived. *See Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 298 (7th Cir. 2018) ("We have repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

cited any authority supporting this interpretation of a corporate officer's fiduciary duty. This Court has held to the contrary. *See In re SGK Ventures, LLC*, 2018 WL 3302663, at *5 (N.D. Ill. June 19, 2018) (citing *Odyssey Partners, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 415 (Del. Ch. Ct. 1999) ("[F]iduciary obligation does not require self-sacrifice . . . . Thus one who may be both a creditor and fiduciary (e.g., a director or a controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditor rights.")). For these reasons, the Court finds for Defendants on Ocean Tomo's breach of fiduciary duty claim as it pertains to the NTT deal.

### B.  Defendants' Claim for Tortious Interference

As discussed, the license agreement provides that PatentRatings's consent was required to license PatentRatings Tools. For this reason, the Court found that Barney's negotiations with NTT could not be considered tortious interference. Defendants also claim that Ocean Tomo tortiously interfered with PatentRatings's deal with NTT.

The relevant question for Defendants' claim is whether PatentRatings could license PatentRatings Tools without Ocean Tomo's consent. The license agreement addresses this question indirectly, but without ambiguity. Ocean Tomo has an exclusive license for PatentRatings Analysis. PatentRatings Analysis is defined as the "data output" of PatentRatings Tools. *See* R. 403-9 at 2 (§ 1.7). So, to the extent the purpose of PatentRatings Tools is to produce PatentRatings Analysis, a license for PatentRatings Tools would be useless without the accompanying license for

42

PatentRatings Analysis. In other words, the license agreements tie Ocean Tomo and PatentRatings (and Barney) together for purposes of any additional licensing of PatentRatings Tools or PatentRatings Analysis. The evidence indicates that NTT reached this very conclusion and would only enter a deal that both Ocean Tomo and PatentRatings would agree to. The failure of Ocean Tomo and PatentRatings to agree was the proximate cause of the deal's failure. But just has the Court has already found that Barney had no duty to agree, neither did Ocean Tomo have such a duty. Under these circumstances, Ocean Tomo cannot be said to have tortiously interfered with PatentRatings's business. Therefore, the Court finds for Ocean Tomo on Defendants' tortious interference claim.

## IV.     Breach of the Operating Agreement

Barney argues that Ocean Tomo breached the operating agreement governing the relationship among Ocean Tomo's members in three ways: (1) improper allocation of the ICAP deal profits; (2) issuing board resolutions in bad faith to deprive Barney of dividends; and (3) failing to comply with Barney's right to access Ocean Tomo's records. The Court addresses each claim in turn.

### A.     The ICAP Deal

In 2005, Ocean Tomo started a patent auction business. The auction business was "built" by former Ocean Tomo member Andrew Ramer. R. 340 at 48 (1738:8-9). Eventually, Malackowski and another former Ocean Tomo member, Dean Becker, became responsible for managing the auction business. R. 386 at 137 (3519:15-17).

43

In 2007 or 2008, Ocean Tomo began working with a company called ICAP in conjunction with the auction business. ICAP is a commodities broker/dealer, and Malackowski testified that Ocean Tomo was interested in using ICAP's "large [client] base and network" to auction patents, and ICAP "had an interest in being a broker to sell patents on a global basis." R. 336 at 198 (851:19-22).

In 2009, Ocean Tomo sold its patent auction business to ICAP for $10 million. Malackowski described the transaction during his trial testimony:

> [ICAP] paid [Ocean Tomo] $5 million in cash. [ICAP] provided [Ocean Tomo] $5 million in [ICAP] stock. [Ocean Tomo] transferred to [ICAP] certain assets related to [the] auction business—web domains, a holding company for certain transactional things. No Ocean Tomo equity.
>
> And we entered into a branding relationship with them, where they could be in the auction business using the Ocean Tomo brand and a referral relationship, where we would refer patents for sale to [what was] now the ICAP Ocean Tomo auction, and after the first two years, we would receive 50 percent of the gross revenue of any of those referrals.

R. 336 at 200 (853:8-18).[12] During the arbitration proceedings, Malackowski testified that Becker "put together" the ICAP deal. R. 411-247 at 5 (20:21-23). However,

_____

[12] In their reply brief, Defendants dispute Malackowski's testimony that Ocean Tomo "would receive 50 percent of the gross revenue of any of those referrals." *See* R. 430 at 21 ("Nowhere in the ICAP closing documents did ICAP agree to pay [Ocean Tomo] '50 percent of the gross' or any percentage."). Defendants argue that such a provision is not in the deal documents. *Id.* (citing R. 411-231 and R. 411-232). These documents, however, are over 400 pages, and the Court does not know whether the documents in the record constitute Ocean Tomo's entire agreement with ICAP. Further, Defendants had two opportunities separated by eight months to cross examine Malackowski's testimony about the deal's terms. They also could have raised the issue in their opening brief giving Ocean Tomo an opportunity to respond. For these reasons, the Court finds Defendants' last-minute argument on this issue to be waived.

44

Malackowski testified at trial that he—Malackowski—was "personally responsible," R. 386 at 152 (3534:24), for the "origination [and] management" of the ICAP "transaction," and that he "did all the work." R. 336 at 215 (868:13-18).

Allocation of the profits from the ICAP deal among Ocean Tomo's members is governed by Ocean Tomo's operating agreement. As a member of Ocean Tomo, Barney is a party to Ocean Tomo's operating agreement. Under the operating agreement, Ocean Tomo's board of managers has discretion to determine whether profits from a transaction are characterized as "Net Profits from Operations" or "Other Net Profits":

> "Net Profits from Operations" and "Net Losses from Operation" shall mean, for each Fiscal Year or other period, such portion of [Ocean Tomo's] Net Profits (or Net Losses) attributable to the ordinary course operation of [Ocean Tomo's] business for such period; provided that, (1) such amount shall exclude any Net Profits or Net Losses resulting from the sale of all or substantially all of [Ocean Tomo's] assets, and (2) such amount shall be subject to any other modification (including any modification that would otherwise be inconsistent with the definition set forth in this paragraph) as determined by the Board of Managers (but shall not in any event include profits from the sale of all or substantially all of [Ocean Tomo's] assets). The portion of [Ocean Tomo's] Net Profits (or Net Losses) constituting Net Profits from Operations (or Net Losses from Operations) shall be determined by the Board of Managers in its sole discretion and such determination shall be conclusive on the Members.

---

In any event, Malackowski's testimony is corroborated by an email sent by Ocean Tomo's chief operating officer during the time period the Ocean Tomo members were debating how to allocate the ICAP deal profits. *See* 411-14 (DX113) ("The ICAP transaction resulted in Ocean Tomo receiving cash up front and 8 years of working in the brokerage/auction space with only upside (50% of all business generated) with no downside risk.").

R. 398-5 at 7 (§ 1.01).[13] The determination of whether profits from a transaction constitute "Net Profits from Operations" or "Other Net Profits" is important because

---

[13] The operating agreement mentions the term "Other Net Profits" only once as the heading for the following provision: "Subject to and after taking into account the special allocations set forth below and in Section 9.02, Net Profits (other than Net Profits from Operations) shall be allocated among the Members for each Fiscal Year in accordance with the respective Percentage Interests." R. 398-5 at 20 (§ 9.01(c)).

"Net Profits" and "Net Losses" are defined as

> an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(l) of the Code shall be included in taxable income or loss), with the following adjustments:
>
> (a) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;
>
> (b) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-l(b)(2)(iv)(i) of the Treasury Regulations and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;
>
> (c) in the event the Gross Asset Value of any Company asset is adjusted pursuant to subsection (b) or ( c) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;
>
> (d) gain or loss resulting from any disposition of any property of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and
>
> (e) in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation."

different types of profits are allocated to Ocean Tomo's members in different ways. "Other Net Profits" are "allocated among the Members for each Fiscal Year in accordance with their respective Percentage Interest." *Id.* at 20 (§ 9.01(c)). By contrast, "[75%] of the Net Profits from Operations shall be allocated to all or any of the Member(s) in such a manner as determined by the Board of Managers in their sole discretion (such allocation to each Member, the 'Performance Allocation') . . . and . . . the remaining [25%] of Net Profits from Operations shall be allocated among the Members in accordance with their respective Percentage Interests." *Id.* at 19-20 (§ 9.01(a)). The 75% of Net Profits from Operations, i.e., the "Performance Allocation," is customarily allocated according to Ocean Tomo's "performance model," which is provided in a written policy giving credit to the members who originated, sold, or managed client engagements. *See* R. 336 at 214 (868:15) (Malackowski testimony); *see also id.* at 207 (860:8-12); R. 411-199 (PX812) at 45-47 (Ocean Tomo's strategic plan and policies, including "compensation plan"). Nevertheless, the operating agreement provides that the board of managers has "sole discretion" to allocate the 75% of Net Profits from Operations "to all or any of the Member(s)" in any manner.

The board's discretion (1) to determine Net Profits from Operations, and (2) to allocate Net Profits from Operations, is limited by a section of the operating agreement providing that "no Member shall have priority over any other Member . . . as to Net Profits," which is defined to include Net Profits from Operations. R. 398-5 at 16 (§ 6.05), 7 (§ 1.01). The word "priority," however, is not defined in the operating

_____

*Id.* at 6-7 (§ 1.01).

agreement, leaving the intent of the parties with respect to its application "susceptible to two conflicting constructions." *Northern Trust Co. v. VIII S. Michigan Assocs.*, 657 N.E.2d 1095, 1104 (Ill. 1995). "The obligation of good faith and fair dealing is . . . used to determine the intent of the parties" in such circumstances. *Id.*; *see*, *e.g.*, *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 676 (7th Cir. 2013) ("[E]ven though the termination clause also says [the defendant] has the right to terminate the Plan for any reason, the fact that the parties anticipated that [the defendant] might have to terminate the Plan 'for regulatory compliance purposes' implies that the parties had a reasonable expectation about how [the defendant] would exercise its discretion in this very situation."); *Interim Health Care of N. Illinois, Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 884 (7th Cir. 2000) (applying the covenant of good faith and fair dealing where the contract provided one party the right to "withhold some account leads, but the contract is vague about which leads it may withhold, and what justifies withholding"). Such ambiguity is present when the section concerning "priority of members" is applied to the Board's discretion to classify "Net Profits from Operations," and so opens a space for the covenant of good faith and fair dealing to play a role here.

For the relevant time period, Ocean Tomo's board of managers consisted of Malackowski and member Andrew Carter. *See* R. 412-9 at 4. Ultimately, of the $10 million in profits from the ICAP deal, Ocean Tomo decided to spend a little more than $3.3 million off the top to pay company liabilities. *See* R. 434-81 (PX320). The remaining $6.67 million in net profits was to be allocated among the members. About

$3.1 million of that $6.67 million was allocated pro rata as Other Net Profits (Malackowski (65.8%), Carter (25.5%), and Barney (8.7%)). *See id.*; DX114 at 2[14]; *see also* R. 336 at 213-16 (866:12–869:14) (Malackowski testimony). The remaining $3.5 million was allocated as Net Profits from Operations, with 25% being allocated pro rata among the members and 75% being allocated to Malackowski for "managing" the ICAP deal. *See* R. 434-81 (PX320); DX114 at 2; *see also* R. 336 at 208-13 (861:24–866:11) (Malackowski testimony). Malackowski testified that although Becker had also played a significant role in the ICAP relationship and transaction, Becker left Ocean Tomo by the time of the allocation decision. Malackowski testified further that the allocation reflected his performance share of the ICAP deal, with Becker's former share being allocated among all the current members, including Barney, pro rata. R. 386 at 152-53 (3534:14–3535:6).

Almost immediately after the ICAP deal was consummated, Barney expressed concern about the plans for allocation of the ICAP deal profits and his desire that the they be allocated entirely pro rata. *See* DX86 at 3 (8/19/09 email from Barney to Malackowski and Carter).[15] In response, Carter argued that the profits should be used to cover a number of Ocean Tomo's liabilities. *See id.* at 2 (8/19/09 email). And in response to Carter, Barney argued that the ICAP deal profits were not "ordinary income from normal business operations" that should be distributed according to the

---

[14] This exhibit was provided to the Court in hard copy during the trial and was not filed on the docket with the parties' post-trial briefs.

[15] This exhibit was provided to the Court in hard copy during the trial and was not filed on the docket with the parties' post-trial briefs.

performance model, but were profits from the "sale of the auction business." *Id.* at 1 (8/24/09 email). Malackowski responded that "our last discussion and agreement with the entire group . . . was to distribute $2 [million] to equity holders." *Id.* (8/24/09 email).

Several months later in January 2010, this debate was apparently still unsettled because Carter and Malackowski exchanged emails discussing "credit" for "the sale," potential credit percentages, and whether they should "giv[e] [Barney] his money off the top." *See* R. 411-10. After discussing different methods of allocating credit among the two of them for the transaction, Carter suggested:

> There is one other way to do it: treat the sale like an operating item instead of a sale item. An argument could be made for that too. . . . If anything, you'll gain at [Barney's] expense.
>
> So partner, I guess we give the baby his bottle and let [Barney] have his 8% or whatever. As for you and me? I think the 25% is right, but we are in this for the long haul so I can live with the 50% scenario. Unlike some of your other now-departed, so-called "partners" (and probably half the people here) I totally understand that you are the reason for everything and I remain grateful.

R. 411-10 at 1.

Six months later in July 2010, Carter and Malackowski were still exchanging emails discussing how to allocate the ICAP deal profits. *See* R. 411-12. Carter wrote:

> We took $2 [million] "off the top" as the partnership agreed at the meeting at your house a year ago. That was split purely by shares, so [Barney] will get his 8% or whatever. The rest we ran thru the comp model, with you getting half credit for the auction (essentially the ICAP sale) and the firm getting the other half of the credit (you get the majority of that back, of course).

50

*Id.* at 2. Malackowski responded that they should discuss "next week," and stated, "Maybe we tell [Barney] that from here the second million is dependent on [PatentRatings] being profitable [and other projects] breaking even [or] getting funded." *Id.* at 1. Carter continued the discussion saying:

> So what I think that means is we pay out about $2 [million] . . . [sic] $1 for "taxes and $1 for "distributions", correct?

> We should make you "whole" for '08 then split the rest pro rata I would think. Or, we could make you whole and distribute an extra $2 [million], for total payout of $2.3 [million].

*Id.*

Twelve days later, Barney emailed Malackowski and Carter regarding "the proposed equity allocations for FY2009," which included the ICAP deal profits. *See* R. 411-13 at 7-8. Barney reiterated his concern that the profits be allocated as the "sale of a business," and not be "mixed in with 2009 operating income . . . and then distributed to the equity partners (primarily [Malackowski]) as performance-based income." *Id.* at 8. Barney also argued that if the profits were to be allocated on a performance basis that Malackowski was not entitled to the 50% that was apparently on the table. Barney asserted that they "had all agreed previously" that Malackowski's piece of the auction business was 25%. *Id.* Barney challenged Malackowski's right to "inherit" Becker's piece of the auction business, arguing that it should be shared among the members pro rata. *Id.*

A week later, after Barney, Malackowski, Carter, and Ocean Tomo's chief operating officer, Jake Geleerd, had a conference call to discuss these issues, Barney

sent an email purporting to summarize the call. *See* R. 411-13 at 1-2. Barney again reiterated his opinion that the ICAP deal profits should not be considered ordinary operations income. He also noted that Malackowski and Carter believed they had reached agreement at a meeting at Malackowski's house in 2009 "that only $2 [million] of the ICAP sale proceeds would be distributed pro rata to the equity partners and that the rest ($8 [million]) would be 'put back into the business.'" *Id.* at 1. Barney stated further, "it is not clear to me how the $8 [million] got 'put back into the business' if the bulk of it is now being allocated/distributed to equity partners as ordinary merit-based income." *Id.*

Despite the apparently ongoing disputes, just five days later, Geleerd sent an email to Malackowski, Carter, and Barney, decisively stating:

> We are treating, as are Ernst & Young and PWC, the ICAP [$10 million] payment as ordinary course income for 2009 . . . . The ICAP transaction resulted in Ocean Tomo receiving cash up front and 8 years of working in the brokerage/auction space with only upside (50% of all business generated) with no downside risk. This was not a sale or disposal of the Company or its property—it changed the income stream of an operating business.

R. 411-14. Only a month after that, however, Malackowski and Geleerd discussed in an email that "the audit" identifies the ICAP deal as a "sale of assets not ord[inary] income." DX123.[16]

As he did during the relevant time period, Barney primarily argues in this case that it could only be bad faith to characterize the profits from the ICAP deal as Net

---

[16] This exhibit was provided to the Court in hard copy during the trial and was not filed on the docket with the parties' post-trial briefs.

Profits from Operations because the deal was a one-time sale of certain assets. *See* R. 412 at 65. Ocean Tomo contends to the contrary that creation of the auction was part of its normal course of business, and the ICAP deal, although it included sale of some assets, was primarily a restructuring of what had developed into a partnership with ICAP on terms that created more liquidity for Ocean Tomo. *See* R. 336 at 200 (853:8-18 (Malackowski's testimony).

Barney argues that the board's decision to characterize the ICAP deal profits as Net Profits from Operations (putting aside for the moment the board's related decision to allocate those profits among members) is evidence of bad faith because the ICAP deal involved a sale of assets that was not in the normal course. Barney's argument is implicitly based on the idea that there is a clear line distinguishing profits earned in the normal course of business and profits from the sale of assets, and that this distinction maps directly on to the operating agreement's distinction between Net Profits from Operations and Net Profits. There is a certain logic to Barney's argument. However, the only sale of assets the operating agreement mentions is a "sale of all or substantially all of [Ocean Tomo's] assets," and Barney does not contend that such a sale occurred here. That strongly implies that the intent of the operating agreement is to characterize asset sales other than a sale of substantially all the company's assets as Net Profits from Operations, contrary to Barney's claim.

Furthermore, to the extent that Barney's interpretation has appeal, it is not at all clear that any other interpretation is necessarily made in bad faith, which is the

finding the Court must make for Barney to prevail on his claim for breach of the operating agreement. The operating agreement gives Ocean Tomo's board the "sole discretion" both (1) to characterize net profits as from Operations, and then (2) to allocate those profits among the members. This double discretion is why the Court determined in its summary judgment opinion, *see* R. 294 at 3-9,[17] that Barney's claim for breach of the operating agreement could only proceed on the theory that the board breached its obligation to not "prioritize" one member over another with respect to allocation of net profits. Although characterization of net profits as "from Operations" implies Ocean Tomo's customary allocation of 75% to the performance model, the operating agreement provides that the board retains "sole discretion" to determine the proper allocation. Thus, the decision by the board to *characterize* the profits from the ICAP deal as Net Profits from Operations is not evidence of bad faith, even if a different characterization decision is conceivable. The real question here is whether the *allocations* the board ultimately made were made in bad faith.

Just like the characterization decision, the board's allocation decision was squarely within its discretion under the terms of the operating agreement. With respect to allocation, Barney's arguments rely on statements in emails and a lack of evidence regarding Malackowski's right to a performance share. The email exchanges contain indications of animosity towards Barney and favoritism to Malackowski. In discussing how to allocate the ICAP deal profits, Carter suggested to Malackowki

---

[17] *Ocean Tomo, LLC v. PatentRatings, LLC*, 262 F. Supp. 3d 553, 557-59 (N.D. Ill. 2017).

that they "give the baby his bottle," and that they could pursue an allocation that would allow Malackowski to "gain at [Barney's] expense." R. 411-10. Later Carter suggested that the allocation should prioritize making Malackowski "whole." R. 411-12.

Ultimately, the board allocated $6.67 million of the $10 million in ICAP profits to members—$3.5 million as Net Profits from Operations, and $3.1 million as Other Net Profits. The import of the emails discussed above must be understood in light of how the board allocated the $6.67 million among Malackowski, Carter, and Barney:

|  | **Malackowski** | **Carter** | **Barney** | **Total** |
|---|---|---|---|---|
| **Net Profits from Operations ("NPfO")** | $2,689,550 (75% of Total NPfO) | $688,809 (77% of 25% of Total NPfO) | $175,858 (19% of 25% of Total NPfO) | $3,554,217 |
| **Other Net Profits ("ONP")** | 2,049,377 (65% of Total ONP) | $792,767 (25% of Total ONP) | $270,733 (8.7% of Total ONP) | $3,112,877 |
| **Total Profits Allocated ("TPA")** | $4,738,927 (71% of TPA) | $1,481,576 (22% of TPA) | $446,591 (6.7% of TPA) | $6,667,094 |

*See* R. 434-81 (PX320). Despite the animosity to Barney and favoritism to Malackowski exhibited in the emails, the ultimate allocations demonstrate that a "compromise"—as Malackowski described it in his trial testimony, R. 336 at 209 (862:21)—was struck by the members. A hypothetical straight application of the customary Net Profits from Operations formula to the total $6.67 million in net

profits from the ICAP deal (a decision which the board had the discretion to make under the operating agreement) would have resulted in Malackowski receiving $6.1 million (i.e., 75% of $6.67 million + 65.8% of 25% of $6.67 million), significantly more than the $4.74 million he was actually allocated. Barney of course objected at the time to Malackowski receiving a full 75% performance share. But even if the Net Profits from Operations formula is applied with Malackowski receiving only a 25% performance share, he still would have received $4.82 million, which is more than he was actually allocated:

$6.67 million x 0.75 (the performance model allocation) = $5 million

$5 million x 0.25 (Malackowski's performance share) = **$1.25 million**

$5 million x 0.75 (the former members' performance share) = $3.75 million

$3.75 million x 0.658 (Malackowski's pro rata share) = **$2.47 million**

$6.67 million x 0.25 (the firm allocation) = $1.67 million

$1.67 million x 0.658 (Malackowski's pro rata share) = **$1.10 million**

**TOTAL = $4.82 million**

Additionally, Ocean Tomo points out that the ultimate allocation took $3.1 million off the top for pro rata allocation, more than the $2 million Malackowski promised to Barney. Of course, the ultimate allocation also provided for a 75% performance share of $3.57 million to Malackowski, to which Barney objected. But had the board stuck with the originally promised $2 million off the top, and allocated the 25% performance share to Malackowski Barney conceded was appropriate, *see* R.

411-13 at 8 (7/28/10 email), Malackowski's total allocation again would have been more than he was actually allocated:

$4.67 million x 0.25 (Malackowski performance share) = **$1.16 million**

$4.67 million x 0.75 (firm performance share) = $3.5 million

$3.5 million x 0.658 (Malackowski pro rata) = **$2.3 million**

$2 million x 0.658 (Malackowski pro rata) = **$1.32 million**

**TOTAL = $4.82 million**

Admittedly, this method of allocation would also have resulted in Barney receiving an additional 0.4% of the total ultimate allocations (or $31,936):

$6.67 million - $2 million (off the top) = $4.67 million (for performance allocation)

$4.67 million x 0.75 (firm performance share) = $3.5 million

$3.5 million x 0.087 (Barney's pro rata share) = **$304,527**

$2 million x 0.087 (Barney's pro rata share) = **$174,000**

**TOTAL = $478,527**

But the Court does not perceive this to be a material difference in the ultimate allocations for purposes of determining whether they were made in bad faith.

All this goes to show that the ultimate allocations were not unfavorable to Barney in the context of the terms he and the other members were negotiating. To the extent emails between Malackowski and Carter demonstrated animosity toward Barney and a prioritization of Malackowski's interests, the ultimate allocation did

57

not reflect those sentiments, but appears to have been a compromise, as Malackowski testified.

Barney claims that he was entitled to an 8.7% allocation of the full $6.67 million in net profits, equaling $579,747, which is $133,156 more than his actual allocation. But this claim is based on the preliminary objection to the characterization of the profits as Net Profits from Operations (as opposed to Other Net Profits), and his insistence that Other Net Profits is the only good faith characterization of a sale of assets. The Court has already explained why Barney's arguments that the operating agreement obligated Ocean Tomo to make such an allocation fail. Thus, the Court finds that neither the emails nor the ultimate allocation amount demonstrates bad faith.

Furthermore, Barney has presented insufficient evidence to demonstrate that it was bad faith for Ocean Tomo to allocate a performance share of the ICAP deal profits to Malackowski. Although there is evidence that Ramer was responsible for creating the auction business, and that Becker was entitled to a performance share before he left Ocean Tomo, this evidence is not incompatible with Malackowski's testimony that he originated and managed the ICAP relationship and transaction. Barney has not presented any evidence to the contrary. And the fact that Carter and Geleerd approved of Malackowski receiving a performance share is evidence that he was entitled to it.

In sum, Barney has failed to meet his burden to demonstrate that Ocean Tomo acted in bad faith in allocating the ICAP deal profits. The Court finds for Ocean Tomo

on Barney's claim for breach of the operating agreement with respect to the ICAP deal.

### B.     Board Resolutions

Barney also claims Ocean Tomo violated the operating agreement by issuing three resolutions during the course of 2011 and 2012 finding Barney in violation of the operating agreement with respect to competing for Boeing's business, the NTT deal, and his handling of his Ocean Tomo-issued laptop. These resolutions served as a basis for Ocean Tomo to deprive Barney of dividend allocations he was owed pursuant to the operating agreement.

Barney argues that these resolutions were made in bad faith such that they constitute violations of the operating agreement. Barney's only argument for bad faith is that they were wrong, and that Ocean Tomo has "acted in bad faith in multiple other ways to deny Barney and [PatentRatings] profits and royalties." R. 412 at 68. The Court has already rejected Barney's claims regarding royalties and the ICAP deal profits. And although the Court has also rejected Ocean Tomo's claim regarding the NTT deal, and will below explain why the Court rejects Ocean Tomo's claims about Barney's handling of his laptop and its data, the claims were not frivolous and thus are not evidence of bad faith. Additionally, although the arbitration panel rejected Ocean Tomo's claim that Defendants were improperly competing for Boeing's business, Defendants have not explained how that claim was brought in bad faith. Further, the Court finds that a good faith dispute existed as to the rightful ownership of a check that Boeing sent to PatentRatings. *See* R. 412 at 18 (¶¶ 63-64)

(PatentRatings "eventually tendered the $48,000 to [Ocean Tomo] after deciding it was not worth the fight."). Thus, the Court finds for Ocean Tomo on Barney's claim for breach of the operating agreement on the basis of the three board resolutions.

### C.    Denial of Access to Records

Barney's third claim that Ocean Tomo violated the operating agreement is based on the allegation that Ocean Tomo deprived him of access to "the records and accounts of the operations and expenditures of the Company." R. 412 at 69. But the operating agreement provides members access to only a specific list of information. *See* R. 398-5 at 16 (§ 6.04) ("Each member shall have the right . . . to inspect and copy . . . the books and records of the Company described in Section 9.09[.]"). Barney does not contend that he was denied access to the records on this list. Rather, in one sentence, Barney argues that Illinois law provides a right to a broader set of information. *See* R. 412 at 69 (citing 805 ILCS 180/1-40, 10-15, 15-5(b)(1)). But he does not explain the difference between the statutory requirements and the operating agreement. The Court's review of the statutes cited reveals none. Thus, the Court finds for Ocean Tomo on this claim.

## V.    Violation of the Illinois Trade Secrets Act

Ocean Tomo claims that Barney violated the Illinois Trade Secrets Act by copying files from his Ocean Tomo-issued laptop and using them to compete with Ocean Tomo. The Act prohibits "misappropriation" of "trade secrets." *See* 765 ILCS 1065/2, 3, 4. The "elements of trade secret misappropriation . . . are: (1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure,

or use; and (3) the owner of the trade secret was damaged by the misappropriation." *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 925 (Ill. App. Ct. 1st Dist. 2005). "Acquisition" is sufficient to constitute "misappropriation" when the secrets are acquired by a "person who knows or has reason to know that trade secret was acquired by improper means." 765 ILCS 1065/2(b)(1). And "improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2(a).

Ocean Tomo argues that Barney improperly acquired Ocean Tomo trade secrets when he copied files from his Ocean Tomo-issued laptop to his personal laptop, because "[n]o reasonable person would believe it was appropriate to copy all files from a company-issued computer to a personal computer and retain those files after the end of his employment." R. 414 at 53. Notably, Ocean Tomo cites no authority for this assertion, such as a contractual or other duty Barney had to refrain from copying the files, or an affirmative duty to delete the copies when he resigned. As an employee and member of Ocean Tomo, Barney was given authorized access to Ocean Tomo's confidential information. This authorization continued after Barney's resignation because he continued to be a member of Ocean Tomo. *See* R. 398-5 at 46-47 (Operating Agreement § 13.17 (contemplating that members would possess confidential information)). Ocean Tomo has failed to present evidence that Barney's acquisition or retention of Ocean Tomo's files was "improper" for purposes of the Act.

The Act also prohibits unauthorized use of trade secrets by a person who has "a duty . . . to maintain its secrecy." *See* 765 ILSC 1065/2(b)(2)(B)(III). Ocean Tomo argues that it is "more likely than not that Barney has . . . used [Ocean Tomo] trade secrets" because Barney has accessed the files since copying them. *See* R. 414 at 53-54. Ocean Tomo also points to evidence that Barney has been working to build a new patent ratings database. *See id.* at 54. Barney concedes that he "took steps to rebuild the [PatentRatings] system after [Ocean Tomo] wrongfully dismantled it and cut off [PatentRatings's] access." R. 420 at 34 (¶ 154). According to Ocean Tomo, "[t]he most reasonable inference from those facts is that Barney accessed files he improperly copied from the [Ocean Tomo laptop] to use in assembling a new [PatentRatings] database, which he would then use to compete with [Ocean Tomo]." R. 414 at 54.

While this might be one reasonable inference, there are many others. Indeed, Barney testified at trial that the date Ocean Tomo argues the files in question were improperly accessed, was a date on which Defendants were producing the files for discovery in this case and the files were accessed as part of the production process. *See* R. 389 at 9 (4098:3-22). Furthermore, Barney denied that he accessed the files for the purpose of competing with Ocean Tomo. *See id.* at 8-9 (4097:25–4098:2). He testified that to the extent he was "rebuilding" the PatentRatings system, it was not to compete with Ocean Tomo but to permit him to fulfill PatentRatings's obligations to Rosebay, *see* R. 345 at 116-18 (2472:14–2474:9); R. 346 at 9 (2612:20-25), which Ocean Tomo expressly permitted in the license agreement.

At bottom, while Ocean Tomo has produced some circumstantial evidence indicating that Barney used Ocean Tomo files to compete against Ocean Tomo, there is equal or greater evidence to the contrary. For these reasons, the Court finds for Barney on Ocean Tomo's Illinois Trade Secrets Act claim.

## VI.    Violation of the Computer Fraud and Abuse Act

A person violates the Computer Fraud and Abuse Act in relevant parts if he "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). A person also violates the Act if he "causes damage" to a computer by "accessing" a "computer without authorization." 18 U.S.C. § 1030(a)(5)(B), (C).

### A.    Ocean Tomo Claims Barney Improperly Copied and Deleted Data from his Ocean Tomo Laptop

Ocean Tomo argues that "[a]n employee who breaches a duty of loyalty to an employer is not authorized to access the employer's computers, and so violates section (a)(2)(C) by copying confidential information for an improper purpose." R. 414 at 61. The only breach of loyalty Ocean Tomo claims is with respect to the NTT deal, *see* R. 414 at 47-48, and the Court has rejected that argument. Since this is Ocean Tomo's only argument for violation of section (a)(2)(C), that argument must fail as well.

Ocean Tomo also argues that "Barney violated section (a)(5) by wiping the [Ocean Tomo laptop]." R. 414 at 61. The problem with Ocean Tomo's argument is that the only direct evidence of who wiped Barney's Ocean Tomo laptop is witness testimony that it was wiped by another Ocean Tomo employee after Barney returned it. *See* R. 420 at 17; R. 426 at 7. Circumstantial evidence of Barney's motive and

opportunity, and that Ocean Tomo does not customarily use the wiping method used on the laptop in question, is insufficient to outweigh the direct evidence. Additionally, since Barney remained a member of Ocean Tomo even after he resigned his employment, Ocean Tomo has not proven that Barnye's access to the laptop was "without authorization."

In any event, even if Barney was responsible for the laptop being wiped, Ocean Tomo's later wiping of the laptop is a supervening cause of any damages (which are an element of a section (a)(5) claim). Clearly, Ocean Tomo was not interested in preserving the information the computer contained.

Moreover, Ocean Tomo's only argument for damages is the cost of the forensic investigation of Barney's laptop to which he copied the Ocean Tomo data. *See* R. 414 at 19 (¶ 90); *see also id.* at 49 ("Had Barney not taken [Ocean Tomo's] confidential information by copying it from the [Ocean Tomo] Laptop, [Ocean Tomo] would not have had to perform a forensic investigation of the Laptop . . . ."). But the Court has rejected the theory of liability based on impermissible *copying*. This theory of damages based on the cost of investigating Barney's laptop has no connection to any potential liability for *wiping* Ocean Tomo's laptop. And to the extent these costs were an aspect of Ocean Tomo's litigation strategy, they are not damages for the purpose of proving the claim. *See Ohio Nat. Life Assur. Corp. v. Davis*, 803 F.3d 904, 910 (7th Cir. 2015) ("Of course generally the victorious party to a lawsuit can't charge his litigation expenses to the loser.").

For these reasons the Court finds for Barney on Ocean Tomo's claim for violation of the Computer Fraud and Abuse Act.

**B.      Ocean Tomo's Additional Claims Regarding the Laptop**

In addressing Ocean Tomo's claims for violation of the Illinois Trade Secrets Act and the federal Computer Fraud and Abuse Act, the Court has found: (1) Barney was not prohibited from copying the data on his laptop; (2) Barney was not prohibited from retaining the data after his resignation because he remained a member of Ocean Tomo; (3) the evidence is insufficient to find by a preponderance of the evidence that Barney used the information on the laptop to compete with Ocean Tomo; (4) the evidence is insufficient to find by a preponderance of the evidence that Barney wiped the laptop; and (5) even if Barney wiped the laptop, the evidence is insufficient to find by a preponderance of the evidence that Ocean Tomo suffered damages. This reasoning also serves as the basis for the Court to reject Ocean Tomo's claims for: (1) conversion, which requires unauthorized possession; (2) breach of fiduciary duty, as Ocean Tomo has failed to identify a relevant duty that Barney breached; (3) violation of the Computer Asset Policy Agreement for "altering" the data; and (4) violation of the employment agreement's prohibition on personal benefit from Ocean Tomo's confidential information.

**C.      Defendants Claim Ocean Tomo Improperly Dismantled Servers**

Defendants also bring a claim for violation of the Computer Fraud and Abuse Act, sections (a)(2) and (a)(5). Defendants argue that Ocean Tomo exceeded its authority to access the servers containing the PatentRatings database by moving

65

them to Chicago and disconnecting them. The license agreement, however, permits the servers to be moved to Chicago. *See* R. 403-9 at 2 (§ 1.6). Further, the relevant statutory phrase "'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled to obtain or alter." 18 U.S.C. § 1030(e)(6). But the license agreement authorizes Ocean Tomo to possess the PatentRatings database, and Defendants do not claim that Ocean Tomo "altered" the information in the servers. Rather, Defendants claim that Ocean Tomo prevented or limited Defendants' access to the information, in breach of the license agreement provision prohibiting Ocean Tomo from using the PatentRatings Tools in a way "that would conflict with the Rosebay Agreement." R. 403-9 at 4 (§ 3.2(c)). That is a breach of contract claim, not a claim for violation of the Act. Therefore, the Court finds for Ocean Tomo on Defendants' Computer Fraud and Abuse Act claim.

## VII. Breach of the Supplemental License Agreement

Defendants argue that when Ocean Tomo shut down the PatentRatings servers, PatentRatings was no longer able to fulfill its contractual obligations to Rosebay. Defendants argue that this constitutes a breach of the supplemental license agreement. But the supplemental license agreement does not require Ocean Tomo to continue to provide access to the PatentRatings system to enable PatentRatings to fulfill its obligations to Rosebay.

Nevertheless, Defendants argue that when Ocean Tomo shut down the servers they converted what was a non-exclusive license under the supplemental license

66

agreement—since Rosebay retained rights under that agreement—into a de facto exclusive license agreement. Defendants argue that the supplemental license agreement calls for a higher royalty fee for an exclusive license under section 3. *See* R. 403-13 at 4. But that section does not mention exclusive or non-exclusive licenses. *Id.* Defendants cite section 3.3 in particular. *See* R. 412 at 32 (¶ 107), 47. But that section is dependent upon the occurrence of a certain "Trigger Event," which is defined as the date on which Ocean Tomo's "actual amount of investment funds and accounts under management . . . totals less than [$50,000,000]." R. 403-13 at 2. The Court is unaware of evidence in the record providing a basis for a finding that this "Trigger Event" occurred. And as discussed, even if the "Trigger Event" occurred, it is not relevant to whether Ocean Tomo created a de facto exclusive license.

Additionally, Ocean Tomo points out that the supplemental license agreement prohibits consequential or specific damages and argues that this should prohibit Defendants from collecting damages based on their inability to provide service to Rosebay. Defendants argue that they do not seek consequential damages but "restitutionary" disgorgement of Ocean Tomo's unjust enrichment from failing to pay for the exclusive license. *See* R. 430 at 27. The problem with this argument is that Defendants do not contend that Ocean Tomo was enriched by shutting down the servers, except by failing to pay an increased royalty rate, which the Court has rejected. Thus, there would be no amount of money to disgorge.

For these reasons, the Court finds for Ocean Tomo on Defendants' claim for breach of the supplemental license agreement

## VIII.  Declaratory Judgment that the License Agreement is Terminated

Defendants seek a declaration that the license agreement is terminated based on three alleged breaches: (1) Ocean Tomo improperly dropped "PatentRatings" from its branding; (2) Ocean Tomo failed to cooperate with the royalty audit; and (3) Ocean Tomo has created a patent ratings system to compete with the PatentRatings system. The Court addresses each in turn.

### A.  Branding

The 2004 license agreement requires Ocean Tomo to appropriately "mark" or brand any materials concerning PatentRatings as "reasonably directed by [PatentRatings]." *See* R. 403-9 at 6-7 (§§ 5.2, 5.4). Malackowski testified that Ocean Tomo changed the name of "Ocean Tomo PatentRatings" to "Ocean Tomo Ratings." R. 337 at 94 (968:3-4). Defendants claim this action violated the 2004 agreement. R. 412 at 51. Ocean Tomo argues that this change was in accordance with PatentRatings's agreement to "change its name to 'Ocean Tomo PatentRatings.'" R. 416 at 56. Although PatentRatings did agree to change its name in that manner, *see* R. 411-1 at 2 (¶ 5), it does not appear that it agreed to drop the name "PatentRatings" entirely, which the name "Ocean Tomo Ratings" does. Because of the absence of such an agreement, the Court finds for Defendants on this claim.

The Court notes that "Ocean Tomo Ratings" is the brand Ocean Tomo used on its new "machine learning-based" patent ratings system that the Court addresses in the next section. Defendants claim Ocean Tomo's new system was created in violation of the license agreement's prohibition on Ocean Tomo making a patent rating system

that is "derivative" of the PatentRatings system. In opposing that claim, Ocean Tomo argues that "Ocean Tomo Ratings" is an alternative system that is not related to the PatentRatings system. To the extent this argument is relevant to the "branding" claim just discussed, it fails for the reasons discussed presently.

### B. Ocean Tomo Ratings

In 2014, Ocean Tomo announced it had created a new patent rating system called "Ocean Tomo Ratings." R. 412-6 at 2. The system used "machine learning" to "provide[] a simple method for measuring and comparing patent quality based on the cumulative characteristics of patents that make them either more or less likely to be maintained." *Id.* Ocean Tomo patented this new system. The patent provides that the invention "employs a set of algorithms based on training data receive [sic] from a database of patent information." R. 398-38 at 13 (p. 2, ¶ 26). Barney testified that the data described in the patent "is a data dump from the PatentRatings system. All the variable names are variable names that I came up with. All the data and the information is information that I programmed into the case." R. 389 at 37-38 (4126:23–4127:1). The Ocean Tomo employees or contractors who created the Ocean Tomo Ratings system had access to the PatentRatings database. *See* R. 412 at 38 (¶ 124).

Barney claims that Ocean Tomo relied on the PatentRatings database to create the Ocean Tomo Ratings system in violation of the following license agreement provisions:

> [Ocean Tomo] will [not] make, cause to be made, or assist another to make any statistical patent analytics tools,

> patent ratings or associated products that are derivative of, or substantially similar to the PatentRatings Tools or the PatentRatings Analysis.

R. 403-9 at 7 (§ 6.1);

> Ocean Tomo acknowledges and agrees that the Licensed Technology contains certain confidential information, trade secrets, and know-how related to statistical patent analysis, mapping and valuation ("Confidential Information") that is proprietary to [PatentRatings]. [Ocean Tomo] agrees to hold such Confidential Information in strict confidence, not to use it commercially for its own benefit or the benefit of anyone else, and not to use the Confidential Information for the purpose of developing or improving a product or method for anyone except [PatentRatings] . . . .

*Id.* at 7-8 (§ 7.1); and

> All improvements will be owned by [PatentRatings]. Should [Ocean Tomo] or its Affiliates develop, either solely or jointly with [PatentRatings], any Improvement, [Ocean Tomo] will communicate to [PatentRatings] all Improvements developed by [Ocean Tomo] or its Affiliates as and when developed. . . . All Improvements developed by [Ocean Tomo] will automatically become part of the Technology License without any further consideration.

*Id.* at 6 (§ 5.3). "Improvement" means any revisions, updates, upgrades, new versions or releases of the PatentRatings Tools. *Id.* at 2 (§ 1.3).

The parties focus their arguments on whether Ocean Tomo Ratings constitutes an "improvement" of the PatentRatings system. Ocean Tomo argues that its new system is an "alternative" ratings system, not an improvement of PatentRatings. R. 416 at 41. The argument is based upon the testimony of Ocean Tomo's expert witness whose report distinguishes between the "machine learning" underlying the Ocean Tomo Ratings system and the "regression model" of the PatentRatings database:

70

At a high level, machine learning tools attempt to discern patterns within data, but with no pre-conceived concepts or requirements as to the structure of these data. Machine learning uses an iterative process, in which the system initially forecasts an outcome based on combinations of input variables. The system then determines the errors of its forecasts, and adjusts accordingly, iterating until these error terms are minimized. The system can also continue to ["]learn" and adjust iteratively as new data are added.

Regression based models also attempt to discern patterns within data, but they start with specific assumptions regarding the structure of these data. In addition, regression models do not work iteratively, but rather make a best fit to a given set of input data. These data often have to be manipulated in order to meet the data structure assumptions of regression modeling. Typically, the resulting model is then used to assess newly-presented cases, rather than these cases being used to help the model to "learn" further over time.

For these reasons, it is my view that the machine learning models described in the 069 Application do not share the same technical foundation as the regression models developed by PR. As such, they represent a fundamentally different approach to data analysis and, in my opinion, do not constitute an improvement on the PR Tools.

R. 400-1 at 97-98 (¶¶ 390-92). Defendants' counter argument rests, at bottom, on Barney's testimony that "maybe machine learning comes with a better, more optimized set of coefficients, and it comes up with that living algorithm that changes week to week. But it's basically an algorithm for rating patents." R. 389 at 35 (4124:14-17).

It appears to be undisputed that both Ocean Tomo Ratings and the PatentRatings system use algorithms to evaluate patents. This is unsurprising since all digital computer programs rely on algorithms. *See* Encyclopaedia Britannica,

"Algorithm" (https://www.britannica.com/science/algorithm) (last visited Apr. 12, 2019) ("a computer program [is] a special type of algorithm"); HowStuffWorks, "What is a computer algorithm?" (https://computer.howstuffworks.com/what-is-a-computer-algorithm.htm) (last visited Apr. 12, 2019) (an "algorithm is the basic technique used to" create computer programs); *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384 (Fed. Cir. 2011) ("The usage 'algorithm' in computer systems has broad meaning, for it encompasses in essence a series of instructions for the computer to follow, whether in mathematical formula, or a word description of the procedure to be implemented by a suitably programmed computer.").

Yet, Barney's argument that Ocean Tomo Ratings is an "improvement" on PatentRatings is based entirely on his testimony that both systems use algorithms to generate a patent evaluation. Ocean Tomo's expert testified that Ocean Tomo Ratings is not an "improvement" but an entirely different method because it uses algorithms to perform "machine learning," whereas PatentRatings uses algorithms to perform regression analysis. Barney implies that the difference between machine learning and regression analysis is immaterial, but he does not explain why this is true. Barney's testimony, in the face of the testimony from Ocean Tomo's expert, is insufficient to demonstrate that Ocean Tomo Ratings is an "improvement" on PatentRatings.

In addition to addressing "improvement, however, the license agreement provides that the PatentRatings system is based on confidential information that Ocean Tomo agreed "not to use . . . for the purpose of *developing* . . . a product or

method for anyone except [PatentRatings]." *Id.* at 7-8 (§ 7.1) (emphasis added). The patent for the Ocean Tomo Ratings system provides that it is "based on training data receive[d] from a database of patent information." R. 398-38 at 2 (¶ 26). Barney testified that the Ocean Tomo Ratings system was based on a "data-dump from the PatentRatings system." R. 389 at 37 (4126:23-24). Ocean Tomo does not dispute this testimony in its trial brief. *See* R. 412 at 46 (¶ 124); R. 416 at 41 (¶ 124). Indeed, Ocean Tomo does not address at all Defendants' argument that the Ocean Tomo Ratings system used the PatentRatings system data and algorithms. Considering Barney's testimony, and Ocean Tomo's failure to contest it, the Court finds it more likely than not that the "database of patent information" underlying the Ocean Tomo Ratings system is the PatentRatings database. The Court also finds that this use of the PatentRatings database constitutes "development of a product or method," which the license agreement permitted to be done only "for" PatentRatings. There is no dispute that the Ocean Tomo Rating system was developed for Ocean Tomo and not PatentRatings. Thus, it was developed in violation of the license agreement.

### C. Royalty Audit

Defendants also claim that Ocean Tomo violated the license agreement provision requiring Ocean Tomo to permit PatentRatings "to inspect or audit [Ocean Tomo's] records . . . to the extent necessary to determine or verify any royalty payments required." R. 403-9 at 6 (§ 4.5(c)). Ocean Tomo argues that "a full review of all 550+ engagements was unnecessary and unreasonable" because the initial "random sampling audit discovered less than $9,000 in underpaid royalties." R. 416

73

at 55. Ocean Tomo may find this discrepancy to be relatively insignificant, but it cannot dispute that PatentRatings's auditor discovered unpaid royalties in each of the two random samples to which Ocean Tomo consented. Despite these findings, Ocean Tomo refused to provide complete records for any additional engagements. Instead, Ocean Tomo agreed to provide only the client deliverable for 20 additional engagements. It was unreasonable for Ocean Tomo to refuse to provide complete records of sample client engagements as long as the sample engagements continued to reveal unpaid royalties. Ocean Tomo's offer to provide only the client deliverable had the added disadvantage—from Defendants' perspective—of being intentionally selected by Ocean Tomo. While immediate and complete production of all records for all 550 Ocean Tomo clients was unreasonable, the random sampling process complied with the intent of the license agreement. Ocean Tomo's failure to continue to supply random samples as long as they continued to reveal unpaid royalties constituted a breach of the license agreement.

As an aside unrelated to Defendants' claim for termination of the license agreement, the license agreement audit provision also requires Ocean Tomo "will reimburse [PatentRatings] for the cost of the audit," if the audit shows that royalties due "in any given quarter exceed the amount of payments actually made . . . by five percent or more." The initial audit performed in 2012 revealed unpaid royalties that satisfy this provision. There is no dispute that the 2012 audit incurred fees of $35,366. *See* R. 411-146 at 20; R. 411-71 at 19; R. 411-183 at 13. The Court awards those fees to Defendants.

### D.    Materiality

The license agreement provides that a "material breach" is a sufficient basis for a party to the agreement to request its termination. *See* R. 403-9 at 10 (§ 10.2(a)). The license agreement does not define "material breach."

Under Illinois law, the materiality of a breach "focuses on two interrelated issues: (1) the intent of the parties with respect to the disputed provision; and (2) the equitable factors and circumstances surrounding the breach of the provision." *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002). The first element requires the fact finder to determine whether "the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it." *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 715 (7th Cir. 1993); *see also Arnhold*, 284 F.3d at 700. The second element requires the fact finder to "take into account the totality of the circumstances and focus on the inherent justice of the matter." *Arnhold*, 284 F.3d at 701. The focus should be on factors such as "whether the breach defeated the bargained-for objective of the parties; whether the non-breaching party suffered disproportionate prejudice; and whether undue economic inefficiency and waste, or an unreasonable or unfair advantage would inure to the non-breaching party." *Id.* (citing *Arrow Master*, 12 F.3d at 715).

The breaches regarding (1) development of a new patent ratings system, and (2) the audit, were material.[18] With respect to Ocean Tomo's failure to comply with the license agreement's audit provision, a license agreement that provides for royalties as a percentage of royalty-bearing revenue, should also provide for the ability to audit the licensee's records. Even assuming that a licensor will act in good faith to pay the royalties owed, reasonable minds can disagree about the meaning of such provisions. (This might be said to be a case in point.) Without a right to inspect and audit, the licensor has surrendered his property to a party who has strong incentives to understate royalty-bearing revenue.

The license agreement's prohibition of the use of the PatentRatings system to develop a competing product or method is at the heart of the agreement. The terms of the parties' agreements demonstrate that they intended their relationship to be a partnership to promote the PatentRatings system. For instance, the parties granted each other ownership percentages in their corporations. Further, unlike a license agreement that provides for a one-time royalty payment, or a fixed annual payment, the parties here agreed that royalties were to be a percentage of revenue on a continuing basis. This also demonstrates an intent to merge their business interests. Contrary to this intent, Ocean Tomo used the PatentRatings databse to develop an alternative patent ratings system that would compete with the PatentRatings

---

[18] The Court finds that the "branding" breach discussed above in section VIII.A is not material.

system. This nearly amounts to an abandonment of the license agreement. Such a material breach is a basis to terminate the license agreement.

Defendants provided written notice of material breach in compliance with the agreement's termination provision. *See* R. 411-80. Ocean Tomo's decision to create a competing patent ratings system strongly implies that the breach is not resolvable, such that the license agreement's provision for a potential resolution of the breach is inapplicable. Accordingly, the Court will enforce the license agreement's requirement that upon termination Ocean Tomo return the Confidential Information and PatentRatings Tools—i.e., the servers. *See* R. 403-9 at 10 (§ 10.3(b)) ("If the parties do not enter the Extension Agreement, [Ocean Tomo] will immediately return to [PatentRatings] all Confidential Information, including any physical embodiment or rendering of the PatentRatings Tools and all databases, software and other structured information, including all collateral materials provided.").

### E.  Termination of the Supplemental License Agreement

Defendants also seek termination of the supplemental license agreement. Like the original license agreement, the supplemental license agreement provides for termination upon "material breach," but does not define that term.

The supplemental license agreement provides that it is a "supplement" to "the terms of the [original license agreement]." *See* R. 403-13 at 1 (preamble). As discussed above, the supplemental agreement was intended to permit Ocean Tomo to use the PatentRatings system to provide consulting services regarding securities sales and investment analysis, rights which had previously been reserved for another entity

known as Rosebay. Thus, the original license agreement was a condition precedent to the supplemental agreement.

Having found a material breach of the license agreement, the Court also finds that the termination of the original license agreement constitutes a material breach of the supplemental license agreement. As discussed, Ocean Tomo's use of the database underlying the PatentRatings system to develop a competing patent ratings system nearly amounts to an abandonment of the license agreement. This is equally true for the uses of the PatentRatings system licensed under the supplemental license agreement and justifies termination of that agreement.

### F. Patent Validity

The Court held that its finding for Ocean Tomo on Defendants' claim for breach of the license agreement made it unnecessary to address the patents' validity as a defense to that claim. It might also have been necessary to address the patents' validity if the license agreement or supplemental license agreement continued to be in effect. But the Court has found that both agreements are terminated. Thus, the patents' validity is no longer relevant to the parties' disputes, and the Court does not reach that issue.

### IX. Buyout

Barney asks the Court to order Ocean Tomo to buy out his ownership interest pursuant to 805 ILCS 180/35-1(a)(5), which permits such an order when the controlling members have acted "in a manner that is oppressive and was, is, or will be directly harmful to" the member seeking a buyout. Barney relies on his claims that

Ocean Tomo's allocation of the ICAP deal profits and the three board resolutions constituted violations of the operating agreement, and that Ocean Tomo breached the license agreement by failing to pay royalties. *See* R. 412 at 72. But as the Court has rejected these claims, they cannot serve as a basis to order a buyout.

Barney also claims that the bases for terminating the license agreement are sufficient to order a buyout. But Ocean Tomo's failure to abide by the license agreement has been remedied by the Court ordering its termination and turn-over of the PatentRatings servers. The Court disagrees with Barney's general assertion that Ocean Tomo has "deprived him of the entire benefit of his ownership interest in Ocean Tomo." *Id.* Of course, Ocean Tomo has sought to deprive Barney of dividends through the arbitration and this litigation. But the arbitrator and this Court have rejected those claims, vindicating Barney's ownership rights. Absent future disputes among the parties (which would not be part of this lawsuit), the Court expects that Barney will receive the benefit of his ownership interest in Ocean Tomo going forward, whether through profit distributions or a mutually agreed upon parting of the ways.

## X.    Attorneys' Fees

Lastly, Barney seeks attorneys' fees pursuant to section 13.18(b) of the operating agreement:

> Indemnification for Actions By or in the Right of the Company. The Company (i) shall indemnify an Indemnified Person who is Manager or Member . . . in each case who was or is a party, or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Indemnified Person is or was a Manager, Member, officer,

> employee or agent of the Company, . . . against expenses
> (including attorney fees and costs) actually and reasonably
> incurred by the Indemnified Person in connection with the
> defense or settlement of the action or suit, if the
> Indemnified Person acted in good faith and in a manner the
> Indemnified Person reasonably believed to be in, or not
> opposed to, the best interests of the Company, provided
> that no indemnification shall be made in respect of any
> claim, issue or matter as to which the Indemnified Person
> shall have been adjudged to be liable for gross negligence
> or willful misconduct in the performance of the
> Indemnified Person's duty to the Company, unless, and
> only to the extent that, the court in which the action or suit
> was brought shall determine upon application that, despite
> the adjudication of liability, but in view of all the
> circumstances of the case, the Indemnified Person is fairly
> and reasonably entitled to indemnity for those expenses as
> the court shall deem proper.

R. 398-5 at 54 (p. 48 § 13.18(b)). The parties argue in their briefs whether Barney has

proven, or can prove, that he acted in good faith or in Ocean Tomo's best interests.

But the parties do not address subsection (c):

> Expenses. To the extent that an Indemnified Person has
> been successful, on the merits or otherwise, in the defense
> of any action, suit or proceeding referred to in paragraph
> (a) or (b) above, or in defense of any claim, issue or matter
> therein, the Indemnified Person shall be indemnified
> against expenses (including attorney's fees and costs)
> actually and reasonably incurred by the Indemnified
> Person in connection therewith.

R. 398-5 at 54 (p. 48 § 13.18(c)). This section appears to *require* that Ocean Tomo pay

Barney's attorneys' fees and expenses for defense of the claims Ocean Tomo brought

against him because the Court found in Barney's favor on those claims. This section

does not refer to good faith or Ocean Tomo's best interests.

Even absent briefing on this particular subsection, the Court is inclined, pursuant to section 13.18(c) of the operating agreement, to order Ocean Tomo to pay the fees and costs Barney incurred defending against Ocean Tomo's claims. It is likely that such an order will engender further dispute among the parties as to the percentage of Barney's fees and costs that are properly attributable to his defense of Ocean Tomo's claims as opposed to the pursuit of his counterclaims. But it may be that the Court's findings and conclusions on the claims made herein will enable the parties to resolve any such outstanding disputes without further intervention of the Court. If not, the Court will receive short briefing on the proper interpretation and application of section 13.18 as a whole.

## Conclusion

Putting aside attorneys' fees, the only claims on which the Court found for the complaining party are Defendants' related claims for a declaratory judgment that the license agreement and the supplemental license agreement are terminated. Ocean Tomo is ordered to deliver the servers containing the PatentRatings Tools to Barney by May 24, 2019. Barney should supply Ocean Tomo with a delivery address by April 26, 2019. Defendants are also awarded the audit fees of $35,366.

The Court will not enter final judgment in the case until the attorneys' fees issue is resolved. A status hearing is set for 9:00 a.m. on May 10, 2019 at which the Court expects the parties to report on: (1) the need for additional briefing on awarding of attorneys' fees under the operating agreement, or (2) any other outstanding issues.

The parties should inform the Court if the status hearing proves unnecessary and the Court should enter final judgment without provision of attorneys' fees.

Once final judgment is entered, to the extent any party plans to seek costs pursuant to 28 U.S.C. § 1920, the bill must be accompanied by a brief explaining why that party should be considered a prevailing party.

ENTERED:

_Thomas M. Durkin_
_____
Honorable Thomas M. Durkin
United States District Judge

Dated:  April 12, 2019